## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

CHERYL SAGATAW and
DEANTHONY BARNES, *on behalf of themselves and a class of similarly-situated individuals*,

Plaintiffs,

vs.

MAYOR JACOB FREY, *in his individual and official capacity*,

Defendant.

Civil Action

No._____

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

## INTRODUCTION

Dozens if not hundreds of unhoused people, most of them Indigenous, have found temporary shelter at Camp Nenookaasi.[1]  This refuge, located in the East Phillips neighborhood of Minneapolis, *see* Ex. 1 (parcel map), is a community-based healing camp rooted in Native religious and cultural practices where people experiencing houselessness can find stable interim shelter.

---

[1] "Nenookaasi" means "hummingbird" in Ojibwe.

1

Plaintiffs in this case are the residents of Camp Nenookaasi. The Defendant, Mayor Jacob Frey, is seeking to evict, displace, and scatter them into the harsh Minnesota winter. Defendant Frey initially scheduled the eviction and destruction of Camp Nenookaasi for December 14, 2023. He postponed the eviction first to December 19, 2023, and then indefinitely. On December 29, 2023, the City posted notice that it intends to evict Camp Nenookaasi in less than a week, on January 4, 2023, a date that looms large on the horizon for Camp residents.

On eviction day, Plaintiffs will be banished from their homes by Defendant Frey's law enforcement officers, equipped with guns and threatening to arrest anyone who does not comply. Plaintiffs' homes will then be bulldozed. The Camp's ceremonial fire and other sacred sites will be desecrated. Insulated tents, yurts, teepees, and other shelters will be destroyed. Whatever personal belongings the Plaintiffs cannot carry away with them will be trashed. Defendant Frey has not proposed adequate or appropriate plans to house well over a hundred soon-to-be-evicted residents at the start of Minnesota's winter season. Given the long and brutal history of encampment sweeps in Minneapolis and the deadly frigid winter ahead, Defendant Frey's planned eviction is dangerous. Plaintiffs not only face irreparable harms, but reasonably fear for their lives.

In the meantime, organizers, community members, social workers, local elected officials, and residents themselves have been hard at work, engaging in

collaborative dialogue and problem-solving together.  By providing food, warmth, shelter, community, and cultural healing, Camp Nenookaasi has served—and continues to serve—as a crucial stepping stone to housing stability, sobriety, and more.  And Camp Nenookaasi has had much success.  Since its inception on August 24, 2023, for example, 76 residents (and counting) have been able to obtain long-term or permanent housing.

If Defendant Frey is permitted to destroy Camp Nenookaasi, Plaintiffs will have nowhere to live.  They will be disconnected from the supportive community they have built, the religious ceremonies and cultural healing that occur there, the food and warmth and shelter from the elements, the clothing and supplies offered through mutual aid, and the outreach workers who regularly come to the Camp to meet with clients and connect people to resources.  Camp Nenookaasi has created meaningful and effective opportunities to escape the cycle of houselessness.  If Defendant Frey is permitted to destroy Camp Nenookaasi, Plaintiffs will lose that opportunity, once again swept from one corner to another of the City as everything they've built is destroyed.

Defendant Frey is targeting his most vulnerable constituents, not only failing to create a livable city for them through his own policies, but egregiously using his power as Mayor to destroy what safety and stability they have managed to build for themselves.  Plaintiffs beg the Court to enjoin him before it is too late.

**JURISDICTION**

1.      Plaintiffs' claims arise under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

2.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law, and pursuant to 28 U.S.C. § 1367 because this Court has supplemental jurisdiction over Plaintiffs' state claims, which arise out of a common nucleus of operative facts and constitute the same case or controversy as the federal claims at the heart of this Complaint.

**PARTIES**

***Representative Plaintiff Cheryl Sagataw***

3.      Cheryl Sagataw is a 32-year-old resident of Camp Nenookaasi and an enrolled member of the Potawatomi Nation.

4.      After attending high school and college in Potawotomi territory/Michigan, Cheryl worked in the food and beverage industry for ten years. Sagataw Decl. ¶ 3. She is a domestic abuse survivor who became homeless when she lost her public housing in March 2023. *Id.* at ¶¶ 4-5.

5.      As an unhoused person, Cheryl has experienced multiple repeated evictions, sweeps, and displacements from the places where she has tried to set up shelter for herself.  She was repeatedly kicked out of the area under Interstate 94 and eventually relocated to the reinstituted Wall of Forgotten Natives.  *Id.* at ¶ 6. When the Wall of Forgotten Natives was cleared for the second time, Cheryl was one of many Plaintiffs who came to Camp Nenookaasi in late August/early September of 2023.  *Id.*

6.      As she describes in her declaration, Cheryl has found stability, security, and great meaning living at Camp Nenookaasi.  *See generally* Sagataw Decl.  The Camp has created space for her to build community and trust, to learn and participate in ceremonies and other culturally important practices, to grieve losses and connect to her spirituality, to develop life skills, to connect with housing and treatment resources, to stay safe from her abuser, and to plan for a future in ways she never before thought possible.  *Id.*

7.      This eviction threatens to take all that away from her.

### *Representative Plaintiff DeAnthony Barnes*

8.      DeAnthony Barnes has experienced housing instability since 2011 and been a part of many unhoused communities.  Barnes Decl. ¶ 2.  He describes Camp Nenookaasi as "unlike any other camp I have ever been in," notable for its "support and resources" and "coordination of care."  *Id.* at ¶ 4.  In fact, DeAnthony

is receiving more resources at Camp Nenookaasi than he received at Avivo, and having more success as a result. *Id.* at ¶ 6. He is making efforts towards his sobriety and getting into treatment, and supporting his girlfriend in doing likewise. *Id.* at ¶ 7. He describes how when people have simple but necessary things—like access to heat—this frees up mental capacity for people to "advance their thought process" beyond survival, allowing them to consider permanent housing and sobriety. *Id.* at ¶¶ 15, 17.

9.      DeAnthony also describes how much it means to know that there are people who still care about him and how Camp Nenookaasi builds trust. *Id.* at ¶ 5. The Camp is a place of unity, where people from significantly different backgrounds are able to live as family. *Id.* at ¶ 12. It's also a place of historical and spiritual significance, where Indigenous ceremonies take place and the history of colonization and the pain and devastation experienced by Indigenous ancestors is brought to the fore. *Id.* at ¶¶ 10-11.

10.      Like many others at Camp Nenookaasi, DeAnthony has experienced numerous prior evictions in which he's lost precious mementos, including pictures of his children, valuable technological equipment containing music he has written, produced, and recorded, critical identification such as birth certificates and identification, and necessities for survival including a generator, clothing, and his tent. *Id.* at ¶¶ 13-14.

11.    If Defendant Frey is permitted to evict and destroy Camp Nenookaasi, DeAnthony fears that he will lose his belongings in the process, including his tent, winter clothes, sleeping bag, generator, music, musical instruments, equipment, and religious scriptures. *Id.* at ¶ 18. He worries about how he and his girlfriend will survive the winter. *Id.* at ¶ 15.

12.    As DeAnthony observes about the upcoming eviction, "[d]estroying Camp Nenookaasi isn't going to get rid of the problem, it's just going to make the problems move to a new location." *Id.* at ¶ 8.

### *Represented Class Plaintiffs*

13.    Plaintiffs in the Represented Class are the other unhoused people who have found a temporary home at Camp Nenookaasi.

14.    Many, if not most, of these residents of Camp Nenookaasi have been evicted before from other encampments in Minneapolis. Crabtree Decl. ¶ 9; Barnes Decl. ¶ 13; Sagataw Decl. ¶¶ 6, 20.

15.    Each of these Plaintiffs have their own unique story—who they are, where they come from, and what struggles have led them to be otherwise unhoused.

16.     Yet all of the Represented Class Plaintiffs now find themselves in the same situation, facing the same terrifying threats of eviction: their shelters bulldozed, their belongings seized and destroyed, their beds thrown in a dumpster, with nowhere else to live.  Barnes Decl. ¶ 13, Sagataw Decl. ¶ 19.

17.     All of the Represented Class Plaintiffs seek to enjoin the looming eviction and preserve the stability, community, and hope they have created together, with each other and with the broader community, at Camp Nenookaasi.

### *Defendant Mayor Jacob Frey*

18.     Defendant Jacob Frey is sued in his official and individual capacity.  In his official capacity, Defendant Frey is the Mayor of the City of Minneapolis, a municipality incorporated in the State of Minnesota.  In his personal capacity, Defendant Frey is a resident of Minneapolis.  As Mayor, Defendant Frey is obligated to uphold the laws and ordinances of the State and City, and has exclusive control and authority over the Minneapolis Police Department.

19.     Defendant Frey campaigned for mayoral office on a promise to "End Homelessness."  Perez Decl. ¶ 27.  Instead of making good on that promise by engaging with the community in meaningful and realistic ways, Defendant Frey has implemented policies and initiatives to drastically increase sweeps and evictions of houseless encampments, using his authority over the Minneapolis Police Department to inhumanely displace people, destroy their homes, and

continue the cycles of violence and trauma faced by the City's most vulnerable

residents. Perez Decl. ¶¶ 23, 29; Johnson Decl. ¶ 14; Crabtree Decl. ¶¶ 24, 29.

## CLASS QUALIFICATIONS FOR CERTIFICATION

20.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2),

named Plaintiffs Cheryl Sagataw and DeAnthony Barnes, bring this class action on

their own behalves and on behalf of all other similarly situated residents of Camp

Nenookaasi. This case meets the prerequisites for class formation and for the type

of action brought.

### *Class Formation*

21.    The following prerequisites allow one or more members of a class to

sue as representative parties on behalf of all members: "(1) the class is so

numerous that joinder of all members is impracticable; (2) there are questions of

law or fact common to the class; (3) the claims or defenses of the representative

parties are typical of the claims and defenses of the class; and (4) the representative

parties will fairly and adequately protect the interests of the class." FED. R. CIV.

PRO. 23(a).  This case meets these prerequisites for class certification.

22.    *Numerosity.* The class is so numerous that joinder of all members is

impracticable. The practicality of joinder is evaluated on a case-by-case basis and,

while no specific numerical threshold exists in law, factors to be considered

include "the size of the class, ease of identifying its members and determining their

addresses, the facility of making service on them if joined, their geographic

dispersion and whether the size of the individual claims is so small as to inhibit

individuals from separately pursuing their own claim." *Glenn v. Daddy Rocks*, 203

F.R.D. 425, 429 (8th Cir. 2001).  There are approximately 170 members of the

Plaintiff class, all of whom are unhoused with no address beyond Camp

Nenookaasi, which is currently slated for eviction.  Serving Plaintiffs individually

would be impossible because, being unhoused, none of them have a reliable

mailing address. When Defendant Frey has ordered prior encampments swept in

the past, Plaintiffs and others similarly situated geographically disperse and are

difficult to locate again. Should Plaintiffs not be granted their requested Temporary

Restraining Order, filed together with this Complaint, then evictions will proceed

and the cycle of dispersal will repeat.  Plaintiffs also are unlikely to be able to

pursue claims as individuals because they are indigent, extremely under-resourced,

and cannot afford to hire private counsel.

23.     *Commonality.* There are questions of law or fact common to the class.

Each member of the class has the same legal claims, as set forth below.  The

Plaintiff class consists of all residents of Camp Nenookaasi who are otherwise

unhoused.  For each of them individually and as a class, Defendant Frey violates

the same Constitutional rights in a functionally identical manner, by directing his

law enforcement agents to destroy each Plaintiffs' home, including their property,

privacy, and shelter, their chance at attaining sobriety and/or long-term housing, and their means of survival.

24.    *Typicality.* The claims of the representative party are typical of the claims of the class. "A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *General Telephone Co. of Southwest vs. Falcon*, 457 U.S. 147, 156 (1982) (citing *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403).  Cheryl Sagataw and DeAnthony Barnes, like each of the class Plaintiffs, live at Camp Nenookaasi and face the stress, trauma, and violence of a looming eviction.  Their interests are identical to those of the class members—namely, for the eviction to be enjoined and the residents permitted to remain and benefit from Camp Nenookaasi, rather than endure yet another forced displacement.

25.    *Adequacy.* The representative Plaintiff will fairly and adequately protect the interests of the class.  Because Cheryl Sagataw and DeAnthony are residents of Camp Nenookaasi, they have the same goals and interests as the other residents—to halt the Mayor's eviction. There is no reason why they cannot fairly and adequately protect the interests of the class. The Eighth Circuit has established that "each representative's interests must be sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Turtle Island Foods, SPC v. Richardson*, 425 F. Supp. 3d 1131 (8th Cir. 2019).  Like in *Turtle*

*Island Foods*, the representatives of this class have similar interests to those of the class in that they are all looking to stop Defendant Frey from destroying their communal home. Because all members of the class, including Cheryl Sagataw and DeAnthony Barnes as representatives, seek first and foremost to have their shelter, stability, and community preserved, it is unlikely that these goals and viewpoints will diverge.

### *Type of Action*

A class action may be brought when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. PRO. 23(b)(2). Here, the requested relief is for Defendant to be enjoined from evicting Plaintiffs when they have nowhere else to live, and from seizing and destroying their property. That relief, the cessation of evictions, would benefit the whole class of residents at Camp Nenookaasi.

## FACTUAL BACKGROUND

### *The Impending Destruction of Camp Nenookaasi by Defendant Frey Continues a Centuries-Old Legacy of Displacement of Indigenous Peoples.*

26.    Camp Nenookaasi is Indigenous-led and its residents are predominantly people of Indigenous ancestry and/or enrolled Native American tribal members. Defendant Frey's proposed eviction of Camp Nenookaasi is simply the latest iteration in a long history of forced displacement of Indigenous

peoples by colonizing governments, as is apparent to the residents themselves. *See, e.g.*, Sagataw Decl. ¶¶ 26-27; Barnes Decl. ¶ 11.

27.     Systemic and genocidal[2] displacement has typified the relationship between the colonizing governments of Europe, the U.S., and its territorial and subsequent state governments, and Indigenous peoples from the beginning.

28.     The State of Minnesota has been no exception.  It portrayed the original occupants of this land as disposable and subhuman, at best inconveniences that posed barriers to putting the land to "better" (i.e., more profitable) uses.  As a report read at a 1901 meeting of Governor Ramsey's Executive Council described:

> The object of [the 1841 Treaty of Governor Doty] was not to open the country for settlement, but primarily to provide a location for the Winnebago Indians, who, since the cession of their lands in 1837, had been on the government's hands under

---

[2]     Use of the word "genocidal" to reflect the relationship between settler-colonizers and Indigenous peoples is intentional and not hyperbolic. The Holocaust Museum in Houston gives a cursory overview of this genocide as follows:

> When European settlers arrived in the Americas, historians estimate there were over 10 million Native Americans living there.  By 1900, their estimated population was under 300,000.  Native Americans were subjected to many different forms of violence, all with the intention of destroying the community.  In the late 1800s, blankets from smallpox patients were distributed to Native Americans in order to spread disease.  There were several wars, and violence was encouraged; for example, European settlers were paid for each Penobscot person they killed.  In the 19th century, 4,000 Cherokee people died on the Trail of Tears, a forced march from the southern U.S. to Oklahoma.  In the 20th century, civil rights violations were common, and discrimination continues to this day.

*Genocide of Indigenous Peoples*, HOLOCAUST MUSEUM OF HOUSTON, https://hmh.org/library/research/genocide-of-indigenous-peoples-guide/ (last visited Apr. 24, 2022).

promise of a permanent home; and, secondarily, to furnish reservations for a number of other tribes similarly situated. In short, it was designed to create of the Sioux country a second Indian Territory, into which to dump all the odds and ends of Indian tribes still left east of the Mississippi. Fortunately, however, this treaty failed of confirmation by the Senate, and thus this vast and fertile territory was saved to a grander destiny.

Thomas Hughes, Report on the 1841 Treaty of Governor Doty, Executive Council Meeting  (Sept. 9, 1901), *available at* https://tile.loc.gov/storage-services/service/gdc/lhbum/0866e/08 66e _0125_0154.pdf.

29.     Minnesota's "grander destiny" meant that Indigenous people would be, once again, forcibly or duplicitously relocated so that the land could be cleared for colonists' settlement. *Id*.

30.     Camp Nenookaasi sits on lands taken from the Dakota peoples through deception, bad faith, duress, and threat of violence more than a century ago.  *See generally* Minnesota Historical Society, "Minnesota Treaties," The U.S.-Dakota War of 1862, https://www.usdakotawar.org/history/treaties/minnesota-treaties.  It stands in defiance of these ongoing attempts to rid what is now Minneapolis of its original inhabitants, in the face of violent Indigenous displacement that continues today.

***Defendant Frey Has Pursued an "End to Homelessness" Through Repeated and Cruel Displacements of Unhoused Minneapolis Residents with Nowhere Else to Live.***

31.     Under the guise of his campaign promise to "end homelessness in five years," Defendant Frey has worked to keep unhoused people destabilized and on the move. *See generally* Perez Decl.

32.     Defendant Frey has overseen the routine dismantling of encampments since he took office in 2018, with significant brutality and little support for evicted residents. *See*, e.g., Crabtree Decl. ¶ 29.

33.     When the Wall of Forgotten Natives was first cleared in 2018, newly elected Defendant Frey and the police he commands played a muted role: instead, local nonprofits, Red Lake Nation, and others in city government spent countless hours and millions of dollars to transition the 175 residents from the encampment to temporary shelter. Deena Winter, *Minnesota Reformer*, "Powderhorn Park residents win reprieve from eviction, for now" July 2, 2020 (last viewed Dec. 17, 2023) https://minnesotareformer.com/2020/07/02/powderhorn-park-residents-win-reprieve-from-eviction-for-now/.

34.     When the encampment at Powderhorn Park formed in spring of 2020, Defendant Frey became a vocal critic of the encampment, although he simultaneously recognized there were no other places where all of the encampments residents could live. *Id*. and @WedgeLIVE, Twitter (July 2, 2020 3:55 PM) https://twitter.com/WedgeLIVE/status/1278779243116130304?s=20 ("[T]he city doesn't have the resources or ability to meet the significant and

immediate need [of the Powderhorn Park residents].”). In fact, Defendant Frey

tacitly acknowledged that the encampment size was growing because so many

people were coming to access services. *Id*.

35. As Defendant Frey himself admitted, the reason unhoused people

moved to the encampment was because residents there were better able to access

treatment and housing services. *Id*.  Nonetheless, he continued to oppose the

encampment, suggesting that he would prefer that the symptoms of poverty and

houselessness—including overdoses and illness, heatstroke and freezing to

death—occur at higher rates in hidden and isolated ways, rather than have people

gather to access the support to improve their lives that is otherwise unavailable to

them without a centralized community like the Powderhorn Park encampment or

Nenookaasi.

36. By August of 2020, Defendant Frey got his way. Over widespread

public opposition, the Powderhorn Park encampment was evicted and destroyed.

Niko Georgiades, *Unicorn Riot*, “Minneapolis Police Sweep West Powderhorn

Encampment, Pepper Spray Defenders” August 15, 2020 (last viewed Dec. 17,

2023)

https://unicornriot.ninja/2020/minneapolis-police-sweep-west-powderhorn-encamp

ment-pepper-spray-defenders/. Mayor Frey first threatened the encampment

residents with an eviction notice, and then threatened residents with armed police

officers, chemical irritants, and drawn weapons. *Id*. At his behest, Minneapolis police officers physically pulled people out of their tents, arrested them, bulldozed their belongings, and threw everything into dumpsters. *Id*.

37.     The destruction of these two large encampments are just the tip of the iceberg. As Plaintiff Cheryl Sagataw described, she has been forcibly displaced so many times that she has lost count. Sagataw Decl. ¶ 20. The same is true for DeAnthony Barnes. Barnes Decl. ¶ 13. For Minneapolis' unhoused population, these evictions are not only frequent, but disastrous.

38.     When encampments are demolished, its former residents do not simply disappear. They are uprooted from their homes, forced to find a new place to sleep, a new shelter against the elements, new bedding to keep them warm, because their only protection against sub-zero winter nights is now crumpled in a dumpster. *See, e.g.*, Sagataw Decl. ¶ 22; Barnes Decl. ¶ 8; Crabtree Decl. ¶ 27; Johnson Decl. ¶ 17. Some relapse or overdose, turning to substance use to numb the stress, pain, and hopelessness. *See, e.g.*, Crabtree Decl. ¶ 27; Johnson Decl. ¶ 17. They lose critical identification, paperwork, and cell phones, lose their connection to outreach workers and resources, lose their spot on waist lists for housing and treatment, and miss appointments and court dates. *See, e.g.*, Sagataw Decl. ¶ 23; Barnes Decl. ¶¶13-14; Crabtree Decl. ¶ 28. They are stolen and sex-trafficked, missing and

murdered.  *See, e.g.*, Sagataw Decl. at ¶ 25; Crabtree Decl. ¶ 27; Johnson Decl. ¶ 17.

39.    With the stability of an encampment, residents can build and maintain relationships with social workers, substance use counselors, lawyers, and other members of the community who can connect residents to the resources and support needed to attain sobriety, apply for a job, clear arrest warrants, and obtain permanent housing.  *See, e.g.*, Johnson Decl. ¶¶ 4-5, 8, 12; Crabtree Decl. ¶¶ 20-21; Sagataw Decl. ¶ 17; Barnes Decl. ¶¶ 7, 17. .

40.    When encampments are cleared, all of this hard-earned stability is destroyed and this progress is lost because the social workers, counselors, lawyers, and others no longer have a way to maintain contact with the unhoused people they had been working with.  *See, e.g.*, Sagataw Decl. ¶ 19; Crabtree Decl. ¶¶ 26-28; Perez ¶¶ 32-33.

41.    Defendant Frey campaigned on a promise to "end homelessness." Perez Decl. ¶27. But in actuality,  his promise appears to have been more that he would hide homelessness, even at the expense of prolonging and exacerbating it by destroying the hugely successful bridge to long-term and permanent housing that is Camp Nenookaasi.

42.    As of October 2023, the median monthly rent in Minneapolis was $1,127 for a one bedroom unit and $1,500 for a two bedroom. HousingLink,

*Minneapolis Rental Housing Brief* (October 2023). Housing providers screen applicants and require them to have an income of 2.5 times the rent, *id.*, but since at least some manner of housing is functionally a prerequisite to employment it becomes almost impossible to break out of the cycle of homelessness without external support.

43.    Some local housing resources exist, but accessing public housing can be a long process as outreach workers must meet with clients and others repeatedly over time to gather documents and paperwork, resolve warrants, etc.  Crabtree Decl. ¶ 21.  People must have a consistent meeting place to regularly connect with outreach workers towards their housing goals.

44.    Shelters simply do not provide this kind of stability, nor are they a realistic or viable option for many unhoused people.  Barnes Decl. ¶ 16. Shelters are often full or inaccessible, leaving unhoused people with few sustainable alternatives to making a shelter for themselves.  *See generally* Glenn Decl. ¶¶ 2-3 (describing the inaccessibility of shelter resources outside of the Hennepin Shelter Hotline's hours); *id.* at ¶¶ 4-5 (describing technical difficulties while on hold and ultimately being on hold for more than half an hour before being able to speak with someone at the Hennepin Shelter Hotline); *id.* at ¶ 5 (describing very few available shelter beds, including only 9 open beds for men in the entire County); *see also*

Barnes Decl. ¶ 16.  This is the reality, despite the Mayor's claim that 90 new shelter beds would be made available January 1 and 2, 2024.

45.     At Camp Nenookaasi, residents are providing for themselves and each other to create a stable stepping-stone home that bypasses the significant challenges and uncertainties that plague the existing shelter system.  Plaintiffs are working hard to create an environment that allows them not only to survive being homeless, but also to transition out of homelessness.

46.     Unfortunately, if history is allowed to repeat itself, Defendant Frey will evict and destroy Camp Nenookaasi and Plaintiffs' hopes for the better future they were building together.

### Defendant Frey, Despite Objections from City Council and Other Government Officials, Intends to Move Forward with Evicting Camp Nenookaasi.

47.     Originally, Defendant announced that Camp Nenookaasi would be evicted on December 14, 2023. This eviction date was pushed back to December 19, 2023.  *See* Ex. 4.  Then, it was postponed until an unspecified future date.  On December 29, 2023, the City posted notice that it intends to evict Camp Nenookaasi in less than a week, on January 4, 2024.  *See* Ex. 5.

48.     These repeated eviction postponements also appear to reflect the tension between Defendant Frey and the significant block of Minneapolis officials who recognize that, until the City provides other meaningful solutions, Camp Nenookaasi is filling lifesaving gaps for the unhoused community during a

Declared Public Health Emergency of Unsheltered Homelessness.  *See, e.g.*, Exs. 2 & 3.  With tireless advocacy from organizers, community members, and residents, City Council has come around to the humanitarian concerns with the impending eviction, and the benefits to the community as well as the residents of having the Camp remain until a more permanent solution can be devised collectively. Perez Decl. at ¶ 29; *see also* Ex. 3.

49.    Prior to the previously scheduled eviction on December 19, for example, residents and organizers held a meeting with City Council and several members of the Minneapolis government. *Id*. at ¶ 26. The only invited government official who chose not to attend was Defendant Frey. *Id*.

50.    This refusal to engage, coupled with his continued opposition to building solutions that address everyone's concerns, demonstrates Defendant Frey's knowing disregard for the health, safety, and wellbeing of Indigenous and unhoused people.  *Id*. at ¶¶ 21-23.

51.    Upon information and belief, neither Defendant nor the law enforcement officers he will task with evicting Camp Nenookaasi residents have reasonable policies and procedures in place to inventory, safeguard, and return seized property.  To the contrary, prior evictions have resulted in the destruction and disposal of  anything Plaintiffs cannot carry away with them. *See, e.g.*, Crabtree Decl. ¶ 13; Sagataw Decl. ¶ 20; Barnes Decl. ¶¶ 13-15, 18.

52.     Based on past patterns and practice, it is anticipated that during the planned eviction of Camp Nenookaasi, law enforcement, at the direction of Defendant Frey, will enter and destroy Plaintiffs' home and seize and destroy all of Plaintiffs' worldly possessions, without warrants or other legal justification. *Id.*; *see also* Sagataw Decl., ¶¶ 19-23; Barnes Decl. ¶¶ 13-15, 18.

53.     Defendant Frey has not indicated what he expects Plaintiffs to do to avoid the threatened destruction of their homes and property, or where Plaintiffs are expected to go after they are evicted.  Crabtree Decl. ¶¶ 26-30.  At this time, Defendant Frey has not proposed a safe and reasonable alternative housing plan for Plaintiffs, and his actions will leave Plaintiffs vulnerable and with few alternatives to the dangers of traffickers, relapse and overdose, infection, and freezing to death. *Id.*; *see also* Glenn Decl. (describing how few shelter beds are available according to the Hennepin Shelter Hotline as of the afternoon of January 1, 2024).

54.     Many class member Plaintiffs are disabled, elderly, and otherwise particularly vulnerable to the elements and limited in their mobility and ability to gather their belongings at the behest of an armed officer threatening arrest.  *See, e.g.*, Crabtree Decl. ¶¶ 8, 13, 14, 27; Johnson Decl. ¶¶ 11, 14.

55.     Without the injunctive relief Plaintiffs now seek, they will be left with no alternative to yet another forced displacement under threat of arrest.  *See, e.g.*, Sagataw Decl.

## CAUSES OF ACTION

### COUNT I:

**Unlawful Seizure & Destruction of Plaintiffs' Property in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution**

56.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

57.     The Fourth Amendment to the United States Constitution and its identically worded counterpart, Article I Section 10 of the Minnesota Constitution, afford all civilians in the United States the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

58.     This Constitutional Right protects Plaintiffs' homes and belongings at Camp Nenookaasi.  *See, e.g.*, *State v. Pippin*, 200 Wn. App. 826 (Wash. Ct. App. 2017) (finding that an unhoused person had privacy interests in their tent). "The Fourth Amendment protects homeless individuals from seizure and summary destruction of their unabandoned, but temporarily unattended, personal property." *Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp. 3d 806, 837 (9th Cir. 2023) (citing *Lavan v. City of Los Angeles*, 693 F.3d 1022).

59.     The announced seizure and destruction of Plaintiffs' property during the eviction of Camp Nenookaasi constitutes a meaningful interference with Plaintiffs' possessory interests in their property, and thus a "seizure." *Id*.

60.    Defendant Frey's planned seizure and destruction of Plaintiffs'
property without a valid warrant, probable cause, or exigent circumstances is
unreasonable and contrary to the Fourth Amendment to the U.S. Constitution, as
applied to State governments and their subdivisions pursuant to the Fourteenth
Amendment and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota
Constitution.

61.    Defendant Frey's policies, practices, and custom of directing his law
enforcement officers to seize and destroy Plaintiffs' property without a valid
warrant, probable cause, or exigent circumstances is unreasonable and contrary to
the Fourth Amendment to the U.S. Constitution, as applied to State governments
and their subdivisions pursuant to the Fourteenth Amendment and 42 U.S.C. §
1983, and Article I, Section 10 of the Minnesota Constitution.

## COUNT II:

**Procedural Due Process Violations Under the Fourteenth Amendment of the
United States Constitution and Article I, Section 7 of the Minnesota
Constitution**

62.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully
set forth herein.

63.    Plaintiffs have a constitutionally protected property interest in their
personal belongings and effects.

64.     Defendant Frey's planned seizure and destruction of Plaintiffs' property deprives them of this protected interest in their personal belongings and effects.

65.     Defendant Frey's planned seizure and destruction of Plaintiffs' property without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim their property violates Plaintiffs' rights to Due Process of law protected by the Fourteenth Amendment to the U.S. Constitution, through 42 U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

66.     Defendant Frey's policy, pattern, and custom of seizing and destroying Plaintiffs' property without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim their property violates Plaintiffs' rights to Due Process of law protected by the Fourteenth Amendment to the U.S. Constitution, through 42 U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

### COUNT III:

### State-Created Danger in Violation of the Right to Substantive Due Process Under the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution

67.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

68.     Plaintiffs are members of a limited, precisely definable group.

69.    Defendant Frey's prior and impending use of bulldozers, armed law enforcement officers, and chemical irritants when forcefully ejecting Plaintiffs from their shelters, and without adequate notice, places Plaintiffs at significant risk of serious, immediate, and proximate harm that Plaintiffs would not otherwise have faced without Defendant's actions.

70.    The risk to Plaintiffs created by Defendant Frey's conduct was and remains obvious and known to him.

71.    Defendant Frey's prior and impending actions in evicting and destroying Camp Nenookaasi are done recklessly and in conscious disregard of the risks they have previously created and continue to create because of the forceful manner in which his law enforcement officers have ejected and plan to eject Plaintiffs from their shelters, destroying their vital personal property in the process.

72.    Defendant Frey's conduct, as outlined in this Complaint, shocks the conscience.

73.    As a direct and proximate consequence of Defendant Frey's above-described policy, pattern, and custom, Plaintiffs were and continue to be subjected to danger of Defendant's own making in violation of the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983, and the Minnesota Constitution.

**COUNT IV:**

**Violation of the Eighth Amendment to the US Constitution**

74.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

75.     The Eighth Amendment to the U.S. Constitution, as applied to the States and their subdivisions through the Fourteenth Amendment, protects civilians from "cruel and unusual punishment."

76.     "The Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Coalition on Homelessness*, 647 F.Supp. 3d at 832 (quoting *Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019)). This includes "criminaliz[ing] indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id*. at 833.

77.     Plaintiffs do not have reasonable alternatives to living at Camp Nenookaasi.

78.     By evicting Plaintiffs, under penalty of arrest, Defendant Frey and his law enforcement officers impose or threaten to impose criminal penalties and other harm and punishment for conduct which Plaintiffs cannot avoid.

79.     The manner in which these evictions are carried out—by armed law enforcement officers under threat of arrest, with residents often pulled out of their tents forcibly, arrested, and even tear-gassed or sprayed with chemical irritants,

their belongings bulldozed, destroyed, and trashed—amounts to a penalty, harm, and/or punishment that Defendant Frey and his law enforcement officers impose or threaten to impose for conduct which Plaintiffs cannot avoid.

## COUNT V:

## Conversion in Violation of Minnesota Common Law

80.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

81.     Plaintiffs are in possession of their personal property and Defendant Frey intends for his agents to intentionally seize and destroy Plaintiffs' property without notice, an opportunity to retrieve it, or adequate compensation, depriving the Plaintiffs of their possessory interest in the property.

82.     Defendant Frey has no lawful authority to seize or order others to seize and destroy Plaintiffs' property. As a direct and proximate consequence of Defendant Frey's acts in authorizing these evictions, Plaintiffs will suffer the loss of their personal property.

## DECLARATORY RELIEF

83.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

84.     An actual controversy exists between Plaintiffs and Defendant Frey. Defendant Frey has planned, announced, and commenced engaging in the unlawful

and unconstitutional acts set forth within. Plaintiffs have suffered, will continue to suffer, and will face imminent and increased suffering as a result of Defendant Frey's unlawful behavior. Plaintiffs seek a declaration of their rights with regard to this controversy and a declaration that Defendant Frey's policies, practices, and customs as set forth herein violate those rights under the United States and Minnesota Constitutions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Honorable Court for the following relief:

1. For preliminary and permanent injunctive relief enjoining Defendant Frey and his officials, employees, agents, officers, assigns, and all those working in concert with him from moving forward with evicting the residents of Camp Nenookaasi, unless and until safe, adequate, culturally appropriate, stable housing can be guaranteed and provided to all residents;

2. For declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, and Rule 57 of the Federal Rules of Civil Procedure, as requested above;

3. For compensatory and punitive damages, in amounts to be determined in future proceedings, against Defendant Frey;

4.  For an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5.  For any other relief that this Honorable Court deems equitable and just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Signed,

Date: January 2, 2024

KIRA A. KELLEY
Climate Defense Project
MN Bar No. 0402932
P.O. Box 7040
Minneapolis, MN 55407
(802) 683-4086
kira@climatedefenseproject.org

*Attorney for Plaintiffs*