# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

CHERYL SAGATAW and
DEANTHONY BARNES, *on behalf of
themselves and a class of
similarly-situated individuals*,

               Plaintiffs,

vs.

MAYOR JACOB FREY, *in his
individual and official capacity*,

               Defendant.

Civil Action No.

0:24-cv-00001-ECT/TNL

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION
FOR TEMPORARY
RESTRAINING ORDER**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. iii

INTRODUCTION............................................................................. 1

FACTUAL BACKGROUND.............................................................. 3

STANDARD OF LAW....................................................................... 9

ARGUMENT.................................................................................... 10

**I. ABSENT A TEMPORARY RESTRAINING ORDER, PLAINTIFFS FACE IRREPARABLE HARM**................................10

**II. PLAINTIFFS' CLAIMS ARE REASONABLY LIKELY TO SUCCEED ON THE MERITS**............................................................14

**A. Count I: Unlawful Seizure & Destruction of Plaintiffs' Property in Violation of the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution** ........................................................15

**B. COUNT II: Procedural Due Process Violations Under the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution**...........17

**C. COUNT III: State-Created Danger in Violation of the Right to Substantive Due Process Under the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution**................................................................19

**D. COUNT IV: Violation of the Eighth Amendment to the US Constitution**................................................................23

**E. COUNT V: Conversion in Violation of Minnesota Common Law**.................................................................................25

**III. BALANCE OF EQUITIES FAVORS PLAINTIFFS, AS AN INJUNCTION WILL NOT HARM THE DEFENDANT**.................26

**IV. A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST**......................................................27

**V. THE TEMPORARY RESTRAINING ORDER SHOULD EXTEND TO PROTECT ALL RESIDENTS OF CAMP NENOOKAASI**.................................................. 28

**VI. THE SECURITY REQUIREMENT SHOULD BE WAIVED**…29

CONCLUSION.................................................. 30

# TABLE OF AUTHORITIES

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV....................................................................... 15-16

U.S. Const. amend. VIII.................................................................... 23-25

U.S. Const. amend. XIV..................................................................... 17, 19

Minn. Const. art. I, §7...................................................................... 17, 19

Minn. Const. art. I, §10.................................................................... 15-16

## STATUTES

42 U.S.C. § 1983.................................................................................. 17

## FEDERAL RULES OF CIVIL PROCEDURE

Federal Rule of Civil Procedure 65................................................... 9, 29

Federal Rule of Civil Procedure 23...................................................... 28

## SUPREME COURT COURT CASES

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ……….…….…….……....... 28-29

*Carey v. Piphus*, 435 U.S. 247 (1978) ………………….….…………. 18

*Coolidge v. New Hampshire,* 403 U.S. 443 (1971) …………..….…………. 15

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) …....……………. 18

*United States v. Jacobsen*, 466 U.S. 109 (1984) …………………….. 15-18

*Zinermon v. Burch*, 494 U.S. 113 (2012) ……….…………….……………… 18

## Eighth Circuit Cases

*Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903 (8th Cir. 2015) ….…..…… 11

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) …………………..……... 20

*Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109 (8th Cir. 1981) ……….. 9, 26

*Fields v. Abbott*, 652 F.3d 886 (8th Cir. 2011) …………………………… 20

*General Motors Corp. v. Harry Brown's*, 563 F.3d 312 (8th Cir. 2009) ….... 11

*Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2005) ………………….. 19-20

*Higbee v. Starr*, 698 F.2d 945, 947 (8th Cir. 1983)………………………… 13

*Home Instead, Inc. v. Florence*, 721 F.3d 494 (8th Cir. 2013) ……...……… 15

*Iowa Utils. Bd. v. FCC*, 109 F.3d 418  (8th Cir. 1996) ………….………... 11

*Kelley v. First Westroads Bank, 840 F.2d 554, 558 (8th Cir. 1988)…..………. 9*

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*,
    530 F.3d 724 (8th Cir. 2008) …................................................. 27

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*,
    826 F.3d 1030 (8th Cir. 2016)…................................................ 29

*S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707
    (8th Cir. 1989) ……………………............................................. 9

*Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992) ........................................ 15

*United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017) …………..……… 15

## District of Minnesota Cases

*Click Boarding LLC v. SmartRecruiters Inc.*, No. 21-CV-210,  2021 WL 6424909

(D. Minn. Apr. 27, 2021)……………………........................................ 10, 15, 26

## MINNESOTA STATE COURT CASES

*Hodge v. Eastern Ry. Co. of Minnesota*, 72 N.W. 1074 (Minn. 1897) …..… 25-26

*Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649 (Minn. 1948) ……….25

*Sawh v. City of Lino Lakes*, 823 N.W.2d 627 (Minn. 2012) …………….....… 18

*State v. Leonard*, 943 N.W.2d 149 (Minn. 2020) ………………………....… 16

## OUT OF CIRCUIT AUTHORITY

*Bass v. Richardson*, 338 F. Supp. 478 (S.D.N.Y. 1991) ………………….....…29

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987) ………...…………….....…… 28

*Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984) …… 28-29

*Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp. 3d 806 (9th Cir. 2023) ………………………………….…..……. 16, 23-24

*Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) …………....……….. 23-24

*Meyer v. Brown & Root Const. Co.*, 661 F.2d 369 (5th Cir. 1981) ……...……..28

*State v. Pippin*, 200 Wn. App. 826 (Wash. Ct. App. 2017) …………….....… 16

*United States v. Place*, 462 U.S. 696 (1983) ………...……….……………… 16

*Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) ………………………………….………………………… 29

**INTRODUCTION**

Plaintiffs in this case are the class of approximately 160 unsheltered houseless people living at Camp Nenookaasi. This Indigenous healing and ceremonial camp in the East Phillips neighborhood of Minneapolis is a refuge for Plaintiffs in many senses of the word. While the importance of a place for Plaintiffs to find security for themselves and their belongings cannot be understated, Camp Nenookaasi provides so much more than life-saving insulation from deadly winter temperatures. With the consistency of Camp Nenookaasi, residents are able to build community through ceremony, connection, ritual, shared meals, and mutual encouragement. Advocates from both governmental and nongovernmental organizations are able to engage much more effectively with Plaintiffs, both because the supportive environment at Camp Nenookaasi motivates residents to seek treatment and care, and because a stable residence allows relationship building between people who live at Camp Nenookaasi and people who visit to provide support.

Defendant in this case is Jacob Frey, the Mayor of the City of Minneapolis. Defendant Frey campaigned for office on a promise to "end homelessness," but thus far has actively opposed City Council, other City employees, unhoused residents of Nenookaasi, their advocates, and housed residents from the surrounding neighborhoods, as they work together to support the unhoused

community in a way that addresses everyone's concerns. Defendant Frey has long been a driving force behind the evictions of unhoused encampments in Minneapolis, and now plans the eviction of Camp Nenookaasi despite a lack of adequate policies or plans in place to ensure (1) that Plaintiffs will have a meaningful opportunity to retain their belongings or retrieve them from the city after the eviction and (2) that Plaintiffs will have a safe place to live and sleep in the days and nights after they are evicted.

Defendant Frey initially scheduled the eviction and destruction of Camp Nenookaasi for December 14, 2023. He postponed the eviction first to December 19, 2023, and then indefinitely. *See* Compl. Ex. 4. On December 29, 2023, the City posted notice that it intends to evict Camp Nenookaasi in less than a week, on January 4, 2023. *See* Compl. Ex. 5. On that day, Camp Nenookaasi residents will be forcibly evicted, under threat of arrest. Everything they cannot carry in their arms will be destroyed. They will be cast out into the Minnesotan winter to scramble for one of the few available short-term shelter beds and fend for survival on the street.

Unless, that is, the Court enjoins the Defendant and halts the planned eviction and destruction of Camp Nenookaasi. Plaintiffs beg this Court to do so.

## FACTUAL BACKGROUND

Plaintiffs incorporate and adopt the factual allegations set forth in the contemporaneously filed Class Action Complaint, including its exhibits, and the supporting declarations of Nicole Perez, Aaron Johnson, Cheryl Sagataw, Christin Crabtree, DeAnthony Barnes and Claire Glenn.

To summarize these salient facts: Plaintiffs are a class of predominantly Indigenous unhoused people who are facing impending eviction from their temporary residence at Camp Nenookaasi.

Defendant Jacob Frey is the Mayor of Minneapolis and a primary driving force behind the impending eviction of Camp Nenookaasi. Perez Decl. ¶ 29. Defendant Frey campaigned on a promise to "end homelessness," but since assuming office in 2018 has ordered numerous evictions of unhoused encampments that have further exacerbated the crisis. *Id*. at ¶ 27; *see also* Compl. Exs. 2 & 3.

As part of these ongoing evictions, law enforcement order unhoused people out of their tents under threat of arrest. Anything that residents cannot carry away with them is bulldozed, thrown in a dumpster, destroyed. Perez Decl. ¶ 9; Crabtree Decl. ¶ 13; Sagataw Decl. ¶ 20; Barnes Decl. ¶¶ 13, 14, 17. Defendant Frey has no apparent policy for how these belongings may be returned, nor reasonable plans for where evictees are supposed to live once their shelters are flattened. *Id*.

Evictions, which can and do happen to the same people over and over, undermine any progress that a person has made towards obtaining stability while at the encampment. Sagataw Decl. ¶¶ 18-20, 23-27; Crabtree Decl. ¶¶ 13, 21; Johnson Decl. ¶¶ 4-5, 12; Barnes Decl. ¶ 17. Except what an evictee manages to carry away with them, Defendant's evictions can result in the loss of everything: identification documents, valuables and mementos, bedding, clothing, tents, and innumerable other categories of belongings to which housed people take access for granted. *See, e.g.*, Sagataw Decl. ¶ 23; Barnes ¶ 13; Johnson ¶¶ 15-17. With a notice of an upcoming eviction comes despair, hopelessness, relapse, overdose, and a general erosion of progress. *See, e.g.*, Sagataw Decl. ¶¶ 18, 19, 25; Perez ¶ 32.

In the past approximately four months since Camp Nenookaasi was formed following the second eviction of the Wall of Natives, around eighty people and counting have been able to find permanent housing. Perez Decl. at ¶ 15, Johnson Decl. ¶ 12 and Crabtree Decl. ¶ 25. Many more have attained or made significant progress towards sobriety, and have been able to access treatment for mental, emotional, and physical health issues that otherwise present barriers to employment and housing. Perez Decl. ¶¶ 18-19, Johnson Decl. ¶¶ 12-13.

Plaintiffs, their supporters, community health workers, City Council members and various government officials, and other stakeholders have been in increasingly productive dialogue for the past several weeks about Camp

Nenookaasi and its residents. Perez Decl. ¶¶ 24-26, 29. City Council agreed to provide portapotties and trash pickup to the site, which has greatly improved residents' ability to keep the encampment sanitary. Crabtree Decl. ¶ 24. Social workers and public health professionals have been advocating alongside residents for the City to cancel the eviction and increase its support for Camp Nenookaasi, which allows them to build relationships with residents and to better connect them with services and treatment. *Id*. at ¶ 25; *see also* Compl. Exs. 2 & 3. The modicum of stability at Camp Nenookaasi allows people from the outside to locate residents for follow-ups, a task that is otherwise nearly impossible when working with the unsheltered unhoused population. Crabtree Decl. ¶ 25; Johnson Decl. ¶¶ 12-13.

Not only is Camp Nenookaasi conducive to residents receiving support from nonprofit and government programs, but also Camp Nenookaasi enables residents to better support themselves, and to take care of each other. Crabtree Decl. ¶¶ 14-19. Residents at Nenookaasi take care of each other and build trust in the process—through this, they show each other that despite widespread societal stigma and abandonment of the unhoused community, they are people deserving of that care and respect. Crabtree Decl. ¶¶ 14-19, Sagataw Decl. ¶¶ 17, 21; Barnes ¶ 4. This itself has an immensely powerful and positive impact on Nenookaasi residents. *See, e.g.*, Barnes ¶¶ 4, 5, 17.

Many people at camp had not previously contemplated sobriety as a realistic option, but are now pursuing treatment and sobriety themselves, inspired by the people they see around them who are in recovery. *See, e.g.*, Perez Decl. ¶¶ 12-19; Barnes Decl. ¶¶ 4, 7. People who have relapsed see others come back and recover from similar setbacks, and people at Camp Nenookaasi talk openly and encouragingly about reconnecting with spirituality and culture. Perez Decl. ¶ 14. Organizers like Nicole Perez emphasize the importance to residents of having people with lived experience and cultural understanding working with them. Perez Decl. ¶¶ 12-13. Ms. Perez herself obtained hard won sobriety, experienced houselessness, and uniquely understands the journey of recovery, including relapse, that many Nenookaasi residents find themselves on. *Id*. at ¶¶ 4-6. The values of harm reduction, sobriety, recovery, and healing pervade Camp Nenookaasi. Perez Decl. ¶¶ 13-14, 16, 18-19.

Camp Nenookaasi has transformed residents' lives. And while many dozens of its residents have gone to treatment and/or obtained permanent housing, it is also the case that sobriety, medical recovery, employment, and housing acquisition do not and cannot happen for every resident overnight. Says one of the Camp's non-resident supporters: "We don't pretend that Camp Nenookaasi is perfect." Crabtree Decl. ¶ 25. However, residents at Camp Nenookaasi and even members of

the surrounding community have observed the Camp to have facilitated an overall collective decline in substance use. *Id.*

Recognizing the unique and powerful role that Camp Nenookaasi plays for its residents, *see generally* Barnes Decl.; Sagataw Decl., members of City Council wrote a public letter to Defendant Frey urging him "[f]irst and foremost, [to] delay the eviction of Camp Nenookaasi until February 16, 2024," to allow adequate time to address the public health needs of Nenookaasi residents and the broader community. *See* Compl. Ex. 3 at 2. But despite the pleas even of his own City Council, Defendant Frey has remained committed to a rushed eviction, destruction of Camp Nenookaasi, and displacement of its residents. Compl. Ex. 5.

Defendant Frey, by (re)announcing the eviction of Camp Nenookaasi over widespread objection from inside and outside the City government, continues the cycle of eviction that keeps Plaintiffs stuck in unhoused instability. Already, the impending eviction and ensuing anxiety and anguish have impacted residents of Nenookaasi. Perez Decl. ¶ 32. "Being told that eviction is coming is draining. It's scary to not know where you're going to go and to be told you have to move and not know where to go or if that next spot will be safe, or when you'll be moved from there. It is traumatizing to not have control over your life." *Id.*

Most residents have been through an eviction before and people who have experience with housing insecurity know what to expect: a massive increase in

overdoses, disease, illness, frostbite, trafficking, and other hardships. Johnson Decl. ¶ 17. Many people may relapse, with disastrous consequences, as evictees "get high to cope with the trauma of losing their home, their security, and their community." *Id.*

After two brief postponements, the eviction is now slated for January 4, 2023. Compl. Exs. 4 & 5.  On that day, Camp Nenookaasi residents will be forced from their homes under threat of arrest.  Sagataw Decl. ¶ 24.  Everything they possess that they cannot carry with them will be destroyed.  *Id.* at 19; Barnes Decl. ¶ 18.  They will need to find a new location from which to survive freezing winter temperatures. Each conversation with a housing or social worker might be their last: once Nenookaasi is evicted, no one will know where to find them or how to reach them.  *See, e.g.*, Sagataw Decl. ¶¶ 19, 22; Johnson Decl. ¶ 12.  This includes their counsel—if the eviction goes through and residents are forced to disperse, with many of them losing court documents, contact information, and electronic access along the way, Plaintiffs will have a much harder time staying informed and involved in the lawsuit brought in their name. The ongoing evictions themselves have undermined Plaintiffs' ability to meaningfully challenge the constitutionality of this practice, and Camp Nenookaasi's eviction will be no exception to that.

Plaintiffs beg this Court to intervene and to adjudicate their claims through reasoned analysis, before Defendant makes this decision on his own and wreaks devastation that cannot be undone.

## STANDARD OF LAW

District courts may grant injunctive relief pursuant to Federal Rule of Civil Procedure 65(b) in the form of a temporary restraining order or a preliminary injunction. The legal standard for both of these remedies is the same. *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989). Temporary restraining orders are mechanisms by which a judge may preserve the status quo during the pendency of the case. *Kelley v. First Westroads Bank*, 840 F.2d 554, 558 (8th Cir. 1988). Injunctive relief is an extraordinary remedy and in awarding it a court applies four factors: (1) the threat of irreparable harm to the movant, (2) the likelihood of success on the merits of the movant's claims, (3) the balance of equities between the movant's prospective harm the injunction would avert, and the nonmoving party's prospective harm as a result of being enjoined, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* at 113.

**ARGUMENT**

Preliminary injunctive relief is warranted, and indeed necessary, to avert disastrous consequences for Plaintiffs. If Defendant Frey moves forward with bulldozing Camp Nenookaasi on January 4, 2024, Plaintiffs will suffer irreparable harm. The eviction will bring with it the serious risk that Plaintiffs will lose most or all of: their physical belongings, their sources of heat and warmth, their sense of safety and community, their progress towards sobriety and other forms of health and well-being, their relationships with social and housing workers, and their chance to procure secure housing. The causes of action that Plaintiffs have against the Defendant are meritorious. Unlike the Plaintiffs, who are highly vulnerable and have nothing to their name aside from what Defendant seeks to deprive them of, Defendant Frey would not be significantly or comparably harmed by this Court granting the requested relief. Finally, the public interest is strongly in favor of judicial action that promotes decreased substance use and houselessness, and that holds members of government accountable to the mandates of the Minnesota and United States Constitutions.

## I.   ABSENT A TEMPORARY RESTRAINING ORDER, PLAINTIFFS FACE IRREPARABLE HARM.

Irreparable harm is the "foundation of issuing an injunction." *Click Boarding LLC v. SmartRecruiters Inc.*, No. 21-CV-210,  2021 WL 6424909, at *2 (D. Minn.

Apr. 27, 2021). Harm is irreparable when "a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *General Motors Corp. v. Harry Brown's*, 563 F.3d 312, 319 (8th Cir. 2009).

When a plaintiff's suffering can be monetized, such as through quantifying lost customer relationships or a decrease in sales in terms of lost profits, courts can find that harm is repairable. *Id*. at 319. One key question is whether the injury is "quantifiable," particularly in financial terms. *Id*. The other key question is how speculative the harm must be: to succeed on a preliminary injunction, the movant must allege harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996); *see also Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015).

Here, the harm is both concretely imminent and also impossible to repair through a monetary award. Defendant, by announcing this eviction, is causing harm already by plunging Plaintiffs into hopelessness and the anticipation of the severe hardships to come. *See, e.g.*, Sagataw Decl. ¶¶ 18, 19, 25; Perez ¶ 32. If the eviction is permitted by this Court, Plaintiffs will lose all stability they have built for themselves at Camp Nenookaasi—how will they stay in contact with housing workers, and what will happen when they can no longer be found by supporters

trying to help them finish applications for housing and/or treatment? Crabtree Decl. ¶ 20. How will they stay in contact with each other, to continue motivating, inspiring, and supporting each other on their paths to recovery? Sagataw Decl. ¶¶ 7, 11, 15, 17. What will they do to survive the harsh winter without their medicines, warm clothes, bedding, tents, heat sources, and other necessary items? Barnes Decl. ¶ 18. And while some physical belongings may be replaced eventually, others may not—such as heirlooms and sacred items. *Id*. Past evictions run by Defendant indicate that, in practice, items are thrown into a dumpster and irrevocably destroyed rather than saved with any possibility of return. *See, e.g.*, *id*. at ¶ 13.

These disruptions and deprivations of property cause a cascade of injuries that a subsequent damages award could never restore. No price could be put on experiencing a relapse, on losing the hard-won progress with social and housing workers on attaining stability, on having to start from square-one with finding and maintaining contact with support systems, or on being able to stay connected to a quite literally life-saving community when no meaningful or reasonable alternatives for survival are available. Sagataw Decl. ¶ 26, Barnes Decl. ¶ 15. No Plaintiff can be adequately compensated if they lose their life. Johnson Decl. ¶ 17.

As has been recognized by this Circuit, the destruction of a person's only living quarters constitutes irreparable harm. *Higbee v. Starr*, 698 F.2d 945, 947 (8th Cir. 1983).

While Defendant Frey is claiming to open up new shelter spaces, in practice the spaces are insufficient to hold all of the residents of Nenookaasi and are challenging to access even for someone not experiencing the hardships of unsheltered homelessness. *See generally* Glenn Decl. Even if a resident were to have or borrow a phone, wait on hold for 30 minutes or more, and then secure one of the limited shelter spots available through the Hennepin Shelter Hotline, a temporary overnight bed at a shelter is an inadequate substitute for the stability of a semi-permanent tent or a yurt in Camp Nenookaasi. Barnes Decl. ¶ 16 (describing, for example, how overnight shelters put you back on the street during the day, without an ability to store your belongings or maintain a heat source).

Shelters are not housing. Shelters provide temporary relief that must be fought for each morning to ensure a place to sleep the next night. Shelters do not provide warmth during the day or a place to store your belongings. Nor do shelters provide any of the transformative, spiritual community support that Camp Nenookaasi residents co-create for each other. Shelters are often full, and beds are difficult to access.

Camp Nenookaasi, unlike rotating and uncertain shelter placement, is the springboard for permanent housing, sobriety, and stability. An eviction would irreparably cause Plaintiffs harm because Plaintiffs would be forced to scatter—losing all personal belongings they cannot carry; losing all progress and relationships towards housing, sobriety, stability; experiencing direct trauma from the wrongful eviction itself, with the threat of force and arrest for noncompliance with the eviction.

Should the Plaintiffs be denied this preliminary injunction but later win the lawsuit on the merits, any monetary or retroactive award would not change the hopelessness they are experiencing now, nor the devastation they are scheduled to experience on January 4, 2024. Since a denial of this injunction would result in Plaintiffs scattering and likely losing most of their technology, relationships, and other means of staying in touch, represented Plaintiffs may be unable to even participate in the lawsuit far enough along to see it through, let alone attempt to remedy their life altering injuries through a monetary award.

## II. PLAINTIFFS' CLAIMS ARE REASONABLY LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to succeed on their claims that Defendant's eminent eviction and destruction of property violates their rights under Federal and Minnesota law. In this Circuit, the likelihood of a movant's success is the most

significant factor of the four, although not dispositive. *Home Instead, Inc. v. Florence*, 721 F.3d 494, 497 (8th Cir. 2013). To show a likelihood of success, Plaintiffs are not required to prove a "greater than fifty percent chance of winning on the merits," but only a "reasonable probability" or a "fair chance" of success. *Click Boarding LLC*, 2021 WL 6424909 at *4 (quotations omitted). Plaintiffs' claims are meritorious and there is a reasonable probability and fair chance that any or all of Plaintiffs' enumerated claims will succeed.

### A. Count I: Unlawful Seizure & Destruction of Plaintiffs' Property in Violation of the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'" *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992). A seizure without a warrant is "per se unreasonable." *United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017).

Defendant has the burden to show that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement. *See Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971). Even if a search or seizure is lawful at its inception, the seizure "can nevertheless violate the Fourth Amendment

because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). Article I, Section 10 of the Minnesota Constitution contains identical language, and provides at least the same—and in some cases, more—protection against government interference with an individual's possessory interest in property. *See State v. Leonard*, 943 N.W.2d 149, 156 (Minn. 2020) ("Article I, Section 10 of the Minnesota Constitution provides greater protection against suspicionless law enforcement conduct than the Fourth Amendment to the United States Constitution.").

This Constitutional Right protects Plaintiffs' homes and belongings at Camp Nenookaasi. See, e.g., *State v. Pippin*, 200 Wn. App. 826 (Wash. Ct. App. 2017) (finding that an unhoused person had privacy interests in their tent) and *United States v. Place*, 462 U.S. 696, 700–01 (1983) (defining personal property as "effects" under the Fourth Amendment). "The Fourth Amendment protects homeless individuals from seizure and summary destruction of their unabandoned, but temporarily unattended, personal property." *Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp. 3d 806, 837 (9th Cir. 2023) (citing *Lavan v. City of Los Angeles*, 693 F.3d 1022).

The taking and destruction of Plaintiffs' property constitutes a meaningful interference with their possessory interest in their property. *Jacobsen*, 466 U.S. at

124–25 (destroying property is a permanent deprivation and is a meaningful interference with an individual's possessory property interest). Defendant Frey's planned eviction will not be done under the auspices of a search and seizure warrant, but will be carried out without the legal authority to search, seize, and destroy Plaintiffs' property. As such, the Defendant's planned eviction and seizure and destruction of property is barred under the federal and state constitutions.

For these reasons, Plaintiffs are likely to succeed on their claim that Defendant's actions constitute an unconstitutional seizure in violation of the federal and state constitutions.

**B. COUNT II**: **Procedural Due Process Violations Under the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution**

Plaintiffs are likely to succeed in their claim that Defendant Frey's planned seizure and destruction of Plaintiffs' property without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim their property violates Plaintiffs' rights to Due Process of law protected by the Fourteenth Amendment to the U.S. Constitution, through 42 U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

No agent of a state government shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV. The Minnesota Constitution similarly provides that "No person shall … be deprived of life, liberty

or property without due process of law." Minn. Const. art I, § 7. These standards are analyzed in equivalent ways by reviewing courts in Minnesota. *Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012).

Procedural due process protects against "the mistaken or unjustified deprivation of life, liberty or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). To determine whether a procedural due process violation has occurred, courts look at whether a deprivation of a property or liberty right occurs, and whether the process the government used to perpetuate that deprivation was constitutionally adequate. *Zinermon v. Burch*, 494 U.S. 113, 126 (2012). "The Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." *Id.* at 127.

"To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). Destroying property is a permanent deprivation and meaningful interference with an individual's possessory property interest. *Jacobsen*, 466 U.S. at 124-25.

Here, the property and liberty rights at issue include both those of Plaintiffs' persons and of their property. Defendant Frey's planned eviction will deprive Plaintiffs of vital and necessary property for survival—including their means of generating heat and staying warm—and then cast them out into Minnesota's winter

cold. Yet the only semblance of process Defendant Frey has offered is the posting

of an eviction notice at the outside of the encampment a few days before it is

scheduled. *See, e.g.*, Compl. Exs. 4, 5. This is not constitutionally

sufficient—Defendant Frey has offered no opportunity to be heard (and in fact, has

refused requests for meetings with Nicole Perez and others), and the evictions do

not involve any pre- or post-deprivation procedures for reclamation of property. To

put it succinctly, "[a]ll you can take with you is one armload," and the rest of

Plaintiffs' belongings will be summarily destroyed by Defendant Frey's agents and

officers, at his direction. Barnes Decl. ¶ 13.

For these reasons, the manner in which Defendant Frey plans to carrying out

the eviction of Camp Nenookaasi violates Procedural Due Process, and thus

Plaintiffs are likely to succeed on this claim brought under the federal and state

constitutions.

## C. COUNT III: State-Created Danger in Violation of the Right to Substantive Due Process Under the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution

Plaintiffs are also likely to succeed on the claim that Defendant Frey's

planned eviction and destruction of Camp Nenookaasi violates their substantive

due process rights by creating the danger to which Plaintiffs are being subjected

and then failing to protect them from it. "[T]he state owes a duty to protect

individuals if it created the danger to which the individuals are subjected." *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005).

To succeed on a state-created-danger theory, Plaintiffs must prove (1) that they were members of a "limited, precisely definable group," (2) that the municipality's conduct put them at "significant risk of serious, immediate, and proximate harm," (3) that the risk was "obvious or known" to the municipality, (4) that the municipality "acted recklessly in conscious disregard of the risk," and (5) that in total, the municipality's conduct "shocks the conscience." *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011). The Supreme Court has explained that official behavior "that would most probably support a substantive due process claim" is "conduct intended to injure in some way unjustifiable by any government interest;" that "is the sort of official action most likely to rise to the conscience-shocking level." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

As discussed in detail in the Complaint, Doc. 1, Plaintiffs are members of a limited and precisely definable group. They are the residents of Camp Nenookaasi who are otherwise unhoused and, absent intervention by this Court, who will be subjected to Defendant Frey's planned eviction, losing their homes, their belongings, their shelters and sources of heat and warmth, their connection to housing and treatment resources, their stability and supportive community.

Defendant Frey's planned eviction puts Plaintiffs at significant risk of serious, immediate, and proximate harm. Camp Nenookaasi's eviction will be carried out by armed law enforcement officers, under threat of arrest and the force that comes with it for those who do not comply; without proper notice and opportunity to be heard, or pre- or post-deprivation procedures for recovering their property; without meaningful housing alternatives to survive the Minnesota winter. Everything Camp Nenookaasi's residents cannot carry away in an armload will be bulldozed and trashed. Barnes Decl. ¶ 13. They will be forced to compete for the few available shelter beds—to the extent they are able to access the Hennepin Shelter Hotline at all—and otherwise scatter and scramble to gather the resources and tools necessary to survive in the upcoming cold winter nights. *See generally* Glenn Decl.; Barnes Decl. In other words, Defendant Frey's planned eviction will cause Plaintiffs irreparable harm. *See* Part I, *infra*. Plaintiffs reasonably fear that the eviction will deprive them of personal belongings necessary to their survival, and simply do not know how they will survive the winter months as a result. *See, e.g.*, Barnes Decl. ¶¶ 15-18; Sagataw Decl. ¶ 22.

Defendant Frey is well-aware of these risks, as the dangers of his planned eviction are both obvious and known to him. These evictions are part of Defendant Frey's pattern and practice, and have gone on for years, with predictable results that residents simply move to another encampment where they are forced to start

over. *See, e.g.*, Barnes Decl. ¶¶ 8, 13, 14, 16, 17; *see generally* Crabtree Decl. With regard to Camp Nenookaasi in particular, Defendant Frey has been informed of these risks by Nicole Perez, by other community members, and even by his own govt officials etc. and City Council. Perez Decl. ¶¶ 20-29; Compl. Exs. 2 & 3; Crabtree Decl. ¶¶ 27-29 (describing the willful incompetence and dangers of the City's repeated evictions); Johnson Decl. ¶ 14 (describing efforts to notify Mayor Frey and other City officials of the impending harm that would be caused by Camp Nenookaasi's eviction).

Despite Defendant Frey's awareness of the substantial risk his actions, and the actions of his officers and agents following his direction, will pose, his continued pursuit of a rushed eviction is done recklessly and in conscious disregard of that risk. *Id.* Although his public rhetoric has indicated more shelter beds are being made available, the reality is that few shelter beds are actually open (and many fewer than the number of Camp Nenookaasi residents slated for eviction January 4), what few shelter beds do exist are difficult to access, and shelters do not provide a meaningful housing solution for Camp Nenookaasi's residents to survive the winter cold, particularly after their sources of heat and warmth are destroyed by Defendant Frey. *See generally* Glenn Decl.; Barnes Decl. ¶ 16.

Finally, Defendants conduct here shocks the conscience. Camp Nenookaasi is an Indigenous healing camp and its residents are disproportionately Indigenous

peoples.  The Camp involves important cultural healing ceremonies, a sacred fire, drumming, and culturally-informed community care.  *See, e.g.*, Perez Decl.  ¶¶ 14-20.  It is a place where real healing is occuring, where people are having transformative success as they pursue sobriety and obtain permanent and long-term housing and treatment.  *See id.*; Crabtree Decl. ¶¶ 18-25. Defendant Frey's planned eviction is a dangerous continuation of the legacy of genocidal displacement of Indigenous peoples, a legacy that is unconscionable to perpetuate.  *See also* ECF 1 (discussing the legacy of genocidal violence against Native peoples in Minnesota). To displace residents and destroy their sources of heat and warmth in a Minnesota winter is unconscionable.  To treat the residents, Plaintiffs themselves, as if they are garbage and destroying their belongings as if they are worthless is unconscionable.

For these reasons, Plaintiffs are likely to succeed on the merits of their claim that Defendant Frey's planned eviction violates their Substantive Due Process Rights under the United States and Minnesota Constitutions.

### D. COUNT IV: Violation of the Eighth Amendment to the US Constitution

The Eighth Amendment to the U.S. Constitution, as applied to the States and their subdivisions through the Fourteenth Amendment, protects civilians from "cruel and unusual punishment."  As a result, it "prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status

or being." *Coalition on Homelessness*, 647 F. Supp. 3d at 832 (quoting *Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019)). This includes "criminaliz[ing] indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id*. at 833.

Here, approximately 160 individuals reside at Camp Nenookaasi. Perez Decl. ¶ 15. Camp Nenookaasi provides its residents with resources, healing, relationships, spirituality, motivation, and deeply transformative community above and beyond just a safe place to sleep and access to heat and warmth. Perez Decl. ¶¶ 7-19; Barnes Decl. ¶¶ 4-7, 10-12, 15; Crabtree Decl. ¶¶ 14-25; Sagataw Decl. ¶¶ 7-17. Plaintiffs do not have reasonable alternatives to living at Camp Nenookaasi—they are unhoused and indigent and have come to Camp Nenookaasi as a last resort for survival. Shelters do not provide an adequate alternative, due to the difficulty in accessing shelter beds, their limited availability across the County, and the nature of overnight shelters that do not provide storage for necessary personal belongings and survival items or provide 24-hour warmth and shelter. *See, e.g.*, Glenn Decl.; Barnes Decl. ¶ 16.

Despite this, Mayor Frey seeks to evict Plaintiffs from Camp Nenookaasi, ordering his law enforcement agents and officers to carry out the eviction under penalty of arrest, imposing and threatening to impose criminal penalties and other harm and punishment for conduct which Plaintiffs cannot realistically avoid.

Furthermore, the manner in which these evictions are carried out—by armed law enforcement officers under threat of arrest, with residents ordered from their tents, their tents knifed by law enforcement, their belongings and bulldozed, destroyed, and trashed—amounts to a penalty, harm, and/or punishment that Defendant Frey and his law enforcement officers impose or threaten to impose for conduct which Plaintiffs cannot avoid.

The Eighth Amendment does not allow Defendant to harm or punish, through property destruction or threats of arrest or otherwise, this putative class of Plaintiffs who have no meaningful alternative to living at Camp Nenookaasi.

### E. COUNT V: Conversion in Violation of Minnesota Common Law

Plaintiffs are likely to succeed on their claim of conversion, as the forced eviction and destruction of Camp Nenookaasi will deprive them of their personal property, constituting a theft by conversion under Minnesota common law.

"Conversion has been defined as an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession." *Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948). To succeed in an action for conversion, the Plaintiffs must prove two elements: "First, property, general or special, in the plaintiff, and a right of possession at the time of the conversion; and, second, a conversion of the thing by

the defendant." *Hodge v. Eastern Ry. Co. of Minnesota*, 72 N.W. 1074, 1075 (Minn. 1897).

As discussed above, Defendant Frey's planned eviction and destruction of Camp Nenookaasi will involve unlawful seizures and destruction of Plaintiffs' property as well as deprivation of property without due process, all in violation of Plaintiffs' rights under the Minnesota and United States Constitutions. Such seizure, destruction, and deprivation of property constitutes conversion under State law, and Plaintiffs thus will succeed on this claim,

## III.   BALANCE OF EQUITIES FAVORS PLAINTIFFS, AS AN INJUNCTION WILL NOT HARM THE DEFENDANT.

A court evaluating this factor "weighs the harm that the movant is likely to suffer absent the requested injunction against the harm other parties will suffer if the Court issues it." *Click Boarding LLC*, 2021 WL 6424909 at 4 (quoting *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993)); *see also Dataphase Sys.*, 640 F.2d at 113.

In this case, the balance of equities weighs strongly in favor of Plaintiffs. Any amorphous health or safety concerns Defendant Frey may assert is dwarfed by the Plaintiffs' interests in maintaining their shelter, their belongings, their access to social services and other resources, their opportunity to obtain the stability to seek

treatment and/or permanent housing. Furthermore, the health and safety concerns that Defendant Frey may assert are a result of cycles of houselessness, addiction, and poverty, and not of Camp Nenookaasi itself—in fact, unhoused people will face these struggles to an even greater degree when living on the streets outside of Camp Nenookaasi. *See, e.g.*, Johnson Decl. ¶ 17; Sagataw Decl. ¶¶ 22-25; Crabtree Decl. ¶¶ 26-30. Defendant Frey's own actions exacerbate the problems he cites to, because evictions and the dispersal of encampments set Plaintiffs back and undo progress they are able to make towards pulling themselves out of homelessness, addiction, and the assorted dangers and hardships that accompany those conditions. *Id.*

## IV.    A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST.

It is in the public interest to ensure that the government does not deprive people of their constitutional rights—the right to be secure in their homes, to be free of unreasonable seizures and cruel punishments, to privacy and procedural and substantive due process. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008) ("[T]he protection of constitutional rights is always in the public interest.").

Furthermore, any pretextual health and safety concerns the Defendant may assert about the encampments are belied by the fact that eviction and destruction of Camp Nenookaasi will directly place the health and safety of its residents in peril,

destroy the progress residents have made towards stability, sobriety, and permanent housing, and damage the community ties and relationships of trust that have been and continue to be built there. *See, e.g.*, Sagataw Decl. ¶¶ 15-20. Residents will lose whatever they cannot carry with them, including their shelters, their bedding, their important documents and identification, their sources of heat and warmth, and be cast out to fend for themselves against the cold of Minnesota winter. *See id.* at ¶ 23-25; Barnes ¶¶ 13, 18. There, the harms Defendant Frey purports to be concerned with will be exacerbated by the trauma and stress of Camp Nenookaasi's destruction and life on the streets. *See, e.g.*, Johnson Decl. ¶ 17; Sagataw Decl. ¶¶ 22-25; Crabtree Decl. ¶¶ 26-30.

## V. THE TEMPORARY RESTRAINING ORDER SHOULD EXTEND TO PROTECT ALL RESIDENTS OF CAMP NENOOKAASI.

Plaintiffs have brought an action for class-wide relief. Even before the class is certified, however, the Court is within its right to issue an injunction that extends beyond the named plaintiff to ensure the prevailing parties are granted the relief to which they are entitled. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 374 (5th Cir. 1981) ("Injunctive relief which benefits non-parties may sometimes be proper even where the suit is not brought as a Rule 23 class action."); *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) ("Class-wide relief may be appropriate even in an individual action."); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir.

1984) ("The plaintiff correctly states that injunctive relief may benefit individuals not party to the action, and that classwide injunctive relief may be appropriate in an individual action."). The district court has the power to order as broad of relief as necessary—including nationwide—where it is required. *Yamasaki*, 442 U.S. at 702.

Here, it is not practical, effective, or sensible to limit the relief to only certain named individuals. Rather, the Court should issue an injunction halting the eviction of all Camp Nenookaasi residents and halt Defendant Frey's perpetuation of the violent cycles of houselessness.


## VI.     THE SECURITY REQUIREMENT SHOULD BE WAIVED.

While a bond is generally required before issuing injunctive relief under Federal Rule of Civil Procedure 65(c), the District Court has discretion to waive the security requirement. *See Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016). Waiver of the security requirement is particularly appropriate where, as here, the Plaintiffs are indigent. See *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (finding waiver of a bond appropriate because of plaintiff's indigency); *Bass v. Richardson*, 338 F. Supp. 478, 489-91 (S.D.N.Y. 1991) (holding that "indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)").

Because of Plaintiffs' indigency, as well as because important constitutional rights of public interest are at stake and damage to the Defendant resulting from a wrongful issuance of a temporary restraining order cannot be shown, this Court should waive the security requirement in this case.

## CONCLUSION

For the foregoing reasons, Representative Plaintiffs Cheryl Sagataw and DeAnthony Barnes and the putative Class Plaintiffs are entitled to the requested injunctive relief enjoining Defendant Mayor Frey from evicting and destroying Camp Nenookaasi.

Date: Jan 2, 2023

KIRA A. KELLEY
Climate Defense Project
MN Bar No. 0402932
P.O. Box 7040
Minneapolis, MN 55407
(802) 683-4086
kira@climatedefenseproject.org
Attorney for Plaintiffs