UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cheryl Sagataw and DeAnthony Barnes, *on behalf of themselves and a class of similarly situated individuals*, | Ct. File No. 24-cv-00001(ECF/TNL) |
| Plaintiffs, | |
| v. | **DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Mayor Jacob Frey, *in his individual and official capacity*. | |
| Defendant. | |

## <u>INTRODUCTION</u>

Plaintiffs have alleged that they are residents of an illegal encampment which the City of Minneapolis ("City") through Mayor Jacob Frey, after prolonged discussions, negotiations and months of offering and providing services, has decided to close due to the extremely dangerous conditions impacting not only those camping on the property but the surrounding community. For months, the City provided individuals at the encampment with repeated connections to shelter services and offered individuals free unlimited storage of their personal belongings. Nonetheless, the increasingly dangerous conditions at the

encampment mandate its closure. Within the past four months, the encampment has been the site of a fatal shooting, the death of a newborn baby, a drug overdose death, sexual assault, vandalism, open drug use, stray gunshots, complaints of human waste, and more than one hundred 911 calls to Minneapolis Police and Fire Departments. Plaintiffs have brought a motion for a temporary restraining order ("TRO") on behalf of themselves and other individuals unlawfully camping on the City lot to stop Mayor Jacob Frey from attempting to put an end to the violence and danger this encampment presents to the residents and the community at large. However, Plaintiffs have no legal right to reside in tents on City property. Moreover, Plaintiffs have had ample notice of the impending closure and time to leave with all of their possessions and have had, and continue to have, free storage available for their items so that none need be lost.  Therefore, Plaintiffs' motion for a TRO should be denied.

## FACTS

### I.      The Inception of the Encampment on August 24, 2023

On August 24, 2023, the Minnesota Department of Transportation ("MNDot") cleared and closed an encampment on MNDot property known as the "Wall of Forgotten Natives." (Declaration of Enrique Valezquez ("Velazquez Decl"), ¶ 2.) Immediately following this closure, several individuals from that site broke through a fence surrounding a City-owned lot located at 2313 13th Avenue

South. *Id.* Within hours of unlawfully breaking into the fenced City property, approximately 40 individuals set up tents and formed a new encampment. *Id.* This encampment ("the Encampment") is the subject of this lawsuit. By August 29, 2023, the size of the Encampment grew to approximately 70 individuals and shortly thereafter rose to over 100 individuals. *Id.* ¶ 3. Since mid-October, the size of the Encampment has oscillated between 100-150 individuals. *Id.*

## II. For Months, the City Devotes Substantial Time and Resources to Connecting Individuals at the Encampment to Services and Property Storage Options.

The City's Homeless Response Team ("HRT") first visited the Encampment on August 24, 2023, the day of its inception. (Valezquez Decl., ¶ 4.) The City's HRT connects homeless individuals with Hennepin County for housing assessments and/or case management, service providers or assigned case workers, storage services in partnership with Downtown Improvement District, shelter services, medical attention through Healthcare for the Homeless, and transportation services to these and other resources. *Id.* ¶ 5. The City's HRT has made no less than 15 separate visits to the Encampment with these offers of assistance. *Id* ¶ 6.

On numerous occasions, the City's additional outreach partners, including Agate, Avivo, Hennepin County's Streets to Housing, and Healthcare for the Homeless, visited the Encampment to engage with the unsheltered individuals to provide services. *Id.* ¶ 7. Moreover, in connection with this Encampment, with the

approval of Mayor Jacob Frey and the Minneapolis City Council, the City provided one-time funding to Helix Health and Housing Services, an organization that provides housing, mental health services, and substance use treatment to underserved populations in collaboration with Red Lake Nation. *Id.* ¶ 8. The City partnered with Helix for outreach to the Encampment, and with the assistance of Helix's outreach efforts, the City has supported 104 residents at the Encampment find housing or other shelter options. *Id.*

In addition to providing connections to shelter options, the role of the City's HRT is to ensure that people are aware of free storage provided to homeless individuals through the City's contract with the Downtown Improvement District ("DID"), an arrangement championed by Mayor Jacob Frey. *Id.* ¶ 9. Individuals can bring their personal property directly to DID for free, safe and secure storage. *Id.* Alternatively, the City's HRT will bring DID bins to an encampment and transport them back to DID for storage. *Id.* DID will store individuals' personal property for an unlimited amount of time, provided that individuals using storage check-in with DID once every 14 days. *Id.* The City's HRT has provided information about free property storage on every visit to the Encampment and will continue to do so up until the date of the closure. *Id.* To date, no one at the Encampment has chosen to use the free DID storage offered by the City's HRT. *Id.*

**III.    City Directors and Staff Engage in Extensive Dialogue About Closure with Encampment Organizers.**

4

In addition to the over 15 visits to the Encampment by the City's HRT, the Director of the City's Community Planning and Economic Development Department and the Director of the City's Regulatory Service Department, with the approval of Mayor Frey, also separately met with Encampment organizers on October 11, 2023, to evaluate the situation, observe conditions, and discuss closure. (Valezquez Decl. ¶ 10.) They discussed ways in which the City would provide assistance to minimize health concerns in advance of the closure. *Id.* For example, while the City historically does not provide portapotties at encampments, recognizing the volume of people present at the Encampment and livability impacts for the surrounding community, City staff worked to add portapotties as part of its plan to effect a healthy closure of the Encampment. *Id* ¶ 11. Identifying a willing vendor was challenging, as vendors have been harassed and assaulted when servicing or removing portapotties in other encampments, and portapotties are regularly vandalized and service vehicles damaged when engaging in encampment response work. *Id.* ¶ 12. Nonetheless, the City was able to secure four portapotties placed immediately outside of the Encampment, inclusive of an accessible portapotty for residents with limited mobility. *Id.* ¶ 13. The Encampment portapotties are serviced six days per week. *Id.*

Additionally, in an effort to improve conditions as the parties worked towards a collaborative closure, the City increased the frequency with which the

City contractor removed rubbish from outside the encampment from once to twice a week. *Id.* ¶ 14. The City's Public Works department eventually took over collection, placed refuse containers on site and began servicing the area five times per week. *Id.*

### III. Encampment Conditions Deteriorate and Community Safety Concerns Increase.

In spite of the efforts by the City and Mayor Frey to minimize health and safety risks as outlined *supra*, as the parties moved towards a closure of the Encampment, dangerous criminal activity continued to increase. In general, encampments are often a breeding ground for criminal activity. This poses risks to not only those living in an encampment, but the community at large, and the Encampment was no exception. (Velazequez Decl ¶ 15.) Since its inception, there have been more than one hundred 911 calls to Minneapolis Police and Fire Departments relating to the Encampment. *Id.* ¶ 16. The calls relate to illegal activity at the Encampment including, but not limited to, death threats amongst campers, assault, gunshots, stolen vehicles, vandalism and property damages, drug overdoses, and fires. *Id.*

In October 2023, there were two notably tragic incidents at the Encampment—one that involved the death of a baby, and one that involved the drug overdose death of an individual at the Encampment. *Id.* ¶ 17. Shortly thereafter, on November 1, 2023, leaders from the Metropolitan Urban Indian

Directors ("MUID") reached out to City Staff and Mayor Frey demanding that the Encampment be closed immediately, citing concerns that not only about the recent deaths and other crimes, but about concerns that criminal activity was being hidden from law enforcement due to threats and physical violence inflicted on those reporting. *Id.* ¶ 18, Ex. A. According to the MUID, neighbors witnessed women and girls being dragged from the Encampment into cars in the middle of the night, open drug use and sex acts throughout the day. *Id.* Then on December 12, 2023, a 45-year-old man was killed at the Encampment after being shot six times. *Id.* ¶ 19.

## IV.   Encampment Closure is Delayed Numerous Times to Allow More Time for Connection to Resources

Due to escalating violence and safety concerns, the Encampment was set for closure on December 14, 2023, and notice of the closure was posted on December 7, 2023. (Valezquez Decl. ¶ 20.) However, Mayor Frey determined that a short delay was appropriate to give those remaining at the Encampment additional time to access shelter and services. *Id.* ¶ 21. Accordingly, a new closure date was set for December 19, 2023. *Id.* During this time between December 7 and December 19, the City's HRT team made numerous visits to the Encampment, offering connection to shelter and services, as well as providing free storage options. *Id.* ¶ 22.

On December 14, 2023, members of the Minneapolis City Council and the Mayor's office, along with County Commissioners, state legislators, and services providers met with Encampment leaders. *Id.* ¶ 23. There was broad agreement that the Encampment needed to close, but City leadership agreed to another extension to provide even more time for access to services and shelter. *Id.* At that meeting, Encampment organizers asked that residents of the encampment be moved to a temporary, 24/7, indoor facility. *Id.* The City actively worked to vet that request along with the County, State, and several experienced social service providers. *Id.* Four experienced and trusted service providers who were capable of providing this level of support were identified: Agate Housing and Services, American Indian Community Development Corporation, Avivo, and Simpson Housing Services. *Id.* After several discussions, all four providers said they could not take on the role of managing such a project. *Id.* Capacity, resources (financial and human capital), and other competing priorities were given as primary reasons for this decision. *Id.* However, these providers said they have the collective capacity to provide supportive housing to approximately 45 to 60 individuals, including offering residents mental health and substance use disorder services. Additionally, with help from Hennepin County and the State of Minnesota, Salvation Army and Rescue Now made plans to add 90 beds to the shelter system the week of January 1, 2024. Hennepin Shelter Hotline, in partnership with the Adult Shelter Connect,

also made plans to help people access these additional beds as well as beds that become available in existing shelters. *Id.* Accordingly, closure of the Encampment was rescheduled for January 4, 2024. *Id.*

Notice of the Encampment closure was posted on December 29, 2023, six days in advance of the closure. *Id.* ¶ 24. Hennepin County service providers have represented to the City that they have engaged with *everyone* at the Encampment. *Id.* ¶ 25. During the time between December 14, 2023, to the present, City staff spent hundreds of collective hours preparing for the closure, allocating resources, designating staff, and assuring that all available resources had been repeatedly made available to those at the Encampment, and that shelter was available for all Encampment individuals. *Id.* ¶ 26. Nonetheless, though Plaintiffs have been aware of the pending closure for nearly a month, they waited until the 11th hour, less than one full day before the scheduled closure, to file their Complaint and bring this Motion for a TRO.

## V.   Plaintiffs' Suggestion that the City and Mayor Jacob Frey Do Not Have Adequate Established Closure Guidelines is Incorrect.

Plaintiffs suggest that the City and Mayor Jacob Frey have no established guidelines or procedures for how encampment closures are conducted. (P. Mem. at 7.) This is simply incorrect. In fact, the City conducts encampment closures in accordance with a set of operational guidelines. (Valezquez Decl. ¶ 27.) Prior to an encampment closure, notice is posted at least 72 hours in advance. *Id.* ¶ 28. It is

undisputed that in the case at hand, notice was posted 6 days prior to the closure date. *Id.* ¶ 24.

On the day of an encampment closure, representatives from multiple departments are often on site. *Id.* ¶ 29. The Minneapolis Health Department handles needle pick-up, if necessary, Minneapolis Public Works will help with cleaning the site, the Minneapolis Department of Regulatory Services may be on hand to assist with community partners, provide shelter information, and offer rides. *Id.* When necessary, Minneapolis Police Department officers are on site to support the other City staff and ensure that homeless individuals, the community, and City staff are safe throughout the duration of the closure. *Id.* The City employees on site encourage individuals to gather and take with them all of their belongings that they have not already placed in storage. *Id.* ¶ 30. City workers will often help individuals move their belongings off-site. *Id.* If individuals forget an item, they are typically allowed back on site to retrieve it provided it is safe for them to do so. *Id.* If specific personal items are left behind and identified, such as a purse or backpack, City workers will retrieve that item and turn it over to outreach workers with the goal of returning it to its owner. *Id.*

Unfortunately, City employees working at encampment closures frequently confront unwanted and often hazardous or dangerous items left behind. *Id.* ¶ 31. This can include garbage, food waste, torn tarps, hypodermic needles, and even

stolen vehicles, explosives, and guns. *Id.* City employees have been stuck with used hypodermic needles when attempting to sort through property at encampment closures. *Id.* Discarded tents are often filled with urine, feces, spoiled food, and rats. *Id.*

## VI.   Closure of the Encampment is Necessary for Important Community Development of the Site

Once the Encampment is closed, pre-development activity for a new community center will be able to start. (Valezequz Decl. ¶ 32.) The Indigenous Peoples Task Force ("IPTF") has a redevelopment agreement with the City to construct the Mikwanedun Audisookon Art and Wellness Center on the site of the Encampment. *Id.* According to IPTF, pre-development work is necessary in advance of the purchase to make it possible to break ground shortly after purchase, which is currently set for February 2024. *Id.* IPTF project managers have represented that delays in starting the project as planned in February 2024 will impact costs and programming for Center. *Id.* When finalized, the site will include IPTF office and clinic space, a commercial kitchen, community garden, small theater, art workshop and gallery, and space to support neighborhood partnerships and entrepreneurship and employment training. *Id.*

## ARGUMENT

## I.   THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff seeks to enjoin Mayor Frey from:

a. Evicting, bulldozing, clearing, sweeping, dismantling, demobilizing, removing infrastructure, or ceasing services to Camp Nenookaasi, the encampment of unhoused individuals located between 12th and 13th Streets and 23rd and 24th Ave, Minneapolis Minnesota.
b. Confiscating or destroying Plaintiff's property, including property shared by the Camp at the Healing Tent, Kitchen Tent, or in other common areas;
c. Entering individual residences at Camp Nenookaasi or otherwise searching the area outside of the common spaces without proper search warrants or consent of the resident whose yurt or tent has been entered.

(ECF Doc. 4 at 2.) This injunction should be denied, or in the alternative, modified.

Injunctive relief is an "extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A TRO may be granted only if the moving party can demonstrate: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Plaintiff has the "complete burden" of proving all the factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). Plaintiffs' motion should be denied as Plaintiffs have failed to meet their burden on every *Dataphase* factor.

### A. Irreparable Harm

Failure to show irreparable harm is an independently sufficient ground for denying a preliminary injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). To make a showing of irreparable harm, Plaintiff "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). Additionally, Plaintiffs must establish that "the harm will not be compensable by money damages." *Ben-Yonatan v. Concordia College Corp.*, 863 F.Supp. 983, 986 (D. Minn. 1994). Plaintiffs have not shown this.

"Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 22 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*)). Put differently, injunctive relief granted to address speculative harm is improper. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015); *see also Jones v. Pub. Hous. Agency of City of St. Paul*, No. 17-5448(MJD/DTS), 2018 WL 3104269, at *2 (D. Minn. Feb. 27, 2018), report and recommendation adopted, 2018 WL 1535935, at *2 (D. Minn. Mar. 29, 2018) (denying injunctive relief involving speculative harm of potential eviction).

Plaintiffs allege that their items will be destroyed in the Encampment closure, but what Plaintiffs neglect to discuss is the fact that their items will only be destroyed *if* they choose to leave the items behind after having had many days of notice that they need to be removed and refusing the offers of places to store them.  That would include Plaintiffs' tents and any other items that they allege are irreplaceable.  If Plaintiffs are successful in finding a place to stay, or take the City's offer of a place to store their items, then the harm of being deprived of their home and possessions would not occur.  Another court in this district has found that individuals experiencing homelessness who are being required to leave an illegal encampment have not suffered irreparable harm because although "[t]he potential harm that the Encampment Plaintiffs face as a result of possible disbandment is not minimal[,] . . . to warrant injunctive relief, the harm must be *certain* and *concrete. Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/LIB), 2020 WL 6337706, at *4 (D. Minn. Oct. 29, 2020) (emphasis in original) (citing *Novus Franchising*, 725 F.3d at 895; *Vision-Ease Lens, Inc. v. Essilor Int'l. SA*, 322 F. Supp. 2d 991, 999 (D. Minn. 2004)).  Here, with the notice that has been given and the free storage that has been made available, there is no reason why Plaintiffs cannot take or store those items they deem irreplaceable.  Should other items of property be lost, they can be compensated by damages.  Additionally, Plaintiffs' claims that they cannot be compensated with money damages for the emotional suffering that would be

14

occasioned by the Encampment closing is not supportable.  In fact, in most § 1983 actions, the plaintiffs can and do seek monetary compensation for emotional suffering.  *See Carey v. Piphus*, 435 U.S. 247, 263 (1978).  Plaintiffs could do so here. Plaintiffs have not shown they will certainly be irreparably harmed by Defendant Mayor Frey, as opposed to the harm caused by their own refusal to move and secure their most important and irreplaceable items, and therefore their motion should fail on this basis alone.

### B.  Balance of Harms

Courts must "consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  Plaintiffs assert that the balance of harm weighs in their favor because "[a]ny amorphous health or safety concerns Defendant Frey may assert is dwarfed by the Plaintiffs' interests in maintaining their shelter, their belongings, their access to social services and other resources, their opportunity to obtain the stability to seek treatment and/or permanent housing." (P. Mem. at 26-27.) Defendants claims of health and safety concerns, however, are not "amorphous." Mayor Frey's interest in closing the Encampment is to stop the unlawful and criminal activity that has taken root there and has already caused multiple deaths. The government "has a strong interest in ensuring the public safety and order[.]"  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994).

Additionally, the City has engaged in weeks of preparation in order to be able to close the encampment on January 4.  Many different agencies inside and outside the City have been placed in readiness.  The Plaintiffs' motion for a TRO is throwing all these plans into limbo until there is a ruling.  Granting the TRO would cause these efforts to be wasted at significant cost of the City and other agencies' time and resources.

Plaintiffs' personal setbacks they allege would be caused by the encampment closures, which are speculative at best, are not greater harms than the continuance of violence, human trafficking, unsafe conditions, and even murder, occurring at the site that Mayor Frey seeks to disrupt.  The balance of harms clearly weighs in favor of Mayor Frey.

## C. Public Interest

Plaintiffs assert that protecting constitutional rights is "always in the public interest" and that Defendant's health and safety reasons for working to close the site are pretextual.  (P. Mem. at 27.)  As discussed *supra,* Defendant's health and safety concerns are most certainly well-founded. As is set forth in the supporting declaration by Regulatory Services Director Enrique Velasquez, the Encampment has become corrupted, and violent crime affecting the safety of those living in and nearby the Encampment is cause for serious and increasing concern. The health and safety concerns that led to the decision to close the Encampment weigh in

favor of denial of the TRO.  The public have a right to expect that the City will act to shut down places that have degenerated to be sites of murder and dead children.

Additionally, the end result of closing this site will be the construction of the Mikwanedun Audisookon Art and Wellness Center by the Indigenous Peoples Task Force ("IPTF").  This is not only in the interest of the public generally but in the interest of the Indigenous community that Plaintiffs have so volubly accused Mayor Frey of failing to care about.

Finally, as discussed below, no constitutional rights will be offended by the denial of the TRO, and therefore the public interest will be unaffected by this.  The public interest weighs heavily in favor of denying the TRO.

### D. Likelihood of Success on the Merits

The decision to close the Encampment was taken after much input from members of the public, both those clamoring for closure and those opposed, work between the legislative and executive branches of the City, and work with the City's other government agency partners. When Plaintiffs, as they do here, intend to enjoin "government action based on presumptively reasoned democratic processes" then they must show that they are *likely* to prevail on the merits. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Here, Plaintiffs are unlikely to succeed on any of their claims, because

all Plaintiffs' claims are premised on the faulty assumption that they have a right to continue residing illegally in the encampment.

Plaintiffs have brought five claims against Mayor Frey in his individual and official capacity: Unlawful Seizure, Deprivation of Procedural Due Process, Deprivation of Substantive Due Process,[1] Violation of the Eighth Amendment of the United States Constitution, and Conversion under Minnesota law.

1. **Plaintiffs' individual capacity claims against Mayor Frey are not likely to succeed.**

a)   *The Unlawful Seizure Claim Fails*

The Fourth Amendment of the United States Constitution requires that any seizure of property be conducted reasonably. U.S. Const. amend. IV. A seizure is a "meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty.*, 506 U.S. 56, 71 (1992).  The reasonableness of a

---

[1] To the extent Plaintiffs also allege illegal seizure or deprivation of due process under the Minnesota Constitution, those claims are not actionable. "No cause of action exists under Section 1983 for a violation of a state constitutional right."  *White v. City of Minneapolis*, No. 21-CV-0371 (WMW/KMM), 2021 WL 5964554, at *7 (D. Minn. Dec. 16, 2021).

Additionally, "there is no corollary to section 1983 under state law, and 'courts have repeatedly stated that Minnesota has not recognized private remedies for violations of the Minnesota Constitution.'" *White v. Dayton*, No. 11-CV-3702 (NEB/DJF), 2023 WL 21918, at *16 (D. Minn. Jan. 3, 2023), *report and recommendation adopted,* No. 11-CV-3702 (NEB/DJF), 2023 WL 1797830 (D. Minn. Feb. 7, 2023); *Jones v. James,* No. Civ. 02–4131, 2005 WL 459652, *8 (D. Minn. Feb. 24, 2005) ("Minnesota does not recognize a tort for deprivation of due process."); *Northstar Legal Found. v. Honeywell Project,* 355 N.W.2d 186, 188 (Minn.Ct.App.1984) (no action lies under Art. I, § 10)

18

seizure depends on the context. *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985). To determine reasonableness, the court must balance both the private and governmental interests. *Soldal*, 506 U.S. at 71.

The competing interests in this case are the Plaintiffs interest in not having their possessions seized and the Defendant's interest in maintaining public health and safety and clearing a piece of land that is meant to be developed into a culturally-specific community center. Plaintiffs' citation of out-of-circuit authority is inapposite as the case cited involved an injunction against a city who was seizing and destroying possessions of homeless individuals *without notice*. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1026 (9th Cir. 2012). A court in this district has found that it can be permissible to permanently deprive an individual of property "when it is necessary to achieve the government's permissible ends." *Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/JFD), 2021 WL 4427215, at *8 (D. Minn. Sept. 27, 2021)(citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)).

The touchstone of the Fourth Amendment is reasonableness. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia,* 528 U.S. 11, 13 (1999) *(per curiam); Katz v. U.S.,* 389 U.S. 347, 357 (1967)). "An action is 'reasonable' under the Fourth Amendment, . . . 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Id.* (quoting *Scott v. U.S.,* 436 U.S. 128, 138 (1978))(emphasis in original). Here, the City reasonably determined, based on the more than one

hundred 911 calls, the multiple deaths, and the reports of human trafficking, that the Encampment is a bed of criminal activity and is endangering residents and the community. The City has engaged in weeks of dialogue and outreach to the residents of the Encampment. Plaintiffs know that the City intends to close the encampment. Plaintiffs have had numerous opportunities to obtain storage for their personal items so that none are lost on the date of closure. When the City's employees come to actually perform the closure and are confronted with a collection of dirty, broken, and soiled objects that have been left behind, it is reasonable for the City to dispose of those items. When it is the experience of City employees conducting the closures that attempting to sort through the items left behind is extremely hazardous and has caused City employees to be stuck with used hypodermic needles and be exposed to feces and other hazardous unknown substances, and for encampments to be infested with vermin, it is objectively reasonable to not attempt to search the items that were left behind after many opportunities for residents to remove them, and to put the left-behind items in the trash. To any reasonable official these items have been abandoned. Seizing or searching abandoned property does not implicate the Fourth Amendment. *Abel v. U.S.*, 362 U.S. 217, 241 (1960); *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011).

But even if it were possible that some items left behind were not intended to be abandoned, the permanent seizure of such property is reasonable and necessary to accomplish the City's goal of safely clearing the Encampment. The City cannot feasibly sort through the giant pile of trash left at an encampment clearing, nor store that pile of vermin-infested trash to wait for individuals to potentially come and pick out a few items. If Plaintiffs left the items behind, knowing that the closure of the encampment was imminent, then that diminishes Plaintiffs' Fourth Amendment interest in those items. *See Hroch v. City of Omaha*, 4 F.3d 693, 697 (8th Cir. 1993) (where plaintiff "took no steps to claim or protect whatever personal property was in the buildings when he knew that demolition was imminent" this shows the plaintiff's "Fourth Amendment interest in these premises was negligible"). Plaintiffs' unlawful seizure claim is unlikely to succeed on the merits.

b)   *The Procedural Due Process Claim Fails*

Even if Plaintiffs fail to take advantage of the time given to remove their possessions, and intentionally leave behind important and irreplaceable items which they do not intend to abandon, the question central to Plaintiffs' Procedural Due Process claim is what process is due before the property is disposed of in such a situation. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). As an initial matter, where a plaintiff has received actual notice of the impending seizure of their property,

21

there is no due process violation. *Hroch,* 4 F.3d at 696.  But in all cases, "[d]ue process is a flexible concept, requiring only such procedural protections as the particular situation demands." *Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d 698, 702–03 (8th Cir. 2004) (quotation omitted).  Specifically, the Supreme Court directs that to determine what procedural protection a particular situation demands, courts should look to three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Courts have also sometimes found that any pre-deprivation process can be dispensed with due to emergency circumstances affecting the public health and welfare.  *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300–01 (1981).

Here, Plaintiffs admit that they have notice of the impending closure of the encampment, therefore, there has been no Procedural Due Process violation. *Hroch*, 4 F.3d 693, 696 (8th Cir. 1993)("Because Hroch had actual notice that the City intended to condemn all buildings on the premises, there was no procedural due process violation.") Plaintiffs' private interest is to maintain their unlawful

residence on City property because they believe it is beneficial to themselves and other Encampment residents.  The City's interest in removing them is due to the serious crimes occurring at this Encampment, as well as allowing the property itself be put to the beneficial use intended for the Indigenous community in Minneapolis.  As to the risk of erroneous deprivation, Plaintiffs are fully aware that if they stay until the day of the closure, they will likely not be able to take all their property with them.  Plaintiffs know the date of the closure.  Plaintiffs have available places to store their property.  It would not be reasonable to require additional processes post-deprivation as it would require the City to store large amount of contaminated trash because individuals did not heed the many warnings to take their belongings before the date of closure.  There has been sufficient process, under the circumstances, to satisfy due process and Plaintiffs' claim is not likely to succeed.

c) <em>The Substantive Due Process Claim Fails</em>

Under the state-created danger theory posited by Plaintiffs as the means that Mayor Frey has deprived them of substantive due process, the plaintiff must prove (1) that he was a member of a limited, precisely definable group; (2) that the state actor's conduct put him at a significant risk of serious, immediate, and proximate harm; (3) that the risk was obvious or known to the state actor; (4) that the state actor acted recklessly in conscious disregard of the risk; and (5) that in total, the

state actor's conduct shocks the conscience. *Montgomery v. City of Ames*, 749 F.3d 689, 694 (8th Cir. 2014), *citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). To shock the conscience, an official's action must either be motivated by an intent to harm or, where deliberation is practical, demonstrate deliberate indifference. *Montgomery* 749 F.3d at 695. Deliberate indifference requires both that the official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and that official actually draw the inference." *Id.* (quotation omitted).

Plaintiffs make claims that they will be placed at significant risk of serious, immediate and proximate harm by being evicted from public land, because they will have their possessions taken from them and will be exposed to the elements in a Minnesota winter, but they cannot succeed on the merits of this claim.  First, Mayor Frey is not requiring Plaintiffs or other residents to leave their tents, winter gear, or other possessions behind, that is their choice.  Second, Mayor Frey does not control the weather and therefore did not create this danger to Plaintiffs.  *Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/JFD), 2021 WL 4427215, at *10 (D. Minn. Sept. 27, 2021) (citing *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005))( "Plaintiffs do not allege a state-created danger because inclement weather and the COVID-19 pandemic, although dangerous, were not created by the state.")

Plaintiffs were already living outside, Mayor Frey is simply telling them that they cannot continue living outside at the Encampment.

Moreover, requiring persons who have, for weeks, been offered shelter and personal storage to vacate encampments that have become violent and public health hazards does not demonstrate deliberate indifference. Nor is it "a dangerous continuation of the legacy of genocidal displacement of Indigenous peoples." Rather, the removal of encampments has been performed by the City in a methodical manner to protect those in the encampments, city staff, and the public, and that is what has happened in this case. Plaintiffs are creating the danger themselves by not availing themselves of the storage options for any necessary gear in advance of the announced closure, or by not making other preparations to leave. Plaintiffs cannot succeed on the merits of their "state created danger" claim and therefore, a TRO should not issue.

*d)*     *The Eighth Amendment Claim Fails*

Plaintiffs also rely on two extra-jurisdictional decisions for the proposition that addressing the public-safety hazards created by the Encampment would violate their rights under the Eighth Amendment. But even that non-binding precedent does not support their case.

In *Martin v. City of Boise*, the Ninth Circuit held that under the Eighth Amendment, "criminal penalties may not be inflicted upon a person for being in

a condition he is powerless to change." 647 F. Supp. 3d 584, 617 (9th Cir. 2019) (quoting *Powell v. Tex.*, 392 U.S. 514, 567 (1968)). At issue was a city-wide *criminal* prohibition on sleeping outside on public property. *Id.* at 603. Immediately and dispositively, this distinguishes *Martin* from the case at hand, as no such similar ordinance or prohibition exists or is being enforced in Minneapolis. To the contrary, violation of M.C.O. 266.40, the Minneapolis Ordinance that prohibits residing in temporary structures, carries no criminal penalties.

Even if the Court were to disregard the fact that criminal penalties that were the crux of the *Martin* case are non-existent in the comparable Minneapolis ordinance, *Martin,* while indisputably nonbinding, is not even persuasive. The Ninth Circuit adopted the "narrow" holding that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public." *Id.* at 617. The other case cited by Plaintiffs, *Coalition on Homelessness v. City and County of San Francisco*, stands for a nearly identical proposition. 647 F. Supp. 3d 806 (N.D. Cal. Dec. 23, 2022).

Here, however, Plaintiffs have offered no evidence that shelter housing is unavailable for the residents of the Encampment. On the contrary, the City has repeatedly offered to connect them shelter, and Plaintiffs do not appear to contend otherwise. Instead, they argue that the shelters, while available, do not fit their

specific needs. (Glenn Decl.; Barnes Decl.) Even if this Court is to adopt *Martin*'s reasoning, it cannot be stretched so far as to require municipalities to not only provide shelter for each unhoused person within their jurisdictions, but to do so while also meeting vague standards of convenience specific to each person. Accordingly, even if the Court were to adopt the reasoning of *Martin* and *Coalition on Homelessness*, they would not support Plaintiffs' position.

Other courts have repeatedly distinguished *Martin* on grounds that are relevant here. For example, in *Frank v. City of St. Louis*, the Eastern District of Missouri held that clearing specific encampments, rather than widely prohibiting sleeping in public as was at issue in *Martin*, did not violate the Eighth Amendment. 458 F. Supp. 3d 1090, 1094 (E.D. Mo. 2020). The Court also noted that St. Louis had a legitimate public-health reason for vacating the camp. *Id.* The same is true here; the issue before the Court is not a city-wide prohibition on sleeping in public places, but rather the clearing of one specific encampment that has demonstrated itself to be a danger to public health and safety.

Other courts have distinguished *Martin* on the grounds that plaintiffs were not at risk of criminal prosecution merely for being unsheltered. *See O'Callaghan v. City of Portland*, No. 3:21-cv-812-AC, 2021 WL 2292344, at *4 (D. Or. June 4, 2021); *Miralle v. City of Oakland*, No. 18-cv-06823-HSG, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018); *see also Aitken v. Aberdeen*, 393 F. Supp. 3d 1075, 1082, (W.D. Wash.

2019) (collecting cases distinguishing *Martin*). In this case, Plaintiffs are not at risk of prosecution merely for being unsheltered, as was at issue in *Martin* and *Coalition on Homelessness*. They simply cannot occupy this dangerous Encampment any longer. Nor are they at risk of having property seized—the City has made free storage available to them. As the Northern District of California recognized, "*Martin* does not establish a constitutional right to occupy public property indefinitely at [plaintiffs'] option." *Miralle*, 2018 WL 6199929, at *2.

e)      The Conversion Claim Fails

To succeed on a conversion claim, Plaintiffs must show they have a lawful interest in property they have intentionally left behind at the encampment when it closes and that they were *unlawfully* deprived of that interest by Defendant. *Brown v. City of Bloomington*, No. CV 15-11(DSD/DTS), 2018 WL 3614125, at *11 (D. Minn. July 27, 2018) (citing *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003)).   Where property is seized by the government with lawful justification, such as a constitutionally valid seizure, then there is no conversion. *Id.* Therefore, as the seizures alleged to be forthcoming by Plaintiffs are lawful under the Fourth Amendment and Fourteenth Amendment as discussed *supra*, there will be no conversion.

    **2.**  **Plaintiff's official capacity claim against Mayor Frey is not likely to succeed.**

Suits against individuals in their official capacity are treated as a suit against the government entity. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).  "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016) (citing *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013)).  Plaintiffs allege an unconstitutional policy or custom, both are unlikely to succeed.

### i. Policy

A municipality is liable under Section 1983 only where its policy is the moving force behind a constitutional violation.  *Slaven v. Engstrom*, 848 F.Supp.2d 994, 1002 (D. Minn. 2012) (citing *Monell*, 436 U.S. at 694–95).  A "policy" is an official policy, a deliberate choice of a guiding principle, or procedure made by the municipal official who has final authority regarding such matters. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  It is only when the "execution of a government's policy . . . inflicts the injury" that a municipality may be held liable. *Monell*, 436 U.S. at 694.  Additionally, a "policy is not unconstitutional if it might allow for unconstitutional conduct in some instances[;] such a policy is unconstitutional only if it requires its officer to act in such an unconstitutional

manner." *Peroceski v. Tarr*, 2009 WL 3202463, at *12 (D. Minn. Sept. 30, 2009)(citations omitted).

While Plaintiffs generically allege that that Defendant's policies violate their property rights, they provide no specifics whatsoever about how and in what way those policies do so. In fact, Plaintiffs do not identify any official City policy regarding the closure of homeless encampments that they allege to be unconstitutional.   To the contrary, Plaintiffs ignore Defendant's fulsome and substantive Operational Guidance document entirely, which lays out detailed procedures for safe and dignified encampment closures that are facially constitutional. The complaint is void of any allegations that would support a claim that the Plaintiffs' purported constitutional violations are based on an official City policy, so any *Monell* claim based on such must be denied.

### ii.  Custom

"[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). For a municipality "to be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to

have the effect and force of law." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Monell*, 436 U.S. at 691).

Plaintiffs have failed to show that the City's custom in closing encampments has been any different than its fully constitutional policies.  The City gives ample notice, engages with individuals at the site, offers services, offers storage, visits multiple times, before finally clearing the site.  Notably, in Plaintiffs' Complaint, the only even vaguely specific allegations of purportedly unlawful conduct at encampment closures related to closures conducted by other entities. The Wall of Forgotten Natives closure was conducted by MNDot. The closure of Powderhorn Park was conducted by the Minneapolis Park and Recreation Board. (Pl. Compl. P. 25-26.) Plaintiff will not be able to establish that the City or Mayor Frey has a custom of closing encampments in a manner that violates individuals' constitutional rights. Plaintiffs' *Monell* claim, therefore, fails.

## II.   EVEN IF THE COURT GRANTS A TEMPORARY RESTRAINING ORDER THE TERMS SHOULD BE MODIFIED TO ALLOW POLICING OF THE ENCAMPMENT CONSISTENT WITH THE CONSTITUTION.

Plaintiffs' motion for a TRO should be denied in its entirety, but if the Court decides to enter a TRO, it is important that Plaintiffs' requested injunction be modified.  Plaintiffs' current injunctive language calls for prohibiting Mayor Frey or his agents from, "Entering individual residences at Camp Nenookaasi or otherwise searching the area outside of the common spaces without proper search

warrants or consent of the resident whose yurt or tent has been entered." Such an order would be extremely problematic for multiple reasons.

First, an order requiring a search warrant to enter a tent at the Encampment would drastically and improperly expand privacy rights of trespassing individuals. It is undisputed that Plaintiffs and others staying at the Encampment are unlawfully trespassing on City property. Courts have repeatedly held that a person who is trespassing on the property of another has no Fourth Amendment protection in the premises occupied wrongfully. *U.S. v. Hunyady,* 409 F.3d 297, 302 (6th Cir. 2005); *United States v. Sanchez*, 635 F.2d 47 (1980) Put differently, one cannot have an expectation of privacy if they are a trespasser. *U.S. v. Brown*, 484 F.Supp.2d 985 (D. Minn. 2007). Notably, this Court has already ruled that tent pitched unlawfully in an encampment on public land is not a home such that its owner has an objectively reasonable expectation of privacy. *Berry*, No. 20-CV-2189 (WMW/LIB), 2021 WL 4427215 (Sept. 27, 2021). Accordingly, any injunctive relief issued by the Court here requiring consent or a search warrant before entering the purported "premises" of a trespasser could potentially have wide ranging and unintended consequences.

Moreover, as a practical matter, requiring consent or a valid search warrant prior to entering an Encampment tent would give the trespassing individuals greater protections than other dwellings have under the constitution. It would

prohibit police officers from entering into a tent if there was probable cause and exigent circumstances, for example a suspect fleeing from the scene of a murder. It would also prohibit an officer or even emergency medical personnel from entering a tent if they believed that someone inside was in imminent danger. There is no basis for such a prohibition, and it is, like the entire Encampment, dangerous to both residents and the public. If an injunction is entered, Defendant requests it be modified to remove this restriction.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully request that the Court deny Plaintiffs' motions for a TRO.

Dated: January 3, 2024

KRISTYN M. ANDERSON
Minneapolis City Attorney
By
*/s/ Sharda Enslin*
Sharda Enslin (#0389370)
Heather P. Robertson (#0390470)
Kristin R. Sarff (#388003)
J. Haynes Hansen (#0399102)
Assistant City Attorneys
Office of the Minneapolis City Attorney
City Hall, Room 210
350 S. Fifth Street
Minneapolis, MN 55415
Telephone: 612-673-3949
sharda.enslin@minneapolismn.gov
heather.robertson@minneapolismn.gov
kristin.sarff@minneapolismn.gov
haynes.hansen@minneapolismn.gov

*Attorneys for Defendant Jacob Frey*