## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

|  |  |
|---|---|
| CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, and TRAVIS NELOMS, *on behalf of themselves and a class of similarly-situated individuals*, | Civil Action 0:24-cv-00001-ECT/TNL |
| Plaintiffs, | |
| vs. | |
| MAYOR JACOB FREY, *in his individual and official capacity*, | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | |

---

### INTRODUCTION

Camp Nenookaasi[1] is a community-based healing camp rooted in Native religious and cultural practices where people experiencing houselessness can find safety and community. Camp Nenookaasi draws upon harm reduction principles and is shaped by and for people who live with substance use disorder and/or other disabilities who have struggled to access or maintain more permanent housing.

---

[1] "Nenookaasi" means "hummingbird" in Ojibwe.

Over one hundred and eighty unhoused people, most of them Indigenous, have found refuge at Camp Nenookaasi since its formation in late August of 2023.

This group has been hugely successful, despite the three evictions and forced relocations of Camp Nenookaasi in the past month and a half. Camp Nenookaasi has provided the necessary interim stability for roughly one hundred now-former residents, who were previously living in day-to-day survival mode on the streets, to transition into more permanent housing. Many of the remaining residents are in various stages of the process of obtaining permanent housing, albeit with derailments and setbacks as a result of the evictions. Camp Nenookaasi remains the only viable option for people in need of a safe and dignified place to be while they navigate shelter and housing systems that are frequently inaccessible to those with substance use disorders or other disabilities.

Plaintiffs in this case are the current residents of Camp Nenookaasi, whose human and constitutional rights Defendant Mayor Jacob Frey continues to violate through his perpetration of these ongoing and repeated evictions. The apparent goal of the evictions is to prevent Plaintiffs from sleeping, building community, and ultimately existing anywhere within the City of Minneapolis. With each eviction, the residents of Nenookaasi are forced under threat of arrest to pack up what belongings they can and relocate. Banished from their homes, Plaintiffs rebuild as best they can and pray that the next eviction is not imminent.

Each eviction adds hardship and trauma. Residents lose important and valuable items, medicines, documents, and means of survival. Camp Nenookaasi was originally a hub for social services, housing outreach teams, harm reduction and substance use providers, and others looking for a reliable place to find and provide support to residents. As Defendant Frey has forced Nenookaasi to relocate repeatedly in the last month and a half, fewer and fewer providers and supportive services make the transition with the Plaintiffs to the new locations to continue working with them.

Despite the accumulating damage and setbacks from these three evictions, Nenookaasi residents continue to provide life-saving and life-changing support for each other. Each eviction brings with it another round of stressors, induces relapses and overdoses, and forces people to have to start from square one again. However, without Nenookaasi, Plaintiffs would be experiencing this every single day– starting from scratch every morning figuring out how to stay warm and safe during the day, where to sleep at night, how to safeguard valuables, and how to endure the smothering hopelessness that comes with living in survival mode. Nenookaasi provides the irreplaceable, indescribable benefit to Plaintiffs of a community dedicated to helping each other out of this cycle. And it is this community that above all else Defendant Frey seeks to destroy.

Defendant Frey is targeting his most vulnerable constituents, not only failing to create a livable city for them through his own policies, but egregiously using his power as Mayor to destroy what safety and stability they have managed to build for themselves. Plaintiffs beg the Court to intervene, to stop this cycle once and for all.

## JURISDICTION

1.      Plaintiffs' claims arise under 42 U.S.C. § 1983 and the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

2.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law, and pursuant to 28 U.S.C. § 1367 because this Court has supplemental jurisdiction over Plaintiffs' state claims, which arise out of a common nucleus of operative facts and constitute the same case or controversy as the federal claims at the heart of this Complaint.

## PARTIES

### *Representative Plaintiff Cheryl Sagataw*

3.      Cheryl Sagataw is a 32-year-old resident of Camp Nenookaasi and an enrolled member of the Potawatomi Nation.

4.      After attending high school and college in Potawotomi territory, Cheryl worked in the food and beverage industry for ten years. She is a domestic abuse survivor who became homeless when she lost her public housing in March 2023.

5.      As an unhoused person, Cheryl has experienced repeated evictions, sweeps, and displacements from the places where she has tried to set up shelter for herself. She was repeatedly kicked out of the area under Interstate 94 and eventually relocated to the reinstituted Wall of Forgotten Natives. When the Wall of Forgotten Natives was cleared for the second time, Cheryl was one of many Plaintiffs who came to Camp Nenookaasi in late August/early September of 2023.

6.      Cheryl has found stability, security, and great meaning living at Camp Nenookaasi. The Camp has created space for her to build community and trust, to learn and participate in ceremonies and other culturally important practices, to grieve losses and connect to her spirituality, to develop life skills, to access housing and treatment resources, to stay safe from her abuser, and to plan for a future in ways she never before thought possible.

7.      Cheryl has endured three evictions of Camp Nenookaasi already. The prospect of never-ending displacement threatens all of the hard-won stability she and her fellow residents of Nenookaasi have built.

### *Representative Plaintiff DeAnthony Barnes*

8.      DeAnthony Barnes is a 35-year-old resident of Camp Nenookaasi.

9.     He has experienced housing instability since 2011 and been a part of many unhoused communities.

10.    For the past approximately two and a half months, DeAnthony has been living at Camp Nenookaasi. He describes Camp Nenookaasi as "unlike any other camp I have ever been in," notable for its "support and resources" and "coordination of care."  In fact, DeAnthony is receiving more resources at Camp Nenookaasi than he ever received when living at Avivo, and having more success as a result.

11.    At Nenookaasi, DeAnthony is making efforts towards his sobriety and getting into treatment, and supporting his girlfriend in doing likewise. At Nenookaasi, DeAnthony observes, people have simple but necessary things—like access to heat—which frees up mental capacity for people to "advance their thought process" beyond survival. Being warm and safe empowers DeAnthony to consider working towards permanent housing and sobriety.

12.    DeAnthony also describes how much it means to know that there are people who still care about him and how Camp Nenookaasi builds trust. The Camp is a place of unity, where people from significantly different backgrounds are able to live as family. It's also a place of historical and spiritual significance, where Indigenous ceremonies take place and the history of colonization and the pain and devastation experienced by Indigenous ancestors is brought to the fore.

13.     Like most people at Camp Nenookaasi, DeAnthony has experienced numerous prior evictions in which he's lost precious mementos, including pictures of his children; valuable technological equipment containing music he has written, produced, and recorded; critical documents such as birth certificates and other forms of identification; and necessities for survival including a generator, clothing, and his tent.

14.     DeAnthony has experienced three evictions of Camp Nenookaasi. With each eviction, DeAnthony loses more and more of his possessions, and his resolve. He fears for his safety, his girlfriend's safety, and the well-being of the other residents who are put in danger by these ongoing evictions. The message he hears from the evictions is that he is not allowed to be or live in his own hometown.

### *Representative Plaintiff Roberta Strong*

15.     Representative Plaintiff Roberta Strong is a 33-year-old Indigenous resident of Camp Nenookaasi. Roberta is disabled by a traumatic brain injury inflicted upon her by an ex boyfriend.

16.     Roberta was living with her grandmother and several other family members at Little Earth, but became homeless when her grandmother died in 2018. Roberta lived on the streets, often staying at other encampments, enduring frequent evictions and displacements. After Roberta was evicted from the Wall of Forgotten

Natives in August of 2023, she found Nenookaasi and has stayed with this encampment since then, and moved with them through three evictions.

17.     The evictions put Roberta into a panic. Because of evictions, Roberta has lost most of her belongings–clothes, medicine, pictures of her family, her son's baby feet prints, and multiple forms of identification.

18.     Roberta has not been able to obtain housing and shelters are not an option for her, even if a bed were to be available. At Nenookaasi, however, she has found stability, and community, unlike anywhere since she's been unhoused. Roberta's two cousins also live at Nenookaasi, so she is able to look out for them, and to accept care from others as well.

19.     Roberta has no form of identification. She struggles with getting her basic needs met and with the ongoing impacts of her traumatic brain injury. Given the well-documented inadequacy and unavailability of temporary shelter beds, which are more accurately described as mats on the floor, Nenookaasi is the only safe place for her to be.

20.     Nenookaasi is Roberta's lifeline, not only for herself but also for the family members she looks after who live here with her.

### *Representative Plaintiff Travis Neloms*

21.     Travis Neloms is a 34-year-old resident of Nenookaasi.

22.     He is Native Puerto Rican and African American, and lives with several diagnosed mental health conditions.

23.     For much of his life, Travis has lived with precarious, unstable, or nonexistent housing. Travis has been living in proximity to many of the same people who now reside at Nenookaasi for the past five years at various encampments and tent sites around Minneapolis, pushed from one location to another, enduring eviction after eviction, and occasionally attempting to find housing or staying at a shelter.

24.     Travis's experience in shelters has been horrible. He was often unable to obtain a spot, given shelters' limited capacity. Even when he did manage to find a spot, he found shelters to be unsafe and unhygienic, with people stealing each others' belongings and with sleeping arrangements that lacked any privacy or dignity. On multiple occasions he became ill because of staying in a shelter. And the next morning he would face again the often impossible challenges of finding somewhere to be during the day and the following night, and where to store his belongings in the meantime.

25.     For the past several months, Travis has been living at Nenookaasi. In his words, "I didn't find Nenookaasi, Nenookaasi found me." Being at Nenookaasi has been a different experience in care, stability, safety, and hope than Travis has experienced anywhere else.

26.     For Travis, Nenookaasi is a place where a group of people who are all struggling still find the energy to support each other, from a place of shared understanding, and as a result people are inspired to do better for themselves and for the group.

27.     Nenookaasi is also much safer, more peaceful, less violent for Travis than his experience being out on the street or in a shelter. When Travis was living on the street he had a hard time storing or protecting his belongings, but at Nenookaasi he is able to retain at least the basic necessities, including life-saving items such as his anti-seizure medications, without having to worry about whether he will still have access to them when he needs them–at least until another eviction happens.

28.     In past evictions, Travis has lost thousands of dollars worth of clothes, bicycles, tents, blankets, medications, and other staples. He has lost important documents such as court paperwork and various forms of identification. Replacing identity documents has been an almost impossible task, given that replacing one form of identification requires showing proof of another, and during evictions Travis lost his drivers license, social security card, and his birth certificate.

29.     He is attempting to rebuild his supply of necessities, but fears that another eviction is imminent and the rug will be pulled entirely out from under him time and time again.

*Represented Class Plaintiffs*

30.     Plaintiffs in the Represented Class are the other unhoused people who have found a temporary home at Camp Nenookaasi.

31.     Upon information and belief, Camp Nenookaasi residents have physical and/or mental disabilities, disorders, and/or conditions, including substance use disorders.

32.     Upon information and belief, Camp Nenookaasi residents have suffered prior evictions in Minneapolis, including the three prior evictions of Camp Nenookaasi since its formation in August of 2023.

33.     While each of these Plaintiffs have their own unique story—who they are, where they come from, and what particular struggles have led them to be otherwise unhoused—all of the Represented Class Plaintiffs now find themselves in the same situation, having endured three evictions in a month's time and facing the prospect of untold more.

34.     With each eviction, Plaintiffs' shelters are bulldozed, their belongings seized and destroyed, their beds thrown in a dumpster, their ceremonial fire and other sacred sites desecrated, their community scattered under threat of arrest.

35.     But Plaintiffs rebuild following every eviction, albeit bringing fewer belongings and new traumas to each new site. Plaintiffs rebuild because Camp Nenookaasi is irreplaceable. By providing food, warmth, shelter, community,

harm-reduction and cultural healing, Camp Nenookaasi serves as a crucial stepping stone to housing and sobriety, a place to find community and safety, and a means of survival when residents have nowhere else to simply exist.

36.     All of the Represented Class Plaintiffs and their Representatives seek to enjoin the practice of ongoing evictions, to stop the arbitrary and hostile relocation of Camp Nenookaasi from place to place around Minneapolis. Plaintiffs ask this Court to preserve the opportunities for growth and transformation that they are co-creating, together and with their housed neighbors, at Camp Nenookaasi.

### *Defendant Mayor Jacob Frey*

37.     Defendant Jacob Frey is sued in his official and individual capacity.  In his official capacity, Defendant Frey is the Mayor of the City of Minneapolis, a municipality incorporated in the State of Minnesota. In his personal capacity, Defendant Frey is a resident of Minneapolis. As Mayor, Defendant Frey is obligated to uphold the laws and ordinances of the State and City, and has exclusive control and authority over the Minneapolis Police Department.

38.     Defendant Frey campaigned for mayoral office on a promise to "End Homelessness." Instead of making good on that promise by engaging with the community in meaningful and realistic ways, Defendant Frey has implemented policies and initiatives to drastically increase sweeps and evictions of houseless encampments, using his authority over the Minneapolis Police Department to

inhumanely displace people, destroy their homes, and continue the cycles of violence and trauma faced by the City's most vulnerable residents.

## CLASS QUALIFICATIONS FOR CERTIFICATION

39.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), named Plaintiffs Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms bring this class action on their own behalves and on behalf of all other similarly situated residents of Camp Nenookaasi. This case meets the prerequisites for class formation and for the type of action brought.

### *Class Formation*

40.    The following prerequisites allow one or more members of a class to sue as representative parties on behalf of all members: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. PRO. 23(a).  This case meets these prerequisites for class certification.

41.    *Numerosity.* The class is so numerous that joinder of all members is impracticable. The practicality of joinder is evaluated on a case-by-case basis and, while no specific numerical threshold exists in law, factors to be considered include "the size of the class, ease of identifying its members and determining their

addresses, the facility of making service on them if joined, their geographic

dispersion and whether the size of the individual claims is so small as to inhibit

individuals from separately pursuing their own claim." *Glenn v. Daddy Rocks*, 203

F.R.D. 425, 429 (8th Cir. 2001).  This case involves well-over one hundred

residents of Camp Nenookaasi, all of whom have lived at the Camp because they

are otherwise unhoused and without any other address.  While some of

Nenookaasi's former residents have found temporary or even long-term housing,

many remain otherwise unhoused, have faced numerous evictions, and could be

evicted again at a moment's notice. Without reliable mailing addresses, serving all

Plaintiffs individually would be impossible. When evictions occur, Plaintiffs and

others similarly situated geographically disperse and are often difficult to locate

again. Plaintiffs also are unlikely to be able to pursue claims as individuals because

they are indigent, extremely under-resourced, cannot afford to hire private counsel,

and lack the physical or technological access to a courtroom.

    42.   *Commonality.* There are questions of law or fact common to the class.

Each member of the class has the same legal claims, as set forth below.  The

Plaintiff class consists of all residents of Camp Nenookaasi who are otherwise

unhoused.  For each of them individually and as a class, Defendant Frey violates

the same Constitutional and statutory rights in a functionally identical manner, by

directing his law enforcement agents to destroy Plaintiffs' homes, including their

property, privacy, and shelter, their chance at attaining sobriety and/or long-term housing, and their means of survival.

43.     *Typicality.* The claims of the representative party are typical of the claims of the class. "A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *General Telephone Co. of Southwest vs. Falcon*, 457 U.S. 147, 156 (1982) (citing *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403).  Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms, like each of the class Plaintiffs, live at Camp Nenookaasi and face the stress, trauma, and violence of the repeated evictions.  Their interests are identical to those of the class members—namely, for the evictions to be enjoined and the residents permitted to remain and benefit from Camp Nenookaasi, rather than endure yet another forced displacement.

44.     *Adequacy.* The representative Plaintiff will fairly and adequately protect the interests of the class.  Because Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms are residents of Camp Nenookaasi, they have the same goals and interests as the other residents—to halt the Mayor's eviction. There is no reason why they cannot fairly and adequately protect the interests of the class. The Eighth Circuit has established that "each representative's interests must be sufficiently similar to those of the class that it is unlikely that their goals

and viewpoints will diverge." *Turtle Island Foods, SPC v. Richardson*, 425 F. Supp. 3d 1131 (8th Cir. 2019).  Like in *Turtle Island Foods*, the representatives of this class have similar interests to those of the class in that they are all looking to stop Defendant Frey from destroying their communal home. Because all members of the class, including Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms as representatives, seek first and foremost to have their shelter, stability, and community preserved, it is unlikely that these goals and viewpoints will diverge.

### *Type of Action*

A class action may be brought when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. PRO. 23(b)(2). Here, the requested relief is for Defendant to be enjoined from evicting Plaintiffs when they have nowhere else to live, and from seizing and destroying their property. That relief, the cessation of evictions, would benefit the whole class of residents at Camp Nenookaasi.

### FACTUAL BACKGROUND

#### *The Repeated Forced Relocation of Camp Nenookaasi by Defendant Frey Continues a Centuries-Old Legacy of Displacement of Indigenous Peoples.*

45.    Camp Nenookaasi is Indigenous-led and its residents are predominantly people of Indigenous ancestry and/or enrolled Native American

tribal members. Defendant Frey's proposed eviction of Camp Nenookaasi is simply the latest iteration in a long history of colonizing governments forcibly displacing Indigenous peoples for political, personal, and/or financial gain.

46.     Systemic and genocidal[2] displacement has typified the relationship between the colonizing governments of Europe, the U.S., and its territorial and subsequent state governments, and Indigenous peoples from the beginning.

47.     The State of Minnesota has been no exception.  It portrayed the original occupants of this land as disposable and subhuman, at best inconveniences that posed barriers to putting the land to "better" (i.e., more profitable) uses.  As a report read at a 1901 meeting of Governor Ramsey's Executive Council described:

> The object of [the 1841 Treaty of Governor Doty] was not to open the country for settlement, but primarily to provide a

---

[2] Use of the word "genocidal" to reflect the relationship between settler-colonizers and Indigenous peoples is intentional and not hyperbolic. The Holocaust Museum in Houston gives a cursory overview of this genocide as follows:

> When European settlers arrived in the Americas, historians estimate there were over 10 million Native Americans living there.  By 1900, their estimated population was under 300,000.  Native Americans were subjected to many different forms of violence, all with the intention of destroying the community.  In the late 1800s, blankets from smallpox patients were distributed to Native Americans in order to spread disease.  There were several wars, and violence was encouraged; for example, European settlers were paid for each Penobscot person they killed.  In the 19th century, 4,000 Cherokee people died on the Trail of Tears, a forced march from the southern U.S. to Oklahoma.  In the 20th century, civil rights violations were common, and discrimination continues to this day.

*Genocide of Indigenous Peoples*, HOLOCAUST MUSEUM OF HOUSTON, https://hmh.org/library/research/genocide-of-indigenous-peoples-guide/ (last visited Apr. 24, 2022).

location for the Winnebago Indians, who, since the cession of their lands in 1837, had been on the government's hands under promise of a permanent home; and, secondarily, to furnish reservations for a number of other tribes similarly situated. In short, it was designed to create of the Sioux country a second Indian Territory, into which to dump all the odds and ends of Indian tribes still left east of the Mississippi. Fortunately, however, this treaty failed of confirmation by the Senate, and thus this vast and fertile territory was saved to a grander destiny.

Thomas Hughes, Report on the 1841 Treaty of Governor Doty, Executive Council Meeting (Sept. 9, 1901), *available at* https://tile.loc.gov/storage-services/service/gdc/lhbum/0866e/0866e _0125_0154.pdf.

48.    Minnesota's "grander destiny" meant that Indigenous people would be, once again, forcibly or duplicitously relocated so that the land could be cleared for colonists' settlement. *Id*.

49.    Camp Nenookaasi sits on lands taken from the Dakota peoples through deception, bad faith, duress, and violence more than a century ago.  *See generally* Minnesota Historical Society, "Minnesota Treaties," The U.S.-Dakota War of 1862, https://www.usdakotawar.org/history/treaties/minnesota-treaties.

50.    Nenookaasi exists in defiance of these ongoing attempts to rid what is now Minneapolis of its original inhabitants, using decolonial and anticolonial values and practices to resist the Indigenous displacement that persists today.

***Defendant Frey Pursues an "End to Homelessness" Through Cruel, Repeated Displacements of Unhoused Minneapolis Residents with Nowhere Else to Live.***

51.    Under the guise of his campaign promise to "end homelessness in five years," Defendant Frey has worked to keep unhoused people destabilized and on the move.

52.    Defendant Frey has overseen the routine dismantling of encampments since he took office in 2018, with significant brutality and negligible support for evicted residents aside from taking credit for what other organizations, community members, and residents themselves have managed to pull together.

53.    When the Wall of Forgotten Natives was first cleared in 2018, newly elected Defendant Frey and the police he commands played a muted role: instead, local nonprofits, Red Lake Nation, and others in city government spent countless hours and millions of dollars to transition the 175 residents from the encampment to temporary shelter. Deena Winter, *Minnesota Reformer*, "Powderhorn Park residents win reprieve from eviction, for now" July 2, 2020 (last viewed Dec. 17, 2023) https://minnesotareformer.com/2020/07/02/powderhorn-park-residents-win-reprieve-from-eviction-for-now/.

54.    When the encampment at Powderhorn Park formed in spring of 2020, Defendant Frey became a vocal critic of the encampment, although he simultaneously recognized there were no other places where all of the encampments residents could live.  *Id*. and @WedgeLIVE, Twitter (July 2, 2020 3:55 PM) https://twitter.com/WedgeLIVE/status/1278779243116130304?s=20

("[T]he city doesn't have the resources or ability to meet the significant and immediate need [of the Powderhorn Park residents]."). In fact, Defendant Frey tacitly acknowledged that the encampment size was growing because so many people were coming to access services. *Id*.

55.     As Defendant Frey himself admitted, the reason unhoused people moved to the encampment was because residents there were better able to access treatment and housing services. *Id*.   Nonetheless, he continued to oppose the encampment, suggesting that he would prefer that the symptoms of poverty and houselessness—including overdoses and illness, heatstroke and freezing to death—occur at higher rates in hidden and isolated ways, rather than have people gather to access the support to improve their lives that is otherwise unavailable to them without a centralized community like the Powderhorn Park encampment or Nenookaasi.

56.     By August of 2020, Defendant Frey got his way. Over widespread public opposition, he ordered the Powderhorn Park encampment to be evicted and destroyed. Niko Georgiades, *Unicorn Riot*, "Minneapolis Police Sweep West Powderhorn Encampment, Pepper Spray Defenders" August 15, 2020 (last viewed Dec. 17, 2023) https://unicornriot.ninja/2020/minneapolis-police-sweep-west-powderhorn-encampment-pepper-spray-defenders/. Mayor Frey first threatened the encampment

residents with an eviction notice, and then threatened residents with armed police officers, chemical irritants, and drawn weapons. *Id*.  At his behest, Minneapolis police officers physically pulled people out of their tents, arrested them, bulldozed their belongings, and threw everything into dumpsters. *Id*.

57.    The destruction of these two large encampments are just the tip of the iceberg.  Plaintiffs have been forcibly displaced so many times that most have lost count. For Minneapolis' unhoused population, these evictions are not only frequent, but disastrous when considered in isolation as well as cumulatively.

58.    When encampments are demolished, former residents do not simply disappear.  They are uprooted from their homes, forced to find a new place to sleep, a new shelter against the elements, new bedding to keep them warm, because their only protection against freezing winter nights is now crumpled in a dumpster.

59.    Some relapse or overdose, turning to substance use to numb the stress, pain, and hopelessness.  Residents lose critical identification, paperwork, and cell phones, lose their connection to outreach workers and resources, lose their spot on waist lists for housing and treatment, and miss appointments and court dates.  They are stolen and sex-trafficked, go missing, and are murdered. When residents lose the stability of an encampment, they lose the relationships with social workers, substance use counselors, lawyers, and other members of the community who had been depending on the encampment to be able to locate their clients. This reverses

progress made towards attaining sobriety, applying for jobs, clearing arrest warrants, and obtaining permanent housing.

60.    Defendant Frey campaigned on a promise to "end homelessness." But in actuality,  his promise appears to have been more that he would hide homelessness, even at the expense of prolonging and exacerbating it by repeatedly seeking to eradicate the hugely successful bridge to long-term and permanent housing that is Camp Nenookaasi.

### *Nenookaasi is a Necessary Stopgap due to the Housing Crisis and Lack of Available and Humane Alternative Places for Unhoused People to Live*

61.    As of October 2023, the median monthly rent in Minneapolis was $1,127 for a one bedroom unit and $1,500 for a two bedroom. HousingLink, *Minneapolis Rental Housing Brief* (October 2023). Housing providers screen applicants and require them to have an income of 2.5 times the rent, *id.*, but since at least some manner of housing is functionally a prerequisite to employment it becomes almost impossible to break out of the cycle of homelessness without external support. Still, Mayor Frey is committed to blocking rent control initiatives.

62.    Some local housing resources exist, but accessing public housing can be a long process as outreach workers must meet with clients and others repeatedly over time to gather documents and paperwork, resolve warrants, etc. People must have a consistent meeting place to regularly connect with outreach workers towards their housing goals.

63.     Shelters simply do not provide this kind of stability, nor are they a realistic or viable option for many unhoused people.  Shelters are often full or inaccessible, leaving unhoused people with few sustainable alternatives to making a shelter for themselves.  Shelter resources are highly inaccessible, particularly outside of the Hennepin Shelter Hotline's hours. Shelters simply do not have enough beds, or even mats on the floor, to provide a space for everyone who might need a place to sleep.

64.     The Mayor claimed that 90 new shelter beds would be made available January 1 and 2, 2024, in anticipation of the January 4, 2024 eviction of Nenookaasi. In practice, this additional capacity did not materialize, as residents, supporters, and City Council members have repeatedly noted. To this day, there are not enough shelter beds in comparison to the number of unhoused people in this City, let alone the residents of Nenookaasi.

65.     Even if a shelter bed were to be available for each resident, shelters are unacceptable conditions to expect or require a person to be subjected to. Shelters have rules that many people, for a variety of reasons, simply cannot comply with, or are accused of violating with little to no recourse or opportunity for due process to challenge the validity of such accusations. People are not allowed to stay with their loved ones or pets. Shelters lack privacy, and often offer people nothing more

than sleeping on mats packed together on the floor. People get sick from staying at shelters, and risk their belongings being stolen.

66.     Shelters are fundamentally unstable. Each morning people are kicked out and face another day of wondering if they will manage to procure a spot at a shelter the next night, and what they will do if, as is likely given the fact that spots fill up sometimes less than an hour after the hotline opens, they cannot obtain one. Shelters provide people with no means of keeping belongings safe, nowhere to go during the day, and above all else no sense of community or the opportunity to build the kinds of life-saving relationships that Nenookaasi engenders.

67.     At camp, unlike a shelter where every day you start from zero, people can pick their heads up and think about the future. This is what gets unhoused encampment residents out of the cycle—this interim stability, care, relationships and connections with other people.

68.     At Camp Nenookaasi, residents are providing for themselves and each other to create a stable stepping-stone home that bypasses the significant challenges, dangers, and uncertainties that plague the existing shelter system. Plaintiffs are working hard to create an environment that allows them not only to survive being homeless, but also to transition out of homelessness.

69.     Unfortunately, if history is allowed to repeat itself, Defendant Frey will evict and destroy Camp Nenookaasi and Plaintiffs' hopes for the better future they were building together.

### Defendant Frey, Over Objections from City Council and Other Government Officials, Has Evicted Camp Nenookaasi Three Times and Counting.

70.     Eviction announcements, delays, and subsequent actions reflect the tension between Defendant Frey and the significant block of Minneapolis officials who recognize that, until the City provides other meaningful solutions, Camp Nenookaasi is filling lifesaving gaps for the unhoused community during a Declared Public Health Emergency of Unsheltered Homelessness. *See*, e.g., Minneapolis Public Health & Safety Committee Meeting, Jan. 31, 2024, available at https://www.youtube.com/live/IgD6sB6GkXI?feature.

71.     With tireless advocacy from organizers, community members, and residents, City Council has recognized the humanitarian and civil rights concerns with impending and ongoing evictions. Council members have called for a halt to the evictions, recognizing the benefits to neighborhoods more broadly, as well as the residents themselves, of supporting Nenookaasi as an interim solution to the housing crisis while working together to devise and implement more permanent remedies.

72.     Prior to the evictions, residents and organizers held a meeting with City Council and several members of the Minneapolis government. The only invited government official who chose not to attend was Defendant Frey.

73.     This refusal to engage, coupled with his continued opposition to building solutions that address everyone's concerns, and his orchestration of three evictions in one month at each subsequent Nenookaasi location, and the increasing brutality of those evictions demonstrates Defendant Frey's knowing disregard for the health, safety, and wellbeing of Indigenous and unhoused people.

74.     At these evictions, Defendant purported to have reasonable policies and procedures in place during evictions to safeguard Plaintiffs' constitutional and statutory rights. In practice, regardless of what policies he may point to on the City's website, Defendant has taken no such pains when repeatedly evicting Camp Nenookaasi residents.

75.     On December 29, a notice was posted announcing that the eviction would take place on January 4, 2024. For the next two evictions, no such prior notice of an impending eviction date was given. Residents only became aware that they were being evicted when they woke in the morning to the sound of drones flying overhead, and saw City and law enforcement vehicles staging on the streets around them.

76.     During the evictions, law enforcement marked Nenookaasi off with crime scene tape. On the January 30th and February 1st evictions, the crime scene tape and police barricades encompassed a multi-block radius around Nenookaasi, not just the camp's perimeter. Law enforcement allowed friends, family, and social service agencies to enter the camp and assist the residents during the January 4th eviction, but became progressively more restrictive at the second and third evictions, arbitrarily delaying, impeding, obstructing, or at times outright refusing access to a variety of parties including press, family and community members, attorneys, social service agencies, and even residents themselves.

77.     Residents themselves were made to understand that they would be arrested if they delayed in packing up and leaving, which threats forced them to rush to gather their belongings in an atmosphere of panic and fear.

78.     Despite Defendant's public statements and claims to the contrary, storage opportunities have been limited, offered in only specific instances to particular residents who happened to present at the time, and often in circumstances that were untrustworthy, impractical, or entirely unusable for those who were offered such storage opportunities. Plaintiffs either had no idea that storage was available to them, or had no way of accessing or utilizing the storage facility all the way downtown, or knew that such storage was not a viable option

due to the size limits and other restrictions, as well as the practical difficulties in accessing their stored items that otherwise might be needed on a daily basis.

79.     Some Plaintiffs left Nenookaasi on eviction day before any service or support agencies arrived, because they feared that they would be arrested if they waited. The City did not even notify most of the service agencies of the surprise evictions on January 30 and February 1, some of whom later arrived only because service providers noticed the barricades on their morning commutes or because residents placed calls for help.

80.     After the evictions, city workers haul and dump rubble on the vacated lots to render old sites unusable and inaccessible to Plaintiffs. The Mayor's office espouses a goal of deterring encampments. The intentional and arbitrary destruction of the City's own (stolen) land reveals the Mayor's strategy: to ensure that Nenookaasi, like its residents, has fewer and fewer places it is allowed to be.

81.     As the evictions have gone on, many Plaintiffs suffer relapses or overdoses because of the stress that evictions bring on. Losing belongings and connections to supporters causes other setbacks and increased challenges in attempting to attain sobriety, housing, employment, and other forms of permanent stability. People go missing altogether after the evictions, or lose their family.

82.     Without the injunctive relief Plaintiffs now seek, they will be stuck in this pointless cycle until they die or until they run out of places to relocate to.

## CAUSES OF ACTION

### COUNT I:

**Unlawful Seizure & Destruction of Plaintiffs' Property in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution**

83.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

84.    The Fourth Amendment to the United States Constitution and its identically worded counterpart, Article I Section 10 of the Minnesota Constitution, afford all civilians in the United States the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

85.    This Constitutional Right protects Plaintiffs' homes and belongings at Camp Nenookaasi.  *See, e.g.*, *State v. Pippin*, 200 Wn. App. 826 (Wash. Ct. App. 2017) (finding that an unhoused person had privacy interests in their tent). "The Fourth Amendment protects homeless individuals from seizure and summary destruction of their unabandoned, but temporarily unattended, personal property." *Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp. 3d 806, 837 (9th Cir. 2023) (citing *Lavan v. City of Los Angeles*, 693 F.3d 1022).

86.    The repeated seizures and destruction of Plaintiffs' property during the evictions of Camp Nenookaasi constitutes a meaningful interference with Plaintiffs' possessory interests in their property, and thus a "seizure." *Id.*

87.     Defendant Frey's repeated seizure and destruction of Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances is unreasonable and contrary to the Fourth Amendment to the U.S. Constitution, as applied to State governments and their subdivisions pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution.

88.     Defendant Frey's policies, practices, and custom of directing his law enforcement officers to seize and destroy Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances is unreasonable and contrary to the Fourth Amendment to the U.S. Constitution, as applied to State governments and their subdivisions pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution.

## COUNT II:

**Procedural Due Process Violations Under the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution**

89.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

90.     Plaintiffs have a constitutionally protected property interest in their personal belongings and effects.

91.     Defendant Frey's repeated seizure and destruction of Plaintiffs' property deprives them of this protected interest in their personal belongings and effects.

92.     Defendant Frey's repeated seizure and destruction of Plaintiffs' property without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim their property violates Plaintiffs' rights to Due Process of law protected by the Fourteenth Amendment to the U.S. Constitution, through 42 U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

93.     Defendant Frey's policy, pattern, and custom of seizing and destroying Plaintiffs' property without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim their property violates Plaintiffs' rights to Due Process of law protected by the Fourteenth Amendment to the U.S. Constitution, through 42 U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

**COUNT III:**

**State-Created Danger in Violation of the Right to Substantive Due Process Under the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution**

94.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

95.     Plaintiffs are members of a limited, precisely definable group.

96.     Defendant Frey's prior and continued impending use of bulldozers, armed law enforcement officers, and chemical irritants when forcefully ejecting Plaintiffs from their only shelters, and without adequate notice, places Plaintiffs at significant risk of serious, immediate, and proximate harm that Plaintiffs would not otherwise have faced without Defendant's actions.

97.     The risk to Plaintiffs created by Defendant Frey's conduct was and remains obvious and known to him.

98.     Defendant Frey's prior and impending actions in repeatedly evicting and destroying Camp Nenookaasi are done recklessly and in conscious disregard of the risks they have previously created and continue to create because of the forceful manner in which his law enforcement officers have ejected and plan to continue ejecting Plaintiffs from their shelters, destroying their vital personal property in the process.

99.     Defendant Frey's conduct, as outlined in this Complaint, shocks the conscience.

100.   As a direct and proximate consequence of Defendant Frey's above-described policy, pattern, and custom, Plaintiffs were and continue to be subjected to danger of Defendant's own making in violation of the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983, and the Minnesota Constitution.

## COUNT IV:

### Violation of the Eighth Amendment to the US Constitution

101.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

102.   The Eighth Amendment to the U.S. Constitution, as applied to the States and their subdivisions through the Fourteenth Amendment, protects civilians from "cruel and unusual punishment."

103.   "The Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Coalition on Homelessness*, 647 F.Supp. 3d at 832 (quoting *Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019)). This includes "criminaliz[ing] indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id*. at 833.

104.   Plaintiffs do not have reasonable alternatives to living at Camp Nenookaasi.

105.   By repeatedly evicting Plaintiffs, regardless of where Camp Nenookaasi is located, and under penalty of arrest, Defendant Frey and his law enforcement officers impose or threaten to impose criminal penalties and other harm and punishment for conduct which Plaintiffs cannot avoid.

106.   The manner in which these evictions are carried out—by armed law enforcement officers under threat of arrest, with residents often pulled out of their

tents forcibly, arrested, and even tear-gassed or sprayed with chemical irritants, their belongings bulldozed, destroyed, and trashed—amounts to a penalty, harm, and/or punishment that Defendant Frey and his law enforcement officers impose or threaten to impose for conduct which Plaintiffs cannot avoid.

## COUNT V:

### Conversion in Violation of Minnesota Common Law

107.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

108.   Plaintiffs are in possession of their personal property and Defendant Frey has repeatedly directed his agents to intentionally seize and destroy Plaintiffs' property without notice, an opportunity to retrieve it, or adequate compensation, depriving Plaintiffs of their possessory interest in the property.

109.   Upon information and belief, Defendant Frey intends to continue directing his agents to intentionally seize and destroy Plaintiffs' property without notice, an opportunity to retrieve it, or adequate compensation, depriving Plaintiffs of their possessory interest in the property.

110.   Defendant Frey has no lawful authority to seize or order others to seize and destroy Plaintiffs' property in this manner. As a direct and proximate consequence of Defendant Frey's acts in authorizing these evictions, Plaintiffs will suffer the loss of their personal property.

## COUNT VI:

### Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

111.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

112.   Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, prohibits discrimination against people with disabilities by state and local governments and their programs.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

113.   As a public entity, Defendant Frey is required to comply with Title II of the ADA, and the actions of Defendant alleged in this Complaint, in his official and individual capacity, relate to services, programs, and activities under Title II.

114.   Discrimination under Title II of the ADA includes administration of programs in a manner that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130(f).

115.   Plaintiffs, the residents of Camp Nenookaasi, are individuals with physical and/or mental disabilities, disorders, and/or conditions including

substance use disorders, and thus are "qualified persons with disabilities" as defined under the ADA.

116.    Defendant Frey's repeated evictions of Camp Nenookaasi residents disparately impact people with disabilities, in violation of the ADA—the people whom Defendant Frey has forcibly removed from their homes and deprived of their personal property under threat of incarceration, and whom Defendant Frey continues to threaten with such treatment, are disproportionately (and exclusively) people with disabilities. The ADA prohibits such discrimination.

117.    Even if there were sufficient shelter beds available—which is not the case—placement in large, crowded shelters where people are forced to sleep on mats on the ground and permitted to stay only upon compliance with rigid rules are unsuitable for people with disabilities because of their disability-related impairments.

118.    Repeated evictions of Camp Nenookaasi residents without first identifying and offering appropriate alternative shelter that meets the disability-related needs of residents does not serve any compelling governmental interest of Defendant Frey.

119.    Furthermore, Defendant Frey's duty not to discriminate against people with disabilities under Title II of the ADA includes a duty to provide reasonable modifications in otherwise neutral policies or practices "when the modifications

are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

120.   Plaintiffs have repeatedly asked Defendant Frey to postpone the repeated evictions of Camp Nenookaasi until appropriate alternative shelter—shelter that would meet Plaintiffs' disability related needs—is made available.  Existing shelter beds are neither sufficient in number to house all Nenookaasi residents, nor are they at all appropriate to meet Plaintiffs' needs related to their physical and/or mental disabilities, disorders, and/or conditions including substance use disorders.

121.   In response to these repeated requests—from Plaintiffs, their supporters, City councilmembers, and undersigned counsel—Defendant Frey not only proceeded with the eviction of Camp Nenookaasi on January 4, 2024, but has repeated the evictions again and again no matter where residents have sought refuge.

122.   A temporary halt to the ongoing evictions of Camp Nenookaasi residents until there is a realistic and appropriate alternative housing option for residents would not impose a fundamental alteration in Defendant Frey's programs. To the contrary, it would serve his purported goal to "end homelessness."

123.   By refusing such reasonable accommodations, Defendant Frey has violated and continues to violate Title II of the ADA.

124.   Finally, Defendant Frey's repeated evictions of Camp Nenookaasi residents and refusal to postpone the evictions until a reasonable accommodation can be made, amounts to intentional discrimination against Plaintiffs on the basis of their disability.

125.   Defendant Frey knows that the residents of Camp Nenookaasi—an Indigenous healing camp serving people struggling with substance use disorder and others with qualified disabilities under the ADA—are disproportionately if not exclusively people with disabilities.

126.   Defendant Frey is aware, and has been made aware, that existing shelter "beds" are not a realistic or appropriate housing alternative for Camp Nenookaasi residents, including for reasons related to their disabilities, and that residents have requested reasonable alternative housing.

127.   Nevertheless, Defendant Frey has refused requests to halt evictions and repeatedly evicted Camp Nenookaasi residents—three times from three separate locations in the past month—despite his knowledge that residents lack any meaningful and appropriate housing alternative.

128.   In doing so, Defendant Frey is administering programs in a way that intentionally discriminates against Plaintiffs, as people with disabilities and on the basis of those disabilities.

## DECLARATORY RELIEF

129.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

130.   An actual controversy exists between Plaintiffs and Defendant Frey. Defendant Frey has repeatedly engaged in the unlawful and unconstitutional acts set forth herein and has announced his plans to continue doing so.

131.   Plaintiffs have suffered, will continue to suffer, and will face imminent and increased suffering as a result of Defendant Frey's unlawful behavior. Plaintiffs seek a declaration of their rights with regard to this controversy and a declaration that Defendant Frey's policies, practices, and customs as set forth herein violate those rights under the United States and Minnesota Constitutions and the Americans with Disabilities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Honorable Court for the following relief:

1. For preliminary and permanent injunctive relief enjoining Defendant Frey and his officials, employees, agents, officers, assigns, and all those working

in concert with him from moving forward with evicting the residents of Camp Nenookaasi, unless and until safe, adequate, accommodative of disability, culturally appropriate, stable housing can be guaranteed and provided to all residents;

2.  For declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, and Rule 57 of the Federal Rules of Civil Procedure, as requested above;

3.  For compensatory and punitive damages, in amounts to be determined in future proceedings, against Defendant Frey;

4.  For an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5.  For any other relief that this Honorable Court deems equitable and just.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Signed,

Date: February 13, 2024

KIRA A. KELLEY
Climate Defense Project
MN Bar No. 0402932
P.O. Box 7040
Minneapolis, MN 55407
(802) 683-4086
kira@climatedefenseproject.org

*Attorney for Plaintiffs*