# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

CHERYL SAGATAW, DEANTHONY
BARNES, ROBERTA STRONG, and
TRAVIS NELOMS, *on behalf of
themselves and a class of
similarly-situated individuals*,

Plaintiffs,

vs.

MAYOR JACOB FREY, *in his
individual and official capacity*,

Defendant.

Civil Action No.
0:24-cv-00001-ECT/TNL

**SECOND DECLARATION OF
AARON JOHNSON IN
SUPPORT OF SECOND
MOTION FOR TEMPORARY
RESTRAINING ORDER**

---

## <u>DECLARATION OF AARON JOHNSON</u>

I, Aaron Johnson, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Aaron Johnson. I am 41.

2. I previously submitted a declaration in this case, dated December 14, 2023.  I am submitting this second declaration because of the harms and injustices that have since occurred.

3. I have been present for all 3 prior Camp Nenookaasi evictions;  Location 1, 13th ave and 23rd street; Location 2, 14th ave and 26th street; Location 3 22nd st and 16th ave.

4. At location 1 the eviction was shocking in spite of advance notice because the eviction had been canceled many times, there were only 20 to 90 shelter beds for about 150 people, and because there were active negotiations between the city and camp organizers that seemed to be productive.

5. At location 2 the notice was not credible or believed at the time of delivery because it was brought by an evangelical pastor with no clear connection to the city. The lack of a clear city mandate made this notice uncredible.

6. At location 3 city workers first provided a backdated trespassing notice, dated before people were present. They later returned with a notice that had a corrected posting date. This notice was dropped off without any verbal exchange that I'm aware of, and included no announced intention to remove people or a date on which removal may occur.

7. At previous evictions I have witnessed, storage for belongings has been an issue for camp residents. On one occasion storage was promised and when MNDOT arrived they brought 20 gallon zip lock bags, which was inadequate.

8. I am unsure about storage offers made at the eviction of location 1. There was too much going on and it may have been offered, but, for that reason, was inadequate and inaccessible.

9. At location 2 and 3 no storage was offered or available. At location 3 no service providers were present at first and they didn't seem to be aware that an eviction was happening until  residents called Avivo. When service providers did arrive all but Avivo were kept out by law enforcement.

10. There is a lack of trust with the city for services provided. Residents don't want to give their belongings to people they see as in league with the ones evicting them and causing trauma.

11. At the eviction of location 1 there were several organizations present and providing services including Avivo, Hennepin County outreach (with purple jackets), and Helix Health & Housing Services. These are the same organizations that were already at camp and coordinating with the camp for weeks previous to get services to residents.

12. At the eviction there was also a HAT bus present. Residents don't like to take the HAT bus because they both have nowhere to go and the bus often has police on it. Having just been forcibly removed by police, they don't feel safe on a bus with them.

13. At the eviction of location 1 residents originally believed 90 "overflow beds" would be available because that was the number the city had been using in negotiations for a voluntary closing of camp. I know that "overflow beds" mean mats on the floor.

14. In the following month of January the city reported that there were 90 beds however It later came out at a City Council meeting that at the time of the eviction there were only 20 beds. This was said by City Council member Jason Chavez and confirmed by city employees. These 20 mats on the floor were grossly inadequate for sheltering the 130 remaining residents, not to mention the other unhoused community members not at camp and in need of shelter.

15. At the eviction of location 2 Shelter Connect said that there were 25 overflow beds available but 16 were reserved leaving 9 for everyone being evicted from the camp as well as the entire unhoused population in the metro.

16. At the eviction of location 3 I video recorded an organizer calling to see how many beds were available. They were told there were 5 beds system wide across the metro. This was later confirmed by another camp organizer.

17. The chief of police was present at all 3 evictions

18. At the eviction at location 1, I estimated 100 to 150 officers on scene.

19. At the eviction at location 2, I estimated 75 to 80 officers on scene.

20. At the eviction at location 3, I estimated 50 to 60 officers on scene.

21. The police role at the evictions became progressively more hectic. Less and less help was allowed for residents. For example, at Location 1 many community members helped move belongings. In subsequent evictions the police put up tape and wouldn't let anyone in to help unless they were a part of a formal organization like Avivo.

22. The police also become progressively more hostile. At the 3rd eviction police began physically leaning into me to keep me further away even though I had press credentials and wasn't obstructing. I was physically moved off the public sidewalk and was threatened with arrest.

23. I helped people move from the Wall of Forgotten Natives to location 1 at the start of the camp. There was a noticeable change in the vibe. There was less conflict and a sense that things were going to be okay. There were problems but there was also hope.

24. As soon as the first eviction notice came it threw things off and internal conflict escalated. When the eviction didn't happen, things seemed to settle back to being more positive.

25. Every time a camp is evicted or a notice to evict is posted it increases the stress on residents which leads to a noticeable rise in tensions and stressors.

26. When the residents ask for help the city doesn't give it, and instead, waits for things to escalate and then blames the camp. For example, residents called 911 for assistance removing a person with a gun from camp. The police failed to assist and physically left the area near the camp where they had been previously stationed. The person then shot someone and city officials used the shooting to say the camp was dangerous.

27. Similarly, things that would have otherwise happened on the street, unseen and unrecorded, become sensationalized and used to punish residents. For example, a resident had a miscarage. The miscarage was reported in rightwing outlets Alpha News and Crimewatch as "a dead baby." The city chose to run with this reactionary narrative to traumatize and criminalize already traumatized residents, especially the woman who miscarried, who was questioned by police and released. This narrative was again repeated by the city and at a January 31st City Council meeting.

28. Witnessing the cruelty of these evictions is a cause of trauma. Every time there is an eviction people go missing and no one is out looking for them. I have a friend missing from the last eviction and I am worried about their wellbeing.

29. I want to make this declaration because I want to help show the world what is going on. I know that many people don't want to give declarations because they fear retaliation.

30. Right now the unsheltered population is at an all time high nationwide. I am aware from reviewing Harvard's Joint Center for Housing Studies that 50 percent of Minnesotans pay more than 30 percent of their income on housing. This is considered unaffordable. 25 percent of Minnesotains pay more than 50 percent of their income on housing. As the cost of housing goes up, the number of people who can't afford housing goes up.

31. This is a nationwide problem, but Minnesota has an opportunity to lead on this issue, set
an example for the country, and show what we can accomplish if we work together.

I declare under penalty of perjury that this declaration is true and correct.

Executed on February 12,  2024, in the City of Minneapolis, County of Hennepin, State of
Minnesota, Treaty-Ceded Territory of the Dakota peoples.

Aaron Johnson