# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, and TRAVIS NELOMS, *on behalf of themselves and a class of similarly-situated individuals*,

Plaintiffs,

vs.

MAYOR JACOB FREY, *in his individual and official capacity*,

Defendant.

Civil Action No. 0:24-cv-00001-ECT/TNL

**DECLARATION OF ANDREW FAHLSTROM IN SUPPORT OF SECOND MOTION FOR TEMPORARY RESTRAINING ORDER**

**DECLARATION OF ANDREW FAHLSTROM**

I, Andrew Fahlstrom, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Andrew Fahlstrom and I am 42 years old.

2. I work as a professional housing organizer with Inquilinxs Unidxs Por Justicia.

3. I came to be involved with Camp Nenookaasi because I knew people who were supporting the Camp and, because I had experience with supporting otherwise unhoused people in encampments in the past, I just started asking how I might be useful. I've tried to be a bridge between what is going on in the encampments and what the general public can do to support, because oftentimes the people who are most on the frontlines don't have the brain capacity to be able to pass that on in understandable ways.

4. I have attended meetings at Camp Nenookaasi, so I can take away the information and try and help communicate it to others. In my experience, having seen roughly a dozen other encampments over the past four years, Camp Nenookaasi has been the best-run one. Camp Nenookaasi has had the least problems, the most controlled access, and the most alignment among residents in very challenging situations. It has also earned itself the most support that I have seen from both immediate neighbors and other community supporters. That's my experience.

5. Camp Nenookaasi also has had some of the best outcomes in transitioning people into more stable housing. What Nenookaasi has meant to me is wanting to join the hundreds of people who have already supported it, and to not see the Minneapolis Police Department ("MPD") erase something that's doing a lot of good in the community.

6. There are so many reasons why Camp Nenookaasi exists, it is difficult to name them all. Our housing system increasingly is only affordable to middle class people in Minneapolis. And that's been increasingly true as corporate ownership of rental housing has increased. By corporate ownership I mean national corporations that buy up buildings for the purpose of getting as much money out of them as possible, instead of providing housing. Specifically, Nenookaasi exists because we have decades of genocidal trauma against Native people in our state, that we continuously see the results of. Hurting people who have experienced both outright genocide as well as cultural genocide, and who suffer the impacts of that. South Minneapolis has been a place where people find resources and connection and community, so encampments have always existed in South Minneapolis. Camp Nenookaasi is simply the latest and most well-known of those encampments, but it exists because our government systems, the laws, the courts, and law enforcement continue to offer punishment for unhoused people instead of resourcing the solutions that would affect the underlying root causes.

7. Camp Nenookaasi provides consistency and continuity where people are, so that they can access resources, and so that social services can find and interact with them. There exists community support in terms of donations of food, the building of yurts, the resourcing of firewood, that lets people have enough ease in their life to be able to make the next

choices toward healing and housing. And then there's community and connection among people who are willing to get in relationship with unhoused people, who bear some of the most extreme impacts of a system that harms them. It's clear that unhoused people are those in our society that have borne the brunt of extraction, theft, and genocide, and are hurting from it. At Camp Nenookaasi they find community, connection, and relationship, and care – I'd add care to that list. Which in my understanding is the thing that most heals addiction. Nicole has offered a steady presence and invitation around culturally grounded healing. That fact that it's no barrier is also key—I think people talk about low barrier shelters, but there's almost no barrier to access all the benefits at Camp Nenookaasi.

8. Nicole Perez has been an organizer at Camp Nenookaasi, really somewhat of a founder, and has past training around substance abuse through her experience at Little Earth.

9. Part of my job is changing the housing system of Minneapolis to work for everyone that needs it. And what Camp Nenookaasi does is it holds and cares for the people who are most affected and have the least access and resources to find good housing solutions so that they don't disappear.

10. I was present at the Waite House site—that is, what people see as the original Camp Nenookaasi—for the eviction. Before dawn, over 100 supporters came to share breakfast and food. There were news cameras everywhere. As the day went on, Minneapolis Public Works vehicles were driving by with increased frequency. At that point, maybe fifty people, dozens at least, went out along 24th Avenue to stand along the street as support for the camp. Organizers, residents, supporters, social service providers, and elected officials held a press conference. Shortly after the conference ended, MPD pulled up along 24th Avenue. Police surrounded camp, arriving en masse in a convoy and using their cars to establish a perimeter.  Seeing that there were less supporters there at that time, officers started talking with and negotiating with Nicole, saying that everyone had to leave. MPD established a police perimeter for two blocks in all directions around camp. Then supporters started assisting residents with transporting their belongings and taking down yurts. At different points the police prevented supporters form coming in to help residents. Officers stopped people from driving in, which delayed supporters from helping, but it also meant that police officers were turning away supporters. Like a U-Haul that got stopped, and it took half an hour to finally be let in. In addition, MPD instructed other city employees to cut holes in the fences and then maintained a presence after dusk, keeping the street shut own and restricting the movement of people. I observed police only on the outside of the fence.

11. I was at the subsequent eviction at 14th Avenue & 26th Street, on January 30, 2024.  There were drones flying above the camp. A white truck with no city markings showed up with a trailer full of metal fencing. Everyone was scared—there was no communication from any officials, no one approached camp. A line of police cars came and shut down 26th Street. I walked over and talked with the officers and asked, "Is anyone gonna communicate with camp?" The officers responded someone was coming. Eventually MPD employees and CPED (Community Planning and Economic Development) employees came to talk with Nicole. They said everyone in the camp had to leave, and they were giving residents 90 minutes for everything to be gone. Multiple people communicated to them that this was an impossible time frame. At this point MPD had put

up a two-block perimeter in all directions again that actively stopped anyone from coming in to support. I communicated to MPD and CPED that there weren't enough people and that we needed more. None of the city's agencies had assistance for residents, they offered no rides and no housing. When I asked if they were going to transport anyone and their belongings, they said they could call an Uber for anyone. When I asked where residents were supposed to go and what they were supposed to do with their belongings, they had no response. I told the officers that we needed more help to meet a 90 minute deadline. The officer in command—I would know the sergeant by sight but can't remember name—said he'd only let people in if I gave a list of names. I told him that was impossible. I don't know if it was a recording, but an announcement played over a police vehicle speaker saying that everyone needed to leave. Volunteers started to disassemble camp, and slowly over the day the police would let small groups in to assist in transportation, transitioning people. I could see a half block away a gathering of 30 people that were trying to come to help, but the officer in command continued to say he wasn't letting people in. They didn't stick to their 90-minute threat, and over the course of the entire day the camp was disassembled and residents' belongings were transported elsewhere. On site were CPED director Erik Hansen & Elfric Porte, and a MPD lieutenant—I believe his name was Saugland, badge number 16. I also communicated to the chief of MPD that more assistance was needed, but he did not respond. Officers were just generally unhelpful and their immediate answer was "no" to all requests: additional volunteers, letting in vehicles, more time, each time the police were just silent, a presence of armed people threatening the camp.

12. I was not at the third, most recent eviction of Camp Nenookaasi.

13. For the first eviction, people were given notice of the eviction date, and that is the date that police came on. This meant that there were enough volunteers to be able to take down a large camp.

14. By contrast, before the second eviction there was a notice delivered by two men who did not identify themselves as city contractors. The notice did not have an eviction date, and it was not clear whether it was real because of the way it was delivered. I wasn't there personally but I watched the video footage of the delivery: Two slightly older white-appearing men pulled up in a rusty van, delivered a sandwich board that had what Minneapolis uses as its notice, saying "please vacate," and the two men did not clearly identify themselves. One said his name was "Pastor Colin," which does not give the appearance of an official city act. They dropped the sandwich board at a street corner outside of camp and then left.

15. Because there was no date on the second notice, which was inadequate and unclear in its delivery, and the eviction came as a surprise, the result was that the second eviction was more chaotic, and it was an under-resourced taking down of camp.

16. With regard to storage, the first eviction was in a much larger space, and so there's no way anyone could know what storage options were offered. I'm not sure how many acres that site was, but there's no easy way to communicate. The police and city employees did not have a loudspeaker, and although I was there I had no knowledge of any storage options being offered that day.

17. During the second eviction, no storage options were offered on the day of eviction. To my knowledge, there were no transportation options proactively offered to residents, no housing options offered, and no social service agencies on site.

18. For the first eviction, I observed that there were social service agencies at the press conference talking about why evictions shouldn't happen. I did see another team show up, but I can't remember who they were, and they came and left. What I observed was community volunteers doing 95% of the work.

19. For the second eviction, no service providers were present at all. City workers did not volunteer any plan or guidance for where people should go—just that they needed to leave. Everyone was scrambling, because it was a surprise and no one was ready—no one had packed anything, no one had the materials ready for packing or transitioning belongings. They were surrounded by police for blocks, scared, confused, angry, sad, and scrambling. Panicked would be another good word.

20. These repeated evictions have really impacted residents. After an eviction happens, people are lost. Some regroup, some disappear, some relapse, and then all the systems of support are taken away. Coordination around food, shelter structures, clothing, social services, sanitation, all the work that people and government have put in for months gets wiped out and everything is chaotic and has to start from zero.

21. Community volunteers get wiped out, too. Imagine moving 100 people's belongings in one day, in the cold. It's deeply exhausting and demoralizing. It's clear that the policy towards encampments is to punish people who aren't accessing housing and scatter them from the site. It makes me really disappointed and mistrustful of the administration of the City of Minneapolis and their intent.

22. I'm aware that the Mayor's administration has been using reports of incidents and presenting them in an inflammatory way to excuse and attempt to justify closing the encampment. The Mayor's office uses reports that involve individual actors to blanket punish all residents. They both resist resourcing the encampment and then use the results or impacts of an under-resourced encampment as the excuse to sweep it. This involves cherry-picking bits of information. For example, the Mayor's office claimed there was a "a dead baby," whereas what really happened was a traumatic situation where a woman had a miscarriage at the camp. They frame camp residents and their actions in a way that does not tell the story of what happened in order to paint a picture for the media to cover the clearing, to attempt to excuse and explain clearing an encampment full of people. I have never seen an encampment have so few problems or issues as the original Camp Nenookaasi near Waite House. If some terrible event happens in an apartment building or home park, you don't evict the entire building/park. It seems to me that the justifications presented by the city are for media spin rather than clear communication or good governance.

23. I am giving a declaration in this case because I feel motivated to try to stop these continued evictions, and to use my position of relative stability and education to participate by doing a declaration. That being said, it takes time and I know that it opens me to investigation or discovery or further interviews, and it puts my name out there in

ways that may make me a target of the City of Minneapolis, or right-wing news sources that are paying close attention to Camp Nenookaasi.

24. I also can understand why other people wouldn't want to give a declaration, because it takes time, it opens you to scrutiny, and potential attack. For me, I obviously needed to have a computer for this, I had to take time off in my work schedule to be present, and not everyone will want to make that choice or can make that choice. Especially if they have been repeatedly targeted by MPD and Mayor Frey's administration in particular.

25. I want to end by saying that I've talked to dozens of neighbors around Nenookaasi encampments, and they are crystal clear that sweeping encampments destabilizes their neighborhoods. I mean this in the sense of it puts people on the street, it makes people more desperate, and neighbors' property is more at risk of being squatted or used for temporary shelter as a result. Overwhelmingly people who neighbor encampments want to see a sane and humane approach. But instead, what poor neighborhoods like Phillips experience over and over are destabilizing evictions with no long-term solutions or resources. I talked to several officers on January 30th that communicated to me they didn't know why they were doing this and that it didn't make sense to them either. They were being ordered to clear the encampment. Even the lieutenant I mentioned who was the incident commander, when I asked him who wanted this to happen, he said "it goes all the way to the top." When I asked him what that meant, he said "who do you think?" I said, "sounds like Jacob Frey," and he just looked at me with a little smile.

I declare under penalty of perjury that this declaration is true and correct.

Executed on February 12, 2024, in the City of Minneapolis, County of Hennepin, State of Minnesota, Treaty-Ceded Territory of the Dakota peoples.

*Andrew Fahlstrom*

Andrew Fahlstrom