# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, and TRAVIS NELOMS, *on behalf of themselves and a class of similarly-situated individuals*, <br><br> Plaintiffs, <br><br> vs. <br><br> MAYOR JACOB FREY, *in his individual and official capacity*, <br><br> Defendant. | Civil Action No. 0:24-cv-00001-ECT/TNL <br><br> **DECLARATION OF JAMIE BACHAUS IN SUPPORT OF SECOND MOTION FOR TEMPORARY RESTRAINING ORDER** |

## **DECLARATION OF JAMIE BACHAUS**

I, Jamie Bachaus, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Jamie Bachaus. I am 35 years old.

2. I live in the Longfellow neighborhood of Minneapolis. I have a masters degree in public health and worked at Allina health until July 2023 when I was laid off. At Allina, I worked with the Native American Community Development Institute (NACDI) and Indigenous partners, like the Division of Indian Work, where I developed skills meeting the specific needs of unhoused populations. My work focused on providing more cultural navigators within the system to better meet community needs. I've worked in health equity and social justice for a long time and have continued this work since being laid off.

3. I became involved with support for Camp Nenookaasi last year when I was supporting grants with NACDI, working with unsheltered folks specifically with Indigenous lineage. I saw a request for Minneapolis residents to show up for support in a December 3, 2023 city council meeting. Since then, I have been involved with trash pickups and coordinations to support Nenookaasi residents and organizers.

4. I am in recovery myself, and as a city resident and neighbor, I understand the need to show up for other neighbors. I know I benefit from a lot of unearned privilege and want to share the resources, time, and energy that I have to show up for other neighbors. At Camp Nenookaasi, it always feels like a community project and not "working alone." Getting to know people seeking recovery provides a sense of camaraderie in my own journey. I have a dear friend who is a resident; it means a lot to help directly and to see the trust residents have for each other. This solidarity and trust are based on everyone involved wanting to achieve better living conditions for residents of Nenookaasi.

5. I am taking this declaration as a supporter of Camp Nenookaasi residents because it is critical to tell the truth of what this community is experiencing. Camp Nenookaasi exists because housing and recovery services for our Indigenous neighbors continue to be unmet by the city. Nenookaasi provides vital healing and shelter for unhoused residents. Camp Nenookaasi is part of an extended history, especially given the work people are doing in the East Phillips neighborhood to address the continuously neglected needs of Native populations in Minneapolis.

6. Camp Nenookaasi provides important resources and stability for residents. The community it builds supports residents; the organizer, Nicole Perez, especially knows everyone by name and puts out calls for when relatives are missing. Residents have shared with me how important this is—the sense of safety and being and not feeling isolated. Being looked out for is important—at Camp Nenookaasi, this includes the

coordination of meals, having warming yurts to sleep in instead of just tents, and having people looking out for one another, their safety, and belongings. Nicole also helps to connect residents with culturally responsive recovery and housing services. Healthcare for the Homeless has been out in Nenookaasi; the stability of knowing where to find the clients that they're serving is extremely helpful. From a harm reduction standpoint, other organizations, like Southside Harm Reduction Services, drop off clean needles and do educational services. Knowing that those resources and trainings are coordinated in a centralized location allows people to know where to go to get those services.

7. I was present for the January 4, January 30, and February 1 evictions. January 4, I arrived there around 5:45 in the morning; there was an invitation for the community and volunteers to have breakfast together. I left and later returned when I heard the city was going through with the eviction. First I approached on foot, and I helped residents move belongings and trash out. Police allowed me to move past their tape to load my car; I accompanied a resident's mother to speak with police and move past tape to help her son move his belongings. I helped another resident load his belongings from the 23rd St location to another site off 26th St. and 14th Avenue.

8. In contrast to the January 30 and February 1 evictions, prior notice was effectively communicated for the January 4 eviction. This allowed many more service providers to help with the move; our community-provided U-Hauls, trucks, and trailers to assist residents move. Coordination rates were much higher given the advance notice; it was much less of a scramble. Healthcare for the Homeless public health nurses were also there that day; I saw one nurse transporting a client and their belongings to the new site. I saw people delivering coordinated meals to residents while moving. There was a higher physical presence of people to help move trash, relocate, and take structures down.

9. On January 30, the 26th St and 14th avenue camp was evicted with insufficient prior notice. Neither I nor anyone I spoke to knew that the eviction was planned and I did not see any prior posted notice. The city announced there were 90 minutes to move over loud speaker around 9am.

10. I found out about that site's eviction on February 1 as it was happening the day of the eviction with no prior notice given that I was aware of. Eventually, after community members spoke with police, they said they'd allow more time to move if progress was being made. The problem was very few people were present because of a lack of advance notice, and many of the volunteers who were present weren't allowed in to help with the moving process. Police officers aggressively taped off the area–they even taped around a person where they were standing. The police were moving out belongings and dropping off concrete scraps on the lot while people's belongings were still on one side of it, transforming this space for community healing into what looked like a crime scene.

2

11. I did not see and was not aware of any storage units made available to residents by the City at the three evictions I was present for (January 4, January 30, and February 1); instead, temporary U-Haul rentals, carts, trailers, and trucks were coordinated and paid for by community members. I myself ended up having to keep a resident's belongings overnight and later returned them to the resident. The city or even nonprofit organizations didn't necessarily provide or have solutions for coordinated storage. Asking a resident to trust a volunteer who doesn't necessarily have a prior existing relationship with your belongings is completely unacceptable. We were putting people's belongings in trash bags and labeling them with tape and Sharpies. On January 30, Eric Hansen, Director of Community Planning & Economic Development of Minneapolis, stated that Ubers could be provided to residents if they walked down to an ambulance parked further away from the camp. That is the only resource provided by the city during these evictions that I am aware of.

12. Sufficient safe spaces meeting the needs of residents were not provided. In the Public Health and Safety Committee meeting press conference meeting January 31, the City said there were only 5 beds available at night and there were more beds available during the day. But officials provided no answer when one of the City Council members asked how many of those beds were still available at night and how many of those beds were available to people struggling with active use. Even when beds are available, I know residents who will not pursue those resources because they do not protect Indigenous folks and survivors staying there. My friend who is a Camp Nenookaasi resident was forced to sleep in her car January 30-February 1, and then at a friend's house on February 2. I saw her on February 3 at the library. Other residents informed me they were going to the library as a temporary warming spot, but with nowhere to sleep.

13. While the City failed to provide storage and safe shelter options for residents during evictions, police also failed to support residents. During the January 30th eviction, mostly what I witnessed was police officers sitting in their cars. The majority of the time, they were outside the Nenookaasi fence. On the 30th, there was a police officer, Andrew Schroeder, who told a community member "you have no purpose here" as she was older (maybe in her 70s) and couldn't help the residents move quickly enough. They had put up crime scene tape encircling Nenookaasi so people couldn't come in. I also saw police officers standing on the sidelines making disparaging remarks about a volunteer's appearance, not helping at all. I did see police officers move some wood into a truck after being repeatedly asked; this is the only police assistance I witnessed. On January 30th and February 1, police officers told organizers, both inside and outside the tape, they couldn't go inside until it was approved. On the 30th, police said Nicole could approve people to come inside the tape, but when City Councilmember Jason Chavez attempted to do so with Nicole's approval, police said Jason was not allowed to enter. Police eventually stopped allowing individuals to come in unless it was a 1:1 swap with

3

someone coming out. It was not consistent at all and led to much confusion for residents and organizers. At one point, police officers said they had to check with their supervisor for procedure; they did not seem to have a clear plan or clear orders.

14. Estimates given at the January 31 Public Health and Safety Committee Meeting state over 160 police cars were present at the January evictions. Given this did not include the police presence at the February 1 eviction, the number of police cars is actually much higher. From what I observed, much of the time police were present at the evictions was spent idling for eight hours per day or blocking off streets or alleyways. This demonstrates the city's misallocation of resources and failure to keep Camp Nenookaasi residents safe. For example, on January 12 when I entered the camp (not during an eviction), police asked me if I had my phone on me and asked me to call 911 if I saw anything of concern as they had gotten a 911 call from Camp Nenookaasi. Then they drove away and did not seem to investigate the 911 call they had mentioned.

15. Government officials in the past have said they're committed to ending houselessness in Minnesota. As a supporter of Camp Nenookaasi, it is disheartening to see those partners are supporting these evictions that we know are not effective or helpful and disconnect people from services. One of my friends ended up going to an emergency dentist on Monday February 5; she had scheduled this previously but was not able to connect with previous provider because of evictions. Evictions disrupt residents' abilities to connect with service providers who come to camp. I see a lack of humanity in how city officials speak to residents as they move their belongings; it feels like with any eviction, there should be legal processes to follow. It feels like there are special exceptions for this group of people where they are not treated with very much respect at all by city officials.

16. Government officials have given dubious reasons for the evictions. We heard from Mayor Frey's administration and officials at the Public Health and Safety Committee update on January 31, 2024. At this meeting, Director of the Minneapolis Department of Public Works Margaret Anderson Kelliher stated concerns about stomach virus at the camps. But my friends who are medics at the camp had taken care of that issue; one person went to the hospital just to confirm safety. They had access to medicine. Another reason stated at this meeting was a shooting outside the camp, as the suspect emerged from within the camp. But Nicole had previously called the police for support in reference to this suspect threatening her, and police refused to come assist her. A city council member brought this failure up to Community Safety Commissioner Todd Barnett, who had no explanation as to why they did not respond. Officials also said fires from the yurts caused increased air pollution in the neighborhood. But this neighborhood is constantly polluted by Smith Foundries and other environmental hazards that the city does not adequately address.

17. The neighborhood of East Phillips has been incredibly disinvested in. If this was happening in another neighborhood or to a different population in the Twin Cities, it feels

4

like the response would be different. It feels structurally racist. From an evidence based perspective, it's not effective and wastes valuable resources that could be invested in the community to show another way of thriving that includes all of us and not just certain populations or racial groups. For example, as a white person who has faced addiction issues, I had different safety nets and people to fall on when I was in situations when my housing was at risk. That is not necessarily the same in communities that are intentionally displaced throughout time and history. Those resources are much more available to individuals like myself than members of other racial or ethnic groups. The city too often fails to provide appropriate resources, and the services that are provided are from the dominant cultural standpoint; a lot of the services in the Twin Cities are especially not tailored to meet the needs of the Native population here.

18. Against this backdrop of unhoused Indigenous folks not receiving appropriate support, Camp Nenookaasi is meant to connect unhoused people to traditional Native healing practices for recovery and long-term housing that are not present in a lot of our government systems or nonprofit systems. Camp Nenookaasi is a place where smudging ceremonies and cedar ceremonies are honored as part of the healing process. The day of the January 30 eviction, a community member came by with smudging for every resident and volunteer, recognizing the crisis of the moment and offering cleansing and healing for anyone participating. On February 1, we went to a cedar ceremony with members of Minnesota Indian Women's Center. Those healing spaces or ceremonies may not be accessible without Nicole sharing those resources and providing rides to those spaces. People also get access to food at those services. This enables connection to greater Indigenous communities available within the Twin Cities' community. Access to these healing practices shows how open-hearted Nicole is; she invited AVIVO staff and anyone present to the cedar ceremony. As a white, non-Native, introverted person, this demonstrated that anyone in our community was welcome to participate. Especially from the lens of recovery, feeling really included even as a non-Indigenous person was very grounding. Camp Nenookaasi is providing reconnection to our bodies and the Earth that is needed as we traditionally go about our lives busily in the capitalist world; it has given me a deeper connection to my values and how I want to show up for the world. Camp Nenookaasi shows us what showing up for one another as a community and being deeply connected to people can look like.

I declare under penalty of perjury that this declaration is true and correct.

Executed on February 19, 2024, in the City of Minneapolis, County of Hennepin, State of Minnesota, Treaty-Ceded Territory of the Dakota peoples.

_____
Jamie Bachaus

5