**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, and TRAVIS NELOMS, *on behalf of themselves and a class of similarly-situated individuals*,<br><br>Plaintiffs,<br><br>vs.<br><br>MAYOR JACOB FREY, *in his individual and official capacity*,<br><br>Defendant. | Civil Action No.<br>0:24-cv-00001-ECT/TNL<br><br>**SECOND DECLARATION OF CHRISTIN CRABTREE IN SUPPORT OF SECOND MOTION FOR TEMPORARY RESTRAINING ORDER** |

# SECOND DECLARATION OF CHRISTIN CRABTREE

I, Christin Crabtree, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Christin Crabtree and I am 43 years old.

2. I previously submitted a declaration in this case, dated December 15, 2023. I am submitting this second declaration because of the harms and injustices that have since occurred.

3. I have two children in Minneapolis and am involved with Minneapolis Families for Public Schools, where I organize to meet community needs with public schools. My expertise is in trauma and healing of domestic of sexual and gender-based violence, education, and recovery; I have previously served on the board of the Domestic Abuse Program and organized with Break the Silence, the survivor-led grassroots movement that built first permanent memorial to survivors of sexual violence in Minneapolis.

4. I met Nicole Perez at a 2023 Little Earth event addressing the crisis of murdered and missing Indigenous women (MMIW). There was an active eviction at that time, which allowed me to become involved. We both spent a lot of time doing outreach in the community to look for people missing from encampments under existing systems, which failed us over and over again. I increased my involvement with Camp Nenookaasi per Nicole's request following the August 17 south Minneapolis encampment eviction. I became involved with Camp Nenookaasi because my son has struggled with substance use and his friend has died from it. Like many of the residents of Camp Nenookaasi, I am a survivor of domestic and sexual violence. I do this work because it is an act of solidarity and pursuit of justice for fellow survivors.

5. Camp Nenookaasi has changed my life. It is a powerful source of hope for me; a source of grounding; a space that has really created social safety and community connection. It gives us the room to create a different possibility than the cycles we've been stuck in: sexual violence, generational trauma, and interpersonal violence are all compounded by our institutional systems. The violence of generational trauma, whether it be abuse, racialized harm, or colonization, is all connected. The colonizer framework created these systems we still live under today; these institutions are reflections of that trauma. I believe and know there is something else that is possible.

6. Camp Nenookaasi provides a new path. That's really powerful. The wellbeing of myself and my children is directly connected to the wellbeing of residents of Camp Nenookaasi. We have developed very strong connections, and I am hopeful the work we are doing can shift the experience of everyone in our city. I want our politicians to not only make statements and resolutions about homelessness and racism; I want them to act. I want

policy and procedure reflecting the words they state, rooted in anti-racism. I see healing modalities for people like me put into practice at Camp Nenookaasi and see how those practices can apply on a bigger scale. I come to this space as a white woman with a level of privilege; if I seek support from existing systems provided by our city, they force me to re-experience trauma and pain. This is even more true for our Black, Native, and non-binary community members. I know we can do better because I see it all the time; Camp Nenookaasi demonstrates this.

7. Camp Nenookaasi exists because our neighborhood, city, and country have a public health crisis. Nenookaasi exists to interrupt the harm compounded by our government. We have neighbors who are vulnerable, who have disabilities, who are survivors of trauma, who have substance use disorders and lack of access to resources. Our city response has been to further punish these already vulnerable people and push them around rather than provide them with resources. Camp Nenookaasi exists to provide stability and security to people who need and deserve it and to shift the practice of our current government.

8. Camp Nenookaasi keeps our communities safe by promoting harm reduction, providing for basic needs, creating community connection, and creating opportunities for healing. Stability means people get access to community organization resources, housing, and the prevention of overdose deaths (which are a policy failure). Camp Nenookaasi provides basic needs like warmth, food, and a place to sleep. Meeting these needs allows people to think about other needs and advance in their recovery. Through this work, we are alleviating and reducing harms from before Camp Nenookaasi existed.

9. The stability Camp Nenookaasi provides helps people feel safe; when people feel safe, healing becomes more possible. When you have people pouring into you, people who are dependable, healing becomes possible. We want to interrupt the crisis of MMIW and violence against Black women and girls, which our politicians have identified as issues, but that these systems compound. We have approximately 15 people who are sober living in the camp. Those kinds of things are priceless; the care, the connection, the camaraderie, which allow people to not only survive but also thrive in the world. We need those things. It's also given a central and tangible way for our community to be engaged to a degree that was not previously possible. It allows housed neighbors to develop relationships with unhoused neighbors. When you see and know unhoused people, it becomes an issue of direct impact to your friends. The two-way rehumanization these connections foster completely change the way we view our policies and systems. I feel safer at Camp Nenookaasi than I do elsewhere; it is powerful that I now have 70 friends who would come running to my support if I needed it.

10. I was present the whole day of the January 4 eviction. I was also present part of the day during the January 30 and February 1 evictions. My previous declaration describes what I witnessed in the August 24 eviction.

11. There was heavy police presence at all three evictions in 2024. As stated in the January 31 Public Health and Safety Committee meeting, there were around 70 officers present for the January 4 eviction. On that day, we were able to work with the police to get them to slow down and not just storm the camp. As the day went on, police became impatient with residents who were still moving. I spoke with police and specifically asked them to call me if they found anyone who was still there so that they wouldn't cause them harm. During the January 30 and February 1 evictions, I could see drones encircling camp and police officers cars blocking streets, including buses trying to get kids to school. On both days I drove around monitoring police presence, which was pretty extreme.

12. Sufficient notice was provided for the January 4 eviction (posted on December 29), but not for the January 30 and February 1 evictions. We received a January 17 email stating eviction was imminent and pending, but had no date listed. I recorded a meeting on January 5 with Mayor Frey stating we would get advanced notice for future evictions and that they would do more than providing regular temporary shelter beds; but this did not happen. Nicole, Chelsea McFarren, and myself sent an email following up from this meeting documenting these commitments, and we received no response.

13. I am also not aware of the City providing adequate storage for residents during these evictions. At the January 31 Public Health and Safety Committee meeting, I witnessed Director of Regulatory Services Enrique Valezquez state no storage was provided within 72 hours of closure or on the day of evictions. Enrique also named American Indian Community Development Corporation (AICDC) and AVIVO as community partners during this meeting, but to my knowledge these partners were not notified of the January 30 eviction in advance.

14. The City also failed to provide safe shelter options for evicted residents. On January 30 and February 1, I am not aware of any specific efforts to shelter Nenookaasi residents. I am aware of temporary shelter beds that are available through various entities, like the Salvation Army. As I observed on the Hennepin County dashboard and as verified by Margaret Anderson Kelliher at the January 31 Public Health and Safety Committee meeting, in January an average of around 20 out of 90 total beds were available. There was discussion of providing distinct beds for Camp Nenookaasi residents, but to my knowledge, that did not happen. The fact that beds remained open is a testament to how unsafe these shelters are for many Camp Nenookaasi residents. For example, the Salvation Army (which is included in Hennepin County dashboard amongst other shelters) is very binary about gender; if you are a transgender or a Native two-spirit person you may not be housed in a space of the correct gender. I know a trans woman

2

who was placed in the men's shelter beds and did not feel safe there; she has subsequently not used those services. If people are choosing to not use the beds and sleep outside, we should be asking why. Many residents have told me that the beds, heated yurts, and places for belongings (including spiritual objects) at Camp Nenookaasi better provide for their needs than the beds provided by Hennepin County or the Salvation Army, which do not accommodate their needs. I know we had a resident who has survived multiple assaults and went to stay at the Salvation Army and felt she was not safe there because the employees were speaking poorly of other unhoused folks staying there. I know Camp Nenookaasi residents who have been assaulted at these shelters. Residents have told me these spaces feel like they are punishing and dehumanizing them for being low-income.

15. The City's repeated displacement of Camp Nenookaasi is traumatic for people, especially because they experience it so many times. It's horrific to watch and be a part of. One former resident I know with diagnosed PTSD spoke to the trauma of repeated evictions. On February 9, I listened to four residents share their experiences with an Axios reporter Kyle Stokes; one resident told the reporter he once used the City's provided storage through the Downtown Improvement District (DID) before the evictions and never got them back. He did not hear back from DID or the City, and he won't trust the City again with his belongings. Every time Camp Nenookaasi is evicted and residents are failed by the services provided by the City, or the lack thereof, further trauma is inflicted.

16. The evictions are very scary for residents; a large part of why we're there is because people go missing during the total chaos evictions bring. Our role as supporters is to keep people safe; evictions disrupt outreach and throw off any systems for basic needs (e.g., food, safety) while everyone is scrambling to relocate on short notice. On February 1, cops and drones were all over during an Ojibwe cedar ceremony at the Minnesota Indian Women's Center; it felt like a war zone. This disrupts people's abilities to regulate their nervous systems and access traditional modes of healing. When people are cut off from other forms of regulation and healing, we see spikes in overdoses and community members who want to prey on residents or sell drugs to them capitalize on this opportunity. When people go missing, we don't know if they have been abducted or killed; it's very sick. One resident got abducted while trying to relocate during the February 1 eviction and beat up; a comrade found her and brought her back to camp.

17. Even for supporters, it is really painful to witness and experience the evictions. I am a survivor who grew up in an abusive home; my own experience has been that these systems purported to support us actually do not; rather, they force us to be further traumatized. I already knew that to be true. But experiencing camp evictions and witnessing how my neighbors get treated is so rough and painful; I see the people many see as "the good guys" committing violence on these survivors who I have become close with and gotten to know deeply. The betrayal and gaslighting from a system that is meant

3

to be for public health and safety makes us feel invisible as survivors; it is a huge betrayal. I don't trust our city government; I have a nervous system response when I see a Public Works truck drive by. It really hurts as a resident of this city. I don't know how to exist in a world with the trauma I've experienced without trying to change it—Camp Nenookaasi allows us to do just that. It is an empowering space of decolonization, the dismantling of these traumatic systems, and community-based healing.

18. I believe the justifications the Mayor has shared for the evictions are dishonest and intellectually lazy. The excuses include a potential norovirus outbreak which was managed effectively and a shooting that the police did nothing to prevent. In particular, a shooting the city cited as reason to evict Camp Nenookaasi demonstrates the police's failure to protect our community. A housed couple who said they were unhoused to access the camp was selling fentanyl and physically abused 5 residents. The man in this couple threatened Nicole at gunpoint on January 11 when she asked the couple to leave, as documented by screenshots of Nicole's texts with the police that she shared with me. An unmarked cop was across the street and they drove away, completely disregarding this life-threatening call. On January 22, I was present and standing next to Nicole when this couple returned. I witnessed Nicole afraid for her life when she called 911, but police told Nicole they couldn't come and she should file a harassment restraining order. The man from this couple later shot someone who was trying to stop the couple from preying on residents; this person who was shot was very beloved by the community and did more to keep the community safe than the police, who used this as an excuse to evict the camp. We did what we "were supposed to do" in contacting the authorities who were meant to keep us safe, and they didn't. January 30, this man was arrested after we'd been evicted, but he was let out of jail after 36 hours. At the January 31 Public Health and Safety Committee meeting, my Council Member Jason Chavez asked Commissioner of Public Safety Todrick Barnett about this police failure and Todrick said he didn't know about it. Camp Nenookaasi residents were dealing with shootings regularly before creating this community that is much safer for them. Closing the camp in response doesn't account for the fact these people, who are the most vulnerable, have nowhere else to go. Dispersing them exposes them to more shootings and makes them less safe; it does not take reality into account.

19. Giving this declaration makes me very anxious of retaliation from the City. I worry about it coming at me or my family and even more so the residents of Nenookaasi and other unhoused folks in our community. I'm always balancing taking up space and doing this work with the risk of retaliation. In that way, I feel very responsible for how I show up. I'm doing it because the people are worth it—they're human beings. This is not a matter of difference of opinion, this is a matter of active harm and violence to people who are vulnerable and deserve better. I know we can do better, not only for residents of Camp

Nenookaasi but for everyone's well-being. Usually the best things we do are the scariest. And I'm not sorry!

20. It is critical that supporters have the courage to take these declarations because many of our residents' survival is criminalized. It's a big risk for residents to take declarations and engage with the law. Some residents have had past legal actions; e.g., one resident couldn't get housed because she had a warrant for stealing a sandwich, others have been criminalized for being on the train too long. When you're unhoused, it's very hard to get mail, and you're likely to miss court dates, leading to a warrant. Many residents' experience has been that the law does not deem them worthy of protection. Even as a housed person, navigating the legal system is really hard; I have had to turn to my public defender friend for guidance in the past. We need recognition that not everyone is starting in the same base in the baseball game. In a system rooted in oppressive practices, the most marginalized in our community are required to participate in their own oppression if they want to engage with these institutions. That sounds heady, but these are people that are scared to go to the hospital or speak to an outreach officer, afraid of harm from people who are supposed to protect them. And many residents have disabilities and may not have capacity to do something like this. I wouldn't want them to have to put themselves even more in harm's way, which is why I am taking this declaration. Sometimes when you're beaten down again and again, the idea you are worthy of taking up space can be hard for folks. I don't know if people in a courtroom can really grasp how big that is, but I hope they can.

21. Ultimately, what we're doing as a city right now is a gross, irresponsible misuse of public funds aside from the ethical considerations. It's wild to me to see the amount of resources put towards evictions, making it so nobody can exist in that space. The green spaces in South Minneapolis, especially Phillips, where there's already few spaces to sit, are now covered in concrete scrap rubble placed by police where we used to be. It looks like a war zone and they'd never do that in other parts of the city. Meanwhile we've got case workers trying to respond in a good way, and the City interrupts any progress the county is able to make. The right hand and left hand don't know what the other is doing. Working in supply chains in my day job, it is striking how wasteful these systems are and how they cause further expensive problems to fix. On top of being wilful harm, it is inefficient and uneconomic. This is not fiduciary responsibility. Our leaders are acting like children.

I declare under penalty of perjury that this declaration is true and correct.

Executed on February 19, 2024, in the City of Minneapolis, County of Hennepin, State of Minnesota, Treaty-Ceded Territory of the Dakota peoples.

*Christin Crabtree*

*Electronically signed by:
Christin Crabtree
Reason: I am the Approver
Date: Feb 19, 2024 15:04 CST*

_____

Christin Crabtree