# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

CHERYL SAGATAW, DEANTHONY
BARNES, ROBERTA STRONG, and
TRAVIS NELOMS, *on behalf of
themselves and a class of
similarly-situated individuals*,

                 Plaintiffs,

    vs.

MAYOR JACOB FREY, *in his
individual and official capacity*,

           Defendant.

Civil Action No.

0:24-cv-00001-ECT/TNL

**MEMORANDUM OF LAW
IN SUPPORT OF
SECOND MOTION
FOR TEMPORARY
RESTRAINING ORDER**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION............................................................................................. 1

FACTUAL BACKGROUND............................................................................. 3

STANDARD OF LAW...................................................................................... 23

ARGUMENT..................................................................................................... 24

   I.  ABSENT A TEMPORARY RESTRAINING ORDER, PLAINTIFFS
      FACE IRREPARABLE HARM................................................................ 25

   II. PLAINTIFFS' CLAIMS ARE REASONABLY LIKELY TO SUCCEED
      ON THE MERITS.......................................................……………… 28

        A. Count I: Unlawful Seizure & Destruction of Plaintiffs' Property in
           Violation of the Fourth Amendment to the United States
           Constitution...................................................................................... 29

        B. COUNT II: Procedural Due Process Violations Under the
           Fourteenth Amendment of the United States Constitution .......... 31

        C. COUNT III: State-Created Danger in Violation of the Right to
           Substantive Due Process Under the Fourteenth Amendment of
           the United States Constitution ....................................................... 33

        D. COUNT IV: Violation of the Eighth Amendment to the US
           Constitution...................................................................................... 36

        E. COUNT V: Conversion in Violation of Minnesota Common
           Law.................................................................................................... 38

        F. COUNT VI: Violation of Title II of the Americans with
           Disabilities Act, 42 U.S.C. § 12131 et seq. ………………….... 39

   III. BALANCE OF EQUITIES FAVORS PLAINTIFFS, AS AN
       INJUNCTION WILL NOT HARM THE DEFENDANT........................ 43

IV. A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC
    INTEREST............................................................................................ 45

V. THE TEMPORARY RESTRAINING ORDER SHOULD EXTEND TO
    PROTECT ALL RESIDENTS OF CAMP NENOOKAASI.................... 47

VI. THE SECURITY REQUIREMENT SHOULD BE WAIVED ……….. 48

CONCLUSION................................................................................................ 48

# TABLE OF AUTHORITIES

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV...............................................................................29

U.S. Const. amend. VIII...........................................................................36

U.S. Const. amend. XIV.......................................................................31, 33

## STATUTES

42 U.S.C. § 1983......................................................................................31

42 U.S.C. § 12131 et seq. ...............................................................39-41

## FEDERAL RULES AND REGULATIONS

Federal Rule of Civil Procedure 65.........................................................23

Federal Rule of Civil Procedure 23.........................................................47

28 C.F.R. § 35.130 ..................................................................................41

## SUPREME COURT COURT CASES

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ...........................................47

*Carey v. Piphus*, 435 U.S. 247 (1978) ...................................................31

*Coolidge v. New Hampshire,* 403 U.S. 443 (1971) ...............................29

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ...............................33

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) .........................32

*United States v. Jacobsen*, 466 U.S. 109 (1984) ..............................29, 32

*Zinermon v. Burch*, 494 U.S. 113 (2012) ..............................................31

# EIGHTH CIRCUIT CASES

*Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903 (8th Cir. 2015) …..…….….… 25

*Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109 (8th Cir. 1981) …….......… 23, 44

*Fields v. Abbott*, 652 F.3d 886 (8th Cir. 2011) …………………………….… 33

*General Motors Corp. v. Harry Brown's*, 563 F.3d 312 (8th Cir. 2009) ………... 25

*Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2005) ……………………….. 33

*Higbee v. Starr*, 698 F.2d 945, 947 (8th Cir. 1983)……………………....… 26

*Home Instead, Inc. v. Florence*, 721 F.3d 494 (8th Cir. 2013) …….….……...…… 28

*Iowa Utils. Bd. v. FCC*, 109 F.3d 418  (8th Cir. 1996) …………….…….....…….. 25

*Kelley v. First Westroads Bank, 840 F.2d 554, 558 (8th Cir. 1988)*……….……. 23

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*,
    530 F.3d 724 (8th Cir. 2008) ……......................................................... 45

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*,
    826 F.3d 1030 (8th Cir. 2016)…….................................................... 48

*S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707
    (8th Cir. 1989) ………………............................................................... 23

*Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992) …........................................ 29

*United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017) ……….……….……... 29

# DISTRICT OF MINNESOTA CASES

*Click Boarding LLC v. SmartRecruiters Inc.*, No. 21-CV-210,  2021 WL
    6424909 (D. Minn. Apr. 27, 2021)………………….......................... 25, 43-44

# MINNESOTA STATE COURT CASES

*Hodge v. Eastern Ry. Co. of Minnesota*, 72 N.W. 1074 (Minn. 1897) …...……... 38

*Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649 (Minn. 1948) ………… 38

# OUT OF CIRCUIT AUTHORITY

*Bass v. Richardson*, 338 F. Supp. 478 (S.D.N.Y. 1991) …………………………. 48

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987) ………..…………….……...… 47

*Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984) ……….. 47

*Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp.
    3d 806 (9th Cir. 2023) ………………………………….……..………... 30, 36

*Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) …………....…....………. 36

*McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) …………………. 42-43

*Meyer v. Brown & Root Const. Co.*, 661 F.2d 369 (5th Cir. 1981) ……..……... 47

*State v. Pippin*, 200 Wn. App. 826 (Wash. Ct. App. 2017) ………….…….….. 29

*United States v. Place*, 462 U.S. 696 (1983) ………..……….………………... 29

*Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701
    (7th Cir. 1977) ………………………………….……………………… 48

## INTRODUCTION

Plaintiffs in this case are the putative class of otherwise unsheltered houseless people living at Camp Nenookaasi. This Indigenous healing and ceremonial camp in the East Phillips neighborhood of Minneapolis remains a refuge for Plaintiffs, despite Defendant Mayor Frey's concerted efforts to destroy, displace, and scatter the community.

Defendant in this case is Jacob Frey, the Mayor of the City of Minneapolis. Defendant Frey has long been a driving force behind the evictions of unhoused encampments in Minneapolis. And in fact, in the month following the denial of Plaintiffs' first Motion for a Temporary Restraining Order, Dkt. 20, Defendant Frey ordered the eviction of Nenookaasi three different times from three different locations. With each eviction, Defendant Frey has ordered increasingly draconian measures, escalated violations of Plaintiff's constitutional rights, and caused ever-aggregating harms to the residents of Nenookaasi.

Defendant Frey has repeatedly kicked Plaintiffs out of the only place they can simply exist, and yet precisely because they have no other option, residents rebuild Nenookaasi and pray that this time, they will be left in peace. With each new location, Nenookaasi continues to provide life-saving insulation from deadly winter temperatures, a secure place for Plaintiffs and their belongings to be, and above all else a transformative community of caring people. The Plaintiffs who are

1

able to survive these disruptions continue to build community through ceremony, connection, ritual, shared meals, and mutual encouragement. The supportive environment at Camp Nenookaasi motivates and empowers residents to pursue sobriety and enter treatment and to nurture the relationships that facilitate seeking out that support. The shrinking population of Nenookaasi would be a pure testament to its own success but for the reality that evictions do also cause residents to go missing, relapse, overdose, become trafficked, and be subjected to other horrible fates.

After the initial eviction on January 4, 2024, Defendant Frey ceased providing any semblance of adequate notice for subsequent evictions, leaving Plaintiffs to scramble during two evictions that occurred without notice and to fear that they may be evicted once again at any day or time. Defendant further lacks, or declines to follow, adequate policies or plans to ensure (1) that Plaintiffs will have a meaningful opportunity to retain their belongings or retrieve them from the City after the eviction and (2) that Plaintiffs will have a safe place to live and sleep in the days and nights after they are evicted. Plaintiffs beg this Court to enjoin the Defendant from putting Plaintiffs through the traumatic and harmful ordeal they have already suffered three times since this lawsuit was first filed. As Plaintiffs predicted and as witnesses attest, these evictions are an unconstitutional, dangerous, counter-productive, and senseless cruelty that must be stopped.

2

## FACTUAL BACKGROUND

Plaintiffs incorporate and adopt the factual allegations set forth in the Class Action Complaint, Dkt. 1, the Amended Class Action Complaint, Dkt. 30, the Declarations of DeAnthony Barnes, Dkt. 5, Cheryl Sagataw, Dkt. 6, Nicole Perez, Dkt. 7, Aaron Johnson, Dkt. 8, Claire Nicole Glenn, Dkt. 9, and Christin Crabtree, Dkt. 10, as well as the Declarations of Roberta Strong, Travis Neloms, Jamie Bachus, Andrew Fahlstrom, Lyle Thunder Hawk, Franklin Eagle Tail, Veronica Tiger, Janet Marie Court, Imogen Page, Isabel Diez, and the Second Declarations of Nicole Perez, Aaron Johnson, DeAnthony Barnes, and Christin Crabtree submitted with this filing.

Plaintiffs Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms represent a putative class of predominantly Indigenous and disabled unhoused people who at any time face eviction from their temporary residence at Camp Nenookaasi. *See generally* Sagataw Decl.; Barnes Decl.; Barnes Second Decl.; Strong Decl.; Neloms Decl.

Defendant Jacob Frey is the Mayor of Minneapolis and a primary driving force behind the evictions of Camp Nenookaasi. Perez Decl. ¶ 29. Defendant Frey campaigned on a promise to "end homelessness," but since assuming office in 2018 has ordered numerous evictions of unhoused encampments that have further

3

exacerbated the crisis. *Id*. at ¶ 27; Fahlstrom Decl. ¶ 21; Diez Decl. ¶ 22; Barnes Second Decl. ¶ 5; Neloms Decl. ¶¶ 18, 21.

### The Context for Camp Nenookaasi

Camp Nenookaasi formed because people in Minneapolis are experiencing unsheltered homelessness and because services for unhoused people are under-resourced and often inaccessible to those who need them the most. *See, e.g.*, Fahlstrom Decl. ¶¶ 6-7, 9. Nenookaasi provides a safe place for those who have no other accessible, reasonable options for places to sleep at night, stay warm and safe during the day, and store their belongings. *See, e.g.*, Thunder Hawk Decl. ¶ 3. As if that stopgap security wasn't enough to justify its existence, the stability and emphasis on relationships at Nenookaasi actively enables people to access the otherwise inaccessible tools and systems that allow them to transition into more permanent housing situations. *See, e.g.*, Barnes Decl. ¶¶ 3-7; Crabtree Decl. ¶ 20 ("Camp Nenookaasi is critically important as a place for people to be as they navigate the many hoops you have to jump through to get resources in our current system.").

Shelters are not a viable alternative to staying at Nenookaasi. First and foremost, there are not enough open spaces at existing shelters for all Nenookaasi residents. *See, e.g.*, Diez Decl. ¶ 14.  During each of the three evictions of Nenookaasi since this lawsuit began and on any given night in between, there are

more residents at Nenookaasi than there are available shelter placements. Page

Decl. ¶ 16; Johnson Second Decl. ¶¶ 4, 14. Furthermore, residents of Nenookaasi

would be competing not just with each other but with the hundreds of other

unhoused people in Minneapolis for these limited placements. *Id*.; *see also* Court

Decl. ¶ 9.

Despite Defendant's representations to the contrary that 90 new shelter beds

would be available, on January 4th when approximately 150 people were evicted

from Nenookaasi there were only about 20 shelter placements available. *See*

Johnson Second Decl. ¶¶ 4, 14. When Nenookaasi was evicted again on January 31

there were nine available shelter placements, and when Nenookaasi was evicted for

a third time on February 1 there were only five available shelter placements. *Id*. at

¶¶ 15-16.

Second, even for the small fraction of Nenookaasi residents who would be

able to obtain one of the extremely limited spaces at a shelter following an

eviction, this arrangement is an untenable substitute. The process for obtaining one

of these limited shelter spots is arduous and uncertain at best. *See generally* Glenn

Decl. When residents do attempt to obtain a spot at a shelter, they are frequently

unable to do so. Thunder Hawk Decl. ¶ 5. Or, they are successful, but find that a

shelter "bed" often means just a mat on a floor in an overcrowded room. Johnson

Second Decl. ¶ 13. At shelters, people are prohibited from having visitors, exposed

to unsanitary conditions and cramped quarters that get them sick, required to keep a curfew and kicked out if unable to keep it, vulnerable to having their belongings stolen, and otherwise unable to stay if they are accused of violating any of the rigid, controlling, and arbitrarily enforced rules with no means of recourse for being accused of breaking them. *See, e.g.*, Page Decl. ¶ 16; Strong Decl. ¶ 9; Tiger Decl. ¶ 9; Barnes Decl. ¶ 16; Neloms Decl. ¶¶ 8, 11. Nenookaasi residents have been assaulted before while staying at shelters. Crabtree Second Decl. ¶ 14. In sum, shelters are "unsafe, unpredictable, and otherwise inappropriate" even for the small few who could reserve a bed in the first place. Page Decl. ¶ 16.

Shelters also trap unhoused people in a cycle of bare survival without hope for building more. Each morning, shelters kick people out and they are forced to start from zero finding a place to store their belongings, survive the day, and sleep at night. Johnson Decl. ¶ 5. Shelters, at best, offer a roof on a night-by-night basis, and nothing more. This impermanence and instability prevents unhoused people from building relationships, the importance of which cannot be understated. Without the semi-permanence of an encampment, people are unable to extricate themselves from this day-to-day survival mode. Crabtree Second Decl. ¶¶ 7-8.

### *Nenookaasi Succeeds Because of Transformational Relationships*

Above all else, what Nenookaasi provides that shelters cannot is a place where long-term, care-based, transformative relationships can develop. Simply put,

according to 20-year-old camp supporter Isabel Diez, "[t]o me, Camp Nenookaasi means family, and not being alone." Diez Decl. ¶ 6; *see also* Tiger Decl. ¶ 12 (describing Nenookaasi as "a big family"). Nenookaasi provides a place where people can give and receive care.

Former Nenookaasi resident Franklin Eagle Tail exemplifies the type of transformation that Nenookaasi makes possible. A year ago, Franklin was unhoused, living on the streets, grieving the recent death of his girlfriend, and unable to take care of himself. Eagle Tail Decl. ¶¶ 5-6. Franklin joined Nenookaasi in late August of 2023. *Id*. at ¶ 3. There, he participated in talking circles and other community-building activities, experienced food security, looked after his sister, brother-in-law, and father, and met with outreach workers who assisted him in finding an apartment. *Id*. at ¶¶ 3-6. Even now, Franklin still comes back to support his friends who remain at Camp Nenookaasi, and has grown from someone who could not even care for himself to someone who seeks out opportunities to care for other people. *Id*. at ¶ 7.

Plaintiff Roberta Strong's experience at Nenookaasi has been similarly transformative. She became homeless in 2018 after her grandmother, who she was living with, died. Strong Decl. ¶ 4. She has lived outside in a tent since then, in various encampments, and found Nenookaasi after being evicted for a second time from the Wall of Forgotten Natives in August of 2023. *Id*. at ¶¶ 5-8. Strong is "so

much more stable here at Nenookaasi than [she] has been anywhere else." *Id*. at ¶ 10. The atmosphere of reciprocal care is apparent to Strong: "My two cousins are here, and they let me take care of them … and people help take care of me in return." *Id*.

Nenookaasi has fostered the development of deep, personal relationships that shelters just cannot sustain. Former resident Veronica Tiger describes falling in love with Nenookaasi residents and how being a part of a supportive, loving community gave her the purpose and strength to achieve sobriety. Tiger Decl. ¶¶ 4, 8-13. In Veronica's words, because of Nenookaasi: "I realized that I was better than just being lost, homeless, addicted, cold. I was able to think about my dreams—finishing my education, getting a job, having a home, taking care of myself … Camp gave me meaning. A purpose." *Id*. at ¶ 8. Veronica's relationships with other residents and camp supporters like Nicole Perez inspired her to get into treatment. *Id*. at ¶ 10. Now, Veronica is three months' sober, has housing, is continuing her education and working steadily towards a better future for her and her children, and takes the time to come back to Nenookaasi to give back to the community that gave her the strength to radically transform her life for the better. *Id*. at ¶¶ 10, 13.

Receiving kindness, and bestowing it to others, is both a source of healing and also a testament to the residents' innate resilience. When given the slightest of

8

breaks from the hardships they've endured during homelessness, residents start to

pull themselves back together. As one supporter observes:

> [W]e started to build trust.  When we first started serving food, for example, people would grab so much because they didn't know when the next meal would come. But now those same people bring food to the elders first. I've seen people find themselves at Nenookaasi—residents who, at first, couldn't look you in the eye, would be afraid and distrustful. But over time residents have been able to authentically connect with each other and even with themselves. People who once struggled to make eye contact now can be seen giving statements at press conferences and city council meetings, empowered in this community together.

Crabtree Decl. ¶ 15.

The power of these caring relationships is obvious to anyone who spends

time at Nenookaasi. Says supporter Andrew Fahlstrom, "Care … in my

understanding is the thing that most heals addiction." Fahlstrom Decl. ¶ 7.

Eighty-four-year-old South Minneapolis resident Janet Marie Court describes her

observations over the course of many visits to Nenookaasi and how incredible it

has been "to see people gaining confidence in themselves. To see people begin to

know that they're valuable. To see people healing." Court Decl. ¶ 6.

Part of this healing involves managing substance use disorders and

addiction. Many people at camp had not previously contemplated sobriety as a

realistic option, but are now pursuing treatment and sobriety themselves, inspired

by the people they see around them who are in recovery. *See, e.g.*, Perez Decl. ¶¶

12-19; Barnes Decl. ¶¶ 4, 7.  People who have relapsed see others recover from

similar setbacks, and people at Camp Nenookaasi talk openly and encouragingly about reconnecting with spirituality and culture as part of recovery. Perez Decl. ¶ 14.  Organizers like Nicole Perez emphasize the importance to residents of having people with lived experience and cultural understanding working with them. *Id*. at ¶¶ 12-13. Ms. Perez herself obtained hard-won sobriety, experienced houselessness, and uniquely understands the journey of recovery, including relapse, that many residents are on. *Id*. at ¶¶ 4-6. Values of harm reduction, sobriety, recovery, and healing pervade Camp Nenookaasi. *Id*. at ¶¶ 13-14, 16, 18-19.

Camp Nenookaasi has transformed residents' lives. And while many dozens of its residents have gone to treatment and/or obtained permanent housing, it is also the case that sobriety, medical recovery, employment, and housing acquisition do not and cannot happen for every resident overnight. Says one supporter: "We don't pretend that Camp Nenookaasi is perfect." Crabtree Decl. ¶ 25. However, residents at Camp Nenookaasi and, importantly, members of the surrounding community have observed the Camp to have facilitated an overall collective decline in substance use. *Id*.

### *Mayor Frey and His Agents Have Advanced False Narratives About Safety at Nenookaasi*

Defendant Frey justifies repeatedly evicting Nenookaasi by citing unfounded and out-of-context claims that Nenookaasi is unsafe and unclean, asserted in these proceedings by the affidavit of only one person, who does not claim to have ever

10

personally visited Nenookaasi or even spoken to a single resident. *See* Dkt. 17, Declaration of Enrique Velazquez.

Diatribes about the dangers of Nenookaasi are misleading because they fail to acknowledge that (1) the safety concerns of unsheltered houselessness drastically overshadow any safety concerns that accompany living at Nenookaasi, and (2) much of the safety concerns that are present at Nenookaasi come from outsiders preying on people in vulnerable positions, as well as lack of city support.

Being unhoused is itself an incredibly dangerous circumstance. *See, e.g.*, Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, POLARIS, July 2018 (finding that 64% of survivors of sex trafficking did not have secure housing at the time they were trafficked), and Crabtree Decl. ¶ 22 (describing the dangers of the street compared to Nenookaasi, particularly for young women).

Safety has been a priority at Camp Nenookaasi since day one, when residents set the practice of discussing and adopting shared agreements to create a safe environment for the most vulnerable: elders, women/two-spirit people, and people with disabilities. Crabtree Decl. ¶ 14. Nenookaasi has systems in place to keep track of who is a resident and ensure that everyone knows each other and knows the agreements, as well as security teams. Tiger Decl. ¶ 6; Bachaus Decl. ¶

6. As a result, Nenookaasi's reputation for safety is widely known amongst the unhoused community at large. Tiger Decl. ¶ 6; Court Decl. ¶ 7.

Defendant cited one hundred 911 calls placed in the area surrounding the encampment, which then were attributed as "relating to the Encampment." Velazquez Decl. ¶ 16. Even taking this number as true, no conclusion can be drawn from this that the encampment is unsafe. No information was provided to contextualize how significant that number might be in comparison to how many calls were placed in that same area prior to Nenookaasi's formation. Nor has any data been offered demonstrating how many of these calls were in reference to actual emergencies, as opposed to neighbors whose prejudice causes them to equate unhoused, disabled, and/or Native people with danger. Says live-in camp supporter Nicole Perez, "[w]e certainly did not have 100 police visiting the camp during that time period." Perez Second Decl. ¶ 8.

The discrepancy between the number cited by the Mayor and the lack of observed police response at Nenookaasi indicates that many of the calls cited were either unrelated to Nenookaasi or were calls to which Minneapolis Police did not respond. *See*, e.g., Bachaus Decl. ¶ 14 (describing police indifference to receiving calls requesting support from within Nenookaasi). Lack of police response could be attributed either to the fact that 911 calls were not actually warranted, or to the

City's indifference, or perhaps even a strategy to encourage unsafe conditions to develop at Nenookaasi as a pretext for subsequent evictions.

Residents and supporters have witnessed this latter scenario play out, where "the residents ask for help[,] the city doesn't give it, and instead, waits for things to escalate and then blames the camp." Johnson Second Decl. ¶ 26. On at least one occasion, residents called 911 because of concerns about a housed, armed, nonresident assaulting residents and trying to sell fentanyl. *Id*.; Crabtree Second Decl. ¶ 18. Instead of assisting Camp residents, law enforcement left the area without taking action *after being notified* that the nonresident was threatening people at gunpoint. *Id*. After multiple 911 calls, the nonresident later shot someone, and the City officials cited the shooting by this nonresident as a basis for the next eviction of Camp Nenookaasi. *Id*.; *see also* Barnes Second Decl. ¶ 9 (describing incidents where residents called first responders in medical emergencies, but first responders declined or delayed providing assistance).

Defendant Frey also referenced the "death of a baby" (which was later dishonestly embellished by Defendant Frey to "dead children," Dkt. 16, ¶ 17) to describe a Nenookaasi resident's tragic stillbirth/miscarriage as a way to further sensationalize Nenookaasi. *See, e.g.*, Velazquez Decl. ¶ 17. This framing was incredibly hurtful when residents and supporters heard it repeated at the January 3, 2024 hearing on Plaintiff's first Motion for a Temporary Restraining Order. Perez

13

Second Decl. ¶ 8. "That was the mother's trauma, and that baby's life, to just put out there, to make it seem like it was something that it wasn't, by someone who had just heard a rumor but who doesn't know the mother, what she's been through." *Id*. Reactionary news outlets originally reported this narrative, which Defendant has since repeated multiple times, and which was bandied about at the January 31st meeting of the Minneapolis Public Health and Safety Committee. Johnson Second Decl. ¶ 27. In reality, this "wasn't a baby that was cared for and then died here, it was a miscarriage. [The Mayor is] trying to make us look bad, so that people think we are a bunch of animals … the Mayor has no idea what happens at this camp. The city doesn't come out here to get the real story, they just take what they get and spin it how they want." Barnes Second Decl. ¶ 8.

Illness, injury, interpersonal violence, deaths—these tragedies can and do happen, in much greater numbers but with much less visibility, when unhoused people live on the streets outside of communities like Nenookaasi. Violence and other forms of harm are unfortunately ubiquitous in all class brackets—any given apartment complex with over one hundred residents will inevitably have bad things happen to people living there.  The difference is that with Nenookaasi, the whole community is evicted any time one resident experiences violence—even as a victim. Court Decl. ¶ 22. Supporter Janet Marie Court names the heightened scrutiny that Nenookaasi is held to, and that she has never felt unsafe during any of

14

her many visits. "The few problems that the camp has had, they have handled

better than I see most other communities handle similar issues." *Id*. As one Plaintiff

puts it, "there's more Bob beating his wife in the suburbs than there are people

having problems in this camp." Neloms Decl. ¶ 22.

And the reality is that these rates of violence are noticeably reduced from the

violence that unhoused people are typically subjected to on the streets. People

report feeling safer at Camp Nenookaasi than they do anywhere else. *See, e.g.*,

Page Decl. ¶ 5. "[A] lot of people here say this is the safest spot they've ever been

since becoming homeless. People sleep without worrying." Perez Decl. ¶ 31.

Defendant cites the general well-being of the surrounding community as

another pretext for evictions. *See, e.g.*, Dkt. 16, p. 2. But in reality, evicting

Nenookaasi would greatly undermine the benefits that the camp provides to the

entire community. Crabtree Second Decl. ¶¶ 6, 8. Most neighbors, or at least the

dozens whom Andrew Fahlstrom has spoken to, "are crystal clear that sweeping

encampments destabilizes their neighborhood." Fahlstrom Decl. ¶ 25.

"Overwhelmingly people who neighbor encampments want to see a sane and

humane approach." *Id*. Even some law enforcement officers question the rationale

of repeatedly destabilizing Nenookaasi only to have it reform a few blocks away, at

great public expense, and with devastating consequences across the board. *Id*.

Unfortunately, the decision to evict Camp Nenookaasi is not up to the people who

15

are most impacted by it, or even the people who are forced to carry it out. The decision "goes all the way to the top," *id*., and the decision-maker at the top is very, very far away from the realities of life at the bottom. This disconnect between ideals during the planning stage and the realities of implementation is also evident in the way that evictions are carried out.

### *Eviction Protocols Are Inadequate and/or Not Followed*

The City cites to many policies and procedures that it purports to follow during evictions. Velazquez Decl. ¶¶ 27-28. Regardless of intentions, and regardless of what the policies may or may not describe, the reality is that evictions are now happening without notice and without meaningful opportunities for residents to safeguard their belongings.

Prior to the first eviction on January 4, 2024, representatives from the City purportedly offering storage downtown attempted to visit the residents. Perez Second Decl. ¶ 4. They came in equipped with small business cards with phone numbers on them, despite the fact that many or most residents do not have phones, wireless plans, or access to electricity to keep a phone charged, and had minimal success engaging with anyone. *Id*. One Plaintiff saw City representatives handing out flyers at a different encampment, and at Nenookaasi a few times in December, but hasn't seen storage offered since then. Neloms Decl. ¶¶ 15, 17. As even the Defendant notes, nobody uses the storage. Velazquez Decl. ¶ 9. This is because the

16

storage is completely impractical, insufficient, impossible, and untrustworthy. Neloms Decl. ¶ 15; Barnes Decl. ¶ 2. People do not trust the City or law enforcement to store their belongings. Johnson Second Decl. ¶ 10. And for good reason: the one known person who did attempt to utilize storage provided by the City ended up having everything confiscated. Crabtree Second Decl. ¶ 15. The City ignored his subsequent attempts to follow up. *Id*. Storage would require people to go all the way downtown to use or access items in storage, and to check in every two weeks to keep belongings from being thrown out, which is unworkable for people lacking reliable transportation. Diez Decl. ¶ 11. Unhoused people frequently are without a way to keep track of the date and time. Presumably a desk calendar or similar would be lower on the priority list behind medications, identity documents, clothing, food, religious items, and other staples if, as the Defendant suggests, unhoused people are required to stow away everything in a difficult-to-access location except what they can carry on their person.

Perhaps because the program has proven so ineffective, it appears to have been abandoned. If people from the Homeless Response Team were present at the January 4 eviction, they did not make their presence known or their resources accessible. Perez Decl. ¶ 5; Johnson Second Decl. ¶ 8; Neloms Decl. ¶ 17; Falstrom Decl. ¶ 16. Storage was also not offered at or prior to the evictions on January 30 or February 1. Johnson Second Decl. ¶ 9; Barnes Second Decl. ¶¶ 3-4;

Neloms Decl. ¶ 17; Fahlstrom Decl. ¶¶ 17, 19; Page Decl. ¶ 13; Diez Decl. ¶ 11; Crabtree Second Decl. ¶ 13.

On February 5, 2024, after the third eviction, a Minneapolis Regulatory services employee named Jose, Vehicle ID 08146, came into Camp with a case of water and a few boxes of granola bars. Perez Second Decl. ¶ 9. Nicole Perez recognized him as someone previously assigned to come to Camp and offer storage and inquired whether storage was available. *Id*. He said no. *Id*.

The City did post notice in advance of the January 4, 2024 eviction. *Id*. at ¶ 5. As a result, social service agencies and nonprofits were present at the January 4, 2024 eviction, attempting to assist residents in answering the question on everyone's minds: *where will we go now*? Law enforcement delayed some vehicles and some friends, family, and supporters, but largely allowed supporters to pass through the police barricades to assist residents in packing up their belongings. Barnes Second Decl. ¶ 2; Fahlstrom Decl. ¶ 10.

For the January 30 and February 1 evictions, however, the only prior "notice" that Plaintiffs received of their impending evictions was the sound of a drone overhead and the sight of law enforcement and city workers setting up perimeters and staging. *Id*. at ¶¶ 6-7; Bachaus Decl. ¶¶ 9-10; Fahlstrom Decl. ¶ 11. In advance of the January 30, 2024, eviction a man dressed like clergy, with no apparent connection to or authority from the City of Minneapolis and who

identified himself only as "Pastor Colin," delivered a "no trespassing" sign to Nenookaasi on a sandwich board. Fahlstrom Decl. ¶ 14; Johnson Second Decl. ¶ 5. The back-dated "no trespassing" sign that appeared prior to the February 1 eviction was similarly devoid of any eviction date. Johnson Second Decl. ¶ 6.

At these second and third evictions, law enforcement encircled a several block radius around Nenookaasi with crime scene tape. On January 30, residents were initially given only 90 minutes to pack up and leave, otherwise they were told that they would be taken to jail for trespassing. Thunder Hawk Decl. ¶ 7; Bachaus Decl. ¶ 9. Residents like Lyle Thunder Hawk who did not want to risk going to jail took law enforcement at their word, packed up an armful of belongings, and left before any social service agencies had even learned yet that an eviction was happening. *Id*. Law enforcement later relented and allowed the residents who remained to have more time.

Law enforcement became progressively and arbitrarily more restrictive with allowing people to enter Nenookaasi during evictions. Unlike at the January 4 eviction, many friends, family, neighbors, social service agencies, press, the undersigned attorney, and even some residents themselves were either significantly delayed or outright denied access to the site once the evictions began on January 30 and February 1. Barnes Second Decl. ¶¶ 3-4; Perez Second Decl. ¶¶ 5-7; Johnson Second Decl. ¶¶ 9, 22; Diez Decl. ¶ 11; Bachaus Decl. ¶ 10; Page Decl. ¶ 13.

19

The policies that are deployed during evictions are not designed to ensure that residents' rights are protected, but rather to scatter people who are gathering to meet each others' needs as a community when government programs are inaccessible to them. Fahlstrom Decl. ¶ 21. The transparent disregard for Plaintiffs becomes all the more apparent to everyone as the pretexts erode with each subsequent eviction. Says one Plaintiff: "[t]he city helping people at evictions is a laughing matter. They just try to figure out how to keep us from having an encampment, they are not trying to help people store their things, transport elsewhere, or have a place to sleep at night." Neloms Decl. ¶ 18.

And ultimately, the lack of notice and support during evictions is just the tip of the iceberg compared to the devastating consequences of the evictions themselves.

### *Evicting Nenookaasi* **Ad Nauseum** *Will Continue to Irreparably Harm Plaintiffs*

Plaintiffs suffer individual and communal devastation as a result of Defendant's repeated evictions. Much of these losses are material. Defendant's assertion that "there have been no claims that any individual lost property at the closure," Valquez Decl. ¶ 2, runs counter to the experiences of every Nenookaasi resident. Evictions have resulted in the loss of: identification documents, valuables and mementos, bedding, clothing, tents, and innumerable other categories of belongings to which housed people take access for granted. *See, e.g.*, Sagataw

Decl. ¶ 23; Barnes Decl. ¶ 13; Johnson Decl. ¶¶ 15-17; Neloms Decl. ¶ 20. For

residents like Travis Neloms, who lost multiple forms of identity documents

through evictions, this has posed an acute barrier since replacing one identity

document typically requires producing another. *See* Neloms Decl. ¶ 20.

Perhaps people who have never experienced the panicked chaos of an

eviction do not know what the experience is like and cannot understand what's so

hard about keeping track of your belongings. Former resident Franklin Eagle Tail

describes his experience at a Camp Nenookaasi eviction:

> When the eviction happened, I had to clear out my yurt and [my
> family members'], too. I gathered what I could and moved it using
> wagons, by hand, and help from supporters. I was moving between the
> camp and the new camp location because I needed a place set up to
> move to. By the time I got back to the old camp, the cops were
> making everyone leave. The cops wouldn't let me finish taking the
> rest of my stuff and told me to just grab whatever I could. I lost my ID
> card, Social Security card, cellphone, clothes, my heater, and other
> personal items.

Eagle Tail Decl. ¶ 7.

In addition to important items, relatives themselves go missing during

evictions. Residents experience a wide range of medical, logistical, spiritual,

emotional, and other compounding harms. Evictions cause death, overdoses,

illness, people going missing or being forced into more dangerous modes of

survival, frostbite and hypothermia, relapsing, losing access to services and

relationships to supports, and cascading harms that also impact the community at

large. Fahlstrom Decl. ¶ 20; Court Decl. ¶ 8; Tiger Decl. ¶ 14; Page Decl. ¶ 21; Johnson Second Decl. ¶ 28; Diez Decl. ¶¶ 15-18. After the February 1 eviction, for example, one resident was kidnapped from the streets and beaten until a supporter found her and brought her to the safety of the reformed Nenookaasi. Crabtree Second Decl. ¶ 16. Many people may relapse, with disastrous consequences, as evictees "get high to cope with the trauma of losing their home, their security, and their community." Johnson Decl. ¶ 17. Evictions are nothing short of devastating.

Even a notice of an upcoming eviction can bring despair, hopelessness, relapse, overdose, and a general erosion of progress. *See, e.g.*, Sagataw Decl. ¶¶ 18-19, 25; Perez Decl. ¶ 32.  "Being told that eviction is coming is draining. It's scary to not know where you're going to go and to be told you have to move and not know where to go or if that next spot will be safe, or when you'll be moved from there. It is traumatizing to not have control over your life." Perez Decl. ¶ 32. Now, with Plaintiffs not even receiving notice, these concerns are near-constant because an eviction could happen at any time.

The population of unsheltered unhoused people is at a "nationwide high." Johnson Second Decl. ¶ 30. Amidst this crisis, Nenookaasi "holds and cares for the people who are most affected … so they don't disappear." Fahlstrom Decl. ¶ 9. Instead of bolstering this effort by allocating resources to support Nenookaasi,

Defendant prefers to spend exorbitant taxpayer dollars forcing residents to continually pick up and relocate a few blocks away.

This cycle must end. Nenookaasi residents deserve a fighting chance, and they beg this Court to enjoin their repeated evictions. The repeated nature of these evictions prove that it is no longer about any one location or any one eviction—this is a total bar of access to and existence within the City itself.

## STANDARD OF LAW

District courts may grant injunctive relief pursuant to Federal Rule of Civil Procedure 65(b) in the form of a temporary restraining order or a preliminary injunction. The legal standard for both of these remedies is the same. *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989). Temporary restraining orders are mechanisms by which a judge may preserve the status quo during the pendency of the case. *Kelley v. First Westroads Bank*, 840 F.2d 554, 558 (8th Cir. 1988). Injunctive relief is an extraordinary remedy and in awarding it a court applies four factors: (1) the threat of irreparable harm to the movant, (2) the likelihood of success on the merits of the movant's claims, (3) the balance of equities between the movant's prospective harm the injunction would avert, and the nonmoving party's prospective harm as a result of being enjoined, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "At base, the question is whether the balance of

equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* at 113.

## ARGUMENT

Preliminary injunctive relief is warranted and necessary to avert the ongoing destruction that Plaintiffs experience. Defendant Frey has evicted Plaintiff's shelter three times in the span of one month, and with each eviction provides less notice and support. Plaintiffs fear that an eviction could happen at a moment's notice, as has happened already twice at Camp Nenookaasi itself. These evictions impose an unfortunately predictable slew of harms: Plaintiffs lose their belongings, shelter, safety, community, progress towards sobriety and other forms of health and well-being, relationships with social and housing workers, and their best chance at both immediate survival and long-term stability.  The causes of action that Plaintiffs have against the Defendant are meritorious. Unlike the Plaintiffs, who have nothing to their name aside from what Defendant seeks to deprive them of, Defendant Frey would not be harmed by the requested relief. The cited safety concerns that Defendant uses to justify evicting Plaintiffs are exacerbated, not addressed, by an eviction. The public interest is strongly in favor of judicial action that promotes decreased substance use, human trafficking, violence, and fiscal irresponsibility, and that holds members of government accountable to the mandates of the United States Constitution.

24

## I. ABSENT A TEMPORARY RESTRAINING ORDER, PLAINTIFFS FACE IRREPARABLE HARM.

Irreparable harm is the "foundation of issuing an injunction." *Click Boarding LLC v. SmartRecruiters Inc.*, No. 21-CV-210, 2021 WL 6424909, at *2 (D. Minn. Apr. 27, 2021). Harm is irreparable when "a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *General Motors Corp. v. Harry Brown's*, 563 F.3d 312, 319 (8th Cir. 2009). In addition to being irreparable, harms must not be speculative: to succeed on a preliminary injunction, the movant must allege harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996); *see also Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015).

Here, the harm is both concretely imminent and also impossible to repair through a monetary award. The injuries to Plaintiffs during evictions are not speculative possibilities: prior evictions ground Plaintiffs' fears in reality. With each eviction of Nenookaasi, Plaintiffs lose more irreplaceable items: medicines, warm clothes, bedding, tents, heat sources, means of both physical and spiritual survival. Barnes Decl. ¶ 18; Barnes Second Decl. ¶ 6; Eagle Tail Decl. ¶ 7; Neloms Decl. ¶ 20. And while some physical belongings may be replaced eventually, others may not—such as heirlooms and sacred items. *See, e.g.*, Barnes Decl. ¶ 18. These disruptions and deprivations of property cause a cascade of injuries that a

25

subsequent damages award could never restore. No price could be put on experiencing a relapse, being kidnapped and beaten, losing the hard-won progress with social and housing workers on attaining stability, having to start from square-one with finding and maintaining contact with support systems, or being able to stay connected to a quite literally life-saving community when no meaningful or reasonable alternatives for survival are available. *See, e.g.*, Sagataw Decl. ¶ 26; Barnes Decl. ¶ 15; Crabtree Second Decl. ¶ 16; Tiger Decl. ¶ 14; Court Decl. ¶ 18.; Fahlstrom Decl. ¶ 20. No Plaintiff can be adequately compensated for their own death. Johnson Decl. ¶ 17.

As has been recognized by this Circuit that the destruction of a person's only living quarters constitutes irreparable harm. *Higbee v. Starr*, 698 F.2d 945, 947 (8th Cir. 1983).

For all but the first of these three evictions since Plaintiffs initiated this lawsuit, notice has not been given. Bachaus Decl. ¶¶ 9-10. At no point in time have residents been offered anything other than performative, but useless, storage options, an effort which appears to have been abandoned entirely. *See, e.g.*, Perez Second Decl. ¶ 4; Neloms Decl. ¶¶ 15, 17; Crabtree Second Decl. ¶¶ 13, 15; Diez Decl. ¶ 11; Johnson Second Decl. ¶¶ 8-10; Perez Decl. ¶ 5; Barnes Second Decl. ¶¶ 2-4; Fahlstrom Decl. ¶¶ 16-17, 19; Page Decl. ¶ 13.

And whether or not Plaintiffs receive notice of evictions does not change the ultimate issue in this case, which is that Plaintiffs are being evicted under threat of arrest when they simply have nowhere else to go.

Shelters are not housing. *See, e.g.*, pp. 4-6, *supra*. Shelters provide temporary relief that must be fought for each morning to ensure a place to sleep the next night. Tiger Decl. ¶¶ 9-13. Shelters do not provide warmth during the day or a place to store your belongings, and people get sick and are assaulted staying at shelters. Crabtree Second Decl. ¶ 14. Nor do shelters provide any of the transformative, spiritual community support that Camp Nenookaasi residents co-create for each other. Page Decl. ¶ 16. Besides, there are nowhere near enough shelter openings to accommodate the residents of Nenookaasi. *See, e.g.*, Bachaus Decl. ¶ 12.

Experiencing these evictions is not a "choice" for residents, nor are there any meaningful opportunities for Plaintiffs to avoid this harm that would render the injury any less concrete. Requiring Plaintiffs to sleep in shelters and to store belongings downtown in a system that they simply cannot access or navigate is futile. This logic asserts that Plaintiffs do not get to have constitutional rights because of their poverty, disabilities, and lack of resources that the City's solutions fail to accommodate, and because of the resilience that allows them to recognize and create the transformative community at Nenookaasi.

Further evictions would irreparably cause Plaintiffs harm because Plaintiffs would once again be forced to scatter—losing all personal belongings they cannot carry; losing all progress and relationships towards housing, sobriety, stability; experiencing direct trauma from the wrongful eviction itself, with the threat of force and arrest for noncompliance with the eviction. Eventually, Plaintiffs will run out of places to rebuild. As the rubble deposited at prior Nenookaasi locations shows, this is exactly what the Mayor wants.

## II.   PLAINTIFFS' CLAIMS ARE REASONABLY LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to succeed on their claims that Defendant's eminent eviction and destruction of property violates their rights under Federal and Minnesota law. In this Circuit, the likelihood of a movant's success is the most significant factor of the four, although not dispositive. *Home Instead, Inc. v. Florence*, 721 F.3d 494, 497 (8th Cir. 2013). To show a likelihood of success, Plaintiffs are not required to prove a "greater than fifty percent chance of winning on the merits," but only a "reasonable probability" or a "fair chance" of success. *Click Boarding LLC*, 2021 WL 6424909 at *4 (quotations omitted). Plaintiffs' claims are meritorious and there is a reasonable probability and fair chance that any or all of Plaintiffs' enumerated claims will succeed, although the success of only any one claim is sufficient.

28

**A. Count I: Unlawful Seizure & Destruction of Plaintiffs' Property in Violation of the Fourth Amendment to the United States Constitution**

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'" *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992). A seizure without a warrant is "per se unreasonable." *United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017).

Defendant has the burden to show that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement. *See Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971). Even if a search or seizure is lawful at its inception, the seizure "can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984).

This Constitutional Right protects Plaintiffs' homes and belongings at Camp Nenookaasi. *See, e.g.*, *State v. Pippin*, 200 Wn. App. 826 (Wash. Ct. App. 2017) (finding that an unhoused person had privacy interests in their tent); *United States v. Place*, 462 U.S. 696, 700-01 (1983) (defining personal property as "effects" under the Fourth Amendment). "The Fourth Amendment protects homeless

29

individuals from seizure and summary destruction of their unabandoned, but temporarily unattended, personal property." *Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp. 3d 806, 837 (9th Cir. 2023).

The taking and destruction of Plaintiffs' property constitutes a meaningful interference with their possessory interest in their property. *Jacobsen*, 466 U.S. at 124-25 (destroying property is a permanent deprivation and is a meaningful interference with an individual's possessory property interest).

Defendant's ineffective outreach to offer Plaintiffs storage that even the Defendant admits the few people who know about it would not use, Velazquez Decl. ¶ 9, and the one known person who used it had all of their belongings taken, Crabtree Second Decl. ¶ 15, does not change the reality that during evictions belongings are thrown into a dumpster and irrevocably destroyed.  Furthermore, Defendant's purported efforts to offer storage to residents prior to evictions appear to have been abandoned.  *See, e.g.*, Perez Decl. ¶ 5; Johnson Second Decl. ¶¶ 8-9; Neloms Decl. ¶ 17; Falstrom Decl. ¶¶ 16-17, 19; Barnes Second Decl. ¶¶ 3-4; Page Decl. ¶ 13; Diez Decl. ¶ 11; Crabtree Second Decl. ¶ 13.

Defendant Frey's evictions are not done under the auspices of a search and seizure warrant or any legal authority to search, seize, and destroy Plaintiffs' property. As such, the Plaintiffs are likely to succeed on their claim that

Defendant's evictions and associated seizure and destruction of property are barred under the federal constitution.

**B. COUNT II**: **Procedural Due Process Violations Under the Fourteenth Amendment of the United States Constitution**

Plaintiffs are likely to succeed in their claim that Defendant Frey's seizure and destruction of Plaintiffs' property without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim their property violates Plaintiffs' rights to Due Process of law protected by the Fourteenth Amendment to the U.S. Constitution, through 42 U.S.C. § 1983.

No agent of a state government shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV.

Procedural due process protects against "the mistaken or unjustified deprivation of life, liberty or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). To determine whether a procedural due process violation has occurred, courts look at whether a deprivation of a property or liberty right occurs, and whether the process the government used to perpetuate that deprivation was constitutionally adequate. *Zinermon v. Burch*, 494 U.S. 113, 126 (2012). "The Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." *Id*. at 127.

31

"To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). Destroying property is a permanent deprivation and meaningful interference with an individual's possessory property interest. *Jacobsen*, 466 U.S. at 124-25.

Here, the property and liberty rights at issue include both those of Plaintiffs' persons and of their property. Defendant Frey's evictions continue to deprive Plaintiffs of vital and necessary property for survival—including their means of generating heat and staying warm—and then cast them out into Minnesota's winter cold. An eviction notice was posted at the outside of the encampment a few days before the first articulated eviction date, but since then Defendant has ceased providing notice of upcoming eviction dates. Perez Second Decl. ¶¶ 6-7. During evictions, residents and their supporters who are actively trying to remove items are arbitrarily denied access, causing possessions to be lost as a result. *See, e.g.*, Eagle Tail ¶ 7. This is not constitutionally sufficient—Defendant Frey has offered no opportunity to be heard, nor do the evictions offer pre- or post-deprivation procedures for reclamation of property.

For these reasons, the manner in which Defendant Frey carries out the repeated eviction of Camp Nenookaasi violates Procedural Due Process, and thus Plaintiffs are likely to succeed on this claim brought under the federal constitution.

32

### C. COUNT III: State-Created Danger in Violation of the Right to Substantive Due Process Under the Fourteenth Amendment of the United States Constitution

Plaintiffs are also likely to succeed on the claim that Defendant Frey's planned eviction and destruction of Camp Nenookaasi violates their substantive due process rights by creating the danger to which Plaintiffs are being subjected and then failing to protect them from it. "[T]he state owes a duty to protect individuals if it created the danger to which the individuals are subjected." *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005).

To succeed on a state-created-danger theory, Plaintiffs must prove (1) that they were members of a "limited, precisely definable group," (2) that the municipality's conduct put them at "significant risk of serious, immediate, and proximate harm," (3) that the risk was "obvious or known" to the municipality, (4) that the municipality "acted recklessly in conscious disregard of the risk," and (5) that in total, the municipality's conduct "shocks the conscience." *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011). The Supreme Court has explained that official behavior "that would most probably support a substantive due process claim" is "conduct intended to injure in some way unjustifiable by any government interest;" that "is the sort of official action most likely to rise to the conscience-shocking level." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

33

As discussed in detail in the Amended Complaint, Dkt. 30, Plaintiffs are members of a limited and precisely definable group. They are the residents of Camp Nenookaasi who are otherwise unhoused and, absent intervention by this Court, will be subjected to Defendant Frey's planned eviction.

Defendant Frey's ongoing evictions put Plaintiffs at significant risk of serious, immediate, and proximate harm. This risk is concretely proven because for many residents, the harms have already occurred and aggregate with each new eviction. *See, e.g.*, Crabtree Second Decl. ¶ 16; Fahlstrom Decl. ¶ 20; Court Decl. ¶8.

Defendant Frey's ongoing evictions will continue causing Plaintiffs irreparable harm. *See* Part I, *infra*. Plaintiffs reasonably fear that the eviction will deprive them of personal belongings, relationships, stability, and community necessary to their survival. *See, e.g.*, Barnes Decl. ¶¶ 15-18; Sagataw Decl. ¶ 22.

Defendant Frey is well-aware of these risks, as the dangers of his planned eviction are both obvious and known to him. These evictions are part of Defendant Frey's pattern and practice, and have gone on for years, with predictable results that residents simply move to another encampment where they are forced to start over. *See, e.g.*, Barnes Decl. ¶¶ 8, 13, 14, 16, 17; Crabtree Decl. With regard to Camp Nenookaasi in particular, Defendant Frey has been informed of these risks by Nicole Perez, by other community members, and even by his own govt officials and City Council. *See, e.g.*, Perez Decl. ¶¶ 20-29; Crabtree Decl. ¶¶ 27-29

34

(describing the willful incompetence and dangers of the City's repeated evictions); Johnson Decl. ¶ 14 (describing efforts to notify Mayor Frey and other City officials of the impending harm that would be caused by Camp Nenookaasi's eviction).

Despite Defendant Frey's awareness of the substantial risk his and his agents' actions will pose, he continues to order evictions. Although his public rhetoric has indicated more shelter beds are being made available, the reality is that few shelter beds are actually open, what few shelter beds do exist are difficult to access, and shelters do not provide a meaningful safe alternative for Camp Nenookaasi's residents.  Page Decl. ¶ 16; Strong Decl. ¶ 9; Tiger Decl. ¶ 9; Barnes Decl. ¶ 16; Neloms Decl. ¶¶ 8, 11; and Crabtree Second Decl. ¶ 14.

Finally, Defendants conduct here shocks the conscience.  Camp Nenookaasi is an Indigenous healing camp and its residents are disproportionately Indigenous peoples.  The Camp involves important cultural healing ceremonies, a sacred fire, drumming, and culturally-informed community care.  *See, e.g.*, Perez Decl.  ¶¶ 14-20.  It is a place where real healing is occuring, where people are having transformative success as they pursue sobriety and obtain permanent and long-term housing and treatment.  *See id.*; Crabtree Decl. ¶¶ 18-25. Defendant Frey's evictions target this success and amount to a dangerous escalation of the legacy of genocidal displacement of Indigenous peoples.

To blame the Plaintiffs for the Defendant's own policy failures and then undermine the ways they make do with taking care of themselves and each other is simply shocking.

For these reasons, Plaintiffs are likely to succeed on the merits of their claim that Defendant Frey's planned eviction violates their Substantive Due Process Rights under the federal constitution.

**D. COUNT IV: Violation of the Eighth Amendment to the US Constitution**

The Eighth Amendment to the U.S. Constitution, as applied to the States and their subdivisions through the Fourteenth Amendment, protects civilians from "cruel and unusual punishment."  As a result, it "prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Coalition on Homelessness*, 647 F. Supp. 3d at 832 (quoting *Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019)). This includes "criminaliz[ing] indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id*. at 833.

Here, the residents of Nenookaasi are being punished for creating a lifeline for themselves where City programs have failed them. Camp Nenookaasi provides its residents with resources, healing, relationships, spirituality, motivation, and deeply transformative community above and beyond just a safe place to sleep and access to heat and warmth.  Perez Decl. ¶¶ 7-19; Barnes Decl. ¶¶ 4-7, 10-12, 15;

36

Crabtree Decl. ¶¶ 14-25; Sagataw Decl. ¶¶ 7-17.  Plaintiffs do not have reasonable alternatives to living at Camp Nenookaasi—they are unhoused, indigent, disproportionately have qualifying disabilities, and have come to Camp Nenookaasi as a last resort for survival.

Despite this, Defendant Frey evicts Plaintiffs from Camp Nenookaasi repeatedly, ordering his agents to carry out the eviction under penalty of arrest, imposing and threatening to impose criminal penalties and other harm and punishment for conduct which Plaintiffs cannot realistically avoid. Thunder Hawk Decl. ¶ 7; Page Decl. ¶ 17.

Furthermore, the manner in which these evictions are carried out—by armed law enforcement officers under threat of arrest, with residents ordered from their shelters, their tents knifed by law enforcement, *see, e.g.*, Barnes Decl. ¶ 14, their belongings and bulldozed, destroyed, and trashed—amounts to a penalty, harm, and/or punishment that Defendant Frey and his law enforcement officers impose or threaten to impose for conduct which Plaintiffs cannot avoid.

The Eighth Amendment does not allow Defendant to harm or punish, through property destruction, threats of arrest or otherwise, this putative class of Plaintiffs who have no meaningful alternative to living at Camp Nenookaasi.

### E. COUNT V: Conversion in Violation of Minnesota Common Law

Plaintiffs are likely to succeed on their claim of conversion, as the forced eviction and destruction of Camp Nenookaasi will deprive them of their personal property, constituting a theft by conversion under Minnesota common law.

"Conversion has been defined as an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession." *Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948). To succeed in an action for conversion, the Plaintiffs must prove two elements: "First, property, general or special, in the plaintiff, and a right of possession at the time of the conversion; and, second, a conversion of the thing by the defendant." *Hodge v. Eastern Ry. Co. of Minnesota*, 72 N.W. 1074, 1075 (Minn. 1897).

As discussed above, Defendant Frey's planned eviction and destruction of Camp Nenookaasi will involve unlawful seizures and destruction of Plaintiffs' property as well as deprivation of property without due process, all in violation of Plaintiffs' rights under the Minnesota and United States Constitutions.  Such seizure, destruction, and deprivation of property constitutes conversion under State law, and Plaintiffs thus will succeed on this claim.

**F. COUNT VI: Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.**

Plaintiffs are likely to succeed on their Title II Claim, because Defendant Frey has discriminated against the disabled residents of Nenookaasi through disparate treatment, intentional discrimination, and by failing to provide reasonable modifications or accommodations to his policies and practices in repeatedly evicting the Camp.

Title II of the Americans with Disabilities Act (ADA) prohibits discrimination against people with disabilities by state and local governments and their programs, explicitly providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Plaintiffs, the residents of Camp Nenookaasi, are disproportionately individuals with physical and/or mental disabilities, disorders, and/or conditions including addiction which qualify them as "persons with disabilities" under the ADA. *See, e.g.*, Strong Decl. ¶ 2, Neloms Decl. ¶ 2, Sagataw Decl. ¶ 17, Barnes Decl. ¶ 4, Tiger Decl. ¶ 4; *see also* Minn. Dep't of Health, *Minnesota Homeless Mortality Report, 2017-2021* (Jan. 2023), *available at* https://www.health.state.mn.us/communities/homeless/coe/coephhmr.pdf

(reporting that nearly 40% of people experiencing homelessness self-reported a disability); 42 U.S.C. § 12102; 42 U.S.C. § 12131.

As a public entity, Defendant Frey, in his official capacity, is required to comply with Title II of the ADA, and the actions of Defendant alleged in this Complaint, in his official and individual capacity, relate to services, programs, and activities under Title II. *See* 42 U.S.C. § 12131; 42 U.S.C. § 12131.

Discrimination under Title II of the ADA includes administration of programs in a manner that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130(f).

Defendant Frey's repeated evictions of Camp Nenookaasi have disproportionately impacted qualified people with disabilities under the ADA. The people who are forcibly removed under threat of arrest, whose belongings and effects are lost in the process, are disproportionately disabled. In addition, even if there were sufficient shelter beds available—a fact which Plaintiffs dispute—such shelter options are not realistic or sufficient alternatives to the stability, accessibility, and support provided at Camp Nenookaasi.

The repeated eviction and forced displacement of Camp Nenookaasi residents from one location to another, without first identifying and offering

40

alternative housing that meets the disability-related needs of its residents does not serve any compelling governmental interest of Defendant Frey.

Furthermore, Defendant Frey's duty not to discriminate against people with disabilities under Title II of the ADA includes a duty to provide reasonable modifications in otherwise neutral policies or practices "when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Over and over again, Plaintiffs have asked Defendant Frey to postpone the repeated evictions of Camp Nenookaasi unless and until appropriate alternative shelter—shelter that would meet many Plaintiffs' disability-related needs—is made available. As Camp Nenookaasi residents and their supporters have repeatedly explained to Defendant Frey, existing shelter beds are neither sufficient in number to house all Nenookaasi residents, nor are they at all appropriate to meet their needs related to their physical and/or mental disabilities, disorders, and/or conditions. Crowded mats on a floor with little to no privacy, strict enforcement of rules and curfews, and no room for securely storing personal belongings and effects are neither humane nor accessible for anyone struggling with chronic homelessness, let alone someone with a qualified physical or mental health disability.

41

Similarly, Defendant Frey is aware that the repeated evictions of Camp Nenookaasi when residents have no meaningful housing alternatives beyond re-establishing Camp on another vacant lot is extremely and disparately difficult for people with disabilities and often makes their symptoms much worse.

Whether through personal interactions with Defendant Frey and his staff, through emails and social media communications, through political processes, or through counsel in the course of negotiating this case, Plaintiffs have repeatedly asked Defendant Frey to postpone the eviction of Camp Nenookaasi and its disproportionately disabled residents until they are offered housing placements that meet their needs.

However, Defendant Frey not only refused to postpone the eviction of Camp Nenookaasi on January 4, 2024, but has carried out two more evictions in the month since.

A temporary delay in the repeated evictions of Camp Nenookaasi to give service providers adequate time to provide residents with appropriate housing alternatives would not impose a fundamental alteration to Defendant Frey's programs or services.

Defendant Frey may claim that his actions are not a violation of Title II because his actions are facially neutral. This is simply not the legal standard. *McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) ("[A] plaintiff

42

need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim. . . . [T]he crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced.").

Finally, Defendant Frey's disability-based discrimination is not only disparate, but intentional. Defendant Frey and his agents are well-aware that Camp Nenookaasi residents are disproportionately disabled. Defendant Frey knows that Camp Nenookaasi is an Indigenous healing camp disproportionately serving people with disabilities. Defendant Frey also is aware, and has been made aware, that existing shelter "beds" are neither sufficient in number nor a realistic or appropriate housing alternative for Camp Nenookaasi residents, including for reasons related to their disabilities, and that residents have requested reasonable alternative housing.

Nevertheless, Defendant Frey has continued to repeatedly evict Nenookaasi residents. In doing so, he administers his programs in a way that intentionally discriminates against people with disabilities on the basis of their disabilities.

III.   **BALANCE OF EQUITIES FAVORS PLAINTIFFS, AS AN INJUNCTION WILL NOT HARM THE DEFENDANT.**

A court evaluating this factor "weighs the harm that the movant is likely to suffer absent the requested injunction against the harm other parties will suffer if

the Court issues it." *Click Boarding LLC*, 2021 WL 6424909 at 4; *see also*

*Dataphase Sys.*, 640 F.2d at 113.

In this case, the balance of equities weighs strongly in favor of Plaintiffs.

The government's strong interest in ensuring the public safety and order is best

served by actively supporting, or at a bare minimum refraining from undermining,

the existence of Nenookaasi. Plaintiffs' interests in maintaining their shelter, their

belongings, their access to social services and other resources, their opportunity to

obtain the stability to seek treatment and/or permanent housing are harmonious

with Defendant's interests in running a safe and humane City. Furthermore, the

health and safety concerns that Defendant Frey may assert are themselves a result

of cycles of houselessness, addiction, and poverty, and not of Camp Nenookaasi.

Health and safety concerns endanger unhoused people, neighbors, and the

community at large to a much greater degree without places like Camp Nenookaasi

that are designed to prioritize safety and sanitation. *See, e.g.*, Johnson Decl. ¶ 17;

Sagataw Decl. ¶¶ 22-25; Crabtree Decl. ¶¶ 26-30. Defendant Frey's own actions

exacerbate the problems he cites to, because evictions and the dispersal of

encampments set Plaintiffs back and undo progress they are able to make towards

pulling themselves out of homelessness, addiction, and the assorted dangers and

hardships that accompany those conditions. *Id.* Evictions do not *disrupt* trafficking,

violence, or unsafe conditions, but *invite* them. Defendant Frey should be estopped

44

from citing any sanitation or safety concerns at Nenookaasi that are products of his own actions or inactions, such as delays or refusals to provide sanitation services like trash pickup and porta-potties, emergency and medical services, and access to social service agencies, and including the evictions themselves.

## IV.   A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST.

It is in the public interest to ensure that the government does not deprive people of their constitutional rights—the right to be secure in their homes, to be free of unreasonable seizures and cruel punishments, to privacy and procedural and substantive due process. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008) ("[T]he protection of constitutional rights is always in the public interest.").

Furthermore, any pretextual health and safety concerns the Defendant may assert about the encampments are belied by the fact that repeated evictions and attempts to destroy Nenookaasi place the health and safety of its residents in peril, destroy the progress residents have made towards stability, sobriety, and permanent housing, and damage the community ties and relationships of trust that have been and continue to be built there.  *See, e.g.*, Sagataw Decl. ¶¶ 15-20.  If evictions are allowed to continue, residents will again and again lose whatever they cannot carry with them, including their shelters, their bedding, their important documents and

45

identification, their sources of heat and warmth, and be cast out to fend for themselves against the cold of Minnesota winter. *See id.* at ¶ 23-25; Barnes  ¶¶ 13, 18. Neighbors themselves chorus for encampments to be kept open. Fahlstrom Decl. ¶ 25.

Defendant referenced "murder and dead children," Dkt. 16, p. 17, as a despicable reframing of events that, had they happened in any equivalent housed community, would have resulted in an influx of support and care rather than further abuses. The reference to "dead children" is an abhorrent and disgraceful attempt to villainize a mother who suffered a stillbirth/miscarriage. A resident was murdered at Nenookaasi in December of 2023 while attempting to enforce the security rules of Camp, which prohibit drug dealers from preying upon residents who are trying to get sober, against two non-residents. Because of the Defendant's prejudice against Nenookaasi residents, the murderers who shot TeBone were assumed to be affiliated with and their actions therefore attributable to the existence of Nenookaasi. We do not blame school shootings on the existence of schools and then fire the teachers and expel the students. It is never appropriate to fault the most vulnerable members of our society for the actions and consequences of other people who seek to take advantage of them.

Every time Nenookaasi is destroyed, it is the entire community who suffers. *See, e.g.*, Johnson Decl. ¶ 17;  Sagataw Decl. ¶¶ 22-25; Crabtree Decl. ¶¶ 26-30.

V.    THE TEMPORARY RESTRAINING ORDER SHOULD EXTEND TO
      PROTECT ALL RESIDENTS OF CAMP NENOOKAASI.

Plaintiffs have brought an action for class-wide relief. Even before the class

is certified, the Court is within its right to issue an injunction that extends beyond

the named plaintiff to ensure the prevailing parties are granted the relief to which

they are entitled. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also*

*Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 374 (5th Cir. 1981) ("Injunctive

relief which benefits non-parties may sometimes be proper even where the suit is

not brought as a Rule 23 class action."); *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th

Cir. 1987) ("Class-wide relief may be appropriate even in an individual action.");

*Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984) ("The

plaintiff correctly states that injunctive relief may benefit individuals not party to

the action, and that classwide injunctive relief may be appropriate in an individual

action."). The district court has the power to order as broad of relief as

necessary—including nationwide—where it is required. *Yamasaki*, 442 U.S. at 702.

Here, it is not in any way practical, effective, or sensible to limit the relief to

only certain named individuals.  Rather, the Court should issue an injunction

halting the eviction of all Camp Nenookaasi residents and Defendant Frey's

perpetuation of the violent cycles of houselessness.

## VI.   THE SECURITY REQUIREMENT SHOULD BE WAIVED.

While a bond is generally required before issuing injunctive relief under Federal Rule of Civil Procedure 65(c), the District Court has discretion to waive the security requirement. *See Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016). Waiver of the security requirement is particularly appropriate where, as here, the Plaintiffs are indigent. *See Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (finding waiver of a bond appropriate because of plaintiff's indigency); *Bass v. Richardson*, 338 F. Supp. 478, 489-91 (S.D.N.Y. 1991) (holding that "indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)").

Because of Plaintiffs' indigency, as well as because important constitutional rights of public interest are at stake and damage to the Defendant resulting from a wrongful issuance of a temporary restraining order cannot be shown, this Court should waive the security requirement in this case.

## CONCLUSION

For the foregoing reasons, Representative Plaintiffs Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, Travis Neloms, and the putative Class Plaintiffs are entitled to the requested injunctive relief enjoining Defendant Mayor Frey from evicting and destroying Camp Nenookaasi.

48

Respectfully submitted,

Date: February 20, 2024

KIRA A. KELLEY
Climate Defense Project
MN Bar No. 0402932
P.O. Box 7040
Minneapolis, MN 55407
(802) 683-4086
kira@climatedefenseproject.org

*Attorney for Plaintiffs*