UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, and TRAVIS NELOMS *on behalf of themselves and a class of similarly-situated individuals,*

Plaintiffs,

vs.

MAYOR JACOB FREY, *in his individual and official capacity*

Defendant.

Civil Action

Case No. 24-CV-00001 (ECT-TNL)

**ANSWER TO AMENDED COMPLAINT**

For his Answer to Plaintiffs' Amended Complaint ("the Complaint"), Defendant Mayor Jacob Frey, in his individual and official capacity, (hereinafter "Mayor Frey" or "Defendant") states and alleges as follows: Except as admitted, qualified or otherwise pleaded herein, Defendant denies each and every allegation, heading, matter, and thing in Plaintiffs' Complaint.

**INTRODUCTION**

The allegations in the narrative paragraphs appearing under the heading "Introduction" in the Complaint are not amenable to an admission or denial in a pleading. Additionally, to the extent that the "Introduction" or other allegations in the Complaint use the term "evicted" or "eviction" or "evicting" to imply that

Plaintiffs had a legal right to stay or camp on public property, those allegations state a legal conclusion for which no responsive pleading is required. To the extent a response is required, however, the allegations are denied.

In further response to Plaintiffs' "Introduction", Defendant affirmatively states that on August 24, 2023, the Minnesota Department of Transportation ("MNDot") cleared and closed an encampment on MNDot property known as the "Wall of Forgotten Natives." (Declaration of Enrique Velazquez ("Velazquez Decl.")[1], ¶ 2.) Immediately following this closure, several individuals from that site broke through a fence surrounding a City-owned lot located at 2313 13th Avenue South. *Id.* Within hours of unlawfully breaking into the fenced City-owned property, approximately 40 individuals set up tents and formed a new encampment. *Id*. This encampment ("the Encampment") is the subject of Plaintiffs' Complaint. By August 29, 2023, the size of the Encampment grew to approximately 70 individuals and shortly thereafter rose to over 100 individuals. *Id.* ¶ 3. From mid-October 2023 to January 4, 2024, the size of the Encampment oscillated between 100-150 individuals. *Id.*

---

[1] The Declaration of Enrique Velazquez Director of the City of Minneapolis Department of Regulatory Services, with exhibits, is filed as ECF Doc. 27. Defendant hereby incorporates by reference this Declaration and exhibits into Defendant's response to each of the numbered allegations in Plaintiffs' Complaint.

The City's Homeless Response Team ("HRT") first visited the Encampment on August 24, 2023, the day of its inception. *Id.* ¶ 4. The City's HRT connects homeless individuals with Hennepin County for housing assessments and/or case management, service providers or assigned case workers, storage services in partnership with Downtown Improvement District, shelter services, medical attention through Healthcare for the Homeless, and transportation services to these and other resources. *Id.* ¶ 5. The City's HRT made no less than 15 separate visits to the Encampment with these offers of assistance. *Id* ¶ 6. On numerous occasions, the City's additional outreach partners, including Agate, Avivo, Hennepin County's Streets to Housing, and Healthcare for the Homeless, visited the Encampment to engage with the unsheltered individuals to provide services. *Id.* ¶ 7. Moreover, in connection with the Encampment, with the approval of Defendant Mayor Jacob Frey and the Minneapolis City Council, the City provided one-time funding to Helix Health and Housing Services ("Helix"), an organization that provides housing, mental health services, and substance use treatment to underserved populations in collaboration with Red Lake Nation. *Id.* ¶ 8.

The City partnered with Helix for outreach to the Encampment, and with the assistance of Helix's outreach efforts, the City has supported 104 residents at

the Encampment find housing or other shelter options. *Id.* In addition to providing connections to shelter options, the role of the City's HRT is to ensure that people are aware of free storage provided to homeless individuals through the City's contract with the Downtown Improvement District ("DID"), an arrangement championed by Defendant. *Id.* ¶ 9. Individuals can bring their personal property directly to DID for free, safe, and secure storage. *Id.* Alternatively, the City's HRT will bring DID bins to an encampment and transport them back to DID for storage. *Id.* DID will store individuals' personal property for an unlimited amount of time, provided that individuals using storage check in with DID once every 14 days. *Id.* The City's HRT has provided information about free property storage on every visit to the Encampment and continued to do so up until the date of the closure. *Id.* In advance of the January 4, 2024 closing, no one at the Encampment chose to use the free DID storage offered by the City's HRT. *Id.*

In addition to the over 15 visits to the Encampment by the City's HRT, the Director of the City's Community Planning and Economic Development Department and the Director of the City's Regulatory Service Department, with the approval of Mayor Frey, also separately met with Encampment organizers on October 11, 2023, to evaluate the situation, observe conditions, and discuss closure. *Id.* ¶ 10. They discussed ways in which the City would provide

assistance to minimize health concerns in advance of the closure. *Id.* For example, while the City historically does not provide portapotties at encampments, recognizing the volume of people present at the Encampment and livability impacts for the surrounding community, City staff worked to add portapotties as part of its plan to effect a healthy closure of the Encampment. *Id* ¶ 11. Identifying a willing vendor was challenging, as vendors have been harassed and assaulted when servicing or removing portapotties in other encampments, and portapotties are regularly vandalized and service vehicles damaged when engaging in encampment response work. *Id.* ¶ 12. Nonetheless, the City was able to secure four portapotties placed immediately outside of the Encampment, including an accessible portapotty for residents with limited mobility. *Id.* ¶ 13. In the weeks prior to closure, the Encampment portapotties were serviced six days per week. *Id.*

Additionally, in an effort to improve conditions as the parties worked towards a collaborative closure, the City increased the frequency with which the City contractor removed rubbish from outside the encampment from once to twice a week. *Id.* ¶ 14. The City's Public Works department eventually took over collection, placed refuse containers on site and began servicing the area five times per week. *Id.*

In spite of the efforts by the City and Defendant Mayor Frey to minimize

health and safety risks as the parties moved towards a closure of the Encampment, dangerous criminal activity continued to increase. In general, encampments pose risks to not only those living in an encampment, but the community at large, and the Encampment was no exception. *Id.* ¶ 15. During its existence, there were more than one hundred 911 calls to Minneapolis Police and Fire Departments relating to the Encampment. *Id.* ¶ 16. The calls related to illegal activity at the Encampment including, but not limited to, death threats amongst campers, assaults, gunshots, stolen vehicles, vandalism and property damage, drug overdoses, and fires. *Id.*

In October 2023, there were two notably tragic incidents at the Encampment—one that involved the death of a baby, and one that involved the drug overdose death of an individual at the Encampment. *Id.* ¶ 17. Shortly thereafter, on November 1, 2023, leaders from the Metropolitan Urban Indian Directors ("MUID") reached out to City Staff and Mayor Frey demanding that the Encampment be closed immediately, citing concerns not only about the recent deaths and other crimes, but about concerns that criminal activity was being hidden from law enforcement due to threats and physical violence inflicted on those reporting. *Id.* ¶ 18, Ex. A. According to the MUID, neighbors witnessed women and girls being dragged from the Encampment into cars in the middle of the night, open drug use and sex acts throughout the day. *Id.* On

December 12, 2023, a 45-year-old man was killed at the Encampment after being shot six times. *Id.* ¶ 19.

Due to escalating violence and safety concerns, the Encampment was set for closure on December 14, 2023, and notice of the closure was posted on December 7, 2023. *Id.* ¶ 20. However, Mayor Frey determined that a short delay was appropriate to give those remaining at the Encampment additional time to access shelter and services. *Id.* ¶ 21. Accordingly, a new closure date was set for December 19, 2023. *Id.* During this time between December 7 and December 19, the City's HRT team made numerous visits to the Encampment, offering connection to shelter and services, as well as providing free storage options. *Id.* ¶ 22.

On December 14, 2023, members of the Minneapolis City Council and Mayor Frey's office, along with County Commissioners, state legislators, and services providers met with Encampment leaders. *Id.* ¶ 23. There was broad agreement that the Encampment needed to close, but City leadership agreed to another extension to provide even more time for access to services and shelter. *Id.* At that meeting, Encampment organizers asked that residents of the encampment be moved to a temporary, 24/7, indoor facility. *Id.* The City actively worked to vet that request along with the County, State, and several experienced social service providers. *Id.* Four experienced and trusted service providers who were capable

of providing this level of support were identified: Agate Housing and Services, American Indian Community Development Corporation, Avivo, and Simpson Housing Services. *Id.* After several discussions, all four providers said they could not take on the role of managing such a project. *Id.* Capacity, resources (financial and human capital), and other competing priorities were given as primary reasons for this decision. *Id.* However, these providers said they had the collective capacity to provide supportive housing to approximately 45 to 60 individuals, including offering residents mental health and substance use disorder services. Additionally, with help from Hennepin County and the State of Minnesota, Salvation Army and Rescue Now made plans to add 90 beds to the shelter system the week of January 1, 2024. Hennepin Shelter Hotline, in partnership with the Adult Shelter Connect, also made plans to help people access these additional beds as well as beds that became available in existing shelters. *Id.* Accordingly, closure of the Encampment was rescheduled for January 4, 2024. *Id.*

Notice of the Encampment closure was posted on December 29, 2023, six days in advance of the closure. *Id.* ¶ 24. Hennepin County service providers represented to the City that they engaged with everyone at the Encampment. *Id.* ¶ 25. During the time between December 14, 2023, up to the closure, City staff spent hundreds of collective hours preparing for the closure, allocating resources, designating staff, and assuring that all available resources had been repeatedly

made available to those at the Encampment, and that shelter was available for all Encampment individuals. *Id.* ¶ 26.

The City conducts encampment closures in accordance with a set of operational guidelines. *Id.* ¶ 27. Prior to an encampment closure, notice is posted at least 72 hours in advance. *Id.* ¶ 28. It is undisputed that in the case at hand, notice was posted, again, 6 days prior to the closure date. *Id.* ¶ 24.

On January 4, 2024, the Encampment closed as scheduled. On the day of the Encampment closure, representatives from multiple departments were on site. *Id.* ¶ 29. Staff from the City of Minneapolis Department of Regulatory Services and Department of Community Planning and Economic Development were present. Minneapolis Public Works was present to assist with cleaning the site. *Id.* Minneapolis Police Department officers were on site to support the other City staff and ensure that homeless individuals, the community, and City staff were safe throughout the duration of the closure. *Id.* On the day of the closure, City staff waited by as those in the Encampment conducted a morning ceremony, held a lengthy press conference, and packed all of their belongings for transport off of the site. The closure was peaceful, and there have been no claims that any individual lost property at the closure. *Id.*

Now that the Encampment is closed, pre-development activity for a new community center will be able to start. (Velazquez Decl. ¶ 30.) The Indigenous

Peoples Task Force ("IPTF") has a redevelopment agreement with the City to construct the Mikwanedun Audisookon Art and Wellness Center on the site of the Encampment. *Id.* According to IPTF, pre-development work is necessary in advance of the purchase to make it possible to break ground shortly after purchase, which is currently set for February 2024. *Id.* When finalized, the site will include IPTF office and clinic space, a commercial kitchen, community garden, small theater, art workshop and gallery, and space to support neighborhood partnerships and entrepreneurship and employment training. *Id.*

The Encampment, and any subsequent iterations of the Encampment, have not offered stability, safety, or dignified conditions to those staying at the Encampment, and have continued to be unlawfully located on public property. Encampments are not the only viable option to the Plaintiffs or those staying at encampments. Additionally, subsequent iterations of the Encampment continue to endanger the public well-being. The City has received numerous complaints from neighbors reporting gun shots, assaults, human trafficking, open-air drug use, discarded hypodermic needles, individuals from the Encampment trespassing on neighboring properties, individuals from the Encampment urinating and defecating on neighboring properties, individuals from the Encampment sleeping on or under decks of neighboring properties, individuals from the Encampment starting fires on neighboring properties, and vandalism and

theft from neighboring properties. (Second Declaration of Enrique Velazquez ("Second Velazquez Decl.")[2] at ¶¶3-4.) Additionally, the unlawful fires at the Encampment have resulted in smoke entering a nearby medical clinic and are interfering with the clinic's operations, including negatively impacting its staff and potentially disrupting its capacity to complete medical tests for patients in its lab. (Second Velazquez Decl. at ¶5.)

## JURISDICTION

1. In response to ¶ 1 of the Complaint, Defendant admits that Plaintiffs purport to bring the stated claims. Denies the claims have merit.

2. In response to ¶ 2 of the Complaint, the allegations state a legal conclusion to which no response is required. To the extent a response is required, denied.

## PARTIES

### *Representative Plaintiff Cheryl Sagataw*

3. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 3 of the Complaint, and, therefore, denies the same.

[2] The Second Declaration of Enrique Velazquez, Director of the City of Minneapolis Department of Regulatory Services, is attached as Exhibit 1 to Defendant's Answer to Plaintiffs' First Amended Complaint.

4. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 4 of the Complaint, and therefore, denies the same.

5. States that Defendant lacks sufficient information to inform a belief as to the truth of the allegations ¶ 5 of the Complaint, and, therefore, denies the same. Defendant affirmatively states that the "area under Interstate 94" and the "Wall of Forgotten Natives" is property that is not owned or operated by the City of Minneapolis and not under the direction or control of Defendant.

6. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 6 of the Complaint, and, therefore, denies the same.

7. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in the first sentence of ¶ 7 of the Complaint, and, therefore denies the same. Denies the remaining allegations in ¶ 7 of the Complaint.

***Representative Plaintiff DeAnthony Barnes***

8. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 8 of the Complaint, and, therefore denies the same.

9. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 9 of the Complaint, and, therefore denies the same.

10. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in the first sentence of ¶ 10 of the Complaint, and, therefore denies the same. Defendant admits Plaintiff Barnes described in his declaration the allegations in the second and third sentences of ¶ 10 of the Complaint. States Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 10 of the Complaint, and, therefore, denies the same.

11. Defendant denies any implication in ¶ 11 of the Complaint that the Encampment offered adequate access to heat or the best connection to permanent housing. States Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 11 of the Complaint, and, therefore, denies the same.

12. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 12 of the Complaint, and, therefore, denies the same. Affirmatively states that the Encampment was the site of significant criminal and violent activity, including murder, assault, human trafficking and drug use.

13. Denies that Defendant was involved in any prior “evictions” of

Plaintiff and denies that Defendant's conduct caused Plaintiff to lose the items described in ¶ 13. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 13 of the Complaint, and, therefore, denies the same.

14. Defendant denies that Plaintiff has experienced any "evictions" as alleged in ¶ 14 of the Complaint. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 14 of the Complaint, and, therefore, denies the same.

*Representative Plaintiff Roberta Strong*

15. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 15 of the Complaint, and, therefore, denies the same.

16. Denies that Defendant was involved in any prior "evictions" or "displacements" of Plaintiff. Denies that Defendant experiences any "evictions" associated with the Encampment or any subsequent iteration. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 16 of the Complaint, and, therefore, denies the same.

17. Denies that Defendant's conduct caused Plaintiff to lose the items described in ¶ 17 of the Complaint. Denies that Plaintiff experienced "evictions." States that Defendant lacks sufficient information to form a belief as to the truth

of any remaining allegations in ¶ 17 of the Complaint, and, therefore, denies the same.

18. Defendant denies that the Encampment offers stability as alleged in ¶ 18 of the Complaint. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 18 of the Complaint, and, therefore, denies the same.

19. Defendant denies the allegations in the third sentence of ¶ 19 of the Complaint. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 19 of the Complaint, and, therefore, denies the same.

20. States that the allegation in ¶ 20 of the Complaint, that the Encampment is a "lifeline", is too vague to be susceptible to responsive pleading, but to the extent a response is deemed to be required, it is denied. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 20 of the Complaint, and, therefore, denies the same.

***Representative Plaintiff Travis Neloms***

21. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 21 of the Complaint, and, therefore, denies the same.

22. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 22 of the Complaint, and, therefore, denies the same.

23. Denies that Plaintiff experienced any "eviction" as a result of Defendant's conduct. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 23 of the Complaint, and, therefore, denies the same.

24. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 24 of the Complaint, and, therefore, denies the same.

25. Defendant denies that the Encampment has offered stability, safety, or appropriate care as alleged in ¶ 25 of the Complaint. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 25 of the Complaint, and, therefore, denies the same.

26. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 26 of the Complaint, and, therefore, denies the same.

27. Denies the implication in ¶ 27 of the Complaint that the Encampment was safe, peaceful, or non-violent, and denies that Defendant experienced any "eviction" as a result of Defendant's conduct. States that Defendant lacks

sufficient information to form a belief as to the truth of the remaining allegations in ¶ 27 of the Complaint, and, therefore, denies the same.

28. Denies that Defendant's conduct caused Plaintiff to lose the items described in ¶ 28 of the Complaint. Denies that Plaintiff experienced "evictions." States that Defendant lacks sufficient information to form a belief as to the truth of any remaining allegations in ¶ 28 of the Complaint, and, therefore, denies the same.

29. Denies that Plaintiff experienced or will experience an "eviction" at the Encampment or any subsequent iteration of the Encampment. States that Defendant lacks sufficient information to form a belief as to the truth of any remaining allegations in ¶ 29 of the Complaint, and, therefore, denies the same.

***Represented Class Plaintiffs***

30. Admit that Plaintiffs seek to bring this action as a purported class action. Deny that Plaintiffs are entitled to class certification. State that Defendant lacks sufficient information to form a belief as to the truth the allegation that unidentified individuals in the purported class are unhoused. Deny the remaining allegations in ¶ 30 of the Complaint.

31. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 31 of the Complaint, and, therefore, denies the same.

32. Denies that Plaintiffs or any purported class member experienced "evictions" at the Encampment and, therefore, denies the allegations in ¶ 32 of the Complaint.

33. Upon information and belief, Defendant admits the allegations in ¶ 33 of the Complaint that each of the Plaintiffs have "their own unique story" and, therefore, affirmatively states that Plaintiffs are not appropriate class representatives. Denies the remaining allegations in ¶ 33 of the Complaint.

34. Denies the allegations in ¶ 34 of the Complaint.

35. Defendant denies that Plaintiffs have experienced an "eviction" from the Encampment. Defendant denies the allegations in the third sentence of ¶ 35 of the Complaint. States that Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in ¶ 35 of the Complaint, and, therefore, denies the same.

36. Defendant denies that the purported "Represented Class Plaintiffs and their Representatives" have experienced or will experience "evictions" from the Encampment. Defendant affirmatively alleges that neighbors of the Encampment, both past and the current iterations, have expressed numerous, serious concerns health and safety concerns related to the Encampment. (Second Velazquez Decl. at ¶¶3-5.)

*Defendant Mayor Jacob Frey*

37. As to the first sentence of ¶ 37, admits the Plaintiffs purport to sue Defendant in his official and individual capacity. Admits the allegations in the second and third sentence of ¶ 37. The remaining allegations in ¶ 37 constitute a legal conclusion to which no responsive pleading is required.

38. Admit that ending homelessness was an important part of Defendant's campaign for Mayor. Affirmatively states that ending homeless in Minneapolis continues to be a priority of Defendant. Deny the remaining allegations in ¶ 38 of the Complaint.

**CLASS QUALIFICATIONS FOR CERTIFICATION**

39. As to the allegations in ¶ 39 of the Complaint, admits that Plaintiffs seek to bring this action as a purported class action. Deny that this case is suitable for class certification and denies that Plaintiffs are suitable class representatives.

***Class Formation***

40. Denies that this case meets the requirements for class certification. The remaining allegations in ¶ 40 of the Complaint constitute a legal conclusion and citation to which no responsive pleading is required.

41. Denies the allegations in ¶ 41 of the Complaint.

42. Denies the allegations in ¶ 42 of the Complaint.

43. Denies the allegations in ¶ 43 of the Complaint.

44. Denies the allegations in ¶ 44 of the Complaint.

***Type of Action***

The allegations in the narrative paragraph appearing under the heading "Type of Action" in the Complaint are not amenable to an admission or denial in a pleading, and constitute a legal conclusion and citation to which no responsive pleading is required. To the extent a response is required, the allegations are denied.

**FACTUAL BACKGROUND**

45. States that Defendant lacks sufficient information to form a belief as to the truth of the allegations in the first sentence of ¶ 45 of the Complaint and, therefore, denies the same. Denies the remaining allegations in ¶ 45 of the Complaint.

46. Denies that Defendant has engaged in "systemic and genocidal" displacement. States that the remaining allegations in ¶ 46 of the Complaint do not pertain to Defendant and that, therefore, no response is required.

47. State that the allegations in ¶ 47 of the Complaint do not pertain to Defendant and that, therefore, no response is required.

48. State that the allegations in ¶ 48 of the Complaint do not pertain to Defendant and that, therefore, no response is required.

49. States that the property at-issue is subject to sale to the Indigenous Peoples Task Force. State that the remaining allegations in ¶ 49 of the Complaint do not pertain to Defendant and that, therefore, no response is required.

50. Denies that there is an ongoing attempt to rid Minneapolis of Indigenous individuals. The remaining allegations in ¶ 50 of the Complaint are too vague to allow for susceptible response and Defendant, therefore, denies the remaining allegations.

51. Denies the allegations in ¶ 51 of the Complaint

52. Denies the allegations in ¶ 52 of the Complaint.

53. Plaintiffs' allegation that Defendant "played a muted role" is too vague to allow for a responsive pleading. Admits that the Minneapolis "city government" under the direction of Defendant has spent extensive time, resources and funds providing access to temporary shelter and permanent housing options for the unhoused. As to the remaining allegations in ¶ 53 of the Complaint, Defendant lacks sufficient information to form a belief as to the truth the allegations and, therefore, denies the remaining allegations.

54. Admits that Defendant was concerned about the serious public health and human safety risks associated with the encampment at Powderhorn Park in 2020. Denies the remaining allegations in ¶ 54 of the Complaint.

55. Denies the allegations in ¶ 55 of the Complaint.

56. Admits that the Powderhorn Park encampment was closed by the Minneapolis Parks and Recreation Board and the Minneapolis Park Police Department, neither of which are under the direction or control of Defendant. Denies the remaining allegations in ¶ 56 of the Complaint.

57. As to the allegations regarding the description or experience of Plaintiffs or unidentified members of the unhoused population, Defendant lacks sufficient information to form a belief as to the truth of the allegations in ¶ 57 of the Complaint and they are, therefore, denied. Denies the remaining allegations in ¶ 57 of the Complaint.

58. Denies the allegations in ¶ 58 of the Complaint.

59. Denies the allegations in ¶ 59 of the Complaint.

60. Admits that ending homelessness was part of Defendants' mayoral campaign. Denies the remaining allegations in ¶ 60 of the Complaint.

61. As to the allegations in ¶ 61 of the Complaint, Defendant lacks sufficient information to form a belief as to the truth of the allegations, they are therefore denied.

62. Defendant admits that local housing resources exist. As to the remaining allegations in ¶ 62 of the Complaint, Defendant lacks sufficient

information to form a belief as to the truth of the allegations, they are therefore denied.

63. Denies the allegations in ¶ 63 of the Complaint.

64. Admits that 90 new shelter beds were made available on January 1 and 2, 2024. Denies the remaining allegations in ¶ 64 of the Complaint.

65. Defendant denies the allegations in ¶ 65 of the Complaint.

66. Defendant denies the allegations in ¶ 66 of the Complaint.

67. Defendant denies the allegations in ¶ 67 of the Complaint.

68. Defendant denies the allegations in ¶ 68 of the Complaint.

69. Defendant denies the allegations in ¶ 69 of the Complaint.

70. Denies the allegations in ¶ 70 of the Complaint.

71. Denies the allegations in ¶ 71 of the Complaint. Affirmatively alleges that the Encampment does not benefit neighborhoods or people staying at the Encampments and does not represent in an interim solution to permanent housing.

72. As to the allegations in ¶ 72 of the Complaint, admits that there was a meeting between organizers, some City council members, and others from the City of Minneapolis enterprise. States that Defendant lacks sufficient information to form a belief as to the truth the allegations regarding who was invited. Admits

that Defendant was unable to attend the meeting in person but affirmatively states that he sent a representative from his office to attend the meeting.

73. Denies the allegations in ¶ 73 of the Complaint.

74. Admits that the City of Minneapolis has reasonable policies and procedures in place relating to the closure of unlawful encampments to safeguard people's rights, if any, associated with a closure, and those policies and procedures are published on the City's website. Denies that the closure of the Encampment has infringed any rights, and denies any remaining allegations in ¶ 74 of the Complaint.

75. Admits the allegation in the first sentence of ¶ 75 of the Complaint. Denies the remaining allegations in ¶ 75 of the Complaint.

76. Admits that friends, family and social service agencies were allowed to enter the Encampment to assist people at the closure. Denies the remaining allegations in ¶ 76 of the Complaint.

77. Denies the allegation in ¶ 77 of the Complaint.

78. Denies the allegations in ¶ 78 of the Complaint.

79. Admits that service providers were present at the Encampment during its closure. States that Defendant lacks sufficient information about when some individuals left the Encampment or what they feared as alleged in the first sentence of ¶ 79 of the Complaint and, therefore, denies the allegations. The

allegation regarding "most" service providers is too vague to allow for responsive pleading and it is, therefore, denied.

80. Admits that material was placed on City owned property to prevent individuals from unlawfully encamping on the property. Admits that the Mayor's Office has a goal of deterring encampments. Affirmatively allege that the Mayor's Office has a goal of transitioning individuals to permanent housing. Denies any remaining allegations in ¶ 80 of the Complaint.

81. Denies the allegations in ¶ 81 of the Complaint.

82. Denies the allegations in ¶ 82 of the Complaint.

**CAUSE OF ACTION**

**COUNT I:**

**Unlawful Seizure & Destruction of Plaintiffs' Property in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution**

83. Defendant repeats all prior responses.

84. The allegations in ¶ 84 of the Complaint state a legal conclusion to which no response is required.

85. The allegations in ¶ 85 of the Complaint state a legal conclusion to which no response is required.

86. Denies the allegations in ¶ 86 of the Complaint.

87. Denies the allegations in ¶ 87 of the Complaint.

88. Denies the allegations in ¶ 88 of the Complaint.

**COUNT II:**

**Procedural Due Process Violations Under the Fourteenth a Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution**

89. Defendant repeats all prior responses.

90. The allegations in ¶ 90 of the Complaint state a legal conclusion to which no response is required.

91. Denies the allegations in ¶ 91 of the Complaint.

92. Denies the allegations in ¶ 92 of the Complaint.

93. Denies the allegations in ¶ 93 of the Complaint.

**COUNT III**

**State-Created Danger in Violation of the Right to Substantive Due Process Under the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution.**

94. Defendant repeats all prior responses.

95. The allegations in ¶ 95 of the Complaint state a legal conclusion to which no response is required.

96. Denies the allegations in ¶ 96 of the Complaint.

97. Denies the allegations in ¶ 97 of the Complaint.

98. Denies the allegations in ¶ 98 of the Complaint.

99. Denies the allegations in ¶ 99 of the Complaint.

100. Denies the allegations in ¶ 100 of the Complaint.

**COUNT IV:**

**Violation of the Eight Amendment to the US Constitution**

101. Defendant repeats all prior responses.

102. The allegations in ¶ 102 of the Complaint state a legal conclusion to which no response is required.

103. The allegations in ¶ 103 of the Complaint state a legal conclusion to which no response is required.

104. Denies the allegations in ¶ 104 of the Complaint.

105. Denies the allegations in ¶ 105 of the Complaint.

106. Denies the allegations in ¶ 106 of the Complaint.

**COUNT V**

**Conversion in Violation of Minnesota Common Law**

107. Defendant repeats all prior responses.

108. Denies the allegations in ¶ 108 of the Complaint.

109. Denies the allegations in ¶ 109 of the Complaint.

110. Denies the allegations in ¶ 110 of the Complaint.

## COUNT VI

**Violation of Title II of the American with Disabilities Act (ADA), 42 U.S.C. et seq.**

111. Defendant repeats all prior responses.

112. The allegations in ¶ 112 of the Complaint state a legal conclusion to which no response is required.

113. The allegations in ¶ 113 of the Complaint state a legal conclusion to which no response is required.

114. The allegations in ¶ 114 of the Complaint state a legal conclusion to which no response is required.

115. The allegations in ¶ 115 of the Complaint state a legal conclusion to which no response is required.

116. Defendant denies the allegations in ¶ 116 of the Complaint.

117. Defendant denies the allegations in ¶ 117 of the Complaint.

118. Defendant denies the allegations in ¶ 118 of the Complaint.

119. The allegations in ¶ 119 of the Complaint state a legal conclusion to which no response is required.

120. Admits that some individuals have asked Mayor Frey to postpone the closure of the Encampment. Denies the remaining allegations in ¶ 120 of the Complaint.

121. Admit that the Encampment was closed after the Court in this action denied Plaintiffs' motion for a temporary restraining order because the closure of the Encampment was lawful. Denies the remaining allegations in ¶ 121 of the Complaint.

122. Denies the allegations in ¶ 122 of the Complaint.

123. Denies the allegations in ¶ 123 of the Complaint.

124. Denies the allegations in ¶ 124 of the Complaint.

125. Denies the allegations in ¶ 125 of the Complaint.

126. Denies the allegations in ¶ 126 of the Complaint.

127. Denies the allegations in ¶ 127 of the Complaint.

128. Denies the allegations in ¶ 128 of the Complaint.

**DECLARATORY RELIEF**

129. Defendant repeats all prior responses.

130. Denies the allegations in ¶ 130 of the Complaint.

131. Denies the allegations in ¶ 131 of the Complaint.

**PRAYER FOR RELIEF**

Plaintiffs' "prayer for relief" is not amenable to an admission or denial in a pleading. To the extent a response is required, Plaintiffs' entitlement to the "prayer for relief" is denied.

**JURY DEMAND**

Defendant acknowledges that Plaintiffs demand a trial by jury. Defendant also demands a trial by jury.

**AFFIRMATIVE DEFENSES**

1. The Complaint fails to state a claim upon which relief can be granted.

2. The actions upon which the Complaint is made were privileged, were commanded or authorized by law, and were done in a reasonable and lawful manner under the circumstances, such that the Defendant is immune from liability.

3. Defendant or any City employee acting on Defendant's behalf is entitled to qualified immunity, official immunity, and/or statutory immunity from liability.

4. Defendant is entitled to immunity under Minn. Stat. § 466.03.

5. Defendant's liability is limited by Minn. Stat. § 466.04.

7. Defendant denies that Plaintiffs have any right to attorney's fees in this action.

8. Plaintiffs have failed to avoid or mitigate the alleged detriment or damages.

9. Plaintiffs have failed to exhaust administrative remedies.

10. Plaintiffs' claims are moot.

11. Plaintiffs lack standing.

12. Defendant denies that Plaintiffs have sustained any damages.

WHEREFORE, Defendant prays for an Order of this Court as follows:

1. Dismissing the allegations and Counts in Plaintiffs' Complaint on the merits and with prejudice;

2. Awarding the Defendant all reasonable costs, disbursements, and attorneys' fees to the fullest extent allowed by law; and

3. For such other and further relief as this Court deems appropriate.

Dated: February 27, 2024

KRISTYN ANDERSON
City Attorney
By */s Sharda Enslin*
SHARDA ENSLIN (#389370)
KRISTIN R. SARFF (#388003)
HEATHER P. ROBERTSON (#390470)
J. HAYNES HANSEN (#399102)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-2180
(612) 673-3919
(612) 673-3949
(612) 673-3339
sharda.enslin@minneapolismn.gov
kristin.sarff@minneapolismn.gov
heather.robertson@minneapolismn.gov
haynes.hansen@minneapolismn.gov

*Attorneys for Defendant Mayor Jacob Frey*