UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cheryl Sagataw, DeAnthony
Barnes, Roberta Strong, and
Travis Neloms, *on behalf of
themselves and a class of similarly
situated individuals*,

Ct. File No. 24-cv-00001(ECF/TNL)

                    Plaintiffs,

          v.

Mayor Jacob Frey, *in his individual and
official capacity.*

                    Defendant.

**DEFENDANT'S
MEMORANDUM IN
OPPOSITION TO
PLAINTIFFS' SECOND
MOTION FOR TEMPORARY
RESTRAINING ORDER**

*To state the obvious, the homelessness problem in Minneapolis as in many other metropolitan areas in the United States poses substantial societal challenges and harms. The homeless suffer harms resulting not merely from being homeless, but also occasionally from government actions and inaction, including actions intended to address the issue. The public suffers harm too and the record shows the presence of such harms here in the form of criminal activities, harms to adjacent neighborhoods, blight, and the hindrance of property development. **In our constitutional structure, how best to balance these societal harms through policy decisions is left in the first instance to the political branches, and here that's the Mayor and the City, not to courts.***

                    -- The Honorable Eric C. Tostrud

          (Enslin Decl. Ex. A (Hearing Transcript ("Tr.") at 63:6-20.)

**INTRODUCTION**

On January 3, 2024, this Court denied the Plaintiffs' first motion for temporary restraining order which sought to enjoin Mayor Jacob Frey ("Mayor Frey") from closing an encampment on a City-owned lot located at 2313 13th Avenue South and referred to by Plaintiffs as "Camp Nenookaasi" (hereafter referred to as the "First Nenookaasi Encampment"). In denying Plaintiffs' Motion, the Court held that the Plaintiffs failed to show "that the policy choices Mayor Frey has made to address these issues with respect to this encampment are unconstitutional, unlawful in some other respect, or create harms that are so one-sided as to justify enjoining his decision to clear the encampment." (Tr. at 63:22-64:1.)

Following the Court's denial of Plaintiffs' Motion, the City closed the First Nenookaasi Encampment on January 4, 2024. Instead of accepting shelter space or connection to other services, individuals at the First Nenookaasi Encampment went directly to another fenced, locked City property, broke in, tore down "no trespassing" signs, and set up a new encampment ("Second Nenookaasi Encampment"). When the Second Nenookaasi Encampment was closed on January 30, 2024, those encamped individuals once again refused shelter services and instead went to yet another fenced and locked City property, broke in, tore down "no trespassing signs," and set up another encampment ("Third Nenookaasi

Encampment"). When the City closed the Third Nenookaasi Encampment on February 1, 2024, the encamped individuals *again* refused shelter services, broke into *another* fenced and locked City property, this one located at 1100 28th Avenue, tore down "no trespassing signs," and set up a fourth iteration of this same encampment ("Current Encampment").

Plaintiffs were encamped at the Current Encampment for a month, and as outlined *infra*, the impact to the surrounding community has been grave. Open intravenous drug use was rampant, and discarded hypodermic needles littered the yards of nearby properties. Individuals from the Current Encampment often trespassed onto the fenced, private properties of nearby neighbors, where they used drugs, fought, slept, started fires, destroyed property, defecated, and urinated. Encamped individuals frequently used the yards of neighboring properties as toilets, leaving soiled toilet paper on the nearby lawns. Garbage and food waste abounded. Smoke from the dozens of fires at the Current Encampment wrought havoc on not only the residential members of the community, but also on a laboratory nearby that provides medical testing services to thousands of people throughout the Twin Cities.

On February 29, 2024, a massive fire broke out at the Current Encampment, burning the Current Encampment to the ground.[1]





---

[1] It is the City's understanding that in the last 24 hours, many of the individuals from the Current Encampment have since moved and trespassed upon a City-owned property located at 2839 14th Avenue South in Minneapolis. (Enslin Decl. ¶4.) Plaintiffs' Motion, however, exclusively seeks relief related and limited to the encampment at the 1100 28th Street East location, and Defendant will focus his response accordingly. (*See* ECF 31.)

(Jensen Decl., Ex. B; Enslin Decl., Ex. B.)  Additionally, the destructive fire at the

Current Encampment also caused significant damage to a nearby home.



(Jensen Decl., Ex. C.)

This simply must end. Plaintiffs, by bringing a second motion for a

temporary restraining order ("TRO") to stop Mayor Jacob Frey from attempting to

put an end to the danger this encampment presents to the residents of the

neighborhood and the community at large, now once again not only asks this

Court to step into the role of policy maker for the City of Minneapolis, but do so

at the expense and safety of the community at large. Plaintiffs have no legal right

to reside in tents or yurts on City property, of which Plaintiffs are well aware. The only way Plaintiffs gained access to the Current Encampment site was by physically breaking the locked fencing surrounding the property and removing signs that informed them that they were trespassing. And we see now more than ever, the catastrophic impact that encampments in general, and *specifically* the Camp Nenookaasi Encampment, can have on the community. Plaintiffs not only ask this Court to create for them a right to trespass on the property of others, but to do so in a way that completely ignores the health, safety and welfare of the community at large. Plaintiffs' second motion for a TRO should be denied.

## FACTS

### I.     The Closure of the First Nenookaasi Encampment.

On January 4, 2024, following the Court's Order, the City of Minneapolis through Mayor Jacob Frey, moved forward with the closure of the First Nenookaasi Encampment. (Velazquez Decl. ¶2.) On the day of the First Nenookaasi Encampment closure, representatives from multiple departments were on site. (*Id.* at ¶3.) Staff, including Directors from the City of Minneapolis' Department of Regulatory Services and Department of Community Planning and Economic Development, were present. Minneapolis Public Works staff was present to assist with cleaning the site. (*Id.*) Minneapolis Police Department officers were on site to support the other City staff and ensure that homeless

individuals, the community, and City staff were safe throughout the duration of the encampment closure. (*Id.*) On the day of the closure, City staff stood by as those in the First Nenookaasi Encampment conducted a morning ceremony, held a lengthy press conference, and packed all of their belongings for transport off of the site. (*Id.* at ¶4.) Individuals at the First Nenookaasi Encampment were given unlimited time to leave with their belongings. (*Id.* at ¶5.) The City had buses standing by to transport people to the Catholic Charities' Opportunity Center, where they could connect with services, including but not limited to housing resources and medical and mental health care providers, as well as have access to storage lockers, internet services, breakfast and lunch services, and laundry. (*Id.* at ¶6.) Not a single individual staying at the First Nenookaasi Encampment, however, chose to take advantage of these services. (*Id.*)

## II. Plaintiffs break into and trespass on another City-owned lot to create a Second Nenookaasi Encampment.

Two days prior, on January 2, 2024, likely in anticipation of the closure of the First Nenookaasi Encampment, individuals associated with First Nenookaasi Encampment broke into a locked, fenced property owned by the Minneapolis Community Planning and Economic Development Department ("CPED") located at 2601 14th Avenue South. (Velazquez Decl. ¶7.) Individuals cut a large hole in the secured fence, tore down "no trespassing" signs that were posted on the site, and began moving in various supplies, including a large amount of firewood. (*Id.*) By

the next day, individuals associated with the First Nenookaasi Encampment had erected four large yurts on the 2601 14th Avenue South CPED property. (*Id.*)

After the closure of the First Nenookaasi Encampment on January 4, 2024, instead of taking up the City's offer of transportation to shelter and connection to services, individuals departed the First Nenookaasi Encampment and proceeded directly to 2601 14th Avenue South, where the aforementioned individuals had already broken in and began setting up another encampment ("Second Nenookaasi Encampment"). (*Id.* at ¶8.) Plaintiffs and others moved their belongings onto the City-owned property and declared this site to be the next iteration of Camp Nenookaasi. Within hours, over 25 individuals and over a dozen yurts had moved from the First Nenookaasi Encampment to the Second Nenookaasi Encampment. (*Id.*)

The next day, on January 5, 2024, City staff met with Camp Organizers. (*Id.* at ¶9.) City staff told the Camp Organizers that they could not stay at the Second Nenookaasi Encampment and needed to leave. (*Id.*) On January 8, 2024, the City once again reposted notice of trespassing signs. (*Id.* at ¶10.) Those signs were once again torn down by individuals in the Second Nenookaasi Encampment. (*Id.*) On January 17, 2024, City staff again met with Camp Organizers and told them that the City would be closing the Second Nenookaasi Encampment. (*Id.* at ¶11.)

III.    **Closure of the Second Nenookaasi Encampment is postponed as a gastrointestinal virus swept through the encampment.**

On January 18, 2024, the City's Health Department was notified by the Minnesota Department of Health of a possible gastrointestinal illness in the Second Nenookaasi Encampment. (*Id.* at ¶12.) The City's Health Department team immediately initiated an investigation. (*Id.* at ¶13.) On January 19, 2024, City Health Department staff visited the Second Nenookaasi Encampment and found that 20 to 30 people were ill with symptoms consistent with a viral gastrointestinal illness. (*Id.*) During the site visit, the Health Department team provided cleaning supplies for common areas, including bleach solution in spray bottles, additional bleach and water for replenishing the spray bottle, gloves, and paper towels. (*Id.* at ¶14.) The Health Department team also met with individuals in the Second Nenookaasi Encampment to discuss community guidelines for minimizing transmission, as well as recommended that new portapotties be provided. (*Id.*) The Health Department determined that closure of the Second Nenookaasi Encampment should be postponed until the virus was contained so as to minimize transmission to other vulnerable populations. (*Id.* at ¶15.)

The Health Department visited the Second Nenookaasi Encampment again on January 20 and 21, 2024. (*Id.* at ¶16.) On January 24, 2024, after 72 hours with no new cases, the City's Health Department determined that the virus was contained and that closure of the Second Encampment Nenookaasi could move

forward. (*Id.* at ¶17.) On January 24, 2024, City staff emailed Camp Organizers and told them that the Second Nenookaasi Encampment would be closing soon. (*Id.*)

## IV.   The Second Nenookaasi Encampment besieges a neighborhood.

In the month of January 2024, the City received hundreds of complaints and 911 calls related to the Second Nenookaasi Encampment. For nearly a month, hypodermic needles, human waste and soiled materials littered the yards of those living in close proximity to the Second Nenookaasi Encampment. (Mellen Decl. ¶¶9-11; Richard Decl. ¶¶6-7.) On January 28, 2024, a shooting of a man occurred immediately outside of the Second Nenookaasi Encampment. (Velazquez Decl. ¶18.) The repeated sounds of gunshots and women being beaten had residents afraid to leave their homes after dark. (Mellen Decl. ¶12.)

Smoke from the dozens of campfires at the Second Nenookaasi Encampment not only permeated the air and created a thick cloud around the neighborhood but infiltrated the homes of those living nearby. (Neste Decl. ¶¶3-4; Mellen Decl. ¶¶3-5; Richard Decl. ¶¶3-5.) Neighbors of the Second Nenookaasi Encampment, some with compromised immune systems and underlying medical conditions, suffered serious health problems as a result of the smoke. (Neste Decl. ¶5; Mellen Decl. ¶¶5-7; Richard Decl. ¶4.) The deteriorating air quality required some neighbors to rely on respiratory medication and in at least two instances forced a visit to urgent care for treatment for smoke inhalation. (Mellen Decl.  ¶7.)

Neighbors were forced to buy costly air filtration systems just to be able to stay in their homes. (*Id*. at ¶8.)

## V.  The City closes the Second Nenookaasi Encampment.

On January 30, 2024, after weeks of notice, the City closed the Second Nenookaasi Encampment. (Velazquez Decl. ¶19.) Individuals at the Second Nenookaasi Encampment were given an unlimited amount of time to pack their belongings. (*Id*. ¶20.) Between the inception of the Second Nenookaasi Encampment on January 4, 2024, and its closure on January 30, 2024, the City's Homeless Response Team made eight separate site visits, each time offering connection to services, shelter, and storage options. (*Id*. at ¶21.) No one at the Second Nenookaasi Encampment chose to use the City's storage options. (*Id*.)

## VI.  Plaintiffs break into and trespass on a third City lot to create a Third Nenookaasi Encampment.

Following the closure of the Second Nenookaasi Encampment on January 30, 2024, rather than take the City up on any of its offers of connection to shelter or services, Plaintiffs once again packed up their belongings and moved them to another City-owned property. (Velazquez Decl. ¶22.) This time, Plaintiffs moved to a third CPED property located at 2213 16th Avenue South in Minneapolis ("Third Nenookaasi Encampment"). (*Id*.) Like the prior two City properties, this property was also fenced and locked, with prominent "no trespassing" signs posted. (*Id*. at ¶23.) Nonetheless, individuals associated with the encampment

proceeded to once again cut open the fence, remove a section, and move their belongings inside the property in what would become the Third Nenookaasi Encampment. (*Id*.)

As with the other sites, individuals associated with the Third Nenookaasi Encampment also quickly tore down the "no trespassing" signs. (*Id*. at ¶24.) Later that evening, City staff returned to the site of the Third Nenookaasi Encampment and reposted "no trespassing" signs. (*Id*.) By the following morning, those signs were once again torn down. (*Id*.) On January 31, 2024, the City returned and again posted "no trespassing signs." (*Id*.)

## VII. The City quickly closes the Third Nenookaasi Encampment after two days, and Plaintiffs break into and trespass on a fourth City lot.

On February 1, 2024, the City closed the Third Nenookaasi Encampment. (Velazquez Decl. ¶25.) Despite being on site for less than two days, Plaintiffs were still given an unlimited amount of time to pack up their belongings. (*Id*. at ¶26.) Rather than take the City up on any of its offers of connection to shelter or services, however, Plaintiffs once again instead packed up their belongings and moved them to another City-owned property. (*Id*. at ¶27.) This property was yet another locked, fenced, CPED property, this time located at 1100 28th Avenue East in Minneapolis. Individuals associated with the Encampment once again broke into the locked and secured property by cutting through the fence, relocated City-owned infrastructure staged in this secure location, and began setting up another

encampment ("Current Encampment"). (*Id.*) Within a day, those individuals had erected approximately 18 to 20 yurts at the Current Encampment. (*Id.*)

## VIII.   A new site with the same problems.

Conditions around the Current Encampment quickly devolved to match those experienced by the neighbors of the Second Encampment. Individuals from the Current Encampment urinated and defecated in the yards of the surrounding properties, often jumping over fences to do so. (Jensen Decl. ¶¶3-4.) Individuals left soiled toilet paper, food waste, and other garbage in neighboring yards. (*Id.* at ¶¶5-7.) In one instance, an individual from the Current Encampment was sleeping under the deck of a neighbor's property for a period of several days in mid-February. (*Id.* at ¶9.) That individual started a fire, which then caused damage to the side of that neighbor's home (*Id.* at ¶9, Ex. A.)

Much like the Second Encampment, neighbors near the Current Encampment reported hearing yelling and arguing throughout the night. (*Id.* at ¶10.) Hypodermic needles littered the sidewalks and yards, and individuals from the Current Encampment brazenly trespassed on neighboring private properties. (*Id.* at ¶¶3, 6, 8-11.) The smoke of more than a dozen fires from the Current Encampment continued to wreak havoc on the health of the community. (*Id.* at ¶¶12-13.) Much like those neighbors of the Second Encampment, neighbors of the

Current Encampment suffered health consequences from having campfire smoke infiltrate their homes. (*Id.*)

In addition to severely impacting the residential neighbors, the smoke from the Current Encampment also impacted a nearby medical facility. (Velazquez Decl. ¶28.) The Allina Central Laboratory ("the Laboratory"), Allina Health's main testing laboratory in the Twin Cities that processes thousands of clinical specimens every day, is located at 2800 10th Avenue South in Minneapolis, approximately 2 blocks from the Current Encampment located at 1100 East 28th Street in Minneapolis. (*Id.* at Ex. A.) On February 25, 2029, Allina staff reported to City staff that employees of the Laboratory had begun noticing a strong odor of campfire smoke inside the Laboratory and determined that the smell was coming from the numerous fires at the Current Encampment. (*Id.*) In order to try to mitigate the smoke odor, the Laboratory had to install 6 HEPA filters running 24 hours a day inside the Laboratory. (*Id.*) This smoke not only created an uncomfortable and disruptive work environment for the Laboratory employees, but there was also concern that if the smoke level continued to increase, particulates in the air could impact the Laboratory's sensitive testing equipment. (*Id.* at ¶30.) Without functioning testing equipment, the Laboratory would not be able to operate. (*Id.*) As noted previously, the Laboratory is Allina's main testing laboratory, and any

impact on operation would have a significant impact on patient access to medical testing. (*Id.*)

## IX.    Fire ravages the Current Encampment.

On February 29, 2024, the day before the filing of this memorandum, a massive fire broke out midday at the Current Encampment. (Velazquez Decl. ¶32.) Within a matter of minutes, the entire Current Encampment went up in flames. (*Id.*)



(Jensen Decl., Ex. B.)

The Minneapolis Fire Department and other first responder personnel immediately responded to the scene. (Velazquez Decl. ¶32.) Within a short period of time, Minneapolis firefighters had the blaze extinguished, but almost nothing was left but charred remains of the encampment residents' property. (*Id.*)



(Enslin Decl., Ex. B.)

The fire spewed a massive amount of smoke into the air, further polluting the neighborhood and surrounding community with smoke. (Velazquez Decl. ¶33.) Some neighboring homes suffered damage as a result of the flames.



(Jensen Decl. Ex. C.)

## **ARGUMENT**

**I.     The Court should deny Plaintiffs' second motion for a TRO.**

Plaintiffs have filed a second motion seeking a TRO.  With that motion, they

seek to enjoin Mayor Frey from:

> a. Evicting, bulldozing, clearing, sweeping, dismantling, demobilizing, removing infrastructure, or ceasing services to Camp Nenookaasi, the encampment of unhoused individuals located between 11th and 12th Avenues on 28th Street, Minneapolis Minnesota.
>
> b. Confiscating or destroying Plaintiff's property, including property shared by the Camp in common areas;

     c.  Entering individual residences at Camp Nenookaasi or otherwise searching the area outside of the common spaces without proper search warrants or consent of the resident whose yurt or tent has been entered.

(ECF Doc. 31 at 2.) The TRO should be denied.

Injunctive relief is an "extraordinary remedy never awarded as a matter of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A TRO may be granted only if the moving party can demonstrate: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Plaintiffs have the "complete burden" of proving all the factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). However, Plaintiffs' motion should be denied as Plaintiffs have failed to meet their burden on every *Dataphase* factor.

## A.    Irreparable Harm

Failure to show irreparable harm is an independently sufficient ground for denying a preliminary injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). To make a showing of irreparable harm, Plaintiffs "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir.

2013).   Additionally, Plaintiffs must establish that "the harm will not be compensable by money damages." *Ben-Yonatan v. Concordia College Corp.*, 863 F.Supp. 983, 986 (D. Minn. 1994). Plaintiffs have not shown this.

"Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).   Put differently, injunctive relief granted to address speculative harm is improper. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015); *see also Jones v. Pub. Hous. Agency of City of St. Paul*, No. 17-5448 (MJD/DTS), 2018 WL 3104269, at *2 (D. Minn. Feb. 27, 2018), report and recommendation adopted, 2018 WL 1535935, at *2 (D. Minn. Mar. 29, 2018) (denying injunctive relief involving speculative harm of potential eviction).

Plaintiffs allege that their belongings would be destroyed from closure of the Current Encampment, but what Plaintiffs neglect to discuss is the fact that their items would only be destroyed *if* they chose to leave the items behind after having had many days of notice that they need to be removed, *if* they refused available housing options, and *if* they refused offers to store their items.  The offer of storage included Plaintiffs' tents and any other items that they allege are irreplaceable.  If

Plaintiffs took appropriate steps to secure their belongings during the notice period, were successful in finding a place to stay, or took the City's offer of a place to store their items, then the purported harm of being deprived of their belongings would not occur. Another court in this district has found that individuals experiencing homelessness who are being required to leave an illegal encampment have not suffered irreparable harm because although "[t]he potential harm that the Encampment Plaintiffs face as a result of possible disbandment is not minimal[,] . . . to warrant injunctive relief, the harm must be *certain* and *concrete*." *Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/JFD), 2020 WL 6337706, at *4 (D. Minn. Oct. 29, 2020) (emphasis in original) (citing *Novus Franchising*, 725 F.3d at 895; *Vision-Ease Lens, Inc. v. Essilor Int'l. SA*, 322 F. Supp. 2d 991, 999 (D. Minn. 2004)). Here, with the notice that has been given, unlimited time to pack, alternative housing, and the free storage that was made available, there is no reason why Plaintiffs could not take or store those items they deemed irreplaceable. Should other items of property be lost, they can be compensated by monetary damages.

Additionally, Plaintiffs' claims that they cannot be compensated with money damages for the "medical, logistical, spiritual, emotional and other compounding harms" that would be occasioned by the Current Encampment closing is not supported by law. (ECF 47 ("P. Mem.") at 21-22.) In fact, this Court

has already held that "the City cannot fairly be faulted" for these types of outcomes. (Tr. at 74:15-18.) Plaintiffs allege that if the Current Encampment were closed, people may "get high to cope with the trauma," or otherwise experience feelings of "despair, hopelessness, relapse, overdose and a general erosion of progress." (P. Mem. at 28.) Plaintiffs, however, do not point to any case law in support of their claim that such damages constitute the irreparable harm required to justify a TRO - in fact, in most § 1983 actions, the plaintiffs can and do seek monetary compensation for emotional suffering. *See Carey v. Piphus*, 435 U.S. 247, 263 (1978). Plaintiffs could do so here.

Moreover, as this Court previously held, "whether any particular plaintiff or person will in fact experience these challenges represents the sort of generalized non-imminent risk that is insufficient under the law to show irreparable harm in the context of a preliminary injunction." (Tr. at 74:19-23.) Plaintiffs have not shown they would certainly be irreparably harmed by the closure of the Current Encampment, as opposed to the harm caused by their own refusal to respond accordingly to notices of the closure by securing their most important and irreplaceable items, obtaining alternative housing that would secure those items, or accepting storage that would secure those items, and therefore their motion should fail on this basis alone.

### B.   Balance of Harms

Courts must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Plaintiffs assert that the balance of harm weighs in their favor because the "government's strong interest in ensuring the public safety and order is best served by actively supporting, or at a bare minimum refraining from undermining, the existence of Nenookaasi." (P. Mem. at 44.) Plaintiffs further allege that allowing the Current Encampment to remain is "harmonious with the Defendant's interest in running a safe and humane City." (*Id.*)

This is patently untrue. While the government certainly "has a strong interest in ensuring the public safety and order[,]" finding that the Current Encampment should be allowed to continue on indefinitely, perhaps for years, is undoubtedly not advancing that goal. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994). To the contrary, Mayor Frey's interest in the closure of the Current Encampment was to stop the unlawful and criminal activity that had taken root there, to stop the staggering environmental impact that the Current Encampment had on the community, and to protect not only those living nearby, but those living *in* the encampment from unhygienic, unsanitary, and unsafe living conditions.

As outlined extensively *supra*, the impact that both past iterations and the Current Encampment had on the community are severe. Individuals from the

Current Encampment created an incredibly unsanitary and unsafe environment for the community - urinating and defecating in the yards of the surrounding properties, leaving soiled toilet paper, food waste, and other garbage in neighboring yards, and littering the sidewalk and properties of others with hypodermic needles. (Jensen Decl. ¶¶4-7.) It is indisputable that the massive amount of smoke generated by the Current Encampment not only caused serious health issues for those in the community but interfered with the operation of businesses and medical facilities in the area.

The personal setbacks that Plaintiffs allege would be caused by the encampment closures, which are speculative at best, are not greater harms than those that have plagued the encampments, including deeply unhygienic conditions, environmental impacts of smoke, violence, human trafficking, unsafe conditions, life-threatening fires, and even murder.  It is these dangers, that time and again have shown that they will follow and cling to the Encampment no matter where it manifests, that Mayor Frey seeks to disrupt.  The balance of harms clearly weighs in favor of Mayor Frey and the closure of the Current Encampment.

### C.    Public Interest

Plaintiffs assert that protecting constitutional rights is "always in the public interest" and that Defendant's health and safety reasons for working to close the encampment are pretextual.  (P. Mem. at 45.)  As discussed *supra,* Defendant's

health and safety concerns are most certainly well-founded. As is set forth in the supporting declarations by multiple neighbors of the various iterations of Camp Nenookaasi, the safety of those living in and nearby the Current Encampment is cause for serious and increasing concern. Neighbors of the Current Encampment could not leave their own homes without fear of confronting human waste or hypodermic needles. Neighbors of the Current Encampment feared for their personal safety, as well as the safety of their homes. Neighbors of the Current Encampment lived day in and day out in homes filled with toxic smoke fumes, suffering through terrible respiratory symptoms as a result. All of this is the result of Plaintiffs unlawfully breaking into and trespassing on City-owned property.

The health and safety concerns that led to the decision to close the Current Encampment weigh in favor of denial of the TRO.  The public has a right to expect that the City will act to shut down activity, including encampments, that have degenerated to be sites of human trafficking, assaults, murder, unlivable smoke, or that caught fire and burned to the ground, endangering the lives of everyone there and all of the surrounding neighbors.

Finally, as discussed below, no constitutional rights will be offended by the denial of the TRO, and therefore the public interest asserted by Plaintiffs will be unaffected by the closure of the encampment.  The public interest weighs heavily in favor of denying the TRO.

### D.      Likelihood of Success on the Merits

When plaintiffs, as they do here, intend to enjoin "government action based on presumptively reasoned democratic processes" then they must show that they are *likely* to prevail on the merits. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Here, Plaintiffs are unlikely to succeed on any of their claims because all of the Plaintiffs' claims are premised on the faulty assumption that they have a right to continue to trespass and encamp illegally on City-owned property.

Plaintiffs have brought six claims against Mayor Frey in his individual and official capacity: Unlawful Seizure, Deprivation of Procedural Due Process, Deprivation of Substantive Due Process,[2] Violation of the Eighth Amendment of

---

[2] To the extent Plaintiffs allege an illegal seizure or deprivation of due process under the Minnesota Constitution, those claims are not actionable. "No cause of action exists under Section 1983 for a violation of a state constitutional right." *White v. City of Minneapolis*, No. 21-CV-0371 (WMW/KMM), 2021 WL 5964554, at *7 (D. Minn. Dec. 16, 2021).

Additionally, "there is no corollary to section 1983 under state law, and 'courts have repeatedly stated that Minnesota has not recognized private remedies for violations of the Minnesota Constitution.'" *White v. Dayton*, No. 11-CV-3702 (NEB/DJF), 2023 WL 21918, at *16 (D. Minn. Jan. 3, 2023), *report and recommendation adopted,* No. 11-CV-3702 (NEB/DJF), 2023 WL 1797830 (D. Minn. Feb. 7, 2023); *Jones v. James,* No. Civ. 02–4131, 2005 WL 459652, *8 (D. Minn. Feb. 24, 2005) ("Minnesota does not recognize a tort for deprivation of due process."); *Northstar Legal Found. v. Honeywell Project,* 355 N.W.2d 186, 188 (Minn. Ct. App. 1984) (no action lies under Art. I, § 10).

the United States Constitution, Conversion under Minnesota law, and violation of Title II of the Americans with Disabilities Act. Plaintiffs are not likely to succeed on the merits of any of these claims.

### 1. Plaintiffs' individual capacity claims against Mayor Frey are not likely to succeed.

#### a) The Unlawful Seizure Claim Fails

The Fourth Amendment of the United States Constitution requires that any seizure of property be conducted reasonably. U.S. Const. amend. IV. A seizure is a "meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty.*, 506 U.S. 56, 71 (1992). The reasonableness of a seizure depends on the context. *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985). To determine reasonableness, the court must balance both the private and governmental interests. *Soldal*, 506 U.S. at 71.

The competing interests in this case are the Plaintiffs' interest in not having their belongings seized after ample opportunity to secure them elsewhere and the Defendant's interest in maintaining public health and safety. Plaintiffs' cite out-of-circuit authority that, "the Fourth Amendment protects homeless individuals from seizure and summary destruction of their unabandoned, but temporarily unattended, personal property." (P. Mem. at 29-30 citing *Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp. 3d 806, 837 (N.D. Cal. 2022), *aff'd in part, remanded in part,* No. 23-15087, 2024 WL 125340 (9th Cir. Jan. 11, 2024), and

*aff'd,* 90 F.4th 975 (9th Cir. 2024)[3] (citing *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012)).   However, since the Ninth Circuit's original holding in 2012 the Eighth Circuit has not adopted such a proposition.   Nor does either *Coalition on Homelessness*  or *Lavan* involve a unified group of encampmers that continues to break into municipal property to relocate their encampment.   *See id.*   Rather, the *Lavan* case involved an injunction against a city who was seizing and destroying possessions of homeless individuals *without notice. Lavan v. City of Los Angeles*, 693 F.3d 1022, 1026 (9th Cir. 2012).   That is clearly not the case here. Plaintiffs in this case *know exactly how to keep their property from being lost at a closure* because they have been through multiple closures before.     Plaintiffs have refused to do that and instead focus on setting up their next illegal encampment, knowing that closure is the inevitable result.   Plaintiffs' can have no expectation that their items will be regarded as "unabandoned" if they choose to leave them where they have illegally trespassed on City property, especially while a closure is occurring. Contrary to any Ninth Circuit holding, a court in this district has found that it can

---

[3] Plaintiffs cite this case as a Ninth Circuit case, but in fact it was a district court case partly overturned by the Ninth Circuit finding that "a person who has refused a specific offer of available shelter is not involuntarily homeless.  We remand for the district court to clarify that the preliminary injunction applies only to the City's enforcement of the enjoined laws as to the involuntarily homeless." *Coal. on Homelessness v. City & Cnty. of San Francisco*, No. 23-15087, 2024 WL 125340, at *1 (9th Cir. Jan. 11, 2024).

be permissible to permanently deprive an individual of property "when it is necessary to achieve the government's permissible ends." *Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/JFD), 2021 WL 4427215, at *8 (D. Minn. Sept. 27, 2021)(citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)).

The touchstone of the Fourth Amendment is reasonableness. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) *(per curiam); Katz v. U.S.,* 389 U.S. 347, 357 (1967)). "An action is 'reasonable' under the Fourth Amendment, . . . 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Id.* (quoting *Scott v. U.S.,* 436 U.S. 128, 138 (1978))(emphasis in original). Here, the City reasonably determined, based on the history of all of the Camp Nenookaasi iterations, which includes hundreds of 911 and 311 calls, multiple deaths, shootings, reports of human trafficking, rampant open-air drug use, destruction of neighboring property, unhygienic and unsanitary conditions, and debilitating smoke permeation, that these encampments endangered residents and the community.

The Current Encampment has continued in suit prior to an explosive fire that recently decimated the encampment. Plaintiffs know they are not permitted to live on these properties. Each of the sites of an iteration Camp Nenookaasi have been fenced and locked City property which the encamped individuals gained access to by cutting through fences and breaking locks. Each of the iterations of

Camp Nenookaasi had *multiple* "no trespassing" signs posted which encamped individuals subsequently tore down. The City engaged in weeks of dialogue and outreach to those at the Current Encampment.  Plaintiffs knew that the City intended to close the Current Encampment.  Plaintiffs had numerous opportunities to secure alternative housing and obtain storage for their personal items so that none are lost on the date of closure.  When the City's employees come to actually perform closures and are confronted with a collection of dirty, broken, and soiled objects that have been left behind, it is reasonable for the City to dispose of those items.  It is the experience of City employees conducting encampment closures that sorting through the items left behind is extremely hazardous because it has caused City employees to be stuck with used hypodermic needles, and be exposed to feces, other hazardous unknown substances, and vermin infestations. (*see* ECF 17 at 31.) Accordingly, it is objectively reasonable to not attempt to search the items left behind after people were given many opportunities to remove them, and to put the left-behind items in the trash or storage.  To any reasonable official, these items have been abandoned.  Seizing or searching abandoned property does not implicate the Fourth Amendment.  *Abel v. U.S.*, 362 U.S. 217, 241 (1960); *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011).

But even if it were possible that some items left behind were not intended to be abandoned, the permanent seizure of such property is reasonable and

necessary to accomplish the City's goal of safely clearing encampments.  The City cannot feasibly sort through the giant pile of trash left at an encampment clearing, nor store that pile of needle-infested trash to wait for individuals to potentially come and pick out a few items.  If Plaintiffs leave items behind, knowing that the closure of an encampment is imminent, then that diminishes Plaintiffs' Fourth Amendment interest in those items.  *See Hroch v. City of Omaha*, 4 F.3d 693, 697 (8th Cir. 1993) (where plaintiff "took no steps to claim or protect whatever personal property was in the buildings when he knew that demolition was imminent" this shows the plaintiff's "Fourth Amendment interest in these premises was negligible").  Plaintiffs' unlawful seizure claim is unlikely to succeed on the merits.

   b)  *The Procedural Due Process Claim Fails*

   Even if Plaintiffs fail to take advantage of the time given to remove their possessions, and intentionally leave behind important and irreplaceable items which they do not intend to abandon, the question central to Plaintiffs' Procedural Due Process claim is what process is due before the property is disposed of in such a situation. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  As an initial matter, where a plaintiff has received actual notice of the impending seizure of their property, there is no due process violation. *Hroch,* 4 F.3d at 696.  But in all cases, "[d]ue process is a flexible concept, requiring only such procedural protections as the particular situation demands." *Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d 698,

702–03 (8th Cir. 2004) (quotation omitted).  Specifically, the Supreme Court directs that to determine what procedural protection a particular situation demands, courts should look to three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Courts have also sometimes found that any pre-deprivation process can be dispensed with due to emergency circumstances affecting the public health and welfare. *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300–01 (1981).

Here, it is undisputed that the Plaintiffs knew that the City would be closing the encampments. Encamped individuals removed the signs informing them that they were trespassing and they obtained illegal access to the City properties by breaking through locked and secured fences. Plaintiffs, or their co-residents, cannot destroy the notice and then claim ignorance and they cannot possibly make a colorable argument that they were unaware that they would be required to vacate the Current Encampment – after three previous encampment closures. There has been no Procedural Due Process violation. *Hroch*, 4 F.3d 693, 696 (8th

Cir. 1993)("Because Hroch had actual notice that the City intended to condemn all buildings on the premises, there was no procedural due process violation.")

Plaintiffs' private interest is to maintain their unlawful occupation of City property because they believe it is beneficial to themselves and others at the Current Encampment.  The City's interest in removing them is due to the serious health and safety concerns arising out of and occurring at all iterations of the Nenookaasi Encampments.   Plaintiffs have available places to store their belongings, and seek shelter.  It would not be reasonable to require additional post-deprivation processes as it would require the City to store large amounts of contaminated trash after individuals did not heed the many warnings to take or store their belongings before the date of closure.  There has been sufficient process, under the circumstances, to satisfy due process and Plaintiffs' claim is not likely to succeed.

### c) The Substantive Due Process Claim Fails

Plaintiffs assert a state-created danger theory to claim that Mayor Frey has deprived them of substantive due process.  However, under that theory, a plaintiff must prove (1) that he was a member of a limited, precisely definable group; (2) that the state actor's conduct put him at a significant risk of serious, immediate, and proximate harm; (3) that the risk was obvious or known to the state actor; (4) that the state actor acted recklessly in conscious disregard of the risk; and (5) that

in total, the state actor's conduct shocks the conscience. *Montgomery v. City of Ames*, 749 F.3d 689, 694 (8th Cir. 2014), *citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). To shock the conscience, an official's action must either be motivated by an intent to harm or, where deliberation is practical, demonstrate deliberate indifference. *Montgomery* 749 F.3d at 695. Deliberate indifference requires both that the official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and that official actually draw the inference." *Id.* (quotation omitted).

Plaintiffs claim that they will be placed at significant risk of serious, immediate and proximate harm by being evicted from public land, because it will "deprive them of personal belongings, relationships, stability, and community necessary to their survival." (P. Mem. at 34.) This claim cannot succeed on the merits. This Court has already held that the Mayor cannot be responsible for risks to certain individuals that his conduct did not and does not create:

> The claim as I understand it is that the Plaintiffs are at risk of harm through the dispossession of their property, being forced to live in the cold in a Minnesota winter, and the risks that certain individuals will face a relapse of underlying health conditions through the loss of stability the camp provides, and by those health conditions I mean health conditions including drug and alcohol dependency, mental health conditions and the like. The City's conduct did not and does not create these risks. Again, the City has given Plaintiffs notice and options to safeguard their belongings. The City is not forcing Plaintiffs to reside outdoors. Plaintiffs reside outdoors today and the City is telling them they need to reside somewhere else, perhaps in

> another outdoor location, perhaps in a shelter. Regardless, the City's conduct does not shock the conscience.

(Tr. at 69:17-70:8.)

Mayor Frey is not requiring Plaintiffs or other residents to leave their tents or other possessions behind, that is their choice. To the extent Plaintiffs fear exposure to the elements, Mayor Frey does not control the weather and therefore did not create this danger to Plaintiffs. *Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/JFD), 2021 WL 4427215, at *10 (D. Minn. Sept. 27, 2021) (citing *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005))( "Plaintiffs do not allege a state-created danger because inclement weather and the COVID-19 pandemic, although dangerous, were not created by the state.") Plaintiffs were already living outside, Mayor Frey is simply telling them that they cannot continue living outside at the Current Encampment.

Moreover, requiring persons who have, for weeks, been offered shelter and personal storage to vacate encampments that have become violent and public health hazards does not demonstrate deliberate indifference. Nor is it "a dangerous escalation of the legacy of genocidal displacement of Indigenous peoples." (P. Mem. at 35.) Rather, the removal of encampments has been performed by the City in a thoughtful manner to protect those in the encampments, city staff, and the public, and that is what has happened in this case. Plaintiffs are creating the danger themselves by not availing themselves of the

storage options for any necessary gear in advance of the closure Plaintiffs knew was coming, or by not making other preparations to leave. Plaintiffs cannot succeed on the merits of their "state created danger" claim and therefore, a TRO should not issue.

### d) *The Eighth Amendment Claim Fails*

Plaintiffs also rely on two extra-jurisdictional decisions for the proposition that addressing the public-safety hazards created by the Current Encampment would violate their rights under the Eighth Amendment. But even that non-binding precedent does not support their case.

In *Martin v. City of Boise*, the Ninth Circuit held that under the Eighth Amendment, "criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." 647 F. Supp. 3d 584, 617 (9th Cir. 2019) (quoting *Powell v. Tex.*, 392 U.S. 514, 567 (1968)). At issue was a city-wide *criminal* prohibition on sleeping outside on public property. *Id.* at 603. Immediately and dispositively, this distinguishes *Martin* from the case at hand, as no such similar ordinance or prohibition exists or is being enforced in Minneapolis. To the contrary, violation of M.C.O. 266.40, the Minneapolis Ordinance that prohibits residing in temporary structures, carries no criminal penalties.

Even if the Court were to disregard the fact that criminal penalties that were the crux of the *Martin* case are non-existent in the comparable Minneapolis

ordinance, *Martin,* while indisputably nonbinding, is not even persuasive. The Ninth Circuit adopted the "narrow" holding that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public." *Id.* at 617. The other case cited by Plaintiffs, *Coalition on Homelessness v. City and County of San Francisco*, stands for a nearly identical proposition. 647 F. Supp. 3d 806.

Here, the Court has already ruled that "Mayor Frey and the City are not criminalizing the status of homelessness" by the act of closing homeless encampments.  (Tr. at 72:17-18.) The Court further correctly noted that "Plaintiffs do not allege that the City is outright prohibiting homelessness, sleeping outside or anything of the sort. Rather, Mayor Frey is alleged to be closing one encampment. Thus, even assuming it to be good law, the Eighth Amendment theory the Ninth Circuit adopted in *Martin* is one Plaintiffs are not likely to prevail on here." (*Id*. at 72:18-24.)

Moreover, other courts have repeatedly distinguished *Martin* on grounds that are relevant here. For example, in *Frank v. City of St. Louis*, the Eastern District of Missouri held that clearing specific encampments, rather than widely prohibiting sleeping in public as was at issue in *Martin*, did not violate the Eighth Amendment. 458 F. Supp. 3d 1090, 1094 (E.D. Mo. 2020). The Court also noted that

St. Louis had a legitimate public-health reason for vacating the camp. *Id.* The same is true here; the issue before the Court is not a city-wide prohibition on sleeping in public places, but rather the clearing of one specific encampment that has demonstrated itself to be a danger to public health and safety.

Other courts have distinguished *Martin* on the grounds that plaintiffs were not at risk of criminal prosecution merely for being unsheltered. *See O'Callaghan v. City of Portland*, No. 3:21-cv-812-AC, 2021 WL 2292344, at *4 (D. Or. June 4, 2021); *Miralle v. City of Oakland*, No. 18-cv-06823-HSG, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018); *see also Aitken v. Aberdeen*, 393 F. Supp. 3d 1075, 1082, (W.D. Wash. 2019) (collecting cases distinguishing *Martin*). In this case, Plaintiffs are not at risk of prosecution merely for being unsheltered, as was at issue in *Martin* and *Coalition on Homelessness*. They simply could not occupy the dangerous Current Encampment any longer. Nor are they at risk of having property seized—the City has made free storage available to them. As the Northern District of California recognized, "*Martin* does not establish a constitutional right to occupy public property indefinitely at [plaintiffs'] option." *Miralle*, 2018 WL 6199929, at *2.

  e)  *The Conversion Claim Fails*

To succeed on a conversion claim, Plaintiffs must show they have a lawful interest in property they have intentionally left behind at the encampment when it closes and that they were *unlawfully* deprived of that interest by Defendant.

*Brown v. City of Bloomington*, No. CV 15-11 (DSD/DTS), 2018 WL 3614125, at *11

(D. Minn. July 27, 2018) (citing *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn.

Ct. App. 2003)).   Where property is seized by the government with lawful

justification, such as a constitutionally valid seizure, then there is no conversion.

*Id.* Therefore, as the seizures alleged to be forthcoming by Plaintiffs are lawful

under the Fourth Amendment and Fourteenth Amendment as discussed *supra*,

there could be no conversion.

> f) *The ADA claim cannot be brought against the Mayor in his individual*
>    *capacity.*

Plaintiffs ostensibly bring all their claims against Mayor Frey in his

individual and official capacity. "Individuals in their personal capacities,

however, are not subject to suit under Title II, which provides redress only from

public entities." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010)

(citing *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1005 n. 8 (8th Cir. 1999) (en banc)).

Plaintiffs' individual claims against Mayor Frey under the ADA are therefore

unlikely to succeed on the merits.

## 2.   **Plaintiffs' official capacity claims against Mayor Frey are not likely to succeed.**

Suits against individuals in their official capacity are treated as a suit against

the government entity. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (citing

*Hafer v. Melo*, 502 U.S. 21, 25 (1991)).  Therefore, Plaintiffs' claims against Mayor

Frey in his official capacity are claims against the City of Minneapolis.

> a) *The Plaintiffs cannot establish liability for a constitutional violation*
> *against the City of Minneapolis under Monell*

"Liability for a constitutional violation will attach to a municipality only if

the violation resulted from an official municipal policy, an unofficial custom, or a

deliberately indifferent failure to train or supervise an official or employee."

*Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016) (citing

*Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013)).

Plaintiffs allege an unconstitutional policy or custom, both are unlikely to succeed.

### i.    Policy

A municipality is liable under Section 1983 only where its policy is the

moving force behind a constitutional violation.  *Slaven v. Engstrom*, 848 F.Supp.2d

994, 1002 (D. Minn. 2012) (citing *Monell*, 436 U.S. at 694–95).  A "policy" is an

official policy, a deliberate choice of a guiding principle, or procedure made by

the municipal official who has final authority regarding such matters. *Mettler*

*v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  It is only when the "execution of

a government's policy . . . inflicts the injury" that a municipality may be held liable.

*Monell*, 436 U.S. at 694.  Additionally, a "policy is not unconstitutional if it might

allow for unconstitutional conduct in some instances[;] such a policy is

unconstitutional only if it requires its officer to act in such an unconstitutional

manner." *Peroceski v. Tarr,* 2009 WL 3202463, at *12 (D. Minn. Sept. 30, 2009)(citations omitted).

While Plaintiffs generically allege that that Defendant's policies violate their property rights, they provide no specifics whatsoever about how and in what way those policies do so. In fact, Plaintiffs do not identify any official City policy regarding the closure of homeless encampments that they allege to be unconstitutional.   To the contrary, Plaintiffs ignore Defendant's fulsome and substantive Operational Guidance document entirely, which lays out detailed procedures for safe and dignified encampment closures that are facially constitutional. (ECF 17, Ex. B.) The amended complaint is devoid of any allegations that would support a claim that the Plaintiffs' purported constitutional violations are based on an official City policy, so any *Monell* claim based on such must be denied.

### ii.   Custom

"[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). For a municipality "to be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread'

unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Monell*, 436 U.S. at 691).

Plaintiffs have failed to show that the City's custom in closing encampments has been any different than is articulated in its constitutional policies. The City gives reasonable notice, engages with individuals at the site, offers services, offers storage, visits multiple times, before finally clearing the site. Plaintiffs will not be able to establish that the City or Mayor Frey has a custom of closing encampments in a manner that violates individuals' constitutional rights. Plaintiffs' *Monell* claim, therefore, fails.

b) *Plaintiffs' Title II ADA claim fails*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability ... be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim, plaintiffs must "show (1) they are qualified individuals with a disability; (2) they were denied the benefits of a public entity's service or program, or otherwise discriminated against; and (3) the denial or discrimination was based on their disability." *Loye v. Cty. of Dakota*, 647 F. Supp. 2d 1081, 1087 (D. Minn. 2009) (citing *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)). Plaintiffs have the burden of proof, and they have failed to show that they

are qualified individuals with a disability, that they were denied any benefits of the City of Minneapolis' service or program or were discriminated against, or that any action taken relating to them at all was based upon any alleged disability.

### i. Plaintiffs have not established they are "qualified individuals with a disability"

Plaintiffs have argued and alleged that they are "are disproportionately individuals with physical and/or mental disabilities, disorders, and/or conditions including addiction which qualify them as 'persons with disabilities' under the ADA." (P. Mem. at 39; *See* ECF Doc. 30 at ¶ 115.) However, they have failed to provide any evidence that they have met the ADA's definition of "qualified individual[s] with a disability." The ADA provides a disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102. Plaintiffs do not specify why it is they are persons with disabilities under the definition. The individual Plaintiffs and proposed class members have information in their declarations regarding the following conditions: chemical dependency/substance abuse/addiction (ECF 5 at ¶ 4, 7 (Plaintiff Barnes), ECF 7 ¶ 6 (Nicole Perez), ECF 34 ¶ 3 (Veronica Tiger)), post-traumatic stress disorder (ECF 6 ¶ 4 (Plaintiff Sagataw), ECF 34 ¶ 3 (Veronica Tiger)), traumatic brain injury (ECF Doc. 39 ¶ 2 (Plaintiff Strong)), a broken ankle (ECF 35 ¶ 2 (Plaintiff Neloms)), various mental health diagnoses (ECF 34 ¶ 3

(Veronica Tiger reporting Bipolar type 2, borderline personality disorder, severe social anxiety, and seasonal depression), ECF 36 ¶ 2 (Plaintiff Neloms "multiple mental health diagnoses")).  These only would qualify as disabilities if they substantially limit one or more major life activities of the individual.  Plaintiffs list various conditions but do not assert or explain that these conditions limit one or more of their major life activities.[4]  Plaintiffs carry the burden of proof and they do not establish that they are "individuals with disabilities" under the Americans with Disabilities Act.

Additionally, to the extent that Plaintiffs or prospective Plaintiffs are claiming the protection of the ADA because of their current, untreated, substance abuse problem (*see* ECF 7, ¶ 14, 18, 19 (referring to persons living in the encampment who are drug users), *see also* Enslin Decl. Ex. C Nicole Perez (Mason) stating "90 percent [of the residents of the encampment] are using fentanyl") the ADA specifically provides that "'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C.A. § 12210(a).  To the extent Plaintiffs' assert that the City of Minneapolis is not providing adequate alternative shelter

---

[4] The statute provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

space because Plaintiffs or other residents of the encampment cannot continue their use of illegal drugs which is necessary because they suffer from addiction, that is not a request legally entitled to accommodation. "[T]he ADA protects only individuals who are no longer using illegal drugs." *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 (8th Cir. 2007) (citing *Campbell v. Minneapolis Public Hous. Auth.,* 168 F.3d 1069, 1072 n. 1 (8th Cir. 1999)).

### ii. Plaintiffs have not established any discrimination in the administration of City services or programs based on any disability

The crux of Plaintiffs' discrimination argument is that the City is requiring the encampments to close and it is doing so "without first identifying and offering alternative housing that meets the disability-related needs of its residents[.]" (P. Mem. 40-41.) Plaintiffs also argue that the City must postpone any closure until the residents "are offered housing placements that meet their needs." (P. Mem. 42.) Essentially, Plaintiffs are arguing that the City is not providing them with a reasonable accommodation for their disability. "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). The issue then is whether Plaintiffs' request, not to be moved from

their chosen illegal encampment until they have found housing that they decide has met their specific needs, is both reasonable and necessary. *See One Love Hous., LLC v. City of Anoka, Minnesota*, No. 22-3071, ___ F.4th ___, 2024 WL 632041, at *6 (8th Cir. Feb. 15, 2024). "[I]n no event is the entity required to undertake measures that would impose an undue financial or administrative burden ... or effect a fundamental alteration in the nature of the service." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (citation omitted).

The City has undertaken closures of the Camp Nenookaasi Encampments several times due to the urgent safety concerns presented by the different encampments. These concerns, sometimes immediately, and sometimes later, become so overwhelming that closure must occur and no further extensions may be given. Plaintiffs have pointed to no particular "program" provided by the City that they request accommodation for except the closure of the encampments. The City does use its resources to close encampments, and as part of that process provides outreach to those at the encampments to attempt to connect them with social services and storage for their items. To postpone closure of dangerous encampments indefinitely while waiting for other organizations to develop housing deemed acceptable to encampment residents, and for encampment residents to be ready and willing to accept that housing when it is available, is a fundamental alteration of the City's programs. *Where Do We Go Berkeley v.*

*California Dep't of Transportation*, 32 F.4th 852, 862 (9th Cir. 2022) ("The district court effectively asked [the California Department of Transportation] to house Plaintiffs on its property until Plaintiffs found new housing, with no regard to the safety risks that make clearing level 1 encampments so critical.")  Therefore, the Plaintiffs' requested accommodation is not reasonable.

However, even if requiring the City to allow Plaintiffs to hold the City's land and neighborhoods hostage until the City provided the Plaintiffs' preferred housing, Plaintiffs' requested accommodation cannot be reasonable unless it is *necessitated* by the Plaintiffs' *disabilities*. *One Love Hous., LLC*, No. 22-3071, 2024 WL 632041, at *6 (citing *Peebles v. Potter*, 354 F.3d 761, 769 (8th Cir. 2004)).  The only facts that are offered about the unsuitability of the available shelter space on an encampment closing day are: "Crowded mats on a floor with little to no privacy, strict enforcement of rules and curfews, and no room for securely storing personal belongings and effects are neither humane nor accessible for anyone struggling with chronic homelessness, let alone someone with a qualified physical or mental health disability."  (P. Mem. 41.)  This alleges, without evidence, that shelter conditions are bad for individuals who are disabled *and* not disabled, and it does not explain why the shelters are not usable by those Plaintiffs who are alleged to be disabled.

None of the Plaintiffs' declarations or allegations state that shelters are not viable options *because of a disability*.  Plaintiff Barnes states that shelters do not work for couples or people struggling with addiction.[5] (ECF 5 ¶16.)  Plaintiff Neloms states he does not like shelters because they "have curfews, rigid, rules, I get sick when I stay there [from poor food/hygiene]" and that he did not like that he had to share a room and could not have company in Agate housing.  (ECF 36 ¶¶  8, 11.)  Plaintiff Strong stated she did not go to shelters because "I am not good with too many rules, I'm not good with having a bedtime, and if you break a rule you get kicked out."  (ECF 29 ¶ 9.)  No Plaintiff alleges or provides evidence that any of the conditions they have identified, mental or physical, is the reason they cannot go to a shelter or cannot otherwise find housing when the City attempts to get them to leave their illegal encampment on City property.  Plaintiffs do not make a connection between their need for more time to find housing and any possible disability.  In fact, Plaintiffs do not even explain what kind of housing they do need, simply that shelters are distasteful to them.  As Plaintiffs do not show that more time is a necessity due to their disability, they cannot show that their requested accommodation is reasonable.

---

[5] As discussed *supra*, the ADA does not protect active illegal drug users so no accommodation would be required to allow an addict to continue using illegal controlled substances.

Plaintiffs have not shown they have a qualifying disability under the ADA nor that the City has discriminated against them in providing any service or program, and their requested accommodation of indefinite, illegal and unsafe encampment on City property is not reasonable. Plaintiffs are not likely to succeed on their ADA claim.

## II. Even if the Court grants a Temporary Restraining Order, the terms should be modified to allow policing of the encampment consistent with the Constitution.

Plaintiffs' motion for a TRO should be denied in its entirety, but if the Court decides to enter a TRO, it is important that Plaintiffs' requested injunction be modified. Plaintiffs' current injunctive language calls for prohibiting Mayor Frey or his agents from, "Entering individual residences at Camp Nenookaasi or otherwise searching the area outside of the common spaces without proper search warrants or consent of the resident whose yurt or tent has been entered." Such an order would be extremely problematic for multiple reasons.

First, an order requiring a search warrant to enter a tent at the Current Encampment would drastically and improperly expand privacy rights of trespassing individuals. It is undisputed that Plaintiffs and others staying at the Current Encampment were unlawfully trespassing on City property. Courts have repeatedly held that a person who is trespassing on the property of another has no Fourth Amendment protection in the premises occupied wrongfully. *U.S. v.*

*Hunyady,* 409 F.3d 297, 302 (6th Cir. 2005); *U.S. v. Sanchez,* 635 F.2d 47 (1980). Put differently, one cannot have an expectation of privacy if they are a trespasser. *U.S. v. Brown,* 484 F.Supp.2d 985 (D. Minn. 2007). Notably, a Court in this District has already ruled that a tent pitched unlawfully in an encampment on public land is not a home such that its owner has an objectively reasonable expectation of privacy. *Berry,* No. 20-CV-2189 (WMW/JFD), 2021 WL 4427215 (Sept. 27, 2021). Accordingly, any injunctive relief issued by the Court here requiring consent or a search warrant before entering the purported "premises" of a trespasser could potentially have wide ranging and unintended consequences.

Moreover, as a practical matter, requiring consent or a valid search warrant prior to entering an encampment tent would give the trespassing individuals greater protections than other dwellings have under the Constitution. It would prohibit police officers from entering into a tent if there was probable cause and exigent circumstances, for example, a suspect fleeing from the scene of a murder. It would also prohibit an officer or even emergency medical personnel from entering a tent if they believed that someone inside was in imminent danger. There is no basis for such a prohibition, and it is, like the Current Encampment, dangerous to both residents and the public. If an injunction is entered, Defendant requests it be modified to remove this restriction.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court

deny Plaintiffs' motions for a TRO.

Dated: March 1, 2024

KRISTYN M. ANDERSON
Minneapolis City Attorney
By
*/s/ Sharda Enslin*
Sharda Enslin (#0389370)
Heather P. Robertson (#0390470)
Kristin R. Sarff (#388003)
J. Haynes Hansen (#0399102)
Assistant City Attorneys
Office of the Minneapolis City Attorney
City Hall, Room 210
350 S. Fifth Street
Minneapolis, MN 55415
Telephone: 612-673-3949
sharda.enslin@minneapolismn.gov
heather.robertson@minneapolismn.gov
kristin.sarff@minneapolismn.gov
haynes.hansen@minneapolismn.gov

*Attorneys for Defendant Jacob Frey*