```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA

-------------------------------------------------------------
                              )   COURT FILE
CHERYL SAGATAW and DeANTHONY  )   NO. 24-CV-1 (ECT/TNL)
BARNES, on behalf of          )
themselves and a class of     )
similarly-situated individuals, )
                              )
              Plaintiffs,     )
                              )
          vs.                 )
                              )
MAYOR JACOB FREY, in his      )
individual and official       )
capacity,                     )   Courtroom 7A
                              )   Wednesday, January 3, 2024
              Defendant.      )   St. Paul, Minnesota
                              )   2:00 P.M.
-------------------------------------------------------------
```

### HEARING ON

### PLAINTIFFS' MOTION FOR A
### TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION

### BEFORE THE HONORABLE ERIC C. TOSTRUD
### UNITED STATES DISTRICT JUDGE

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S:**

**For the Plaintiffs:**      KIRA AAKRE KELLEY, ESQUIRE
                            238 Emerald Street
                            Minneapolis, Minnesota  55414

**For the Defendant:**       **MINNEAPOLIS CITY ATTORNEY'S OFFICE**
                            **CIVIL DIVISION**
                        By:  SHARDA R. ENSLIN
                            HEATHER PASSE ROBERTSON
                            KRISTIN R. SARFF
                            J. HAYNES HANSEN
                            Assistant City Attorneys
                        City Hall - Suite 210
                        350 South Fifth Street
                        Minneapolis, Minnesota  55415

*    *    *    *

1        (2:00 p.m.)

2                    **P R O C E E D I N G S**

3                      **IN OPEN COURT**

4                THE COURT:  Good afternoon, everyone.  Please be

5       seated.

6                We are here this afternoon for a hearing on what

7       is styled as a motion for a temporary restraining order in

8       Cheryl Sagataw and DeAnthony Barnes versus Mayor Jacob Frey.

9       This is Civil File Number 24-1.

10               Let me at this time invite counsel to note their

11      appearances, starting with the plaintiffs.

12               MS. KELLEY:  Good afternoon, Your Honor.  This is

13      Attorney Kira Kelley for the plaintiffs.

14               THE COURT:  Good afternoon.

15               And who do we have on behalf of the Mayor?

16               MS. ENSLIN:  Good afternoon, Your Honor.  Sharda

17      Enslin, the attorney for the City of Minneapolis, here on

18      behalf of Mayor Jacob Frey.  Along with me I have my

19      colleagues Heather Robertson, Kristin Sarff, and Hayes

20      Hansen.

21               THE COURT:  All right, terrific.  Good afternoon

22      to all.

23               All right.  This is Plaintiffs' motion.  I

24      indicated earlier that it was styled as a motion for

25      temporary restraining order.  Typically Rule 65 contemplates

Enslin Decl. Ex. A

1    the temporary restraining orders are issued ex parte and

2    without notice.  We're sort of past that point here, and so

3    I would think it is more appropriately referred to as a

4    preliminary injunction request, but please feel free to let

5    me know if you disagree with that, Ms. Kelley, but let's

6    hear from you first.

7            MS. KELLEY:  Thank you, Your Honor.  And should

8    I -- may I approach the podium?

9            THE COURT:  Please.  And while you're walking

10   there, I think I will have questions, but what I'll do is

11   instead of sort of leading with those out of the gate what

12   I'll do is try to ask those where they seem to fit within

13   the context of your argument.

14           MS. KELLEY:  That sounds great, Your Honor.

15           Am I correct in assuming I should plan for

16   approximately 20 minutes or perhaps save some time to

17   respond, maybe a 15 and five split?

18           THE COURT:  Particularly owing to the speed with

19   which the motion was filed and the relative haste with which

20   we are proceeding, I'm going to invite you to take the time

21   that you think you reasonably need --

22           MS. KELLEY:  Okay.

23           THE COURT:  -- to tell me about your position and

24   your clients' position in this case and I'm going to invite

25   the City to do the same.  I will give you an opportunity for

Enslin Decl. Ex. A

1   rebuttal whether you reserve time or not once the City's

2   done arguing, or once the Mayor is done arguing, I should

3   say.

4            MS. KELLEY:  Okay.  Thank you, Your Honor.  I

5   appreciate that.  And I agree with your assessment regarding

6   Rule 65(b) and I'm sure you know the **S.B. McLaughlin** case.

7   The standard is the same whether it's a PI or a TRO.

8            First off, thank you, Judge Tostrud, and thank you

9   to the court staff for making this hearing happen.  I know

10  that temporary restraining orders or preliminary injunctions

11  are a scheduling challenge for everyone, and this is all

12  happening over the holidays.  It's a quick notice, quick

13  turnaround, and we're all scrambling, but I just -- I really

14  appreciate and my clients really appreciate this opportunity

15  to be heard, so thank you for that.

16           And we'll keep it simple.  We're not here to waste

17  anybody's time.  We're here because Camp Nenookaasi

18  community members, government officials from multiple

19  departments, agencies, and jurisdictions, and the residents

20  themselves are working together, are realizing that the best

21  way to address the crisis that unhoused populations

22  experience is for people to meet each other where they're at

23  and to engage in and with encampments by supporting people,

24  moving them from interim stability to permanent stability,

25  rather than forcing them to disperse, making problems worse

Enslin Decl. Ex. A

1     and keeping people stuck in a vicious cycle.

2              This lawsuit is narrowly tailored both in causes

3     of action and in defendants.  I'm sure we're all aware of

4     the lawsuit filed a few years ago by the ACLU and Minnesota

5     Legal Aid.  We look to that.  We look to interpretations of

6     law by Judge Wright, the Honorable Judge Wright, and we

7     ensure that we stick to claims that have merit, looking at

8     her interpretations for guidance.  We're not throwing

9     spaghetti at the wall.  We're not naming every potential

10    defendant under the sun.  We chose to do that because Camp

11    Nenookaasi residents and organizers appreciate the support

12    that they've received from Hennepin County, from the City

13    Council, from state and local government officials across

14    the board.

15             This camp has been so successful in part because

16    it is a collaborative effort.  The City Council declared

17    unsheltered homelessness a public health emergency, and that

18    declaration is Exhibit 2 of the Complaint.  Eight members of

19    City Council issued a public letter to Mayor Frey begging

20    him to at least halt the evictions until February 24th.

21    That's attached as Exhibit 3 to the Complaint.  And instead

22    of responding or engaging in this conversation, Mayor Frey

23    scheduled these evictions for January 4th.

24             We're asking the Court to enjoin the one person

25    standing in the way of this real team effort that is having

Enslin Decl. Ex. A

1    transformative impact.  City Council, Hennepin County, state

2    social workers, nonprofit representatives, residents, and

3    neighbors, look how many people are behind this.

4            At this stage we're asking you to preserve the

5    status quo during the pendency of this case and there are

6    four familiar factors in that test.  I'll run through them

7    one by one, but again, Your Honor, I invite questions at any

8    time.  And the first of these four factors is irreparable

9    harm.

10           Now, that has two components.  So the first

11   component is this question of is there an adequate remedy at

12   law, and that's often a financial consideration.  Say this

13   case moves forward and we end up winning.  Will money

14   damages make people whole again?  And what's at stake here

15   is thinking about taking away everything that Camp

16   Nenookaasi has been able to provide for people and has

17   allowed them to provide for each other.  And could monetary

18   damages years from now make Plaintiffs whole from these

19   injuries that are coming at them should this eviction move

20   forward?

21           And we know with addiction and with the opiate

22   crisis, these are real and serious issues.  Change and

23   trauma are hugely destabilizing.  Nenookaasi is a camp that

24   is rooted in principles of sobriety and helping people get

25   on the road to recovery.  Relapse is all too likely when you

Enslin Decl. Ex. A

1    take that stability away from people.

2              THE COURT:  Is there a factual dispute with what

3    the Mayor has said about things that have happened within

4    the camp?

5              MS. KELLEY:  The mayor is I think attempting to

6    portray what's happening at camp from --

7              THE COURT:  Sorry.  I need to just interrupt

8    you --

9              MS. KELLEY:  Yes.  Go for it.

10             THE COURT:  -- Ms. Kelley, and I apologize.

11             I'm hearing dings, which tells me that somebody's

12   got their phone on, and what I'm going to instruct you if

13   you are here with your phone on is to turn your phone off at

14   this time.  Cell phones cannot be used in a federal

15   courtroom while proceedings are in process, and so I'll ask

16   that that happen at this time.

17             If it doesn't happen, I'll stop proceedings again

18   and instruct that we figure out who's got their phone on and

19   we may end up in a position where we have to invite that

20   person to leave to turn it off or take more particular steps

21   in that regard.  I'd rather not do that.

22             Thank you.  I appreciate it.

23             Ms. Kelley?

24             MS. KELLEY:  Yes, Your Honor.  You asked if there

25   was a factual dispute specifically regarding drug use at

Enslin Decl. Ex. A

1      camp or --

2              THE COURT:  Well, we've got more serious

3      allegations.  We've got allegations that an infant died in

4      the camp, and we've got allegations that someone died of a

5      drug overdose in the camp, and we've got allegations

6      regarding reports of human trafficking, or concerns of human

7      trafficking.  And it seemed to me if I read the affidavits

8      and declarations fairly that those are not issues or

9      contentions with which the plaintiffs are taking issue.

10             MS. KELLEY:  Yes, Your Honor.  I think that's

11     accurate to say, and I can -- I was planning on addressing

12     this in the public interest section of this, but --

13             THE COURT:  That's fine.  That's fine.

14             MS. KELLEY:  -- I could address it sooner if Your

15     Honor would prefer.

16             THE COURT:  No.  I'll leave it to your outline.

17     That makes fine sense to me for you to address it there.

18             MS. KELLEY:  Thank you.

19             So we're talking about whether the harm of an

20     eviction could be adequately compensated by an award of

21     financial damages later on.  And if somebody relapses, if

22     somebody overdoses, if somebody dies or suffers any of these

23     consequences as a result of an eviction, no amount of money

24     is going to bring them back.  You can't put a price on

25     sobriety, or stability, or knowing where you're going to

Enslin Decl. Ex. A

1    sleep at the end of the day.

2            My client, Mr. Barnes, you read his declaration.

3    You know -- he lost his music in a prior eviction, he lost

4    what he was working on, his art, his creations.  You can't

5    write the same song twice.  And a lot of what Plaintiffs

6    stand to lose is sacred to them, or is hard fought with the

7    interim stability that camp provides for them to really make

8    some sort of a life, to be a springboard to permanent

9    stability, and you can't replace that springboard.

10           When people are evicted -- and we've seen this in

11   the declarations of people who have gone through this time

12   and time again when Defendant puts these evictions through,

13   is they lose everything, and every time you start over it

14   gets harder and harder to find the will to keep doing that.

15           And just lastly with the issue of the

16   irreparably --

17           THE COURT:  Let me ask a question about that if I

18   could, Ms. Kelley.  I don't doubt any of that.  I'm in no

19   position to doubt it and it makes sense to me that those are

20   real concerns.

21           MS. KELLEY:  Yes.

22           THE COURT:  But talking about relapse

23   specifically, one of the things that the Eighth Circuit

24   tells me in binding precedent is that the issue -- or to

25   find that there is irreparable harm, I need to have a

Enslin Decl. Ex. A

1    measure of certainty that something like that's going to

2    occur and I need to be able to identify specifics.

3              Can you cite a case that reaches that kind of

4    conclusion on facts like the ones that we have here, or

5    what's the closest that you've got?

6              MS. KELLEY:  Sure, Your Honor.  And I appreciate

7    your attention to the declarations, because I really think

8    that this is where the heart of our legal support comes

9    from, is not so much does a case squarely address this

10   precedent, but has it happened before when evictions have

11   happened in the past.

12             And you can see in the declarations that -- I

13   believe it was -- let's see.  You can look at the

14   declaration of Cheryl Sagataw, one of the representative

15   plaintiffs, paragraph 19:

16             "If Camp Nenookaasi is destroyed, I will still do

17   my best to get into treatment and stay connected to the

18   community we've built here, but it will be so much harder.

19   I don't know where I will go or where I will live.  I don't

20   know where my belongings will end up.  I won't be able to

21   carry all of my belongings, so most of my things will be

22   destroyed.  Everything will become so much harder, and the

23   destruction of this camp will be deeply traumatic to me and

24   every other resident here.  If I'm not here, I don't know

25   how RS Eden will contact me to let me know that a bed is

Enslin Decl. Ex. A

12

1    available.  I'm worried that I will lose my spot and not get

2    into treatment if Camp Nenookaasi is destroyed."

3           And that's just one example.  If we take that

4    declaration of somebody who's been through more evictions

5    than she could count or list in a declaration and you apply

6    it to the approximately 150 residents of the camp and say

7    what happens when all of these people scatter when they lose

8    their spots at treatments and housing, it's really a

9    question of people losing everything.

10          Did I answer your question, Your Honor?

11          THE COURT:  It did.  Thank you.

12          MS. KELLEY:  And the last thing about just whether

13   monetary awards would be able to repair the harm is just --

14   how could my clients stay in touch with me if they are

15   scattered to even five years from now potentially benefit

16   from a monetary award?  When I want to talk to my clients, I

17   go down to camp as do the other social workers, treatment,

18   service providers, housing workers, members of the City

19   government that are working to support this camp.  I would

20   not know how to get in touch with my clients without this

21   camp.  Many of them don't have phones, or if they did, their

22   phone got destroyed in the last eviction that they went

23   through.

24          And the second component of that first factor of

25   irreparable harm is that the harm must be certain and of

Enslin Decl. Ex. A

1    such great imminence.  So we know the eviction is certain.

2    It's been posted and we can take the Mayor at his word.

3          And the other benefit in the legal analysis

4    unfortunately is just that we've seen these evictions happen

5    before.  We've seen -- many or most of the represented

6    plaintiffs have experienced them directly, so they know

7    exactly what to expect.  In the Mayor's memorandum he

8    mentions that there are policies in place and that there are

9    people who are going to be there and help people keep track

10   of their belongings, and you can look at the declaration of

11   Aaron Johnson, paragraphs 5 and 6, to -- excuse me, Your

12   Honor.  It is paragraph . . .

13          THE COURT:  Fifteen.

14          MS. KELLEY:  Thank you, Your Honor.  It is

15   paragraph 15 and paragraph 16 in particular, that there was

16   one worker present that -- there was attempts made by the

17   City to have spots open at shelters that just didn't

18   materialize, that weren't accessible, that despite best

19   intentions and despite policies allegedly being in place,

20   that's not what happens.

21          And you can also see in Cheryl Sagataw's

22   declaration as well just how in practice evictions have

23   worked for her.  If you're not at camp when they come, if

24   you're at a medical appointment, visiting a friend, doing

25   any number of necessary daily things, you're meeting with a

Enslin Decl. Ex. A

1    housing worker, if you're anywhere else but at camp when

2    that happens, you don't even get the chance to run away with

3    an armful of your belongings.

4         And I will note just the last thing on that first

5    factor, that the destruction of a person's only living

6    quarters constitutes irreparable harm, and that's the **_Higbee_**

7    **_vs. Starr_** case out of the Eighth Circuit in 1983.

8         Now, the Mayor might argue that this isn't their

9    only living quarters, that shelter beds are available.

10   First and foremost, shelters are not living quarters.  Camp

11   Nenookaasi, as you can see throughout the declarations, is

12   the safest place that many of my clients have felt since

13   they've become unhoused, that it is the interim stability

14   that's the best thing while they look for permanent

15   long-term housing, that a shelter -- if you're in a

16   partnership, you can't stay with your partner at a shelter

17   when they're split by gender.  If you have a pet, you can't

18   bring your pet.  If you want someplace to be during the day

19   in the freezing cold Minnesota winter, shelters often kick

20   you out at 7 o'clock in the morning and then you're spending

21   all of your time trying to find a place for the next night.

22        And if you look to the declaration of Claire

23   Nicole Glenn, you can see that even finding a place at a

24   shelter, even if beds are available, requires having a

25   phone, which many plaintiffs don't, or if they do, it may

Enslin Decl. Ex. A

```
1    very well be destroyed when everything is scooped up and

2    thrown in the trash.  It requires having a charge on that

3    phone, which is hard to obtain when you're an unsheltered,

4    unhoused person.  It means wading through different -- being

5    placed on hold, calling back.  It's not accessible and

6    there's no room for people's belongings.  You really lose

7    everything, including the ability to have your belongings

8    with you.

9            And there's also mention in the defendants'

10   memorandum of storage downtown, and as that memorandum

11   notes, nobody has used that.  That's an unutilized offer,

12   because it's just not practical to have your belongings

13   stored downtown that you then have to go downtown to access.

14   People don't have cars, people don't have phones.  It's not

15   a viable replacement to this interim housing as a substitute

16   to long-term housing.

17           And time and time again in this Complaint we just

18   see my clients, the plaintiffs, are making due with what

19   they have because the purported options that are available

20   to them just aren't viable.  They're not functional.  And to

21   expect somebody to check in every two weeks when they don't

22   have a car or a phone in order to maintain those

23   possessions, it's just not a risk with people's valuables

24   that they feel comfortable taking, that they're going to

25   have continued guaranteed access to them.
```

Enslin Decl. Ex. A

16

1          I'll move to the second factor unless you have any

2     other questions.

3          THE COURT:  I do not.

4          MS. KELLEY:  And that second factor of the

5     four-part test for injunctive relief is the likelihood of

6     success on the merits, and this requires a reasonable

7     probability or a fair chance on any one of these five causes

8     of action.  I'll just briefly run through them.

9          The first count of the Complaint is unlawful

10    seizure of property in violation of the Fourth Amendment,

11    and we know that warrantless seizures are presumed unlawful

12    and that an unlawful seizure of belongings violates

13    possessory interests even if the seizure may be lawful at

14    its inception.  It's not just the fact that things are

15    taken.  It's the fact that they're permanently taken,

16    destroyed.

17         And the Fourth Amendment according to the Ninth

18    Circuit -- and again, we're in the Eighth Circuit, but we'd

19    ask this Court to find that very persuasive authority in a

20    well-reasoned opinion, the *Coalition of Homelessness vs.*

21    *City and County of San Francisco*.  It says that the Fourth

22    Amendment protects homeless individuals from seizure and

23    summary destruction of their unabandoned but temporarily

24    unattended personal property.

25         And what that case and what my clients are asking

Enslin Decl. Ex. A

1     this Court to recognize is that these evictions are telling

2     unhoused people because you don't own a rental or a living

3     space, you don't get to have art, community, stability,

4     religious and spiritual mementos, that if you don't own a

5     home or at least rent one, then you can't own physical

6     property, even lifesaving medical supplies, sacred items,

7     the means to keep warm and the paperwork and identify

8     documents needed to keep up with and comply with systems of

9     ordered society, that you can only have those things if you

10    also have a place to put them, and that would be an

11    untenable proposition of law.

12            The second count of the Complaint is procedural

13    due process violations, and once again this involves looking

14    at a two-part analysis.

15            First, is there a deprivation of a property or a

16    liberty right, and then second, was that process used to

17    deprive Plaintiffs of that right adequate.

18            This eviction, as we've discussed, will result in

19    the destruction and deprivation of all of Plaintiffs'

20    belongings that they cannot carry away with them, and aside

21    from these posted eviction notices, there is no process.

22    There's just one notice posted on a bulletin board which is

23    attached as an exhibit to the Complaint, Exhibit 5.  They

24    don't have a means to challenge this.

25            THE COURT:  So it seems as though -- two things

Enslin Decl. Ex. A

```
 1    here.  The first is, it seems to me as though the better

 2    take on the duration of notice that was provided is to go

 3    back to, what was it, December 7th?

 4              MS. KELLEY:  This is the third notice posted.

 5              THE COURT:  Yes.

 6              MS. KELLEY:  The 19th was the second and the

 7    original was December 14th.

 8              THE COURT:  14th.

 9              MS. KELLEY:  Yes.

10              THE COURT:  I thought the 14th was the first day

11    that the Mayor indicated he would clear the camp and then

12    notice was given before then.

13              MS. KELLEY:  Correct, yes.  The date was for the

14    14th, but the notice was given prior to that, yes.

15              THE COURT:  On the 7th?  Do I have that right,

16    or --

17              MS. KELLEY:  I would trust your recollection on

18    that that, Your Honor.

19              THE COURT:  I'm not sure I would, but that's why

20    I'm asking.  It seems to me that in terms of assessing the

21    facts around the duration of the notice, the better answer

22    is to go back to the 7th.  Do you agree or do you think that

23    that would be incorrect for some reason?

24              MS. KELLEY:  I think that that would be incorrect,

25    Your Honor, simply because the date -- the period of time
```

Enslin Decl. Ex. A

1    prior to December 29th where the eviction was postponed

2    indefinitely coincided with this incredible collaborative

3    effort between City Council and other members of Minneapolis

4    and Hennepin County and residents and their supporters that

5    I think was an indication of potentially the eviction being

6    postponed until adequate interim solutions were agreed upon

7    by everybody.  That there was a City Council meeting in

8    mid-December that tons of people showed up to, the City

9    Council heard hours of testimony, and I think it's in the

10   declaration of Nicole Perez that there was a meeting in late

11   December between residents and supporters and social workers

12   and City officials.  Everybody who was invited, except for

13   Defendant Frey, chose -- attended except for him.

14          And it was really generative.  There was other

15   solutions being proposed, such as moving the entire

16   community to a warehouse that's also discussed in Defendant

17   Frey's memorandum, and until December 29th, people thought

18   the eviction is postponed.  Maybe they're waiting until we

19   work this out together.

20          But I think more to the point, Your Honor,

21   regardless of notice, due process requires notice and an

22   opportunity to be heard, and the fact is that in order to be

23   heard, my clients, these plaintiffs, had to file their own

24   lawsuit, that there was no other process.  We wouldn't be

25   having this conversation if they hadn't found an attorney

Enslin Decl. Ex. A

1    and found the will even despite everything that they're

2    going through to come together and say no, we need to have

3    our constitutional rights heard by somebody with the

4    authority to do so, and if you have to file a lawsuit to get

5    your rights heard, there's no process.

6              THE COURT:  The process that you describe in your

7    memorandum seems to me is sort of a continuation of the

8    political process that you've described here so far this

9    afternoon, is that fair?

10             MS. KELLEY:  I might rephrase that, Your Honor, to

11   say that the process that exists is only what my clients

12   have made for themselves, that the Mayor here is seeking to

13   deprive them of these property and liberty rights and by so

14   doing has not created any process, so you have organizers

15   and supporters from the camp who are saying, well, we will

16   put ourselves on the edge and we will make time at City

17   Council.  We will organize the community to talk to and

18   petition our elected officials because no process -- it's

19   not as though somebody came down and said, "Here's your

20   belongings, here's your notice.  We are giving you an

21   opportunity to tell us that we can't do this."  That

22   opportunity had to be self-created from the community.

23             THE COURT:  But what more -- I mean, what more

24   process -- because I didn't see it in the brief.  What more

25   process would turn this into an adequate situation from the

Enslin Decl. Ex. A

1    14th Amendment's perspective?

2            MS. KELLEY:  I think that the adequate process

3    would be if the Mayor or his office were to be creating and

4    offering the types of opportunities that my clients here

5    have created and offered for themselves.

6            So we've got the City Council declaring a public

7    health emergency, but they don't have any meaningful power

8    to impact this.  There are people everywhere who are saying

9    what's happening is not right, and by everywhere I mean

10   inside and outside government at multiple levels.  But

11   there's no place to influence the decisionmaker by

12   presenting evidence, by asking that decisionmaker, who is

13   Defendant Mayor Frey, to apply the law to the facts, and

14   that would be an adequate process that just doesn't exist.

15           Would Your Honor like me to proceed to the

16   third cause of action or --

17           THE COURT:  Certainly.

18           MS. KELLEY:  The third cause of action is the

19   state-created danger, substantive due process violation

20   again under the 14th Amendment.  And the state-created

21   danger concept applies when a government creates a danger

22   for its civilians, its constituents, and then is subject

23   because of that creation to a duty to protect those it

24   endangers, and failing to protect people from a danger that

25   the government creates is a due process violation.

Enslin Decl. Ex. A

1              In *Fields vs. Abbott*, which is Eighth Circuit

2      precedent from 2011, there's a five-part test, and the first

3      part is that the plaintiffs must be members of a limited and

4      precisely definable group.  That's fairly straightforward.

5      It's the residents of Camp Nenookaasi.

6              The second part of this five-part test is that the

7      municipality's conduct has to put them at significant risk

8      of serious, immediate and proximate harm, and we've

9      discussed this.  It is about to be the heart of winter in

10     Minnesota and this is Plaintiffs' only way to stay warm,

11     both at night and during the day.  This is where Plaintiffs

12     house all of their necessary equipment for their basic

13     survival and this is the place where they also have the best

14     chance of getting out of this vicious cycle of homelessness,

15     moving from eviction to eviction.  So the significant risk

16     of serious, immediate and proximate harm from the eviction

17     that Defendant is pushing forward is really life or death.

18             The third part is that the risk was obvious or

19     known to the municipality, and as you can see from Exhibits

20     2 and 3 of the Complaint, these documents from all of City

21     Council and the eight members who wrote the letter,

22     widespread protests, this case has been all over the news,

23     the meetings and the efforts described in Nicole Perez's

24     declaration.  You can see that even people in the City, many

25     people are working on this because they understand the risks

Enslin Decl. Ex. A

1    of eviction on residents and the need to not deprive the

2    plaintiffs from their interim safety net, that this is an

3    obvious or known risk that Defendant Frey is fully aware of

4    and he obviously understands that being unhoused is a

5    horrific experience, that we don't want this, and yet he is

6    here with this eviction seeking to deprive people of their

7    best chance of getting out of that situation.

8            And the fifth factor of this five-part test for

9    state-created danger is that the municipality's conduct must

10   shock the conscience.  To campaign on a promise to end

11   homelessness and then to purport to make good on that

12   process by seeking instead to put unhoused people in more

13   danger, to destroy the best and most successful joint effort

14   that is making unprecedented progress towards giving people

15   the opportunity to help themselves, to help each other, to

16   find housing, to get sober, to put their lives back on

17   track, to do that in the name of public safety and in the

18   name of quote-unquote "ending homelessness," that's

19   unconscionable.

20           And this is perhaps uncomfortable for many of us

21   in the room to think about, but something that's also

22   intimately relevant and fundamentally at issue here is

23   thinking about context and history.

24           This is an Indigenous healing camp.  We are on

25   stolen land.  Most of the residents of this camp are Native

Enslin Decl. Ex. A

1    descendants who are dealing with the aftermath of land

2    theft, of inter-generational trauma.  There is a reason that

3    houselessness disproportionally affects Indigenous people

4    and that so many people at this camp are Native.

5            And part of this has to do with -- it's shocking

6    that the narrative here is that this camp is dangerous.

7    That is unconscionable and shocking when for centuries,

8    since first contact with colonizers and Indigenous people

9    here, that's been the narrative that settler colonists have

10   used to take this land, is that Native people don't know

11   what's best for themselves.

12           You have declarations from people who spend all

13   their time at this camp who really know this community and

14   they're saying, "This is the safest place I've ever been

15   since I've been unhoused."  They're saying this is the thing

16   that is helping people find stability, find housing, enter

17   recovery.  They're saying, "We are here.  We are doing the

18   best we can and there are no safe or better options."  And

19   then you have someone who doesn't live there, who hasn't

20   spent time there, who doesn't go to the meetings to talk

21   about this saying, "You're a danger to yourselves"?

22           That's just -- it's disrespectful to the work

23   that's being done at the camp when you can see across the

24   board numbers are down for drug use.  People in the

25   neighborhood are seeing fewer and fewer needles on the

Enslin Decl. Ex. A

1    ground.  People are having tremendous success with bettering

2    their lives and connecting and stopping the harm that's been

3    happening for so long.

4            So, for the State of Minnesota to steal someone's

5    land -- or it was a territory at that time, I suppose -- and

6    then to have its officers and agents, subdivisions, the

7    Mayor of the City of Minneapolis, to go on to tell their

8    family members and descendants that because they don't have

9    land they don't get to feel safe, they don't get to have

10   belongings or privacy or live with their loved ones, that's

11   unconscionable.

12           The fourth claim is a violation of the Eighth

13   Amendment.  The Eighth Amendment prohibits the state from

14   punishing an involuntary act or condition if it is the

15   unavoidable consequence of one's status or being, and that

16   is a Ninth Circuit Court of Appeals opinion, the *Coalition*

17   *on Homelessness* case previously cited.

18           And this involuntary question, it speaks to the

19   heart of what you're doing when you're punishing or you're

20   imposing harm on homeless people for sleeping outdoors when

21   they don't have anywhere else to go, for existing during the

22   day with their belongings on public property on the, quote,

23   "false premise" that they had a choice in the matter.

24   That's from that Ninth Circuit case.

25           Do the plaintiffs have a choice?  Is the shelter

Enslin Decl. Ex. A

1     adequate when they can't bring anything more than an armful

2     with them and where they have to leave their community?  I

3     think beyond just a place to sleep at night, with that all

4     of the hardships of having to find that anew every morning,

5     people deserve community.  And it's totally understandable

6     for Plaintiffs to not feel like they have a choice when they

7     have a place where they're really able to start getting

8     their lives together, or when they're stuck in that crisis

9     response, trauma brain, waking up at 7:00 every morning,

10    getting kicked out of the shelter, having to scramble to

11    find a place to sleep the next night and not knowing where

12    their meals will come from, where their friends are, or how

13    they could possibly stay in touch with anybody who's able to

14    help them get out of that.

15          THE COURT:  The one case that applied the Ninth

16    Circuit's decision in **_Martin_** in the Eighth Circuit, at

17    least, is **_Frank vs. City of St. Louis_**.  How do you respond

18    to the judge's reasoning in that case?

19          MS. KELLEY:  I'm unfamiliar with that case off the

20    top of my head, Your Honor.  Would you --

21          THE COURT:  Certainly.  So in that case, the City

22    of St. Louis decided to do something that I understand is at

23    least comparable to what's going on here, which is it

24    decided to remove an encampment from a particular area of

25    the city.  It didn't ban or outlaw homelessness altogether,

Enslin Decl. Ex. A

1    or punish it altogether.  It moved it from one place, said

2    it can't occur there, and presumably left it to occur, if at

3    all, other places.  And therefore, the court in that case

4    concluded that the Ninth Circuit's reasoning didn't apply,

5    either because *de jure* it wasn't outlawed or *de facto* it

6    wasn't outlawed.

7            MS. KELLEY:  I would agree with that reasoning,

8    Your Honor, and I think that's the heart of this request, is

9    we need more time.  That the way to evict an encampment is

10   not at gunpoint.  It's not under threat of arrest.  It is

11   through the ability for people to work together, including

12   residents.  Residents have to be a part of this decision and

13   when you're evicting people at gunpoint they're not, but

14   there has been conversations and we've heard from both the

15   memorandum from the City and from organizers and supporters

16   of this camp like Nicole Perez that residents are willing to

17   work with the City and address concerns and to move

18   somewhere as long as that's done so that they can remain a

19   community, they can keep this culture of healing going and

20   not scattered.  There's a huge difference between being

21   evicted with nowhere to go and collaboratively agreeing to

22   move somewhere else.

23           The fifth cause of action, quickly, if you're

24   ready for that, is the cause of conversion, and that's,

25   simply put, the plaintiff has a property interest and the

Enslin Decl. Ex. A

1    defendant converts it.

2          Moving on to the --

3          THE COURT:  What do I do with the state

4    constitutional claims?  I mean, the Mayor points out,

5    correctly, that they're not covered under 1983, and you

6    agree with that, right?  You can't assert a state

7    constitutional claim through 1983.

8          MS. KELLEY:  Yes.

9          THE COURT:  Okay.  Is it -- do you agree that

10   those claims sort of go in -- sort of survive or don't to

11   the same extent as the federal claims?

12         MS. KELLEY:  I think for the purpose of

13   preliminary injunctive relief we just -- we're looking at

14   whether at least one of these claims survive.  And if you

15   look at the state claims, some of them, the state

16   constitution mirrors exactly the federal constitution and

17   we're just looking at the state claim as a supplement to

18   that and because the precedent is analogous.  Looking at the

19   claim of state conversion, for example, I would say that

20   that bears on other factors of the Complaint where a

21   violation of law is at issue.

22         THE COURT:  Different, though, common-law claim.

23         MS. KELLEY:  Right.

24         THE COURT:  Right.  And I'm just -- I'm trying, at

25   least -- and I may not be doing a very good job of it, but

Enslin Decl. Ex. A

1     just asking about the state constitutional claims.  Those,

2     you agree, survive --

3             MS. KELLEY:  I see what you're saying.

4             THE COURT:  -- or don't to the same extent as the

5     federal claims.

6             MS. KELLEY:  The federal constitutional claims are

7     the primary basis of those causes of action, and the state

8     constitutional claim is referenced within each -- like,

9     within the same count.  So referencing the state

10    constitutional provision in the same count of the Complaint

11    as the corollary federal part -- because the federal cause

12    of action is really what is supported, like you're saying,

13    by the 1983 statute, but the state constitutional claim is

14    another way of looking at it.  It's not the basis for the

15    violation of 1983.  It is the -- it's sort of the -- you

16    can't have one without the other, and the federal claim

17    supports the federal statute, but the state constitutional

18    claim supports these legal arguments because their case law

19    interprets them functionally identically.

20            THE COURT:  Functionally identically.

21            MS. KELLEY:  Right.  The -- what is it -- the

22    Minnesota Fourth Amendment equivalent is construed in the

23    same manner.

24            THE COURT:  And you agree that's true of all of

25    the constitutional provisions that are at issue here.

Enslin Decl. Ex. A

1          MS. KELLEY:  I would not be prepared, Your Honor,

2     to make a blanket statement like that.  I would think of it

3     more like a belt-and-suspenders strategy where the primary

4     basis is the federal law claim, but we have this -- state

5     constitutional protections as well.

6          THE COURT:  Okay.

7          MS. KELLEY:  I'll turn to the third factor.  And

8     looking at the four factors of injunctive relief, we've just

9     discussed the various merits of the claims and that it is

10    reasonably likely that at least one of these claims whether

11    brought under the state or federal constitution will prevail

12    and that's sufficient to meet that second factor.

13         The third factor is the balance of equities.  And

14    ultimately, the balance of equities is what's the harm by

15    granting this to the parties versus what's the harm by not,

16    and that invites the question:  When granting this

17    injunction, what would you be preserving and what would you

18    be putting a stop to, and how does that factor into the

19    interests of both parties.

20         So here we see by granting this injunctive relief

21    you're preserving a chance for widespread, long-term

22    improvements that both parties are interested in seeing.

23         The Mayor tries to take credit for the successes

24    that the camp is responsible for.  In the Mayor's memorandum

25    we learned that a hundred and four people -- it's up from

Enslin Decl. Ex. A

31

1    the numbers cited in the declarations taken in December -- a

2    hundred and four people have been able to find stable

3    housing.  That's huge.  That is unprecedented.  And if that

4    progress is so laudable, why not allow the camp to keep

5    going?  When otherwise in the history of this city has there

6    been such success with getting people into permanent

7    housing?  And I would love to hear if the Mayor's attorneys

8    do have an answer to that question, but I think it just

9    hasn't happened.

10           This camp is getting people off the streets, into

11   housing, into recovery, like never before, and that is

12   because it is a cultural place rooted in Indigenous

13   principles, run by people with direct-lived experience.  As

14   you see from Nicole's declaration, the people who work here

15   are the people who are approaching this with empathy and

16   with a willingness to work together to find solutions.

17           The balance of equities favors granting this

18   injunction because it's in both parties' interests for this

19   camp to keep going.  The Mayor's promise to end

20   homelessness, this camp is actually making that happen in

21   ways that the City alone hasn't been able to do.  And I

22   don't want to devalue the hard work of social workers, of

23   housing workers, of City officials and outreach personnel

24   who are really trying to make a difference.  And I want to

25   honor that work and name that it is Camp Nenookaasi that is

Enslin Decl. Ex. A

1    making those workers effective, that this place -- to go and

2    find somebody, to be able to meet with somebody, to have a

3    couple follow-up questions, to come back in a couple of days

4    and find them again is huge, and the camp is making that

5    possible.  The success of Camp Nenookaasi is because of

6    Nenookaasi.

7              The fourth factor, the public interest -- and I'll

8    address your questions from earlier, but if I miss anything,

9    Your Honor, please ask me again.

10             And just first off, the City makes light of this

11   in its response, but the protection of constitutional rights

12   is always in the public interest and not just when it's

13   convenient.

14             First and foremost, this lawsuit is in the public

15   interest.

16             And second, something we all care about, public

17   safety.  Being unhoused is unsafe.  Being unhoused puts you

18   in an incredible vulnerable position.  You can look at

19   statistics across the board about overdoses that happen in

20   the unsheltered, unhoused community, about deaths, about

21   violence, about substance use, about trafficking, all of

22   these concerns brought up in the City's memorandum, the

23   Mayor's memorandum.

24             Being unhoused is just dangerous and this camp is

25   allowing people to first and foremost experience a modicum

Enslin Decl. Ex. A

33

1    of interim safety.  I shudder to think about what would have

2    happened to these a hundred and fifty or so plaintiffs had

3    this camp not existed.  Where would they be without

4    Nenookaasi?  And the way that they're able to, like, get out

5    of it is important as well, but just first and foremost what

6    it allows them in the meantime.

7            The public safety concerns are not a result of the

8    residents or of the camp.  Vulnerable people get preyed on

9    by others, and T-Bone's tragic death that's also referenced

10   thoroughly in the Mayor's memorandum, other instances cited

11   the overdose as you were talking about, or -- there was one

12   overdose, but the -- people are distributing Narcan, they're

13   getting trained in Narcan.  They are learning how to watch

14   for signs of that and are saving each other's lives in ways

15   that wouldn't happen on the street.  This is a community

16   where people watch out for each other, where they're working

17   together out of an imperfect situation in ways that are

18   demonstrating gains across the board.

19           The vestiges of this violence, which I would say

20   are not -- they're not Plaintiffs causing this harm and

21   violence, systemic poverty, racism, anti-Indigenous

22   oppression.  These structural frameworks cause all sorts of

23   harms to the whole community, not just the people that live

24   at Camp Nenookaasi, and because they're all at camp gathered

25   in one place, these problems are more visible.  But how many

Enslin Decl. Ex. A

1    people would be dying of an overdose under an underpass or

2    would be trafficked and nobody would even know that what

3    we're looking at here is a trade-off between are people

4    visibly struggling, but in ways that are meaningfully

5    reducing that hardship and those struggling, or are people

6    struggling invisibly in much greater numbers and to a much

7    greater extent scattered all over the City, and which one is

8    preferable?

9           And from a purely utilitarian perspective, it's

10   more efficient for social and housing workers.  It's safer

11   for residents.  There is a decline in substance use.  There

12   is support for getting out of that situation, but it's just

13   more visible because it's more concentrated.  And that does

14   speak to what you were saying earlier about the case that

15   informed the Ninth Circuit opinion and what's discussed by

16   both parties to this case.  Nobody is saying this should be

17   the permanent solution, but until there's something better

18   that everyone agrees on, this is the best that we have.  And

19   the public interest is in favor of doing what is necessary

20   to minimize suffering and to minimize danger, to minimize

21   violence, to address the root causes of poverty, of

22   colonization of racism.

23          Everyone that we're working with, that everyone

24   is -- my clients are working with, these social workers,

25   these housing workers, representatives of City and County

Enslin Decl. Ex. A

35

1      government, they're in support of this, because they know

2      that it is making it easier for meaningful transformative

3      impact to be had, and that's in the public interest.  We

4      want to use our tax dollars well.  We want social workers to

5      have a meaningful chance at connecting with people and

6      pulling them into recovery and allowing people to take steps

7      for themselves to stabilize their lives.  It's in the public

8      interest not to just pull the rug out and deprive the

9      residents of this -- their one best chance at this.

10             I'll just end and then of course if there's

11     questions, but it's in the public interest to remember that

12     people aren't disposable.  We shouldn't just hide people

13     away because they're unsightly or because we don't want to

14     contemplate the realities of what we're seeing.

15             Plaintiffs' belongings might be disposable, they

16     might get thrown in the trash tomorrow, but my clients will

17     still be there and they'll be left to pick up the pieces, to

18     start again from nothing like they have many time and time

19     again.  They're not worth just abandoning.

20             The care and compassion that camp allows people to

21     provide to each other and the opportunity for people to use

22     Camp to demonstrate their resiliency to really get out of

23     it, it is in the public interest to recognize this is

24     working and we just need a little more time for that to

25     continue to work, for concerns to be addressed through this

Enslin Decl. Ex. A

1    collaborative process as all parties come together, and for

2    a longer term permanent solution to be found for everyone.

3    But the last thing we need is for camp to be evicted, people

4    to be scattered, and for us to be in the exact same position

5    five months from now when another encampment tries to form

6    and we're right back where we started.

7              THE COURT:  Thank you, Ms. Kelley.

8              MS. KELLEY:  Thank you, Your Honor.

9              THE COURT:  Ms. Enslin?

10             MS. ENSLIN:  Good afternoon, Your Honor.  Sharda

11   Enslin here, Assistant City Attorney, here today on behalf

12   of Mayor Jacob Frey.

13             The City of Minneapolis and the Defendant Mayor

14   Jacob Frey made a determination to close the encampment

15   located at 2313 13th Avenue South.  That is the encampment

16   that is the subject of this lawsuit.

17             Three deaths have occurred at this encampment

18   within the last three months.  That includes a fatal drug

19   overdose, the death of a baby, and a homicide of a man who

20   was shot six times in the encampment, and these are just the

21   most egregious examples.

22             There have been more than one hundred 911 calls

23   within the past four months related to this encampment.  And

24   that doesn't just include calls made from nearby community

25   members, though the record is certainly rife with those.

Enslin Decl. Ex. A

1    Calls related to vandalism, to open drug use, to public

2    sexual acts, to hit-and-runs, to stray gunshots, and human

3    trafficking.  And I believe Your Honor asked Plaintiffs'

4    counsel if they dispute early on in their argument those

5    facts that the Mayor has put forward, and the answer was no.

6    That's because this is what is occurring at that encampment.

7            And this is just related -- those are just related

8    to calls made from community members outside of the

9    encampment.  What we haven't even really discussed yet is

10   the fact that dozens and dozenss of these 911 calls

11   originated from within the encampment itself, from

12   individuals within the encampment who fear for their safety

13   or the safety of others that are in the encampment.  Drug

14   overdoses, unresponsive individuals, assaults, gunshots,

15   persons in crisis.  These are the kind of calls that the

16   Minneapolis Police Department and the Minneapolis Fire

17   Department are getting on nearly a daily basis related to

18   this encampment.

19           This encampment is dangerous.  It is a threat to

20   those that are staying within it and it is a threat to the

21   surrounding community, and that is why the Mayor in

22   connection with the City have made a determination that this

23   encampment must now be closed.

24           And as outlined in the City's memorandum in detail

25   and as set forth in the City's operational guidelines which

Enslin Decl. Ex. A

1   were included as an exhibit to the declaration of the
2   Director of Regulatory Services, the City does not take
3   closures of encampments lightly.  It is the City's goal,
4   it's the City's mission, to do these encampment closures in
5   a way that treats unsheltered individuals with dignity, that
6   connects people to services and to shelter, and that treats
7   personal belongings with respect.  And this mission has been
8   exemplified in the way that the City and the Mayor have
9   addressed the closure of this particular encampment.
10          Parties at this encampment arrived on the
11   encampment on August 24th, 2023.  They broke through a
12   fence, cut through a fence that was closed off securing the
13   property, and within hours 40 individuals had climbed
14   through the broken fence, were trespassing on secured City
15   property, and set up tents.
16          Did the City or the Mayor send police officers to
17   arrest those individuals?  Did the City or the Mayor cite
18   those individuals for destruction of property?  No.  Instead
19   what the City did and what the Mayor did was send the
20   Homeless Resource Team that very day to that site to start
21   connecting people with services.
22          That Homeless Resource Team has been out there at
23   least 15 more times since then connecting people with
24   services.  And I will tell you, Your Honor, they're out
25   there right now.  They are out there right now connecting

Enslin Decl. Ex. A

1    people to services, offering storage, helping people to move

2    off of the street, to move away from sleeping outside on the

3    ground, into shelter, to take their belongings from being

4    left inside a tent to a secure, unlimited storage facility

5    where they can access those at any time.

6            They are providing transportation for people to

7    sites that they would like to go, to the storage facility.

8    They're bringing storage bins to the encampment so that

9    individuals can pack up their goods and that the staff there

10   can help with that.  That's occurring right now.

11           When the City saw individuals -- when the Mayor

12   saw individuals start to accumulate goods and property at

13   this encampment over the course of the last few months, did

14   they immediately go to the encampment and start throwing

15   things away even though as a matter of law those individuals

16   were in fact trespassing?  No.  Instead, they not only --

17   the Mayor not only instructed his Homeless Response Team to

18   go out to provide storage options to connect these

19   individuals to services, but the Mayor brought with his team

20   a host of service providers that go to Hennepin County, that

21   are independent service providers, that work together with

22   these human -- or the City Resource Team in order to make

23   these connections for individuals to shelter.

24           The idea that the City has not engaged -- the

25   Mayor has not engaged in discussions, in negotiations, in

Enslin Decl. Ex. A

1     giving the individuals at the encampment an opportunity to

2     be heard, that's just not accurate.  It's just not what has

3     happened in this case and that's laid out I think pretty

4     clearly in the City's factual background.

5            The City staff have had multiple meetings,

6     multiple sit-downs, they've met with encampment leaders, all

7     with the purpose of trying to find some kind of resolution

8     to connect those in the encampment with shelter, with

9     housing, with services, with property storage.  This wasn't

10    something that happened one time, that happened a week

11    before the closure.  This has been happening for months.

12    They have been out there weekly since August.

13           In addition, the City has made multiple attempts

14    and the Mayor has in connection with that made the same

15    attempts to find other opportunities for providing those in

16    the encampment with the type of potentially housing

17    situations they're looking for.  As we outlined in our

18    memorandum, the City actually met with builders, with

19    different resource groups, to try to find out was it

20    possible, could we have a building, could there be a center

21    where people could go, where they could stay.  All of these

22    avenues were exhausted prior to getting to the point that

23    we're at.

24           It is indisputed that the City has made extensive

25    efforts over the last four months to try to connect these

Enslin Decl. Ex. A

1    individuals with housing, to try to compromise, to try to

2    negotiate, and to try to facilitate a situation in which

3    individuals can be connected to resources and also not be

4    sleeping on the ground on a City lot.

5           I want to talk about -- I want to start by

6    focusing with regards to the legality of the preliminary

7    injunction and the factors and the tests that we're looking

8    at here.

9           The first thing I want to do is, I want to talk

10   about the irreparable harm.  So, Plaintiffs' counsel had

11   said that they look towards the current class action lawsuit

12   that is going on right now in Minneapolis, the **Berry vs.**

13   **Hennepin County and City of Minneapolis** lawsuit.  I am lead

14   counsel on that lawsuit for the City of Minneapolis.  I am

15   intimately familiar with it.

16          And what I can tell you is there was a similar

17   motion for a temporary restraining order made at the

18   inception of that lawsuit in 2020.  And if we're looking to

19   the way that was handled, particularly as Plaintiffs'

20   counsel said, by Judge Wright, that motion was denied.  And

21   in fact, that motion was denied exclusively on the

22   irreparable harm basis.

23          Because what Judge Wright held is that it is not

24   enough to have harm.  It is not enough to allege that there

25   is some kind of damages.  In order to issue -- to warrant

Enslin Decl. Ex. A

1    the issuance of a temporary restraining order, the harm must

2    be irreparable.  It must be something that cannot be

3    adequately addressed through monetary damages.  It's

4    something that cannot be speculative and it must be certain

5    and concrete.

6           You asked Plaintiffs' counsel to provide you with

7    an example of a case that is similar to what they're asking

8    for here where the harm is speculative, but also proved to

9    be enough to warrant the granting of a temporary restraining

10   order, and the plaintiffs' counsel could not cite such a

11   case.  They deferred and referred you to the declarations of

12   their clients.

13          I can refer you to such a case.  It's the **_Berry_**

14   case.  That determination was made by Judge Wright, that

15   that isn't enough, that the harm has to be irreparable in

16   nature and it has to be something that cannot be solved

17   through monetary damages, and that just doesn't exist here.

18          And, Your Honor, please do stop me with questions

19   as I go as well.  I want to talk a little bit about the

20   balance of the harms here as well too.

21          We have to look at the reality of the situation

22   that we're in, which is, we have an encampment that is

23   massively unsafe in which people are dying and in which

24   calls come in on almost a daily basis from a community that

25   is being terrorized by unsafe, hazardous and criminal

Enslin Decl. Ex. A

1    activity, and this is supported by leaders from the

2    Metropolitan Urban Indian Directors Community.  In fact,

3    submitted with the City's submissions was a letter from that

4    group signed on by every member of that community, saying

5    that this encampment must close.  It's not safe.  It is

6    hazardous.  There are conditions that are not safe for human

7    habitation there, and it's important that we look at that

8    and address the severity of that when we're considering the

9    balancing of the harms.

10          Plaintiffs' counsel has represented that their

11   clients will experience harm if they are forced to leave the

12   camp, if they are forced to scatter, if they are required to

13   move to shelter instead of staying at the camp.

14          The City is not requiring them -- the Mayor is not

15   requiring them to scatter.  The Mayor is not requiring them

16   to lose this community.  The closure of the encampment does

17   not mandate that they cannot be in touch with each other,

18   that they cannot meet and regroup every day if they so

19   choose.  They simply cannot sleep outside in tents on City

20   property.  It is not safe and it is not lawful.  And that

21   when balanced cannot compete with the drastic harm that is

22   being faced by not only those people that are living at the

23   encampment, but the community surrounding the encampment as

24   well.

25          The public interest in closing the encampment is

Enslin Decl. Ex. A

1    also extremely high.  Again, I feel like a broken record,

2    but, Your Honor, the truly dire, dangerous situation creates

3    a grave risk for the public.  The Mayor cannot stand by

4    while members of the community are dying at this homeless

5    encampment, while people are being shot and killed, while

6    people are overdosing, while people within the encampment

7    are calling for the police to come and help with individuals

8    who are unconscious, who are unresponsive.  That is not in

9    the public interest.

10          And I agree it is absolutely in the public

11   interest to have unhoused individuals to have a path for

12   permanent, stable housing.  The encampments are not the way

13   forward for that.  The idea that encampments are the best

14   way or, as Plaintiffs insinuate, the only way for a stable,

15   reliable path to housing is absolutely inconsistent with the

16   history of how unhoused individuals transition to stable

17   housing for decades in this city.

18          Prior to 2020, large-scale encampments in

19   Minneapolis were not really a thing.  And it is not the case

20   that prior to 2020 unhoused individuals were without any

21   recourse, were without any avenue to obtain stable housing.

22   That's because the more effective, the safer for both the

23   individual and the community avenue for that is through the

24   shelter system, is through the temporary housing system.

25          And this idea that individuals won't be able to be

Enslin Decl. Ex. A

45

1     reached, that outreach workers won't be able to find folks

2     if they leave the encampment and go to a shelter is, again,

3     inconsistent with decades of experience of how outreach work

4     and social services reach the unhoused community.  It is not

5     necessary for there to be an encampment for that

6     communication and for those relationships to foster.

7              I'd like to talk a little bit about the likelihood

8     of success on the merits for these claims.  I'd like to

9     first talk about the Fourth Amendment claim.

10             Again, imperative to this is the underlying

11    principle that those living at the encampment at 2313 13th

12    Avenue South are in fact trespassing.  And again, I would

13    direct Your Honor to Judge Wright's ruling in the **_Berry_**

14    lawsuit, which was that there is no right to privacy to live

15    on government land.  It does not exist.  We have cited that

16    in her ruling on that in our brief and Plaintiffs do not

17    argue the contrary.  So what we have here are Plaintiffs

18    attempting to assert a privacy right that doesn't exist.

19    There is no right here to occupy government land, to set up

20    a structure and to have that expectation of privacy.  It

21    simply isn't the case.  It's inconsistent with the law.

22             As far as the Eighth Amendment claim goes --

23             THE COURT:  Can I ask a couple --

24             MS. ENSLIN:  Yes, Your Honor.

25             THE COURT:  -- questions?  I just want to be sure

Enslin Decl. Ex. A

1   I understand the City's position.  I didn't see it in the

2   brief and I want to be sure that I wouldn't be thinking

3   about it incorrectly.

4            It's City-owned property, correct?

5            MS. ENSLIN:  The City does own the property.

6            THE COURT:  Does the City have the authority to

7   consent to have its own officers go in and undertake to

8   remove the camp?  It seems to me it does.

9            MS. ENSLIN:  It does, Your Honor.

10            THE COURT:  And consent, as we all know, is an

11   exception to the warrant requirement, correct?

12            MS. ENSLIN:  Correct.

13            THE COURT:  Okay.  And though -- I understand the

14   argument's about the right of privacy, but the seizure of a

15   good, a thing, counts as a Fourth Amendment seizure

16   regardless of whether there's a privacy interest at stake,

17   right?

18            MS. ENSLIN:  Correct.

19            THE COURT:  But there's a post-deprivation remedy

20   for that, or at least as I understand it you're telling me

21   there's sort of a pre-deprivation opportunity and a

22   post-deprivation remedy, right?

23            MS. ENSLIN:  Correct.

24            THE COURT:  Okay.  Then I understand it.  Thank

25   you.

Enslin Decl. Ex. A

1          MS. ENSLIN:  Yes.  And just to clarify what those
2     pre-deprivation and post-deprivation remedies are, the
3     pre-deprivation remedy is the individuals are given
4     extensive notice.
5          THE COURT:  And the City will store your stuff.
6          MS. ENSLIN:  And the City will store your things
7     through a contract with the Downtown Improvement District.
8     They will transport your goods there.  They will provide you
9     with a storage bin.  Yes, you do need to check in with the
10    Downtown Improvement District every two weeks via phone
11    call, via in person, to assure that you are still interested
12    in keeping the belongings.
13         And this isn't in the brief, but I will tell Your
14    Honor this has been my experience litigating encampment
15    cases for years now.  The City historically prior to the
16    contract with DID, the City did actually itself, the City's
17    Public Works Department, stored encampment residents' goods
18    for a period of time in 2020.  In fact, the City stored
19    goods of over a hundred different encampment residents in
20    2020.  They brought bins to encampment sites, they picked up
21    residents' goods, and they brought them to a Public Works
22    facility, over a hundred different individuals' belongings.
23    Less than three of those bins were ever claimed.
24         So there is an interest on behalf -- I say that to
25    explain the position of DID with requiring some kind of

Enslin Decl. Ex. A

```
1    check-in and continued interest in the belongings that have
2    been stored.
3            Again, too, the post-deprivation, the City has a
4    claims process.  The City is -- will take -- there is a
5    claims committee, there is a claims process that is outlined
6    in detail on the City's website.  If you believe you have
7    lost property as a result of the City's actions, you can
8    submit a claim and the City will evaluate the claim, they
9    will look at your information and determine if that actually
10   did happen.  And if it did, the City will address the claim.
11   That's the post-deprivation remedy and that exists and
12   that's existed for years.
13           But in addition, here we really see that
14   pre-deprivation remedy which again provides weeks of notice.
15   And there have been issues in the past with encampment
16   closures where parties just have not agreed what is the
17   right way to do it, how much notice do you need to provide,
18   is three days enough, is six days enough, is it important to
19   tell the date.  And here the City has conducted this
20   particular encampment closure in a way that's consistent
21   with every activist, every organizer, every encampment
22   leader that it has come in contact with regarding notice,
23   regarding the amount of time, regarding the storage made
24   available and regarding the opportunity for people to leave
25   with their belongings.
```

Enslin Decl. Ex. A

1          And again, to touch on the irreparable harm piece

2     as it relates specifically to belongings, again, if you have

3     notice and you have the opportunity to store your things, at

4     some point this turns over into a situation in which

5     individuals who actively choose to ignore the notice, to not

6     remove their goods, to not take up storage, become the

7     architects of their own irreparable harm, and that simply

8     cannot be the basis for a TRO.  When all of those

9     opportunities are provided and the individuals make a

10    determination that they don't want to do that, it's simply

11    illogical that then they could turn around and say, "I

12    didn't take storage, I didn't remove my things, even though

13    I had a month's notice and now I've been irreparably

14    harmed."  At some point there has to be a level of

15    rationality there.

16         So before I move on to talk about the Eighth

17    Amendment claim, was there anything related to Fourth

18    Amendment seizures that I could clarify for Your Honor?

19              THE COURT:  No.  Thank you.

20              MS. ENSLIN:  Okay.  I do want to talk about the

21    validity and the likelihood of success on the merits on the

22    Eighth Amendment claim, because it is extremely important

23    and it is very distinguishable, the case at hand from the

24    cases that are relied on in support of this claim by the

25    plaintiffs.

Enslin Decl. Ex. A

50

1          The absolute most important piece of the -- the

2     touchstone of the cases, *Martin v. Boise*, is that you cannot

3     criminalize homelessness.  So in that case there was a city

4     ordinance that allowed criminal sanctions to be imposed on

5     anyone sleeping outdoors.  That is simply not the case here

6     and that is highly distinguishable.  There are no criminal

7     penalties in the City of Minneapolis for simply being

8     unhoused.  That doesn't exist.

9          THE COURT:  An ordinance prohibiting it exists,

10    but you're saying it's not criminal.

11         MS. ENSLIN:  It's not criminal, correct.  And in

12    order for it to reach that Eighth Amendment standard, in

13    order for it to be comparable to *Martin v. Boise*, it has to

14    be criminal.  So *Martin v. Boise* is simply irrelevant and

15    certainly not instructive to the situation that we have

16    here.

17         And furthermore, we've seen the City actively and

18    the Mayor actively step aside from taking criminal action

19    full stop on these individuals.

20         The State of Minnesota has a law against

21    trespassing.  That does not -- it's not particular to

22    whether or not you are a housed person or you are an

23    unhoused person.  Nonetheless, the Mayor and the City have

24    not enforced that statute against these individuals that

25    have been living at this encampment.  They would be proper

Enslin Decl. Ex. A

51

1    under color of law to have done so on August 24th, 2023, the

2    very first day that those individuals cut open that fence

3    and entered the City's property.  The City and the Mayor

4    could have directed law enforcement to cite and arrest

5    individuals.  They didn't, because, again, that's not what's

6    happening here.  Unlike **Martin v. Boise**, homelessness is not

7    being criminalized here.

8            To the contrary, the efforts here to close this

9    encampment are to preserve the safety of those individuals

10   that are living within it, because the criminal activity

11   abounds.  And as Plaintiffs' counsel said, living unhoused

12   puts individuals at a higher risk of being exposed, of being

13   preyed upon.  And unfortunately, what we know happens is

14   when you put a vulnerable population together in a group

15   outside without heat, without running water, without

16   plumbing, and you put these vulnerable people together in

17   the elements, they are preyed upon, and that is absolutely

18   the case that is happening in this encampment.  Those

19   individuals are not safe living there.  In fact, they're in

20   a position where they're being exposed by not seeking

21   shelter, by not connecting with services.

22           And again, it's important to note that the

23   individuals that remain at the site are making a conscious

24   decision to do so.  Every individual that is at that

25   encampment has been contacted, has been offered shelter

Enslin Decl. Ex. A

1    services.  That is in the City's declaration.  Those

2    individuals choose not to go.

3         The City understands that there may be situations

4    about a shelter that individuals might not like.  While

5    there are ample varieties of shelters, it's true there are

6    some shelters that are not co-ed that might require a couple

7    to split up and stay separately.  I will say that there are

8    always family shelters available for families to stay at 100

9    percent of the time in the City of Minneapolis.  There may

10   not be a shelter that will take your dog, that's correct,

11   but do you know what?  The Minneapolis Regulatory Services

12   Department will arrange for your animal to be kept safe

13   while you are at a shelter.  That is something that they do.

14   So there are ways around a lot of these things, and at the

15   end of the day they might not be anyone's first choice.  The

16   City acknowledges that, but that doesn't mean that the other

17   option, the more acceptable option, is to sleep outside

18   trespassing on City property.

19        One thing I want to touch briefly on that we

20   haven't talked about just yet, Your Honor, too is what

21   the -- and again, this goes to the public interest -- what

22   the encampment and its existence is doing to the development

23   of that particular property.

24        So currently, the City lot in which the 2313 13th

25   Avenue South encampment, the encampment that is the subject

Enslin Decl. Ex. A

1    of this lawsuit, that encampment exists on a piece of

2    property that is set to be sold to the Indigenous Peoples

3    Task Force.  The Indigenous Peoples Task Force is going to

4    convert that property into a wellness and community center.

5    In order to do so, they need to start preparing the

6    property.  The property is set to be sold in February, less

7    than a month from now.  The Indigenous Peoples Task Force

8    has represented to the City that without adequate time to

9    prepare the property in advance of the sale, it's going to

10   delay the building of the community center.  It's going to

11   delay the services that the community center would provide.

12   That is absolutely in the public interest.  By allowing the

13   encampment to exist, we're not only maintaining a safe -- or

14   maintaining an unsafe, dangerous situation, but we're

15   preventing the development of a safe and helpful community

16   center.

17          So I think we already touched a little bit on the

18   procedural due process piece as well, Your Honor, the

19   availability of an opportunity to be heard prior to the

20   closure and an opportunity to address the plaintiffs'

21   individual belongings and the eventual -- what would happen

22   to those belongings after the closure.

23          Interestingly, what Plaintiffs really want is a

24   policy change.  They want to be able to stay at the

25   encampment for as long as they want.  It's not a matter of

Enslin Decl. Ex. A

54

1    whether or not there is adequate process.  I don't think

2    there is any process that would satisfy what the plaintiffs

3    are looking for.  The only process that would be acceptable

4    to them based on what I've heard today and what's in the

5    briefing is an agreement that they don't have to leave, and

6    that's simply a policy decision.  That's not a legal

7    decision here.

8              The City of Minneapolis has made a determination

9    with its elected officials and its appointed directors that

10   this encampment needs to close.  They are given weeks of

11   notice, they are given opportunity for storage, they are

12   given the opportunity for transportation, and they are

13   connected to shelter services.  This is unequivocally

14   adequate process for Plaintiffs to make a determination as

15   to how they want to move forward.  And if they choose not to

16   take up those options, not to take up storage, to leave

17   their personal belongings behind, again, at some point there

18   needs to be some ownership over those decisions.

19             I realize I've bounced around quite a bit, and

20   candidly, Your Honor, I haven't slept in 36 hours, so if you

21   have other questions or if there's areas that I have missed

22   that you would like to direct me towards, I would be happy

23   to answer further.  I know we've been going for almost an

24   hour and a half and I'm very cognizant of Your Honor's time

25   as well.

Enslin Decl. Ex. A

1              THE COURT:  I do not have other questions,

2    Ms. Enslin.  My primary questions revolved around the Fourth

3    Amendment claim and the Mayor's position with respect to

4    that.  I apologize.  So I do not have other questions.

5              MS. ENSLIN:  All right.  Well, then I will sit

6    down at this point and I thank you for your time, Your

7    Honor.

8              THE COURT:  Thank you.  Ms. Kelley?

9              MS. KELLEY:  Thank you, Your Honor.  I'll try to

10   be concise with my rebuttal.

11             The crux of what we're arguing about here seems to

12   be the difference between how things are imagined when

13   people design them from the position of government, from the

14   Mayor's office, how things look in the dream world and how

15   they look to the people that are trying to access these

16   services.  And there's a lot of people working really hard,

17   there's a lot of compassion and good intentions and effort

18   from all sides of this problem, but the solution that

19   Defendant Frey is proposing disregards how people know it to

20   work out in reality.  And people are at Camp Nenookaasi

21   because that's the best they can do, because it is better to

22   be there than to be out on the streets or in a shelter,

23   because those options -- the shelter options don't work the

24   way that maybe they've been designed, or they're not enough,

25   or they're not the same.

Enslin Decl. Ex. A

56

1          If you look at the declarations from plaintiff

2     Sagataw on page 25, or declarant Crabtree, page -- paragraph

3     7 and subsequent, camp saves people from trafficking.  The

4     epidemic of Missing and Murdered Indigenous Women and

5     two-spirits is very real, it is very dangerous, and it

6     impacts people.  In particular, unhoused populations are

7     very vulnerable to that.

8          Camp is a place where people go to find safety.

9     And while dangerous things happen at camp as they happen

10    everywhere, the declarations are clear from the people that

11    have spent time at camp, it is a lot safer there than it is

12    anywhere else.  Again, it is just the preference of the

13    Mayor to have horrible things happen in a scattered way

14    where it's less visible than to have people actually

15    improving things imperfectly and with setbacks and with bad

16    things still happening, but at a much reduced number in one

17    concentrate location.  People are getting help because they

18    can be found.

19         And it's clear from City Council meetings, from

20    the letter of the eight City Council members, Exhibit 2,

21    from the declarations, that that's the reality.  You might

22    think, oh, you go find somebody and follow up with them, but

23    when housing and social workers and representatives and

24    nonprofits and all of these budget-constrained entities have

25    employees that are using staff time to call six or seven

Enslin Decl. Ex. A

1    different places, to go traipse around under bridges, that's

2    the time that they could be spending at Nenookaasi meeting

3    with people rather than trying to find them, actually

4    helping them.

5            There's also -- I just wanted to correct the

6    difference in the **Berry** case, Your Honor.  I think it's a

7    bit disingenuous to cite to that dismissal of the TRO and

8    call that analogous fact patterns or an analogous legal case

9    when in fact in the **ACLU** case, first and foremost, the

10   temporary restraining order is a highly fact-specific

11   inquiry.

12           And second of all, the basis for denying that TRO

13   was largely because the plaintiffs weren't, as Counsel said,

14   about to suffer irreparable harm, but in that case it was

15   because they had found stable housing that allowed them to

16   liaise with their attorneys to bring this lawsuit.

17           And here the plaintiffs that we have are --

18   Nenookaasi is the only place they have.  If this eviction

19   goes through, I do not know how I will find them.

20           Judge Wright's opinion in the temporary

21   restraining order relied on this irreparable harm factor,

22   but the facts were different.  Those plaintiffs were in

23   transitional housing that wasn't an encampment.

24           And just to speak on the merits of the claims in

25   that **ACLU** case, the **Berry** case, we looked at that case and

Enslin Decl. Ex. A

58

```
1    we did recognize Judge Wright's opinions on the Fourth

2    Amendment privacy, and that's why we eliminated that count

3    and focused on seizure as our Count One of our Complaint,

4    not the privacy concerns, but that it is the taking and the

5    destruction of the belongings and not necessarily the

6    privacy interest in law enforcement going through people's

7    tents.  That was in recognition of Judge Wright's opinion

8    and in order to maintain in compliance with the precedent in

9    this circuit.

10          And I'll also note that that case is still going.

11   It's awaiting further pretrial decisions, but to the extent

12   that the claims are the same, the claims are still going.

13   They've survived motions to dismiss, they're at the summary

14   judgment stage, and have made it that far.  The question at

15   the TRO stage was the imminency, and like I said, the facts

16   are different.

17          The other thing I wanted to note that felt too

18   disingenuous not to correct was just that it's not a

19   conscious decision, it's not a choice, for my clients to be

20   at camp.  And my client Cheryl Sagataw, for example, she's

21   been trying to get housing since August.  She feels like

22   she's on the precipice of it, she's making real progress,

23   but it's been the stability of camp that has allowed her to

24   maintain that relationship with that housing.  We're here to

25   make that happen.  It's not as though she hasn't been trying
```

Enslin Decl. Ex. A

59

```
1    or she could be somewhere else, but just chooses to be at
2    camp.
3              And DeAnthony is another example of that.  You see
4    in DeAnthony's declaration that he's been at camp for a
5    month and he's already been able to access and take
6    advantage of more services in that one month than he did in
7    a year living at the Tiny Homes, which is another shelter
8    alternative.
9              So it's just disingenuous and it's not fair to our
10   clients to say that this is a choice for them when if they
11   had somewhere safer to be they'd be there.  If they had a
12   different alternative, they would use it.  It's again the
13   difference between what happens in practice and what happens
14   in reality.
15             And you can also see this whole -- the offer of
16   keeping your stuff downtown in the City.  People have these
17   belongings because they need access to them.  Think about
18   how many items you or I or any of us use on a daily basis,
19   that to travel all the way downtown every time you want to
20   use your reading glasses.  It just -- life becomes
21   impossible without access to the day-to-day things that make
22   it possible for people, and it's completely unreasonable to
23   ask people to store everything downtown when they don't have
24   phones, they don't have cars.  They don't know where they're
25   going to sleep at the end of the night when they're not at a
```

Enslin Decl. Ex. A

1    place like Nenookaasi.  So the storage is just impractical.

2    And that I think is evidenced by the fact that as the Mayor

3    says in his memo, nobody's using it.

4         Another thing just to note is how else can you

5    explain that the camp that peaked at around 180 residents

6    has resulted in 104 people finding housing.  That's

7    unprecedented.  If this camp is allowed to keep going, it'll

8    keep shrinking, because what people are doing is working and

9    that matters.

10        We look at the housing workers, we listen to City

11   Council, because City Council, they're the ones that have

12   been holding these meetings, have been listening to

13   residents.  And again, we're certainly not discrediting the

14   people within different departments of levels of government

15   in the City and the County that are really trying to work on

16   this and are really listening, because what's happening is

17   working.  A hundred and four people out of a camp that

18   peaked at 180, finding permanent housing is huge.

19        Just briefly on the Eighth Amendment.  To say that

20   they're not going to be punished because there's no

21   ordinance is -- it's just also incorrect when they're going

22   to be arrested if they don't leave and that's punishment,

23   let alone the fact that the harm that's happening through

24   the seizure and destruction of all their stuff.  It's

25   negative imposed consequences by the government, including

Enslin Decl. Ex. A

```
 1    arrest, including criminal consequences for existing when

 2    they have nowhere else to go.  That's the violation of the

 3    Eighth Amendment.  And to try to find a factual distinction

 4    whether or not there's an ordinance just doesn't pan out

 5    with the law.

 6              All we're asking is for Your Honor to give the

 7    camp more time.  We're not asking for the camp to be held

 8    open forever.  My clients don't want to live at Camp

 9    Nenookaasi forever.  They just don't want to be homeless

10    forever.  And they want a place to stay at night where they

11    can wake up and know they can come back at the end of the

12    day.  They want a place to be warm during the day where they

13    can transition into housing arrangements that the City finds

14    more palatable, where they can support each other in doing

15    the work that they need to do to get themselves back on the

16    right track.

17              They all say it's working and Your Honor has read

18    the declarations carefully.  I thank you for that, because I

19    think that the people who spend the most time there are the

20    people who best understand the reality of what's going on.

21    They're just asking for more time and they're just asking

22    for the opportunity to address the problems that we all care

23    about.  We're all coming here because we care about some of

24    the same things and the people who are experiencing it are

25    the people who know best what's working.
```

Enslin Decl. Ex. A

62

1           Thank you.

2           THE COURT:  Thank you, Ms. Kelley.

3           Okay.  We have been here for roughly an hour and a

4    half and what I'd like to do at this point is take about a

5    ten- or 15-minute recess and I will return following the

6    conclusion of that recess and announce a decision from the

7    bench.  So if everyone will indulge me that time, I would

8    appreciate it and we'll return, as I say, in approximately

9    ten or 15 minutes.

10        (Recess taken at 3:38 p.m.)

11                          *      *      *      *

12        (3:53 p.m.)

13                         IN OPEN COURT

14          THE COURT:  All right.  Please be seated,

15    everyone.

16           I appreciate the speed and thoroughness with which

17    the parties have briefed these issues and I commend the

18    lawyers for their work.  This is one of those cases that

19    required unusually urgent attention and as a result very

20    likely -- well, we've heard -- very long hours for the

21    lawyers, and to operate on those conditions is quite

22    difficult and stressful, but it's of vital importance given

23    the significance and nature of the issue with which we are

24    dealing here today.

25           As I said, I will announce the decision from the

Enslin Decl. Ex. A

1    bench here today.  What I am about to say as it is recorded

2    in the transcript of these proceedings will be the only

3    place in which the rationale will be recorded.  There will

4    not be a separate memorandum, in other words, filed on the

5    docket, only an order.

6            To state the obvious, the homelessness problem in

7    Minneapolis as in many other metropolitan areas in the

8    United States poses substantial societal challenges and

9    harms.

10           The homeless suffer harms resulting not merely

11   from being homeless, but also occasionally from government

12   actions and inaction, including actions intended to address

13   the issue.  The public suffers harm too and the record shows

14   the presence of such harms here in the form of criminal

15   activities, harms to adjacent neighborhoods, blight, and the

16   hindrance of property development.

17           In our constitutional structure, how best to

18   balance these societal harms through policy decisions is

19   left in the first instance to the political branches, and

20   here that's the Mayor and the City, not to courts.

21           So, to summarize, I find that Plaintiffs have not

22   shown in this case that the policy choices Mayor Frey has

23   made to address these issues with respect to this encampment

24   are unconstitutional, unlawful in some other respect, or

25   create harms that are so one-sided as to justify enjoining

Enslin Decl. Ex. A

64

1    his decision to clear the encampment.  For these reasons I

2    will deny the motion for a preliminary injunction.

3            A preliminary injunction is an extraordinary

4    remedy.  The Eighth Circuit's familiar ***Dataphase*** decision

5    describes the list of considerations applied to decide

6    whether to grant a preliminary injunction.  These include

7    the likelihood of the movant's success on the merits, the

8    threat of irreparable harm to the movant in the absence of

9    relief, the balance between that harm and the harm that the

10   relief would cause to the other litigants, and finally the

11   public interest.

12           The core question is whether the equities so favor

13   the movant that justice requires the court to intervene to

14   preserve the status quo until the merits are determined.

15           The burden of establishing the four factors lies

16   with the parties seeking injunctive relief here, the

17   plaintiffs.  While no single factor is determinative, the

18   probability-of-success-on-the-merits factor is the most

19   significant.  Although this factor uses the term

20   "probability," the movant need not show a greater than 50

21   percent likelihood of success.  The absence of a likelihood

22   of success on the merits strongly suggests that preliminary

23   injunctive relief should be denied.  Here, I conclude that

24   Plaintiffs are not likely to prevail on the merits of any

25   one of their claims.

Enslin Decl. Ex. A

1    I begin with the Fourth Amendment claim, and I

2    should make clear that when I discuss the federal

3    constitutional claims I am also intending to encompass

4    within that discussion the analogous state constitutional

5    theory.

6    The Fourth Amendment protects the right of the

7    people to be secure in their persons, houses, papers and

8    effects against unreasonable searches and seizures.  The

9    seizure occurs when law enforcement meaningfully interferes

10   with an individual's possessory interests in property.

11   Reasonableness is the ultimate standard under the Fourth

12   Amendment and the reasonableness determination must reflect

13   a careful balancing of governmental and private interests.

14   That is from the Supreme Court's decision in the **Soldal vs.**

15   **Cook County** case, 506 U.S. 56, at 62 to 63 and 71.  Here,

16   the seizure or seizures Plaintiffs anticipate are not likely

17   to be unreasonable in the relevant sense.

18   First, without intending at all to understate the

19   challenges they face, Plaintiffs have been given substantial

20   and reasonable notice of the City's intent to remove them

21   from the property and the City has given Plaintiffs ample

22   time and a means to store any personal property they wish to

23   preserve from damage or destruction as part of the removal.

24   Plaintiffs have identified no good reason why they

25   could not take advantage of the option the City has

Enslin Decl. Ex. A

1    provided, certainly no compelling reason why they could not

2    take advantage of that option.  In other words, Plaintiffs

3    have it within their own ability to prevent the seizure of

4    their property.

5          Second, the reasons the City has identified to

6    justify the seizure are more than reasonable.  The

7    encampment has been the site of an infant's death, an

8    adult's drug overdose death, and homicide.  There have been

9    reports of human trafficking occurring from the encampment

10   along with reports of other criminal activity and there have

11   been more than one hundred 911 calls to the encampment.

12         Third, the property is owned by the City, and just

13   as any property owner may consent to the entry of law

14   enforcement for purposes of removing a trespasser or

15   trespassers, the City may consent here.

16         Fourth and finally, the City has identified

17   numerous sensible reasons justifying the decision to treat

18   items left behind as abandoned and destroy them.

19         With respect to Plaintiffs' procedural due process

20   claim, as for this aspect of the Due Process Clause,

21   standard analysis proceeds in two steps.  I am to first ask

22   whether there exists a liberty or property interest of which

23   a person has been deprived or is to be deprived, and if so,

24   whether the procedures followed by the state were

25   constitutionally sufficient.

Enslin Decl. Ex. A

1           Regarding that second aspect, the Supreme Court

2     directs that to determine what procedural protection a

3     particular situation demands, I am to look to three factors.

4           First, the private interest that will be affected

5     by the official action.

6           Second, the risk of an erroneous deprivation of

7     such interest through the procedures used, and the probative

8     value, if any, of additional or substitute procedural

9     safeguards.

10          And third, the government's interest, including

11    the function involved, and the fiscal and administrative

12    burdens that the additional or substitute procedural

13    requirements would entail.

14          Here, Plaintiffs have received notice of the

15    City's intent to clear the encampment.  Owing to extensions

16    given by the City, the notice has been significant, running

17    to roughly 28 days, if you include extensions, which I find

18    it reasonable to do.

19          The persons residing within the camp have been

20    given additional process, again in the sense that the City

21    has provided a means for them to have any valuables or other

22    belongings placed in storage at no cost to the individuals.

23    The risk of an erroneous deprivation thus depends largely on

24    a resident's decision not to take advantage of this option.

25          Importantly, as I understand Plaintiffs' brief and

Enslin Decl. Ex. A

1     argument, the additional or substitute safeguards they seek

2     are not really procedural, but political.  Plaintiffs ask

3     for more time with Mayor Frey and perhaps other elected

4     officials to try to change their minds.  That is a fair

5     request, but I do not understand this type of request to

6     participate in additional political process to be the sort

7     of procedural safeguard the Due Process Clause generally

8     contemplates.

9            Finally, the government's interest here is

10    substantial given the encampment's unlawful nature, the

11    incidents and activities that have occurred there, the

12    threat to public safety the camp poses, and the City's

13    imminent plans to develop the space.

14           With respect to Plaintiffs' substantive due

15    process claim, the State owes a duty to protect individuals

16    if the State created the danger to which the individuals are

17    subjected.  To succeed on a state-created danger theory of

18    liability, the plaintiff must prove:

19           First, that she was a member of a limited

20    precisely definable group;

21           Second, that the municipality's conduct put her at

22    a significant risk of serious, immediate, and proximate

23    harm;

24           Third, that the risk was obvious or known to the

25    municipality;

Enslin Decl. Ex. A

1            Fourth, that the municipality acted recklessly in
2       in conscious disregard of the risk; and
3            Fifth, that in total the municipality's conduct
4       shocks the conscience.
5            Actionable claims that satisfy the fifth factor
6       involve abuse of power so brutal and offensive that it does
7       not comport with traditional ideas of fair play and decency.
8       Mere negligence or even gross negligence do not satisfy this
9       requirement.  Instead, a state-created danger claim usually
10      requires proof of intent to harm, though proof of deliberate
11      indifference may also suffice.  To show deliberate
12      indifference, an official must be aware of facts from which
13      the inference could be drawn that a substantial risk of
14      serious harm exists, and he must also draw the inference.
15           Plaintiffs, I find, are not likely to be able to
16      show the second through fifth elements.
17           The claim as I understand it is that the
18      plaintiffs are at risk of harm through the dispossession of
19      their property, being forced to live in the cold in a
20      Minnesota winter, and the risks that certain individuals
21      will face a relapse of underlying health conditions through
22      the loss of stability the camp provides, and by those health
23      conditions I mean health conditions including drug and
24      alcohol dependency, mental health conditions and the like.
25           The City's conduct did not and does not create

Enslin Decl. Ex. A

1  these risks.  Again, the City has given Plaintiffs notice

2  and options to safeguard their belongings.  The City is not

3  forcing Plaintiffs to reside outdoors.  Plaintiffs reside

4  outdoors today and the City is telling them they need to

5  reside somewhere else, perhaps in another outdoor location,

6  perhaps in a shelter.

7          Regardless, the City's conduct does not shock the

8  conscience.  Clearing a homeless encampment that has been

9  the site of an infant's death, a drug overdose death, a

10 homicide and more than 100 police calls in roughly 140 days,

11 and genuine concerns regarding criminal conduct and human

12 trafficking, does not shock the conscience.

13         With regard to the Eighth Amendment claim, the

14 Eighth Amendment prohibits government infliction of cruel

15 and unusual punishment.  Whether the Eighth Amendment's

16 prohibition on cruel and unusual punishment may be applied

17 to regulating homelessness is the subject of some debate.

18 There is a petition pending in the Supreme Court to hear

19 that issue now accompanied by dozens of amicus briefs on all

20 sides.  *See, City of Grants Pass v. Johnson*, and that is

21 Number 23-175.

22         The Ninth Circuit held in its *Martin* decision that

23 the Eighth Amendment prohibits the imposition of criminal

24 penalties for sitting, sleeping, or lying outside on public

25 property on homeless individuals who could not obtain

Enslin Decl. Ex. A

1    shelter.  Its reasoning relied on a line of Supreme Court

2    cases holding that criminal penalties may not be inflicted

3    upon a person for being in a condition that she or he is

4    powerless to change.  The Ninth Circuit held that just as

5    the state may not criminalize the state of being homeless in

6    public places, the state may not criminalize conduct that is

7    an unavoidable consequence of being homeless; namely,

8    sitting, lying or sleeping on the streets.  That is a quote

9    from the *Martin* decision at 920 F.3d 617.

10       *Martin*'s reasoning has not been addressed by our

11   Eighth Circuit Court of Appeals.  The court in the Eastern

12   District of Missouri, which is within the Eighth Circuit, in

13   *Frank v. City of St. Louis*, 458 F.Supp.3d 1090, that

14   decision is from 2020.  There, St. Louis was seeking to

15   close homeless encampments in the city within a certain area

16   and a resident of one of those encampments, Ms. Frank,

17   sought a TRO.  Her claim was that closure of the encampment

18   would punish her based on her status as a homeless person in

19   violation of the Eighth Amendment under *Martin*'s reasoning.

20       The district court in that case, Judge Pitlyk,

21   distinguished *Martin*.  The *Martin* ordinances prohibited the

22   use of public property as a temporary or permanent place of

23   dwelling, lodging or residence, and occupying, lodging or

24   sleeping in any building, structure or public place, whether

25   public or private, without the permission of the owner or

Enslin Decl. Ex. A

1    person entitled to possession or in control thereof.

2            The Ninth Circuit recognized that the Eighth

3    Amendment's prohibition on cruel and unusual punishment bars

4    a city from prosecuting people criminally for sleeping

5    outside on public property when those people have no other

6    home or shelter to go to.

7            In *Frank*, though, there was no ordinance.  The

8    city's notice and order to close the encampments was

9    expressly limited to a certain area rather than being

10   enforced citywide.  St. Louis was, therefore, in the view of

11   the *Frank* court, not criminalizing the state of being

12   homeless or its unavoidable consequences, such as sleeping

13   in public.  It was not clear to the *Frank* court, in fact,

14   that St. Louis was criminalizing homeless anywhere.  At the

15   TRO hearing the city claimed it did not intend to arrest

16   individuals residing at the encampments.

17           Similarly here, Mayor Frey and the City are not

18   criminalizing the status of homelessness.  Plaintiffs do not

19   allege that the City is outright prohibiting homelessness,

20   sleeping outside or anything of the sort.  Rather, Mayor

21   Frey is alleged to be closing one encampment.  Thus, even

22   assuming it to be good law, the Eighth Amendment theory the

23   Ninth Circuit adopted in *Martin* is one Plaintiffs are not

24   likely to prevail on here.

25           Turning to the conversion claim, the elements of

Enslin Decl. Ex. A

1    the conversion claim under Minnesota law are

2    straightforward.  They are that the plaintiff has a property

3    interest and the defendant deprives a plaintiff of that

4    interest.  However, there can be no conversion.  Whereas, I

5    have found likely to be the case here, the government has

6    lawful justification to seize property.

7          The second *Dataphase* factor is irreparable harm

8    which occurs when a party has no adequate remedy at law,

9    typically because its injuries cannot be fully compensated

10   through a damages award.  The harm must be likely in the

11   absence of an injunction, great, and of such imminence that

12   there is a clear and present need for equitable relief.  The

13   plaintiff must show more than a future risk of irreparable

14   harm.  There must be a clear showing of immediate

15   irreparable injury.  Failure to show irreparable harm is an

16   independently sufficient ground upon which to deny a

17   preliminary injunction.

18         Here, Plaintiffs are not likely to suffer

19   irreparable harm attributable to the Mayor or City's

20   actions.  To the extent Plaintiffs claim that irreparable

21   harm might flow from the destruction of property and

22   belongings, the City, as noted several times now, has shown

23   that it has given Plaintiffs an adequate, reasonable

24   opportunity to avoid that by storing any such belongings in

25   line with the City's arrangements.  That any particular

Enslin Decl. Ex. A

1    plaintiffs have failed to take advantage of that option or

2    perhaps chosen deliberately not to means the property

3    destruction that will occur through clearing of the

4    encampment is effectively the plaintiffs' responsibility.

5            Plaintiffs also express concerns regarding the

6    consequences particular individuals may experience as the

7    result of being uprooted from the encampment.

8            They point out, for example, that some residents

9    of the camp have found stability and sobriety there and may

10   find it difficult to maintain their mental health and

11   sobriety away from the camp.  There are three legal answers

12   to these concerns, but I should make clear that none of

13   these legal answers is intended to undermine these concerns'

14   genuineness or seriousness.

15           First, the City cannot fairly be faulted if a camp

16   resident experiences these challenges as the result of a

17   lawful removal and clearing of the camp, and I have found

18   that to be the case here.

19           Second, whether any particular plaintiff or person

20   will in fact experience these challenges represents the sort

21   of generalized non-imminent risk that is insufficient under

22   the law to show irreparable harm in the context of a

23   preliminary injunction.

24           Third, the City has not been blind to these

25   challenges.  Its submissions describe extensive efforts to

Enslin Decl. Ex. A

1    connect those persons in the camp with resources to address

2    these and many other challenges.

3           The last two factors to consider are the balance

4    of the relative harms and the public interest.  For

5    practical purposes, these factors merge when a plaintiff

6    seeks injunctive relief against the government.

7           As I observed at the start of this order, the

8    homelessness problem in Minneapolis, as in other places,

9    poses substantial challenges and societal harms to those who

10   are homeless, to the public, and to public officials.  Here,

11   Plaintiffs have not shown that the policy choices Mayor Frey

12   has made to address these issues with respect to this

13   encampment are unlawful or create harms that are, as I have

14   said, so one-sided as to justify halting his decision to

15   clear the camp.

16          For all these reasons, then, I will order that

17   Plaintiffs' motion for a temporary restraining order and

18   preliminary injunction be denied, and I will order that

19   judgment be entered accordingly.

20          As I indicated earlier, that will be the only --

21   the transcript, that is to say, will be the only source of

22   memorialization of the terms of that order and memorandum.

23          I quoted a number of cases in the course of

24   explaining that decision.  I chose not to cite the cases

25   simply for the sake of efficiency here today.  I will leave

Enslin Decl. Ex. A

1        it to the lawyers if they are curious about that to obtain a

2        copy of the transcript and then conduct an appropriate

3        search to identify the source of those quotations.  If the

4        lawyers have questions or concerns or have difficulty

5        finding any of those, please feel free to contact chambers

6        and I'll do my best to get you an answer.

7                  Again, I thank the lawyers for their prompt work.

8                  I should add I made this decision because I've

9        done my best to follow the law and this is where the law

10       leads me.  I don't know what the best policy decision is

11       here.  I think the lawyers on both sides, both as reflected

12       in their briefs and here today at the hearing, have done an

13       excellent job of conveying their clients' positions with

14       respect to those issues.

15                 But I think it's important for me to be clear

16       again in just saying that making policy decisions is not the

17       job of a federal district court judge.  My job is to compare

18       the legal arguments the lawyers have made with the law and

19       the standards for granting or governing the issuance or

20       denial of a preliminary injunction such as that is requested

21       here, and so that is the nature of the decision that has

22       been made today.

23                 Let me stop there and ask, Ms. Kelley, anything

24       further that you think we need to cover here today?

25                 MS. KELLEY:  No, Your Honor.

Enslin Decl. Ex. A

1            THE COURT:  All right.  How about from the Mayor's

2      perspective?

3            MS. ENSLIN:  No, Your Honor.

4            THE COURT:  All right.  Thank you, everyone.

5      We're adjourned.

6            (Proceedings concluded at 4:18 p.m.)

7                    *     *     *     *

8

9            C  E  R  T  I  F  I  C  A  T  E

10

11        I, **TIMOTHY J. WILLETTE,** Official Court Reporter
          for the United States District Court, do hereby
12        certify that the foregoing pages are a true and
          accurate transcription of my shorthand notes,
13        taken in the aforementioned matter, to the best
          of my skill and ability.

14

15              */s/ Timothy J. Willette*

16

            **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
17         Official Court Reporter - U.S. District Court
         Warren E. Burger Federal Building & U.S. Courthouse
18            316 North Robert Street - Suite 146
                 St. Paul, Minnesota  55101
19                    651.848.1224

20

21

22

23

24

25

Enslin Decl. Ex. A