# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CHERYL SAGATAW,
DEANTHONY BARNES, ROBERTA
STRONG, ~~and~~ TRAVIS NELOMS,
ALVIN BUTCHER, ADRIAN TIGER,
CHANCE ASKENETTE, DEVEN
CASTON, LOLA HEGSTROM, and
RONDEL APPLEBEE, *on behalf of
themselves and a class of similarly-
situated individuals*,

                    Plaintiffs,

            vs.

MAYOR JACOB FREY, *in his
individual and official capacity*,

                    Defendant.

Civil Action

0:24-cv-00001-ECT/TNL

**SECOND AMENDED
CLASS ACTION
COMPLAINT AND
DEMAND FOR
JURY TRIAL**

Formatted Table

## INTRODUCTION

Plaintiffs in this case are the evicted residents of Camp Nenookaasi[1] ~~is~~,

whose human and constitutional rights Defendant Mayor Jacob Frey continues to

---

[1] "Nenookaasi" means "hummingbird" in Ojibwe.

1

violate. Defendant orders law enforcement to shuffle people from one street to another to seize and destroy their means of survival in the name of public safety, then blocks, underfunds, and interferes with meaningful solutions that help get people into humane, stable housing.

Camp Nenookaasi formed as a community-based healing camp rooted in Native religious and cultural practices where people experiencing houselessness can find safety and community. Camp Nenookaasi draws, drawing upon evidence-based harm reduction principles and is shaped by and for people who live with substance use disorder and/or other disabilities who have struggled to access or maintain more permanent housing. strategies to meaningfully intervene in cycles of addiction and houselessness. Over one hundred and eighty unhoused people, most of them Indigenous, have found refuge at Camp Nenookaasi sinceafter its initial formation in late August of 2023. The interim stability at the first Nenookaasi location allowed approximately one hundred of these former residents to transition from living in day-to-day survival mode on the streets to treatment and more permanent housing.

This group has been hugely successful, despite the three evictions and forced relocations of Camp Nenookaasi in the past month and a half. Camp Nenookaasi has provided the necessary interim stability for roughly one hundred now-former residents, who were previously living in day-to-day survival mode on the streets, to

transition into more permanent housing. Many of the remaining residents are in various stages of the process of obtaining permanent housing, albeit with derailments and setbacks as a result of the evictions. Camp Nenookaasi remains the only viable option for people in need of a safe and dignified place to be while they navigate shelter and housing systems that are frequently inaccessible to those with substance use disorders or other disabilities.

Plaintiffs in this case are the current residents of Camp Nenookaasi, whose human and constitutional rights Defendant Mayor Jacob Frey continues to violate through his perpetration of these ongoing and repeated evictions. The apparent goal of the evictions is to prevent Plaintiffs from sleeping, building community, and ultimately existing anywhere within the City of Minneapolis. With each eviction, the residents of Nenookaasi are forced under threat of arrest to pack up what belongings they can and relocate. Banished from their homes, Plaintiffs rebuild as best they can and pray that the next eviction is not imminent.

Instead of celebrating this miraculous success and leveraging City resources to amplify the transformational power of community members, nonprofits, and residents themselves working together to make change, Defendant Mayor Jacob Frey of the City of Minneapolis launched a series of repeated evictions that pushed Nenookaasi residents from one vacant lot to another within the same approximate half-mile square of the East Phillips neighborhood.

3

Each eviction adds hardship and trauma. ~~Residents lose important and valuable items, medicines, documents, and means of survival~~, and causes overdoses, relapses, and death. Camp Nenookaasi was originally a hub for social services, housing outreach teams, harm reduction and substance use providers, and others looking for a reliable place to find and provide support to residents. As Defendant Frey has forced ~~Nenookaasi~~Plaintiffs to relocate repeatedly in the last ~~month~~eight and a half months, fewer ~~and fewer~~support providers are able to stay connected and Plaintiffs are harder pressed to provide for themselves. Plaintiffs' necessities are trashed as soon as they are rebuilt, and ~~supportive services make the transition~~Plaintiffs cannot stay in touch with ~~the Plaintiffs to the new locations to continue working with them~~providers when Defendant repeatedly bulldozes their phones, contact lists, treatment and housing paperwork, and places they can be found.

~~Despite the accumulating damage and setbacks from these three evictions, Nenookaasi residents continue to provide life-saving and life-changing support for each other. Each eviction brings with it another round of stressors, induces relapses and overdoses, and forces people to have to start from square one again. However, without Nenookaasi, Plaintiffs would be experiencing this every single day—starting from scratch every morning figuring out how to stay warm and safe during the day, where to sleep at night, how to safeguard valuables, and how to endure the~~

4

~~smothering hopelessness that comes with living in survival mode. Nenookaasi provides the irreplaceable, indescribable benefit to Plaintiffs of a community dedicated to helping each other out of this cycle. And it is this community that above all else Defendant Frey seeks to destroy.~~

Mayor Frey could choose to allocate City resources towards expanding shelter availability, subsidizing more affordable housing, creating public health or digital connectivity initiatives, improving sanitation services at encampments, or any other number of worthy causes. Instead, the past year has seen taxpayer dollars lavished on overtime for hundreds of law enforcement to drive unhoused people out of their tents under threat of arrest, on heavy machinery to bulldoze residents' worldly possessions into dumpsters, and on large slabs of concrete to guard the now-unusable plots of stolen land.

While vestiges of the relationships, care, and progress that Nenookaasi brought to the unhoused community in Minneapolis can still be seen, the pressure of repeated evictions reduced Nenookaasi's ability to help residents find permanent housing, and eventually caused Nenookaasi as a formal encampment to disband. Survivors of Nenookaasi evictions for the most part remain unhoused. Some have disappeared, leaving loved ones fearing the worst. Some have obtained housing through city programs, where they attempt to recover from the trauma and material

5

losses that evictions cause both directly and indirectly, by stripping unhoused people of the modicum of safety an encampment provides.

Nenookaasi gave residents a voice. People who had been too overwhelmed fighting for day-to-day survival on the streets were able to advocate for themselves, connect not only with housing workers but also with attorneys, politicians, community organizers, and each other to clamor for better solutions from the City of Minneapolis. From various backgrounds and perspectives, these people continue working together, listening to each other, collaborating, and coming up with solutions that are data- and experience-driven. But the Mayor of Minneapolis and his evictions continue to threaten and undermine this progress.

Defendant Frey is targeting his most vulnerable constituents, not only failing to create a livable city for them through his own policies, but egregiously using his power as Mayor to destroy what safety and stability they have managed to build for themselves. Nenookaasi has been evicted from the City, but its former residents are still here, and still suffering. Plaintiffs beg the Court to intervene, to stop this cycle once and for all Defendant's unconstitutional and unlawful use of executive authority to continue wreaking havoc on Plaintiffs and the entire community of South Minneapolis.

**JURISDICTION**

6

1.    Plaintiffs' claims arise under 42 U.S.C. § 1983, 42 U.S.C. § 12131, and the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

2.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law, and pursuant to 28 U.S.C. § 1367 because this Court has supplemental jurisdiction over Plaintiffs' state claims, which arise out of a common nucleus of operative facts and constitute the same case or controversy as the federal claims at the heart of this Complaint.

## PARTIES

### *Representative Plaintiff Cheryl Sagataw*

3.    Cheryl Sagataw is a 32- year-s old resident of Camp Nenookaasi and, an enrolled member of the Potawatomi Nation, and a former resident of Nenookaasi who endured repeated evictions of that Camp.

4.    After attending high school and college in Potawotomi territory, Cheryl worked in the food and beverage industry for ten years. She is a domestic abuse survivor who became homeless when she lost her public housing in March of 2023 and became homeless.

7

5.    ~~As an unhoused person~~Since then, Cheryl has experienced ~~repeated~~numerous evictions, sweeps, and displacements from ~~the places where~~wherever she ~~has tried~~attempts to set up shelter for herself. She was repeatedly kicked out of the area under Interstate 94 and eventually relocated to the reinstituted Wall of Forgotten Natives. When the Wall of Forgotten Natives was cleared for the second time, Cheryl was one of many Plaintiffs who came to Camp Nenookaasi in late August/early September of 2023.

6.    Cheryl ~~has~~ found stability, security, and great meaning living at Camp Nenookaasi. The Camp ~~has~~ created space for her to build community and trust, to learn and participate in ceremonies and other culturally important practices, to grieve losses and connect to her spirituality, to develop life skills, to access housing and treatment resources, to stay safe from her abuser, and to plan for a future in ways she never before thought possible.

7.    ~~Cheryl has endured three~~Repeated evictions of ~~Camp Nenookaasi already. The prospect of never-ending displacement threatens all of the hard-won stability she and her fellow residents of~~ Nenookaasi have ~~built~~eroded this progress towards permanent stability, and Cheryl remains unhoused.

### *Representative Plaintiff DeAnthony Barnes*

8.    DeAnthony Barnes is a 35-year-old former resident of Camp Nenookaasi.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

8

9. He has experienced housing instability since 2011, and been a part of many unhoused communities.

10. ~~For the past approximately two and a half months,~~ DeAnthony ~~has been living at~~ moved to Camp Nenookaasi~~. He describes Camp Nenookaasi~~ in late 2023, and described it as "unlike any other camp I have ever been in," notable for its "support and resources" and "coordination of care."  In fact, DeAnthony ~~is receiving~~ received more resources at Camp Nenookaasi in a two and a half month period than he ever received when living at Avivo, and ~~having~~ had more success as a result.

11. ~~At~~ While at Nenookaasi, DeAnthony ~~is making~~ made efforts towards his sobriety and getting into treatment, and support~~ing~~ed his girlfriend in doing likewise. ~~At~~ DeAnthony observed the power of Nenookaasi~~, DeAnthony observes,~~ in allowing people ~~have~~ simple ~~but necessary things~~ necessities—like access to heat—which free~~s~~d up mental capacity for people to "advance their thought process" beyond survival. Being warm and safe empower~~s~~ed DeAnthony to consider working towards permanent housing and sobriety.

12. DeAnthony also describe~~s~~d how much it mean~~s~~t to know that there are people who still care about him, and how Camp Nenookaasi build~~s~~t trust. The Camp ~~is~~ was a place of unity, where people from significantly different backgrounds ~~a~~were able to live as family. ~~It's~~ It was also a place of historical and

spiritual significance, where Indigenous ceremonies t~~a~~ooke place and the history of colonization and the pain and devastation experienced by Indigenous ancestors ~~is~~was brought to the fore.

13.     Like most people at Camp Nenookaasi, DeAnthony ~~has~~ experienced numerous prior evictions in which he~~'s~~ lost precious mementos, including pictures of his children; valuable technological equipment containing music he has written, produced, and recorded; critical documents such as birth certificates and other forms of identification; and necessities for survival including a generator, clothing, and his tent.

14.     DeAnthony ~~has~~ experienced at least three evictions of Camp Nenookaasi. With each eviction, DeAnthony los~~t~~est more and more of his possessions, and his resolve. He fears for his safety, his girlfriend's safety, and the well-being of the other residents who are put in danger by these ongoing evictions. The message he hears from the evictions is that he is not allowed to be or live in his own hometown.

***Representative Plaintiff Roberta Strong***

15.     Representative Plaintiff Roberta Strong is a 33-year-old ~~Indigenous~~Bois Fort member and former resident of Camp Nenookaasi. Roberta is disabled by a traumatic brain injury inflicted upon her by an ex boyfriend.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

16.     Roberta was living with her grandmother and several other family members at Little Earth, but became homeless when her grandmother died in 2018. Roberta lived on the streets, often staying at other encampments, enduring frequent evictions and displacements. After Roberta was evicted from the Wall of Forgotten Natives in August of 2023, she ~~found Nenookaasi and has stayed with this encampment since then, and moved with them through three evictions.~~moved into Camp Nenookaasi.

17.     ~~The~~Roberta endured repeated evictions of Nenookaasi, which put Roberta into a panic.

~~17.~~18.  Because of evictions, Roberta has lost most of her belongings–clothes, medicine, pictures of her family, her son's baby feet prints, and multiple forms of identification.

~~18.     Roberta has not been able to obtain housing and shelters are not an option for her, even if a bed were to be available. At Nenookaasi, however, she has found stability, and community, unlike anywhere since she's been unhoused. Roberta's two cousins also live at Nenookaasi, so she is able to look out for them, and to accept care from others as well.~~

19.     Roberta has no form of identification. She struggles with getting her basic needs met and with the ongoing impacts of her traumatic brain injury. ~~Given the well-documented inadequacy and unavailability of temporary shelter beds,~~

Formatted: Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0"

Formatted: Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0"

which are more accurately described as mats on the floor, Nenookaasi is the only safe place for her to be. The unparalleled stability and community at Nenookaasi transformed her, particularly by allowing her to give and receive care for her cousins and for others.

20.     Nenookaasi is Roberta's lifeline, not only for herself but also for the family members she looks after who live here with her.

20.     Constant displacement undermines this progress. Roberta remains unhoused and subject to being evicted from a camp at a moment's notice.

### *Representative Plaintiff Travis Neloms*

21.     Travis Neloms is a 34-year-old former resident of Nenookaasi.

22.     He is Native Puerto Rican and African American, and lives with several diagnosed mental health conditions.

23.     For much of his life, Travis has lived with precarious, unstable, or nonexistent housing. Travis has been living in proximity to many of the same people who now reside at Nenookaasi for For the past five years at various encampments and tent sites around Minneapolis, ., the City has pushed Travis from one location encampment or tent site to another, enduring eviction after eviction, and occasionally attempting to find all around Minneapolis. Amidst constant evictions, Travis periodically attempts to obtain housing or staying at a shelter.

12

24.    Travis's ~~experience~~experiences trying to stay in shelters has been horrible. He was often unable to obtain a spot, given shelters' limited capacity. Even when he did manage to find a spot, he found shelters to be unsafe and unhygienic, with people stealing each others' belongings and with sleeping arrangements that lacked any privacy or dignity. On multiple occasions he became ill because of staying in a shelter. And the next morning he would face again the often impossible challenges of finding somewhere to be during the day and the following night, and where to store his belongings in the meantime.

25.    ~~For the past several months,~~ Travis ~~has been living~~came to live at Nenookaasi~~.~~ in late 2023. In his words, "I didn't find Nenookaasi, Nenookaasi found me." Being at Nenookaasi ~~has been~~brought a ~~different experience in~~level of care, stability, safety, and hope than Travis ~~has~~had ever experienced ~~anywhere else~~.

~~26.    For Travis,~~ Nenookaasi ~~is a place where a group of people who are all struggling still find the energy to support each other, from a place of shared understanding, and as a result people are inspired to do better for themselves and for the group.~~

~~27.~~26.  ~~Nenookaasi is~~was also much safer, more peaceful, less violent for Travis than ~~his experience~~being out on the street or in a shelter. When Travis was living on the street or in a shelter he had a hard time ~~storing or protecting~~retaining

Formatted: Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

his belongings, but at Nenookaasi he ~~is able to retain~~could keep at least the basic

necessities, including life-saving items such as his anti-seizure medications,

without having to worry about whether he ~~will~~would still have access to them

when he need~~ed~~s them ~~at least until another eviction happens~~.

28.27.  In past evictions, Travis ~~has~~ lost thousands of dollars worth of clothes,

bicycles, tents, blankets, medications, and other staples. He ~~has~~ lost important

documents such as court paperwork and ~~various forms of~~ identification. Replacing

identity documents has been an almost impossible task, given that replacing one

form of identification requires showing proof of another, and during Nenookaasi

evictions Travis lost his driver's license, social security card, and his birth

certificate.

29.28.  He is attempting to rebuild his ~~supply of~~ necessities, but fears that

another eviction is imminent and the rug will be pulled entirely out from under him

time and time again.

### *Representative Plaintiff Lola Hegstrom*

29.     Lola Hegstrom is a 41-year-old former resident of Camp Nenookaasi.

She is a member of Red Lake Nation, and is currently unhoused. She has PTSD,

severe depression, anxiety, and Borderline Personality Disorder, as well as

debilitating back pain that requires her to sleep upright in a chair.

14

30.     After Lola was evicted from the Wall of Forgotten Natives, she came to Nenookaasi. She stayed by herself in a tent, but enjoyed having people nearby. Being at an encampment, especially Nenookaasi, felt safe and gave her a sense of community. This security kept Lola with the group throughout multiple evictions.

31.     At one point, Lola attempted to use the storage that she had heard, secondhand, the City was offering. The City only allowed her to store one tote. Because storage was so hard to access and because she needed access to the stored items, she ended up having to remove even that one tote from storage.

32.     After the fire destroyed Nenookaasi on 28th Street and 12th Avenue, Lola moved with the other residents of Nenookaasi to 28th Street and 14th Avenue. On July 25, 2024, Lola was asleep in her tent when law enforcement entered the encampment at around 7AM with no prior warning or announcement and told everyone that they had ten minutes to gather what they could carry in one trip and depart.

33.     At evictions, Lola has lost jewelry, clothing, her sleeping chair, tents, expensive purses, her childrens' toys, her birth certificate, mental health and medical paperwork, a generator, and more. When Lola protests to law enforcement at evictions that she needs more time in order to pack up her belongings, law enforcement falsely and prejudicially assume that she has stolen her belongings as a way to justify forcing her to abandon her valuables.

15

34.     Repeated evictions take a toll on Lola's mental health. She is tired of the assumptions, prejudice, and false solutions put forward by people who do not understand the problem.

***Representative Plaintiff RonDel Applebee***

35.     RonDel Applebee is a 29 year old former resident of Camp Nenookaasi. He is a descendant of Standing Rock Oglala Sioux, and a member of Fond du Lac Nation of Ojibwe.

36.     RonDel has lived in Minneapolis his whole life and graduated from Augsburg Fairview Academy. He experienced housing instability and hardship from a young age, and suffers from PTSD, chemical dependency, anxiety, and depression. His family has experienced tremendous losses. RonDel is committed to staying connected to and caring for the relatives he has left, and stays close to his younger cousin Chance so he can look out for him.

37.     After being evicted from the Wall of Forgotten Natives in August of 2023, RonDel joined Chance at Camp Nenookaasi. At the first Nenookaasi eviction, he was allowed time to retrieve belongings and to help others move.

38.     At the next Nenookaasi location, 26th and 14th, RonDel was only allowed to make one trip out, and therefore lost the majority of his possessions, including a folder of important documents. At that eviction lost his ID and his

social security card, which he has yet been unable to replace. He was unable to find his family until after the next Nenookaasi location was evicted.

39.   RonDel rejoined the group at the 28th and 12th location, then moved with the others to 28th and 14th after the fire. While at the 28th and 14th Nenookaasi encampment, RonDel was able to make contact with a housing worker and apply for a referral.

40.   After completing the referral, RonDel waited sixty days before he was placed in housing. RonDel's mother had also been given housing through Helix, on an earlier timeline than his, so eventually he went to stay with her while he waited.

41.   RonDel worried for his mother's safety in her Helix housing placement. He described her neighborhood as a "war zone." Shootings happened routinely in and around the building, with bullets flying through the window and in the hallways. RonDel asked his mom to sleep in the back room because he believed that to be the safest place for her.

42.   At around the same time that RonDel's own Helix housing placement came through, his mother's entire building was condemned. Instead of finding a new housing placement for her, Helix sent her to a shelter.

43.   RonDel has been housed through Helix in South Minneapolis for about two months now, but he is worried that he will be kicked out. He has gotten emails saying that his rent is not being paid. Helix is taking half of his general

17

assistance payments to put towards rent and was supposed to be paying the remainder, but the overdue notices and late fees make RonDel worry that he will soon become homeless again due to corruption in the program ostensibly designed to help him.

*Representative Plaintiff Chance Askenette*

44.     Chance Askenette is a 24-year-old former resident of Nenookaasi and is Oglala Lakota, a member of Pine Ridge.

45.     For the first twelve years of his life, Chance moved from his parents' home to his grandmother's to foster care and back. Chance ran away at age twelve to avoid being taken again by child protective services, and has spent the second half of his life homeless.

46.     Chance was at Camp Nenookaasi since its inception. The camp gave him safety and structure, and he stuck with the group from eviction to eviction. For most, Chance was only able to make one trip with his belongings when ordered to vacate by law enforcement and was not told in advance the eviction was coming. As a result, he has lost sentimental, expensive, life-saving, and needed belongings.

47.     He would consider storing his belongings downtown, but has never spoken to anyone from the Homeless Response Team or the City about it and is unclear how that offering would work or how to use it.

18

48.     He currently lives at an encampment in East Phillips with several family members. His cousin RonDel visits often to check on him.

### *Representative Plaintiff Adrian Tiger*

49.     Adrian Tiger is a 35-year-old former resident of Camp Nenookaasi and a member of the Standing Rock Sioux Nation. He was born and raised at Little Earth, and has been homeless for a long time.

50.     Adrian came to Nenookaasi when it first formed, and stayed because he felt safer there and he liked being around family. He moved with Nenookaasi throughout the repeated evictions. At these evictions, he often woke up to law enforcement ordering him out of his tent and was unable to bring more than whatever he could carry with him in one or two trips. As a result, he has lost clothes, shoes, electronics, valuables, important papers, and identity documents.

51.     He has attempted to obtain housing in the past, without success, and as a result has no choice but to remain on the street.

### *Representative Plaintiff Deven Caston*

52.     Deven Caston is 34 years old and a former resident of Nenookaasi. He grew up in various Minneapolis suburbs, and has been homeless since about four years ago when he and the mother of his child lost their apartment.

53.     Being unhoused makes it hard for Deven to take care of himself. He has ADHD and anxiety, but stopped going to therapy. A few winters ago, while

19

sleeping without shelter, Deven was afflicted by such severe frostbite that the toes on his left foot fell off. He continues to experience mobility issues and severe pain in what remains of his foot to this day.

54.   Since moving to Nenookaasi after the eviction of the Wall of Forgotten Natives, Deven has been evicted several times. Because of these evictions, Deven repeatedly loses the entirety of whatever belongings he has been able to accumulate since the last time he was evicted, aside from the occasional grocery bag of food or clothes he is able to carry with him.

55.   Despite his physical limitations and pain, Deven does his best to be a good neighbor. He picks up trash in the alley where he stays, and gets hired for odd jobs now and then doing light yard work for adjacent apartments. Deven values contributing positively to the neighborhood. The evictions make him feel horrible, unwanted by everyone. He picks up trash to change others' impression of him.

56.   Deven remains unhoused at an encampment in the East Phillips neighborhood, but has been attempting to get housing. A case worker was previously helping him, but stopped coming. Deven worries that she is unable to find him given his constant displacement, or worse–that she gave up on him.

### Representative Plaintiff Alvin Butcher

57.   Alvin Butcher is a former resident of Nenookaasi, a member of White Earth, the Mississippi Band of Ojibwe, and currently lives in an encampment in

20

East Phillips. Alvin has PTSD, depression, and a physical disability stemming from several botched surgeries in his right foot.

58.     Alvin has a background in the construction industry and has lived in South Minneapolis for most of his life in order to be close to his children. His landlord kicked him out during the initial COVID-19 pandemic, but he did not contest the illegality of that eviction because he was worried about potential negative impacts on his rental history.

59.     In November of 2023, Alvin moved into Nenookaasi and was evicted with the group several times. He recalls having more time at that first January eviction, but being forced out in a hurry at subsequent evictions, causing him to lose clothes, blankets, food, important papers, and electronics.

60.     At one eviction of Nenookaasi, law enforcement told him that if he was not out of his tent, it would be bulldozed with him still in it.

61.     Alvin lives with his partner. They are not married, so going to a shelter would mean being separated from her. He knows that she would not be safe in a shelter given her own mental health struggles that shelters are not equipped to handle, and says he would rather sleep on the ground in a tent with her than lie awake in a shelter worrying about her safety.

62.     Alvin is very concerned with cleanliness at encampments where he stays. Like many of his fellow residents, he takes pains to keep the area clean and

21

wishes the City provided better sanitation services. He buys trash bags and distributes them among other residents and encourages everyone to do their part.

63.     The repeated evictions are challenging for Alvin emotionally. The uncertainty and instability exacerbate his depression. He has been trying unsuccessfully to find housing. He was approved for it, but the agency stopped contacting him. Alvin slipped through the cracks in a broken system.

### *Represented Class Plaintiffs*

30.64.  Plaintiffs in the Represented Class are the other unhoused people who have found a temporary home at and experienced evictions from Camp Nenookaasi.

31.65.  Upon information and belief, former Camp Nenookaasi residents have physical and/or mental disabilities, disorders, and/or conditions, including substance use disorders.

32.     Upon information and belief, Camp Nenookaasi residents have suffered prior evictions in Minneapolis, including the three prior evictions of Camp Nenookaasi since its formation in August of 2023.

66.     Represented Plaintiffs are defined precisely by those who were evicted one or more times from Camp Nenookaasi since its formation in August of 2023 at the following approximate locations and dates: on 23rd Street and 13th Avenue on January 4, 2024; from 2601 14th Street, on January 30, 2024; from

22

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0"

2213 16th Avenue on February 1, 2024; and/or from 2839 14th Avenue on July 25, 2024.

67.     These repeated evictions forced Nenookaasi as a formal encampment to disintegrate and eventually disband, but Defendant continues to evict Plaintiffs from one lot to another in the East Phillips neighborhood.

33.68.  While each of these Plaintiffs have their own unique story—who they are, where they come from, and what particular struggles have led them to be otherwise unhoused—all of the Represented Class Plaintiffs now find themselves in experienced injuries of the same situation, having endured three evictions in a month's timeelk and facingtraceable to the prospect of untold more. same Defendant.

34.69.  With each eviction, Plaintiffs' shelters are bulldozed, their belongings seized and destroyed, their beds thrown in a dumpster, their ceremonial fire and other sacred sites desecrated, their community scattered under threat of arrest.

35.70.  ButAside from the few who manage to obtain and remain in housing, Plaintiffs must rebuild following every eviction, albeit bringing fewer belongings and more new traumas to each new site. Plaintiffs rebuild because Camp Nenookaasi is irreplaceable. By providing food, warmth, shelter, community, harm reduction and cultural healing, Camp Nenookaasi serves as a crucial stepping stone to housingscatter and sobriety, a placereform a few blocks away every time,

23

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

only to ~~find community and safety, and a means~~brace for the next round of ~~survival when residents have nowhere else to simply exist.~~ pointless displacement.

~~36.~~71.  ~~All of the~~ Represented Class Plaintiffs and their Representatives seek to enjoin the practice of ongoing evictions, to stop the arbitrary and hostile relocation of ~~Camp Nenookaasi~~unhoused people from ~~place~~one empty lot to ~~place~~another in circles around south Minneapolis. Plaintiffs ask this Court to ~~preserve~~ put an end to dangerous constitutional violations that Defendant perpetrates, at the ~~opportunities for growth~~expense of true gains in safety and ~~transformation that they are co-creating, together~~security for Plaintiffs and ~~with their housed neighbors, at Camp Nenookaasi~~the community at large.

### *Defendant Mayor Jacob Frey*

~~37.~~72.  Defendant Jacob Frey is sued in his official and individual capacity. In his official capacity, Defendant Frey is the Mayor of the City of Minneapolis, a municipality incorporated in the State of Minnesota. In his personal capacity, Defendant Frey is a resident of Minneapolis. As Mayor, Defendant Frey is obligated to uphold the laws and ordinances of the State and City, and has exclusive control and authority over the Minneapolis Police Department.

~~38.~~73.  Defendant Frey campaigned for mayoral office on a promise to "End Homelessness." Instead of making good on that promise by engaging with the community in meaningful and realistic ways, Defendant Frey has implemented

24

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

policies and initiatives to drastically increase sweeps and evictions of houseless

encampments, using his authority over the Minneapolis Police Department to

inhumanely displace people, destroy their homes, and continue the cycles of

violence and trauma faced by the City's most vulnerable residents.

### CLASS QUALIFICATIONS FOR CERTIFICATION

39.74.  Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2),

named Plaintiffs Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis

Neloms, Alvin Butcher, Adrian Tiger, Chance Askenette, Deven Caston, Lola

Hegstrom, and RonDel Applebee bring this class action on their own behalves and

on behalf of all other similarly situated evicted former residents of Camp

Nenookaasi. This case meets the prerequisites for class formation and for the type

of action brought.

### *Class Formation*

40.75.  The following prerequisites allow one or more members of a class to

sue as representative parties on behalf of all members: "(1) the class is so

numerous that joinder of all members is impracticable; (2) there are questions of

law or fact common to the class; (3) the claims or defenses of the representative

parties are typical of the claims and defenses of the class; and (4) the representative

parties will fairly and adequately protect the interests of the class." FED. R. CIV.

PRO. 23(a).  This case meets these prerequisites for class certification.

25

41.76.  *Numerosity*. The class is so numerous that joinder of all members is impracticable. The practicality of joinder is evaluated on a case-by-case basis and, while no specific numerical threshold exists in law, factors to be considered include "the size of the class, ease of identifying its members and determining their addresses, the facility of making service on them if joined, their geographic dispersion and whether the size of the individual claims is so small as to inhibit individuals from separately pursuing their own claim." *Glenn v. Daddy Rocks*, 203 F.R.D. 425, 429 (8th Cir. 2001).  This case involves well-over one hundred former residents of Camp Nenookaasi, all of whomwho multiple evictions have lived at the Camp because they are otherwise unhousedsince dispersed and without any other address.  While some of Nenookaasi's former residents have found temporary or even long-term housing, many remain otherwise unhoused, have faced numerous evictions,who asa result frequently lose the means and could be evicted again at a moment's notice. Without reliable mailing addresses, serving all Plaintiffs individually would be impossible. When evictions occur, Plaintiffs and others similarly situated geographically disperse and are often difficult to locate again.manner of contacting supporters, such as attorneys. Plaintiffs also are unlikely to be able to pursue claims as individuals because they are indigent, extremely under-resourced, cannot afford to hire private counsel, and lack the

physical or technological access to a courtroom. Even for those who obtain housing, this is often only temporary.

42.77.  *Commonality. There are  of Questions.* The case is comprised primarily of legal and factual questions of law or fact that are common to the class. Each member of the class has, based on a discrete number of evictions within the past year, all executed by the same legal claims, as set forth below.  The Defendant within the same roughly half-mile square area. For each Plaintiff class consists of all residents of Camp Nenookaasi who are otherwise unhoused.  For each of them individually and for the class as a classwhole, Defendant Frey violates the same Constitutional and statutory rights in a functionally identical manner, by directing his law enforcement agents to destroy Plaintiffs' homes, including their property, privacy, and shelter, and disrupts their chance at attaining sobriety and/or long-term housing, and their means of survival.

43.78.  *Typicality of Claims.* The claims of the representative party are typical of the claims of the class. "A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."" so that pursuing their individual interests will advance the interests of the class. *General Telephone Co. of Southwest vs. Falcon*, 457 U.S. 147, 156-157 (1982) (citing *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403). Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms, Alvin

Butcher, Adrian Tiger, Chance Askenette, Deven Caston, Lola Hegstrom, and RonDel Applebee, like each of the class Plaintiffs, live at Camp Nenookaasi and faceexperienced the stress, trauma, and violencedevastation of the repeated evictions. Their and are likely if not guaranteed to continue being subjected to them. By pursuing their individual claims against ongoing evictions, they will simultaneously further the interests are identical to those of the represented class members—namely, for the evictions to be enjoined and the residents permitted to remain and benefit, whose harms stem from Camp Nenookaasi, rather than endure yet another forced displacement. that same practice.

44.79. *Adequacy.* The representative Plaintiff will fairly and adequately protect the interests of the class. Because Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms are residents of Camp Nenookaasi, they have the same goals and interests as the other residents—to halt the Mayor's eviction. There is no reason why they cannot fairly and adequately protect the interests of the class. The Eighth Circuit has established that "each"[E]ach representative's interests must be sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Turtle Island Foods, SPC v. Richardson*, 425 F. Supp. 3d 1131 (8th Cir. 2019). Like in *Turtle Island Foods*, the representatives of this class have similar interests to those of the class in that they are all looking to stop Defendant Frey from destroying their communal home.

~~Because all members of the class, including Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms as representatives, seek first and foremost to have their shelter, stability, and community preserved, it is unlikely that these goals and viewpoints will diverge~~Because Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, Travis Neloms, Alvin Butcher, Adrian Tiger, Chance Askenette, Deven Caston, Lola Hegstrom, are all currently unhoused, and because RonDel Applebee is currently threatened with the prospect of becoming unhoused soon and because he is deeply invested in the well-being of his loved ones who remain unhoused, all Representative Plaintiffs have the same goals and interests as the rest of their class. They want meaningful solutions to the housing crisis, which starts with putting an end to resource-intensive evictions that are widely known to only exacerbate the very problems that they purport to address.

**Formatted:** Not Highlight

### *Type of Action*

A class action may be brought when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. PRO. 23(b)(2). Here, the requested relief is for Defendant to be enjoined from evicting Plaintiffs when they have nowhere else to live, and from seizing and destroying their property. That relief, the cessation of evictions, would benefit the whole class of residents at Camp Nenookaasi.

Plaintiffs here request an "available approach that is gaining ground in class action lawsuits," wherein Representative Plaintiffs seek injunctive relief on behalf of the whole class, and then evaluate damages on an individual basis. *Ebert v. General Mills, Inc*., 823 F.3d 472, 480 (8th Cir. 2016).

## FACTUAL BACKGROUND

***The Repeated Forced Relocation of Camp Nenookaasi by Defendant Frey Continues a Centuries-Old Legacy of Displacement of Indigenous Peoples.***

45.80.  Camp Nenookaasi iswas Indigenous-led, and its residents awere predominantly people of Indigenous ancestry and/or enrolled Native American tribal members. Defendant Frey's proposed eviction ofEvicting Camp Nenookaasi is simplywas the latest iteration in a long history ofcenturies-old pattern whereby colonizing governments forcibly displacinged Indigenous peoples from stolen land for political, personal, and/or financial gain.

46.81.  Systemic and genocidal[2] displacement has typified the relationship between the colonizing governments of Europe, the U.S., and its territorial and

---

[2] Use of the word "genocidal" to reflect the relationship between settler-colonizers and Indigenous peoples is intentional and not hyperbolic. The Holocaust Museum in Houston gives a cursory overview of this genocide as follows:

> When European settlers arrived in the Americas, historians estimate there were over 10 million Native Americans living there. By 1900, their estimated population was under 300,000. Native Americans were subjected to many different forms of violence, all with the intention of destroying the community. In the late 1800s, blankets from smallpox patients were distributed to Native Americans in order to spread disease. There were

---

*Margin note:*

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

subsequent state governments, and Indigenous peoples from ~~the beginning.~~their

first contact.

47.82.  The State of Minnesota has been no exception.  It portrayed the

original occupants of this land as disposable and subhuman, at best inconveniences

that posed barriers to putting the land to "better" (i.e., more profitable) uses.  As a

report read at a 1901 meeting of Governor Ramsey's Executive Council described:

> The object of [the 1841 Treaty of Governor Doty] was not to open the country for settlement, but primarily to provide a location for the Winnebago Indians, who, since the cession of their lands in 1837, had been on the government's hands under promise of a permanent home; and, secondarily, to furnish reservations for a number of other tribes similarly situated.  In short, it was designed to create of the Sioux country a second Indian Territory, into which to dump all the odds and ends of Indian tribes still left east of the Mississippi. Fortunately, however, this treaty failed of confirmation by the Senate, and thus this vast and fertile territory was saved to a grander destiny.
>
> Thomas Hughes, Report on the 1841 Treaty of Governor Doty, Executive Council Meeting   (Sept. 9, 1901), *available at* https://tile.loc.gov/storage-services/service/gdc/lhbum/0866e/0866e _0125_0154.pdf.

---

several wars, and violence was encouraged; for example, European settlers were paid for each Penobscot person they killed.   In the 19th century, 4,000 Cherokee people died on the Trail of Tears, a forced march from the southern U.S. to Oklahoma.  In the 20th century, civil rights violations were common, and discrimination continues to this day.

*Genocide of Indigenous Peoples*, HOLOCAUST MUSEUM OF HOUSTON, https://hmh.org/library/research/genocide-of-indigenous-peoples-guide/ (last visited Apr. 24, 2022).

31

48.83.  Minnesota's "grander destiny" meant that Indigenous people would be, once again, forcibly or duplicitously relocated so that the land could be cleared for colonists' settlement. *Id.*

49.84.  Camp Nenookaasi sits on Plaintiffs are evicted repeatedly from lands previously taken from the Dakota peoplesits original Indigenous stewards through deception, bad faith, duress, and violence more than a century ago.  *See generally* Minnesota Historical Society, "Minnesota Treaties," The U.S.-Dakota War of 1862, https://www.usdakotawar.org/history/treaties/minnesota-treaties.

85.     Nenookaasi exists in defiance of these ongoing attempts to rid what is now Minneapolis of its original inhabitants, using decolonial and anticolonial values and practices to resist the Indigenous displacement that persists today. Indigenous displacement persists today, particularly in the East Phillips neighborhood. Defendant targets the disproportionately Indigenous unhoused population with eviction after eviction, moving people from one block to another indefinitely in an attempt to make them go away.

50.

***Defendant Frey Pursues an "End to Homelessness" Through Cruel, Repeated Displacements of Unhoused Minneapolis Residents with Nowhere Else to Live.***

51.86.  Under the guise of his campaign promise to "end homelessness in five years," Defendant Frey has worked to keep unhoused people destabilized and on the move.

52.87.  Defendant Frey has overseen the routine dismantling of encampments since he took office in 2018, with significant brutality and negligible support for evicted residents aside from taking credit for what other organizations, community members, and residents themselves have managed to pull together.

53.88.  When the Wall of Forgotten Natives was first cleared in 2018, newly elected Defendant Frey and the police he commands played a muted role: instead, local nonprofits, Red Lake Nation, and others in city government spent countless hours and millions of dollars to transition the 175 residents from the encampment to temporary shelter. Deena Winter, *Minnesota Reformer*, "Powderhorn Park residents win reprieve from eviction, for now" July 2, 2020 (last viewed Dec. 17, 2023) https://minnesotareformer.com/2020/07/02/powderhorn-park-residents- win-reprieve-from-eviction-for-now/.

54.89.  When the encampment at Powderhorn Park formed in spring of 2020, Defendant Frey became a vocal critic of the encampment, although he simultaneously recognized there were no other places where all of the encampments residents could live.  *Id*. and @WedgeLIVE, Twitter (July 2, 2020 3:55 PM) https://twitter.com/WedgeLIVE/status/1278779243116130304?s=20 ("[T]he city doesn't have the resources or ability to meet the significant and immediate need [of the Powderhorn Park residents]."). In fact, Defendant Frey

tacitly acknowledged that the encampment size was growing because so many people were coming to access services. *Id*.

55.90.  As Defendant Frey himself admitted, the reason unhoused people moved to the encampment was because residents there were better able to access treatment and housing services. *Id*.  Nonetheless, he continued to oppose the encampment, suggesting that he would prefer that the symptoms of poverty and houselessness—including overdoses and illness, heatstroke and freezing to death— occur at higher rates in hidden and isolated ways, rather than have people gather to access the support in centralized communities like Nenookaasi or the Powderhorn encampment to improve their lives through supports that isare otherwise unavailable to them without a centralized community like the Powderhorn Park encampment or Nenookaasi.

56.91.  By August of 2020, Defendant Frey got his way. Over widespread public opposition, he ordered the Powderhorn Park encampment to be evicted and destroyed. Niko Georgiades, *Unicorn Riot*, "Minneapolis Police Sweep West Powderhorn Encampment, Pepper Spray Defenders" August 15, 2020 (last viewed Dec. 17, 2023) https://unicornriot.ninja/2020/minneapolis-police-sweep-west-powderhorn-encampment-pepper-spray-defenders/. Mayor Frey first threatened the encampment residents with an eviction notice, and then threatened residents with armed police officers, chemical irritants, and drawn weapons. *Id*.  At his behest,

34

Minneapolis police officers physically pulled people out of their tents, arrested them, bulldozed their belongings, and threw everything into dumpsters. *Id*.

57.92.  The destruction of these two large encampments are just the tip of the iceberg.  Plaintiffs have been forcibly displaced so many times that most have lost count. For Minneapolis' unhoused population, these evictions are not only frequent, but disastrous when considered in isolation as well as cumulatively.

58.93.  When encampments are demolished, former residents do not simply disappear.  They are uprooted from their homes, forced to find a new place to sleep, a new shelter against the elements, new bedding to keep them warm, because their only protection against freezing winter nights is now crumpled in a dumpster.

59.94.  Some relapse or overdose, turning to substance use to numb the stress, pain, and hopelessness.  Residents lose critical identification, paperwork, and cell phones, lose their connection to outreach workers and resources, lose their spot on waist lists for housing and treatment, and miss appointments and court dates.  They are stolen and sex-trafficked, go missing, and are murdered. When residents lose the stability of an encampment, they lose the relationships with social workers, substance use counselors, lawyers, and other members of the community who had been depending on the encampment to be able to locate their clients. This reverses

35

progress made towards attaining sobriety, applying for jobs, clearing arrest

warrants, and obtaining permanent housing.

60.95.  Defendant Frey campaigned on a promise to "end homelessness." But

in actuality,  his promise appears to have been more that he would hide

homelessness, even at the expense of prolonging and exacerbating it by repeatedly

seeking to eradicate. Defendant Frey eradicated the hugely successful bridge to

long-term and permanent housing that iswas Camp Nenookaasi and any semblance

of stability its former residents have attempted to regain since.

***Nenookaasi iswas a Necessary Stopgap due to the Housing Crisis and Lack of
Available and Humane Alternative Places for Unhoused People to Live***

61.96.  As of October 2023, the median monthly rent in Minneapolis was

$1,127 for a one bedroom unit and $1,500 for a two bedroom. HousingLink,

*Minneapolis Rental Housing Brief* (October 2023). Housing providers screen

applicants and require them to have an income of 2.5 times the rent, *id.*, but since

at least some manner of housing is functionally a prerequisite to employment it

becomes almost impossible to break out of the cycle of homelessness without

external support. Still, Mayor Frey is committed to blocking rent control

initiatives.

62.97.  Some local housing resources exist, but accessing public housing can

be a long process as outreach workers must meet with clients and others repeatedly

over time to gather documents and paperwork, resolve warrants, etc. People must

36

have a consistent meeting place to regularly connect with outreach workers towards their housing goals.

63.98.  ~~Shelters simply do not provide this kind of stability, nor are they a realistic or viable option for many unhoused people.  Shelters are often full or inaccessible, leaving unhoused people with few sustainable alternatives to making a shelter for themselves.  Shelter resources are highly inaccessible, particularly outside of the Hennepin Shelter Hotline's hours.~~ Shelters simply do not have enough beds, or even mats on the floor, to provide a space for everyone who might need a place to sleep. Every night would be a gamble, for someone to rely on a shelter for stability, which is unsafe and unrealistic. What shelter resources do exist are highly inaccessible, particularly outside of the Hennepin Shelter Hotline's hours and for those with mental and physical disabilities. Unhoused people find shelters to be unsafe hubs of disease, violence, and theft where people are frequently discriminated against, mistreated, and kicked out.

64.99.  The Mayor claimed that 90 new shelter beds would be made available January 1 and 2, 2024, in anticipation of the January 4, 2024 eviction of Nenookaasi. In practice, this additional capacity did not materialize, and in fact the available shelter resources are currently slated to decline, as residents, supporters, and City Council members have repeatedly noted. ~~To this day, there are not~~

~~enough shelter beds in comparison to the number of unhoused people in this City,~~
~~let alone the residents of Nenookaasi~~.

~~65.      Even if a shelter bed were to be available for each resident, shelters~~
~~are unacceptable conditions to expect or require a person to be subjected to.~~
~~Shelters have rules that many people, for a variety of reasons, simply cannot~~
~~comply with, or are accused of violating with little to no recourse or opportunity~~
~~for due process to challenge the validity of such accusations. People are not~~
~~allowed to stay with their loved ones or pets. Shelters lack privacy, and often offer~~
~~people nothing more than sleeping on mats packed together on the floor. People~~
~~get sick from staying at shelters, and risk their belongings being stolen.~~

~~66.~~100.      Shelters are fundamentally unstable. Each morning people are
kicked out and face another day of wondering if they will manage to procure a spot
at a shelter the next night, and what they will do if, as is likely given the fact that
spots fill up sometimes less than an hour after the hotline opens, they cannot obtain
one. Shelters provide people with no means of keeping belongings safe, nowhere
to go during the day, and above all else no sense of community or the opportunity
to build the kinds of life-saving relationships that ~~Nenookaasi engenders~~a stable
encampment can engender.

~~67.      At camp, unlike a shelter where every day you start from zero, people~~
~~can pick their heads up and think about the future. This is what gets unhoused~~

38

encampment residents out of the cycle—this interim stability, care, relationships and connections with other people.

68.101.    At Camp Nenookaasi, residents are providingcould provide for themselves and each other to create a stable stepping-stone home that bypassesd the significant challenges, dangers, and uncertainties that plague the existing shelter system. Plaintiffs are working hard toStable encampments create an environment that allows themPlaintiffs not only to survive being homeless, but also to transition out of homelessness.

69.102.    Unfortunately, if history is allowed to repeat itself, Defendant Frey will evict and Frey's eviction campaign is dead set on keeping Plaintiffs trapped in this cycle, ordering law enforcement and bulldozers to destroy Camp Nenookaasi and Plaintiffs' hopesany stability Plaintiffs manage to build for the better future they were building together.themselves.

***Defendant Frey, Over Objections from City Council and Other Government Officials, Has Evicted CampOrdered Repeated Evictions of Nenookaasi and Subsequent Camps.***

The initial Nenookaasi ***Three Times and Counting.***

70.103.    Evictioneviction announcements, and delays, and subsequent actions reflect reflected the tension between Defendant Frey and the significant block of Minneapolis officials who recognized that, until the City provides other meaningful solutions, Camp Nenookaasi is filling lifesavingfilled life saving gaps in services for the unhoused communityresidents during a Declared Public Health

Emergency of Unsheltered Homelessness. *See*, e.g., Minneapolis Public Health & Safety Committee Meeting, Jan. 31, 2024, available at https://www.youtube.com/live/IgD6sB6GkXI?feature.

71.104.    With tireless advocacy from organizers, community members, and residents, City Council has recognizedaffirmed the humanitarian and civil rights concerns with impending and ongoing evictions. Council members have called for a halt to the evictions, recognizingnoting the benefits of encampments to neighborhoods more broadly, as well as to the residents themselves, of supporting. Organizations across the city join them in calling for more support to Nenookaasi and its successors as an interim solutions to the housing crisis, while working together to devise and implement more permanent remedies.

72.105.    Prior to the evictionsfirst Nenookaasi eviction, residents and organizers held a meeting with City Council and several members of the Minneapolis government. The only invited government official who chose not to attend was Defendant Frey.

73.106.    This refusal to engage, coupled with his continued opposition to building solutions that address everyone's concerns, and his orchestration of three evictions in one month at each subsequent Nenookaasi location, and the increasing brutality of those evictions demonstrates Defendant Frey'sFrey continually reveals his knowing disregard for the health, safety, and wellbeing of Indigenous and

unhoused people through this refusal to collaborate, continued opposition to solutions, and ongoing evictions.

74.107.      At these evictions, Defendant purporteds to have reasonable policies and procedures in place during evictions to safeguard Plaintiffs' constitutional and statutory rights. In practice, regardless of what policies he may point to on the City's website, Defendant has taken no such pains when repeatedly evicting Camp Nenookaasi residents. At the first Nenookaasi eviction, with a large crowd of supporters, politicians, and media to bear witness, residents were given almost a week's notice and an opportunity to make several trips to retrieve their belongings. But this highly publicized eviction was a performance: since then evictions happen without any notice. Plaintiffs risk arrest or physical harm should they attempt to flee with anything more than one or two armloads' worth of belongings.

75.      On December 29, a notice was posted announcing that the eviction would take place on January 4, 2024. For the next two evictions, no such prior notice of an impending eviction date was given. Residents Plaintiffs only becaome aware that they weare being evicted when they woake in the morning to the sound of drones flying overhead, and sawlaw enforcement yelling at them to get up and leave, and City and law enforcement vehicles staging on the streets around them.

41

76.108.    During the evictions, law enforcement marked Nenookaasi off with crime scene tape. On the January 30th and February 1st evictions, the crime scene tape and police barricades encompassed a multi-block radius around Nenookaasi, not just the camp's perimeter. Law enforcement allowed friends, family, and Even social service agencies who Defendant claims are on site to enter the camp and assist the residents during the January 4th eviction,are often not notified of evictions but became progressively more restrictive at the second and third evictions, arbitrarily delaying, impeding, obstructing,instead find out when street closures and law enforcement staging areas disrupt their morning commutes to work or at times outright refusing access to a variety of parties including press, family and community members, attorneys, social service agencies, and even residents themselvesschool.

77.109.    Residents themselves wereare made to understand that they wouldwill be arrested — or bulldozed —if they delayed in packing up and leaving, which threats forced them to rush to gather their belongings in an atmosphere of panic and fear. They are sometimes too afraid of being arrested to wait for service providers or supporters to arrive.

110.    Despite Defendant's public statements and claims to the contrary, Regardless of what policies the Defendant may point to on the City's website,

Formatted: Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

shelter beds, housing, and storage are not meaningfully available to Plaintiffs before or during evictions.

78.111.     Storage opportunities have beenare limited to nonexistent, offered in only specific instances to particular residents who happened to present at the time, and often in circumstances that weare untrustworthy, impractical, or entirely unusable for those who were offered such storage opportunities.. Plaintiffs either hadve no idea that storage wasis ostensibly available to them, and/or hadve no way of accessing or utilizing the storage facility all the way downtown, or kneow that such storage wasis not a viable option due to the size limits and other restrictions, as well as and the practical difficulties in accessingmatter of needing regular access to their stored items that otherwise might be needed on a daily basisbelongings.

79.     Some Plaintiffs left Nenookaasi on eviction day before any service or support agencies arrived, because they feared that they would be arrested if they waited. The City did not even notify most of the service agencies of the surprise evictions on January 30 and February 1, some of whom later arrived only because service providers noticed the barricades on their morning commutes or because residents placed calls for help.

112.   After the evictions, city workers haul and dump rubble on the vacated lots to render old sites unusable and inaccessible to Plaintiffs. Hundreds of

43

thousands of City dollars that are earmarked for responding to the crisis of homelessness have instead gone to pay for putting fences up around empty land.

80.113.    The Mayor's office espouses a goal of deterring encampments. The intentional and arbitrary destruction of the City's own (stolen) land reveals the Mayor's strategy: to ensure that Nenookaasi, like its residents, hasunhoused people have fewer and fewer places it isthey are allowed to be.

81.114.    As therelentless evictions have gone oncontinue, many Plaintiffs suffer relapses or overdoses because of the stress that evictions bring on. Losing belongings and family heirlooms, connections to supportersfriends and service providers, identification, and shelter causes other cascading setbacks and increased challenges in attempting to attain sobriety, housing, employment, and other forms of permanent stability. People go missing altogether after the evictions, or lose their familyloved ones.

82.115.    Without the injunctive relief Plaintiffs now seek, they will be stuck in this pointless cycle until they die or until they run out of places to relocate to.

44

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

**CAUSES OF ACTION**

**COUNT I:**

**Unlawful Seizure & Destruction of Plaintiffs' Property in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution**

~~83.~~116.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

~~84.~~117.    The Fourth Amendment to the United States Constitution and its identically worded counterpart, Article I Section 10 of the Minnesota Constitution, afford all civilians in the United States the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

~~85.~~118.    This Constitutional Right protects Plaintiffs' homes and belongings ~~at Camp Nenookaasi.~~as unhoused persons with expectations of privacy over their guarded belongings. *See, e.g.*, *State v. Pippin*, 200 Wn. App. 826 (Wash. Ct. App. 2017) (finding that an unhoused person had privacy interests in their tent). "The Fourth Amendment protects homeless individuals from seizure and summary destruction of their unabandoned, but temporarily unattended, personal property." *Coalition on Homelessness v. City and County of San Francisco*, 647 F. Supp. 3d 806, 837 (~~9th Cir. 2023~~N.D. Cal. 2022) (citing *Lavan v. City of Los Angeles*, 693 F.3d 1022~~).~~) (abrogated on other grounds by City of Grants Pass, Oregon v. Johnson, 144 S.Ct. 2202 (2024)).

45

86.119.      The repeated seizures and destruction of Plaintiffs' property during the evictions of Camp Nenookaasi ~~constitutes a~~and its successors constitute meaningful interference with Plaintiffs' possessory interests in their property, and thus a "seizure." *Id*.

87.120.      Defendant Frey's repeated seizure and destruction of Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances is unreasonable and contrary to the Fourth Amendment to the U.S. Constitution, as applied to State governments and their subdivisions pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution.

88.121.      Defendant Frey's policies, practices, and custom of directing his law enforcement officers to seize and destroy Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances is unreasonable and contrary to the Fourth Amendment to the U.S. Constitution, as applied to State governments and their subdivisions pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution.

<div align="center">

**COUNT II:**

**Procedural Due Process Violations Under the Fourteenth Amendment of the
United States Constitution and Article I, Section 7 of the Minnesota
Constitution**

</div>

89.122.    Plaintiffs reallege and incorporate the preceding paragraphs as
if fully set forth herein.

90.123.    Plaintiffs have a constitutionally protected property interest in
their personal belongings and effects.

91.124.    Defendant Frey's repeated seizure and destruction of Plaintiffs'
property deprives them of this protected interest in their personal belongings and
effects.

92.125.    Defendant Frey's repeated seizure and destruction of Plaintiffs'
property without adequate and effective notice, an opportunity to be heard, and
pre- and post-deprivation mechanisms to challenge and reclaim their property
violates Plaintiffs' rights to Due Process of law protected by the Fourteenth
Amendment to the U.S. Constitution, through 42 U.S.C. § 1983, and Article I,
Section 7 of the Minnesota Constitution.

93.126.    Defendant Frey's policy, pattern, and custom of seizing and
destroying Plaintiffs' property without adequate and effective notice, an
opportunity to be heard, and pre- and post-deprivation mechanisms to challenge
and reclaim their property violates Plaintiffs' rights to Due Process of law
protected by the Fourteenth Amendment to the U.S. Constitution, through 42
U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0"

<div align="center">

**COUNT III:**

**State-Created Danger in Violation of the Right to Substantive Due Process Under the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution**

</div>

~~94.~~127.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

~~95.~~128.     Plaintiffs are members of a limited, precisely definable group.

~~96.~~129.     Defendant Frey's prior and continued impending use of bulldozers, and armed law enforcement officers, and chemical irritants when forcefully ejecting Plaintiffs from their only shelters, and without adequate notice, places Plaintiffs at significant risk of serious, immediate, and proximate harm that Plaintiffs would not otherwise have faced without Defendant's actions.

130.    Defendant refuses to provide and/or adequately service port-a-potties, trash pick-up, and other simple, life-saving sanitation facilities at encampments. Residents inevitably fall ill due to diseases that would be entirely preventable with such facilities. Defendant uses the foreseeable consequences of intentionally under resourcing camps as the basis for ordering emergency personnel not to respond to treat people within encampments.

48

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

131.    Repeated evictions force Plaintiffs to remain vulnerable and trapped in cycles of homelessness, where they are then preyed upon by human traffickers, drug dealers, arsonists, and murderers, which the City then declines to investigate.

~~97.~~132.      The risk to Plaintiffs created by Defendant Frey's conduct was and remains obvious and known to him.

> **Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0"

~~98.~~133.      Defendant Frey's prior and impending actions in repeatedly ~~evicting~~Plaintiffs and ~~destroying Camp~~forcing Nenookaasi ~~are~~to disband were done recklessly and in conscious disregard of the risks they have previously created and continue to create because of the forceful manner in which his law enforcement officers have ejected and plan to continue ejecting Plaintiffs from their shelters, destroying their vital personal property in the process.

~~99.~~134.      Defendant Frey's conduct, as outlined in this Complaint and articulated by numerous outraged residents and neighbors at public comment hearings throughout the past year, shocks the conscience.

~~100.~~135.      As a direct and proximate consequence of Defendant Frey's above-described policy, pattern, and custom, Plaintiffs were and continue to be subjected to danger of Defendant's own making in violation of the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983, and the Minnesota Constitution.

**COUNT IV:**

~~Violation of the Eighth Amendment to the US Constitution~~

**Intentional Infliction of Emotional Distress**

~~101.~~136.    Plaintiffs reallege and incorporate the preceding paragraphs as

if fully set forth herein.

~~102.    The Eighth Amendment to the U.S. Constitution, as applied to the~~

~~States and their subdivisions through the Fourteenth Amendment, protects civilians~~

~~from "cruel and unusual punishment."~~

~~103.    "The Eighth Amendment prohibits the state from punishing an~~

~~involuntary act or condition if it is the unavoidable consequence of one's status or~~

~~being." *Coalition on Homelessness*, 647 F.Supp. 3d at 832 (quoting *Martin v. City~~

~~of Boise*, 920 F.3d 584, 616 (9th Cir. 2019)). This includes "criminaliz[ing]~~

~~indigent, homeless people for sleeping outdoors, on public property, on the false~~

~~premise they had a choice in the matter." *Id*. at 833.~~

~~104.    Plaintiffs do not have reasonable alternatives to living at Camp~~

~~Nenookaasi.~~

~~105.    By repeatedly evicting Plaintiffs, regardless of where Camp~~

~~Nenookaasi is located, and under penalty of arrest, Defendant Frey and his law~~

~~enforcement officers impose or threaten to impose criminal penalties and other~~

~~harm and punishment for conduct which Plaintiffs cannot avoid.~~

~~106.    The manner in which these evictions are carried out—by armed law~~

~~enforcement officers under threat of arrest, with residents often pulled out of their~~

50

tents forcibly, arrested, and even tear-gassed or sprayed with chemical irritants, their belongings bulldozed, destroyed, and trashed—amounts to a penalty, harm, and/or punishment that Defendant Frey and his law enforcement officers impose or threaten to impose for conduct which Plaintiffs cannot avoid.

**COUNT V:**

**Conversion in Violation of Minnesota Common Law**

107.   Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

108.   Plaintiffs are in possession of their personal property and Defendant Frey has repeatedly directed his agents to intentionally seize and destroy Plaintiffs' property without notice, an opportunity to retrieve it, or adequate compensation, depriving Plaintiffs of their possessory interest in the property.

109.   Upon information and belief, Defendant Frey intends to continue directing his agents to intentionally seize and destroy Plaintiffs' property without notice, an opportunity to retrieve it, or adequate compensation, depriving Plaintiffs of their possessory interest in the property.

110.   Defendant Frey has no lawful authority to seize or order others to seize and destroy Plaintiffs' property in this manner. As a direct and proximate consequence of Defendant Frey's acts in authorizing these evictions, Plaintiffs will suffer the loss of their personal property.

137.   ~~COUNT VI:~~ "The tort of intentional infliction of emotional distress requires proof that: (1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; (4) and the distress suffered was severe." *Kelly v. City of Minneapolis*, 598 N.W. 657, 666 (1999) (citing *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn.1983)). A Defendant's conduct must "pass[] the boundaries of decency" and be "utterly intolerable to the civilized community." *Id*.

138.   Defendant's commitment to evictions, in the face of evidence, testimony, and public outcry that evictions actually exacerbate the harms used to justify them, is outrageous.

139.   It is outrageous to evict Indigenous people from their own ancestral homelands.

140.   It is utterly intolerable to spend money that was earmarked for helping unhoused people on building fences to keep them out of the only places they feel a modicum of safety.

141.   It is extreme to push the same group of people from one vacant lot to another in the same half-mile radius instead of providing them with basic hygiene supplies.

142.   It is deplorable to blame the violence of people who prey on the City's most vulnerable constituents on those constituents themselves, as a pretext for not defending or supporting them.

143.   It is cruel to promise to provide unhoused people with housing, storage, and shelter beds, and to then blame those same people for not accessing them, when in fact these services are inadequate, inhumane, inaccessible, or even wholly nonexistent.

144.   The trauma of repeatedly being told you do not belong, of repeatedly being exposed to dangerous elements of all sorts, of having your family heirlooms and pictures of your children considered to be garbage, of falling asleep every night not knowing whether you will wake up to law enforcement shouting you out of your only shelter, this is the result of behavior that can only be described as outrageous and causes severe and devastating impacts on Plaintiffs' emotional stability and will to survive.

145.   These evictions are intentional; Defendant orders them to occur and maintains full control over the agencies carrying them out. Defendant has had every opportunity, including by official actions taken by his own City Council, to learn about the severe devastation his evictions cause to Plaintiffs and other unhoused residents of Minneapolis. His decision to continue ordering eviction after eviction is nothing short of disturbingly well-informed.

53

## COUNT V:

**Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.**

~~111.~~146.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

~~112.~~147.    Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, prohibits discrimination against people with disabilities by state and local governments and their programs.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

~~113.~~148.    As a public entity, Defendant Frey is required to comply with Title II of the ADA, and the actions of Defendant alleged in this Complaint, in his official and individual capacity, relate to services, programs, and activities under Title II.

~~114.~~149.    Discrimination under Title II of the ADA includes administration of programs in a manner that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130(f).

~~115.~~150.	Plaintiffs, the residents of Camp Nenookaasi, are individuals with physical and/or mental disabilities, disorders, and/or conditions including substance use disorders, and thus are "qualified persons with disabilities" as defined under the ADA.

~~116.~~151.	Defendant Frey's repeated evictions of Camp Nenookaasi residents disparately impact people with disabilities, in violation of the ADA—the people whom Defendant Frey has forcibly removed from their homes and deprived of their personal property under threat of incarceration, and whom Defendant Frey continues to threaten with such treatment, are disproportionately (and exclusively) people with disabilities. The ADA prohibits such discrimination.

~~117.~~152.	Even if there were sufficient shelter beds or storage meaningfully available—which is not the case—placement in large, crowded shelters where people are forced to sleep on mats on the ground and permitted to stay only upon compliance with rigid rules are unsuitable for people with disabilities because of their disability-related impairments. Nor is storage downtown feasible for people with limited mobility, difficulty traveling, and the need to access stored belongings.

~~118.~~153.	Repeated evictions ~~of Camp Nenookaasi residents~~Plaintiffs without first identifying and offering appropriate alternative shelter ~~that meets~~

55

theand storage for belongings that meet their disability-related needs of residents does not serve any compelling governmental interest of Defendant Frey.

119.154.     Furthermore, Defendant Frey's duty not to discriminate against people with disabilities under Title II of the ADA includes a duty to provide reasonable modifications in otherwise neutral policies or practices "when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

120.155.     Plaintiffs have repeatedly asked Defendant Frey to postpone the repeated evictions of Camp Nenookaasi until appropriate alternative shelter—shelter that would meet Plaintiffs' disability related needs—is made available. Existing shelter beds are neither sufficient in number to house all Nenookaasi residents, nor are they at all appropriate to meet Plaintiffs' needs related to their physical and/or mental disabilities, disorders, and/or conditions including substance use disorders.

121.156.     In response to these repeated requests—from Plaintiffs, their supporters, City councilmembers, and undersigned counsel—Defendant Frey not only proceeded with the eviction of Camp Nenookaasi on January 4, 2024, but has

repeated the evictions again and again no matter where residents have sought refuge.

122.157.    A temporary halt to the ongoing evictions of Camp Nenookaasi residents until there is a realistic and appropriate alternative housing option for residents would not impose a fundamental alteration in Defendant Frey's programs.  To the contrary, it would serve his purported goal to "end homelessness."

123.158.    By refusing such reasonable accommodations, Defendant Frey has violated and continues to violate Title II of the ADA.

124.159.    Finally, Defendant Frey's repeated evictions of Camp Nenookaasi residents and refusal to postpone the evictions until a reasonable accommodation can be made, amounts to intentional discrimination against Plaintiffs on the basis of their disability.

125.160.    Defendant Frey knows that the residents of Camp Nenookaasi—an Indigenous healing camp serving people struggling with substance use disorder and others with qualified disabilities under the ADA—are disproportionately if not exclusively people with disabilities.

126.161.    Defendant Frey is aware, and has been made aware, that existing shelter "beds" are not a realistic or appropriate housing alternative for

Camp Nenookaasi residents, including for reasons related to their disabilities, and that residents have requested reasonable alternative housing.

127.162.    Nevertheless, Defendant Frey has refused requests to halt evictions and repeatedly evicted Camp Nenookaasi residents—three times from three separate locations in the past month—despite his knowledge that residents lack any meaningful and appropriate housing alternative.

128.163.    In doing so, Defendant Frey is administering programs in a way that intentionally discriminates against Plaintiffs, as people with disabilities and on the basis of those disabilities.

## DECLARATORY RELIEF

129.164.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

130.165.    An actual controversy exists between Plaintiffs and Defendant Frey. Defendant Frey has repeatedly engaged in the unlawful and unconstitutional acts set forth herein and has announced his plans to continue doing so.

131.166.    Plaintiffs have suffered, will continue to suffer, and will face imminent and increased suffering as a result of Defendant Frey's unlawful behavior. Plaintiffs seek a declaration of their rights with regard to this controversy and a declaration that Defendant Frey's policies, practices, and customs as set forth

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.44" + Indent at:  0"

herein violate those rights under the United States and Minnesota Constitutions, state tort law, and the Americans with Disabilities Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask this Honorable Court for the following relief:

1. For preliminary and permanent injunctive relief enjoining Defendant Frey and his officials, employees, agents, officers, assigns, and all those working in concert with him from moving forward with evicting the residents of Camp Nenookaasiencampments in East Phillips, unless and until safe, adequate, accommodative of disability, culturally appropriate, stable housing can be guaranteed and provided to all residents or unless such evictions are temporary relocations conducted in the same manner as law enforcement might clear an apartment or school in the case of an active shooter or a house fire;

2. For declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, and Rule 57 of the Federal Rules of Civil Procedure, as requested above;

3. For compensatory and punitive damages, in amounts to be determined in future proceedings, against Defendant Frey;

4. For an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5. For any other relief that this Honorable Court deems equitable and just.

59

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

<div style="margin-left:40%">Signed,</div>

Date: ~~February 13~~September 15, 2024

_____

<div style="margin-left:40%">

KIRA A. KELLEY
Climate Defense Project
MN Bar No. 0402932
P.O. Box 7040
Minneapolis, MN 55407
(802) 683-4086
kira@climatedefenseproject.org

*Attorney for Plaintiffs*

</div>

60