UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, Travis Neloms, *on behalf of themselves and all others similarly situated*,<br><br>　　　　　　　Plaintiffs,<br><br>　vs.<br><br>Jacob Frey,<br><br>　　　　　　　Defendant. | Case No. 24-cv-0001 (ECT/TNL)<br><br>NOTICE OF DEPOSITION OF CITY OF MINNEAPOLIS |

　　Please take notice that Plaintiffs Cheryl Sagataw, DeAnthony Barnes, Roberta Strong, and Travis Neloms, on behalf of themselves and the putative class of those similarly situated, ("Plaintiffs") will take the deposition of the City of Minneapolis on XXX, 2024, beginning at XXX a.m. until adjournment thereafter. The deposition will be taken via remote videoconferencing technology, as agreed by the parties. The deposition will be taken before a certified court reporter authorized to administer oaths, and the parties agree that the court reporter may swear in the deponent remotely. Plaintiffs' counsel's office will circulate access instructions and/or dial-in instructions in advance of the deposition.

　　If remote videoconferencing technology becomes unavailable for more than thirty consecutive minutes during the deposition, then, at the option of Plaintiff's counsel, Plaintiff may either proceed telephonically (or by remote videoconference with Plaintiff's counsel's video turned off) or may adjourn the deposition and reconvene the deposition to continue in-person or by remote videoconference on a mutually convenient date.

Exhibit D

Plaintiff intends to record the testimony by videoconference technology, in addition to recording the testimony by stenographic methods.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), the City of Minneapolis must designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and this or these designee(s) should be prepared to testify regarding the following topic areas of inquiry, as specifically enumerated and detailed below:

## I. CITY POLICIES AND PROCEDURES RELATED TO UNHOUSED CONSTITUENTS

1. Planning, discussion, and decision-making of houselessness-related policies. This includes, for example: the planning, discussion, and decision-making that has informed the City of Minneapolis's policies, procedures, and decisions regarding the Homeless Response Team, the "encampment closure process," and other storage and encampment policies; any and all revisions, or proposals for revisions, to these policies since August 2023; and formal as well as informal or de facto revisions or deviations in how these policies have been implemented.

2. Storage offerings to unhoused Minneapolis residents in policy and practice. This includes how storage is offered to unhoused people, the process for accessing storage, the length of time storage may be utilized, the parameters for what can be stored, the supports (if any) available for helping people transport belongings to storage, and how and by whom the planning and implementation decisions of storage policies are made.

Exhibit D

3. The roles and responsibilities of the Department of Regulatory Services, in general and in relation to the provision of storage and administration of other services for unhoused people in Minneapolis.

4. The City's relationship with its "outreach partners," listed in Defendant's answer as: Agate, Avivo, Hennepin County's Streets to Housing, and Healthcare for the Homeless. This includes: how these organizations were/are identified and selected; how the City communicates, supervises, directs, or manages the activities that these outreach partners take on the City's behalf; and whether other organizations, such as the Catholic Charities Opportunity Center, are considered outreach partners and why or why not.

5. The City's policies, procedures, and roles regarding shelter bed availability. This includes: how the City supervises, supports, manages, and tracks the provision and availability of shelter beds, if at all; whether and to what extent the City ensures accommodations for people with disabilities; whether and to what extent the City verifies the availability and accessibility of beds; whether and how decisions are made to make additional beds available; how additional beds are made available; and which and how many organizations participate in providing overnight beds to unhoused Minneapolis residents.

6. Policies and procedures regarding making and maintaining contact with unhoused clients. This includes what policies or procedures are used or have been adopted by the City and/or its outreach partners to inform how service providers identify, support, and stay in contact with prospective unhoused clients, including

those individuals without permanent addresses or telephone numbers and/or who have disabilities.

7. Discussions or communications between third parties and the City regarding unhoused persons, encampments, and low-income housing. This includes discussions and communications regarding health and safety and impacts on the real estate market, the parties to such communications, and the fora over which these communications take place. This also includes discussions or communications with civilian crime reporting/monitoring organizations, like "Crime Watch," "21 Days of Peace," and "We Push for Peace."

8. The contract between the City and Helix. This includes the processes, reasoning, and discussions or communications that informed, led to, and/or resulted in the contract, any requests for proposals, and any oversight mechanisms and metrics to assess Helix's fulfillment of the contract terms.

9. "No Trespassing" signage, fencing, and depositing of concrete and rubble. This includes which properties have had such items erected and when, how the City decides which properties should be posted and/or fenced and/or filled with concrete and rubble, and who makes such decisions and erects such items on behalf of the City.

10. Publicly shared information about land ownership and status, including who manages the following City website: https://www.minneapolismn.gov/government/government-data/datasource/vacant-condemned-property-dashboard/.

II. NENOOKAASI EVICTIONS

11. The decisions made to evict Nenookaasi. This includes the processes, factors, and discussions or communications that have informed the decision of whether or not to evict Nenookaasi and when, the manner in which such processes, factors, and discussions or communications are documented or recorded, and who has final decision-making authority.

12. The City agencies and agents who have been present at each of the prior Nenookaasi evictions[1] and their roles. This includes the instructions or "briefs" given to each of these agencies and agents before and during evictions, whether and how agencies or agents are given such instructions or "briefed," and what if any feedback, debriefing, or review occurs after each eviction.

13. Claims of inadequacies during evictions and subsequent investigations. This includes whether and to what extent the City has received or is aware of claims, complaints, or allegations that storage is functionally unavailable to residents, shelter beds are unavailable, and residents are not given adequate notice or an opportunity to salvage their belongings during evictions. This includes what steps if any the City has taken to investigate and/or address such claims, complaints, or allegations.

14. Measures taken to protect the rights of people with disabilities during evictions, if any.

15. Decisions about how much time residents are permitted to pack up their belongings during evictions, including who makes such decisions, what factors go

---

[1] These evictions include each eviction referenced in the Second Amended Complaint and supporting documentation, as well as the July 25, 2024 eviction of the encampment on the 2800 block of 14th Ave S.

into such decisions, what discussions or communications have informed such decisions, whether the City has received or is aware of complaints that residents have not received sufficient time, and what steps have been taken to address such complaints if any.

16. Communication from the City to residents prior to and during evictions. This includes specific details regarding how, if at all, the City insures residents are made aware of alternate housing options, transportation, and other resources; who shares such information with residents, to whom they have specifically shared such information, and when; and how if at all such information-sharing is documented.

17. The destruction and/or disposal of shelters, personal effects, and other items during evictions, including any inventories or documentation of such items, how such items are destroyed or otherwise disposed of, and by whom.

18. Law enforcement presence at evictions, including: how many officers, how many vehicles, in what formations, and with what weapons and equipment have been dispatched to evictions; who makes decisions regarding law enforcement dispatch to and tactics at evictions; and by what process and with what input are those decisions made.

19. Law enforcement documentation of evictions, including whether and how many law enforcement officers have had body worn cameras during each of the evictions and/or have written reports pertaining to any of the evictions.

20. Arrests, threats of arrests, and physical threats made by law enforcement during evictions, including the number and context of each and whether weapons were drawn and/or discharged.

21. Official complaints filed against the City or its agents or agencies related to the evictions, including the number, sources, and subject matter of such complaints, and any responses or efforts to address such complaints by the City.

22. Statements made by the City to the public and/or any third party or parties regarding or relating to the Nenookaasi evictions. This includes any statements regarding the notice given to residents, the justifications for evictions, and how encampments generally or Nenookaasi specifically has been or would be handled.

23. The ceasing of notices for evictions, including what justifications or decisions led to the City not providing notice for evictions, who was a part of discussions or communications that informed such justifications or decisions, and who had final decision-making authority.

24. The "pastor" the City hired to provide notice to Nenookaasi residents, including who this person is, why and how they were "authorized" by the City to provide eviction-related notice to residents and by whom, and what training and/or instructions they received.

### III.  EFFORTS BY THE CITY TO ADDRESS THE NEEDS OF NENOOKAASI RESIDENTS AND THEIR HOUSED NEIGHBORS

25. Assessment and documentation of the size and nature of Nenookaasi, including whether, when, and to what extent the City has attempted to assess and/or document such things as the population, the number of yurts and/or tents, and the number of fires and/or heaters, and how such information is collected, maintained, and verified. This includes the source or basis for the City's claims that there were 18-20 fires at Nenookaasi.

Exhibit D

26. 311 calls, 911 calls, and other complaints or requests for emergency services regarding or relating to Nenookaasi, including: how complaints are documented and retained; how many such complaints or requests for emergency services have been made since August 2024 to the City, including to the Minneapolis Police Department; the nature of these requests; the number of repeat (as opposed to new or distinct) complainants; the number of calls made by Nenookaasi residents themselves; and whether and how the basis, substance, and cause of those complaints and the identity of the complainant were verified.

27. Data regarding complaints to the City related to or regarding unhoused people or encampments in the East Phillips neighborhood prior to September of 2023, including baseline or comparative data illustrating rates of 311 calls, 911 calls, and other complaints or requests for emergency services, including those related to drug overdoses, discarded hypodermic needles, human trafficking, gun discharges, air pollution, thefts and other crimes, and waste or refuse.

28. City ordinances and regulations alleged to have been violated by the Nenookaasi encampment and its residents and the typical or usual City responses to violations of such ordinances.

29. The City's current, planned, proposed, and anticipated future uses of each of the prior locations of Nenookaasi from which residents have been evicted, including what related discussions or communications have or are taking place, who (including individuals, agencies, and third parties) has participated or is participating in such discussions or communications, how such decisions are made and who has final decision-making authority.

30. Meetings with Nenookaasi organizers, liaisons, residents, and supporters, including when such meetings have occurred, who has participated in such meetings, what was discussed and how such meetings were documented or recorded, and what discussions or communications did City officials and agents have related to such meetings (including before and after).

31. Information regarding the outbreak of Norovirus at Nenookaasi, including what information the City received or generated, and any information regarding any identified cause, reports of sickness, proposed and/or adopted safety and treatment measures, and communications with or orders to law enforcement or emergency responders about whether and how to respond during the outbreak.

## IV. THE FIRE

32. The names, positions, and contact information of all staff, agencies, or agents who visited Nenookaasi on behalf of the City during the week prior to February 28, 2024, including but not limited to individuals who were sent to Nenookaasi to discuss the fires and/or smoke, as well as how these individuals were briefed or instructed and any debrief or report-back to the City.

33. Investigations regarding the fire at Nenookaasi on February 28, 2024, including what investigations have taken place, what investigations are ongoing, how investigations have been documented, who has conducted or is conducting such investigations, and any findings or reports.

34. Investigations regarding the arson or attempted arson which took place at Nenookaasi during the week prior to February 28, 2024, including what investigations have taken place, what investigations are ongoing, how

Exhibit D

investigations have been documented, who has conducted or is conducting such investigations, and any findings or reports.

35. The City's fire and arson investigation procedures, including the standard operating procedures for fire and arson investigations.

36. The role of the Minneapolis Fire Department and Minneapolis Police Department, including the Arson Investigation Unit, in investigating fires and suspected arsons generally, and in the case of the Nenookaasi fire in particular.

Dated: August 12, 2024

s/*Kira Kelley*
Kira Kelley (#402932)
Climate Defense Project
P.O. Box 7040
Minneapolis, MN 55407
Phone: (802) 683-4086
Email: kira@climatedefenseproject.org

_//s// Claire Nicole Glenn_
**Claire Nicole Glenn** (she/her)
Staff Attorney
Climate Defense Project
P.O. Box 7040
Minneapolis, MN 55407
651-343-4816
claire@climatedefenseproject.org
District of Columbia License No. 888242412
Maryland License No. 1902280002
Minnesota License No. 0402443

**ATTORNEYS FOR PLAINTIFFS**

Exhibit D