EXHIBIT A

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA

2     ----------------------------------------------------------

3
      Cheryl Sagataw, DeAnthony Barnes,
4     Roberta Strong, Travis Neloms,
      on behalf of themselves and
5     all others similarly situated,

6
                         Plaintiffs,
7
           vs.                    Case No. 24-cv-0001 (ECT/TNL)
8

9     Jacob Frey,

10
                         Defendant.
11

12    ----------------------------------------------------------

13

14

                      VIDEOCONFERENCE RULE 30(B)(6)

15
                      DEPOSITION OF **CITY OF MINNEAPOLIS**
16
                            BY ITS DESIGNEE
17
                        **ENRIQUE VELAZQUEZ**
18
                          December 10, 2024
19
                             9:00 a.m.
20

21

22

23

24

25    Reported by:  Melissa A. Chamberlin, RPR

2

1                           I N D E X

2    EXAMINATION                                              PAGE

3
        Ms. Kelley                                             4
4

5

    EXHIBITS MARKED:
6

7
          None
8

9

    OBJECTIONS:
10

11
        Ms. Enslin:      Pages:  18, 21, 22, 28, 67, 74, 75, 76,
12                               92, 100, 154, 192, 201, 202

13

14    INFORMATION/DOCUMENT REQUEST:

15

16        None

17

18    INSTRUCTIONS NOT TO ANSWER:

19

20        None

21

22    COURT REPORTER'S CERTIFICATE:                           224

23

24
      DEPOSITION CORRECTION SHEET:                            225
25

Enrique Velazquez                                    3

1    APPEARANCES:

2
              On Behalf of the Plaintiffs:
3
                  Kira Kelley
4                 Claire Glenn (Pages 1-122)
                  Attorneys at Law
5                 Climate Defense Project
                  P.O. Box 7040
6                 Minneapolis, Minnesota 55407
                  (802) 683-4086
7                 kira@climatedefenseproject.org
                  claire@climatedefenseproject.org
8

9    ALSO PRESENT:  Karmen McQuitty

10
              On Behalf of the Defendant:
11
                  Sharda Enslin
12                Kristin Sarff
                  Attorneys at Law
13                Minneapolis City Attorney's Office
                  350 South Fifth Street
14                Room 210
                  Minneapolis, Minnesota 55415
15                (612) 763-2010
                  sharda.enslin@minneapolismn.gov
16                kristin.sarff@minneapolismn.gov

17                    *   *   *   *   *   *   *   *   *

18

19            The following is the videoconference

20   Rule 30(b)(6) deposition of **City of Minneapolis** by its

21   designee **Enrique Velazquez,** taken pursuant to Notice of

22   Taking Deposition, before Melissa A. Chamberlin, RPR and

23   Remote Notary Public in the State of Minnesota,

24   commencing at 9:00 a.m., December 10, 2024.

25

Enrique Velazquez                    4

1            (Reporter's Note:  This deposition is

2        subject to the limitations associated with the

3        use of technology, including but not limited to

4        telephone and video signal interference, freezing,

5        static, signal interruptions, and other

6        restrictions and limitations associated with remote

7        court reporting via telephone, speakerphone and/or

8        videoconference.)

9

10            (The following proceedings were duly

11        had:)

12                    **ENRIQUE VELAZQUEZ,**

13            after having been first duly sworn,

14              states on his oath as follows:

15

16            THE WITNESS:  I do.

17                       **\*\*\***

18                    **EXAMINATION**

19    **BY MS. KELLEY:**

20    Q.    Thank you for -- for being here.  Just to start

21        things off, my name is Kira Kelley, and I represent

22        the plaintiffs in this case.

23            You are here for a noticed organizational

24        deposition under Rule 30(b)(6).

25            Today is December 10, 2024.  We have a court

Enrique Velazquez                    5

1      reporter here to make a precise record of these

2      proceedings.

3          And just some housekeeping.  I -- I'm hoping

4      to work together with you to make the court

5      reporter's job as easy as possible.  So I'm going

6      to do my best not to talk over you and -- and

7      vice versa.  And if you could respond to questions

8      with a "yes" or a "no" rather than like an "uh-huh"

9      or a "nope," those are harder -- or a nod.

10     Things -- so just a verbal "yes" or "no" if you're

11     responding to a question like that.

12         And you might predict where I'm going with a

13     question.  But just to keep the record clear, if

14     you could let me finish it, even if you already

15     know where it's going.

16         And if you don't understand what I'm asking

17     you, that's totally fine.  Please just ask me to

18     clarify, and I'll do my best.

19         If you don't ask for clarification, then I

20     will assume that you are understanding the

21     question.

22         Does all -- does all that sound okay?

23  A.   Yes.  Understood.

24  Q.   Okay.  And I'm hoping that we can commit to getting

25     through this efficiently and amicably.  I want to

Enrique Velazquez                                    6

1         honor everyone's time to be here and -- and

2         humanity.

3               So if we need breaks, please ask.  And that

4         goes for other attorneys on the call and -- and the

5         court reporter.  If you -- for any reason,

6         something's going on, you need to go to the

7         bathroom, get water, get a snack, like, please say

8         something, and we'll take a break.

9               That -- also, if -- if it makes sense to maybe

10        plan for, like, a lunch break at noon if we get

11        that far, does that work for everyone else?

12   A.   Yes.  Sounds good.

13               MS. ENSLIN:  (Attorney nods head.)

14   BY MS. KELLEY:

15   Q.   Okay.  And -- yeah.  Is "Mr. Velazquez" the best

16        way to address you, or what's your preference?

17   A.   Yes.  "He," "him," "his" pronouns.  "Enrique" works

18        fine for me as well.

19   Q.   Okay.  And are you clearheaded today for this

20        deposition?  Is there any reason that -- that you

21        might not be able to -- to remember things or speak

22        clearly, sleep deprivation, changes in medication,

23        anything like that?

24   A.   Nothing of the sort.  No.

25   Q.   Okay.  Thank you.  So let's -- let's get started.

Enrique Velazquez                    7

1           Would you please just state your name for the

2      record?

3   A.  Certainly.  My name is Enrique Velazquez.

4   Q.  And, Mr. Velazquez, what's your job title or

5      titles?

6   A.  My title is the Director of Regulatory Services.

7   Q.  Where is that?

8   A.  For the City of Minneapolis.

9   Q.  Okay.  And how long have you been in that position?

10  A.  I have served as the City's Director of Regulatory

11     Services for a little more than one year, starting

12     October 5, 2023.

13  Q.  And where did you work before that?

14  A.  Prior to assuming the role of Director of

15     Regulatory Services, I was Director of Inspections

16     Services, which is one of the divisions within

17     Regulatory Services, and served in that capacity

18     from August 1, 2022, until my appointment as

19     Director of Regulatory Services in October.

20  Q.  What -- what precipitated the -- the move?  Was

21     there anything?

22  A.  There was organ- -- organizational changes that

23     happened where the previous Director of

24     Regulatory Services took a promotion as a Deputy

25     City Operations Officer, which created the vacancy.

Enrique Velazquez                    8

1          So I applied and was appointed into the role.

2   Q.     Congrats.  And were you working for the City prior

3          to that -- prior to that 2022 date?

4   A.     Yes.  I joined the City of Minneapolis on May 9,

5          2016.  My first three years were within Public

6          Works, Surface Water & Sewers division.  And then I

7          moved over to Community Planning and Economic

8          Development as the manager of Business Licensing

9          and Consumer Services in 2019 -- May of 2019 --

10  Q.     Okay.  And --

11  A.     -- and I moved from there into Regulatory Services

12         as the Director of Inspections Services.

13  Q.     What's -- what is -- is there any educational

14         background that's relevant to your work with the

15         City?

16  A.     Yes.  So I hold a master's in business

17         administration with a focus in nonprofit and public

18         management, a bachelor's in business administration

19         with focus areas in project management and finance.

20         And then I hold a certificate with the Economic

21         Development Institute with the University of

22         Oklahoma.

23  Q.     And generally speaking, what are the duties and

24         responsibilities of your current job?

25  A.     So the duties and responsibilities of my current

Enrique Velazquez                              9

1      role are to oversee four specific business units.

2      Inspections Services, which oversees housing,

3      rental property inspections, commercial building

4      inspections, high-occupancy dwelling unit

5      inspections, special events, hazardous material

6      response, spill response, vacant buildings, vacant

7      and blighted buildings to make sure that they are

8      not occupied and that they progress on a path

9      towards habitability again.  That's one division.

10         The second division is Traffic Control &

11     Parking Management, which, as the name implies,

12     they focus on making sure that there's ease of

13     traffic flow and that parking regulations are

14     adhered to.

15         Animal Care & Control, which oversees our

16     veterinary services, sheltering services, fostering

17     programs, and animal rescue and animal -- animal

18     care within the city.

19         The fourth is Operations & Engagement, which

20     includes multiple different aspects of our work

21     that serves as the backbone.  It's our customer

22     service functions, our letter writing and

23     engagement with communities, with business owners,

24     with property owners, with rental license holders.

25     It also incorporates our alternative enforcement,

Enrique Velazquez                          10

1        which oversees portfolio inspections of large

2        suites of portfolios of properties that need to be

3        handled in a specific way.  It includes our housing

4        and renter liaisons, which engage with renters who

5        are experiencing some hardship with the property

6        owners and then also engaging with property owners

7        to resolve those specific issues and provide

8        various levels of support for both parties so that

9        we can prevent displacement at all possible and

10       then provide an easy pathway for any individuals

11       experiencing those kinds of hardships where they

12       are at risk of being displaced.

13            And then the last unit within Operations &

14       Engagement is our Homeless Response Team, which is

15       one of the mechanisms for the City's response to

16       unsheltered homelessness.  And I oversee and am the

17       facilitator of the City's response to unsheltered

18       homelessness.

19   Q.  Thank you.  And did you spend any time preparing

20       for today's deposition?

21   A.  Yes, I did.

22   Q.  And what did you do to prepare?

23   A.  I met with my attorney, Ms. Enslin.  We spent about

24       three hours together.  And then to refresh my

25       memory on a couple of the different details, I met

Enrique Velazquez                         11

```
 1        with Deputy Commissioner of Health Heidi Ritchie to

 2        review certain different aspects with respect to

 3        Helix Health and Human Services as well as the

 4        norovirus outbreak that occurred.

 5    Q.  And how -- about how long was the conversation

 6        with -- with that third person who wasn't

 7        Attorney Enslin?

 8    A.  That conversation lasted between five to ten

 9        minutes.

10    Q.  Okay.  Did you exchange any documents with that

11        person?

12    A.  No, I did not.

13    Q.  Or look at any documents?

14    A.  No.

15    Q.  And are you here testifying on behalf of the City

16        of Minneapolis?

17    A.  Yes, I am.

18    Q.  Are you represented by Attorney Enslin in this

19        case?

20    A.  Yes, I am.

21    Q.  All right.  Do you have other -- any other legal

22        representatives?

23    A.  Let's see.  So we have Kristin Sarff and . . .  Who

24        is the --

25                MS. ENSLIN:  I think -- Kira, do you want
```

Enrique Velazquez                    12

1         to clarify if you mean outside of the City

2         Attorney's Office?

3                  MS. KELLEY:  Sure.  Yeah.  It --

4         you're --

5                  MS. ENSLIN:  Because we're --

6                  MS. KELLEY:  Well, we'll --

7                  MS. ENSLIN:  -- just one unit.  So we

8         represent everybody as an office.

9                  So I think you might be referring -- the

10        deponent might be referring to other folks from

11        this office.

12                  But I think what you're getting at is

13        does he have representation outside the City

14        Attorney's Office?

15                  Am I -- and maybe I'm wrong.  So sorry --

16        so I'm sorry to interrupt.  I just -- I -- I -- I

17        sense where he was struggling to -- to find the

18        right name, and I wanted to help.

19                  MS. KELLEY:  That's my next question.

20                  But feel free to respond, Mr. Velazquez.

21   A.   I am not represented by any other entities outside

22        of the City Attorney's Office.

23   BY MS. KELLEY:

24   Q.   Okay.  And next, I'm going to get into some

25        questions about the Operational Guidance,

Enrique Velazquez                    13

1          Encampment Response on City-Owned Properties, which
2          was -- which you submitted as an exhibit to a
3          declaration.
4               Are you -- are you familiar with that policy?
5    A.    Yes, I am familiar with the document.
6    Q.    The December 16, 2022, document, just so that we're
7          all on the same page?
8    A.    Yes.
9    Q.    Okay.  Who wrote that?
10   A.    So the City Operations Guide was written by the
11         interim manager for the homeless and encampment
12         response program, Christina Dowling, with
13         assistance from me and a few other individuals.
14   Q.    Do you remember any of those other individuals?
15   A.    Let's see.  I believe Blair Foy, who was
16         communications manager.  She has since left -- left
17         the City.
18              And Kira Hasbargen, who, at the time, was the
19         Director of Operations & Engagement.  She has since
20         moved into a different capacity.  Still with the
21         City of Minneapolis, just in a different capacity
22         now.  Those are the names that I recall.
23   Q.    And aside from the -- the people who drafted it,
24         who else had input on it?
25   A.    I would imagine that legal counsel also had input

Enrique Velazquez                    14

1      into -- or at least reviewed the document as well

2      as representatives from the Mayor's office and

3      Community Planning and Economic Development.  I

4      can't recall specifically who, but I -- I can at

5      least on the surface say these are some of the

6      different areas in which they would have provided

7      some input.

8   Q.  Do you remember the -- the means by which that

9      input was solicited or -- or provided?

10  A.  Most likely it was provided through a shared

11     document where others could review the document and

12     then make any sort of comments or editorial

13     changes --

14  Q.  Okay.

15  A.  -- before it was finalized.

16  Q.  Like a Google doc?

17  A.  It would have been a Microsoft Word document on a

18     SharePoint or OneDrive.

19  Q.  Okay.  And how involved was the rest of your

20     department in crafting this policy?

21  A.  Outside of the individuals named, no others were

22     really involved in the crafting of the document.

23  Q.  Okay.  Did you look to any -- did you or the other

24     crafters look towards other sources of information

25     to inform the policy decisions you were making?

Enrique Velazquez                    15

1    A.    So if I understand the question, you're asking if

2          we looked at -- at any other sources outside of the

3          City or other municipalities?

4    Q.    Thank you for seeking clarification.  This is

5          great.  Let me rephrase.

6              If -- as you -- as you were all crafting this

7          document, what was informing the decisions you were

8          making?

9    A.    So a few different factors.  We saw an increase in

10         attention from City Council and community members

11         wondering what exactly it was that we were doing

12         with respect to -- what was our approach.

13             So rather than continually answer the same

14         questions or similar questions, we want to make it

15         as transparent as possible so that our internal

16         stakeholders within the City, with our elected

17         leaders, as well as community members would have a

18         pathway so they could understand how we approached

19         this work, the sensitivity that went into the work,

20         how we were placing individuals at the center of

21         the work, and what our process generally was.

22         As -- so that was kind of the -- the premise.

23             And then as we started to pull in those

24         details, we also looked externally to some other

25         municipalities to see, okay, how are others -- how

Enrique Velazquez                          16

1        are -- our peers within this area, the Twin Cities

2        area, how are they communicating what they do, and

3        do they have a public-facing document?  Or, you

4        know, if they share any details, what exactly do

5        they share and to what extent?  Just so that we

6        can --

7    Q.   Yeah.

8    A.   -- make sure we're transparent and, at the same

9        time, not placing our own staff at risk by sharing

10       too much information that could be --

11   Q.   Were you --

12   A.   -- exploited.

13   Q.   Oh, sorry.

14            Were you in communication with these other

15       municipalities?

16   A.   I -- yes.  I'm in regular communication with my

17       counterpart in the City of St. Paul.

18   Q.   Okay.  And when you looked at how other

19       municipalities were doing this, was that just by

20       reviewing public-facing documents?

21   A.   Initially it was by reviewing public-facing

22       documents.  And then if we had some additional

23       questions, then it was reaching out by email or

24       scheduling a meeting or a phone call just to try

25       and learn a little bit more about how they arrived

Enrique Velazquez                    17

1      at that specific decision to share information X

2      versus Y or what -- what was appearing below the

3      surface versus above the surface.

4   Q.  And do you have -- do you remember what -- what

5      other towns or munic- -- municipalities were they?

6   A.  Here in the Twin Cities, primarily the City of

7      St. Paul, since they're the second largest city in

8      the metropolitan area.

9          Other cities did not have public-facing

10     information that we could see at that time.

11         Spanning more broadly, we did evaluate the

12     City of Seattle, City of Milwaukee, others that are

13     comparable size that we know that they have some

14     level of robust engagement on the response to

15     unsheltered homelessness.

16  Q.  And who from the Mayor's office reviewed this

17     document before it was finalized?

18  A.  It would have been one of the policy directors who

19     has since left the City, Peter Ebnet, E-b-n-e-t.

20  Q.  Do you remember what input, if any, Peter gave to

21     that -- to the draft?

22  A.  So Peter's input would have been reviewing the --

23     the shared document and then also providing some

24     additional advice on different municipalities to

25     engage with if there were others that we needed to

Enrique Velazquez                    18

1          seek input from just to make sure that we provided

2          as robust of a document as possible.

3    Q.    Did Peter have any specific concerns with the

4          document?

5    A.    Not to my recollection.

6    Q.    And prior to December 16, 2022, when that document

7          was adopted, were there other policies in place

8          governing the City's interactions with unhoused

9          encampments on its properties?

10   A.    So let me begin by saying the document itself is

11         not so much a -- a policy.  It's our operating

12         guidance.  It's our -- it's our practice.

13             And what the document does is it memorializes

14         how we have been operating.  So that was the focus

15         of the document.

16             So our -- our policy, if you will, had not

17         really shifted or changed mu- -- much.  It was just

18         more of making sure that it's memorialized, it's

19         visible, it's publicly accessible so that others

20         who have an interest in this space can see exactly

21         what the City's approach is to managing unsheltered

22         homelessness and our overall response.

23   Q.    So the -- there are policies that exist

24         independently of this operational document?

25                 MS. ENSLIN:  Objection.  Vague.

Enrique Velazquez                    19

1           MS. KELLEY:  That would probably be more

2       appropriate as a -- well, you can answer,

3       Mr. Velazquez, and we'll deal with that later.

4   A.  Sure.  So there are policies that exist.  It's up

5       to our legislative body to develop the policies and

6       then for our mayor to also either develop in tandem

7       with our legislative body but also to adopt

8       policies.

9           So as the administration or the staff within

10      the administration, we do not necessarily set

11      policies.  We follow the policy.  And the operating

12      guidance is built upon those policies and -- and

13      laws that are in place.

14  BY MS. KELLEY:

15  Q.  Okay.  I just have to clarify, Mr. Velazquez.  When

16      you say, "We don't set poli-" -- "policy."  "We

17      follow policy."  Could you clarify who the "we" is?

18  A.  Yes.  The "we" is administration and staff.

19  Q.  Okay.

20  A.  So if we separate the City of Minneapolis into

21      different parts, the legislative body is the

22      City Council.  The executive body is the Mayor and

23      his cabinet.  And then the administration are all

24      of the staff who are -- are charged with -- and

25      specifically Regulatory Services, who are charged

Enrique Velazquez                    20

 1              with upholding the laws of the federal government,

 2              the State of Minnesota, and our own Minneapolis

 3              Code of Ordinances.  So we uphold those laws which

 4              are, in effect, policies.

 5     Q.       Okay.  And have -- have those policies

 6              substantively changed in the past -- I guess we'll

 7              say your -- your tenure at -- in the City?

 8     A.       Policies with respect to the response to

 9              unsheltered homelessness specifically?

10     Q.       Correct.

11     A.       No.  These policies have not substantively changed.

12              And, really, the governing policy we have is

13              Minneapolis Code of Ordinances 244.60, which

14              specifies that temporary dwelling structures -- or

15              temporary structures that are erected for the

16              purpose of human habitation are not permitted

17              within the city of Minneapolis.

18     Q.       Are there other policies, whether formal or

19              informal, that govern the process for sweeping

20              encampments?

21     A.       Are there other policies that govern the process

22              for sweeping encampments?  So encampment closures?

23     Q.       (Attorney nods head.)

24     A.       There are no policies that are documented that

25              outline the process or the practice in which City

Enrique Velazquez                    21

1        staff would close or clear encampments.

2    Q.   Okay.  Are there informal pol- -- like,

3        undocumented policies that is -- for example, "This

4        is the way that this is done, albeit not written

5        down"?

6    A.   I'll say that our process and our approach to

7        encampment closure is documented in our City

8        operating guide to unsheltered homelessness, the

9        document that was referenced from December 2022.

10   Q.   Is that binding on City employees in any way?

11            MS. ENSLIN:  Objection to the extent it

12       calls for a legal conclusion.

13            MS. KELLEY:  You can answer,

14       Mr. Velazquez.

15            MS. ENSLIN:  You can answer.

16            THE WITNESS:  Okay.

17   A.   So with respect to the operating guidance, it's --

18       it's guidance.  Within the guidance, it also

19       specifies that while we endeavor to meet all these

20       specific objectives, there are some set parameters

21       that might interfere with our ability to move

22       forward with that.

23          So specifically, we evaluate four critical

24       areas:  public safety, public health, community

25       livability, and then other environmental factors

Enrique Velazquez                    22

1          that might interfere with safe conduct or safe

2          operation at these specific encampment locations.

3                So when public safety is -- places individuals

4          at the encampments or immediate neighbors or those

5          within the -- the main geographic area at risk,

6          then we have to move promptly to resolve that

7          situation, which can include immediate closure of

8          the encampment, which goes against the guidance

9          that's there that specifies that, you know, we will

10         provide 72 hours advance notice, we'll provide

11         notice in writing of the impending closure date.

12         However, specific circumstances might predicate

13         that we deviate from that, which is also documented

14         in the operating guidance.

15   BY MS. KELLEY:

16   Q.    So there is no policy requiring any specific amount

17         of notice prior to closures?

18                MS. ENSLIN:  Objection.  Mischaracterizes

19         the testimony.

20   A.    Yeah, so the operating guidance specifies that we

21         will endeavor to provide a 72-hour,

22         three-business-day advance notice of -- of closure.

23                However, I want to -- I want to predicate that

24         every single City-owned site at least is fenced, is

25         posted "No Trespassing" with a reference to the

Enrique Velazquez                    23

1        specific code of ordinances that outlines what

2        trespassing looks like and what property rights are

3        and that any -- any who enter are considered to

4        have been trespassed -- or are trespassing.

5        Therefore, that, by itself, is notice.

6    BY MS. KELLEY:

7    Q.   Were any unhoused people involved in creating the

8        Encampment Response, the -- the previously

9        referenced Operational Guidance?

10   A.   Any currently or previously unhoused individuals?

11   Q.   First, currently -- or unhoused at the time of

12       their -- their involvement in giving input.

13   A.   No.  No, not at the time that the document was

14       drafted.

15   Q.   How about people with experience being unhoused in

16       the City of Minneapolis generally?

17   A.   Yes.

18   Q.   And who -- do you remember who that individual or

19       individuals was?

20   A.   I do.  That person is me.

21   Q.   Mr. Velazquez, if I could just ask, like, a bit

22       more of your -- your experience with houselessness.

23   A.   Certainly.  I found myself where my mother

24       committed suicide.  My father was living in

25       Germany.  And my step-father left the area, leaving

Enrique Velazquez                    24

1       me by myself for my last two and a half years of

2       high school.

3            Then I went off to college with all of my

4       belongings and couldn't afford to stay and returned

5       to a -- a state where I was unsheltered and made

6       friends on my way to Minnesota, having never been

7       here before, who put me up and allowed me to sofa

8       surf until I could get on my feet and start working

9       again and eventually work my way back to college.

10  Q.  Thank you for sharing that, Mr. Velazquez.

11  A.  Certainly.

12  Q.  And just -- sorry.  I -- I want to be really clear

13      with my prior question.

14           Aside from "twenty-two forty-four sixty," are

15      there other policies that relate to encampment

16      evictions or unsheltered houselessness in the City?

17  A.  Other than Minneapolis Code of Ordinances 244.60,

18      there are probably multiple different laws that

19      relates to the specific area with respect to how

20      property is used that would impact zoning

21      ordinance.

22  Q.  And just -- sorry.  To -- to clarify again.

23           I don't mean laws that unhoused people might

24      be violating by virtue of their status as unhoused

25      persons, but rather, policies that govern how the

Enrique Velazquez                    25

1        City is required to interact with unhoused persons.

2   A.   I understand.  There are no other policies or other

3        ordinances in place that govern how the City

4        responds to unsheltered homelessness.

5   Q.   And were there any people with -- with nonphysical

6        and/or mental or intellectual disabilities who were

7        involved in giving input into the -- the

8        Operational Guidance policy as to -- or not

9        policy -- the Operational Guidance document we

10       discussed?

11  A.   Not to my knowledge, no.

12  Q.   And what steps has the City taken to ensure that

13       the way that it conducts evictions of unhoused

14       encampments is responsive to the needs of unhoused

15       people with disabilities?

16  A.   Well, I can begin by saying that the City of

17       Minneapolis has a Homeless Response Team that

18       conducts outreach and engagement at each of the

19       different encampments that are reported within the

20       city.  And the focus there is to do that initial

21       triage of who are the people at the encampment,

22       what's the makeup of the individuals, are there

23       veterans, are -- are there elderly individuals, are

24       there children or families?  Try and make an

25       assessment of any sort of barriers or language

Enrique Velazquez                    26

1          assessment -- or language needs or other -- other

2          types of needs.  And then engaging with

3          Social Service and outreach partners from there.

4               So as part of that initial assessment that the

5          team will make, they will make the appropriate

6          connections, especially if they see that there are

7          individuals who at least physically present as

8          having some level of a disability.  That also

9          informs that when we do place porta-potties, that

10         we make sure that there are accessible

11         porta-potties so that that by itself does not

12         pre- -- present a barrier to individuals who are at

13         the encampments.

14    Q.   When was the Homeless Response Team created?

15    A.   So the Homeless Response Team, it has been kind of

16         an evolution over the last, let's see, five years

17         following The -- The Wall of Forgotten Natives

18         encampment that occurred on Minnesota Department of

19         Transportation property along the Highway 55 sound

20         wall and Franklin.

21              It started with some individuals from various

22         departments coming together.  There was a

23         representative from Community Planning and Economic

24         Development, a representative from Public Works,

25         another from the Mayor's office, another from the

Enrique Velazquez                        27

 1        police department that just organically gravitated

 2        to one another.

 3             And seeing that the work was continuing beyond

 4        this initial encampment, The Wall of Forgotten

 5        Natives -- Natives encampment specifically, there

 6        was a staffing position that was added within

 7        Community Planning and Economic Development to

 8        focus on that work.

 9             A second position was added within the Health

10        Department, and then another was added within the

11        City Coordinator's Office.

12             And then over time, those three positions

13        eventually came together in 2022 within

14        Regulatory Services with a dedicated manager so

15        that collectively there -- there was one Homeless

16        Response Team and one response system versus

17        segments of -- of a response system in various

18        areas.

19   Q.   Those positions, you're saying that they moved into

20        your department?

21   A.   Yes.   That's correct.

22   Q.   Okay.   And how -- how many people total make up the

23        Homeless Response Team?

24   A.   The Homeless Response Team that's now within

25        Regulatory Services is a four-person team.   There's

Enrique Velazquez                    28

1        a manager, a lead Homeless Response Coordinator,

2        and two additional Homeless Response Coordinators.

3        And depending on how the budget turns out this

4        year, we might have two more Homeless Response

5        Coordinators.  We'll see.

6    Q.    Where does that budget come from?

7    A.    The prior --

8                MS. ENSLIN:  I just -- I -- I just want

9        to object to the extent this is outside the scope

10       of the topics.

11               Do you -- can you direct me to a certain

12       topic that would relate to budgeting or --

13               MS. KELLEY:  Sure.

14               MS. ENSLIN:  -- budget decisions?

15               MS. KELLEY:  I would say this fits --

16       let's see.

17               The -- so No. 6, "Policies and procedures

18       regarding making and maintaining contact with

19       unhoused clients."

20               This is a -- a -- a procedure for --

21       making contact with unhoused people is the HRT and

22       that the -- what the City has done to stay in

23       contact with unhoused people includes allocating a

24       budget to create this team to do that work.

25               MS. ENSLIN:  Okay.  I'm going to maintain

Enrique Velazquez                    29

1        an objection to it.

2                    But, you know, he can answer.

3                    THE WITNESS:  Okay.  Thank you.

4                    Sorry.  Would you mind rephr- --

5        restating the question?  I already --

6                    MS. KELLEY:  Sure.

7                    THE WITNESS:  -- forgot half of it.

8                    I want to make sure I respond to the

9        correct question.

10                    MS. KELLEY:  Of course.  Thank you.

11   BY MS. KELLEY:

12   Q.    I'm wondering where the budget -- or the funding

13         for the HRT comes from.

14   A.    Ah.  Thank you.  Yes.  Thank you for the reminder.

15                    So initially, the budget for the Homeless

16         Response Team came from American Rescue Plan Act

17         dollars from the federal government.  So we

18         utilized that funding to basically provide a pilot,

19         if you will, to prove out how this team could

20         function and operate.

21                    And with our supplemental budget year of 2024,

22         the team moved from the grant funding from the

23         American Rescue Plan Act dollars over to the

24         general fund.  So that happened in 2024.

25                    And then the proposed additions for 2025 and

Enrique Velazquez                              30

1          beyond would also be general fund dollars.

2               And part of the reason for the shift from

3          grant dollars to general fund is because the

4          American Rescue Plan Act dollars have a sunset of

5          the end of this year, end of 2024.

6               So we wanted to make sure that the team was --

7          would have some reassurance that their work

8          would -- would be allowed to continue and that we

9          would be able to continue to provide these services

10         to residents and then communities beyond 2024.

11              Generally speaking, where do the general fund

12         dollars come from?  That comes from our revenue

13         base, our tax base.  So --

14    Q.   Okay.

15    A.   -- property taxes and -- and -- and such.

16    Q.   And are -- are -- these four individuals, are they

17         full-time?

18    A.   Yes, they are full-time.

19    Q.   Do you have the names of those indi- -- the --

20         those employees?

21    A.   I do.  The manager is Maikao Vue.  Lead Homeless

22         Response Coordinator is Joseph Olson.  Homeless

23         Response Coordinator, José Acuña-Fernandez.  And

24         then the fourth person, I'm going to stumble over

25         their name because she actually just started.

Enrique Velazquez                          31

1        First name is Suheb.  I can't recall the last name

2        offhand.

3   Q.   And how are those -- how are they trained?

4   A.   On the job primarily.  So there's a level of

5        training on the homeless response -- or I should

6        say the response operating guidance as kind of a

7        baseline.  But then while going out and engaging

8        with others, also partnering with our peers in the

9        City of Saint Paul, we will help train on the other

10       side.

11            So if the City of Saint Paul has some new

12       staff, we'll invite them in over on our side as

13       well so they could learn what -- habits in St. Paul

14       and then learn how we operate in Minneapolis and

15       vice versa.

16            We also engage with Hennepin County and

17       planners over -- within Housing Stability who

18       oversee outreach in Homeless Response from the

19       county perspective since Hennepin County is the

20       continuum of care for the area.

21  Q.   Do they receive any specific training in supporting

22       people with PTSD?

23  A.   I would probably have to go back and look to see

24       what specifics -- specific courses and any types of

25       training.  But generally, they do receive training

Enrique Velazquez                    32

1        on how to engage, how to de-escalate, how to

2        identify risks or potential of individuals that are

3        experiencing some level of crisis.

4   Q.   And are those trainings -- what -- what do those

5        trainings look like?  Are they in person?  Are

6        they . . .

7   A.   The trainings can take many shapes.  It could be on

8        the job in the field, it could be classroom, it

9        could be through experiential learning with a -- a

10       mock setup.  We -- we've done that in the past.  It

11       could be virtual trainings.

12            So there's a whole array of different things

13       depending on various learning styles and what's the

14       best mechanism or best medium to deliver that

15       information so that people can retain that

16       information.

17  Q.   What's a mock setup?

18  A.   So -- yeah, I didn't characterize it very well.

19            So we might have actors that come in to mimic

20       certain types of behaviors.  And it's an

21       opportunity to learn through experiential

22       opportunity in a safe environment, kind of in a

23       vacuum where it's an individual that's portraying

24       or presenting with certain problems, and then

25       that -- our staff would then work through

Enrique Velazquez                          33

1           de-escalating that situation or identifying some

2           different ways in which to engage with that

3           individual.

4                And then the actor, they would take off the

5           actor hat and then others -- other peers within the

6           area would help critique that response, identify

7           different ways to improve or provide some level of

8           coaching.

9    Q.     Do other City agencies or agents besides the

10          Homeless Response Team participate in those mock

11          setups with -- with you all?

12   A.     Yes.  We have conducted similar ex- -- experiences

13          like that with inspectors in a variety of different

14          areas with our housing inspectors, fire inspectors,

15          business licensing.  They've all done that.  Health

16          inspectors as well.  So a variety of different

17          touchpoints where there's that potential to engage

18          with the general public so that we can identify

19          people that might -- might be experiencing some

20          level of a crisis or some level of a trauma

21          response so that we are aware of how to cease that

22          harm, if it's our own staff that are in -- in that

23          environment where perhaps just the interaction is

24          triggering for an individual.  So it's just kind of

25          building that awareness and then also finding ways

Enrique Velazquez                          34

1           to de-escalate and get -- get the appropriate

2           responders engaged.

3     Q.    Law enforcement ever involved in those mock setups?

4     A.    I do not have personal knowledge of them

5           participating, though I can speculate that most

6           likely they would have gained similar training.

7     Q.    And how much of the Homeless Response Team's day to

8           day is -- is fieldwork?

9     A.    The Homeless Response Team is in the field five

10          days per week, so pretty much full-time.  They are

11          in the field engaging with individuals experiencing

12          unsheltered homeless.

13    Q.    Do they have specific instructions?

14    A.    Can you clarify what you mean by "instructions"?

15    Q.    Sure.  What are they tasked with doing?

16    A.    Okay.  So the Homeless Response Team is tasked with

17          responding to 311 calls, which are cases reported

18          by community members of various nuisance activities

19          or behaviors that are occurring in the field with

20          respect to unsheltered homeless.  Those are --

21          those are the ones in which the Homeless Response

22          Team is tasked with responding to.

23              Response can be an email response, phone call

24          as well as pre- -- predominantly in-the-field

25          action to engage with the individuals that are

Enrique Velazquez                                35

1            experiencing unsheltered homelessness at

2            encampments.

3                  So identifying and verifying that the location

4            of the encampment is, in fact, matching with what

5            the complainant indicated, doing an initial triage

6            with the individuals at the encampment, identifying

7            how many people, how many structures, what's the

8            overall setup, so that collectively we, as a

9            response system, know how to come alongside those

10           individuals and provide some supportive services as

11           we collectively work to help them transition from

12           unsheltered to stable housing.

13  Q.    And just to get into the -- the concrete technical

14           application of that, how -- how do they make -- how

15           do they obtain that data, the number of individuals

16           and -- and whatnot?

17  A.    So the Homeless Response Team, generally they go

18           out as a two-person team to each of the different

19           encampment sites.

20                  So once there's a report that there's the

21           presence of an encampment, the two-person team will

22           go out to that specific site, and it's by

23           observation.

24                  While they're engaging with individuals,

25           they're also making sure that they're aware of the

Enrique Velazquez                        36

1        surroundings, counting structures, counting tents,

2        just surveilling the area and then cataloging that

3        information, at first in writing and then

4        incorporating that information into a shared

5        document.

6    Q.  Is there any other data collection that happens

7        outside of their handwritten notes and the shared

8        document?

9    A.  Yes.  On a weekly basis, the Homeless Response Team

10       meets with their peers that operate within the

11       boundaries of the City of Minneapolis.  So that

12       would be the Minnesota Department of

13       Transportation, Minneapolis Park and Recreation

14       Board, Metro Transit, Homeless Action People,

15       Public Works, Minneapolis Police Department,

16       Minneapolis Crime Prevention Specialists.  I'm sure

17       I'm forgetting an agency or two.

18            But collectively, there are multiple eyes that

19       are watching encampments, especially as some of

20       these different circles start to converge into

21       concentric circles, and there's some overlaps.

22            So we take information.  We compare notes.  We

23       identify property ownership.  There's a -- there's

24       kind of a knowledge sharing that happens with that

25       specific group.

Enrique Velazquez                          37

1   Q.   And when the Homeless Response Team individuals are

2        not responding to 311 calls or at these joint team

3        meetings, what else are they doing?

4   A.   Well, really, that consumes 100 percent of their

5        time responding to these 311 calls.  But it's --

6        the 311 calls relate specifically to encampments.

7        So they're -- every single day they're in

8        encampments.

9   Q.   Okay.  And I think I'm going to -- I'm going to, I

10       think, zoom back out and move away from -- we -- we

11       sidebarred on the HR- -- the Homeless Response Team

12       for a bit.

13            But how -- how do the agencies within the City

14       communicate on what the plan is for conducting

15       evictions?  How do they -- how do they plan to

16       conduct encampment sweeps?

17  A.   By "agencies," we're referring to the individual

18       departments and business units within the City of

19       Minneapolis; correct?

20  Q.   Correct.  Yes.

21  A.   Okay.  Okay.  I just wanted to make sure.

22  Q.   Yeah.

23  A.   So collectively, we have a unified team that meets

24       every single week.  I facilitate the meeting in

25       partnership with Community Planning and Economic

Enrique Velazquez                    38

1      Development, Public Works, Minneapolis Police

2      Department, City Attorney's Office, a

3      representative from the Mayor's office, Minneapolis

4      Health Department, Emergency Management Division --

5      or Department -- Emergency Management Department.

6           And we discuss kind of a high-level strategy

7      of what we're going to look at and how we're going

8      to move forward with encampment closures or what

9      some of the next steps are to get us to a place

10     where we can close the specific encampment or set

11     of encampments, if you will.

12          And I already indicated the four main factors

13     we look at:  It's public health, public safety,

14     community livability, and then other environmental

15     factors that might elevate the priority level of a

16     specific encampment closure over a different one.

17          And generally speaking, all encampments are

18     going to close.  It's just a matter of when they're

19     going to close with respect to the number of

20     resources we have and overall impact that the

21     encampment is having within the broader system

22     within the neighborhood or community.

23  Q.  Does anybody in that group visit these encampments

24      in person themselves?

25  A.  Yes.  We do have the Homeless Response Team that

Enrique Velazquez                    39

1    visits the encampment in person.  We do have

2    representatives from Public Works as well as

3    Minneapolis Police Department that visit for a

4    variety of different activities, all relating to

5    support for the individuals at the encampments so

6    that the impact on community livability is not

7    compounded.

8        Depending on property ownership -- because

9    encampments can form on City-owned property, on

10   privately owned property.  It can -- they can form

11   on property owned by other government agencies.

12       So depending on if it's a City-owned property,

13   we might have representatives from -- that

14   represent the ownership, if you will.  And

15   Community Planning and Economic Development is

16   primarily the landowner for City ownership.

17       So representatives from Community Planning and

18   Economic Development will also go to the

19   encampments and evaluate the situation or figure

20   out what other services need to be provided to

21   curate the parcel itself, not so much for the

22   activity but for the parcel.

23   Q.   Who from the Mayor's office is there?

24   A.   From the Mayor's office that engages in this --

25   Q.   Leads the meeting.

Enrique Velazquez                    40

1   A.    -- work group or this team?

2   Q.    Yeah.

3   A.    So previously it was Peter Ebnet, who was the

4         policy director.  Now it's Michael Ohama, who is

5         one of the -- the policy advisors for the Mayor.

6   Q.    And when -- sorry.  Do you call this a working

7         group?  Or what -- what do you call this?

8   A.    Honestly, I don't really think about the name of

9         it.  I just focus on the work.  But it's the -- the

10        City's Unsheltered Homelessness Governing Group.

11  Q.    Okay.  If I call it the working group, you'll

12        understand what I mean for --

13  A.    Yes.

14  Q.    -- short?

15  A.    Yes.

16  Q.    Okay.  When individuals who are part of this

17        working group make visits to unsheltered houses'

18        encampments, is there other locations where they

19        document what they're seeing aside from what you

20        already discussed with the -- the Homeless Response

21        Team's shared document?

22  A.    I'm not aware that there are other locations where

23        information is documented as far as what they

24        observe.  We try to capture it all into a single

25        source of truth.

Enrique Velazquez                    41

1    Q.    What do you mean "a single source of truth"?

2    A.    Rather than have disparate pieces of information

3          sequestered in a variety of different departments

4          or people's hands, we try and pull all that

5          information together so that the number of people,

6          number of structures, specific locations, the

7          train, all that is housed in one single -- one

8          single shared document.

9    Q.    And that's the Homeless Response Team's document?

10   A.    Correct.

11   Q.    Okay.  Who decides when to initiate an encampment

12         sweep?

13   A.    So we take a collaborative effort within this

14         Unsheltered Response Governing Group and

15         collectively make a decision on when to move

16         forward with closure and clearing of an encampment.

17         So it's more by consensus than it is one single

18         individual.

19   Q.    Is there a -- a criteria that are looked at to make

20         that consensus decision?

21   A.    Yes.  As stated previously, we evaluate public

22         health, public safety, community livability, and

23         other environmental factors.  So we look at all

24         those different elements and make a determination

25         on which encampment to prioritize for closure over

Enrique Velazquez                          42

 1          others.

 2   Q.     Does anyone in the working group have veto power

 3          or, I guess, a way to -- to block the consensus?

 4   A.     I'm struggling with that question a little bit

 5          because we all have voice into how to move forward.

 6          And ultimately, we find a way to get to the "yes."

 7          There might be some other competing priorities, but

 8          generally speaking, with all the information on the

 9          table, we arrive at consensus and all are able to

10          move forward recognizing that, yes, Encampment A is

11          priority over Encampments B, C, D or 2 through 34.

12   Q.     Is there anyone besides this working group who is

13          party to discussions about whether and when to

14          evict encampments?

15   A.     Well, generally speaking, this is the -- the group

16          that is charged with making the determination and

17          the recommendations on when to close, which

18          specific locations to close, and some of the

19          different operating parameters towards closure.

20          There is generally no interference with that

21          specific structure and no others that are involved

22          in making that determination or that could

23          potentially deviate from the path that -- that we

24          take.

25   Q.     And once consensus is reached among the working

Enrique Velazquez                    43

1       group, where do you -- where do you take that

2       consensus next?

3   A.  So when we arrive at consensus, there is also

4       typically a date associated with arriving at that

5       consensus.  So it's not only will we move forward

6       with closure, it's when will we move forward with a

7       specific closure, and what does it look like to

8       close that encampment?

9           So we look at a variety of different

10      parameters.  When can we make it happen?  What are

11      the different supports that we'll be able to

12      provide and that our partners will be able to come

13      in and help us provide for that specific date?

14          So it's a "Yes, and."  It's a "Yes, we're

15      going to move forward with closure, and we need to

16      provide all these other details."

17          If we don't have the resources, if our

18      partners aren't available, if we don't have -- or

19      our partners don't have shelter capacity, then we

20      have to revisit the decision on the closure and

21      look at a different date and try and get all these

22      different elements to line up.

23  Q.  So the working group does consult with -- with

24      partners -- service provider partners?

25  A.  In a way, yes, we do con- -- look at service

Enrique Velazquez                    44

1          provider partners.  And I say "in a way," because
2          Hennepin County is the responsible authority as the
3          continuum of care.  They are our conduit to the
4          different service organizations that provide
5          shelter and housing.
6               We do not have necessarily the direct
7          relationship to be able to influence that.  We work
8          through Hennepin County that has the direct
9          relationship and that has all of the contracts and
10         the agreements and the funding with -- the funding
11         relationship with each of these different partners.
12   Q.    Would you reach out to, then, Hennepin County to
13         say, "Okay.  How many shelter beds are available in
14         ad-" -- "in advance of this eviction?"  Or how
15         would that go?
16   A.    So Hennepin County does a really good job of
17         communicating shelter availability in advance.
18         They have a public-facing dashboard where you can
19         see the availability at the start of the -- the day
20         and availability at the end of the day.  So we use
21         that as kind of the initial benchmark.  And then
22         just by nature of Homeless Response Team, Crime
23         Prevention Specialists, police department, Public
24         Works, all these different entities that might
25         provide services at encampment.

Enrique Velazquez                            45

1          We have multiple touchpoints where we can

2      assess, at different parts of the day, how many

3      people are actually at the encampment and then

4      match that up with shelter availability.  And if

5      there's not enough, then, yes, connecting with

6      Hennepin County to say, "Okay.  We are planning on

7      closing an encampment.  Here is our estimate of

8      individuals at the encampment."

9          Hennepin County also has direct service

10     providers or direct outreach through their Streets

11     to Housing program, and they can also provide their

12     input on what they estimate the number of

13     individuals are when their outreach workers go

14     on-site to do individual assessments within -- with

15     specific people.  So they can scan their periphery

16     and provide that level of that detail to help us

17     balance what we believe to be right versus what

18     they believe versus other entities.

19         And then from there, work together to see how

20     we can add some additional shelter capacity, or are

21     there other mechanisms that the county can employ

22     to make sure that there's enough space for

23     everyone.  So that takes some coordination and some

24     planning.

25  Q.  Is there a -- a -- a go-to person at Hennepin or an

Enrique Velazquez                          46

1              agency that you're in communication with to have

2              those conversations?

3    A.    Yes.  We engage directly with the director for

4              Housing Stability and his team.  So it's multiple

5              different people.  But my -- my relationship is

6              with the -- the director who oversees the continuum

7              of care.

8    Q.    Who is that?

9    A.    That person is David Hewitt.

10   Q.    And does this working group take meeting minutes?

11   A.    We do not.  If there are specific actions, I

12             believe we take note of those actions and then

13             drive to the action items to make sure that we have

14             resolution and close them out.

15   Q.    And once you come up with a -- with a plan, as

16             you've just described, do you send that to the

17             Mayor for ultimate approval?

18   A.    Once we have the plan, the details of which

19             specific location, number of individuals we

20             estimate at the -- at the site, closure date and

21             shelter capacity and some of the different

22             supports, all gets documented, and it is shared

23             with the Mayor, shared with our City Operations

24             Officer more as -- how do I want to characterize

25             it? -- for information purposes, not for approval

Enrique Velazquez                              47

1          to move forward with the closure.

2    Q.    Do you have standing authority to move forward at

3          your own discretion as a working group?

4    A.    We do have the authority to move forward as the

5          working group because we are comprised of multiple

6          different departments that are tasked with ensuring

7          safe, habitable quality housing and community

8          livability and viability.

9              So as part of our -- our individual authority,

10         we have that.  But then as we come together, we are

11         able to move forward in unison.

12   Q.    And does -- does the Mayor give input at other

13         parts of the process?  Does he ever attend meetings

14         or otherwise weigh in?

15   A.    Well, the Mayor certainly does have meetings with

16         respect to policy direction and different elements

17         in which he or the office would like to see have

18         happen.

19             To give an example, we are seeing an increase

20         in fentanyl use and abuse within the city and the

21         overall impact that that's having on individuals

22         who are experiencing unsheltered homelessness at

23         encampments.

24             So the Mayor is weighing in on more of a

25         health-focused response with respect to opioid

Enrique Velazquez                    48

 1          addiction and fentanyl use and how do we provide a

 2          bookend.  It's the prevention piece.  It's the

 3          awareness and education upfront so that we are

 4          educating people as much as possible so that they

 5          do not seek that pathway.  It -- it's the recovery

 6          and the treatment more on the back end of making

 7          sure that individuals that are looking to escape

 8          that or looking to find a pathway out of fentanyl

 9          use and -- and abuse that there are various

10          supports and ways for them to be able to transition

11          out of that when they're ready.

12    Q.    When you say, like, policy -- you said the -- the

13          Mayor has input on policy directions.  Do you mean,

14          like, City code, or what policies?

15    A.    More of -- no, not City codes.  That would come

16          from City Council.  More of, I guess,

17          organizational direction since the Mayor leads the

18          administration.

19              So finding pathways.  If -- if we're not

20          already thinking of them, the Mayor wants to weigh

21          in on ways to try and leverage those specific

22          pathways or our working plans to be able to address

23          some of these different deficiencies.

24    Q.    Has the Mayor given any specific feedback about the

25          way that encampment evictions are carried out?

Enrique Velazquez                    49

1    A.    Most recently the Mayor indicated a desire to close

2          encampments faster and to not allow them to form to

3          begin with.

4    Q.    And is there a -- is there a standard procedure for

5          when the decision is made to close an encampment,

6          how service providers are to be notified?

7    A.    Yes.  So once a decision is made to close an

8          encampment, I direct the manager of the Homeless

9          Response Team to engage with her counterparts at

10         Hennepin County, that are more closely affiliated

11         with the service and outreach partners, to make

12         Hennepin County aware of the impending closure,

13         which location, and the -- the date.

14               And then Hennepin County also notifies the

15         various service organizations that operate or have

16         outreach workers that are operating at that

17         encampment so that they're aware.

18               And then it's also a matter of notifying

19         shelters and others that operate in the space --

20         the unsheltered homelessness space -- so that they

21         can adjust their operation, if need be, to shift

22         personnel, add staffing, or do those operational

23         types of things so that if there is a surge of

24         individuals that are looking to move into shelter

25         or who need transportation to get to shelter, that

Enrique Velazquez                    50

1              they have the capacity to be able to do that.

2    Q.    How far in advance is notice given to

3          Hennepin County and to service providers?

4    A.    That -- that's taken on a case-by-case basis,

5          really.

6                  In certain instances, we've been able to give

7          upwards of a month advan- -- advance notice,

8          depending on the complexity of -- of the situation.

9                  In other cases, we've been limited in

10         providing notice as the encampment closure happens.

11         It kind of depends on what are -- what are the

12         situations?  What's -- what's developing on --

13         excuse me.  What's developing in the field at that

14         time, and what precipitated the closure?

15                 So if there's a public safety risk or

16         public -- you know, severe risk of harm to staff,

17         harm to others in community and it prompts imminent

18         closure, then we communicate in real-time as things

19         are happening because closure is -- is quite

20         imminent.  In other situations, we're able to plan

21         more in advance and build in more of that -- that

22         change management with our partners.

23   Q.    Who makes the decision whether -- whether to

24         proceed imminently or to have buffer time and --

25         and advance notice?

Enrique Velazquez                    51

1    A.    So, really, it's determined by the conditions that

2          are happening and that are emergent in the field.

3          That's really what -- what prompts it.

4                So if we're seeing violence happening, if

5          people are being murdered at encampments, if

6          there's gun violence, if the -- these things are

7          active, that prompts that immediate response to

8          close the encampment.

9    Q.    But who -- who specifically -- what -- which human

10         beings make that decision?

11   A.    So the responses come from the Minneapolis Police

12         Department.  Who specifically within the

13         Minneapolis Police Department?  I can venture a

14         guess.  I -- I wouldn't know conclusively.

15   Q.    When you're in a -- when you're in a working group

16         meeting and you're deciding we need to evict

17         tomorrow as opposed to far in advance, whose --

18         whose decision is it to -- to proceed with an

19         immediate eviction?

20   A.    So in my interpretation, immediate is now.  So if

21         there is something that's happening right now and

22         the decision is made to close right now, that is

23         a -- an emergency response decision to respond to

24         what's happening right now versus something

25         happening tomorrow, then that would still be this

Enrique Velazquez                              52

1        working group.

2             We would take the advice from the police

3        department or if it's from the Health Department or

4        whichever individual department that is making the

5        request, but ultimately, it's handled by a

6        consensus.

7  Q.    Okay.  But when it is an emergency decision as

8        opposed to a consensus decision, who makes it?

9  A.    Again, that would depend on what's the nature of

10        the emergency?  Is it a health -- health risk where

11        people are going to die because of a public health

12        incident that's happening?  Likely that would come

13        from the Minneapolis Health Department.

14             If people are dying because of gun violence or

15        other illegal activities and behaviors that are

16        happening within the encampment or immediate

17        vicinity, that would be more of a law

18        enforcement -- Minneapolis Police Department that

19        would make the recommendation.

20  Q.    So the -- is it a recommendation or is it authority

21        that either the Health Department or the police

22        department, depending on the context, have to order

23        the eviction to happen?

24  A.    So in my view, it's a recommendation because it

25        still requires additional partners to come

Enrique Velazquez                     53

1      alongside.  We would need traffic control most

2      likely, depending on the location of the

3      encampment.  Traffic control would be required to

4      help block traffic, help navigate traffic flow, a

5      variety of different factors so that the community

6      is minimally impacted by not only the encampment

7      but the activity that's happening to close the

8      encampment.

9            Public Works would have to be involved.  So

10     they need to have resources available and ready to

11     go to clear the encampment after individuals have

12     been removed from the encampment.

13  Q.  Okay.

14  A.  So it's -- it -- it's not as direct or not as

15     binary.

16  Q.  Okay.  And how -- the decision to -- to give notice

17     to residents, who -- who decides when and how that

18     is done?

19  A.  And by "residents," you mean the individuals that

20     are residing on the specific encampment --

21  Q.  Correct.

22  A.  -- not the -- okay.  Okay.  I just wanted to

23     bifurcate that.

24  Q.  Good -- good clarification.  Thank you.

25  A.  Okay.  So within the -- this working group, we make

Enrique Velazquez                              54

1          the decision on -- as part of the closure process,

2          it -- we back it up to see, okay, if we're closing

3          on -- let's see.  What's today?  If we're closing

4          on December 13th and we want to provide -- well,

5          let's -- let's evaluate.  Are we providing the

6          minimum three business days' advance notice?  Are

7          there different factors that are converging that

8          would predicate that we are not able to provide the

9          advance notice such as we've seen hostility, we've

10         seen a lot of outside agitators engage when City

11         staff are present or when our contractors are

12         present?  Do we have reasonable . . .  Sorry.  Do

13         we have reason to believe that violence might erupt

14         or there might be significant confrontation that

15         would impede on our ability to move forward with

16         closure and preserve safety for staff, for the

17         residents on the encampment, and surrounding

18         community?

19              So if those different elements come back as,

20         yes, there's reasonable suspicion or there's a high

21         risk, then we might delay providing the written

22         notice.  We might provide verbal notice instead of

23         written, or we might do other things to try and

24         de-escalate and mitigate the risk when it converges

25         with staff, contractor, community safety.

Enrique Velazquez                    55

1          But we -- we go through a -- a series of -- of

2          decisions along the way to see, Can we move forward

3          with closure?  When do we provide advance notice?

4          Who's going to be the one providing the notice?

5          Some of that depends on whether it's on City-owned

6          property, another government agency's property, or

7          private property as far as who's going to provide

8          the -- the notice and what support we, as a city,

9          are going to provide for those individuals that

10         are -- that are providing the notice, and then

11         confirmation of notice being given.  So a variety

12         of different factors converge.

13    Q.   When you say "we" in reference to the -- the people

14         making those decisions, based on the factors you've

15         just articulated, do you mean the working group as

16         we've been calling it?

17    A.   Yes.  That's right.

18    Q.   So is there ever a situation where the Minneapolis

19         Police Department could demand an immediate closure

20         of a camp?

21    A.   Well, certainly if there is a significant risk.  We

22         experienced that earlier this year where there was

23         an individual that allegedly was going from camp to

24         camp killing people inside the encampments.  So

25         that prompted immediate response.

Enrique Velazquez                    56

1    Q.    Are there other agencies that could also make

2          immediate demands for closure, other City agencies?

3    A.    Again, we would have to evaluate that on a

4          case-by-case basis.  That was a very extreme case

5          where we needed to make that immediate response.

6                Conceptually, the Minneapolis Health

7          Department could also move to close immediately.

8          But, again, we would need all of our other partners

9          within the working group to come alongside and

10         support that decision, not just supporting it from

11         a conceptual perspective or we support the idea but

12         physically providing resources to help support the

13         closure.

14   Q.    If there are no available shelter beds on a --

15         prior to a -- a desired encampment closure, is the

16         policy to still go forward with it?

17   A.    So our focus as a working group is on the people.

18         We want to make sure that we're not unnecessarily

19         displacing the individuals while also balancing

20         community livability and community needs.

21               So when we move forward with plans for

22         closure, that's part of why it's important to know

23         how many people are at the encampment so that we

24         can contrast that with the number of shelter beds

25         that are available and supportive housing that's

Enrique Velazquez                           57

1          available.

2                  Because if we see that there are not enough

3          spaces for people to go to, then that's pretty much

4          a nonstarter.  And we've -- we've seen that in the

5          past with previous encampment closures where the

6          number of individuals at the encampment outweighs

7          the number of shelter spaces that were available.

8          So we've delayed closure so that Hennepin County

9          and other partners could bring additional spaces

10         online so that we would have enough spaces if

11         everyone chose to go into shelter.  Ordinarily,

12         people don't.  But we -- we -- we make a best

13         effort to make sure that they have the opportunity

14         if they choose to avail themselves of it.

15    Q.   And when those -- when those additional spaces are

16         brought online, does the City or this working group

17         have any control over what those additional spaces

18         look like?

19    A.   No, we do not.  That's managed by Hennepin County

20         since they are the continuum of care and manage the

21         Coordinated Entry System.  They have set parameters

22         for what spacing would look like and what it would

23         need to be, and -- and some -- some of it depends.

24                 So as new shelters come online, they might

25         have a specific purpose or a function.  It could be

Enrique Velazquez                          58

1       family, it could be for children, it could be a

2       variety of different methodologies in which those

3       spaces come online.  So some of that dictates what

4       the spaces are going to look like and what the

5       needs are going to be and what that distribution

6       is.

7   Q.  Do you have any -- any input or oversight or -- I

8       guess, yeah, input or oversight as to what those

9       parameters are or what those spaces look like?

10  A.  No.  As a city, we do not have input into that

11      space because Hennepin County, they are the

12      continuum of care.  So, really, it's their

13      discretion, and they're the ones who are providing

14      the funding and receiving the funding to manage the

15      continuum of care and the overall homelessness

16      response system.

17  Q.  Is there any mechanism for designating or reserving

18      spots for encampment residents prior to a closure?

19  A.  So individuals at encampments can reserve spots.

20      But as a -- as an organization, the City of

21      Minneapolis does not have the ability to reserve

22      spaces for individuals at encampments.

23          I -- I can say that they're -- I believe there

24      was one instance in which there was a deviation

25      from that, and that's because there was a brand-new

Enrique Velazquez                    59

1        shelter that was coming online.  So we worked with

2        that shelter provider to expedite their opening and

3        simultaneously delaying the closure so that we

4        could conceptually shift individuals from the

5        encampment that we were planning on closing over

6        into the shelter.  So right off the bat since they

7        were just starting their operation, Hennepin County

8        and the shelter operator agreed to reserve a block

9        of spaces for individuals that were coming out of a

10       specific encampment.

11   Q.  What -- do you remember what date that was?

12   A.  That -- to the best of my recollection, that was in

13       the winter of 2022.  I might get my years wrong

14       here.

15   Q.  That's okay.  I was mostly wondering if it was

16       prior to Nenookaasi.

17   A.  I believe it was prior to Nenookaasi.

18   Q.  And what -- what agency was that?  What shelter was

19       that?

20   A.  I believe it was Rescue Now.

21   Q.  Just going back a bit to -- to the notice and the

22       working group deciding who provides notice.

23           Do you remember tasking somebody named

24       Pastor Colin (phonetic) to provide notice to

25       encampment residents prior to a closure?

Enrique Velazquez                    60

1    A.    I do not recall authorizing a Pastor Colin to

2          provide notice.  Though, I am familiar with the

3          specific instance in which he was present while

4          notice was provided.

5    Q.    Could you just tell me what that situation was or

6          ex- -- explain your knowledge of that situation?

7    A.    Certainly.  I'll back up a little bit, if you allow

8          me --

9    Q.    Sure.

10   A.    -- a little bit of liberty here.

11         So City of Minneapolis, we own a lot of

12         property.  And by default, we are kind of the owner

13         of last resort.  So when properties are lost due to

14         tax forfeiture or there are no heirs available and

15         the property is surrendered over to Hennepin

16         County, Hennepin County makes a best effort to seek

17         buyers for those different properties.

18         And in instances where there are no interested

19         buyers, the City of Minneapolis will acquire those

20         properties in an effort to try and find ways to

21         redevelop them for low- to moderate-income families

22         and -- and just redevelop or package them into a

23         bundle so that they can be redeveloped as a set.

24         So by this practice, the City, through

25         Community Planning and Economic Development, owns

Enrique Velazquez                                  61

1          hundreds of vacant parcels.  They can't possibly --

2          the staff can't possibly manage all of that, so

3          they contract with a third party to do the property

4          management.  They do the maintenance.  They cut the

5          grass.  They do the snow removal.  They provide for

6          the fencing and posting of "No Trespassing" signage

7          on all of these vacant parcels and then rove around

8          to make sure that all of the City-owned properties

9          are fully compliant with the property and housing

10         maintenance code.

11              And on the specific event in which you're

12         describing where Pastor Colin was present, we

13         tasked this property management company with going

14         and providing notice of trespass and the closure

15         date for when the encampment was going to be

16         closed.

17              And on prior attempts to engage at the

18         property, the individual from the property

19         management company that was going and providing

20         some level of service and just follow-up in posting

21         of notices was threatened by individuals at the

22         encampment.  Whether they were residents of the

23         encampment or whether they were visiting, it is

24         unclear.

25              But they -- they felt threatened by

Enrique Velazquez                    62

1      individuals who were present at that time and,

2      instead, did not post notice.  They left and

3      returned with a friend, who happens to be a pastor,

4      and just wanted that extra individual, that extra

5      person there for their own personal safety so that

6      they could provide the notice and then leave the

7      area.  They don't engage.  They don't do any other

8      work.  They just provide the notice and leave.  So

9      when -- well . . .

10  Q.  Is it the same managing company or contractor that

11      you use for all City-owned properties?

12  A.  Yes.  That's correct.  It's the same property

13      management company for all City-owned -- or

14      City-owned properties owned by Community Planning

15      and Economic Development.

16  Q.  Who is that contractor?

17  A.  I don't have the name offhand.  I could probably

18      find that information.

19  Q.  We can -- we can table that question.

20          Are they -- are they tasked with providing

21      notice and "No Trespassing" signs anytime there's

22      an eviction in the City of an unhoused encampment

23      on the City property?

24  A.  Yes.  That is correct.  They pro- -- they ensure

25      that the fencing is intact, that the "No

Enrique Velazquez                          63

1        Trespassing" signage that's on the fencing and in

2        the property is intact.

3             And when there is a notice of closure, then

4        that contractor will go out and either post it on

5        the fence or something exterior or something in- --

6        internally.

7             They've also -- depending on the -- the setup

8        for the encampment and its proximity within the

9        neighborhood, they've also set up wedge boards in

10       the past.

11   Q.  Are they given specific instructions or parameters

12       for these signs?

13   A.  We have a standard template for signage.  And

14       whether it's on private property, other government

15       agencies', or City-owned properties, we try to use

16       the exact same template and same language that

17       specifies the notice of no trespassing, the

18       ordinance, that the site is set for closure.  And

19       if we're going to provide the date, then the date

20       and time.

21   Q.  Okay.  Do they report to the working group to get

22       these instructions or . . .

23   A.  So from the working group, there are other staff

24       that will also engage and do work.  So there are

25       other individuals who are not part of the working

Enrique Velazquez                                64

 1          group that will receive the instruction of what's

 2          to happen next, and then they will, in turn,

 3          provide direction to the contractor.  So they'll

 4          provide them with the signage, provide them with

 5          the operating parameters of be sure to -- you know,

 6          in the example of closure on December 13th, and we

 7          plan on providing three days' advance notice, then

 8          the instruction will be, "By December 10th, you

 9          must go to this site by this time and post notice,

10          take pictures that you posted" -- "posted the

11          notice and provide us that information as

12          photographic documentation that you did complete

13          the task."

14   Q.     And are they given any kind of instructions on how

15          to identify themselves as agents of the City or

16          devices to assist in doing that?  By "devices," I

17          mean letterhead or badges or seals, anything that

18          could indicate "We are a representative of the

19          City"?

20   A.     That, I'm not positive of.  I'm not sure how they

21          present themselves physically, if there's any sort

22          of a lanyard or documentation or anything visible

23          that indicates that they are a contractor of the

24          City.  I'm not infinitely familiar with that level

25          of detail.

Enrique Velazquez                    65

1   Q.   Do you know if the City does have oversight or

2        definitively doesn't have oversight into the way in

3        which these contractors are instructed to identify

4        themselves?

5   A.   I'll back up and say since they're a property

6        management company, the focus is on managing the

7        property and not on people because the -- the

8        intent is they're going to cut the grass, they're

9        going to remove root weeds, they're going to take

10       care of snow removal, those kinds of things, and

11       that people should not be resident on vacant

12       property.

13            So from that perspective, there generally has

14       not been a need to identify because they're just

15       managing the property.

16            In this specific instance when there are

17       individuals experiencing unsheltered homelessness

18       on these vacant -- on these properties that should

19       be vacant, I can see how there would be some

20       bumping up of what they're tasked with doing versus

21       what these unsheltered residents might see and not

22       knowing -- or I -- I don't know if they -- if they

23       know or don't know or how they represent themselves

24       or how they identify as they approach to place the

25       signage.

Enrique Velazquez                            66

1              I -- like I said, I don't -- I don't know that

2         level of detail of how they represent themselves or

3         if they have any sort of devices that would

4         indicate to others visibly that they are agents for

5         the City of Minneapolis.

6    Q.   Just to make sure I'm understanding you clearly,

7         this -- this contracting company, do they

8         specifically just manage properties that, as you

9         described, the City acquires because nobody else

10        wanted, or do they manage all vacant City lots?

11   A.   They manage all vacant City parcels owned by

12        Community Planning and -- and Economic Development.

13   Q.   Has the City been made aware of instances where the

14        Operational Guidance on evictions has not been

15        followed?

16   A.   Well, the Operational Guidance for encampment

17        closure is dictated by the working group.  So if we

18        make a decision in that moment that goes against

19        the operating parameters, we stand that up against

20        the parameters and say, "Why would we" -- "why

21        would we deviate from it?  Are there extenuating

22        circumstances that predicate that we are going to

23        deviate and that the level of risk is high enough

24        that it warrants deviation?  If not, we're not

25        deviating."  So that's the decision point that

Enrique Velazquez                    67

1         would happen.

2              So it's the working group that would have the

3         most intimate knowledge of whether we deviate or

4         whether we don't.

5              And then we're also either present ourselves

6         or have staff that are present that can follow

7         through and see from a transparency perspective,

8         did we actually uphold what we were intending to

9         do?

10             But there should be enough milestones along

11        the way from decision to closure that indicate

12        whether we are remaining on -- on -- on the path to

13        closure as we outlined within that working group.

14   Q.   I was wondering more so about, regardless of the

15        integrity of your process, the -- the pushback or

16        the flak that you might get from other people.

17             MS. ENSLIN:  Objection.  Vague.

18             MS. KELLEY:  I can restate the question,

19        if it makes it easier for you.

20             THE WITNESS:  Yes, please.

21             MS. KELLEY:  All right.

22   BY MS. KELLEY:

23   Q.   Do people complain to you and/or the working group

24        about the way that evictions are conducted when you

25        make decisions to deviate from the poli-- -- the

Enrique Velazquez                    68

1        Operational Guidance?

2   A.    I will have to bifurcate the -- the people.  So

3         from a community perspective, they wish that we

4         were -- operated faster and closed them much

5         faster.  From -- within the City, those that are

6         aware or even those that are not as intimately

7         aware of how we operate, they want to make sure

8         that we have a humane response.  And usually, I

9         walk them through, "Here's the process.  Here's the

10        teams.  Here's what we have."

11            And I'm able to demonstrate that, yeah, we are

12        taking a humanistic -- we're taking a

13        human-centered approach, that we are doing all

14        these things.  And that's part of why it takes as

15        long as it does.

16            So as much as it would be great to not have

17        encampments at all, the reality is these -- there

18        are a variety of different factors that lead to it.

19        So we have to work with individuals, meet them

20        where they are and help them move into that next

21        phase of -- of life for themselves.

22            But generally from community perspective, they

23        want encampments closed faster.  As soon as they're

24        set up, they want them closed.  So that would be

25        the resistance or pushback that we receive when we

Enrique Velazquez                69

1          provide notice and then eventually move to closure.

2               We generally don't have pushback from

3          individuals when we go in the opposite direction of

4          moving to closure quickly and not providing a -- a

5          lengthy advance notice period.

6     Q.   And are you -- are you getting this feedback in the

7          form of phone calls or emails?  How are you having

8          these conversations with community members?

9     A.   Primarily we receive emails.  Also, direct feedback

10         from community meetings at var- -- var- -- various

11         police precincts or different city council members

12         will stand up community meetings and listening

13         sessions in response to safety concerns within an

14         area.  So I receive that information there.

15              Council Member Jenkins led a -- a Think Tank

16         in September.  It was a series of three different

17         meetings inviting community members to engage in

18         making some recommendations on how to respond to

19         unsheltered homelessness and received in- -- input

20         during those sessions as well.

21    Q.   And what do you -- what do you do with the input?

22         Where does it go from -- from there?

23    A.   So the approach we take is there's no

24         one-size-fits-all approach to unsheltered

25         homelessness.  People enter through a variety of

Enrique Velazquez                    70

1       different means.  They need to exercise their

2       agency, and we want to provide as many

3       opportunities as possible to help people recognize

4       their agency, to take control of it, and to move

5       from unstable housing to stable housing.

6            So we take that input.  We evaluate it.  I say

7       "we" as in if I receive the information, I bring it

8       to this unsheltered working group.

9            If it comes through other individuals that

10      attend community sessions, it all comes into this

11      unsheltered working group so that we can

12      collectively identify how we might pivot our

13      approach.  Or if there's enough merit to

14      incorporate more funding into the budget process,

15      as an example, to stand up different elements with

16      respect to the un- -- the City's response to

17      unsheltered homelessness.

18  Q.  And when -- when you said that the Mayor expressed

19      an interest to have evictions -- or encampments be

20      closed faster and/or not form at all, did he offer

21      any basis for expressing that desire?

22  A.  If I recall, that was, I believe, in response to

23      seeing a number of different individuals who are

24      experience -- experiencing unsheltered homelessness

25      who are addicted to fentanyl.

Enrique Velazquez                         71

1          Going out in the community and engaging with

2      individuals and seeing just the pervasiveness of

3      addiction and engaging with community members who

4      were very concerned for themselves, for their

5      property, for their businesses, for their neighbors

6      and for the -- their unsheltered neighbors as well,

7      that this just cannot continue.  We need to do

8      something different.

9          So part of that response is close encampments

10      more quickly and do not allow encampments to form

11      because they are unsafe for the individuals that

12      are residing in the encampments, and they present

13      high level of safety risk for the neighbors that

14      surround them.

15   Q.   Is there a way that unhoused individuals could get

16      in touch affirmatively with the Homeless Response

17      Team if they wanted to?

18   A.   Well, the Homeless Response Team, aside from being

19      present at encampments and making regular visits to

20      encampments, you know, they can engage directly

21      that way.  The team also has a -- a shared email

22      box.  You can contact through Minneapolis 311.

23      Just dialing 311 on your phone from within the City

24      of Minneapolis, or outside of the City of

25      Minneapolis, (612) 673-3000 to get to 311 to try

Enrique Velazquez                        72

1           and get to the Homeless Response Team.  Since

2           they're in the field full time, they have no desk.

3           They have no desk phones.  But that would be --

4     Q.    Yeah.

5     A.    -- probably the most expedient way to get in touch

6           with them, and then they can reach back out to

7           any -- any individual that contacts them.

8     Q.    Do they have -- do they give out this contact

9           information when they do visits?

10    A.    I'm not positive of what details are included on

11          the information sheet that they provide, if it's

12          just the email address or if it's email address

13          plus the number for the Minneapolis 311 along with

14          the list of shelter and service providers that

15          operate within the unsheltered homelessness

16          framework.

17    Q.    So they -- they give out some -- some

18          documentation, but you're not sure what's on it?

19          Is that what you're saying?

20    A.    I'm saying that while they provide documentation of

21          available resources, I'm not -- I'm not certain of

22          the specificity of the Homeless Response Team's

23          information on that list of resources.

24              Because the focus for the Homeless Response

25          Team, while they're doing outreach and engagement,

Enrique Velazquez                    73

1        it's on doing triage and making sure that they

2        connect individuals experiencing unsheltered

3        homelessness to the service providers and to

4        Hennepin County and make sure that the individuals

5        have access to all these resources that can provide

6        them with the direct services versus the Homeless

7        Response Team, which is one more mechanism to

8        connect them to all these different resources.

9    Q.   Do the Homeless Response Team individuals have a

10       way to follow up with somebody who they visited

11       once if they wanted to find that person and do a --

12       a second visit with them?

13   A.   Well, I'll -- I'll say this again.  The focus is on

14       triage.  We do not connect -- collect names or

15       personal information for any of the individuals

16       that we connect with -- or that the Homeless

17       Response Team connects with.  That is -- that

18       responsibility -- responsibility lies with

19       Hennepin County and with the service providers.

20       They have access to the Homeless Management

21       Information System and can add people into the

22       system and evaluate them for placement within the

23       Coordinated Entry System.

24           The Homeless Response Team is primarily for

25       triage and -- and basic connection.  And the best

Enrique Velazquez                                74

1          way to do that is in person.  So if members of the

2          Homeless Response Team go to the encampment and

3          engage with an individual who is looking to connect

4          with their caseworker, that Homeless Response

5          Coordinator can look into the Homeless Management

6          Information System, identify who the case manager

7          is for the individual they're meeting with at that

8          moment, and then find their contact information and

9          make the connection that way.

10              Otherwise, we generally do not -- the Homeless

11         Response Team -- when I say "we" in this case, the

12         Homeless Response Team does not collect that

13         personal information and doesn't make appointments

14         with individuals, does not connect in that regard

15         to do that active case management or follow-up.

16  Q.     Is it -- is it the position of this working group

17         that encampments are more unsafe than individuals

18         who are unsheltered and homeless but not in an

19         encampment?

20              MS. ENSLIN:  I'm going to object to the

21         extent this is outside the scope of the deposition.

22         Is this -- is there a topic that addresses this?

23              MS. KELLEY:  Sure.  I think it falls kind

24         of generally under the "Planning, discussion, and

25         decision-making of houselessness-related policies,"

Enrique Velazquez                    75

1       No. 1.  The decision-making that informs the City

2       of Minneapolis's procedures regarding whether or

3       not to evict -- evict would inherently be informed

4       by whether or not the City thinks that evictions

5       put individuals in more or less danger as opposed

6       to unsheltered houselessness without encampment.

7                MS. ENSLIN:  Okay.  I'm just going to log

8       a standing objection to this line of questioning.

9                The witness can answer.

10               I'm also going to object to the extent

11      this calls for an incomplete hypothetical.

12               You can answer.

13               THE WITNESS:  Okay.

14   A.  Well, what I can say about that is that encampments

15      are not a safe environment for individuals who are

16      experiencing unsheltered homelessness.

17          We can point to 911 call data.  We can point

18      to community livability data through 311 or 911

19      that indicate that crime and other violent offenses

20      increase with the presence and how -- the length of

21      time that encampment is present within an area or a

22      neighborhood.

23          It isn't necessarily to say that the

24      individuals resident within the encampment are the

25      reason for that.  It is to say that an encampment

Enrique Velazquez                    76

1       forms an attractive nuisance where individuals will

2       look to exploit those who are experiencing

3       unsheltered homelessness.

4           They'll look to take advantage of the -- the

5       screen, if you will, of an encampment to harm

6       others within the community, to -- to steal, to

7       break in, to cause disruption and other -- other

8       types of harm, to engage in sex trafficking and

9       other human trafficking.  It's a mechanism that

10      attracts an element of bad actors that are looking

11      to exploit individuals.

12  BY MS. KELLEY:

13  Q.   Sure.  My question is more for the individual who

14      is either residing at an encampment or not residing

15      at an encampment but in both situations

16      experiencing homelessness.

17          Does the encampment provide, according --

18      do -- do you have a position on the relative safety

19      that an encampment would provide?

20          Let me know if you need me to rephrase that

21      question.

22              MS. ENSLIN:  I'm -- I'm just going to

23      object to the extent that calls for speculation,

24      and it's an incomplete hypothetical.

25              MS. KELLEY:  Sure.

Enrique Velazquez                    77

1    BY MS. KELLEY:

2    Q.    I'm -- I'm asking if -- if the working group has a

3          position on whether encampments are safer or less

4          safe for unhoused individuals.

5    A.    The position is that encampments are unsafe,

6          period, and they are less safe than for individuals

7          that are unsheltered residing independently on

8          their own.

9    Q.    Okay.

10                 MS. KELLEY:  And I guess I would just --

11         I'll pause and check in and see how everybody is

12         doing.  We've been going at this for a while.  And,

13         yeah, does anyone want to take a -- a breather?

14                 MS. MCQUITTY:  That's a good idea.

15                 MS. KELLEY:  (Attorney nods head.)

16                 MS. MCQUITTY:  Maybe ten minutes?

17                 THE WITNESS:  Could we take a break?

18                 MS. ENSLIN:  Yeah.  How about -- should

19         we take a ten-minute break?

20                 MS. MCQUITTY:  (Attorney nods head.)

21                 MS. KELLEY:  That sounds -- yeah.  Does

22         that work for everyone else?

23                 THE WITNESS:  (Witness nods head.)

24                 MS. ENSLIN:  (Attorney nods head.)  Come

25         back at 10:55.  Sound good?

Enrique Velazquez                          78

```
 1              MS. KELLEY:  (Attorney nods head.)
 2              MS. MCQUITTY:  (Attorney nods head.)
 3              (Recess from 10:45 a.m. to 10:57 a.m.)
 4   BY MS. KELLEY:
 5   Q.   Has the working group looked at any data comparing
 6        the, I guess, negative outcomes for people
 7        experiencing houselessness while dispersed as to --
 8        compared to the negative outcomes they experience
 9        when living at encampments?
10   A.   I'm trying to wrap my mind around the -- the
11        question.  Apologies.
12   Q.   Take your time.
13   A.   So conceptually, have we looked at outcomes for
14        individuals experiencing homelessness that are in
15        encampments versus not in encampments?  Is that the
16        question?
17   Q.   Yeah.
18   A.   No, we have not looked at those specific parameters
19        because the -- the -- the focus for this working
20        group is on encampments.  Encampments are illegal.
21        So how do we work with individuals inside the
22        encampments to help them progress to a stage where
23        they're sheltered and they're stably housed and not
24        in encampments.  So that's --
25   Q.   Okay.
```

Enrique Velazquez                                    79

1    A.    -- the primary focus.

2          And then more of the analysis of the outcomes

3          for those that are housed but might be housing

4          unstable, those that are unhoused, those that are

5          in encampments, that analysis work would happen at

6          Hennepin County as the continuum of care and quite

7          possibly at the State of Minnesota for the

8          Minnesota Interagency Council on Homelessness.

9    Q.    Okay.  Do they give you any of their data or

10         reports?

11   A.    No.  We do not have that data or reporting because

12         our focus is solely on encampments within

13         Minneapolis, not all the different variants of

14         homelessness that exists within the system.

15   Q.    Okay.  Thank you.  I'm going to switch gears a

16         little bit and ask some questions about the

17         storage.

18   A.    Okay.

19   Q.    So could you just give us an overview of what --

20         what's the storage that the City offers to unhoused

21         people for their belongings?

22   A.    Certainly.  So the City of Minneapolis has a

23         contract with the Downtown Improvement District to

24         provide storage.  There's two different contracts

25         that are present.  One, as I mentioned before, the

Enrique Velazquez                    80

1          Homeless Response Team was kind of an amalgamation

2          of multiple different individuals from different

3          departments that all joined and are now in

4          Regulatory Services.

5              Our contracts were kind of the same way, where

6          there was a contract with the Health Department for

7          storage in the downtown space specifically, and I

8          think some of the focus there was for individuals

9          that were walking around with their belongings,

10         that they would have a safe space to leave their

11         belongings while they took in a shower, did a

12         variety of other things, generally not necessarily

13         focused on unsheltered homelessness.

14             And then there's a second contract with the

15         City Coordinator's Office that was for storage of

16         personal items for individuals experiencing

17         unsheltered homelessness in encampments.

18             So both of those contracts came together.  Reg

19         Services -- Regulatory Services, we hold these

20         contracts now.

21             And what it looks like is -- for the personal

22         belongings storage, it's a large tote.  I can't

23         recall the dimensions of the tote.  But our

24         Homeless Response Team members, they have these

25         totes available.  As they go and do engagement with

Enrique Velazquez                              81

1           individuals experiencing homelessness at

2           encampments, they offer storage at each one of the

3           different site visits.  "Do you want to go to

4           shelter?"  "Do you have a case manager?"  "Do you

5           want to connect with your case manager?"  "Do you

6           want to go to" -- you know, "Do you want storage?"

7           Just offering an -- an array of different services.

8           So that's how --

9    Q.     That -- that's --

10   A.     -- that functions.  And then --

11   Q.     Sorry.  I'm going to back you up a little bit just

12          to make sure I'm understanding the two contracts.

13   A.     Certainly.

14   Q.     Is the Health Department contract designed to be

15          more temporary just while people are doing

16          something like showering?

17   A.     Yes.  It's designed to be more temporary whereas

18          the -- well, I guess, both contracts are designed

19          to be temporary.

20              The health one is more immediate temporary

21          where it's very short term while I'm engaging in

22          something else, while I'm getting services, leave

23          my belongings with the Downtown Improvement

24          District, and then I retrieve them later.

25              The encampment-specific storage, the personal

Enrique Velazquez                              82

1            belongings storage, is more of a intermediate-term

2            temporary where individuals can place their

3            belongings in a bin.  They have to provide

4            identification so that we know who they are and

5            that they are releasing their belongings for

6            storage purposes.  It makes it easier when they go

7            to claim their property later if they're able to

8            say, "Yes, this is who I am."  And they can provide

9            some level of proof that -- proof of ownership for

10           their belongings.  The requirement there is that

11           they check in once every 14 days and that storage

12           was initially intended to be for three months

13           maximum.  Though, I can say that the Downtown

14           Improvement District still has all the personal

15           items and personal effects that they agreed to take

16           on.  They have not destroyed anybody's items in the

17           three-plus years that we've had the contract in

18           place.

19      Q.   Has the -- the contract -- or so the -- you just

20           said the contract for the encampment storage has

21           been in place for three years.  How long --

22      A.   Yes.

23      Q.   -- has the contract been in place for the

24           Health Department storage?

25      A.   The Health Department storage came about in 2020 to

Enrique Velazquez                              83

1          2021.  I'm a little fuzzy on exactly when.  But

2          both of them are roughly three to four years --

3     Q.   Okay.

4     A.   -- is how long we've had them in place.

5     Q.   And is that -- are those in the same -- is it

6          stored in the same building?

7     A.   Yes.  They are stored in the Downtown Improvement

8          District's offices downtown off of Hennepin Avenue.

9     Q.   Is that the -- is it by the Greyhound terminal?

10         It's okay if you don't know.

11    A.   I don't recall the specific location.  I haven't

12         been to that facility in -- in quite some time.

13    Q.   Okay.  Thanks for indulging these clarifying

14         interruptions.  I appreciate you, Mr. Velazquez.

15    A.   Certainly.

16    Q.   And the -- the check-in every 14 days for the

17         encampment storage, how does one do that?

18    A.   So when an individual basically surrenders their

19         belongings to be stored, they're provided their

20         contact information so they can call and check in,

21         or they can visit and physically in person check in

22         on their belongings or retrieve some items out

23         of -- out of storage if they so choose.  So it's a

24         couple of different mechanisms that are in place

25         that will allow them to check in.

Enrique Velazquez                    84

1    Q.    And when they -- when they call, is it like a
2          number menu, is it a robot, is it a person?
3    A.    It is a person on the other end of the phone that
4          they can connect with, and that way that individual
5          can look up the record of their belongings and make
6          sure that they take notation of, "Okay.  This
7          individual checked in on their belongings and
8          here's the date," so that they can update the
9          record.
10   Q.    When the Homeless Response Team offers storage, are
11         they offering the -- the tote storage or the bin
12         storage or both?
13   A.    It's a -- it's a tote, and that's -- that's what
14         they offer.
15   Q.    So do they -- does the Homeless Response Team offer
16         storage that is encampment specific, the -- the
17         larger-volume storage?
18   A.    So if I understand the question, it sounds as
19         though the question is on:  Are we offering a
20         larger storage option for the entirety of the
21         encampment or either --
22   Q.    The -- so I'm -- I'm envisioning what you've just
23         described -- and please correct me if I'm wrong --
24         as there are two storage contracts with separate --
25         kind of separate offerings.

Enrique Velazquez                    85

1            The first being the Health Department tote,
2       and the second being the encampment-specific bins.
3    A.  (Witness nods head.)
4    Q.  Am I -- please correct any misunderstandings that I
5       have just made.
6    A.  Certainly.  Okay.  That makes sense.
7            So the health contract one is primarily for
8       downtown.  That one is not offered at encampments.
9            The Homeless Response Team, they travel around
10      with -- you know, using the same terminology, they
11      travel around with the bins so that --
12   Q.  Okay.
13   A.  -- anybody that wishes -- anybody in an encampment
14      that wishes to store their personal belongings in
15      that moment that they make the decision, they can
16      have access to the bin and store their personal
17      items, and then the Homeless Response Team can
18      transport that to the Downtown Improvement District
19      for storage.
20   Q.  Okay.
21   A.  We try to capitalize on when individuals in the
22      moment make the decision so that they have that
23      immediate gratification knowing that, okay, they've
24      made a choice, and we're responding to the choice
25      that they've made.

Enrique Velazquez                              86

1    Q.    Is there a volume limit on how many bins or on --

2          if objects don't fit in a bin?

3    A.    So the volume limit is that their items need to fit

4          inside the bin, and they get one bin.  So they have

5          to make some decisions on what items they want to

6          put into storage for safekeeping versus items that

7          if they're going to use more routinely on a --

8          on -- on an ongoing basis that they wish to either

9          travel with or keep close by.

10   Q.    And does the City offer storage for items that

11         don't fit?  Like, that wouldn't fit in a bin such

12         as furniture or anything bigger than a bin, I

13         guess?

14   A.    We have on a case-by-case basis.  It's not

15         something we normally do.  So there have been

16         instances where we have offered larger storage.

17              I can think of a case where there's an

18         individual that repairs bicycles.  So it was his --

19         part of his gig.  It was how -- part of how we

20         participate in the -- in the services economy,

21         repairing bicycles.

22              He had a number of bicycles and was

23         unsheltered.  And when we moved to close that

24         specific location where that individual was

25         operating, the decision was made to help transport

Enrique Velazquez                    87

1           his bicycles into storage, and we procured a

2           storage unit for the individual's bicycles.

3    Q.     Okay.

4    A.     What happened after the fact was he acquired more

5           bicycles and then stayed outside with his new

6           collection of bicycles and never checked in on the

7           storage unit of -- of items.

8    Q.     So then -- then what happened to the bicycles in

9           storage?

10   A.     Well, I think they're -- the -- the contract was

11          coming to some -- some sort of an end where we

12          weren't going to be able to store them any longer

13          or -- yeah, store them any longer or pay for the

14          storage for any longer and approached the

15          individual to find out what he wanted to do with

16          his belongings, and he didn't want them.  So they

17          were transported, I believe, with Solid Waste and

18          Recycling so they could recycle them or rehab them.

19          I'm not exactly sure how they -- they were

20          ultimately dispositioned, since they were his

21          belongings that -- that we were storing on his

22          behalf.

23   Q.     So if somebody -- I guess, kind of in line with

24          that.

25               If somebody doesn't check in within the

Enrique Velazquez                    88

1       14 days, is there a process that is followed for --

2       for checking in with them?

3   A.  I'm trying to recall the specific information that

4       is required to be provided.  I know something

5       personally identifiable with a picture

6       identification.  I don't know if we collect -- "we"

7       being the Downtown Improvement District, if they

8       have contact information because the Homeless

9       Response Team collects that for them or not.

10          What I can say is the Downtown Improvement

11      District has not disposed of anybody's belongings.

12      They're still in storage.  Seventeen individuals

13      have utilized storage and only one person has ever

14      checked in.  Yeah.

15  Q.  Only one person has ever done the 14-day check-in

16      thing?

17  A.  Yes, only one.

18  Q.  How do people --

19  A.  All the belongings are still there.

20  Q.  Okay.  How do people -- like, not checking in for

21      the purpose of keeping things there but check-in

22      for the purpose of accessing their belongings, how

23      would that work?

24  A.  So with that, they have the contact information for

25      the Downtown Improvement District.  So they can --

Enrique Velazquez                    89

1          while it presents a barrier, and we recognize that

2          it's a barrier, it is downtown.  And with the

3          majority of the encampments being more on the

4          perimeter of Minneapolis versus in the central

5          business district, we have partnered with

6          Metro Transit and their Homeless Action Team for

7          bus tokens so that people could get downtown and

8          get back.

9               We've also provided -- we have access to --

10         we, the Homeless Response Team, has access to an

11         Uber account so that they can pay to transport

12         people so that they can access their belongings.

13              And I can say that, you know, we have received

14         feedback about the centralized location for storage

15         and how it's not in community.

16              So one of the pieces that I advocated for

17         adding into this next budget cycle for 2025 and

18         2026 is more funding so that the Homeless Response

19         Team can have access to storage that's in community

20         with -- or -- or surrounding encampments so that

21         storing of their personal belongings and accessing

22         their personal belongings doesn't create one more

23         barrier to holding on to their personal effects.

24    Q.   How -- how would a unhoused person, like, access a

25         bus token or an Uber ride to take advantage of that

Enrique Velazquez                              90

1         offering?

2    A.   The Homeless Response Team delivers bus tokens when

3         they -- they have a limited number, but they'll

4         deliver them for anybody that asks.

5              So it's one of those pieces of "Do you

6         need" -- "do you need transportation somewhere?"

7         "Do you" -- you know.  Some individuals have access

8         to safe housing, and I'll -- I'll use air quotes

9         around "safe housing" because that housing might be

10        sofa surfing on the couch for a relative.

11             So some individuals might see that the

12        conditions are not so favorable or what's coming up

13        is not so favorable, and they will choose to go

14        into safe housing and will connect with the

15        Homeless Response Team or the Homeless Action Team,

16        and they go out and do their visits as well to

17        access and receive bus tokens or ask for a ride.

18   Q.   Is -- the Homeless Action Team and the Homeless

19        Response Team, those are different -- are they

20        different?

21   A.   They are different.  The Homeless Action Team is

22        through Metro -- I'm sorry.  I'm converging two

23        different words -- through Metro Transit, so the

24        Transit Authority.

25   Q.   Okay.  What -- could you just give me an overview

Enrique Velazquez                                91

1         of what the Homeless Action Team is?

2    A.   So the Homeless Action Team, to the best of my

3         knowledge, they do outreach and engagement efforts.

4         Their primary focus is for encampments that are on

5         or immediately adjacent to Metro Transit areas.  So

6         that would be the Light Rail; Light Rail stations;

7         the bridges surrounding the Light Rail, if the

8         Light Rail train travels over or underneath a

9         bridge; it would be along the bus lines, if there

10        are individuals experiencing unsheltered

11        homelessness who are taking up shelter in a bus

12        shelter or at a bus stop or a bus bench.

13             So they engage with those individuals and try

14        to help them find pathways to stable and supportive

15        housing similar to how the Homeless Response Team

16        engages with individuals on private property and

17        City-owned property.

18   Q.   Okay.  Does the Homeless Action Team send a

19        representative or participate in the working group

20        meetings?

21   A.   The Homeless Action Team participates in a separate

22        work group meeting where the -- the City of

23        Minneapolis Homeless Response Team convenes meeting

24        with Minneapolis Park and Recreation Board,

25        Minnesota Department of Transportation, City of

Enrique Velazquez                              92

1        Saint Paul, Hennepin County, those that are engaged

2        in the outreach work.  So that's the avenue for

3        information and connection --

4    Q.   Okay.

5    A.   -- to the conduit that feeds over to the working

6        group -- the City's working group.

7             The Homeless Response Team or the --

8        represented by the manager of the Homeless Response

9        Team will bring that information forward to the

10       internal working group.

11   Q.   I see.  And how often does that broader

12       Hennepin County/St. Paul Homeless Action

13       Team/Homeless Response Team meeting happen?

14   A.   That happens every week on Monday.

15   Q.   Okay.  These -- the decisions about what can be

16       stored, where it would be stored, how often you

17       have to check in, who made those decisions?

18            MS. ENSLIN:  I'm going to just object to

19       the extent that's a compound question.

20            You can answer.

21            MS. KELLEY:  Sure.

22            THE WITNESS:  Sure.

23   A.   So with respect to the check-in, that was part of

24       the contract as it was set up.  I -- I'm not

25       familiar with how the individuals that negotiated

Enrique Velazquez                               93

1           the contract arrived on a 14-day check-in and how

2           much storage capacity they would have or when to

3           discard of personal items.

4                What I can say is most likely it was we were

5           anticipating a great response -- meaning high

6           volume of response -- of individuals that would

7           look to take advantage of storage.

8                So there needed to be some sort of mechanism

9           in place so that storage can flow smoothly so that

10          individuals that are looking to benefit from it are

11          not blocked by others that did take advantage of it

12          and didn't check in or chose to abandon their

13          property.

14               Because we've had such low response with very

15          few people over the last four year -- three years,

16          '21 to '24, no items have been discarded.

17               We've blown way past the 14-day requirement

18          for check-in, and the Downtown Improvement District

19          is okay with that because they do not see that --

20          the volume isn't there.  So it -- these are just

21          bins that are sitting there in their space, and

22          they're focusing on just storing these belongings.

23     BY MS. KELLEY:

24     Q.   Is there any requirements or -- yeah, requirements

25          that individuals who use these bins submit to

Enrique Velazquez                    94

1           searches of the bins or what they put in them?

2    A.    To the best of my knowledge, no, there's no

3          requirement like that.  We do not catalog what goes

4          into the bin.  The individual that moves their

5          items into the storage bin and places them there,

6          they might catalog them.  But the focus from the

7          City perspective is solely on ensuring that

8          individuals have access to storage or at least the

9          storage option if they choose to avail themselves

10         of it.

11              We transport it over to the Downtown

12         Improvement District.  We continue to fund it to

13         make sure that their items are not discarded.

14              But otherwise, there's no other indication, no

15         other record that the City maintains of who the

16         individuals are and whether they stored belongings

17         or what the belongings are.  So from, like, a law

18         enforcement perspective, that would be completely

19         outside of the bounds.

20   Q.    Okay.  So the record of who stores what is held

21         by -- like, where -- where is that record held?

22   A.    That would be the individual that chose to store

23         their belongings.  And if there is a separate

24         record, it might be the Downtown Improvement

25         District just so that they know who stored items,

Enrique Velazquez                          95

1           what's in the -- what's in the -- in the bin.

2      Q.   And this is probably an ignorant question on my

3           part.  What is the Downtown Improvement?  Is that

4           part of the City, the Downtown Improvement District

5           or . . .

6      A.   Oh, the Downtown Improvement District is kind of

7           a -- a subworking group of the Downtown Council,

8           which is an economic development nonprofit

9           organization that is focused on ensuring the City

10          of Minneapolis and specifically downtown is

11          represented in a positive light, that they attract

12          positive influences, conventions, conferences, all

13          those different kinds of revenue-generating

14          economic drivers to the City.

15               So the Downtown Improvement District was

16          developed to help amplify that message with kind of

17          a -- a Disneyland, Disney World kind of a feel with

18          ambassadors that greet people.  They provide

19          wayfinding.  They provide positive elements to

20          downtown that just by their presence help detract

21          from negative elements that might look to take

22          advantage of visitors or tourists and -- and the

23          like.

24     Q.   Is there a -- a bidding process prior to selecting

25          the Downtown Improvement District as a partner for

Enrique Velazquez                    96

1       these contracts?

2  A.   Typically, just speaking in general terms to our

3       procurement process, we generally do go through

4       requests for proposals where other entities could

5       bid on this.  I'm not familiar with how we la- --

6       landed on this specific vendor --

7  Q.   Um-hum.

8  A.   -- at this specific time.

9            We also could have gone with a sole source

10      because Downtown Council, Downtown Improvement

11      District, plus our emergency management personnel,

12      police department, fire and whatnot, they could

13      have arrived at a similar conclusion of "We need to

14      have storage.  We need to have storage options

15      available."

16           And just speaking hypothetically, I could see

17      the Downtown Improvement District saying, you know,

18      "We have space.  We could store belongings.  We

19      could try this out, see how it works, and do some

20      level of sole-source contracting that way."

21 Q.   When storage is offered by the Homeless Response

22      Team to residents, on a kind of a literal level,

23      how do they do that?

24 A.   So when Homeless Response Coordinators go to

25      encampments, they attempt to go door to door or

Enrique Velazquez                          97

 1          tent to tent to engage individuals.  They make

 2          announcements:  "Hey, Homeless Response Team.  Just

 3          doing a wellness check on you," and then solicit

 4          engagement.  "We have snacks."  "We have socks."

 5          "We have" -- "we have a variety of different

 6          things."  "Hello, we have water."  And just try to

 7          draw people out of their tents so that they can

 8          engage.  Not everybody chooses to engage.  But

 9          that's kind of the -- the process that they follow

10          to try and build engagement.

11              And then as they engage to either receive

12          snacks, receive water, receive whatever it is

13          that -- whatever perishable item that they have

14          right there with them, that's when coordinators

15          will ask, "Hey, are you connected?  Do you have a

16          case manager?  Who's your case manager?  Do you

17          want us to put you in touch with a case manager?

18          This encampment will be closing.  Do you have any

19          items you'd like to store?  We have bins available.

20          We have them in the vehicle.  Would you like us to

21          arrange that for you to store your belongings for

22          you?"

23    Q.    In addition to going tent to tent, does the

24          Homeless Response Team typically spend time in

25          common areas of the encampment?

Enrique Velazquez                           98

1   A.   They'll stay for as long as there's engagement.  So

2        if there's a -- a -- a fair and net amount of

3        individuals that wish to engage, then they'll

4        remain present.  They'll stay engaging.  It all

5        depends on what are the -- what are the parameters

6        at that -- that location?  What's -- you know, they

7        have to maintain situational awareness because they

8        go out in pairs.  Are things becoming hostile?  Are

9        people becoming agitated?  Are there other things

10       that are rising to the surface that might predicate

11       that our coordinators need to back out?  So it --

12       it depends.

13            But, yeah, they have stayed in common areas

14       and engaged with people.  They've engaged with

15       other caseworkers and outreach workers as they go

16       to those specific locations where they can do some

17       level of a debrief on- -- on-site of "Hey, you

18       know, we" -- "we visited multiple times and this

19       person never comes out.  Have you talked to them?"

20       "Oh, yeah, this is who they are, and here's" --

21       "here's what's going on.  They work nights, so

22       they're sleeping during the day," or a variety of

23       different things like that.

24  Q.   Yeah.  And how -- how do they document the

25       interactions that they have with people?

Enrique Velazquez                    99

1   A.   So the Homeless Response Team has a shared

2        document, almost like a spreadsheet, where they

3        document the date of the visit, how many people

4        they've connected with, how many people they

5        feel -- based off of, you know, peripheral and

6        anecdotal information of, you know, collecting

7        information from the two individuals, they'll share

8        that data -- how many people they feel are there,

9        number of structures.  Are there other -- other

10       extenuating circumstances that are present there?

11       Did they see illicit drug -- drug use, an array of

12       needles?  How many people did they actually engage

13       with that accepted shelter versus storage versus

14       snacks or -- or personal effects?  So they just

15       keep track of that information.

16  Q.   I'm going to -- I'm going to talk about Nenookaasi,

17       and I'm going to kind of give you an idea of what

18       I'm considering Nenookaasi to be.  Is that -- so we

19       can be on the same page.  How does that sound?

20  A.   Sounds good.  Thank you.

21  Q.   Okay.  So Nenookaasi being described as the

22       encampment that was the -- the big one on

23       13th Avenue near 2313 from late August until

24       January 4th.

25            And the January 4th eviction was followed by a

Enrique Velazquez                              100

1        January 30th eviction from a location -- so from

2        January 4th to January 30th, it was on 14th Avenue

3        near 2601.

4   A.   Um-hum.

5   Q.   And then that location existed for a short period

6        of time from -- so after the 14th Avenue was

7        evicted, it was 16th Avenue South from January 30th

8        to February 1st.

9             And then the location moved to 1105 East 28th

10       Street from February 1st until the fire.

11            And then from February 29th to July 25th, at

12       or near 2839 14th Avenue South.

13            I'm going to pause for a second just to see if

14       you have questions about that or if that makes

15       sense to you what I'm defining as Nenookaasi.

16  A.   Yes.

17  Q.   How many Nenookaasi residents were offered storage

18       by the Homeless Response Team?

19            MS. ENSLIN:  I'm just going to object to

20       this to the extent it's, yeah, improper inquiry for

21       a 30(b)(6) deposition.

22            You can answer if you know.

23  A.   I'll say that every time the Homeless Response Team

24       personnel visit Nenookaasi or any other encampment,

25       they offer storage.

Enrique Velazquez                    101

1           So as many people as are willing to engage,

2      that's how many people are offered storage with

3      multiple visits.  So the same person might be

4      offered storage 15 times for each one of the 15

5      visits.  Though, they may not connect with

6      100 percent of the people that are at the

7      encampment.

8  BY MS. KELLEY:

9  Q.   And how many people who are Nenookaasi residents

10      ended up using storage offered by the Homeless

11      Response Team?

12  A.   None.

13  Q.   Was there any conversation in the City about the --

14      the lack of use of this offering and ways to

15      address that?

16  A.   Yes.  So taking a look at the data that the

17      Homeless Response Team collects from their

18      engagements over time, there are a couple of

19      different factors.  One is the size of the storage,

20      and the second, the location in proximity to

21      encampments.

22           So that's where -- while I'm not able to

23      address anything in the immediacy, we were able to

24      incorporate elements and proposals into the next

25      budget cycle so that we could identify sources for

Enrique Velazquez                          102

1    storage that are in community.

2         We also looked at existing service providers

3    such as the Catholic Charity -- Catholic Charities

4    Mary Frey Opportunity Center where they have

5    storage lockers there.  They have a limited number

6    of lockers, very low cost, and they're able to

7    provide storage for 30 days, and then that

8    individual that has a storage locker would have to

9    surrender the locker.  They go to the back of the

10   list so that other people can avail themselves of

11   the limited quantity of storage lockers they have

12   before they get access to a locker again.

13        So we looked at a variety of different sources

14   to try and solve the puzzle of personal belongings

15   storage with the funding and resources we have.

16  Q.  Were any changes made based on those explorations

17      to the existing way that the City offers storage?

18  A.  Again, that's where we added into the next year's

19      budget cycle the options for storage within

20      community.

21           But we have to wait until the budget is

22      approved, and then we can issue a request for

23      proposal so that we can identify those sources and

24      move forward with a -- a different, more robust

25      storage solution than what we're able to offer

Enrique Velazquez                    103

1        right now with this initial Downtown Improvement

2        District contract.

3   Q.   Is Catholic Charities one of the City's outreach

4        partners?

5   A.   Catholic Charities is one of Hennepin County's

6        outreach service organizations -- or I should say

7        they -- they offer a -- a warming shelter service.

8        And especially from November to April during the

9        inclement weather months, they provide warming.  So

10       whether it's daytime or nighttime operations,

11       there's multiple different organizations that

12       provide that.

13           Catholic Charities is a shelter provider with

14       a number of different shelters both in Minneapolis

15       and St. Paul, so they are part of both continuums

16       of care.

17  Q.   Okay.  And the -- the City has used the term

18       "outreach partners" in a couple of its documents.

19       Would you mind explaining what that means?

20  A.   Sure.  So even though we do not have the direct

21       relationship with any of these Social Service

22       organizations -- meaning we're not funding them

23       directly; the funding goes through Hennepin

24       County -- we still consider them partners.

25           Our -- the City's Homeless Response Team is in

Enrique Velazquez                                    104

```
 1          the field engaging with individuals experiencing
 2          unsheltered homelessness, and they will also
 3          interact with other outreach organizations such as
 4          Avivo and Agate and Streets to -- Streets to
 5          Housing and Homeless to Housing and referring to
 6          different organizations out in the field.
 7               So from that perspective, we see them as
 8          partners.  We see each other as partners in the
 9          work because collectively we're all engaging in the
10          space to solve the riddle of unsheltered
11          homelessness.
12   Q.     The -- the -- the City's kind of description about
13          those partners has included Agate, Avivo, Hennepin
14          County Streets to Housing, and Healthcare for the
15          Homeless.
16               Are there more than I'm -- that I'm missing?
17   A.     American Indian Community Development Corporation
18          also has outreach.  They also have shelter,
19          emergency shelter housing, supportive housing.
20          They have a variety of different elements along the
21          overall continuum.
22               And I -- I'll say that Hennepin County, they
23          contract with these different partners and evaluate
24          them on performance and may make different
25          structural decisions or may engage in different
```

Enrique Velazquez                                    105

1              partnerships.

2                   Because I think of Rescue Now.  I think of

3              Shelter Connect.  Those are also some different

4              agencies that Hennepin County connects with as part

5              of the overall continuum of care, supportive

6              housing system.

7     Q.    Does the City of Minneapolis have any kind of

8           control over who Hennepin County selects to be

9           these outreach partners?

10    A.    If I may, let me back up in time just a little bit.

11          There was a point in time where the City of

12          Minneapolis contracted with a couple of different

13          outreach partners.  Agate and Avivo, I believe,

14          were two of the partners that we did have contracts

15          with.  At the same time, Hennepin County had

16          contracts with them.

17    Q.    Okay.

18    A.    So while we had a specific defined

19          scope-of-services contract with these partners, the

20          county had a slightly different scope of services

21          contract with these partners.

22                So at different parts of time, they would

23          converge together.  Sometimes they interfered

24          with -- with one another where the -- the

25          partner -- if they followed one, the guidance and

Enrique Velazquez                    106

1          the scope of work in one, they were in conflict

2          with another.

3               So what we ended up doing as a city was we

4          transferred our contracts to Hennepin County and

5          then also provided some level of funding over to

6          Hennepin County so that as a sole source,

7          Hennepin County would manage the contracts, manage

8          the relationships with the partners.

9               And since we were contributing, we also have

10         some level of input into who Hennepin County

11         selects or -- or the deliverables that would come

12         out of it.  So that's part of how the relationship

13         works between the City of Minneapolis and Hennepin

14         County.

15              So to answer your question, we were able to

16         provide some level of recommendations, not so much

17         on who the partners are.  We leave that to the

18         county to select who the partners are.  It's -- our

19         focus is more on what exactly do we get for the

20         contributions, what deliverables, how -- what kind

21         of data are -- are these partners able to provide

22         to give us an indication that we're moving the

23         needle on unsheltered homelessness and if we need

24         to do more or if we need to do something different,

25         or how do we continue to adapt our -- our approach

Enrique Velazquez                               107

1          and our investments to make sure that we are being

2          responsible partners in the space too?

3     Q.   Do you remember when those contracts should --

4          contracts shifted from you to Hennepin County?

5     A.   I do not recall.  The contracts themselves were

6          held by Community Planning and Economic

7          Development, and they predated my move into

8          Regulatory Services.  If I had to estimate, I -- I

9          speculate it's somewhere between 2021 and 2022.

10    Q.   Okay.  What are the -- what are the criteria that

11         you provide to Hennepin with regards to what -- who

12         you'd like them to pick for their contracts?

13    A.   Generally speaking, outreach-focused, make

14         effective utilization of the Homelessness

15         Management Information System, accurate reporting,

16         flexible partnership.  Meaning, as conditions

17         change in the field, as the needs change, that

18         they're able to make adjustments and pivot and

19         provide a level of partnership that while they

20         receive funding from the various agencies, whether

21         it's directly from Hennepin County or indirectly

22         from the City of Minneapolis, that their outreach

23         workers are focused on engagement and helping

24         individuals move from unstable housing into stable

25         housing and that their focus is not on deriding the

Enrique Velazquez                                    108

1           approaches by any of these organizations that are
2           funding them.
3   Q.    Does the City have any mechanisms to ensure that
4           the -- these outreach partners are accessible to
5           people with disabilities?
6   A.    Could you repeat the question one more time?
7   Q.    Sure.  Does the City have any mechanisms in place
8           or processes to verify that these partners are
9           offering services that are accessible to people
10          with disabilities?
11  A.    No, we do not have -- we, as a city, do not have
12          mechanisms to verify.  We leave the responsibility
13          of managing the relationships and the operating
14          parameters to Hennepin County as the lead for the
15          continuum of care.
16  Q.    Is there any verification prior to Nen- --
17          Nenookaasi evictions that occurred with regards to
18          these outreach partners' capacity to provide
19          services in advance of an eviction?
20  A.    I'm sorry.  I'm not sure I understand the question.
21  Q.    Totally.  I'll -- thank you for being diligent
22          about asking when you don't understand.
23              The -- in advance of a Nenookaasi eviction,
24          what, if anything, does the City do to verify the
25          availability of resources provided by these

Enrique Velazquez                                    109

1          outreach partners?

2    A.    So prior to closure, as I mentioned before, the

3          Homeless Response Team gathers information of how

4          many people we estimate to be there or how many

5          people they -- the -- the team estimates to be

6          present at an encampment.  What are some of the

7          different demographic characteristics that they've

8          identified?  Do they -- do they see individuals

9          that are on crutches, in wheelchairs having various

10         medical needs or medical -- well, I said "medical"

11         already -- medical needs or other -- other types of

12         needs that would inform how we respond to not only

13         individuals in the encampment but also leading up

14         to the day of closure.

15              Then we take that information -- the Homeless

16         Response Team specifically will inform partners

17         during their Monday -- their Monday meeting, the

18         stand-up meetings, with the other agencies and

19         provide the level of information so that all these

20         other agencies are also aware, and they can adjust

21         or tailor their response with respect to outreach.

22         That also informs the process for identifying

23         shelter spaces.

24              So that information is shared with

25         Hennepin County that oversees the continuum of care

Enrique Velazquez                    110

1          and the Coordinated Entry System and our, you know,

2          sheltering system so that they have an idea of

3          genders, age -- if we're able to collect that --

4          and mobility.  Or are there some other extenuating

5          circumstances that indicate that certain

6          individuals within the encampments require a -- a

7          different level of care?

8               But all the information feeds over to

9          Hennepin County so that they can make necessary

10         adjustments, which includes coordinating with

11         outreach providers on how to adapt and adjust their

12         outreach on a continual basis.

13   Q.    Has anybody from the working group or reporting to

14         the working group ever tried to access these

15         outreach partner services from the user end?

16   A.    I couldn't even speculate if -- if any individuals

17         have or haven't or what the feedback has been.

18              I do know that Hennepin County routinely

19         checks in on their providers to make sure that the

20         systems are working as designed and making some

21         adjustments as necessary into the operations to

22         make sure that the end users have the best possible

23         experience possible and that they actually utilize

24         the -- the systems and services and can do so in a

25         way that isn't harmful for them or doesn't create

Enrique Velazquez                               111

1           more harm or reactivate traumas.

2    Q.     So has anybody in the working group ever, like,

3           called -- for example, called the number, called

4           the hotline for trying to reserve a shelter bed?

5    A.     I can say that I have personally while actively

6           trying to find a shelter bed for an individual --

7    Q.     Yeah.

8    A.     -- or individuals as I encounter them in my

9           day-to-day work.

10   Q.     Would you mind just walking us through when that

11          was and what happened?

12   A.     Sure.  I recall it was leaving from -- it was not

13          from an encampment.  I'll -- I'll preface it

14          from -- from that perspective.  I was not actively

15          at an encampment.

16              I was leaving my office building, just walking

17          outside, and there was an individual in the lobby

18          who was looking -- just talking to people, asking

19          for the use of their phone, engaging with them.

20              I discovered that they needed access to

21          shelter, identified gender, approximate age, which

22          helped us figure out which phone line to call,

23          which number to call.  This was before

24          Hennepin County made a switch to the number to call

25          for their shelter providers.  Before, it was

Enrique Velazquez                              112

1       disparate with multiple -- we had to ask those

2       different questions to identify which provider to

3       call.  Now, it's a single number, so it's a little

4       bit more streamlined.

5            But after I gathered this individual's

6       demographic information, contacted the phone number

7       and found out what space was available.  I did not

8       have to wait terribly long.  It rang just a few

9       times, found out that there was space.  And then

10      between the two of us, myself and the individual,

11      mapped out a route to get them over to where a

12      shelter was.

13   Q.  When did the -- when did that consolidated phone

14      number switch happen?

15   A.  I'm not positive on when it happened.  I recall

16      hearing about it towards the end of 2023, but I'm

17      not exactly positive when Hennepin County made the

18      switch.

19   Q.  Has anybody in the working group tried calling

20      the -- the Coordinated Entry number?

21   A.  Not to my knowledge.

22   Q.  And does the City arrange for buses to be at

23      evictions to take people places?

24   A.  Depending on the location, the proximity, other --

25      other factors contributing to where the encampment

Enrique Velazquez                    113

1          is located, the time of day, a variety of different

2          factors and number of people present, we have made

3          arrangements to provide busing.  We do have a -- a

4          contract with the bus company to be able to provide

5          that service.

6               The Metro Transit Homeless Action Team, they

7          have a bus that has been present before as well.

8          Also, partnership with American Indian Community

9          Development Center.  They have a bus or a mini --

10         mini bus where they have gone to encampment

11         closures and just sat and remained while we worked

12         through the process of closing the encampment and

13         then offering transportation to shelter from there.

14              We've provided transportation to the

15         Catholic Charities Mary Frey Opportunity Center in

16         the past as well.  So we've done a number of

17         different things.  It all depends on what's the

18         situation, how many people, and what are -- what

19         are the -- what are the needs?  Because every one

20         of them is a little bit different.

21    Q.   Are there people who are instructed to, during

22         evictions, tell evictees of encampments, "Hey,

23         there's a bus over there, and this is where that

24         bus is going"?

25    A.   That's -- yeah, thank you for the question.

Enrique Velazquez                    114

1          So as part of the -- the process -- I'll --

2     I'll step you through on the -- the day of.  So the

3     property --

4  Q.  Okay.

5  A.  -- owner, whether it's on City property, private

6     property, or other government agency, whatever

7     the -- whatever that looks like, that property

8     owner or the representative of the property makes

9     an announcement and then also goes tent by tent.

10         With that announcement, they announce that the

11    encampment is illegal.  It violates Code of

12    Ordinances 244.60 and that individuals that are on

13    the property are trespassing, based off of this

14    ordinance and others, and that they are being given

15    verbal notice of trespass.  They need to vacate and

16    not return within a year.  And if they return

17    within a year, then they may be arrested or subject

18    to other civil liability.  Anyone who is interested

19    in finding transportation, they'll provide the

20    direction.

21         So it's -- it's pretty well orchestrated as

22    far as what that transportation looks like, whether

23    there are individuals from the Homeless Response

24    Team that are present that will arrange for an Uber

25    ride for individuals to go to safe -- safe housing,

Enrique Velazquez                    115

1       whether it's a shelter, whether it's a family's

2       house, rel- -- relative, a friend's house, whatever

3       that looks like that's not another encampment, the

4       Homeless Response Team has tran- -- arranged for

5       transportation.

6            If it's a bus, that individual, through their

7       announcement, will direct people over to the bus

8       and detail exactly what kind of a bus, where it's

9       headed, whether it's a Metro Transit bus or it's

10      AICDC, American Indian Community Development

11      Corporation, or whatever the -- the situation is,

12      but providing those details so that broadly and

13      then individually people receive that information.

14  Q.  So that announcement will be made by -- on a

15      tent-by-tent basis with that level of detail?

16  A.  Yes.  So it's -- it's both.  It's broadly and then

17      also tent by tent.  I've participated in some of

18      these tent-by-tent announcements as well, and by

19      and large, people -- they -- when City staff show

20      up and we start the tent- -- tent-by-tent process,

21      people will say, "Yep.  I heard the announcement.

22      Thank you.  Appreciate it."  And then they might

23      have some clarifying questions of "Wait.  What kind

24      of transportation, and where is it?  I wasn't clear

25      on which direction.  Is it this corner?  Is it that

Enrique Velazquez                    116

1          corner?"  And then --

2     Q.   When --

3     A.   -- providing the clarity of where to go.

4     Q.   When you say "broadly," are we talking like a -- a

5          megaphone in the center of camp, or what do you

6          mean?  Is that a general announcement?

7     A.   Yeah, it's a general announcement.  It's been

8          handled by a variety of different mechanisms.  A

9          megaphone or the police department has a vehicle

10         that has speakers mounted on the exterior of it.

11    Q.   Um-hum.

12    A.   So the announcement might be either prerecorded or

13         it might be someone there with a microphone that is

14         speaking the message and then it's amplified

15         broadly just open air versus on an individual

16         basis.

17    Q.   Is the substance of the announcement functionally

18         the same between the broad and the individual?

19    A.   Yes, substantively it is.  There's a -- a script

20         that's formed before either recording the

21         announcement or making the general statement, and

22         that that same individual will go tent to tent

23         providing the exact same information just to make

24         sure that there's consistency in the process.

25    Q.   Who writes that script?

Enrique Velazquez                    117

1    A.    We have kind of a boiler- -- boilerplate template

2          of what needs to be included in that script.  And

3          then depending on what services are available or

4          how we have adjusted, then the person who's making

5          the announcement will make adjustments to that

6          script so that it's set, it's clear, they know from

7          an operational standpoint where to direct people.

8          Because ultimately the focus is, yes, we want the

9          vacant land to return to being vacant land.  We

10         want it to return to compliance.  But we can't

11         highlight this enough:  We want to make sure that

12         people have access to services and supports that

13         they need.

14   Q.    And at the time that those announcements are made,

15         is law enforcement present at that point?

16   A.    Let me ask a clarifying question.

17   Q.    Sure.

18   A.    This is still with respect to Nenookaasi

19         encampments, correct, not just encampments broadly?

20   Q.    Sure.  Let's -- let's say Nenookaasi.  Yeah.

21             Is -- is law enforcement present at Nenookaasi

22         evictions at or before the time when the

23         announcements are being made?

24   A.    Yes.  Law enforcement is present, especially for

25         utilizing their equipment.  They're absolutely --

Enrique Velazquez                    118

1   Q.    Yeah.

2   A.    -- present for the amplification or the microphone.

3   Q.    Are law enforcement given instructions with regards

4         to outreach partners about how to interact with

5         service providers during evictions?

6   A.    I'm going to take a sip, and then give me one

7         moment.

8   Q.    Totally.  Take your time.

9               MS. KELLEY:  And we could also -- I

10        notice it's getting close to lunchtime.  I don't

11        need to push anybody.  So, yeah, let me know if you

12        want to take a lunch break.

13              THE WITNESS:  Oh, yeah.  We're flying by.

14  A.    So I'll back up and just provide a little

15        background on what's provided to law enforcement.

16        In most cases, we have a roll call where those

17        that are leading teams will be present at the roll

18        call.

19        And a roll call is facilitated by the

20        commander that is attached to this unsheltered work

21        group.  The commander from the police department

22        attached to the sheltered workgroup, they're the

23        ones that oversee a team that is actively engaged

24        in encampments.  They have the situational

25        awareness of what's happening, the makeup of the --

Enrique Velazquez                    119

1          the encampment, the location, the main

2          thoroughfares, other events and activities that are

3          happening in close proximity to the -- the

4          encampment.

5              And they put together -- "they" being the

6          commander and the -- and the commander's team from

7          the Minneapolis Police Department will put together

8          kind of an operational framework for the day of the

9          closure.  That includes how many resources the

10         police department will need.  How many resources

11         are going to be required from traffic control?

12         What types of equipment and staffing are required

13         from Public Works to clear or even resecure the

14         site afterwards?  It includes what other City staff

15         might be needed there, whether we need

16         representative -- representatives from the

17         Health Department or if we need Homeless Response

18         presence or what that looks like for Homeless

19         Response.

20             And if there are requests for busing or

21         transportation, it all depends on what's the

22         profile of the individuals that are at the

23         encampment, and do they have varying degrees of --

24         of needs that we need to be very attentive to.

25    BY MS. KELLEY:

Enrique Velazquez                                120

1    Q.   How far in advance do these roll calls happen prior

2         to an eviction?

3    A.   The roll call happens the day of.

4    Q.   Okay.

5    A.   The preparation happens leading up to it.  It could

6         be days, it could be weeks of preparation to lead

7         up to the encampment closure.

8              Roll call is the morning of that outlines not

9         only which representatives are going to be there,

10        but also where should they station, whether --

11   Q.   Yeah.  Is that --

12   A.   I'm sorry.

13   Q.   Is that where it's decided, for example, how many

14        trips residents are allowed to make with their

15        belongings when they're leaving an encampment?

16   A.   So at roll call, it's -- that's when it's

17        communicated.  Now, whether --

18   Q.   Okay.

19   A.   I think the decision happens earlier on.  But when

20        it's communicated out, that's when it's

21        communicated to all of us collectively:  emergency

22        management, police department, traffic.

23             All of us hear the same message of how it's

24        going to unveil itself --

25   Q.   Yeah.

Enrique Velazquez                    121

1   A.     -- and who the points of contact are that are

2          familiar with the -- both outreach as well as

3          residents at the encampment.

4                 So that's primarily the Minneapolis Police

5          Department Commander and their team that visits the

6          encampments on a regular basis, just like the

7          Homeless Response Team does.

8                 So they are acutely aware of which individuals

9          actually are residents versus not residents, which

10         ones are outreach workers, versus not.  So we

11         provide --

12  Q.     The -- sorry to interrupt.

13  A.     Yeah.

14  Q.     The Minneapolis Commander who would facilitate roll

15         calls specific to Nenookaasi is -- is who?

16  A.     Commander Monica Hanson.

17  Q.     Okay.

18                MS. KELLEY:  And, yeah, I -- I want to

19         pause here and just -- I know -- I think we floated

20         earlier a noon lunch, and I want to respect

21         everybody's time.

22                THE WITNESS:  Okay.

23                MS. KELLEY:  How -- does that sound okay

24         to -- to take a break?

25                MS. ENSLIN:  Yeah.

Enrique Velazquez                    122

1            THE WITNESS:  Yeah.

2            MS. KELLEY:  No pressure.  We don't have

3       to.  But just -- yeah.

4            MS. ENSLIN:  What do you think is a good

5       amount of time for a break?  We can be -- we can be

6       short.

7            MS. KELLEY:  That's fine with me.

8       Melissa, how are you feeling?

9            (Court Reporter off-record discussion.)

10           MS. MCQUITTY:  Half an hour?

11           MS. KELLEY:  Half an hour?  Does that --

12           MS. ENSLIN:  Yeah.  That's great.

13           THE WITNESS:  Sure.  That's perfect.

14           MS. KELLEY:  Okay.  Thanks, everybody.

15           (Recess from 12:00 p.m. to 12:30 p.m.)

16           (Ms. Glenn leaves videoconference

17       deposition.)

18  BY MS. KELLEY:

19  Q.   I'm going to ask you a bit about shelter beds,

20       revisiting that conversation from earlier.

21           How much funding does the City provide to

22       organizations that provide beds for homeless people

23       in the cities -- in the city?

24  A.   That, I'm not sure off the top of my head how much

25       money we've provided with respect to -- there's a

Enrique Velazquez                                    123

1              couple of different elements.

2                    There's capital investment to stand up

3              shelters and newer operations, then there's ongoing

4              sustained operations.

5                    We've provided one-time funding in each of the

6              different aspects as different needs have emerged.

7              But I couldn't tell you off the top of my head how

8              much we've invested for Provider A for capital

9              investment or improvements versus operations and

10             how that relates to other shelter operators.

11    Q.       Is the City involved in or aware of the rules that

12             shelters impose on who might -- or who can stay,

13             for how long, et cetera, at a shelter?

14    A.       We are loosely aware of some of the different rules

15             and requirements.  But that's primarily managed by

16             Hennepin County and the -- and Housing Stability as

17             far as how those different mechanisms will work

18             that also align with whatever those -- the scopes

19             of focus are for each of those different

20             organizations.  Some have a religious affiliation,

21             and they might have different requirements than

22             those that are more culturally specific versus not

23             religious and not culturally focused.

24    Q.       And you don't control them?

25    A.       We do not, no.

Enrique Velazquez                          124

1    Q.    Okay.  And when -- when decisions were made, for

2          example, in anticipation of the January 4th

3          eviction of Nenookaasi in 2024, who made the

4          decision to open up additional shelter beds?

5    A.    So that was kind of a confluence of different

6          elements that were all converging on one another.

7          We recognized that with the existing shelter

8          capacity as reported by Hennepin County and the

9          number of individuals that were present at

10         Camp Nenookaasi on a consistent basis that we

11         thought were residents who were experiencing

12         unsheltered homelessness, there was a delta.  So we

13         recognized that there was a need.

14             There was a shelter provider that was already

15         in the process of working through their

16         application, their -- I should say their

17         development.  They already were working on their

18         shelter applications and working on bringing that

19         effort online, and they already had a timetable on

20         when they would be able to open and in what

21         capacity they'd be able to open.

22             So it was an element of working with the

23         county, work -- who also brought in the shelter

24         provider, and then working internally to land on a

25         date that would work that would help individuals

Enrique Velazquez                                    125

1          move into a shelter if they so chose and mitigate

2          the risk of remaining outside in the harsh

3          environment --

4      Q.   Um-hum.

5      A.   -- because January is cold.

6      Q.   Has the City ever been made aware of complaints

7          that the shelters provided through this Hennepin

8          County partnership are unsafe and/or unsanitary?

9      A.   I've heard criticisms like that when we offer

10          access to shelter.  And then we take that

11          information and have -- I've personally taken that

12          information and provided it to David Hewitt and

13          others at Hennepin County who then investigate,

14          through their various channels, but they

15          investigate the -- the validity of the different

16          complaints.  They've continued to make updates to

17          the sheltering system and shelter operations to try

18          and mitigate as many of those different points as

19          they happen.  Or just to identify that while those

20          specific criticisms might have been true in the

21          past, they are no longer concerns that people

22          should have now.  It's -- it's older information

23          that had they been in the -- in the shelters and

24          been engaged or visited them more frequently in the

25          recent term -- time, they would see that those

Enrique Velazquez                                126

1              different situations no longer exist.

2    Q.    What -- what changes or improvements are you aware

3          of that have been made to shelters to address these

4          concerns?

5    A.    One in particular that I'm aware of relates to the

6          reservation system.  So historically, if somebody

7          were in -- in a shelter, they would have to leave

8          and then call in at a later time to make a

9          reservation to come back.

10              And now, one of the -- so you -- you -- the

11         individual would have shelter, they'd have to leave

12         shelter, and they'd -- they'd have to try and find

13         their way back into shelter every single day.

14              One of the changes that the county made is --

15         actually two, with respect to the reservations.

16              One is they no longer charge.  So the

17         individual no longer has to pay for their

18         reservation.  So that cost component was

19         eliminated.

20              The second is, yes, they will have to leave at

21         a certain time.  Before they leave at that certain

22         time -- that time certain in the morning, they have

23         the option to reserve their spot for the next

24         night.  So that is handled before they even leave

25         for the morning.  So that when they come back at --

Enrique Velazquez                          127

1    at night, they -- they at least can leave in --

2    with a piece of mind knowing that "I don't have to

3    pay for it.  I don't have to find a way to earn

4    money to pay for my shelter space, and I have a

5    guaranteed spot right back where I was."  So it

6    eliminates that level of --

7  Q.   Yeah.

8  A.   -- of risk and uncertainty for individuals.

9  Q.   When -- when you're evaluating the availability of

10   a shelter bed, in a scenario where somebody calls

11   the centralized number, reserves a bed earlier in

12   the day but then at the end of the day doesn't show

13   up, is that bed counted as available?

14  A.   That bed is ultimately counted as available because

15   there are multiple check-ins.  There's the check-in

16   at 8 a.m. of here's the landscape of shelter --

17   shelter beds generally and how many are reserved

18   versus not reserved and in what -- what

19   demographic?  Is it -- is it mixed?  Is it male

20   only?  Is it female?  Is -- is it family?  What

21   does it look like?

22        There's a second count that happens middle of

23   the day between 3 and 4 p.m., then forms for the

24   evening of how many spaces are truly available

25   versus how many were reserved in the morning block

Enrique Velazquez                                    128

1          of time.

2               And then ultimately in the evening time, how

3          many people actually -- who have a reservation,

4          actually showed up for that reservation?  Because

5          if they don't show up by a certain period of

6          time -- I -- I don't recall the exact time.  I

7          think it's -- it might be 10 p.m.  If they do not

8          show by that time -- or -- or they -- they have an

9          8 p.m. reservation.  If they don't show by 10, that

10         bed is then released and then it's made available

11         again.

12    Q.   Okay.

13    A.   So somebody who is able to contact the number and

14         call in, they might find that a bed that was not

15         available an hour or two hours before is now

16         available.

17    Q.   Do you know how -- if that happens frequently?

18    A.   I don't have knowledge on that area of how often it

19         happens.

20    Q.   Yeah.  Has anybody from the working group visited a

21         shelter?

22    A.   I know I personally have.  I visited a few

23         different shelters.  I've even volunteered at

24         shelters.  But I'm -- I'm not aware of any -- of

25         our current generation of the working group

Enrique Velazquez                                129

1           members, if they have visited any of our shelters.

2      Q.   I'm going to switch gears a little bit.  Thanks for

3           bearing with me.

4                Does the City receive requests or demands from

5           third parties asking for the City to conduct

6           evictions?

7      A.   A request from third parties?  Are -- is that in

8           reference to private individuals or other

9           organizations?

10     Q.   Well, there are both.  Whatever --

11     A.   Okay.

12     Q.   Whatever you're aware of.

13     A.   For sure.  Sticking with kind of the lens of

14          Camp Nenookaasi, we did receive requests from

15          representatives of the Metropolitan Urban Indian

16          Directors to close Camp Nenookaasi with urgency.

17     Q.   What about groups like 21 Days of Peace or

18          Crimewatch or We Push for Peace?

19     A.   I am not aware that the City has received any

20          requests from any of those groups to close

21          encampments.

22     Q.   Does the City notify any of -- any of those listed

23          groups in advance of evictions?

24     A.   Not to my knowledge, we do not.

25     Q.   Aside from service providers and encampment

Enrique Velazquez                    130

1       residents and law enforcement, who else does the

2       City notify in advance of upcoming encampment

3       sweeps?

4   A.  I'll recharacterize -- characterize briefly.  So

5       law enforcement is present as part of the -- the

6       working group.  So they're --

7   Q.  Okay.

8   A.  Minneapolis police is already aware of an impending

9       closure.  But aside from that, the City notifies

10      Hennepin County.  Depending on the proximity of the

11      encampment to other agencies or other properties,

12      we may notify the Minneapolis Park and Recreation

13      Board, notify Minnesota Department of

14      Transportation, City of Saint Paul.

15          If the encampment is on or near Light Rail or

16      the bus line and individuals may migrate over to

17      St. Paul, prompting a response there -- or

18      prompting the City of Saint Paul to take action in

19      response to an influx of individuals.  We might

20      notify different entities within Hennepin County.

21      Aside from those in the Office of Housing

22      Stability, there's the Hennepin County Property and

23      Maintenance Group that maintains areas underneath

24      bridges that cross over county state-aid highways.

25      Hennepin County, Lake Street, Cedar Avenue, those

Enrique Velazquez                    131

1       are Hennepin County thoroughfares.

2           So if there's a risk that encampments might

3       move over into those specific spaces or the

4       encampment is already at a City-owned property

5       that's adjacent to one of those spaces, we'll

6       notify the county and make sure that they're aware

7       that we plan to close and see if they would like to

8       partner with us, how they would like to handle this

9       so that we can move together in unison.

10          We'll also notify Metro Transit, especially in

11      the event that the encampment is in close proximity

12      to Light Rail so that they can also engage with the

13      Homeless Action Team at various stops along the --

14      the Light Rail.

15  Q.  Specifically regarding Nenookaasi evictions -- and

16      let me know if you need me to go back over what I

17      mean when I say "Nenookaasi evictions" -- had the

18      City been made aware of any instances where notice

19      to service providers was not given in advance of a

20      Nenookaasi encampment sweep?

21  A.  Just give me one -- one moment to run through the

22      list of --

23  Q.  Take your time.

24  A.  -- sites where Nenookaasi has operated.

25          I can definitively say that with respect to

Enrique Velazquez                              132

```
 1              the third Nenookaasi iteration, which I believe was

 2              in place end of January to February 1st or 2nd --

 3      Q.      Um-hum.

 4      A.      -- of 2020- -- what year is this? -- 2024.

 5      Q.      Correct.

 6      A.      That service providers were not provided advance

 7              notice of that one.  Also recognizing that the

 8              encampment was in place for a period of, at most,

 9              three days, I believe --

10      Q.      Okay.

11      A.      -- and was closed in response to emerging

12              situations with community members and the residents

13              at the encampment that created an unsafe

14              environment for all the individuals involved.  So

15              we moved to swift closure of that specific

16              encampment.

17      Q.      Do you remember if residents of the encampment were

18              given advance notice, the third encampment?

19      A.      To my recollection, yes, they were given advance

20              notice.  I do not recall if -- oh, actually, I do

21              recall that there was a -- a posting that happened

22              at that location.

23                  In terms of did it meet the three days?  It

24              did not meet the three days, and it was because of

25              the emerging safety risk to community and the
```

Enrique Velazquez                    133

1        residents at the encampment.

2            But verbally they were given notice.  They had

3        notice in advance since this was a fenced lot with

4        "No Trespassing" signage no- -- posted that was

5        removed and then later replaced and then removed

6        again.

7    Q.  And just with regards to any of those other

8        Nenookaasi evictions that you were running through

9        in your mind, was there instances you can recall

10       where service providers were not given notice in

11       advance of an eviction?

12   A.  Not to -- not as far as I recall.

13   Q.  I'm going to use the term "Civilian Crime

14       Prevention Organization," and then I'm going to

15       define it.

16   A.  (Witness nods head.)

17   Q.  Are you familiar with We Push for Peace?

18   A.  I'm loosely familiar with them.  I've heard the

19       name, but I'm not terribly familiar with the

20       organization.

21   Q.  Or 21 Days of Peace is another one?

22   A.  Yeah -- excuse me; apologies -- similar.  I'm

23       familiar with them, but I'm -- I'm not terribly

24       familiar with the organization or how they operate.

25   Q.  Does the City have any communication with these

Enrique Velazquez                                    134

1        types of civilian crime investigation groups?

2   A.   I can't really speak to how they might converge in

3        other aspects of the City's work.  For example, if

4        they're engaged in behavioral crisis response or

5        neighborhood policing or how any of those specific

6        departments within the City might engage

7        organizations such as this.

8             What I can say is that with respect to the

9        City's response to unsheltered homelessness, we do

10       not have an engagement or affiliation or any sort

11       of contracts of any kind with those two different

12       organizations.

13  Q.   Sure.  Thank you.  I'm going to ask about Helix --

14       the Helix Health and Housing Service -- Services,

15       but I might call it Helix for short.

16            Will you understand what I'm talking about if

17       I just say "Helix"?

18  A.   I will.  Certainly.

19  Q.   Okay.  Would you tell me about the contract between

20       the City and Helix with the opioid settlement

21       money?  Just a -- an overview of what that

22       contract's purpose was.

23  A.   Certainly.  So the He- -- the Helix Health and --

24       and Housing Services came about -- we recognize

25       that unsheltered homelessness is untenable.  We're

Enrique Velazquez                                135

1       trying to find different pathways to address

2       unsheltered homelessness and listen to the

3       individuals that are experiencing unsheltered

4       homelessness.  We heard safety.  We heard, "The

5       individuals in the encampment are" -- "are my

6       support group."  "We are family."  And that the

7       existing Social Service organizations have a very

8       finite definition of family.  It's -- you know,

9       it's a couple with child.  It's -- that is

10      contractually bound to one another in some -- some

11      way through adoption, through marriage, various

12      ways to identify what family is.

13          And what we saw at encampments, while "family"

14      did not meet that definition -- so individuals, if

15      they chose to go into shelter, had to separate.

16      And maybe one person goes into shelter, but they

17      cannot move in as a family unit.  The other person

18      has to stay behind or the other people who are part

19      of their family have to stay behind.

20          And the overall focus is helping people

21      exercise their agency so that they can transition

22      from unsheltered into stable housing.

23          So members of Red Lake came to us with a

24      proposal for Helix, which would allow for cohorts

25      of individuals to move into stable, supportive

Enrique Velazquez                              136

1    housing.  They would go through the process of

2    qualifying these individuals.  And the primary

3    focus was on individuals who are indigenous -- from

4    indigenous communities that would allow Helix to

5    tap into federal dollars specifically earmarked for

6    Urban Indian Affairs.

7        So by utilizing these funding -- this funding

8    source, they would be able to maintain a -- a

9    revenue stream from the federal government to

10   these -- to stand up the supportive services model

11   that allows Helix and Red Lake Nation to engage in

12   culturally relevant and culturally specific healing

13   and wraparound services for these individuals that

14   does not strip away their identity.

15       It focuses on treating the addiction or the

16   mental health or whatever the -- the specific

17   elements are.

18       So how it came about, through interagency, our

19   intergovernment relations, Red Lake Nation engaging

20   with the Mayor of Minneapolis and his office, who

21   then heard the proposal, what the ask was, and

22   presented it to our unsheltered work group.

23       So we agreed that it -- it made sense.  And

24   the focus initially was for a cohort of a maximum

25   of 32 individuals.  Over time, it would grow to 32.

Enrique Velazquez                        137

1            But they would move into supportive housing,

2            provide the wraparound services.

3                 And then over a few years of time, they would

4            eventually be able to transition out of the

5            supportive housing into stable housing elsewhere to

6            free up space so that more individuals could then

7            move in as a cohort.

8     Q.    Mr. Velazquez, I really deeply appreciate the

9            thoroughness of what you prepared, and I don't mean

10           to -- to cut you off.  But just in the interest

11           of -- you're -- you're --

12    A.    Oh, sure.

13    Q.    -- answering a lot of questions that I'm about to

14           get to later on in my outline, and it --

15    A.    Oh, yeah.

16    Q.    -- might make more sense, for a clear record, if --

17           if you could answer the question I'm asking, and

18           then I'll get to the next one.  But I definitely

19           appreciate the --

20    A.    Thank you.

21    Q.    -- thoroughness of your answers.

22                Was there a -- a basis for the decision to go

23           with Helix without doing any kind of bidding or

24           requests for proposals?

25    A.    So the -- the -- the City -- as I mentioned earlier

Enrique Velazquez                                    138

1          on, the City can go through a couple of different

2          avenues.  We can do a request for proposal or we

3          can do sole source.

4               And the way that the Helix structured the --

5          the proposal, we chose to go with the sole source

6          to try and stand this -- this one- -- one-time

7          funding option up to see how effective it could be

8          and if there's appetite to move in a different

9          direction.

10   Q.    At any point, were there other organizations

11         considered besides Helix?

12   A.    To my knowledge, Red Lake was the only one that

13         came forward with this proposal.

14   Q.    And do you remember who the individuals were at

15         Red Lake -- Red Lake who introduced this idea?

16   A.    If I recall, it was Adam Fairbanks.

17   Q.    Does the -- does the contract with Helix require

18         Helix to verify the individuals remain housed past

19         their initial placement?

20   A.    So the contract with Helix was one-time funding in

21         2023 to stand up their program.  But there were no

22         other requirements or -- or any sort of other --

23         how would you say -- other metrics that we were

24         measuring in terms of the effectiveness and

25         efficacy of their -- the program.

Enrique Velazquez                               139

1   Q.    So like the -- what would you say is areas that

2         exist, if any, where the City has oversight in how

3         Helix performs their contract?

4   A.    Again, this was one-time funding to stand up the

5         operation.  Their ongoing operation is solely up to

6         them.

7               What I can also say is that we're currently

8         working through a document review to make sure that

9         the money that they asked for and the money that

10        the City provided, that those two things match.

11              So through the Minneapolis Health Department,

12        they're going through reviewing every invoice,

13        tracking all of the expenditures to make sure that

14        what Helix said they were going to spend the money

15        on, they actually spent the money on.

16  Q.    Does the City receive notice when people who obtain

17        housing through Helix are later evicted or

18        displaced?

19  A.    We do not -- as a city, we do not receive notice of

20        when individuals are evicted from Helix housing or

21        any other housing.

22  Q.    Do -- do Helix residents pay for any part of their

23        housing costs?

24  A.    I don't know that I'm able to answer that in terms

25        of how --

Enrique Velazquez                    140

1    Q.    Totally fine.

2    A.    -- how they operate.

3    Q.    Did -- were you aware of the complaint sent to the

4          City about Helix and how they've been operating?

5    A.    I am aware of the complaint, yes.

6    Q.    Would you just describe, like, how that complaint

7          has been addressed?

8    A.    To my knowledge, that's part of how we moved into

9          the space where the Health Department, which is the

10         entity that ultimately provided the funding to

11         Helix and managed that specific launching of the

12         contract, they're doing the document review.  So

13         evaluating the invoices, evaluating all the

14         expenditures and working with the principals at

15         Helix to evaluate how they have navigated in

16         this -- this specific space of the framework.

17   Q.    Is that evaluation in response to the complaint?

18   A.    I believe so, yes.  I'm not 100 percent positive if

19         this was already baked in or if this was directly

20         in response.

21   Q.    Switching -- switching gears a little bit.  The --

22         you mentioned earlier the "No Trespassing" signs

23         and the posting being contracted to a -- a

24         management company.

25              Does the City contract out other forms of

Enrique Velazquez                    141

1          labor surrounding evictions?  For example, putting

2          fences up or sweeping -- like, physically removing

3          possessions?  Is that contract work?

4     A.   I can say that for the cleanup work, that is not

5          contracted.  That's Public Works staff that manage

6          that.

7               As far as fencing, that would depend.  If it's

8          a City-owned parcel, there's two different avenues.

9          Either the City of Minneapolis Public Works will

10         manage that work or our Community Plan- -- Planning

11         and Economic Development, they have the property

12         management contract and they could utilize the

13         contract there.

14              If it's a private parcel, Public Works could

15         do that work, or we -- we might contract with a

16         third party to do the fencing work for the property

17         owner and then bill that back to them.  So it kind

18         of depends on the situation and resource

19         availability at the time.

20    Q.   Who made the decision to spend American Rescue Plan

21         Act funding on putting fences up?

22    A.   I would have to say that I don't know that American

23         Rescue Plan Act dollars are used for fencing

24         purposes.

25    Q.   What's the -- who makes the decision generally

Enrique Velazquez                                    142

1           where to put fencing up around City property

2           specifically?

3    A.     Okay.  Thank you.  Yeah, around City property

4           specifically?  Generally all City-owned lots, which

5           is to say those owned by Community Planning and

6           Economic Development, are fenced and signed --

7    Q.     And is the --

8    A.     -- and that decision comes from -- it would be the

9           property owner, which is Community Planning and

10          Economic Development.

11   Q.     So the mechanics of how that decision arises and

12          comes to pass, like, what communications are had

13          to -- to mechanically create and implement that

14          decision?

15   A.     I believe it's more of a tacit decision of these

16          are City-owned parcels, we need to -- as a property

17          owner, the City needs to live by the same standard

18          that privately owned properties need to take, which

19          is they need to secure the property.  And that's

20          the mechanism that leadership within Community

21          Planning and Economic Development chose and chose

22          to fence all City-owned properties.

23   Q.     Okay.

24   A.     So it's not a mechanism of when are we fencing one

25          property versus another.  It's all properties will

Enrique Velazquez                         143

1          be fenced and will be maintained by the management

2          company.

3    Q.    Has that always been the case?

4    A.    That has been the case at least for as long as I've

5          been in the -- within Regulatory Services.  So for

6          a little over two years, that has been the case,

7          and City-owned properties have been fenced.

8    Q.    What is the -- the purpose of putting fencing up?

9    A.    So citing Minneapolis Code of Ordinances 244.60,

10         Erecting temporary structures for the purpose of

11         dwelling is unlawful, and it's the property owner's

12         responsibility to make sure that the property meets

13         and follows property and housing maintenance code,

14         which includes securing the property to prevent

15         trespass.  So that's the focus.  It's a

16         lower-barrier security mechanism to prevent people

17         from trespassing on -- on property.

18   Q.    Is the eventual goal that all City property has

19         secure fencing around it?

20   A.    All City-owned property has secure fencing on it.

21   Q.    Okay.  And is there -- is there a thought or intent

22         of where unhoused folks are supposed to go but

23         for -- like, if not for these fenced-in properties?

24   A.    The thought is that individuals who are

25         experiencing unsheltered homelessness should seek

Enrique Velazquez                               144

1          shelter indoors in supportive housing, in shelters,

2          in indoor spaces.

3    Q.    For -- for the encampment sweeps, you mentioned

4          Public Works does some of the services, and there

5          are contractors who do other work in conjunction

6          with encampment sweeps.

7              Do you know the names of any of those

8          contractors and what they -- what services they

9          offer?

10   A.    So I mentioned that Public Works will do the

11         cleanup of the encampment and they may do fencing.

12         Private contractors that might be involved

13         depending on property type?  I'm not positive of

14         the contractor that Community Planning and Economic

15         Development uses for their property management.  I

16         believe that's also the organization that would be

17         responsible for the fencing.  Otherwise, there is

18         another contract with Hansen Brothers Fence

19         Company.

20   Q.    Okay.  And are -- are those contracts standing

21         agreements or case-by-case responsive to evictions?

22   A.    So with respect to the Community Planning and

23         Economic Development contractor and Hansen

24         Brothers, I'll separate -- I'll separate those two.

25             Community Planning and Economic Development's

Enrique Velazquez                              145

1     contractor is not specific to encampment response.

2     It's specific to property management.

3          So with all the City-owned properties being

4     fenced, their role is to make sure that the

5     property -- the grass is cut, weeds are cut back,

6     trees are maintained, that every single one of the

7     City-owned parcels meet and abide by the housing

8     and property maintenance code.  And -- and if the

9     fence is damaged, they need to repair the fence.

10    If signage is missing, they need to address that.

11    So whatever the deficiency is, their focus is on

12    returning the property to compliance.

13         For Hansen Brothers, that contract, I believe,

14    is with Public Works, and it's -- I don't recall

15    how many years that contract is.  I don't have that

16    information right in front of me.  But it's for

17    a -- a variety of different needs, whether it's

18    fencing around construction projects, whether it's

19    for provide -- providing safe pathways if there's

20    nearby construction around sidewalks, things like

21    that, and it also includes for properties --

22 Q.   Okay.

23 A.   -- in response to unsheltered homelessness

24    encampments.

25 Q.   Who's -- who is in charge of depositing the

Enrique Velazquez                           146

1          concrete rubble blocks on evicted sites?

2    A.    So the concrete rubble comes from Public Works.  So

3          that would be Public Works that would procure and

4          place those materials.

5    Q.    Is there any criteria for deciding where those --

6          the rubble gets deposited?

7    A.    Yes.  The criteria is if we evaluated -- we, as in

8          the unsheltered work group -- evaluated sites that

9          are of a certain size where it might be an

10         attractive target for an encampment to form,

11         structures of some kind, whether it's riprap,

12         rubble, limestone, utility poles, they were placed

13         at these different locations.

14             If the location is the site of a former

15         encampment, then to prevent people from reoccupying

16         those spaces, all those different mechanisms were

17         evaluated and -- and employed as well.

18   Q.    And that's -- the working group makes that

19         decision?

20   A.    Correct, or a subset of it.  Public Works.  A lot

21         of these properties are owned by Community Planning

22         and Economic Development.  So that group, plus

23         Public Works, plus myself would evaluate where and

24         how to place those.

25   Q.    And where does -- where does the funding come for

Enrique Velazquez                                147

1          that?

2    A.    Well, the rubble is already present from various

3          construction projects and it's just offsite at a

4          holding facility.  And the funding for the actual

5          transportation and placement is from Public Works.

6    Q.    Okay.  Are you familiar with the website -- it's

7          titled, "Minneapolis DataSource Vacant and

8          Condemned Property Dashboard"?

9    A.    Yes, I am familiar with that website.

10   Q.    Do you know who -- who updates it, manages it?

11   A.    So that website is one of the work products for

12         Regulatory Services, Inspections Services division.

13         They curate the information.  Management would be

14         from Operations and Engagement data analysts.

15   Q.    Is there like one individual person who is tasked

16         with, like, actually going in and doing the

17         computer nerd thing to keep that data up to date?

18   A.    Not one individual, no.

19   Q.    Is it something that multiple people have access

20         to?

21   A.    Yes.  I can describe kind of the -- the work if you

22         prefer.

23   Q.    Yes, please.

24   A.    Okay.  So we have an Enterprise Land Management

25         System as a back end.  And we have a strategic

Enrique Velazquez                                    148

1          inspections group that oversees our vacant and

2          boarded building and vacant property list.

3                So as they go through and evaluate those

4          vacant properties, that information gets entered

5          into our Enterprise Land Management System.  And

6          then data analysts create a dashboard that

7          automatically scrapes that information and provides

8          updates on a routine basis.

9    Q.    I'm going to bring us back to a topic we were -- we

10         were getting at before we took our lunch break, the

11         roll call, and specific to each Nenookaasi

12         encampment.

13               And let's -- let's start with the January 4th,

14         that first Nenookaasi eviction from the big camp.

15               Why -- whose decision was it to delay that

16         eviction past its initial announced eviction date?

17   A.    So that was -- if I recall, that was more of a

18         collaborative decision to delay the closure.  And

19         the reason being is recognizing that we had a delta

20         between the number of individuals that were at the

21         encampment versus what was available in terms of

22         shelter capacity.  So we wanted to allow time to

23         true up those two numbers.

24   Q.    Do you remember at its peak approximately how many

25         people were at that encampment?

Enrique Velazquez                    149

1   A.    If I recall, it was around 150 people.

2   Q.    And over time, did that number change?

3   A.    Over time, yes, the number definitely changed.  It

4         started out smaller and then more people entered

5         the space and people -- it was kind of a waterfall

6         effect is what I would describe it as.

7              As people moved out of the encampment and

8         moved into supportive housing, more people came in

9         replacing them and then more people came on top of

10        that, which got us to approximately 150.

11  Q.    And do you have a sense of why -- why people were

12        able to -- actually, let me start -- let me start

13        with -- do you know about how many people were able

14        to move from that encampment into supportive or

15        transitional housing?

16  A.    You could probably separate that question into

17        leading up to the closure and then maybe day of

18        closure.

19  Q.    Sure.

20  A.    So leading up to the closure, I'm not -- I'm not

21        aware of how many were able to move into stable or

22        supportive housing outside of the numbers that were

23        reported from Helix because I believe they were

24        able to move 104 people into housing leading up to

25        the closure and on the day of closure.

Enrique Velazquez                                    150

1    Q.    104 people combined leading up to the day of

2          closure?

3    A.    Correct.

4    Q.    And do you have any idea, like, why that number is

5          so -- is what it is?

6    A.    Why Helix was able to move 104 people?

7    Q.    From Nenookaasi to housing, yeah.

8    A.    From Nenookaasi?  From my recollection of

9          engagements with Helix, it was the process they

10         went through to identify individuals in the

11         encampment.

12             The Homeless Response Team communicated in

13         advance that members from Helix would be going

14         on-site and engaging with individuals to do some

15         level of screening or assessment, if you will, and

16         they were identifying cohorts of the people to move

17         into housing.

18             So I think it's that process plus the fact

19         that the individuals who are working at Helix are

20         members of Red Lake.  They are providing culturally

21         relevant, culturally specific services, which is

22         part of what Camp Nenookaasi has been asking for.

23             Having healing that's culturally specific and

24         supportive housing that is culturally specific and

25         being able to move as a cohort and move with their

Enrique Velazquez                    151

1          definition of family.
2               So a combination of those factors helped Helix
3          and helped Camp Nenookaasi move that many people
4          from the camp into housing.
5    Q.    Did the working group or anybody with the City
6          confirm prior to the January 4th eviction that
7          there was more available shelter beds that night
8          than residents of Nenookaasi?
9    A.    Yes, we did do that verification in combination
10         with what we had -- what I already stated for --
11         for Helix and what they reported to us, plus the
12         new shelter Rescue Now that came online and their
13         beds, plus Shelter Connect that added shelter
14         space, and the new information -- updated reporting
15         from Hennepin County.
16   Q.    And do you remember on January 4th who was present
17         on behalf of the City at that eviction?
18   A.    While I do not recall all the individuals that were
19         present, I can say that I was present; the
20         Community Planning and Economic Development
21         Director, Erik Hansen, was present; the Housing
22         Policy and Development Director, Elfric Porte; the
23         Director of Solid Waste and Recycling,
24         David Herberholz; then manager of the Homeless
25         Response Team, Christina Dowling.  Those are just

Enrique Velazquez                                    152

1        individuals that I recall offhand.  There were many

2        others that were present as well.

3    Q.  And this roll call meeting, does that happen

4        on-site?

5    A.  Typically, roll call will happen off-site in

6        advance.  Yes, off-site.

7    Q.  Okay.  Are there meeting minutes taken at the roll

8        call?

9    A.  Not to my knowledge, no.

10   Q.  Are there reports or instructions or scripts

11       prepared in advance and brought to the roll call,

12       like a briefing?

13   A.  There is a PowerPoint-style briefing that is

14       prepared and presented.

15   Q.  Who -- who prepares that?

16   A.  That would be the Commander for Procedural Justice

17       within the Minneapolis Police Department who

18       oversees the police liaisons into the unsheltered

19       homeless work group.

20   Q.  And at that meeting, is it communicated to

21       everybody whether or not service providers are

22       allowed inside the police perimeter?

23   A.  I'm trying to recall the potential scripting and

24       where that specific element might come into my

25       track.  So just bear with me as I process through

Enrique Velazquez                                    153

1           it.

2    Q.     Okay.

3    A.     There is scripting in there that identifies whether

4           homeless -- or sorry -- outreach workers, that

5           they're notified and which ones we anticipate

6           arriving and who the points of contact are to

7           engage with to allow them in to -- for the purpose

8           of assisting individuals pack up and leave the --

9           the area.

10   Q.     For the January 4th eviction, what were the

11          restrictions at that roll call around who could or

12          couldn't enter the encampment to assist with people

13          getting out and moving things out?

14   A.     At that specific roll call for January 4th, there

15          were no restrictions placed.

16   Q.     And were -- were residents given any time limits on

17          packing up their belongings?

18   A.     No.  Residents were not given a specific time

19          limit.

20   Q.     And after the January 4th eviction, what happened

21          to belongings that weren't packed up?

22   A.     So any belongings that were left on premise that

23          individuals did not identify that they were coming

24          back for or that they needed assistance in taking

25          down or removing, those, I believe, were discarded.

Enrique Velazquez                            154

1    Q.    Were they documented or had pictures taken of them

2          or inventoried in any way before being discarded?

3    A.    Any items that appeared to be of value, I believe,

4          were documented and either left with -- Public

5          Works, I believe, left them with the police liaison

6          to the unsheltered work group.  Otherwise, they

7          were not documented.

8    Q.    Do you have a sense of, like, the -- the volume of

9          belongings at -- at that January 1st eviction that

10         were destroyed?

11               MS. ENSLIN:  Objection.  Calls for

12         speculation.

13   A.    Several dump trucks' worth.

14   BY MS. KELLEY:

15   Q.    And a sense of how many -- what -- what volume and

16         types of objects were categorized as valuable and

17         retained?

18   A.    I believe there was a backpack that appeared to

19         con- -- contain contents that were set aside in

20         case the individual decided to come back for it.

21   Q.    Do you mean set aside at -- at the site?

22   A.    At the site, handed to the Minneapolis police

23         liaison to the unsheltered response work group who

24         engages --

25   Q.    Do you know --

Enrique Velazquez                                          155

1    A.    -- with individuals at the encampments regularly.

2    Q.    Do you know who that person is, the police liaison?

3    A.    Yes, I know who -- who it is.  We've had a couple

4          of staffing transitions, so I'm trying to recall

5          who specifically was there on that day.  I believe

6          it was Lieutenant Carlson.  That's what I --

7    Q.    Do you have a sense of how many law enforcement

8          total were at that eviction, the January 4th

9          eviction?

10   A.    No, I do not.

11   Q.    Okay.  Do you know who decides how many law

12         enforcement to dispatch to any given eviction?

13   A.    So the dispatch of law enforcement is dependent on

14         the situations on-site and on the scene and in the

15         area.  So it could be quite a few.  It could be

16         very few.  And not all are present on-site.  There

17         are certain individuals that are allocated for bike

18         response; others for booking; others for, you know,

19         other aid; others for setting up a perimeter.

20   Q.    Booking in the event that arrests are made?

21   A.    Correct, in case that's needed.

22   Q.    To your knowledge, have there been arrests at

23         Nenookaasi evictions?

24   A.    To my knowledge, we have not had a single arrest at

25         any of the Nenookaasi encampment evictions.

Enrique Velazquez                    156

1   Q.   Have arrests been threatened at Nenookaasi

2        encampment evictions?

3   A.   The only threat of arrest that I recall is for

4        outside agitators, not individuals who are

5        experiencing unsheltered homelessness that were

6        looking to leave the area.

7   Q.   Okay.

8   A.   So agitators that were looking to disrupt the

9        process of orderly closure and clearing of the

10       site.

11  Q.   Do you remember what -- what the outside agitators

12       were doing?

13  A.   If I recall, they were standing in opposition to a

14       representative for -- for the City, who was

15       advising of the notice of trespass, not willing to

16       move out of the way, not allowing closure to move

17       forward.

18  Q.   Okay.  And at the Nenookaasi number one eviction,

19       how did the City ensure that residents were made

20       aware of transportation and housing options?  Yeah,

21       like -- that's -- full -- full question.

22            How -- how were they made aware of their

23       transportation and housing options on the first

24       Nenookaasi eviction?

25  A.   Sure.  With respect to the first Camp Nenookaasi

Enrique Velazquez                    157

1       closure, we had met with the organizers in advance

2       and worked on -- or worked towards a specific

3       closure date.  Even with delays to the dates of

4       closure, we made sure, as a body, that we were

5       engaged and working with them so that they were

6       aware, which was the request, that they be aware,

7       the organizers be made aware.

8           And then as the Homeless Response Team would

9       go out, as others would go out from the Minneapolis

10      Police Department Liaison Team or outreach workers,

11      that organizers were made aware and individuals

12      were made aware of busing options, busing to

13      shelter, busing to the Catholic Charities Frey

14      Opportunity Center on the day of closure, and

15      options with -- with Helix and others that there

16      are these housing options that are -- are being

17      made available.

18  Q.  Who -- who did you meet with?  Like, who are the

19      camp organizers that you met with?

20  A.  So to my recollection, it was Nicole --

21      Nicole Mason.

22  Q.  Anyone else?

23  A.  I'm trying to recall if there was another

24      individual or if it was solely Nicole Mason.  I was

25      out for one of those meetings.  So I -- I'm -- I'm

Enrique Velazquez                              158

1        not positive if Christin Crabtree was also

2        represented as -- as part of the -- that

3        discussion.

4   Q.   And who from the City or other nonencampment

5        representatives were at those meetings?

6   A.   That would be C- -- Chief Operations Officer

7        Margaret Anderson Kelliher.  Mayor Frey was also

8        present at one of the meetings.  The meeting that I

9        missed, those two were present.  Michael Ohama and

10        Peter Ebnet, both from the Mayor's office.  And I'm

11        not positive if there were others outside of this

12        group that were -- of the individuals that I

13        mentioned that were present.

14   Q.   I'm going to move us to the second Nenookaasi camp.

15        That was the one that was evicted on January 30th

16        and that it was on 14th Avenue near 2601.

17            Do you -- do you recall why that camp was

18        evicted?  What led to that eviction?

19   A.   Other than those individuals were trespassing on --

20        on property, the other factors that led to the

21        closure, excessive smoke.

22   Q.   Okay.

23   A.   It was disrupting neighbors and quality of --

24        quality of life, air quality for vulnerable

25        individuals that lived immediately surrounding the

Enrique Velazquez                                    159

1              encampment.

2    Q.    Were there other specific security concerns that

3          incentivized the eviction?

4    A.    There was an individual that was shot and killed

5          directly in front of the encampment after running

6          out of the encampment.

7    Q.    Do you know if that was a resident?

8    A.    I do not know if it was a resident or somebody who

9          was visiting individuals at the encampment.

10   Q.    And whose decision was it to move forward with the

11         January 30th eviction?

12   A.    Collectively that came from the unsheltered working

13         group.

14   Q.    And did you all confirm prior to that decision that

15         the City had more available shelter beds than

16         encampment residents?

17   A.    We did.

18   Q.    How was that confirmed?

19   A.    Engagement with Hennepin County to verify shelter

20         capacity and availability, engagement with their

21         service agencies and partners, also connection with

22         Helix Health and Housing Services to see what

23         capacity they had.  So collectively evaluating the

24         system just to make sure that there was enough

25         space.

Enrique Velazquez                          160

1   Q.    Was there a -- there was a roll call prior to that
2         eviction?
3   A.    Yes.  That's right.
4   Q.    And, sorry, just to -- just to clarify, were there
5         instructions at that roll call that were different
6         from instructions on the January 4th roll call with
7         regards to who could enter the perimeter?  Let's
8         start there.
9   A.    Not that I recollect, no.
10  Q.    Okay.  At that roll call, was there instructions
11        given placing limits on the number of trips that
12        residents could make with their belongings?
13  A.    No, not at all.
14  Q.    Were law enforcement given any instructions about
15        who they could or could not let into the perimeter?
16  A.    The only direction was for individuals that were
17        looking to get in, to connect them with the police
18        liaison.
19  Q.    Was the police --
20  A.    And that police -- sorry.
21  Q.    Was the police liaison then instructed to allow
22        them in?
23  A.    The police liaison would then evaluate if the
24        individual was -- what was the nature of those that
25        were looking to get in?  Was it for obstruction?

Enrique Velazquez                    161

```
 1          Was it to volunteer to help carry items out?  Were
 2          they a resident?  Were they an outreach worker?  So
 3          just more so for that immediate identification of
 4          who is the individual looking to get in, and then
 5          the liaison would escort them in.
 6   Q.     Did people require an escort to be let in at that
 7          eviction?
 8   A.     I believe that would be yes.  Yes.
 9   Q.     And you listed a couple of categories of people,
10          and I -- I don't want to assume.
11               Just to be clear, agitators would not be
12          allowed in but everyone else would?
13   A.     Yes.  Correct.
14   Q.     And was there a time limit placed on how long
15          residents would have to pack their things up?
16   A.     No, there was no time limit.
17   Q.     Okay.  Is there a -- a debrief or a feedback
18          process after eviction with the different City
19          agents and agencies who participate in them?
20   A.     Yes.  During our regular unsheltered working group
21          meetings, post closure, we'd lead off the next
22          meeting with a debrief on the closure:  "What went
23          well?"  "What didn't go so well?"  "What are some
24          things that we need to improve upon?"  "What can we
25          do more of?"
```

Enrique Velazquez                    162

1    Q.    And are there people who are not ordinarily part of

2          that working group who are able to give input into

3          that debrief?

4    A.    The debrief is comprised of all the different

5          entities that are present or have a role from the

6          City perspective.

7                So the short answer, generally no.  We also

8          should have all those different voices already

9          represented in the work group.

10   Q.    Okay.  So going back to the -- the second -- the

11         January 30th eviction at Nenookaasi.

12               Are you aware of any residents who weren't

13         inside the encampment at the time the eviction

14         began?

15   A.    I am not.

16   Q.    Okay.  Are you -- were you present at that second

17         eviction?

18   A.    Yes, I was.

19   Q.    So do you have a sense of at the end of the day

20         when everyone had left, how much stuff was left?

21   A.    There was quite a bit of debris.  Not nearly as

22         much as with the first Nenookaasi closure but

23         certainly a -- a fair amount of debris.

24   Q.    Was there any documentation process that the City

25         engaged in over the items that were left?

Enrique Velazquez                                    163

1   A.   No.

2   Q.   Was there any -- anything sorted into valuable or

3        unvaluable?

4   A.   Not at that closure, no.

5   Q.   So everything was -- was dumpstered essentially?

6   A.   To my knowledge, that's correct.  Anything that was

7        not classified as potentially stolen property or

8        high value that people have reported as stolen.

9   Q.   Does somebody go through the belongings to see what

10       might be stolen or of high value at that eviction?

11  A.   For large items, for example, if somebody were to

12       claim that their ring was stolen, we would have no

13       way of identifying that ring within everything

14       else.  But a bicycle or a motorcycle or a

15       snowblower, those larger items, it would be easier

16       to identify.  Propane tanks, we've had reports of

17       those being stolen.  So setting those larger

18       valuable items aside so that police can go through

19       the process of evaluating whether the description

20       matches with what's recovered on the site.

21  Q.   And do you remember about how many law enforcement

22       were at that second eviction?

23  A.   I do not remember how many were.

24  Q.   Do you remember anybody at that eviction wanting

25       to -- to be gathering more of their belongings but

Enrique Velazquez                    164

1           not being allowed to?

2   A.   No, I do not.

3   Q.   Let's move us to the -- the February 1st eviction.

4           So that was the really quick turnaround, the third

5           iteration of Nenookaasi on 16th Avenue, and that

6           was the one where you mentioned there was -- there

7           wasn't notice to service providers or -- or

8           72 hours to residents.  Just to remind us of which

9           one that was.

10          What -- what precipitated the quick eviction

11          there?  Was it any specific incidents?

12  A.   Yes.  The surrounding neighbors and the residents,

13          those in- -- individuals experiencing unsheltered

14          homelessness, started to engage in a confrontation.

15          The community wanted the encampment gone.  They

16          wanted the encampment to not set up.  And things

17          were escalating.  Tempers were flaring.  And we

18          needed to maintain a law enforcement presence

19          on-site around the clock to try and mitigate and

20          de-escalate the situation.  That's what

21          precipitated the closure.

22  Q.   How was the City made aware of the conflict between

23          the housed and unhoused neighbors of that

24          community?

25  A.   That was from phone calls from the community to law

Enrique Velazquez                              165

1          enforcement, calls to 911, other parties that were

2          observant of what was happening calling 911 to

3          report what they were witnessing.

4    Q.    And who from the City was present at that eviction?

5    A.    So at that specific closure, since it was only a

6          matter of days, I believe it was solely law

7          enforcement that was present at the closure.  I'm

8          not aware of others that were present.

9    Q.    Were you at that one?

10   A.    I was not.

11   Q.    And did you -- do you know if there was a roll call

12         in advance of that eviction?

13   A.    There was a -- there was a roll call.

14   Q.    And were instructions given at that roll call with

15         respect to how many trips that residents could make

16         with their belongings in and out of the encampment?

17   A.    There were no instructions with regard to number of

18         trips people can make.  The focus is on as long as

19         people are making progress towards leaving the

20         site, there's really no time limit and no limit to

21         the number of trips.

22   Q.    Okay.  Is that -- is that universally true from

23         eviction to eviction?  They don't -- law

24         enforcement are not instructed on a trip limit?

25   A.    Correct.  That's correct.

Enrique Velazquez                    166

1    Q.    Okay.  Was there a time limit placed on that third

2          eviction?

3    A.    No, there's no time limit.

4    Q.    Is it -- is it something that you're aware of that

5          law enforcement de facto enforce a trip limit or

6          create that requirement?

7    A.    No, I'm not aware that anyone in law enforcement

8          would create that -- that limit or that

9          requirement.  The focus is on ensuring people are

10         making progress towards leaving the site.  We don't

11         want to hold on to their property.  If they would

12         like to take it, by all means, we -- we've -- I've

13         even seen police officers assist people in carrying

14         items out or getting -- getting items over to

15         volunteers or to vehicles.  The City does not want

16         to hold on to any of that property.  So whatever it

17         takes, we'll -- we'll work with those individuals

18         to make it happen.

19   Q.    And at that third eviction with regards to the --

20         the instructions on the perimeter, was there any

21         criteria about who would or wouldn't be allowed to

22         enter the encampment to help evacuate residents?

23   A.    Similar to other closures, instructions are to

24         notify the police liaison, so basically the

25         incident commander, and that person will make the

Enrique Velazquez                    167

1    determination, or walk over to talk to the

2    individual and walk them through just to make sure

3    that they are truly there to -- to help, to

4    volunteer or provide services and not to disrupt.

5         So if they don't have a reason to be in the

6    encampment or inside the perimeter, they're not

7    allowed inside the perimeter.  That's kind of the

8    basic binary decision.

9  Q.  And then with -- with residents who are going in

10    and out, do they have to check back in with that

11    police liaison every time they're going in and out?

12 A.  No, they do not.

13 Q.  Do service providers and community members and

14    assistants have to check in with that liaison every

15    time they go in and out?

16 A.  No, just the initial time.  And if I can provide a

17    little context around that?

18 Q.  Yeah, please do.

19 A.  So the police liaison -- or that -- that police

20    liaison unit, the commander and lieutenant and

21    sergeant, they're engaged, they're at the

22    encampments on a regular basis.  They're building

23    relationships.  They know who the outreach workers

24    are.  They know who the individuals that are

25    resident at these encampments are.  So it's easier

Enrique Velazquez                    168

1              for them to identify who is there to collect their

2              belongings, who's there as a resident, those kinds

3              of things, versus a police officer that works in a

4              completely different precinct in a different sector

5              of the City who is assigned to this work as a

6              detail.  That person is not going to know.

7      Q.     Right.

8      A.     So that's where -- to try and make it as open and

9              transparent a process as possible, all of those

10             different decisions are funneled to the liaison,

11             who can then walk over and make the determination

12             and walk those people in.  So rather than . . .

13     Q.     (Attorney nods head.)

14     A.     It -- it creates a little bit of a barrier.  But

15             we're trying to create an environment where those

16             who really need to be there have the opportunity

17             to -- to be there and to help or move their

18             belongings out versus those that are just

19             interested in gawking or observing what's going on.

20     Q.     Right.  And then the law enforcement officers who

21             are not the police liaison, are they instructed to

22             refer individuals who are trying to access the

23             encampment to support to the police liaison?

24     A.     Yes.  That's right.

25     Q.     Okay.  And going back again specifically to the

Enrique Velazquez                                    169

1              third eviction on -- the early February eviction.

2    A.   (Witness nods head.)

3    Q.   Was there a -- any documentation that happened of

4         items that remained in the encampment after the

5         humans had been removed?

6    A.   No, not to my knowledge.  No documentation was

7         crafted or -- or reflected.

8    Q.   How about any items of any apparent value that were

9         specifically noted or kept aside?

10   A.   Not that I'm aware of, no.

11   Q.   And the approximate volume of items destroyed at

12        the end of the day?

13   A.   Yeah, that I couldn't attest to.  I wasn't there to

14        observe that.  But I do know that there is

15        documentation of the volumes of -- of waste and

16        waste materials that were collected and discarded.

17        Public Works would have that information.

18   Q.   Okay.  Thank you.

19             And at that third location, was there any

20        advanced checks by the working group of the

21        availability of shelter beds and services prior to

22        the eviction?

23   A.   Yes.  Yes.  That happens on an ongoing basis, and

24        shelter availability was relatively unchanged from

25        the closure just before a few days before.

Enrique Velazquez                                170

1    Q.    So there was -- there was a check, and there was a

2          confirmation that there was enough beds for the

3          estimated number of residents?

4    A.    Yes.  That's right.

5    Q.    And I think -- I think we're ready to move on to

6          the -- well, the next eviction was the fire.  So

7          that wasn't -- I'm going to -- I'm going to skip

8          that encampment because that wasn't an eviction.

9          That was the fire.

10         But I -- I'm going to ask you some questions

11         now that are specific to the July 25th eviction of

12         the -- the fifth Nenookaasi iteration on

13         2839 14th Avenue South.  So that was the location

14         that people moved to after the fire.  We could --

15         we could call it Nenookaasi five.  Does that make

16         sense?

17   A.    Yes.

18   Q.    Okay.  And was there any decision-making basis for

19         that eviction?

20   A.    If I recall, that one was in a residential area

21         with vulnerable adults next door and those that

22         were in recovery adjacent to the property.

23         So that created just general public health

24         issues and more concentrated health issues for

25         those specific individuals that had either moved

Enrique Velazquez                                171

1           out of unsheltered homelessness into something a

2           little bit more supportive and stable.  They were

3           trying not to go back.

4                   There were a few individuals who were -- who

5           relapsed as -- as a result of the presence of the

6           encampment and the presence of -- of drug use and

7           drug dealing that was happening either right there

8           on the property or immediately outside of -- of

9           that property.  In addition to general safety

10          concerns.

11    Q.    And did you confirm prior to that decision to evict

12          that there was an available number of shelter beds

13          that matched the approximate number of residents at

14          the encampment?

15    A.    Yes, we did.

16    Q.    Who was present on behalf of the City at that

17          eviction?

18    A.    On behalf of the City, I was present; Erik Hansen,

19          the Community Planning and Economic Development

20          Director, was present; Elfric Porte, the Housing

21          Policy and Development Director; David Herberholz,

22          the Solid Waste and Recycling Director; Nick

23          Gerold, general foreman; and then a number of

24          individuals from Minneapolis Police Department were

25          present.

Enrique Velazquez                           172

1   Q.   And generally speaking, the number of individuals

2        from the police department, that's up to the

3        discretion of the -- the representative of the

4        police department who's in your working group?

5   A.   Correct.  It's also dependent on what's the

6        situation at the site, where is it in relation

7        geographically?  So what's the overall area of

8        need?

9   Q.   And was notice provided to those -- the residents

10       of the fifth site prior to that eviction?

11  A.   Yes, notice was provided.

12  Q.   How -- how was that -- or how far in advance?  I

13       guess I'll start there.

14  A.   I'm hesitating only because I'm -- I'm -- I can't

15       remember if this specific site was three days or

16       five days, but it was at least three days in

17       advance.

18  Q.   And how was that notice given?

19  A.   Posted signage, plus outreach.  Plus the

20       Minneapolis police liaisons, when they go on-site,

21       they do verbally give notice that the encampment is

22       closing.  And one thing to keep in mind, the

23       sign -- the property itself was fenced.  It was

24       signed.  It was noticed.

25           So the only thing that we're -- we're really

Enrique Velazquez                          173

1          talking about right now is the date of the closure.

2          Because everybody has had notice that they were

3          illegally trespassing when cutting through the

4          fence and entering.

5    Q.    Right.  So as far as the -- not counting the

6          general "No Trespassing" signs, but with reference

7          to the posted sign you're referencing, that had a

8          specific closure date on it?

9    A.    Correct.

10   Q.    And when the police liaison enters, that person is

11         referencing the specific closure date?

12   A.    Yes.  That's right.

13   Q.    Is that true -- kind of zooming back out and

14         looking at other Nenookaasi evictions, is that

15         across-the-board true that the -- the eviction sign

16         has the date on it?

17   A.    Typically it does, yes.  Unless there's something

18         imminent, like an immediate security threat.  In

19         which case, we're not able to post the date, post

20         the time, might not even be able to give that

21         advance notice.  It all depends on what's the

22         situation at the site.

23   Q.    So looking at the -- looking at the five sites, the

24         fourth site was burned, so that's irrelevant to

25         this question --

Enrique Velazquez                                         174

1   A.    (Witness nods head.)  Yeah.

2   Q.    -- and the third site had the urgency condition

3         and --

4   A.    Correct.

5   Q.    -- wasn't noticed.

6               The first, second, and fifth, there was a date

7         posted in advance?

8   A.    Correct.  That's right.

9   Q.    Okay.  Zooming back into this fifth eviction.

10              At the roll call, was there instructions with

11        regards to who could enter the perimeter?

12  A.    With the fifth -- fifth one, there were

13        instructions on who could enter.  Volunteers,

14        whether they could enter or not, which outreach

15        organizations were scheduled or planning to come

16        out to support.

17              So a similar perimeter was set up.  Similar

18        communication from those police officers that were

19        managing the perimeter to the Homeless Response

20        liaison on the police department so that that

21        individual could make the determination of "Yes,

22        allow them in"; "No, not to allow them in," or

23        those kinds of determinations.

24  Q.    It's helpful for me to see this -- kind of the

25        whole pattern and then talk about anomalies.

Enrique Velazquez                    175

1            You're saying that the general protocol with

2       the police liaison evaluating "Is this an agitator

3       or is this somebody trying to be helpful" applied

4       also applied at the -- at the fifth eviction?

5    A.   Yes.

6    Q.   All right.  And was that deviated from -- was that

7       general policy deviated from at any of the other

8       evictions?

9    A.   No, not to my knowledge.

10   Q.   Okay.  And I'm -- I'm sorry if I already asked you

11      this.  Was there a time limit placed on the fifth

12      eviction of --

13   A.   No.

14   Q.   -- how much time residents had?  No.  Okay.

15   A.   No, no time limit.  As long as they're making

16      progress, we'll allow them to make as many trips as

17      possible and provide whatever support is needed.

18   Q.   Okay.  And were service providers given notice of

19      the July 25th eviction?

20   A.   Yes, they were.

21   Q.   Were service providers present on the site?

22   A.   Yes.

23   Q.   And were residents made aware that service

24      providers were there available to help them?

25   A.   Yes, they were.

Enrique Velazquez                                    176

1    Q.    How was that communicated?

2    A.    So communication from the City to the service

3          providers was through Hennepin County to identify

4          which ones would -- excuse me -- which ones would

5          be present.

6                And then once we know which one was going to

7          be present, the Homeless Response Team would go out

8          and communicate and reinforce, "Yep, closure is

9          happening," offers services, offers storage, advise

10         that Street Outreach Team or whomever is going to

11         be here on -- on the day of closure.  "So if you

12         have any last-minute questions and whatnot, the" --

13         "this is an opportunity."

14               And then the outreach team would go out in

15         advance as well the day of closure to reemphasize

16         that same point.  "We're here.  We're here to help.

17         Closure is coming.  Let us know" -- "let's" --

18         "let's figure out how to get you into housing, get

19         you into shelter, get you integrated into the

20         Coordinated Entry System."

21   Q.    At the July 25th eviction, was there any

22         documentation of belongings that were left behind

23         after the humans were removed at the end of the

24         day?

25   A.    Not to my knowledge, no.

Enrique Velazquez                    177

1    Q.    Was there any items that were categorized as

2          valuable or potentially stolen that were set aside?

3    A.    I don't recall any from that location.

4    Q.    So, really, the one instance you recall of

5          something being set aside was that backpack that

6          one time at the first eviction?

7    A.    The backpack at the first closure, and then I

8          recall a collection of propane tanks from the first

9          and second.  Not the third.  Certainly not the

10         fourth.  I don't recall any from the fifth in -- in

11         the middle of summer.

12   Q.    Okay.  And any approximate volume of things

13         destroyed at the end of the fifth eviction?

14   A.    Approximately two to three dump trucks is what I

15         recall seeing.

16   Q.    Generally speaking, what happens to the yurts at

17         Nenookaasi evictions?

18   A.    Generally, those get taken down.  So the residents

19         of the encampment will take those down.  They might

20         bring in volunteers.  Generally, they -- they will

21         take them down themselves and transport them off of

22         the property.  We, as a city, don't want to take

23         them.  They're nicely con- -- constructed.

24   Q.    Were there situations at Nenookaasi evictions where

25         yurts aren't removed from the property?

Enrique Velazquez                    178

1   A.    I don't recall an instance where they were not

2         removed by the residents of the encampment.

3                   MS. KELLEY:  And I think I -- again, I

4         want to check in and see how everyone is doing.

5                   Do we need a break?  Are we good?  Do --

6         does anyone . . .

7                   MS. MCQUITTY:  Can we maybe just take

8         like --

9                   MS. ENSLIN:  Ten minutes?

10                  MS. MCQUITTY:  -- five for the --

11                  MS. KELLEY:  Five?

12                  MS. MCQUITTY:  -- bathroom?

13                  MS. ENSLIN:  (Attorney nods head.)

14                  MS. KELLEY:  Yeah.

15                  Melissa, does that work for you to take

16        a --

17                  THE COURT REPORTER:  Yeah.  That's fine.

18                  MS. KELLEY:  -- a ten-minute bathroom

19        break?

20                  THE COURT REPORTER:  Yeah.

21                  MS. KELLEY:  Okay.

22                  THE WITNESS:  All right.

23                  MS. KELLEY:  Let's do that.  So we'll be

24        back at --

25                  THE WITNESS:  2:07.

Enrique Velazquez                              179

1           MS. KELLEY:  -- 2:07.

2           (Recess from 1:58 p.m. to 2:07 p.m.)

3     BY MS. KELLEY:

4     Q.   When you were at any of these evictions, did you

5          observe anybody with -- any encampment resident

6          with physical disabilities or mobility issues?

7     A.   If I recall from the first Nenookaasi encampment at

8          2313 13th Avenue, I do recall seeing someone in a

9          wheelchair.

10    Q.   And do you know how -- how that was addressed with

11         regards to their -- moving them out of the

12         encampment?

13    A.   I did not see them -- oh, sorry.  Your question is

14         specific to the encampment closure; correct?

15    Q.   Correct.

16    A.   Oh, okay.  I did not see them present at the

17         encampment closure.  I saw them earlier on because

18         the encampment was present for multiple months.  So

19         I saw them when I visited in October, but I did not

20         see them at the closure in January.

21    Q.   Okay.  At these roll calls, is there any

22         conversation about how to address residents'

23         physical and/or mental or intellectual

24         disabilities?

25    A.   At roll call, I do not recall those conversations.

Enrique Velazquez                              180

1          We would have those during the unsheltered working

2          group meetings in advance of deciding on closure.

3     Q.   Would that be a part of any of the briefing

4          materials or the PowerPoint?

5     A.   If we encountered, then it would have appeared.  We

6          didn't -- we didn't encounter that for the day of

7          closure.

8     Q.   You didn't encounter what?  Sorry.

9     A.   Sorry.  I'm not being very clear.

10          So while we encountered individuals who might

11          have presented with disabilities prior to making

12          the decision to closure, those individuals that we

13          identified were not present when we moved forward

14          with closure.  They'd already either moved into

15          housing or they -- they moved into a -- a different

16          space.  So we --

17    Q.   Okay.

18    A.   If -- you know, hypothetically speaking, if they

19          were still present, then we would certainly make

20          sure that as part of our preparation materials,

21          that there were clear guidelines on how to approach

22          these specific individuals who would be present,

23          they can identify them and -- and how to navigate

24          so that we can help them transition out of the

25          space.

Enrique Velazquez                                    181

1    Q.    Would these roll call meetings be captured on law

2          enforcement body-worn camera?

3    A.    I'm not aware that body-worn cameras would be

4          active during roll call.  I -- I'm not sure how

5          those processes and procedures work specifically

6          for the police department to be able to articulate

7          that.

8    Q.    Would body-worn camera be activated during

9          evictions?

10   A.    Body-worn cameras are certainly active during

11         encampment closures, yes.

12   Q.    Okay.  Are you aware of any complaints lodged with

13         the City in response to Camp Nenookaasi evictions?

14   A.    With respect to the complaints, are you referring

15         to complaints from the residents of the encampment

16         to the City or other complaints about the

17         encampment to the City?

18   Q.    Complaints -- not -- not complaints about the

19         unhoused people themselves but complaints filed

20         either by unhoused people or those in support of

21         them about the conduct of the evictions.

22   A.    I am aware of -- I received a -- a multitude of

23         form emails and phone calls and text messages from

24         around the country about closure of Camp

25         Nenookaasi.

Enrique Velazquez                          182

1    Q.    And how -- how were those complaints handled?

2    A.    First, evaluating the substance of the complaint

3          and the nature of them.  Some of them call on the

4          Mayor's policies and how they're inhumane, about

5          the closure themselves with incorrect dates and

6          information.  I still get them today, even though

7          there is no set date or timetable for any closures,

8          referring back to the original Nenookaasi site at

9          2313 13th Ave- -- 13th Avenue.  So some of it, I

10         have to take with a grain of salt because it's a

11         form letter.

12   Q.    Are there informal complaints or conversations that

13         you've had with people that are objecting to or

14         upset with the manner in which Nenookaasi evictions

15         are conducted?

16   A.    Again, from the perspective of individuals who are

17         experiencing homelessness or supportive of the

18         Nenookaasi encampment complaining to the City?  I

19         just want to make sure that we're still --

20   Q.    Yes.

21   A.    -- on the same -- okay.

22   Q.    Same -- same parameters.  Thank you for clarifying.

23   A.    Okay.  Thank you.  Thank you very much.

24               Yes, I am aware of complaints about, you know,

25         people either verbally sharing their -- their

Enrique Velazquez                        183

```
 1        criticism or their complaints with the City's

 2        response to unsheltered homelessness.

 3   Q.   Do people come to the working group with these

 4        concerns?

 5   A.   Yeah, those of us who receive these different

 6        concerns, we certainly present that into the

 7        working group to identify here's the volume, here's

 8        the nature, here's some of the themes that have

 9        emerged from the various elements of information or

10        the data sources that we've received.

11   Q.   And are there intern- -- like, City employees

12        themselves who expressed these concerns to you or

13        the working group?

14   A.   There have been City employees that have expressed

15        concerns, yes.

16   Q.   Do you have a ballpark of how many employees that

17        is?

18   A.   Three that I can recall.

19   Q.   Who were those three?

20   A.   Daniel LaCroix, Narin Sihavong, and I'm trying to

21        remember -- I can picture his -- picture the face

22        of the -- the third person, but I can't recall the

23        name of them.  One works in Regulatory Services,

24        the second in Community Planning and Economic

25        Development.  There was a third from Public Works.
```

Enrique Velazquez                           184

1        I -- I can't recall his name.

2    Q.   And were the substance of each of these complaints

3         substantively similar or different?

4    A.   With respect to the complaint from -- substantively

5         similar with slight deviation in a couple of

6         different areas.  I can cover those if you like.

7    Q.   Sure.  If you wouldn't mind just summarizing, that

8         would be great.

9    A.   Sure.

10   Q.   Thanks.

11   A.   Sure.  With the case of Mr. LaCroix, who is himself

12        Native American, it was about inflicting additional

13        harm to Native people who have historically

14        experienced generational traumas and trying to find

15        ways to provide a response that's culturally

16        relevant and specific that --

17   Q.   How was that -- how was that complaint addressed?

18   A.   I offered to sit down with him and show him how we

19        respond and the different ways that we are working

20        to address all these different concerns and how

21        we're trying to find pathways for individuals to

22        exercise their agency.  So he appreciated having

23        that information and -- and receiving it.

24   Q.   And the next individual?

25   A.   For Mr. Sihavong, it was about the fact that we're

Enrique Velazquez                               185

1       closing encampments, period.  And I think some of

2       that was with respect to this individual manages

3       the contracts for the property management company

4       within Community Planning and Economic Development.

5            So they would have to instruct the contractor

6       to go in, take care of the property, to mend the

7       fencing, to put up the -- the signage.  So I think

8       there was some sort of a conflict between how to

9       approach that work and the work itself.

10   Q.  And how was -- how was that complaint addressed?

11   A.  Just trying to reiterate that encampments aren't --

12       aren't legal.  We can't allow them to happen.  If

13       we need to shift the workload or shift the

14       responsibility elsewhere, you know, that -- that's

15       a different conversation.  But this is part of the

16       work as the person that's responsible and managing

17       this contract.

18            But it was mostly focused on the contract and

19       the -- the consternation of having to tell the

20       contractor to go out and do this unenviable task.

21   Q.  Has anybody complained to the City about the

22       unavailability or inaccessibility of storage during

23       evictions?

24   A.  We have received that complaint in person during

25       the encampment closure of -- more of why do we not

Enrique Velazquez                              186

1          offer storage?  Why do -- "why is the Homeless

2          Response Team not present with storage bins

3          offering storage on the day of the closure?"

4                And the response there is, you know, we were

5          offering these services leading up to the closure

6          and making it clear that it's not going to be

7          available on the day of closure, and that we still

8          are going to move forward.  This has to -- has to

9          happen.  So take advantage of them while they're

10         offered.

11               But on the day of, it's focused on

12         demobilizing and -- and moving off of the property.

13    Q.   Do you remember receiving any complaints from a

14         City employee named Chelsea McFarren?

15    A.   I remember receiving emails from Chelsea McFarren.

16         At -- she was not a City employee, though, at the

17         time that we received it.  I think she -- she was

18         prior but not -- not when I received additional

19         complaints later.

20    Q.   Additional complaints beyond what?

21    A.   I'm sorry?  Could you repeat that?

22    Q.   Sure.  You said you received additional complaints

23         later.  I'm wondering if there was initial

24         complaints.

25    A.   No.  Sorry.  Sorry.  I didn't.  Not while she was

Enrique Velazquez                              187

1          an employee of the City.  It was sometime after --

2          after she separated from the City that I

3          received -- I was forwarded an email, but it wasn't

4          directly to me.  It was to somebody else, and it --

5          it routed over to me eventually.

6     Q.   Do you remember the substance of Ms. McFarren's

7          complaints?

8     A.   I don't recall off the top of my head the -- the

9          specific nature.  I'll see if I can summarize what

10         I interpret to be the nature of -- of the

11         complaint.  I'm struggling.  I remember seeing it.

12         I -- I'm struggling to remember the specificity of

13         it.

14    Q.   Do you remember if she was an employee at the time

15         that she drafted the email, sent it?  I guess I

16         don't know how long it was sitting in her drafts.

17         But you're saying that she was no longer an

18         employee at the time you read the email.  Was she

19         an employee at the time that she wrote the email?

20    A.   So Ms. McFarren and I were like two ships passing

21         in the night.  I started within Regulatory Services

22         on August 1, 2022, which seemed to align with her

23         last day with the City.  So I received her email --

24         I can't recall if it was late in 2023 or if it was

25         earlier in 2024.  It was quite a significant time

Enrique Velazquez                                188

1        difference from when she left the City to when I

2        received that specific email -- or when she drafted

3        that email.

4    Q.  Do you know if her concerns with the encampment

5        closures was part of the reason for the separation?

6    A.  I couldn't speculate on why she separated from the

7        City.

8    Q.  And you -- you mentioned receiving verbal

9        complaints in person about the provision of storage

10       at Nenookaasi evictions.

11           Were you aware of other complaints relayed in

12       person at evictions regarding shelter bed

13       availability?

14   A.  The only complaints I recall receiving about

15       shelter bed availability is about units staying

16       together.  So family --

17   Q.  Okay.

18   A.  -- units staying together when legally they're not

19       family members.

20   Q.  Just to be sure I'm understanding you, people were

21       complaining that they couldn't access a shelter

22       because their family unit couldn't stay together?

23   A.  Yes.  That's correct.  Under the definitions of

24       family shelter, this unit, this cohort of

25       individuals that might identify as a family,

Enrique Velazquez                    189

1            legally are not family.  So they would not be able

2            to go into family shelter together --

3    Q.      Okay.

4    A.      -- because legally they were not family.

5    Q.      And same question about your -- your awareness of

6            people's complaints verbally at evictions with

7            regards to notice given to residents or service

8            providers of -- of that eviction.

9    A.      I loosely recall receiving some complaints from

10           individuals about not having notice or not having

11           adequate notice.

12                Again, we point back to the fence was already

13           up.  There was signage on the fence.  There was

14           signage inside the property.  That is the initial

15           benchmark for notice.  And then anything above and

16           beyond that, it's posted, outreach advises when

17           it's closing.  The poli- -- Minneapolis Police

18           Department liaisons provide notice.  So there's

19           multiple layers of notice that people will receive

20           before the closure.

21   Q.      Getting down to the end here.  Thank you so much

22           for -- for bearing with us and the -- the attention

23           to detail you're providing.

24                How -- how many housed neighbors, I'll call

25           them -- meaning people who live in a house or an

Enrique Velazquez                           190

1          apartment near an encampment.

2                How many housed neighbors of Nenookaasi did

3          the City talk to about -- about Nenookaasi?

4    A.    That's difficult to quantify.  We have had a number

5          of residential neighbors, as well as commercial and

6          nonprofit neighbors, just recognizing that the

7          various iterations of Camp Nenookaasi have emerged

8          in a variety of different settings.

9                The very first one was in a partial

10         residential and commercial space where the

11         Indigenous Peoples Task Force was nearby, In- --

12         Indigenous Health Board, and a variety of different

13         agencies were represented there.

14               So we did receive complaints and did engage

15         with those specific residents, if you will, in --

16         within the community as well as residential

17         neighbors that were concerned for their -- for the

18         health, for the viability, a variety of different

19         things.

20               But, yes, throughout we have been in contact.

21         "We" being a va- -- variety of representation from

22         the City, whether it's myself, whether it's

23         Community Planning and Economic Development,

24         Minneapolis Police Department through the liaisons

25         or even the 3rd Precinct representatives or Crime

Enrique Velazquez                    191

1          Prevention Specialists.  A variety of different

2          individuals have connected with housed residents.

3    Q.    And is that -- is that done through those

4          individuals reaching out to the City or the City

5          going door -- going door to door in the

6          neighborhood or both?  How's that done?

7    A.    So a lot of the engagement is more of those

8          individual entities or residents connecting with

9          the City, looking for some sort of an action, or it

10         could be through community meetings or safety

11         neighborhood type of meetings that are called in

12         response to an event or an emergent safety concern.

13   Q.    Do you know the -- do you remember any of the --

14         what you called commercial neighbors, who those

15         groups were that -- that reached out to the City

16         with concerns?

17   A.    The Indigenous Peoples Task Force and the Indian

18         Health Board, the American Indian Community

19         Development Center, the Metropolitan Urban Indian

20         Directors.  They each reached out with respect to

21         the first iteration of Nenookaasi.

22   Q.    Did you all do any -- any door knocking at all for

23         housed residents in neighborhoods around

24         Nenookaasi?

25   A.    No, not to my knowledge.

Enrique Velazquez                          192

1    Q.    Okay.  So the outreach is -- is people reaching out

2          to you?

3    A.    Correct.

4    Q.    Okay.  And are these -- are these complaints and

5          conversations documented and stored anywhere?

6    A.    If they submitted emails or 311 -- Minneapolis 311

7          service requests, they would be documented there.

8          Otherwise, phone calls may not be documented unless

9          there was a follow-up by email.

10   Q.    Do you recall any of these -- let's say -- let's

11         call them non-Nenookaasi residents.  So whether

12         that's individuals, nonprofits or commercial

13         neighbors, do any of these neighbors have neutral

14         or positive feelings about the encampment that

15         you've heard from?

16   A.    No, they do not.

17   Q.    Okay.  How many requests for emergency services

18         were attributed to the Nenookaasi locations?

19              MS. ENSLIN:  I'm just going to object to

20         the extent that calls for data that would call for

21         speculation.

22              But you can answer if you know.

23   A.    I can recall three or four separate events where

24         emergency services were -- were called or summoned

25         in some capacity.

Enrique Velazquez                               193

1    BY MS. KELLEY:

2    Q.   Just three or four events -- or, I guess --

3    A.   Just what I recall.

4    Q.   That you -- okay.

5    A.   And I -- I'm -- right, and I'm -- I'm loosely

6         familiar with our 911 system.  I don't have access

7         to the data to be able to look at all of that

8         information, but trust that any emergent issues

9         that would -- would come up, would come up through

10        our Minneapolis police liaisons or -- or others on

11        that front.

12   Q.   When you're looking at the -- the number of 911 or

13        311 calls responsive to an encampment, is there a

14        way that you -- that you differentiate whether

15        those calls are coming about encampment residents

16        or from encampment residents?

17   A.   I think the only way I can respond to that is a

18        Priority 1 call is a Priority 1 call.  Whether it's

19        about a resident in the encampment or it's

20        triggered by a person within the encampment, it's

21        still a Priority 1, and the first responsibility is

22        to address that im- -- immediate need to preserve

23        public health, public safety, preserve that life

24        safety.

25   Q.   So I guess to give an example, if -- if a resident

Enrique Velazquez                              194

1           of an encampment were to call 311 to try to talk to

2           a Homeless Response Team person, that -- that data

3           would show up the same as if a housed neighbor was

4           calling to complain about a needle on the ground?

5    A.     Essentially, yes, they would go to different areas

6           of the city, but yes.

7    Q.     Is there a -- a baseline that you're comparing

8           the -- when you say there is this many 911 or 311

9           calls responsive to an encampment and you look at

10          that as a factor justifying eviction or

11          incentivizing eviction, is that compared to any

12          baseline data, or are 311 and 911 calls in the area

13          not responsive to that specific encampment?

14   A.     What I can, again, say generally is that we gather

15          this data -- "this data" being 311 calls and 911

16          calls.  We gather that information ongoing.

17              And when an encampment emerges in a specific

18          area, our crime analysts or 311 analysts are able

19          to see the deviation in call activity, call

20          volumes, call types not only relative to the

21          previous period -- "period" being week, two weeks,

22          month -- but also relative to the same time

23          previous year.

24              So that way they can detect, Is what is

25          currently being experienced an anomaly?  Is it on

Enrique Velazquez                              195

```
 1          par with where we were at this point last year,

 2          where we would see a similar spike?  Or is it

 3          something that is -- can be attributable to the

 4          emergence and presence of an encampment and others

 5          that might seek to utilize the cover of the

 6          encampment to engage in other illicit behaviors?

 7    Q.    Is there a way to differentiate between calls that

 8          are -- I guess, how do you -- how do you verify

 9          that a call is about a resident as opposed to a

10          call being about, say, somebody who doesn't live

11          there but is, like, preying upon a vulnerable

12          population?

13    A.    So if I understand the question, I think the

14          response there is that we have to look at what --

15          what's the behavior that's taking place, whether

16          it's a resident or it's somebody that's preying on

17          a resident that is there in the community.

18              There needs to be a -- an equal measured

19          response to whatever that complaint is to address

20          the behavior and de-escalate the situation or -- or

21          resolve whatever the conflict is.

22    Q.    In terms of tracking data about the number of 311

23          or 911 calls that are about behaviors of encampment

24          residents, is there a way to verify that the person

25          engaging in the complained-of behavior is a
```

Enrique Velazquez                              196

1           resident as opposed to an unhoused person who

2           doesn't live at the encampment or somebody who

3           isn't actually unhoused?

4    A.     Yeah, I don't know that there is a meaningful way

5           to bifurcate that information, not until somebody

6           responds to the specific complaint and -- and gets

7           to the root cause of what's happening.

8               But I don't know what that looks like from

9           a -- an analytical perspective on the back end

10          after conducting that initial inspection and

11          investigation.

12   Q.     As far as the data that -- that the working group

13          is using to make eviction decisions, you don't make

14          those distinctions?

15   A.     We do not make that level of distinction --

16   Q.     Okay.

17   A.     -- because even if it's somebody from the outside

18          that is agitating the situation or preying upon

19          individuals at the encampment, there is no real

20          distinguishable way to address the situation with

21          that outside actor without addressing the

22          encampment, at least not presently.

23   Q.     Okay.  Do you have baseline data about the general

24          presence of discarded needles in East Phillips?

25   A.     So is the question with respect to the volume of

Enrique Velazquez                                197

1           discarded needles in East Phillips?

2      Q.   Right.

3      A.   I do not.  What I can share is that through the

4           Minneapolis Department of Health, we do have a

5           contract with a third party responsible for needle

6           collection and pickup in -- at least in public

7           spaces, public right-of-way, publicly owned

8           parcels.  That does not extend into private areas,

9           private parcels.

10               However, this third party does provide

11          instruction and provide buckets and materials to

12          private property owners -- owners so that they can

13          collect the needles themselves, and then the third

14          party will collect the buckets.

15               I don't know if they weigh them, how they --

16          how they evaluate or how -- what that looks like in

17          terms of volume or number of discarded syringes.

18          Public Works also, I believe, gathers up some level

19          of data.

20     Q.   Okay.

21     A.   We'd have to take a look at that.

22     Q.   Do you -- did you receive air pollution complaints

23          about Nenookaasi?

24     A.   Yes, we did.

25     Q.   And how were those -- would you say that that --

Enrique Velazquez                    198

1          how does that number compare to the air pollution

2          complaints the City receives about, for example,

3          Smith Foundry or Interstate 94?

4     A.   I can't really speculate on the complaints for

5          Smith Foundry or I-94 because those would reside

6          within our Environmental Health system, not so much

7          within our unsheltered response.

8     Q.   Okay.

9     A.   So I can't really compare the two or -- yeah.

10    Q.   And then the City made some -- some representations

11         in earlier filings about a dead baby at the first

12         Nenookaasi encampment.  Just wondering if that

13         information was ever verified.

14    A.   Yes, that was verified.  There was a -- if I

15         recall, someone gave birth to a stillborn child at

16         the encampment.

17    Q.   And how -- how did you learn of that?

18    A.   I learned of it from the Indigenous Peoples Task

19         Force because this -- or an individual went to the

20         Indigenous Peoples Task Force, knocked on the door

21         to advise that there was an unresponsive person,

22         who was bleeding profusely, who was in the

23         encampment.

24              So when the Indigenous Peoples Task Force went

25         and -- showed up, that's what they discovered.  And

Enrique Velazquez                                      199

 1            then one of the many phone calls was to the City

 2            where they relayed that information.

 3    Q.     But you were aware the whole time that this was a

 4            stillborn, not a child who had been at one point

 5            alive and then deceased?

 6    A.     I wasn't aware at that moment where it was reported

 7            to us, but later discovered it was -- it was a

 8            stillborn child.

 9    Q.     Okay.  Is there a -- a metric for deciding when to

10            provide porta-potties to an encampment?

11    A.     So historically the City has not provided

12            porta-potties.  There was a brief period when there

13            was an eviction moratorium in place and encampments

14            were permitted in Minneapolis Park and Recreation

15            Board property that porta-potties were offered at

16            that point, and then that went away when the

17            eviction moratorium was lifted and encampments were

18            no longer authorized at Park Board properties.

19                We did not bring back the concept of

20            porta-potties until 2023, where those were provided

21            in conjunction with a closure date.

22    Q.     Okay.  And what's the -- what's the basis or

23            reasoning behind deciding to provide a porta-potty?

24    A.     The primary focus is on community livability,

25            public health.  Those two factors.  Waste removal

Enrique Velazquez                                        200

```
 1          is -- it's -- you know, people will void wherever
 2          they need to void.  They -- it's -- it's a natural
 3          part of human existence, and they need someplace to
 4          be able to void and should have some level of
 5          dignity to do so without it being in the neighbor's
 6          property or utilizing facilities that are not
 7          intended for that purpose.
 8    Q.    Do you find that providing and servicing
 9          porta-potties does increase the -- the public
10          health outcomes of that encampment?
11    A.    It's certainly one of the different factors that
12          contributes to improved public health.  You know,
13          also on the -- on the foundation that no human
14          should live in an encampment because it is not a
15          safe or healthy environment to live in, that it
16          falls short of the minimum housing standard that
17          the City has set.
18    Q.    Were -- were porta-potties provided to each of
19          the -- the five Nenookaasis?
20    A.    Porta-potties were offered to one, two, four, and
21          five.  Three was only there for a period of a few
22          days.  I don't recall that we provided
23          porta-potties in the few days that they were there.
24    Q.    And are they serviced on any kind of schedule?
25    A.    They are.  We have had a few different vendors
```

Enrique Velazquez                                    201

1        operate in this space.  The schedule was a little

2        bit different from vendor to vendor.

3             The vendor at the time for Nenookaasi one,

4        two, four -- one, two, and four serviced six days

5        per week.  It was a different vendor, if I recall,

6        for Nenookaasi five, and those were serviced five

7        days per week.

8    Q.  Do you happen to remember the names of either of

9        those vendors?

10   A.  I remember an acronym, SAS.

11   Q.  Was that for the first -- one, two, and --

12   A.  For the -- correct.

13   Q.  Do you remember an acronym for the second?

14   A.  The second one is Wruck Sanitation, W-r-u-c-k.

15   Q.  Okay.  What ordinances are encampment residents

16       violating typically, aside from the --

17            MS. ENSLIN:  I'm going to -- sorry to

18       interrupt you.  I thought you were done.

19            I was going to say -- put an objection in

20       to the extent it calls for a legal conclusion.

21            MS. KELLEY:  Okay.

22            THE WITNESS:  Do you want me to --

23            MS. ENSLIN:  You can answer.

24   A.  Yeah, so on the surface, Minneapolis Code of

25       Ordinances 244.60, which for all intents and

```
 1          purposes states that erecting a structure -- a

 2          temporary structure for the purpose of human

 3          habitation is illegal, and it does not conform to

 4          the minimum -- minimum housing and property

 5          maintenance standard.  It also violates zoning

 6          ordinance.

 7   BY MS. KELLEY:

 8   Q.     I think -- if you just have any of the -- the

 9          titles or numbers of the statutes off the top of

10          your head.

11                  MS. ENSLIN:  Objection.  Calls for a

12          legal conclusion.

13   A.     I do not.

14   BY MS. KELLEY:

15   Q.     Okay.  Going through -- I guess, are these -- are

16          the -- are the violations of ordinances documented

17          anywhere?  What -- what the residents are

18          violating, is that -- is that documented within the

19          city?

20   A.     Are you asking if the ordinances are documented

21          within the City or --

22   Q.     Sorry.  That -- that's --

23   A.     -- the violations for each --

24   Q.     -- a weirdly phrased question.

25                  When a -- when a Nenookaasi resident or a
```

Enrique Velazquez                                    203

1        group of residents is violating a City ordinance,

2        is there a process by which the City documents,

3        "Hey, this person is violating this ordinance," or

4        "This encampment is violating this ordinance"?  Is

5        that documented, and do those documents live

6        anywhere?

7   A.   Well, the notice of violation is essentially posted

8        at -- at every site.  So as somebody enters,

9        they're essentially acknowledging that they're

10       violating.  The -- we don't take individuals' names

11       because the focus is not on prosecuting or

12       otherwise citing those individuals.  The focus is

13       on the people and helping them access their agency

14       so that they can move into supportive stable

15       housing.  We don't want to create a barrier for

16       that.

17            So, no, we do not provide any sort of a

18       citation or other documentation that indicates to

19       that individual, "You are in violation of all of

20       these different codes of ordinance personally."

21  Q.   Okay.  So there's no -- there's no other, really,

22       way that the City addresses residents being in

23       violation of City ordinances aside from evictions?

24  A.   When Homeless Response personnel and Minneapolis

25       police personnel and Crime Prevention Specialists

Enrique Velazquez                                          204

1          go on-site to engage with these individuals at

2          encampments, they're advised that they're in

3          violation, that the encampment is illegal, it has

4          to close, and trying to convince them that they

5          need to move on while also providing access to

6          services.

7    Q.    Okay.

8    A.    But we --

9    Q.    But they're not -- they're not given, like, tickets

10         or citations or anything?

11   A.    No, not at all.  Not at all.

12   Q.    Okay.

13   A.    Yeah, we recognize that having citations or

14         warrants or any of those different types of

15         legal -- what would you call it?  You know, any --

16         any -- having any of those different kinds of

17         elements on your record can also present a barrier

18         to get into shelter.  So we -- we want to -- we

19         don't want to add to barriers for people to get

20         into shelter.  We want to decrease barriers for

21         people to get into shelter.

22   Q.    Okay.  Just thinking about Nenookaasi one through

23         five, are all of those properties owned by CPED or

24         managed by CPED?

25   A.    Yes, I believe they are all managed by CPED.

Enrique Velazquez                                    205

1    Q.    And so it would be -- CPED would be the -- the

2          agency that decides how those properties get used?

3    A.    Yes.  That's right.

4    Q.    And I know Nenookaasi one is under -- is under some

5          contract for an anticipated future use; right?

6          What is -- what's going in at Nenookaasi one?

7    A.    So Nenookaasi one was actually transferred to the

8          Indigenous Peoples Task Force.  That's been a

9          project that's been underway for about 14 years.

10         And they plan on building a -- a healing center, an

11         education center, have a community space.  They're

12         going to transfer their offices into that space

13         and -- let's see.  What else were they going to do?

14         Health services.  They're going to provide health

15         services there as well.

16   Q.    Okay.  Any similar plans or contracts or agreements

17         for future uses of the Nenookaasi two through five?

18   A.    I believe number two is earmarked for housing

19         development, for deeply affordable housing.  I

20         don't know who the -- the potential developer is

21         for that, but it's -- it's somewhere in the

22         pipeline of coming to fruition.  And essentially,

23         all of these different parcels are going to be used

24         for low to -- or affordable to deeply affordable

25         housing.

Enrique Velazquez                                    206

1   Q.   What -- what do you mean "deeply affordable"?

2   A.   So affordable housing is considered to be

3        60 percent or lower of the annual median income for

4        the area as set by Met Council.  Deeply affordable

5        would be 30 percent or less.

6   Q.   Okay.  So Nenookaasis two through five are all

7        somewhere in the trajectory of being earmarked for

8        housing development?

9   A.   Yes.  That's right.

10  Q.   And you mentioned earlier a -- a -- two meetings.

11       One that you were at and one you weren't with

12       Nicole Mason.

13            Has the City or the working group had other

14       meetings specifically with Nenookaasi residents?

15  A.   Not specifically.  What I can say is that on the

16       day of encampment closures where Nicole Mason is

17       present, she will engage with either myself or with

18       Erik Hansen, the Director of Community Planning and

19       Economic Development.

20  Q.   Do you have other -- other meetings as a working

21       group where you invite unhoused people generally to

22       come to these meetings?

23  A.   Not presently.  That is something that I am working

24       on to invite individuals with lived experience to

25       form almost an advisory group to inform on our

Enrique Velazquez                    207

1      response to make sure that how we are responding as

2      a city, as an organization, takes into

3      consideration those different attributes from

4      individuals with lived experience to help us on the

5      procedural side as well as where we could

6      potentially spend funding in the future.

7   Q.  Do you -- do you remember the norovirus outbreak?

8   A.  I do.

9   Q.  Would you mind just telling me how the City learned

10      of that and what happened?

11  A.  So I learned of it from our Deputy Commissioner of

12      Health, Heidi Ritchie, who received information.

13      I -- I'm not positive on where she received the

14      information from, if it was specifically from

15      Minnesota Department of Health or if it was through

16      Hennepin Health.

17          But in any event, she received information and

18      then deployed her team to go to the site, to do an

19      evaluation, and do some initial health screening

20      and assessment of individuals on -- on -- at

21      Nenookaasi two.

22  Q.  And did your -- did your office or anybody verify

23      the reports that this was indeed norovirus?

24  A.  The Minneapolis Department of Health through their

25      epidemio- -- epi- -- epidemiological team, they did

Enrique Velazquez                                         208

1          conduct some treatings to verify that it was the

2          norovirus.

3     Q.   What safety and/or treatment measures were adopted

4          in response to the outbreak?

5     A.   So a couple of the different things that we did

6          initially was close off the existing portable

7          toilets and requested brand-new sets of portable

8          toilets to be brought on-site.  Provided health

9          advisories to the individuals within the

10         encampments, as well as immediate neighbors, so

11         that they were aware of the presence of norovirus

12         and how to combat it.  So increased handwashing,

13         things of that nature.

14              The Health Department also provided some

15         instruction about food preparation to make sure

16         that additional people would not be subjected to

17         the norovirus.

18              This site was already targeted for closure

19         with a set closure date.  And then under the advice

20         of the Health Department, we delayed closure until

21         after they were able to confirm that there was no

22         further risk of spread for norovirus into the

23         community or to other individuals at other

24         encampments.

25    Q.   Was there any communication or instruction to City

Enrique Velazquez                                    209

1           law enforcement or emergency personnel about

2           whether or how they should enter the camp -- enter

3           Nenookaasi during the norovirus outbreak?

4    A.     Yes.  Our Health Department did provide basic

5           instruction of what to do, what not to do.  That

6           was communicated during the unsheltered work group

7           so that those departments that would engage at the

8           encampment, whether it's the Homeless Response

9           Team, Public Works, Solid Waste and Recycling Team,

10          or Minneapolis Police Department, that they would

11          each have first awareness, visibility into what to

12          do and how to approach and if they needed to

13          approach.

14   Q.     I think I've got one -- one last section left, and

15          then we'll let you go.

16             So I'm going to ask you some questions about

17          the fire and the time period leading up to that at

18          the -- I believe that is the fourth iteration of

19          Nenookaasi.  Yeah.

20             Do you know the names of -- of staff members,

21          and which agency they belong to, of City

22          representatives who visited Nenookaasi the week

23          prior to February 28, 2024?

24   A.     The week prior to February 28, 2024?

25   Q.     So the fire was February 28, 2024.

Enrique Velazquez                                    210

1    A.    Correct.

2    Q.    The week leading up to it --

3    A.    Okay.

4    Q.    -- do you know who all went to the camp that week?

5    A.    Yes.  I just had to double-check the week prior.

6          Because I know just days before, I did have staff

7          there, but I wasn't sure if that was the week prior

8          because I don't pay attention to was it Sunday or

9          Monday.

10             I did have staff there from Inspections

11        Services, Fire Inspections Services.  It was Fire

12        Inspector Roger Kemp who visited that encampment.

13        I believe there was a second individual, but I

14        can't recall who that person was and -- but I did

15        have two fire inspectors that were present.

16   Q.    And what were they told?  What were their

17        instructions when they were sent to visit the camp?

18   A.    Certainly.  Let me start with the original reason

19        why they were at the -- at the encampment.

20             So we received complaints from Allina Health

21        Systems, which operated a -- a lab that was just

22        adjacent to the encampment.

23             So the smoke from the fires that were at --

24        going on at the encampment were not only causing

25        air quality issues for -- for their clinic guests

Enrique Velazquez                                    211

1          but also for staff, it was also interfering with

2          their diagnostic equipment as they tried to run

3          blood panels and a variety of other diagnostics

4          for -- for their patients who were coming in.

5               So that was what precipitated the response

6          from Fire Inspections Services.  And I believe the

7          plan was also to bring in Environmental Health from

8          an air quality perspective so that both could do an

9          inspection, could do outreach, and engage with the

10         residents at this iteration of Camp Nenookaasi

11         about the fires.

12              So part of it was -- part of that engagement

13         was -- included identifying what kinds of materials

14         they were burning, seeing if they could provide

15         some recommendations around what materials to burn

16         versus not burn and general fire safety.

17    Q.   And did you get a report back or any briefing or

18         follow-up from those individuals after they made

19         those visits?

20    A.   Yes.  The report back I received from Fire

21         Inspections was that they -- the encampment

22         residents were burning a lot of materials that were

23         not intended to be -- to be burned, that they

24         provided advice and guidance on what materials

25         could be burned, recognizing that any material they

Enrique Velazquez                                    212

1          burn is in violation of City ordinance since we do

2          not allow recreational fires.  But certain

3          materials clearly should not be burned for risk of

4          combustion.

5               And they identified a wall or a series of

6          walls of propane tanks that were all gathered

7          together not too far from a fire and advised that

8          that needed to -- to be moved to prevent any sort

9          of accident or injury or just unforeseen action.

10   Q.    Do you know if the residents responded to this

11         advice or took any steps to address the concerns?

12   A.    From what I understand -- oh, one of the other

13         pieces of advice that was provided was to ensure

14         that there's somebody on fire watch, which is to

15         say that at all hours of the day in which there are

16         fires present, that somebody is -- within that

17         encampment is on watch so that if there's a fire,

18         if there's a spark, that that person can

19         effectively sound the alarm to notify the rest of

20         the residents in the area so that they have an

21         opportunity to escape from a fire and preserve life

22         safety.  That's ult- -- ultimately what Fire

23         Inspections Services is about, it's about the life

24         safety.

25               So from that perspective, the residents

Enrique Velazquez                                    213

1           advised that they do have fire extinguishers.  They

2           needed more fire extinguishers.  And they were

3           planning on setting up fire watch around the clock,

4           that somebody was always watching and that they

5           would just formalize that.

6      Q.   So residents -- you're saying residents, like,

7           took -- took steps in response to these

8           instructions or . . .

9      A.   Yes.  That's correct.

10     Q.   Okay.  And then we had the fire on February 28th.

11          What investigation, if any, has taken place

12          regarding the cause of that fire?

13     A.   Yeah, when there's a fire such as this one, the

14          City has two arson investigations units -- one

15          within the police department, one within the fire

16          department -- and they each conduct their

17          investigations into the fire and into what's the

18          cause of the fire and where to go from there.

19          From the police department investigation, the

20          conclusion was basically that it's inconclusive of

21          how the fire started because there was so much

22          damage that was caused, and there were multiple

23          potential sources of -- of spark that would have

24          ignited the fire, just based off of what was

25          present on the site.

Enrique Velazquez                                214

1   Q.   How -- how long do these two types of arson

2        investigations typically take?

3   A.   That's -- that's hard to really say on how long it

4        would take.  I guess it depends on the complexity

5        of the fire and the structures and what -- what's

6        present and more importantly, what remains of the

7        structure of whatever was damaged in the fire to

8        provide any sort of leading indicators.

9             In a case such as this one, with the entire

10       area summarily destroyed, there was not much to

11       investigate.

12  Q.   So you said the -- the police department issued

13       a -- a closed process -- or they -- they issued a

14       finding that it was inconclusive.

15            Did the fire department come back with any

16       kind of conclusion to their investigation?

17  A.   Yeah.  The fire department's conclusion is that

18       there were multiple potential sources.  And with

19       the level of damage at the site, that it was also

20       inconclusive as far as the source of the fire.

21            But ultimately, in -- in both instances,

22       because the -- all these different sources and

23       potential starts to the fire, arson was not

24       suspected.

25  Q.   And both of those investigations are closed at this

Enrique Velazquez                                    215

1           point?

2    A.     Yes.  That's correct.

3    Q.     How were those investigations documented?

4    A.     So jointly, there's about a 40-page report that

5           covers both the -- the police arson investigation

6           as well as the fire department arson investigation.

7           And these are cataloged and uploaded to the Police

8           Information Management System.

9    Q.     The -- the police arson investigation, do you have

10          names of individuals who prepared that report or

11          conducted that investigation?

12   A.     The arson investigator is Sergeant Mike Nimlos.

13   Q.     How about the fire department?

14   A.     That is -- I can't remember his title --

15          Larry Oker.

16   Q.     Was there any deviations between standard procedure

17          for investigating a fire generally as opposed to

18          how the fire at Nenookaasi was investigated from

19          either investigation department?

20   A.     No, not to my knowledge.

21   Q.     How -- how long after the fire was the site

22          cleared?

23   A.     So the site remained exactly as it was post fire

24          pending the conclusion of the investigations.  And

25          there's another element, which was from the Health

Enrique Velazquez                                216

1        Department.

2             As a city, we weren't sure what was -- what

3        materials were -- were being burned and what the

4        environmental impact was, so we needed to wait

5        until Environmental Health completed their

6        Environmental Health Impact Assessment.  I believe

7        it was at least another week after the fact before

8        that was concluded and then clearing took place at

9        some point thereafter.

10   Q.  Were there any investigations that took place

11       regarding the arson or attempted arson in the week

12       leading up to the February 28th fire?

13   A.  Investigation into arson the week leading up to the

14       fire?

15   Q.  At Nenookaasi.

16   A.  At Nenookaasi?

17   Q.  Yeah.

18   A.  I'm aware that there was a response to a fire --

19       not that there was suspected arson -- when the

20       portable toilets burned.

21   Q.  Yeah, could you -- could you go into that a little

22       bit?  What happened with the -- the porta-potty

23       fire?

24   A.  What happened with the porta-potty fire is, based

25       on my recollection, that an individual started a

Enrique Velazquez                    217

 1            small fire to keep themselves warm inside the

 2            porta-potty, and it's plastic.  The material

 3            burned, and then the -- the chemicals inside the --

 4            the basin accelerated that -- the burn of that

 5            fire.

 6    Q.      Was that investigated and/or documented, that

 7            incident?

 8    A.      Making an assumption that it was.  I mean, yes, it

 9            was investigated.  Making an assumption that it was

10            documented.  I did not see the documentation.

11    Q.      Did you see the -- the video of the guy?

12    A.      No, I did not.

13    Q.      Okay.  Were you -- were you aware that there was

14            video?

15    A.      No.

16    Q.      Okay.  Is there anything that I haven't asked you

17            that you think is relevant that you'd like to share

18            about the City's response to Nenookaasi or

19            houseless encampments in general?

20    A.      Yeah, I can say that the City's response to

21            unsheltered homelessness continues to evolve over

22            time.

23                Where we are today is not where we were when

24            the very first encampment formed along The Wall of

25            Forgotten Natives along Highway 55.

Enrique Velazquez                    218

1          Even with the first iteration of Nenookaasi at

2      2313 13th Avenue South to where we are today, we

3      continue to evolve.  And I think we continue to

4      evolve for the better while keeping residents at

5      the center, while keeping our unsheltered neighbors

6      at the center of -- of the conversation to find

7      pathways to help them exercise their agency and

8      move it from unstable housing into stable housing.

9      So everything that we do is with that focus and

10     with that mindset.

11         So every dollar we spend, every -- every

12     action we take is so that we can make sure we

13     realize that goal.

14  Q.  What are some of those evolutions, if you can

15     describe it?  How has -- how has the response

16     evolved since The Wall of Forgotten Natives and

17     since the beginning of Nenookaasi?

18  A.  Definitely.  So since The Wall of Forgotten

19     Natives, we now have a Homeless Response Team.  We

20     have funding.  We have vehicles.  We offer snacks

21     and other services.  We have storage, even though

22     it's not -- not being utilized -- or it's

23     underutilized.  And we're looking to find different

24     ways to bring storage into communities.

25         We didn't offer porta-potties for a period of

Enrique Velazquez                     219

1    time.  Now we're offering those different types of

2    services to address community livability.

3        We didn't offer trash service before.  We

4    offer that service because it detracts from

5    community livability if we don't.  It attracts

6    nuisance.  It attracts disease and -- and vermin

7    if -- if we don't.

8        Having a dedicated liaison team with the

9    Minneapolis Police Department that's active and

10   engaged at encampments.

11       Having security cameras present at some of the

12   larger encampments so that we at least can observe

13   what's happening and -- and provide some sort of --

14   even if it's latent, provide some level of response

15   and reasonable assurance that we're targeting bad

16   actors that engage in these spaces.  We're not

17   targeting people who are experiencing homelessness.

18       We engaged Helix to stand up a whole new

19   supportive housing model that, I think, addresses a

20   specific need that some of our un- -- unsheltered

21   neighbors and residents have echoed that, "Hey, you

22   know, this is our family.  And we can't" -- "we

23   don't" -- "we don't fit into any of these different

24   buckets.  Help us find a bucket that we can fit

25   into."

Enrique Velazquez                                   220

1         We've looked at Land -- Land Back.  We're

2      working on a variety of different initiatives with

3      tribal nations to find pathways so that they can

4      reclaim some of these different parcels of land and

5      use them for a favorable purpose.

6         Engaging with individuals with lived

7      experience.  We're -- we're trying a lot of

8      different ways.  There's nothing that's off the

9      table for us to get to a place where we can get to

10     functional zero, which is there are no unsheltered

11     individuals within the city.

12  Q.  Okay.  I have one more question, and then I think

13     we're -- I think we're done.  Just something that

14     you mentioned earlier that I was confused about.

15         Within the police department, is there like a

16     Homeless Response Team equivalent that's -- that is

17     housed with the police liaison at the law

18     enforcement?

19  A.  Yes, that's right.  That's right.  So the -- they

20     reside within the Office of Procedural Justice

21     within the Minneapolis Police Department.  It's

22     under the command of Commander Monica Hanson.

23     There's a lieutenant and then a sergeant who are

24     both assigned to this -- this unit, and their sole

25     focus is on unsheltered homelessness and encampment

Enrique Velazquez                          221

1          response.

2    Q.    Is it just those three individuals?

3    A.    Yes.  Those three are the fulcrum within the police

4          department, and then they liaise with all the --

5          the different precincts wherever additional support

6          is needed.

7    Q.    And the names of the other two individuals that are

8          under the commander?

9    A.    Lieutenant John Haugland and Sergeant

10         William Martin.

11   Q.    And their -- what's their kind of day to day --

12         like, what -- what actually do they do?

13   A.    So they engage with our unsheltered residents at

14         encampments, field calls from community --

15         community members, participate in community events

16         and activities focused on public safety and

17         encampment response.

18              They receive information from their crime

19         analysts counterparts within the police department

20         to evaluate what's happening, what's -- what's

21         changing, receive information from precincts

22         specifically for encampments on what's occurring

23         with respect to our mobile cameras that are in

24         place near larger encampments.

25              If situations escalate, they're the ones who

Enrique Velazquez                                222

1      are kind of the first in for those different

2      situations for larger encampments.  For smaller

3      encampments, it's handled by the precinct level.

4           And as we -- they provide advice into the

5      unsheltered homelessness work group, advice on

6      public safety and what's the situation from a law

7      enforcement lens.

8           For the encampments, crimes that are being

9      experienced or perpetrated on community, they

10     develop and prepare the briefing when we get to the

11     day of closure and lead that effort for closure.

12  Q.   Okay.

13  A.   So, yeah --

14  Q.   And their --

15  A.   -- they're that -- that central fulcrum.

16  Q.   And their range is the whole city of Minneapolis?

17  A.   Yes.  That's right.

18  Q.   Got it.

19           MS. KELLEY:  I realize my follow-up

20     question was really a follow-up question with

21     several subparts.  Thanks for bearing with me.

22           I think -- I think that's a wrap.  Really

23     appreciate your time, Mr. Velazquez, and your

24     knowledge that you've shared with us.

25           THE WITNESS:  Thank you.  Yeah, I

Enrique Velazquez                          223

1        appreciate the opportunity.

2                    MS. ENSLIN:  Well, we will -- we will

3        read and sign then, Melissa.

4                        (The videoconference Rule 30(b)(6)

5        deposition concluded at 3:16 p.m.)

6                        (The original transcript has been

7        delivered to Ms. Kelley.)

8                                    ***

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, Melissa A. Chamberlin, RPR, hereby certify that
    I am qualified as a verbatim shorthand reporter, that I
    took in stenographic shorthand the videoconference
4    Rule 30(b)(6) deposition under oath of **City of
    Minneapolis** by its designee **Enrique Velazquez,** at the
5    time and place aforesaid;

6          That the transcript consisting of 225 pages is a
    true and correct, full and complete transcription of the
7    testimony of this witness, to the best of my ability and
    given the quality of the audio in the videoconference
8    Rule 30(b)(6) deposition setting;

9          That the review of the transcript was requested;

10         That the cost of the original transcript has been
    charged to the party who noticed the videoconference
11    Rule 30(b)(6) deposition and that all parties who ordered
    copies have been charged at the same rate for such
12    copies;

13         That I am not a relative or employee of any of the
    parties or a relative or employee of any of the
14    attorneys;

15         That I have no interest, financial or otherwise, in
    this action and have no contract with the parties or
16    attorneys or persons with an interest in this action;

17         Witness my hand and seal this 26th day of
    December, 2024.

18

19

20         _____
               Melissa A. Chamberlin
21         Registered Professional Reporter

22

23

24         My Commission Expires:  01/31/2025

25

VIDEOCONFERENCE RULE 30(b)(6) DEPOSITION
CORRECTION SHEET

CASE TITLE:  Sagataw, et al. vs. Frey
DEPOSITION DATE:  December 10, 2024

I, **Enrique Velazquez,** having read my deposition, do hereby certify that I have read the preceding pages of my deposition and find the same to be true and correct (except as follows:)

PAGE NO.     LINE NO.    CORRECTION/CHANGE       REASON

DATED:  _____          _____
                                        Enrique Velazquez

**RETURN PROCEDURE:**

* Return **this** correction sheet directly to Attorney Kira Kelley, Climate Defense Project, P.O. Box 7040, Minneapolis, Minnesota 55407 **January 30, 2025.** Please retain a copy for your records.

* Please email a copy to Melissa A. Chamberlin, RPR, at machamberlin04@gmail.com.  Thank you.

**'**

'21 [1] - 93:16
'24 [1] - 93:16

**0**

01/31/2025 [1] - 224:24

**1**

1 [6] - 7:18, 75:1, 187:22, 193:18, 193:21
1-122 [1] - 3:4
10 [6] - 1:18, 3:24, 4:25, 128:7, 128:9, 225:3
100 [4] - 2:12, 37:4, 101:6, 140:18
104 [3] - 149:24, 150:1, 150:6
10:45 [1] - 78:3
10:55 [1] - 77:25
10:57 [1] - 78:3
10th [1] - 64:8
1105 [1] - 100:9
12:00 [1] - 122:15
12:30 [1] - 122:15
13th [7] - 54:4, 64:6, 99:23, 179:8, 182:9, 218:2
14 [4] - 82:11, 83:16, 88:1, 205:9
14-day [3] - 88:15, 93:1, 93:17
14th [5] - 100:2, 100:6, 100:12, 158:16, 170:13
15 [2] - 101:4
150 [2] - 149:1, 149:10
154 [1] - 2:12
16 [2] - 13:6, 186:9
16th [2] - 100:7, 164:5
18 [1] - 2:11
192 [1] - 2:12
1:58 [1] - 179:2
1st [5] - 74:18, 100:10, 132:2, 154:9, 164:3

**2**

2 [1] - 42:11
201 [1] - 2:12
2016 [1] - 8:5
2019 [2] - 8:9
202 [1] - 2:12
2020 [2] - 82:25, 132:4
2021 [2] - 83:1, 107:9
2022 [9] - 7:18, 8:3,

13:6, 18:6, 21:9, 27:13, 59:13, 107:9, 187:22
2023 [5] - 7:12, 112:16, 138:21, 187:24, 199:20
2024 [15] - 1:18, 3:24, 4:25, 29:21, 29:24, 30:5, 30:10, 124:3, 132:4, 187:25, 209:23, 209:24, 209:25, 224:17, 225:3
2025 [3] - 29:25, 89:17, 225:23
2026 [1] - 89:18
21 [3] - 2:11, 129:17, 133:21
210 [1] - 3:14
22 [1] - 2:11
224 [1] - 2:22
225 [2] - 2:24, 224:6
2313 [2] - 179:2, 179:8, 182:9, 218:2
24-cv-0001 [1] - 1:7
244.60 [5] - 20:13, 24:17, 114:12, 143:9, 201:25
25th [4] - 100:11, 170:11, 175:19, 176:21
2601 [2] - 100:3, 158:16
26th [1] - 224:17
28 [4] - 2:11, 209:23, 209:24, 209:25
2839 [2] - 100:12, 170:13
28th [3] - 100:9, 213:10, 216:12
29th [1] - 100:11
2:07 [3] - 178:25, 179:1, 179:2
2nd [1] - 132:2

**3**

3 [1] - 127:23
30 [3] - 102:7, 206:5, 225:23
30(B)(6 [1] - 1:14
30(b)(6 [7] - 3:20, 100:21, 223:4, 224:4, 224:8, 224:11, 225:1
30(b)(6) [1] - 4:24
30th [6] - 100:1, 100:2, 100:7, 158:15, 159:11, 162:11
311 [18] - 34:17, 37:2,

37:5, 37:6, 71:22, 71:23, 71:25, 72:13, 75:18, 192:6, 193:13, 194:1, 194:8, 194:12, 194:15, 194:18, 195:22
32 [2] - 136:25
34 [1] - 42:11
350 [1] - 3:13
3:16 [1] - 223:5
3rd [1] - 190:25

**4**

4 [2] - 2:3, 127:23
40-page [1] - 215:4
4th [12] - 99:24, 99:25, 100:2, 124:2, 148:13, 151:6, 151:16, 153:10, 153:14, 153:2, 155:8, 160:6

**5**

5 [1] - 7:12
55 [2] - 26:19, 217:25
55407 [2] - 3:6, 225:23
55415 [1] - 3:14

**6**

6 [1] - 28:17
60 [1] - 206:3
612 [2] - 3:15, 71:25
67 [1] - 2:11
673-3000 [1] - 71:25
683-4086 [1] - 3:6

**7**

7040 [2] - 3:5, 225:22
72 [2] - 22:10, 164:8
72-hour [1] - 22:21
74 [1] - 2:11
75 [1] - 2:11
76 [1] - 2:11
763-2010 [1] - 3:15

**8**

8 [2] - 127:16, 128:9
802 [1] - 3:6

**9**

9 [1] - 8:4
911 [10] - 75:17, 75:18, 165:1, 165:2, 193:6, 193:12, 194:8, 194:12, 194:15,

195:23
92 [1] - 2:12
94 [1] - 198:3
9:00 [2] - 1:19, 3:24

**A**

a.m [5] - 1:19, 3:24, 78:3, 127:16
abandon [1] - 93:12
abide [1] - 145:7
ability [4] - 21:21, 54:15, 58:21, 224:7
able [46] - 6:21, 30:9, 42:9, 43:11, 43:12, 44:7, 47:11, 48:10, 48:22, 50:1, 50:6, 50:20, 54:8, 68:11, 82:7, 87:12, 101:22, 101:23, 102:6, 102:25, 106:15, 106:21, 107:18, 110:3, 113:4, 124:20, 124:21, 128:13, 136:8, 137:4, 139:24, 149:12, 149:13, 149:21, 149:24, 150:6, 150:25, 162:2, 173:19, 173:20, 181:6, 189:1, 193:7, 194:18, 200:4, 208:21
absolutely [1] - 117:25
abuse [2] - 47:20, 48:9
accelerated [1] - 217:4
accepted [1] - 99:13
access [22] - 73:5, 73:20, 85:16, 89:9, 89:10, 89:12, 89:19, 89:24, 90:7, 90:17, 94:8, 102:12, 110:14, 111:20, 117:12, 125:10, 147:19, 168:22, 188:21, 193:6, 203:13, 204:5
accessible [4] - 18:19, 26:10, 108:4, 108:9
accessing [2] - 88:22, 89:21
accident [1] - 212:9
according [1] - 76:17
account [1] - 89:11
accurate [1] - 107:15
acknowledging [1] - 203:9

acquire [1] - 60:19
acquired [1] - 87:4
acquires [1] - 66:9
acronym [2] - 201:10, 201:13
across-the-board [1] - 173:15
Act [5] - 29:16, 29:23, 30:4, 141:21, 141:23
action [8] - 34:25, 46:13, 130:18, 191:9, 212:9, 218:12, 224:15, 224:16
Action [12] - 36:14, 89:6, 90:15, 90:18, 90:21, 91:1, 91:2, 91:18, 91:21, 92:12, 113:6, 131:13
actions [2] - 46:11, 46:12
activated [1] - 181:8
active [4] - 51:7, 74:15, 181:4, 181:10, 219:9
actively [1] - 111:5, 111:14, 118:23
activities [5] - 34:18, 39:4, 52:15, 119:2, 221:16
activity [3] - 39:22, 53:7, 194:19
actor [3] - 33:4, 33:5, 196:21
actors [3] - 32:19, 76:10, 219:16
actual [1] - 147:4
acutely [1] - 121:8
Acuña [1] - 30:23
Acuña-Fernandez [1] - 30:23
ad [1] - 44:14
Adam [1] - 138:16
adapt [2] - 106:25, 110:11
add [4] - 45:20, 49:22, 73:21, 204:19
added [5] - 27:6, 27:9, 27:10, 102:18, 151:13
addicted [1] - 70:25
addiction [3] - 48:1, 71:3, 136:15
adding [1] - 89:17
addition [2] - 97:23, 171:9
additional [15] - 16:22, 17:24, 28:2, 45:20, 52:25, 57:9, 57:15, 57:17, 124:4,

184:12, 186:18, 186:20, 186:22, 208:16, 221:5
**additions** [1] - 29:25
**address** [16] - 6:16, 48:22, 72:12, 101:15, 101:23, 126:3, 135:1, 145:10, 179:22, 184:20, 193:22, 195:19, 196:20, 212:11, 219:2
**addressed** [4] - 140:7, 179:10, 184:17, 185:10
**addresses** [3] - 74:22, 203:22, 219:19
**addressing** [1] - 196:21
**adequate** [1] - 189:11
**adhered** [1] - 9:14
**adjacent** [4] - 91:5, 131:5, 170:22, 210:22
**adjust** [3] - 49:21, 109:20, 110:11
**adjusted** [1] - 117:4
**adjustments** [4] - 107:18, 110:10, 110:21, 117:5
**administration** [7] - 8:17, 8:18, 19:9, 19:10, 19:18, 19:23, 48:18
**adopt** [1] - 19:7
**adopted** [2] - 18:7, 208:3
**adoption** [1] - 135:11
**adults** [1] - 170:21
**advan** - 50:7
**advance** [36] - 22:10, 22:22, 44:14, 44:17, 50:2, 50:7, 50:21, 50:25, 51:17, 54:6, 54:9, 55:3, 64:7, 69:5, 108:19, 108:23, 120:1, 129:23, 130:2, 131:19, 132:6, 132:18, 132:19, 133:3, 133:11, 150:13, 152:6, 152:11, 157:1, 165:12, 172:12, 172:17, 173:21, 174:7, 176:15, 180:2
**advanced** [1] - 169:20
**advantage** [6] - 76:4, 89:25, 93:7, 93:11, 95:22, 186:9

**advice** [8] - 17:24, 52:2, 208:19, 211:24, 212:11, 212:13, 222:4, 222:5
**advise** [2] - 176:9, 198:21
**advised** [3] - 204:2, 212:7, 213:1
**advises** [1] - 189:16
**advising** [1] - 156:15
**advisories** [1] - 208:9
**advisors** [1] - 40:5
**advisory** [1] - 206:25
**advocated** [1] - 89:16
**Affairs** [1] - 136:6
**affiliated** [1] - 49:10
**affiliation** [2] - 123:20, 134:10
**affirmatively** [1] - 71:16
**afford** [1] - 24:4
**affordable** [6] - 205:19, 205:24, 206:1, 206:2, 206:4
**aforesaid** [1] - 224:5
**afterwards** [1] - 119:14
**Agate** [3] - 104:4, 104:13, 105:13
**age** [2] - 110:3, 111:21
**agencies** [14] - 33:9, 37:13, 37:17, 39:11, 56:1, 56:2, 105:4, 107:20, 109:18, 109:20, 130:11, 159:21, 161:19, 190:13
**agencies'** [1] - 63:15
**agency** [12] - 36:17, 46:1, 59:18, 70:2, 70:4, 114:6, 135:21, 184:22, 203:13, 205:2, 209:21, 218:7
**agency's** [1] - 55:6
**agents** [4] - 33:9, 64:15, 66:4, 161:19
**agitated** [1] - 98:9
**agitating** [1] - 196:18
**agitator** [1] - 175:2
**agitators** [5] - 54:10, 156:4, 156:8, 156:11, 161:11
**agreed** [3] - 59:8, 82:15, 136:23
**agreements** [3] - 44:10, 144:21, 205:16
**AICDC** [1] - 115:10
**aid** [2] - 130:24, 155:19

**air** [7] - 90:8, 116:15, 158:24, 197:22, 198:1, 210:25, 211:8
**al** [1] - 225:2
**alarm** [1] - 212:19
**albeit** [1] - 21:4
**align** [2] - 123:18, 187:22
**alive** [1] - 199:5
**allegedly** [1] - 55:23
**Allina** [1] - 210:20
**allocated** [1] - 155:17
**allocating** [1] - 28:23
**allow** [14] - 49:2, 60:7, 71:10, 83:25, 135:24, 136:4, 148:22, 153:7, 160:21, 174:22, 175:16, 185:12, 212:2
**allowed** [8] - 24:7, 30:8, 120:14, 152:22, 161:12, 164:1, 166:21, 167:7
**allowing** [1] - 156:16
**allows** [1] - 136:11
**almost** [2] - 99:2, 206:25
**alongside** [3] - 35:9, 53:1, 56:9
**ALSO** [1] - 3:9
**alternative** [1] - 9:25
**amalgamation** [1] - 80:1
**ambassadors** [1] - 95:18
**American** [10] - 29:16, 29:23, 30:4, 104:17, 113:8, 115:10, 141:20, 141:22, 184:12, 191:18
**amicably** [1] - 5:25
**amount** [4] - 22:16, 98:2, 122:5, 162:23
**amplification** [1] - 118:2
**amplified** [1] - 116:14
**amplify** [1] - 95:16
**analysis** [2] - 79:2, 79:5
**analysts** [5] - 147:14, 148:6, 194:18, 221:19
**analytical** [1] - 196:9
**Anderson** [1] - 158:7
**anecdotal** [1] - 99:6
**Animal** [1] - 9:15
**animal** [3] - 9:17
**announce** [1] - 114:10
**announced** [1]

**148:16
**announcement** [11] - 114:9, 114:10, 115:7, 115:14, 115:21, 116:6, 116:7, 116:12, 116:17, 116:21, 117:5
**announcements** [4] - 97:2, 115:18, 117:14, 117:23
**annual** [1] - 206:3
**anomalies** [1] - 174:25
**anomaly** [1] - 194:25
**answer** [15] - 15:13, 19:2, 21:13, 21:15, 29:2, 75:9, 75:12, 92:20, 100:22, 106:15, 137:17, 139:24, 162:7, 192:22, 201:23
**ANSWER** [1] - 2:18
**answering** [1] - 137:13
**answers** [1] - 137:21
**anticipate** [1] - 153:5
**anticipated** [1] - 205:5
**anticipating** [1] - 93:5
**anticipation** [1] - 124:2
**anytime** [1] - 62:21
**apartment** [1] - 190:1
**apologies** [2] - 78:11, 133:22
**apparent** [1] - 169:8
**APPEARANCES** [1] - 3:1
**appeared** [3] - 154:3, 154:18, 180:5
**appearing** [1] - 17:2
**appetite** [1] - 138:8
**application** [2] - 35:14, 124:16
**applications** [1] - 124:18
**applied** [3] - 8:1, 175:3, 175:4
**appointed** [1] - 8:1
**appointment** [1] - 7:18
**appointments** [1] - 74:13
**appreciate** [6] - 83:14, 115:22, 137:8, 137:19, 222:23, 223:1
**appreciated** [1] - 184:22
**approach** [13] - 15:12,

**18:21, 21:6, 65:24, 68:13, 69:23, 69:24, 70:13, 106:25, 180:21, 185:9, 209:12, 209:13
**approached** [2] - 15:18, 87:14
**approaches** [1] - 108:1
**appropriate** [3] - 19:2, 26:5, 34:1
**approval** [2] - 46:17, 46:25
**approved** [1] - 102:22
**approximate** [4] - 111:21, 169:11, 171:13, 177:12
**April** [1] - 103:8
**area** [23] - 16:1, 16:2, 17:8, 22:5, 23:25, 24:19, 31:20, 33:6, 36:2, 62:7, 69:14, 75:21, 128:18, 153:9, 155:15, 156:6, 170:20, 172:7, 194:12, 194:18, 206:4, 212:20, 214:10
**areas** [13] - 8:19, 14:6, 21:24, 27:18, 33:14, 91:5, 97:25, 98:13, 130:23, 139:1, 184:6, 194:5, 197:8
**arises** [1] - 142:11
**arrange** [3] - 97:21, 112:22, 114:24
**arranged** [1] - 115:4
**arrangements** [1] - 113:3
**array** [3] - 32:12, 81:7, 99:11
**arrest** [2] - 155:24, 156:3
**arrested** [1] - 114:17
**arrests** [3] - 155:20, 155:22, 156:1
**arrive** [2] - 42:9, 43:3
**arrived** [3] - 16:25, 93:1, 96:13
**arriving** [2] - 43:4, 153:6
**arson** [11] - 213:14, 214:1, 214:23, 215:5, 215:6, 215:9, 215:12, 216:11, 216:13, 216:19
**articulate** [1] - 181:6
**articulated** [1] - 55:15
**aside** [15] - 13:23, 24:14, 40:19, 71:18,

129:25, 130:9,
130:21, 154:19,
154:21, 163:18,
169:9, 177:2, 177:5,
201:16, 203:23
**aspects** [4] - 9:20,
11:2, 123:6, 134:3
**assess** [1] - 45:2
**assessment** [5] -
25:25, 26:1, 26:4,
150:15, 207:20
**Assessment** [1] -
216:6
**assessments** [1] -
45:14
**assigned** [2] - 168:5,
220:24
**assist** [3] - 64:16,
153:12, 166:13
**assistance** [2] - 13:13,
153:24
**assistants** [1] - 167:14
**assisting** [1] - 153:8
**associated** [3] - 4:2,
4:6, 43:4
**assume** [2] - 5:20,
161:10
**assuming** [1] - 7:14
**assumption** [2] -
217:8, 217:9
**assurance** [1] -
219:15
**attached** [2] - 118:20,
118:22
**attempt** [1] - 96:25
**attempted** [1] - 216:11
**attempts** [1] - 61:17
**attend** [2] - 47:13,
70:10
**attention** [3] - 15:10,
189:22, 210:8
**attentive** [1] - 119:24
**attest** [1] - 169:13
**Attorney** [12] - 6:13,
11:7, 11:18, 20:23,
77:15, 77:20, 77:24,
78:1, 78:2, 168:13,
178:13, 225:22
**attorney** [1] - 10:23
**Attorney's** [5] - 3:13,
12:2, 12:14, 12:22,
38:2
**attorneys** [3] - 6:4,
224:14, 224:16
**Attorneys** [2] - 3:4,
3:12
**attract** [1] - 95:11
**attractive** [2] - 76:1,
146:10
**attracts** [1] - 76:10,

219:5, 219:6
**attributable** [1] -
195:3
**attributed** [1] - 192:18
**attributes** [1] - 207:3
**audio** [1] - 224:7
**August** [3] - 7:18,
99:23, 187:22
**Authority** [1] - 90:24
**authority** [5] - 44:2,
47:2, 47:4, 47:9,
52:20
**authorized** [1] -
199:18
**authorizing** [1] - 60:1
**automatically** [1] -
148:7
**avail** [3] - 57:14, 94:9,
102:10
**availability** [12] -
44:17, 44:19, 44:20,
45:4, 108:25, 127:9,
141:19, 159:20,
169:21, 169:24,
188:13, 188:15
**available** [27] - 43:18,
44:13, 53:10, 56:14,
56:25, 57:1, 57:7,
60:14, 72:21, 80:25,
96:15, 97:19, 112:7,
117:3, 127:13,
127:14, 127:24,
128:10, 128:15,
128:16, 148:21,
151:7, 157:17,
159:15, 171:12,
175:24, 186:7
**Ave** [1] - 182:9
**Avenue** [13] - 83:8,
99:23, 100:2, 100:6,
100:7, 100:12,
130:25, 158:16,
164:5, 170:13,
179:8, 182:9, 218:2
**avenue** [1] - 92:2
**avenues** [2] - 138:2,
141:8
**Avivo** [3] - 104:4,
104:13, 105:13
**aware** [48] - 33:21,
35:25, 40:22, 49:12,
49:17, 66:13, 68:6,
68:7, 109:20, 121:8,
123:11, 123:14,
125:6, 126:2, 126:5,
128:24, 129:12,
129:19, 130:8,
131:6, 131:18,
140:3, 140:5,
149:21, 156:20,

156:22, 157:6,
157:7, 157:11,
157:12, 162:12,
164:22, 165:8,
166:4, 166:7,
169:10, 175:23,
181:3, 181:12,
181:22, 182:24,
188:11, 199:3,
199:6, 208:11,
216:18, 217:13
**awareness** [6] - 33:25,
48:3, 98:7, 118:25,
189:5, 209:11

## B

**baby** [1] - 198:11
**bachelor's** [1] - 8:18
**backbone** [1] - 9:21
**background** [2] -
8:14, 118:15
**backpack** [3] - 154:18,
177:5, 177:7
**bad** [2] - 76:10, 219:15
**badges** [1] - 64:17
**baked** [1] - 140:19
**balance** [1] - 45:17
**balancing** [1] - 56:19
**ballpark** [1] - 183:16
**Barnes** [1] - 1:3
**barrier** [8] - 26:12,
89:1, 89:2, 89:23,
143:16, 168:14,
203:15, 204:17
**barriers** [3] - 25:25,
204:19, 204:20
**base** [2] - 30:13
**based** [6] - 55:14,
99:5, 102:16,
114:13, 213:24,
216:24
**baseline** [4] - 31:7,
194:7, 194:12,
196:23
**basic** [3] - 73:25,
167:8, 209:4
**basin** [1] - 217:4
**basis** [17] - 36:9, 50:4,
56:4, 70:21, 86:8,
86:14, 110:12,
115:15, 116:16,
121:6, 124:10,
137:22, 148:8,
167:22, 169:23,
170:18, 199:22
**bat** [1] - 59:6
**bathroom** [3] - 6:7,
178:12, 178:18
**bear** [1] - 152:25

**bearing** [3] - 129:3,
189:22, 222:21
**becoming** [2] - 98:8,
98:9
**bed** [10] - 111:4,
111:6, 127:10,
127:11, 127:13,
127:14, 128:10,
128:14, 188:12,
188:15
**beds** [13] - 44:13,
56:14, 56:24,
122:19, 122:22,
124:4, 127:17,
151:7, 151:13,
159:15, 169:21,
170:2, 171:12
**began** [1] - 162:14
**begin** [3] - 18:10,
25:16, 49:3
**beginning** [1] - 218:17
**Behalf** [2] - 3:2, 3:10
**behalf** [6] - 1:4, 11:15,
87:22, 151:17,
171:16, 171:18
**behavior** [3] - 195:15,
195:20, 195:25
**behavioral** [1] - 134:4
**behaviors** [5] - 32:20,
34:19, 52:15, 195:6,
195:23
**behind** [4] - 135:18,
135:19, 176:22,
199:23
**beings** [1] - 51:10
**belong** [1] - 209:21
**belongings** [42] -
24:4, 79:21, 80:9,
80:11, 80:22, 81:23,
82:1, 82:3, 82:5,
82:10, 83:19, 83:22,
84:5, 84:7, 85:14,
87:16, 87:21, 88:11,
88:19, 88:22, 89:12,
89:21, 89:22, 93:22,
94:16, 94:17, 94:23,
96:18, 97:21,
102:14, 120:15,
153:17, 153:21,
153:22, 154:9,
160:12, 163:9,
163:25, 165:16,
168:2, 168:18,
176:22
**below** [1] - 17:2
**bench** [1] - 91:12
**benchmark** [2] -
44:21, 189:15
**benefit** [1] - 93:10
**best** [13] - 5:6, 5:18,

**bearing** [3] - 129:3,
6:15, 32:14, 57:12,
59:12, 60:16, 73:25,
91:2, 94:2, 110:22,
224:7
**better** [1] - 218:4
**between** [12] - 11:8,
106:13, 107:9,
112:10, 116:18,
127:23, 134:19,
148:20, 164:22,
185:8, 195:7, 215:16
**beyond** [5] - 27:3,
30:1, 30:10, 186:20,
189:16
**bicycle** [1] - 163:14
**bicycles** [8] - 86:18,
86:21, 86:22, 87:1,
87:2, 87:5, 87:6,
87:8
**bid** [1] - 96:5
**bidding** [2] - 95:24,
137:23
**bifurcate** [3] - 53:23,
68:2, 196:5
**big** [2] - 99:22, 148:14
**bigger** [1] - 86:12
**bike** [1] - 155:17
**bill** [1] - 141:17
**bin** [11] - 82:3, 84:11,
85:16, 86:2, 86:4,
86:11, 86:12, 94:4,
94:5, 95:1
**binary** [2] - 53:15,
167:8
**binding** [1] - 21:10
**bins** [8] - 85:2, 85:11,
86:1, 93:21, 93:25,
94:1, 97:19, 186:2
**birth** [1] - 198:15
**bit** [20] - 16:25, 23:21,
37:12, 42:4, 59:21,
60:7, 60:10, 79:16,
81:11, 105:10,
112:4, 113:20,
122:19, 122:2,
140:21, 162:21,
168:14, 171:2,
201:2, 216:22
**Blair** [1] - 13:15
**bleeding** [1] - 198:22
**blighted** [1] - 9:7
**block** [4] - 42:3, 53:4,
59:8, 127:25
**blocked** [1] - 93:11
**blocks** [1] - 146:1
**blood** [1] - 211:3
**blown** [1] - 93:17
**Board** [7] - 36:14,
91:24, 130:13,
190:12, 191:18,

199:15, 199:18
**board** [1] - 173:15
**boarded** [1] - 148:2
**boards** [1] - 63:9
**body** [9] - 19:5, 19:7, 19:21, 19:22, 157:4, 181:2, 181:3, 181:8, 181:10
**body-worn** [4] - 181:2, 181:3, 181:8, 181:10
**boiler** [1] - 117:1
**boilerplate** [1] - 117:1
**bookend** [1] - 48:2
**booking** [2] - 155:18, 155:20
**bound** [1] - 135:10
**boundaries** [1] - 36:11
**bounds** [1] - 94:19
**Box** [2] - 3:5, 225:22
**box** [1] - 71:22
**brand** [2] - 58:25, 208:7
**brand-new** [2] - 58:25, 208:7
**break** [11] - 6:8, 6:10, 76:7, 77:17, 77:19, 118:12, 121:24, 122:5, 148:10, 178:5, 178:19
**breaks** [1] - 6:3
**breather** [1] - 77:13
**bridge** [1] - 91:9
**bridges** [2] - 91:7, 130:24
**brief** [1] - 199:12
**briefing** [5] - 152:12, 152:13, 180:3, 211:17, 222:10
**briefly** [1] - 130:4
**bring** [8] - 57:9, 70:7, 92:9, 148:9, 177:20, 199:19, 211:7, 218:24
**bringing** [1] - 124:18
**broad** [1] - 116:18
**broader** [2] - 38:21, 92:11
**broadly** [6] - 17:11, 115:12, 115:16, 116:4, 116:15, 117:19
**Brothers** [3] - 144:18, 144:24, 145:13
**brought** [4] - 57:16, 124:23, 152:11, 208:8
**bucket** [1] - 219:24
**buckets** [3] - 197:11, 197:14, 219:24
**budget** [12] - 28:3,

28:6, 28:14, 28:24, 29:12, 29:15, 29:21, 70:14, 89:17, 101:25, 102:19, 102:21
**budgeting** [1] - 28:12
**buffer** [1] - 50:24
**build** [2] - 50:21, 97:10
**building** [7] - 9:3, 33:25, 83:6, 111:16, 148:2, 167:22, 205:10
**buildings** [2] - 9:6, 9:7
**built** [1] - 19:12
**bumping** [1] - 65:20
**bundle** [1] - 60:23
**burn** [4] - 211:15, 211:16, 212:1, 217:4
**burned** [7] - 173:24, 211:23, 211:25, 212:3, 216:3, 216:20, 217:3
**burning** [2] - 211:14, 211:22
**bus** [19] - 89:7, 89:25, 90:2, 90:17, 91:9, 91:11, 91:12, 113:4, 113:7, 113:9, 113:10, 113:23, 113:24, 115:6, 115:7, 115:8, 115:9, 130:16
**buses** [1] - 112:22
**Business** [1] - 8:8
**business** [9] - 8:16, 8:18, 9:1, 9:23, 22:22, 33:15, 37:18, 54:6, 89:5
**businesses** [1] - 71:5
**busing** [5] - 113:3, 119:20, 157:12, 157:13
**buyers** [2] - 60:17, 60:19
**BY** [21] - 1:16, 4:19, 6:14, 12:23, 19:14, 22:15, 23:6, 29:11, 67:22, 76:12, 77:1, 78:4, 93:23, 101:8, 119:25, 122:18, 154:14, 179:3, 193:1, 202:7, 202:14

## C

**cabinet** [1] - 19:23
**camera** [2] - 181:2, 181:8
**cameras** [4] - 181:3,

181:10, 219:11, 221:23
**Camp** [10] - 124:10, 129:14, 129:16, 150:22, 151:3, 156:25, 181:13, 181:24, 190:7, 211:10
**camp** [12] - 55:20, 55:23, 55:24, 116:5, 148:14, 151:4, 157:19, 158:14, 158:17, 209:2, 210:4, 210:17
**cannot** [2] - 71:7, 135:17
**capacity** [15] - 7:17, 13:20, 13:21, 43:19, 45:20, 46:21, 50:1, 93:2, 108:18, 124:8, 124:21, 148:22, 159:20, 159:23, 192:25
**capital** [2] - 123:2, 123:8
**capitalize** [1] - 85:21
**capture** [1] - 40:24
**captured** [1] - 181:1
**care** [15] - 9:18, 31:20, 44:3, 46:7, 57:20, 58:12, 58:15, 65:10, 79:6, 103:16, 105:5, 108:15, 109:25, 110:7, 185:6
**Care** [1] - 9:15
**Carlson** [1] - 155:6
**carried** [1] - 48:25
**carry** [1] - 161:1
**carrying** [1] - 166:13
**Case** [1] - 1:7
**CASE** [1] - 225:2
**case** [28] - 4:22, 11:19, 50:4, 56:4, 74:6, 74:11, 74:15, 81:4, 81:5, 86:14, 86:17, 97:16, 97:17, 143:3, 143:4, 143:6, 144:21, 154:20, 155:21, 173:19, 184:11, 214:9
**case-by-case** [4] - 50:4, 56:4, 86:14, 144:21
**cases** [3] - 34:17, 50:9, 118:16
**caseworker** [1] - 74:4
**caseworkers** [1] - 98:15
**catalog** [2] - 94:3, 94:6

**cataloged** [1] - 215:7
**cataloging** [1] - 36:2
**categories** [1] - 161:9
**categorized** [2] - 154:16, 177:1
**Catholic** [7] - 102:3, 103:3, 103:5, 103:13, 113:15, 157:13
**caused** [1] - 213:22
**causing** [1] - 210:24
**cease** [1] - 33:21
**Cedar** [1] - 130:25
**center** [6] - 15:20, 116:5, 205:10, 205:11, 218:5, 218:6
**Center** [5] - 102:4, 113:9, 113:15, 157:14, 191:19
**centered** [1] - 68:13
**central** [2] - 89:4, 222:15
**centralized** [2] - 89:14, 127:11
**certain** [14] - 11:2, 28:11, 32:20, 32:24, 50:6, 72:21, 110:5, 126:21, 126:22, 128:5, 146:9, 155:17, 212:2
**certainly** [19] - 7:3, 23:23, 24:11, 47:15, 55:21, 60:7, 79:22, 81:13, 83:15, 85:6, 134:18, 134:23, 162:23, 177:9, 180:19, 181:10, 183:6, 200:11, 210:18
**certificate** [1] - 8:20
**CERTIFICATE** [1] - 2:22
**certify** [2] - 224:2, 225:4
**cetera** [1] - 123:13
**Chamberlin** [5] - 1:25, 3:22, 224:2, 224:20, 225:24
**change** [4] - 50:22, 107:17, 149:2
**changed** [4] - 18:17, 20:6, 20:11, 149:3
**changes** [6] - 6:22, 7:22, 14:13, 102:16, 126:2, 126:14
**changing** [1] - 221:21
**channels** [1] - 125:14
**characteristics** [1] - 109:7
**characterize** [3] -

32:18, 46:24, 130:4
**charge** [2] - 126:16, 145:25
**charged** [5] - 19:24, 19:25, 42:16, 224:10, 224:11
**Charities** [6] - 102:3, 103:3, 103:5, 103:13, 113:15, 157:13
**Charity** [1] - 102:3
**check** [22] - 77:11, 82:11, 83:16, 83:20, 83:21, 83:25, 87:25, 88:15, 88:21, 92:17, 92:23, 93:1, 93:12, 93:18, 97:3, 127:15, 167:10, 167:14, 170:1, 178:4, 210:5
**check-in** [7] - 83:16, 88:15, 88:21, 92:23, 93:1, 93:18, 127:15
**check-ins** [1] - 127:15
**checked** [3] - 84:7, 87:6, 88:14
**checking** [2] - 88:2, 88:20
**checks** [2] - 110:19, 169:20
**Chelsea** [2] - 186:14, 186:15
**chemicals** [1] - 217:3
**Cheryl** [1] - 1:3
**Chief** [1] - 158:6
**child** [4] - 135:9, 198:15, 199:4, 199:8
**children** [2] - 25:24, 58:1
**choice** [2] - 85:24, 83:23, 90:13, 94:9
**chooses** [1] - 97:8
**chose** [8] - 57:11, 93:12, 94:22, 125:1, 135:15, 138:5, 142:21
**Christin** [1] - 158:1
**Christina** [2] - 13:12, 151:25
**circles** [2] - 36:20, 36:21
**circumstances** [4] - 22:12, 66:22, 99:10, 110:5
**citation** [1] - 203:18
**citations** [2] - 204:10, 204:13
**Cities** [2] - 16:1, 17:6
**cities** [2] - 17:9, 122:23

**citing** [2] - 143:9, 203:12

**City** [196] - 3:13, 3:20, 7:8, 7:25, 8:2, 8:4, 8:15, 11:15, 12:1, 12:13, 12:22, 13:1, 13:10, 13:17, 13:21, 15:3, 15:10, 15:16, 16:17, 17:6, 17:12, 17:19, 19:20, 19:22, 20:7, 20:25, 21:7, 21:10, 22:24, 23:16, 24:16, 25:1, 25:3, 25:12, 25:16, 27:11, 28:22, 31:9, 31:11, 33:9, 36:11, 37:13, 37:18, 38:2, 39:9, 39:12, 39:16, 46:23, 48:14, 48:15, 48:16, 54:10, 55:5, 56:2, 57:16, 58:20, 60:11, 60:19, 60:24, 61:8, 62:11, 62:13, 62:14, 62:22, 62:23, 63:15, 64:15, 64:19, 64:24, 65:1, 66:5, 66:9, 66:10, 66:11, 66:13, 68:5, 71:23, 71:24, 75:1, 75:4, 79:20, 79:22, 80:15, 86:10, 91:17, 91:22, 91:25, 94:7, 94:15, 95:4, 95:9, 95:14, 101:13, 102:17, 103:17, 105:7, 105:11, 106:13, 107:22, 108:3, 108:7, 108:24, 112:22, 114:5, 115:19, 119:14, 122:21, 123:11, 125:6, 129:4, 129:5, 129:19, 129:22, 130:2, 130:9, 130:14, 130:18, 131:4, 131:18, 133:25, 134:6, 134:20, 137:25, 138:1, 139:2, 139:10, 139:16, 140:4, 140:25, 141:8, 141:9, 142:1, 142:3, 142:4, 142:16, 142:17, 142:22, 143:7, 143:18, 143:20, 145:3, 145:7, 151:5, 151:17, 156:14, 156:19, 158:4, 159:15, 161:18, 162:6, 162:24,

164:22, 165:4, 166:15, 168:5, 171:16, 171:18, 176:2, 181:13, 181:16, 181:17, 182:18, 183:11, 183:14, 185:21, 186:14, 186:16, 187:1, 187:2, 187:23, 188:1, 188:7, 190:3, 190:22, 191:4, 191:9, 191:15, 198:2, 198:10, 199:1, 199:11, 200:17, 202:21, 203:1, 203:2, 203:22, 203:23, 206:13, 207:9, 208:25, 209:21, 212:1, 213:14, 224:4

**city** [19] - 9:18, 17:7, 20:17, 25:20, 47:20, 55:8, 58:10, 69:11, 106:3, 108:11, 122:23, 139:19, 177:22, 194:6, 202:19, 207:2, 216:2, 220:11, 222:16

**CITY** [1] - 1:15

**City's** [16] - 7:10, 10:15, 10:17, 18:8, 18:21, 40:10, 70:16, 92:6, 103:3, 103:25, 104:12, 134:3, 134:9, 183:1, 217:18, 217:20

**City-owned** [20] - 13:1, 22:24, 39:9, 39:12, 55:5, 61:8, 62:11, 62:13, 62:14, 63:15, 91:17, 131:4, 141:8, 142:4, 142:16, 142:22, 143:7, 143:20, 145:3, 145:7

**civil** [1] - 114:18

**Civilian** [1] - 133:13

**civilian** [1] - 134:1

**claim** [2] - 82:7, 163:12

**Claire** [1] - 3:4

**claire@ climatedefenseprojec .org** [1] - 3:7

**clarification** [3] - 5:19, 15:4, 53:24

**clarify** [7] - 5:18, 12:1, 19:15, 19:17, 24:22,

34:14, 160:4

**clarifying** [4] - 83:13, 115:23, 117:16, 182:22

**clarity** [1] - 116:3

**classified** [1] - 163:7

**classroom** [1] - 32:8

**cleanup** [2] - 141:4, 144:11

**clear** [12] - 5:13, 21:1, 24:12, 53:11, 115:24, 117:6, 119:13, 137:16, 161:11, 180:9, 180:21, 186:6

**cleared** [1] - 215:22

**clearheaded** [1] - 6:19

**clearing** [3] - 41:16, 156:9, 216:8

**clearly** [3] - 6:22, 66:6, 212:3

**clients** [1] - 28:19

**Climate** [2] - 3:5, 225:22

**clinic** [1] - 210:25

**clock** [2] - 164:19, 213:3

**close** [26] - 21:1, 38:10, 38:18, 38:19, 42:17, 42:18, 43:8, 46:14, 49:1, 49:5, 49:7, 51:8, 51:22, 53:7, 56:7, 71:9, 86:9, 86:23, 118:10, 119:3, 129:16, 129:20, 131:7, 131:11, 204:4, 208:6

**closed** [8] - 61:16, 68:4, 68:23, 68:24, 70:20, 132:11, 214:13, 214:25

**closely** [1] - 49:10

**closing** [9] - 45:7, 54:2, 54:3, 59:5, 97:18, 113:12, 172:22, 185:1, 189:17

**closure** [96] - 21:7, 22:7, 22:11, 22:22, 38:16, 41:16, 41:25, 42:19, 43:6, 43:7, 43:15, 43:20, 46:20, 47:1, 49:12, 50:10, 50:14, 50:18, 50:19, 54:1, 54:16, 55:3, 55:19, 56:2, 56:13, 56:15, 56:22, 57:8, 58:18, 59:3, 59:25, 61:14, 63:3, 63:18, 64:6, 66:17, 67:11,

67:13, 69:1, 69:4, 109:2, 109:14, 119:9, 120:7, 130:9, 132:15, 148:18, 149:17, 149:18, 149:20, 149:25, 150:2, 156:9, 156:16, 157:1, 157:3, 157:4, 157:14, 158:21, 161:21, 161:22, 162:22, 163:4, 164:21, 165:5, 165:7, 169:25, 173:1, 173:8, 173:11, 176:8, 176:11, 176:15, 176:17, 177:7, 179:14, 179:17, 179:20, 180:2, 180:7, 180:12, 180:14, 181:24, 182:5, 185:25, 186:3, 186:5, 186:7, 189:20, 199:21, 208:18, 208:19, 208:20, 222:11

**closures** [10] - 20:22, 22:17, 38:8, 57:5, 113:11, 166:23, 181:11, 182:7, 188:5, 206:16

**coaching** [1] - 33:8

**Code** [6] - 20:3, 20:13, 24:17, 114:11, 143:9, 201:24

**code** [5] - 23:1, 48:14, 61:10, 143:13, 145:8

**codes** [2] - 48:15, 203:20

**cohort** [4] - 136:24, 137:7, 150:25, 188:24

**cohorts** [2] - 135:24, 150:16

**cold** [1] - 125:5

**Colin** [3] - 59:24, 60:1, 61:12

**collaborative** [2] - 41:13, 148:18

**collect** [7] - 73:14, 74:12, 88:6, 110:3, 168:1, 197:13, 197:14

**collected** [1] - 169:16

**collecting** [1] - 99:6

**collection** [4] - 36:6, 87:6, 177:8, 197:6

**collectively** [11] - 27:15, 35:8, 35:11,

36:18, 37:23, 41:15, 70:12, 104:9, 120:21, 159:12, 159:23

**collects** [2] - 88:9, 101:17

**college** [2] - 24:3, 24:9

**combat** [1] - 208:12

**combination** [2] - 151:2, 151:9

**combined** [1] - 150:1

**combustion** [1] - 212:4

**coming** [10] - 26:22, 59:1, 59:9, 87:11, 90:12, 153:23, 176:17, 193:15, 205:22, 211:4

**command** [1] - 220:22

**Commander** [4] - 121:5, 121:14, 152:16, 220:22

**commander** [7] - 118:20, 118:21, 119:6, 121:16, 166:25, 167:20, 221:8

**commander's** [1] - 119:6

**commencing** [1] - 3:24

**comments** [1] - 14:12

**commercial** [5] - 9:3, 190:5, 190:10, 191:14, 192:12

**Commission** [1] - 224:24

**Commissioner** [2] - 11:1, 207:11

**commit** [1] - 5:24

**committed** [1] - 23:24

**common** [2] - 97:25, 98:13

**communicate** [3] - 37:14, 50:18, 176:8

**communicated** [7] - 120:17, 120:20, 120:21, 150:12, 152:20, 176:1, 209:6

**communicating** [2] - 16:2, 44:17

**communication** [7] - 16:14, 16:16, 46:1, 133:25, 174:18, 176:2, 208:25

**communications** [2] - 13:16, 142:12

**communities** [4] - 9:23, 30:10, 136:4, 218:24

**Community** [29] - 8:7, 14:3, 26:23, 27:7, 37:25, 39:15, 39:17, 60:25, 62:14, 66:12, 104:17, 107:6, 113:8, 115:10, 141:10, 142:5, 142:9, 142:20, 144:14, 144:22, 144:25, 146:21, 151:20, 171:19, 183:24, 185:4, 190:23, 191:18, 206:18

**community** [48] - 15:10, 15:17, 21:24, 34:18, 38:14, 38:22, 39:6, 41:22, 47:7, 50:17, 53:5, 54:18, 54:25, 56:20, 68:3, 68:22, 69:8, 69:10, 69:12, 69:17, 70:10, 71:1, 71:3, 75:18, 76:6, 89:15, 89:19, 102:1, 102:20, 132:12, 132:25, 164:15, 164:24, 164:25, 167:13, 190:16, 191:10, 195:17, 199:24, 205:11, 208:23, 219:2, 219:5, 221:14, 221:15, 222:9

**Company** [1] - 144:19

**company** [10] - 61:13, 61:19, 62:10, 62:13, 65:6, 66:7, 113:4, 140:24, 143:2, 185:3

**comparable** [1] - 17:13

**compare** [3] - 36:22, 198:1, 198:9

**compared** [2] - 78:8, 194:11

**comparing** [2] - 78:5, 194:7

**competing** [1] - 42:7

**complain** [2] - 67:23, 194:4

**complainant** [1] - 35:5

**complained** [2] - 185:21, 195:25

**complained-of** [1] - 195:25

**complaining** [2] - 182:18, 188:21

**complaint** [12] - 140:3, 140:5, 140:6, 140:17, 182:2,

184:4, 184:17, 185:10, 185:24, 187:11, 195:19, 196:6

**complaints** [31] - 125:6, 125:16, 181:12, 181:14, 181:15, 181:16, 181:18, 181:19, 182:1, 182:12, 182:24, 183:1, 184:2, 186:13, 186:19, 186:20, 186:22, 186:24, 187:7, 188:9, 188:11, 188:14, 189:6, 189:9, 190:14, 192:4, 197:22, 198:2, 198:4, 210:20

**complete** [2] - 64:12, 224:6

**completed** [1] - 216:5

**completely** [2] - 94:18, 168:4

**complexity** [2] - 50:8, 214:4

**compliance** [2] - 117:10, 145:12

**compliant** [1] - 61:9

**component** [1] - 126:18

**compound** [1] - 92:19

**compounded** [1] - 39:7

**comprised** [2] - 47:5, 162:4

**computer** [1] - 147:17

**con** [1] - 43:25, 154:19, 177:23

**concentrated** [1] - 170:24

**concentric** [1] - 36:21

**concept** [1] - 199:19

**conceptual** [1] - 56:11

**conceptually** [3] - 56:6, 59:4, 78:13

**concern** [1] - 191:12

**concerned** [2] - 71:4, 190:17

**concerns** [14] - 18:3, 69:13, 125:21, 126:4, 159:2, 171:10, 183:4, 183:6, 183:12, 183:15, 184:20, 188:4, 191:16, 212:11

**concluded** [2] - 216:8, 223:5

**conclusion** [8] - 21:12, 96:13, 201:20, 202:12, 213:20, 214:16, 214:17, 215:24

**conclusively** [1] - 51:14

**concrete** [3] - 35:13, 146:1, 146:2

**Condemned** [1] - 147:8

**condition** [1] - 174:2

**conditions** [3] - 51:1, 90:12, 107:16

**conduct** [6] - 22:1, 37:16, 129:5, 181:21, 208:1, 213:16

**conducted** [4] - 33:12, 67:24, 182:15, 215:11

**conducting** [2] - 37:14, 196:10

**conducts** [2] - 25:13, 25:18

**conduit** [2] - 44:3, 92:5

**conferences** [1] - 95:12

**confirm** [4] - 151:6, 159:14, 171:11, 208:21

**confirmation** [2] - 55:11, 170:2

**confirmed** [1] - 159:18

**conflict** [4] - 106:1, 164:22, 185:8, 195:21

**confluence** [1] - 124:5

**conform** [1] - 202:3

**confrontation** [2] - 54:14, 164:14

**confused** [1] - 220:14

**congrats** [1] - 8:2

**conjunction** [2] - 144:5, 199:21

**Connect** [2] - 105:3, 151:13

**connect** [11] - 73:2, 73:8, 73:14, 73:16, 74:3, 74:14, 81:5, 84:4, 90:14, 101:5, 160:17

**connected** [3] - 97:15, 99:4, 191:2

**connecting** [2] - 45:5, 191:8

**connection** [4] - 73:25, 74:9, 92:3, 159:21

**connections** [1] - 26:6

**connects** [2] - 73:17, 105:4

**consensus** [10] - 41:17, 41:20, 42:3, 42:9, 42:25, 43:2, 43:3, 43:5, 52:6, 52:8

**consider** [1] - 103:24

**consideration** [1] - 207:3

**considered** [3] - 23:3, 138:11, 206:2

**considering** [1] - 99:18

**consistency** [1] - 116:24

**consistent** [1] - 124:10

**consisting** [1] - 224:6

**consolidated** [1] - 112:13

**consternation** [1] - 185:19

**constructed** [1] - 177:23

**construction** [3] - 145:18, 145:20, 147:3

**consult** [1] - 43:23

**Consumer** [1] - 8:9

**consumes** [1] - 37:4

**contact** [13] - 28:18, 28:21, 28:23, 71:22, 72:8, 74:8, 83:20, 88:8, 88:24, 121:1, 128:13, 153:6, 190:20

**contacted** [1] - 112:6

**contacts** [1] - 72:7

**contain** [1] - 154:19

**contents** [1] - 154:19

**context** [2] - 52:22, 167:17

**continual** [1] - 110:12

**continually** [1] - 15:13

**continue** [7] - 30:8, 30:9, 71:7, 94:12, 106:25, 218:3

**continued** [1] - 125:16

**continues** [1] - 217:21

**continuing** [1] - 27:3

**continuum** [11] - 31:20, 44:3, 46:6, 57:20, 58:12, 58:15, 79:6, 104:21, 105:5, 108:15, 109:25

**continuums** [1] - 103:15

**contract** [36] - 61:3,

79:23, 80:6, 80:14, 81:14, 82:17, 82:19, 82:20, 82:23, 85:7, 87:10, 92:24, 93:1, 103:2, 104:23, 105:19, 105:21, 113:4, 134:19, 138:17, 138:20, 139:3, 140:12, 140:25, 141:3, 141:12, 141:13, 141:15, 144:18, 145:13, 145:15, 185:17, 185:18, 197:5, 205:5, 224:15

**contract's** [1] - 134:22

**contracted** [3] - 105:12, 140:23, 141:5

**contracting** [2] - 66:7, 96:20

**contractor** [11] - 54:25, 62:10, 62:16, 63:4, 64:3, 64:23, 144:14, 144:23, 145:1, 185:5, 185:20

**contractors** [5] - 54:11, 65:3, 144:5, 144:8, 144:12

**contracts** [21] - 44:9, 79:24, 80:5, 80:18, 80:20, 81:12, 81:18, 84:24, 96:1, 105:14, 105:16, 106:4, 106:7, 107:3, 107:4, 107:5, 107:12, 134:11, 144:20, 185:3, 205:16

**contractually** [1] - 135:10

**contrast** [1] - 56:24

**contributes** [1] - 200:12

**contributing** [2] - 106:9, 112:25

**contributions** [1] - 106:20

**Control** [2] - 9:10, 9:15

**control** [7] - 53:1, 53:3, 57:17, 70:4, 105:8, 119:11, 123:24

**convenes** [1] - 91:23

**conventions** [1] - 95:12

**converge** [4] - 36:20, 55:12, 105:23, 134:2

**converges** [1] - 54:24

**converging** [3] - 54:7,

90:22, 124:6
**conversation** [7] - 11:5, 11:8, 101:13, 122:20, 179:22, 185:15, 218:6
**conversations** [5] - 46:2, 69:8, 179:25, 182:12, 192:5
**convince** [1] - 204:4
**Coordinated** [5] - 57:21, 73:23, 110:1, 112:20, 176:20
**coordinating** [1] - 110:10
**coordination** [1] - 45:23
**Coordinator** [4] - 28:1, 30:22, 30:23, 74:5
**Coordinator's** [2] - 27:11, 80:15
**coordinators** [2] - 97:14, 98:11
**Coordinators** [3] - 28:2, 28:5, 96:24
**copies** [2] - 224:11, 224:12
**copy** [2] - 225:23, 225:24
**corner** [2] - 115:25, 116:1
**Corporation** [2] - 104:17, 115:11
**Correct** [14] - 20:10, 41:10, 53:21, 132:5, 150:3, 155:21, 165:25, 172:5, 173:9, 174:4, 174:8, 179:15, 192:3, 210:1
**correct** [20] - 27:21, 29:9, 37:19, 37:20, 62:12, 62:24, 84:23, 85:4, 117:19, 146:20, 161:13, 163:6, 165:25, 179:14, 188:23, 201:12, 213:9, 215:2, 224:6, 225:5
**correction** [1] - 225:22
**CORRECTION** [2] - 2:24, 225:1
**CORRECTION/ CHANGE** [1] - 225:6
**cost** [3] - 102:6, 126:18, 224:10
**costs** [1] - 139:23
**couch** [1] - 90:10
**Council** [7] - 15:10, 19:22, 48:16, 79:8, 95:7, 96:10, 206:4

council [2] - 69:11, 69:15
**counsel** [1] - 13:25
**count** [1] - 127:22
**counted** [2] - 127:13, 127:14
**counterpart** [1] - 16:17
**counterparts** [2] - 49:9, 221:19
**counting** [3] - 36:1, 173:5
**country** [1] - 181:24
**County** [53] - 31:16, 31:19, 44:2, 44:8, 44:12, 44:16, 45:6, 45:9, 49:10, 49:12, 49:14, 50:3, 57:8, 57:19, 58:11, 59:7, 60:16, 73:4, 73:19, 79:6, 92:1, 103:24, 104:14, 104:22, 105:4, 105:8, 105:15, 106:4, 106:6, 106:7, 106:10, 106:14, 107:4, 107:21, 108:14, 109:25, 110:9, 110:18, 111:24, 112:17, 123:16, 124:8, 125:8, 125:13, 130:10, 130:20, 130:22, 130:25, 131:1, 151:15, 159:19, 176:3
**county** [8] - 31:19, 45:21, 105:20, 106:18, 124:23, 126:14, 130:24, 131:6
**County's** [1] - 103:5
**County/St** [1] - 92:12
**couple** [12] - 10:25, 83:24, 101:18, 103:18, 105:12, 123:1, 135:9, 138:1, 155:3, 161:9, 184:5, 208:5
**course** [1] - 29:10
**courses** [1] - 31:24
**court** [4] - 4:7, 4:25, 5:4, 6:5
**Court** [1] - 122:9
**COURT** [4] - 1:1, 2:22, 178:17, 178:20
**cover** [2] - 184:6, 195:5
**covers** [1] - 215:5
**CPED** [4] - 204:23,

204:24, 204:25, 205:1
**Crabtree** [1] - 158:1
**crafted** [1] - 169:7
**crafters** [1] - 14:24
**crafting** [4] - 14:20, 14:22, 15:6
**create** [9] - 28:24, 89:22, 110:25, 142:13, 148:6, 166:6, 166:8, 168:15, 203:15
**created** [4] - 7:25, 26:14, 132:13, 170:23
**creates** [1] - 168:14
**creating** [1] - 23:7
**crime** [4] - 75:19, 134:1, 194:18, 221:18
**Crime** [5] - 36:16, 44:22, 133:13, 190:25, 203:25
**crimes** [1] - 222:8
**Crimewatch** [1] - 129:18
**crisis** [3] - 32:3, 33:20, 134:4
**criteria** [5] - 41:19, 107:10, 146:5, 146:7, 166:21
**critical** [1] - 21:23
**criticism** [1] - 183:1
**criticisms** [2] - 125:9, 125:20
**critique** [1] - 33:6
**cross** [1] - 130:24
**crutches** [1] - 109:9
**culturally** [9] - 123:22, 123:23, 136:12, 150:20, 150:21, 150:23, 150:24, 184:15
**curate** [2] - 39:21, 147:13
**current** [3] - 8:24, 8:25, 128:25
**cut** [5] - 61:4, 65:8, 137:10, 145:5
**cutting** [1] - 173:3
**cycle** [3] - 89:17, 101:25, 102:19

---

**D**

**damage** [2] - 213:22, 214:19
**damaged** [2] - 145:9, 214:7

**danger** [1] - 75:5
**Daniel** [1] - 183:20
**dashboard** [2] - 44:18, 148:6
**Dashboard** [1] - 147:8
**data** [24] - 35:15, 36:6, 75:17, 75:18, 78:5, 79:9, 79:11, 99:8, 101:16, 106:21, 147:14, 147:17, 148:6, 183:10, 192:20, 193:7, 194:2, 194:12, 194:15, 195:22, 196:12, 196:23, 197:19
**DataSource** [1] - 147:7
**DATE** [1] - 225:3
**date** [26] - 8:3, 22:11, 43:4, 43:13, 43:21, 46:20, 49:13, 59:11, 61:15, 63:19, 84:8, 99:3, 124:25, 147:17, 148:16, 157:3, 173:1, 173:8, 173:11, 173:16, 173:19, 174:6, 182:7, 199:21, 208:19
**DATED** [1] - 225:19
**dates** [2] - 157:3, 182:5
**David** [4] - 46:9, 125:12, 151:24, 171:21
**day-to-day** [1] - 111:9
**days** [19] - 34:10, 82:11, 83:16, 88:1, 102:7, 120:6, 132:9, 132:23, 132:24, 165:6, 169:25, 172:15, 172:16, 200:22, 200:23, 201:4, 201:7, 210:6
**Days** [2] - 129:17, 133:21
**days'** [2] - 54:6, 64:7
**daytime** [1] - 103:10
**de** [7] - 32:1, 33:1, 34:1, 54:24, 164:20, 166:5, 195:20
**de-escalate** [5] - 32:1, 34:1, 54:24, 164:20, 195:20
**de-escalating** [1] - 33:1
**dead** [1] - 198:11
**deal** [1] - 19:3
**dealing** [1] - 171:7

**DeAnthony** [1] - 1:3
**debrief** [5] - 98:17, 161:17, 161:22, 162:3, 162:4
**debris** [2] - 162:21, 162:23
**deceased** [1] - 199:5
**December** [11] - 1:18, 3:24, 4:25, 13:6, 18:6, 21:9, 54:4, 64:6, 64:8, 224:17, 225:3
**decided** [2] - 120:13, 154:20
**decides** [4] - 41:11, 53:17, 155:11, 205:2
**deciding** [6] - 51:16, 59:22, 146:5, 180:2, 199:9, 199:23
**decision** [42] - 17:1, 41:15, 41:20, 43:20, 49:5, 49:7, 50:23, 51:10, 51:18, 51:22, 51:23, 52:7, 52:8, 53:16, 54:1, 56:10, 66:18, 66:25, 67:11, 74:25, 75:1, 85:15, 85:22, 86:25, 120:19, 124:4, 137:22, 141:20, 141:25, 142:8, 142:11, 142:14, 142:15, 146:19, 148:15, 148:18, 159:10, 159:14, 167:8, 170:18, 171:11, 180:12
**decision-making** [3] - 74:25, 75:1, 170:18
**decisions** [13] - 14:25, 15:7, 28:14, 55:2, 55:14, 67:25, 86:5, 92:15, 92:17, 104:25, 124:1, 168:10, 196:13
**declaration** [1] - 13:3
**decrease** [1] - 204:20
**dedicated** [2] - 27:14, 219:8
**deeply** [5] - 137:8, 205:19, 205:24, 206:1, 206:4
**default** [1] - 60:12
**Defendant** [2] - 1:10, 3:10
**Defense** [2] - 3:5, 225:22
**deficiencies** [1] - 48:23
**deficiency** [1] - 145:11

**define** [1] - 133:15
**defined** [1] - 105:18
**defining** [1] - 100:15
**definitely** [3] - 137:18, 149:3, 218:18
**definition** [3] - 135:8, 135:14, 151:1
**definitions** [1] - 188:23
**definitively** [2] - 65:2, 131:25
**degrees** [1] - 119:23
**delay** [3] - 54:21, 148:15, 148:18
**delayed** [2] - 57:8, 208:20
**delaying** [1] - 59:3
**delays** [1] - 157:3
**deliver** [2] - 32:14, 90:4
**deliverables** [2] - 106:11, 106:20
**delivered** [1] - 223:7
**delivers** [1] - 90:2
**delta** [2] - 124:12, 148:19
**demand** [1] - 55:19
**demands** [2] - 56:2, 129:4
**demobilizing** [1] - 186:12
**demographic** [3] - 109:7, 112:6, 127:19
**demonstrate** [1] - 68:11
**Department** [44] - 26:18, 27:10, 36:12, 36:15, 38:2, 38:4, 38:5, 39:3, 51:12, 51:13, 52:3, 52:13, 52:18, 52:21, 55:19, 56:7, 80:6, 81:14, 82:24, 82:25, 85:1, 91:25, 119:7, 119:17, 121:5, 130:13, 139:11, 140:9, 152:17, 157:10, 171:24, 189:18, 190:24, 197:4, 207:15, 207:24, 208:14, 208:20, 209:4, 209:10, 216:1, 219:9, 220:21
**department** [27] - 14:20, 27:1, 27:20, 44:23, 52:3, 52:4, 52:22, 96:12, 116:9, 118:21, 119:10, 120:22, 172:2,

172:4, 174:20, 181:6, 213:15, 213:16, 213:19, 214:12, 214:15, 215:6, 215:13, 215:19, 220:15, 221:4, 221:19
**department's** [1] - 214:17
**departments** [7] - 26:22, 37:18, 41:3, 47:6, 80:3, 134:6, 209:7
**dependent** [2] - 155:13, 172:5
**deployed** [1] - 207:18
**deponent** [1] - 12:10
**deposited** [1] - 146:6
**depositing** [1] - 145:25
**DEPOSITION** [4] - 1:15, 2:24, 225:1, 225:3
**deposition** [14] - 3:20, 4:1, 4:24, 6:20, 10:20, 74:21, 100:21, 122:17, 223:5, 224:4, 224:8, 224:11, 225:4, 225:5
**Deposition** [1] - 3:22
**deprivation** [1] - 6:22
**Deputy** [3] - 7:24, 11:1, 207:11
**deriding** [1] - 107:25
**describe** [4] - 140:6, 147:21, 149:6, 218:15
**described** [4] - 46:16, 66:9, 84:23, 99:21
**describing** [1] - 61:12
**description** [2] - 104:12, 163:19
**designating** [1] - 58:17
**designed** [4] - 81:14, 81:17, 81:18, 110:20
**designee** [2] - 3:21, 224:4
**DESIGNEE** [1] - 1:16
**desire** [2] - 49:1, 70:21
**desired** [1] - 56:15
**desk** [2] - 72:2, 72:3
**destroyed** [5] - 82:16, 154:10, 169:11, 177:13, 214:10
**detail** [7] - 45:16, 64:25, 66:2, 115:8, 115:15, 168:6, 189:23

**details** [7] - 10:25, 15:24, 16:4, 43:16, 46:18, 72:10, 115:12
**detect** [1] - 194:24
**determination** [6] - 41:24, 42:16, 42:22, 167:1, 168:11, 174:21
**determinations** [1] - 174:23
**determined** [1] - 51:1
**detract** [1] - 95:20
**detracts** [1] - 219:4
**develop** [3] - 19:5, 19:6, 222:10
**developed** [1] - 95:16
**developer** [1] - 205:20
**developing** [2] - 50:12, 50:13
**development** [4] - 95:8, 124:17, 205:19, 206:8
**Development** [31] - 8:8, 8:21, 14:3, 26:24, 27:7, 38:1, 39:15, 39:18, 60:25, 62:15, 66:12, 104:17, 107:7, 113:9, 115:10, 141:11, 142:6, 142:10, 142:21, 144:15, 144:23, 146:22, 151:20, 151:22, 171:19, 171:21, 183:25, 185:4, 190:23, 191:19, 206:19
**Development's** [1] - 144:25
**deviate** [6] - 22:13, 42:23, 66:21, 66:23, 67:3, 67:25
**deviated** [2] - 175:6, 175:7
**deviating** [1] - 66:25
**deviation** [4] - 58:24, 66:24, 184:5, 194:19
**deviations** [1] - 215:16
**devices** [3] - 64:16, 66:3
**diagnostic** [1] - 211:2
**diagnostics** [1] - 211:3
**dialing** [1] - 71:23
**dictated** [1] - 66:17
**dictates** [1] - 58:3
**die** [1] - 52:11
**difference** [1] - 188:1
**different** [145] - 9:20,

10:25, 11:2, 13:20, 13:21, 14:6, 15:9, 17:24, 19:21, 24:18, 25:19, 32:12, 33:2, 33:7, 33:13, 33:16, 35:18, 36:20, 38:16, 39:4, 41:3, 41:24, 42:19, 43:9, 43:11, 43:21, 43:22, 44:4, 44:11, 44:24, 45:2, 46:5, 46:21, 47:6, 47:16, 48:23, 53:5, 54:7, 54:19, 55:12, 58:2, 60:17, 68:18, 69:11, 69:16, 70:1, 70:15, 70:23, 71:8, 73:8, 79:13, 79:24, 80:2, 81:3, 81:7, 83:24, 90:19, 90:20, 90:21, 90:23, 95:13, 97:5, 98:23, 101:19, 102:13, 102:24, 103:11, 103:14, 104:6, 104:20, 104:23, 104:24, 104:25, 105:3, 105:12, 105:20, 105:22, 106:24, 109:7, 110:7, 112:2, 113:1, 113:17, 113:20, 116:8, 123:1, 123:6, 123:14, 123:17, 123:19, 123:21, 124:5, 125:15, 125:18, 126:1, 128:23, 130:20, 134:11, 135:1, 138:1, 138:8, 141:8, 145:17, 146:13, 146:16, 160:5, 161:18, 162:4, 162:8, 168:4, 168:10, 180:15, 183:5, 184:3, 184:6, 184:19, 184:20, 185:15, 190:8, 190:12, 190:18, 191:1, 194:5, 200:11, 200:25, 201:2, 201:5, 203:20, 204:14, 204:16, 205:23, 207:3, 208:5, 214:22, 218:23, 219:1, 219:23, 220:2, 220:4, 220:8, 221:5, 222:1
**differentiate** [2] - 193:14, 195:7
**difficult** [1] - 190:4

**dignity** [1] - 200:5
**diligent** [1] - 108:21
**dimensions** [1] - 80:23
**direct** [12] - 28:11, 44:6, 44:8, 45:9, 45:10, 49:8, 53:14, 69:9, 73:6, 103:20, 115:7, 117:7
**direction** [8] - 47:16, 48:17, 64:3, 69:3, 114:20, 115:25, 138:9, 160:16
**directions** [1] - 48:13
**directly** [8] - 46:3, 71:20, 103:23, 107:21, 140:19, 159:5, 187:4, 225:22
**director** [3] - 40:4, 46:3, 46:6
**Director** [15] - 7:6, 7:10, 7:14, 7:15, 7:19, 7:23, 8:12, 13:19, 151:21, 151:22, 151:23, 171:20, 171:21, 171:22, 206:18
**Directors** [2] - 129:16, 191:20
**directors** [1] - 17:18
**disabilities** [7] - 25:6, 25:15, 108:5, 108:10, 179:6, 179:24, 180:11
**disability** [1] - 26:8
**discard** [1] - 93:3
**discarded** [8] - 93:16, 94:13, 153:25, 154:2, 169:16, 196:24, 197:1, 197:17
**discovered** [3] - 111:20, 198:25, 199:7
**discretion** [3] - 47:3, 58:13, 172:3
**discuss** [1] - 38:6
**discussed** [2] - 25:10, 40:20
**discussion** [3] - 74:24, 122:9, 158:3
**discussions** [1] - 42:13
**disease** [1] - 219:6
**Disney** [1] - 95:17
**Disneyland** [1] - 95:17
**disparate** [2] - 41:2, 112:1
**dispatch** [2] - 155:12, 155:13

**dispersed** [1] - 78:7
**displaced** [2] - 10:12, 139:18
**displacement** [1] - 10:9
**displacing** [1] - 56:19
**disposed** [1] - 88:11
**dispositioned** [1] - 87:20
**disrupt** [2] - 156:8, 167:4
**disrupting** [1] - 158:23
**disruption** [1] - 76:7
**distinction** [1] - 196:15
**distinctions** [1] - 194:14
**distinguishable** [1] - 196:20
**distribution** [1] - 58:5
**District** [17] - 79:23, 81:24, 82:14, 85:18, 88:7, 88:11, 88:25, 93:18, 94:12, 94:25, 95:4, 95:6, 95:15, 95:25, 96:11, 96:17, 103:2
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 89:5
**District's** [1] - 83:8
**division** [4] - 8:6, 9:9, 9:10, 147:12
**Division** [1] - 38:4
**divisions** [1] - 7:16
**doc** [1] - 14:16
**document** [32] - 13:5, 13:6, 14:1, 14:11, 14:17, 14:22, 15:7, 16:3, 17:17, 17:23, 18:2, 18:4, 18:6, 18:10, 18:13, 18:15, 18:24, 21:9, 23:13, 25:9, 36:5, 36:8, 40:19, 40:21, 41:8, 41:9, 98:24, 99:2, 99:3, 139:8, 140:12
**documentation** [11] - 64:12, 64:22, 72:18, 72:20, 162:24, 169:3, 169:6, 169:15, 176:22, 203:18, 217:10
**documented** [18] - 20:24, 21:7, 22:13, 40:23, 46:22, 154:1, 154:4, 154:7, 192:5, 192:7, 192:8, 202:16, 202:18, 202:20, 203:5,

215:3, 217:6, 217:10
**documents** [7] - 11:10, 11:13, 16:20, 16:22, 103:18, 203:2, 203:5
**dollar** [1] - 218:11
**dollars** [8] - 29:17, 29:23, 30:1, 30:3, 30:4, 30:12, 136:5, 141:23
**done** [11] - 21:4, 28:22, 32:10, 33:15, 53:18, 88:15, 113:16, 191:3, 191:6, 201:18, 220:13
**door** [8] - 96:25, 170:21, 191:5, 191:22, 198:20
**double** [1] - 210:5
**double-check** [1] - 210:5
**Dowling** [2] - 13:12, 151:25
**down** [7] - 21:5, 153:25, 177:18, 177:19, 177:21, 184:18, 189:21
**Downtown** [21] - 79:23, 81:23, 82:13, 83:7, 85:18, 88:7, 88:10, 88:25, 93:18, 94:11, 94:24, 95:3, 95:4, 95:6, 95:7, 95:15, 95:25, 96:10, 96:17, 103:1
**downtown** [7] - 80:7, 83:8, 85:8, 89:2, 89:7, 95:10, 95:20
**draft** [1] - 17:21
**drafted** [4] - 13:23, 23:14, 187:15, 188:2
**drafts** [1] - 187:16
**draw** [1] - 97:7
**drive** [1] - 46:13
**drivers** [1] - 95:14
**drug** [4] - 99:11, 171:6, 171:7
**due** [1] - 60:13
**duly** [2] - 4:10, 4:13
**dump** [2] - 154:13, 177:14
**dumpstered** [1] - 163:5
**during** [15] - 69:20, 98:22, 103:8, 109:17, 113:21, 118:5, 161:20, 180:1, 181:4, 181:8, 181:10, 185:22,

185:24, 209:3, 209:6
**duties** [2] - 8:23, 8:25
**dwelling** [3] - 9:4, 20:14, 143:11
**dying** [1] - 52:14

### E

**E-b-n-e-t** [1] - 17:19
**early** [1] - 169:1
**earmarked** [3] - 136:5, 205:18, 206:7
**earn** [1] - 127:3
**ease** [1] - 9:12
**easier** [4] - 67:19, 82:6, 163:15, 167:25
**East** [3] - 100:9, 196:24, 197:1
**easy** [2] - 5:5, 10:10
**Ebnet** [3] - 17:19, 40:3, 158:10
**echoed** [1] - 219:21
**economic** [2] - 95:8, 95:14
**Economic** [26] - 8:7, 8:20, 14:3, 26:23, 27:7, 37:25, 39:15, 39:18, 60:25, 62:15, 66:12, 107:6, 141:11, 142:6, 142:10, 142:21, 144:14, 144:23, 144:25, 146:22, 151:20, 171:19, 183:24, 185:4, 190:23, 206:19
**economy** [1] - 86:20
**ECT/TNL** [1] - 1:7
**editorial** [1] - 14:12
**educating** [1] - 48:4
**education** [2] - 48:3, 205:11
**educational** [1] - 8:13
**effect** [2] - 20:4, 149:6
**effective** [2] - 107:14, 138:7
**effectively** [1] - 212:19
**effectiveness** [1] - 138:24
**effects** [3] - 82:15, 89:23, 99:14
**efficacy** [1] - 138:25
**efficiently** [1] - 5:25
**effort** [6] - 41:13, 57:13, 60:16, 60:20, 124:19, 222:11
**efforts** [1] - 91:3
**either** [20] - 19:6, 52:21, 63:4, 67:5, 76:14, 84:21, 86:8,

97:11, 116:12, 116:20, 141:9, 154:4, 170:25, 171:7, 180:14, 181:20, 182:25, 201:8, 206:17, 215:19
**elderly** [1] - 25:23
**elected** [1] - 15:16
**element** [4] - 76:10, 124:22, 152:24, 215:25
**elements** [14] - 41:24, 43:22, 47:16, 54:19, 70:15, 95:19, 95:21, 101:24, 104:20, 123:1, 124:6, 136:17, 183:9, 204:17
**elevate** [1] - 38:15
**Elfric** [2] - 151:22, 171:20
**eliminated** [1] - 126:19
**eliminates** [1] - 127:6
**elsewhere** [2] - 137:5, 185:14
**email** [14] - 16:23, 34:23, 71:21, 72:12, 187:3, 187:15, 187:18, 187:19, 187:23, 188:2, 188:3, 192:9, 225:24
**emails** [5] - 69:7, 69:9, 181:23, 186:15, 192:6
**emerged** [3] - 123:6, 183:9, 190:7
**emergence** [1] - 195:4
**Emergency** [2] - 38:4, 38:5
**emergency** [9] - 51:23, 52:7, 52:10, 96:11, 104:19, 120:21, 192:17, 192:24, 209:1
**emergent** [3] - 51:2, 191:12, 193:8
**emerges** [1] - 194:17
**emerging** [2] - 132:11, 132:25
**employ** [1] - 45:21
**employed** [1] - 146:17
**employee** [8] - 186:14, 186:16, 187:1, 187:14, 187:18, 187:19, 224:13, 224:13
**employees** [5] - 21:10, 30:20, 183:11,

183:14, 183:16
**Encampment** [3] - 13:1, 23:8, 42:10
**encampment** [191] - 13:11, 20:22, 21:7, 22:2, 22:8, 24:15, 25:21, 26:18, 27:4, 27:5, 35:4, 35:6, 35:19, 35:21, 37:16, 38:8, 38:10, 38:16, 38:21, 39:1, 41:11, 41:16, 41:25, 43:8, 44:25, 45:3, 45:7, 45:8, 48:25, 49:5, 49:8, 49:17, 50:10, 51:8, 52:16, 53:3, 53:6, 53:8, 53:11, 53:12, 53:20, 54:17, 56:15, 56:23, 57:5, 57:6, 58:18, 59:5, 59:10, 59:25, 61:15, 61:22, 61:23, 62:22, 63:8, 66:16, 74:2, 74:19, 75:6, 75:21, 75:24, 75:25, 76:5, 76:14, 76:15, 76:17, 76:19, 81:25, 82:20, 83:17, 84:16, 84:21, 85:2, 85:13, 97:18, 97:25, 99:22, 100:24, 101:7, 109:6, 109:13, 111:13, 111:15, 112:25, 113:10, 113:12, 114:11, 115:3, 119:1, 119:4, 119:23, 120:7, 120:15, 121:3, 129:25, 130:2, 130:11, 130:15, 131:4, 131:11, 131:20, 132:8, 132:13, 132:16, 132:17, 132:18, 133:1, 135:5, 144:3, 144:6, 144:11, 145:1, 146:10, 146:15, 148:12, 148:21, 148:25, 149:7, 149:14, 150:11, 153:12, 155:25, 156:2, 159:1, 159:5, 159:6, 159:9, 159:16, 162:13, 164:15, 164:16, 165:16, 166:22, 167:6, 168:23, 169:4, 170:8, 171:6, 171:14, 172:21, 177:19, 178:2,

179:5, 179:7, 179:12, 179:14, 179:17, 179:18, 181:11, 181:15, 181:17, 182:18, 185:25, 188:4, 190:1, 192:14, 193:13, 193:15, 193:16, 193:19, 193:20, 194:1, 194:9, 194:13, 194:17, 195:4, 195:6, 195:23, 196:2, 196:19, 196:22, 198:12, 198:16, 198:23, 199:10, 200:10, 200:14, 201:15, 203:4, 204:3, 206:16, 209:8, 210:12, 210:19, 210:22, 210:24, 211:21, 212:17, 217:24, 220:25, 221:17

**encampment-specific** [2] - 81:25, 85:2

**encampments** [84] - 18:9, 20:20, 20:22, 21:1, 22:4, 25:14, 25:19, 26:13, 35:2, 36:19, 37:6, 37:8, 38:11, 38:17, 38:23, 39:5, 39:9, 39:19, 40:18, 42:14, 47:23, 49:2, 51:5, 55:24, 58:19, 58:22, 68:17, 68:23, 70:19, 71:9, 71:10, 71:12, 71:19, 71:20, 74:17, 75:14, 77:3, 77:5, 78:9, 78:15, 78:20, 78:22, 78:24, 79:5, 79:12, 80:17, 81:2, 85:8, 89:3, 89:20, 91:4, 96:25, 101:21, 110:6, 113:22, 117:19, 118:24, 121:6, 129:21, 131:2, 135:13, 145:24, 155:1, 167:22, 167:25, 185:1, 185:11, 199:13, 199:17, 204:2, 208:10, 208:24, 217:19, 219:10, 219:12, 221:14, 221:22, 221:24, 222:2, 222:3, 222:8

**Encampments** [1] - 42:11
**encounter** [3] - 111:8, 180:6, 180:8
**encountered** [2] - 180:5, 180:10
**end** [18] - 30:5, 44:20, 48:6, 84:3, 87:11, 110:15, 110:22, 112:16, 127:12, 132:2, 147:25, 162:19, 169:12, 176:23, 177:13, 189:21, 196:9
**endeavor** [2] - 21:19, 22:21
**ended** [2] - 101:10, 106:3
**enforce** [1] - 166:5
**enforcement** [27] - 9:25, 34:3, 52:18, 94:18, 117:15, 117:21, 117:24, 118:3, 118:15, 130:1, 130:5, 155:7, 155:12, 155:13, 160:14, 163:21, 164:18, 165:1, 165:7, 165:24, 166:5, 166:7, 168:20, 181:2, 209:1, 220:18, 222:7
**engage** [39] - 10:4, 17:25, 31:16, 32:1, 33:2, 33:17, 34:25, 46:3, 49:9, 54:10, 61:17, 62:7, 63:24, 69:17, 71:20, 74:3, 76:8, 91:13, 97:1, 97:8, 97:11, 98:3, 99:12, 101:1, 104:25, 131:12, 134:6, 136:11, 153:7, 164:14, 190:14, 195:6, 204:1, 206:17, 209:7, 211:9, 219:16, 221:13
**engaged** [12] - 34:2, 92:1, 98:14, 118:23, 125:24, 134:4, 157:5, 162:25, 167:21, 219:10, 219:18
**Engagement** [4] - 9:19, 10:14, 13:19, 147:14
**engagement** [15] - 9:23, 17:14, 25:18, 72:25, 80:25, 91:3,

97:4, 97:10, 98:1, 107:23, 134:10, 159:19, 159:20, 191:7, 211:12
**engagements** [2] - 101:18, 150:9
**engages** [3] - 39:24, 91:16, 154:24
**engaging** [16] - 10:6, 26:2, 31:7, 34:11, 35:24, 71:1, 71:3, 81:21, 98:4, 104:1, 104:9, 111:19, 136:19, 150:14, 195:25, 220:6
**Enrique** [6] - 3:21, 6:17, 7:3, 224:4, 225:4, 225:20
**ENRIQUE** [2] - 1:17, 4:12
**ENSLIN** [30] - 6:13, 11:25, 12:5, 12:7, 18:25, 21:11, 21:15, 22:18, 28:8, 28:14, 28:25, 67:17, 74:20, 75:7, 76:22, 77:18, 77:24, 92:18, 100:19, 121:25, 122:4, 122:12, 154:11, 178:9, 178:13, 192:19, 201:17, 201:23, 202:11, 223:2
**Enslin** [5] - 2:11, 3:11, 10:23, 11:7, 11:18
**ensure** [5] - 25:12, 62:24, 108:3, 156:19, 212:13
**ensuring** [4] - 47:6, 94:7, 95:9, 166:9
**enter** [10] - 23:3, 69:25, 153:12, 160:7, 166:22, 174:11, 174:13, 174:14, 209:2
**entered** [2] - 148:4, 149:4
**entering** [1] - 173:4
**Enterprise** [2] - 147:24, 148:5
**enters** [2] - 173:10, 203:8
**entire** [1] - 214:9
**entirety** [1] - 84:20
**entities** [7] - 12:21, 44:24, 45:18, 96:4, 130:20, 162:5, 191:8
**entity** [1] - 140:10
**Entry** [5] - 57:21, 73:23, 110:1,

112:20, 176:20
**environment** [7] - 32:22, 33:23, 75:15, 125:3, 132:14, 168:15, 200:15
**Environmental** [4] - 198:6, 211:7, 216:5, 216:6
**environmental** [4] - 21:25, 38:14, 41:23, 216:4
**envisioning** [1] - 84:22
**epi** [1] - 207:25
**epidemio** [1] - 207:25
**epidemiological** [1] - 207:25
**equal** [1] - 195:18
**equipment** [3] - 117:25, 119:12, 211:2
**equivalent** [1] - 220:16
**erected** [1] - 20:15
**erecting** [2] - 143:10, 202:1
**Erik** [3] - 151:21, 171:18, 206:18
**erupt** [1] - 54:13
**escalate** [6] - 32:1, 34:1, 54:24, 164:20, 195:20, 221:25
**escalating** [2] - 33:1, 164:17
**escape** [2] - 48:7, 212:21
**escort** [2] - 161:5, 161:6
**especially** [5] - 26:6, 36:19, 103:8, 117:24, 131:10
**essentially** [5] - 163:5, 194:5, 203:7, 203:9, 205:22
**estimate** [5] - 45:7, 45:12, 46:20, 107:8, 109:4
**estimated** [1] - 170:3
**estimates** [1] - 109:5
**et** [2] - 123:13, 225:2
**evacuate** [1] - 166:22
**evaluate** [15] - 17:11, 21:23, 39:19, 41:21, 54:5, 56:3, 70:6, 73:22, 104:23, 140:15, 146:23, 148:3, 160:23, 197:16, 221:20
**evaluated** [3] - 146:7, 146:8, 146:17

**evaluating** [7] - 127:9, 140:13, 159:23, 163:19, 175:2, 182:2
**evaluation** [2] - 140:17, 207:19
**evening** [2] - 127:24, 128:2
**event** [5] - 61:11, 131:11, 155:20, 191:12, 207:17
**events** [5] - 9:5, 119:2, 192:23, 193:2, 221:15
**eventual** [1] - 143:18
**eventually** [5] - 24:9, 27:13, 69:1, 137:4, 187:5
**evict** [5] - 42:14, 51:16, 75:3, 171:11
**evicted** [6] - 100:7, 139:17, 139:20, 146:1, 158:15, 158:18
**evictees** [1] - 113:22
**eviction** [67] - 44:14, 51:19, 52:23, 62:22, 99:25, 100:1, 108:19, 108:23, 120:2, 124:3, 133:11, 148:14, 148:16, 151:6, 151:17, 153:10, 153:20, 154:9, 155:8, 155:9, 155:12, 156:18, 156:24, 158:18, 159:3, 159:11, 160:2, 161:7, 161:18, 162:11, 162:13, 162:17, 163:10, 163:22, 163:24, 164:3, 164:10, 165:4, 165:12, 165:23, 166:2, 166:19, 169:1, 169:22, 170:6, 170:8, 170:17, 170:19, 171:17, 172:10, 173:15, 174:9, 175:4, 175:12, 175:19, 176:21, 177:6, 177:13, 189:8, 194:10, 194:11, 196:13, 199:13, 199:17
**evictions** [37] - 24:16, 25:13, 37:15, 48:25, 66:14, 67:24, 70:19, 75:4, 108:17,

112:23, 113:22, 117:22, 118:5, 129:6, 129:23, 131:15, 131:17, 133:8, 141:1, 144:21, 155:23, 155:25, 156:2, 173:14, 175:8, 177:17, 177:24, 179:4, 181:9, 181:13, 181:21, 182:14, 185:23, 188:10, 188:12, 189:6, 203:23
**evolution** [1] - 26:16
**evolutions** [1] - 218:14
**evolve** [3] - 217:21, 218:3, 218:4
**evolved** [1] - 218:16
**ex** [2] - 33:12, 60:6
**exact** [3] - 63:16, 116:23, 128:6
**exactly** [9] - 15:11, 16:4, 18:20, 83:1, 87:19, 106:19, 112:17, 115:8, 215:23
**EXAMINATION** [2] - 2:2, 4:18
**example** [12] - 21:3, 47:19, 64:6, 70:15, 111:3, 120:13, 124:2, 134:3, 141:1, 163:11, 193:25, 198:2
**except** [1] - 225:5
**excessive** [1] - 158:21
**exchange** [1] - 11:10
**excuse** [3] - 50:13, 133:22, 176:4
**executive** [1] - 19:22
**exercise** [4] - 70:1, 135:21, 184:22, 218:7
**exhibit** [1] - 13:2
**EXHIBITS** [1] - 2:5
**exist** [4] - 18:23, 19:4, 126:1, 139:2
**existed** [1] - 100:5
**existence** [1] - 200:3
**existing** [5] - 102:2, 102:17, 124:7, 135:7, 208:6
**exists** [1] - 79:14
**expedient** [1] - 72:5
**expedite** [1] - 59:2
**expenditures** [2] - 139:13, 140:14
**experience** [8] -

23:15, 23:22, 70:24, 78:8, 110:23, 206:24, 207:4, 220:7
**experienced** [4] - 55:22, 184:14, 194:25, 222:9
**experiences** [1] - 33:12
**experiencing** [26] - 10:5, 10:11, 32:3, 33:19, 34:11, 35:1, 47:22, 65:17, 70:24, 73:2, 75:16, 76:2, 76:16, 78:7, 78:14, 80:16, 81:1, 91:10, 104:1, 124:11, 135:3, 143:25, 156:5, 164:13, 182:17, 219:17
**experiential** [2] - 32:9, 32:21
**Expires** [1] - 224:24
**explain** [1] - 60:6
**explaining** [1] - 103:19
**exploit** [2] - 76:2, 76:11
**exploited** [1] - 16:12
**explorations** [1] - 102:16
**expressed** [3] - 70:18, 183:12, 183:14
**expressing** [1] - 70:21
**extend** [1] - 197:8
**extent** [10] - 16:5, 21:11, 28:9, 74:21, 75:10, 76:23, 92:19, 100:20, 192:20, 201:20
**extenuating** [3] - 66:21, 99:10, 110:4
**exterior** [2] - 63:5, 116:10
**externally** [1] - 15:24
**extinguishers** [2] - 213:1, 213:2
**extra** [2] - 62:4
**extreme** [1] - 56:4
**eyes** [1] - 36:18

## F

**face** [1] - 183:21
**facilitate** [2] - 37:24, 121:14
**facilitated** [1] - 118:19
**facilitator** [1] - 10:17
**facilities** [1] - 200:6
**facility** [2] - 83:12, 147:4

**facing** [5] - 16:3, 16:20, 16:21, 17:9, 44:18
**fact** [5] - 35:4, 87:4, 150:18, 184:25, 216:7
**facto** [1] - 166:5
**factor** [1] - 194:10
**factors** [17] - 15:9, 21:25, 38:12, 38:15, 41:23, 53:5, 54:7, 55:12, 55:14, 68:18, 101:19, 112:25, 113:2, 151:2, 158:20, 199:25, 200:11
**fair** [2] - 98:2, 162:23
**Fairbanks** [1] - 138:16
**falls** [1] - 74:23, 200:16
**familiar** [1] - 13:4, 13:5, 60:2, 64:24, 92:25, 96:5, 121:2, 133:17, 133:18, 133:19, 133:23, 133:24, 147:6, 147:9, 193:6
**families** [2] - 25:24, 60:21
**family** [18] - 58:1, 127:20, 135:6, 135:8, 135:12, 135:13, 135:17, 135:19, 151:1, 188:16, 188:19, 188:22, 188:24, 188:25, 189:1, 189:2, 189:4, 219:22
**family's** [1] - 115:1
**far** [15] - 6:11, 40:23, 50:2, 51:17, 55:7, 114:22, 120:1, 123:17, 133:12, 141:7, 172:12, 173:5, 196:12, 212:7, 214:20
**faster** [5] - 49:2, 68:4, 68:5, 68:23, 70:20
**father** [2] - 23:24, 23:25
**favorable** [3] - 90:12, 90:13, 220:5
**February** [11] - 100:8, 100:10, 100:11, 132:2, 164:3, 169:1, 209:23, 209:24, 209:25, 213:10, 216:9
**federal** [4] - 20:1, 29:17, 136:5, 136:9

**feedback** [6] - 48:24, 69:6, 69:9, 89:14, 110:17, 161:17
**feeds** [2] - 92:5, 110:8
**feelings** [1] - 192:14
**feet** [1] - 24:8
**felt** [1] - 61:25
**female** [1] - 127:20
**Fence** [1] - 144:18
**fence** [7] - 63:5, 142:22, 145:9, 173:4, 189:12, 189:13
**fenced** [8] - 22:24, 133:3, 142:6, 143:1, 143:7, 143:23, 145:4, 172:23
**fenced-in** [1] - 143:23
**fences** [2] - 141:2, 141:21
**fencing** [15] - 61:6, 62:25, 63:1, 141:7, 141:16, 141:23, 142:1, 142:24, 143:8, 143:19, 143:20, 144:11, 144:17, 145:18, 185:7
**fentanyl** [4] - 47:20, 48:1, 48:8, 70:25
**Fernandez** [1] - 30:23
**few** [13] - 13:13, 15:9, 93:15, 112:8, 128:22, 137:3, 155:15, 155:16, 169:25, 171:4, 200:21, 200:23, 200:25
**field** [12] - 32:8, 34:9, 34:11, 34:19, 34:24, 50:13, 51:2, 72:2, 104:1, 104:6, 107:17, 221:14
**fieldwork** [1] - 34:8
**fifth** [10] - 170:12, 172:10, 174:6, 174:9, 174:12, 175:4, 175:11, 177:10, 177:13
**Fifth** [1] - 3:13
**figure** [3] - 39:19, 111:22, 176:18
**filed** [1] - 181:19
**filings** [1] - 198:11
**finalized** [2] - 14:15, 17:17
**finance** [1] - 8:19
**financial** [1] - 224:15
**fine** [5] - 5:17, 6:18, 122:7, 140:1, 178:17

**finish** [1] - 5:14
**finite** [1] - 135:8
**fire** [44] - 33:14, 96:12, 100:10, 170:6, 170:9, 170:14, 209:17, 209:25, 210:15, 211:16, 212:7, 212:14, 212:17, 212:21, 213:1, 213:2, 213:3, 213:10, 213:12, 213:13, 213:15, 213:17, 213:18, 213:21, 213:24, 214:5, 214:7, 214:15, 214:17, 214:20, 214:23, 215:6, 215:13, 215:17, 215:18, 215:21, 215:23, 216:12, 216:14, 216:18, 216:23, 216:24, 217:1, 217:5
**Fire** [5] - 210:11, 211:6, 211:20, 212:22
**fires** [4] - 210:23, 211:11, 212:2, 212:16
**first** [25] - 4:13, 8:5, 23:11, 31:1, 36:3, 85:1, 148:14, 156:23, 156:25, 162:22, 174:6, 177:6, 177:7, 177:8, 179:7, 182:2, 190:9, 191:21, 193:21, 198:11, 201:11, 209:11, 217:24, 218:1, 222:1
**fit** [6] - 86:2, 86:3, 86:11, 219:23, 219:24
**fits** [2] - 28:15, 69:24
**Five** [1] - 178:11
**five** [14] - 11:8, 26:16, 34:9, 170:15, 172:16, 173:23, 178:10, 200:19, 200:21, 201:6, 204:23, 205:17, 206:6
**flak** [1] - 67:16
**flaring** [1] - 164:17
**flexible** [1] - 107:16
**floated** [1] - 121:19
**flow** [3] - 9:13, 53:4, 93:9
**flying** [1] - 118:13
**focus** [33] - 8:17, 8:19,

9:12, 18:14, 25:20, 27:8, 40:9, 56:17, 65:6, 72:24, 73:13, 78:19, 79:1, 79:12, 80:8, 91:4, 94:6, 106:19, 107:25, 117:8, 123:19, 135:20, 136:3, 136:24, 143:15, 145:11, 165:18, 166:9, 199:24, 203:11, 203:12, 218:9, 220:25
**focused** [9] - 47:25, 80:13, 95:9, 107:13, 107:23, 123:23, 185:18, 186:11, 221:16
**focuses** [1] - 136:15
**focusing** [1] - 93:22
**folks** [2] - 12:10, 143:22
**follow** [11] - 19:11, 19:17, 61:20, 67:6, 73:10, 74:15, 97:9, 192:9, 211:18, 222:19, 222:20
**follow-up** [6] - 61:20, 74:15, 192:9, 211:18, 222:19, 222:20
**followed** [4] - 66:15, 88:1, 99:25, 105:25
**following** [3] - 3:19, 4:10, 26:17
**follows** [3] - 4:14, 143:13, 225:5
**food** [1] - 208:15
**Force** [6] - 190:11, 191:17, 198:19, 198:20, 198:24, 205:8
**foreman** [1] - 171:23
**forfeiture** [1] - 60:14
**forgetting** [1] - 36:17
**forgot** [1] - 29:7
**Forgotten** [5] - 26:17, 27:4, 217:25, 218:16, 218:18
**form** [10] - 39:9, 39:10, 49:2, 69:7, 70:20, 71:10, 146:10, 181:23, 182:11, 206:25
**formal** [1] - 20:18
**formalize** [1] - 213:5
**formed** [2] - 116:20, 217:24
**former** [1] - 146:14
**forms** [3] - 76:1,

127:23, 140:25
**forty** [1] - 24:14
**forty-four** [1] - 24:14
**forward** [23] - 21:22, 38:8, 41:16, 42:5, 42:10, 43:5, 43:6, 43:15, 47:1, 47:2, 47:4, 47:11, 54:15, 55:2, 56:16, 56:21, 92:9, 102:24, 138:13, 156:17, 159:10, 180:13, 186:8
**forwarded** [1] - 187:3
**fostering** [1] - 9:16
**foundation** [1] - 200:13
**Foundry** [2] - 198:3, 198:5
**four** [13] - 9:1, 21:23, 24:14, 27:25, 30:16, 38:12, 83:2, 93:15, 192:23, 193:2, 200:20, 201:4
**four-person** [1] - 27:25
**fourth** [5] - 9:19, 30:24, 173:24, 177:10, 209:18
**Foy** [1] - 13:15
**framework** [3] - 72:16, 119:8, 140:16
**Franklin** [1] - 26:20
**free** [2] - 12:20, 137:6
**freezing** [1] - 4:4
**frequently** [2] - 125:24, 128:17
**Frey** [6] - 1:9, 102:4, 113:15, 157:13, 158:7, 225:2
**friend** [1] - 62:3
**friend's** [1] - 115:2
**friends** [1] - 24:6
**front** [3] - 145:16, 159:5, 193:11
**fruition** [1] - 205:22
**fulcrum** [2] - 221:3, 222:15
**full** [7] - 30:17, 30:18, 34:10, 72:2, 156:21, 224:6
**full-time** [3] - 30:17, 30:18, 34:10
**fully** [1] - 61:9
**function** [2] - 29:20, 57:25
**functional** [1] - 220:10
**functionally** [1] - 116:17
**functions** [2] - 9:22,

81:10
**fund** [5] - 29:24, 30:1, 30:3, 30:11, 94:12
**funding** [28] - 29:12, 29:18, 29:22, 44:10, 58:14, 70:14, 89:18, 102:15, 103:22, 103:23, 106:5, 107:20, 108:2, 122:21, 123:5, 136:7, 138:7, 138:20, 139:4, 140:10, 141:21, 146:25, 147:4, 207:6, 218:20
**funneled** [1] - 168:10
**furniture** [1] - 86:12
**future** [3] - 205:5, 205:17, 207:6
**fuzzy** [1] - 83:1

## G

**gained** [1] - 34:6
**gather** [2] - 194:14, 194:16
**gathered** [2] - 112:5, 212:6
**gathering** [1] - 163:25
**gathers** [2] - 109:3, 197:18
**gawking** [1] - 168:19
**gears** [3] - 79:15, 129:2, 140:21
**gender** [1] - 111:21
**genders** [1] - 110:3
**general** [18] - 29:24, 30:1, 30:3, 30:11, 33:18, 96:2, 116:6, 116:7, 116:21, 170:23, 171:9, 171:23, 173:6, 175:1, 175:7, 196:23, 211:16, 217:19
**generally** [29] - 8:23, 15:21, 23:16, 30:11, 31:25, 35:17, 38:17, 42:8, 42:15, 42:20, 65:13, 68:22, 69:2, 74:10, 74:24, 80:12, 96:3, 107:13, 127:17, 141:25, 142:4, 162:7, 172:1, 177:16, 177:18, 177:20, 194:14, 206:21, 215:17
**generating** [1] - 95:13
**generation** [1] - 128:25

**generational** [1] - 184:14
**geographic** [1] - 22:5
**geographically** [1] - 172:7
**Germany** [1] - 23:25
**Gerold** [1] - 171:23
**gig** [1] - 86:19
**given** [23] - 48:24, 50:2, 55:11, 63:11, 64:14, 114:14, 118:3, 131:19, 132:18, 132:19, 133:2, 133:10, 153:16, 153:18, 155:12, 160:11, 160:14, 165:14, 172:18, 175:18, 189:7, 204:9, 224:7
**Glenn** [2] - 3:4, 122:16
**go-to** [1] - 45:25
**goal** [2] - 143:18, 218:13
**Google** [1] - 14:16
**govern** [4] - 20:19, 20:21, 24:25, 25:3
**governing** [2] - 18:8, 20:12
**Governing** [2] - 40:10, 41:14
**government** [7] - 20:1, 29:17, 39:11, 55:6, 63:14, 114:6, 136:9
**grain** [1] - 182:10
**grant** [2] - 29:22, 30:3
**grass** [2] - 61:5, 65:8, 145:5
**gratification** [1] - 85:23
**gravitated** [1] - 27:1
**great** [5] - 15:5, 68:16, 93:5, 122:12, 184:8
**greet** [1] - 95:18
**Greyhound** [1] - 83:9
**ground** [1] - 194:4
**group** [77] - 36:25, 38:23, 40:1, 40:7, 40:11, 40:17, 42:2, 42:12, 42:15, 43:1, 43:23, 46:10, 47:3, 47:5, 51:15, 52:1, 53:25, 55:15, 56:9, 56:17, 57:16, 59:22, 63:21, 63:23, 64:1, 66:17, 67:2, 67:13, 67:23, 70:8, 70:11, 74:16, 77:2, 78:5, 78:20, 91:19, 91:22, 92:6, 92:10, 95:7, 110:13, 110:14,

111:2, 112:19, 118:21, 128:20, 128:25, 130:6, 135:6, 136:22, 146:8, 146:18, 146:22, 148:1, 151:5, 152:19, 154:6, 154:23, 158:12, 159:13, 161:20, 162:2, 162:9, 169:20, 172:4, 180:2, 183:3, 183:7, 183:13, 196:12, 203:1, 206:13, 206:21, 206:25, 209:6, 222:5
**Group** [3] - 40:10, 41:14, 130:23
**groups** [5] - 129:17, 129:20, 129:23, 134:1, 191:15
**grow** [1] - 136:25
**guaranteed** [1] - 127:5
**guess** [17] - 20:6, 42:3, 48:16, 51:14, 58:8, 77:10, 78:6, 81:18, 86:13, 87:23, 172:13, 187:15, 193:2, 193:25, 195:8, 202:15, 214:4
**guests** [1] - 210:25
**Guidance** [7] - 12:25, 23:9, 25:8, 25:9, 66:14, 66:16, 68:1
**guidance** [11] - 18:12, 19:12, 21:17, 21:18, 22:8, 22:14, 22:20, 31:6, 105:25, 211:24
**guide** [1] - 21:8
**Guide** [1] - 13:10
**guidelines** [1] - 180:21
**gun** [2] - 51:6, 52:14
**guy** [1] - 217:11

## H

**habitability** [1] - 9:9
**habitable** [1] - 47:7
**habitation** [2] - 20:16, 202:3
**habits** [1] - 31:13
**Half** [2] - 122:10, 122:11
**half** [2] - 24:1, 29:7
**hand** [1] - 224:17
**handed** [1] - 154:22
**handle** [1] - 131:8
**handled** [6] - 10:3, 52:5, 116:8, 126:24,

182:1, 222:3
**hands** [1] - 41:4
**handwashing** [1] -
208:12
**handwritten** - 36:7
**Hansen** [6] - 144:18,
144:23, 145:13,
151:21, 171:18,
206:18
**Hanson** [2] - 121:16,
220:22
**hard** [1] - 214:3
**harder** [1] - 5:9
**hardship** [1] - 10:5
**hardships** [1] - 10:11
**harm** [7] - 33:22,
50:16, 50:17, 76:5,
76:8, 111:1, 184:13
**harmful** [1] - 110:25
**harsh** [1] - 125:2
**Hasbargen** [1] - 13:18
**hat** [1] - 33:5
**Haugland** [1] - 221:9
**hazardous** [1] - 9:5
**head** [18] - 6:13,
20:23, 77:15, 77:20,
77:23, 77:24, 78:1,
78:2, 85:3, 122:24,
123:7, 133:16,
168:13, 169:2,
174:1, 178:13,
187:8, 202:10
**headed** [1] - 115:9
**healing** [3] - 136:12,
150:23, 205:10
**Health** [35] - 11:1,
11:3, 27:9, 38:4,
52:3, 52:13, 52:21,
56:6, 80:6, 81:14,
82:24, 82:25, 85:1,
119:17, 134:14,
134:23, 139:11,
140:9, 159:22,
190:12, 191:18,
197:4, 198:6,
207:12, 207:15,
207:16, 207:24,
208:14, 208:20,
209:4, 210:20,
211:7, 215:25,
216:5, 216:6
**health** [22] - 21:24,
33:15, 38:13, 41:22,
47:25, 52:10, 52:11,
81:20, 85:7, 136:16,
170:23, 170:24,
190:18, 193:23,
199:25, 200:10,
200:12, 205:14,
207:19, 208:8

**health-focused** [1] -
47:25
**Healthcare** [1] -
104:14
**healthy** [1] - 200:15
**hear** [1] - 120:23
**heard** [7] - 115:21,
125:9, 133:18,
135:4, 136:21,
192:15
**hearing** [1] - 112:16
**Heidi** [2] - 11:1,
207:12
**heirs** [1] - 60:14
**held** [3] - 94:20, 94:21,
107:6
**Helix** [34] - 11:3,
134:13, 134:14,
134:15, 134:17,
134:20, 134:23,
135:24, 136:4,
136:11, 137:23,
138:4, 138:11,
138:17, 138:18,
138:20, 139:3,
139:14, 139:17,
139:20, 139:22,
140:4, 140:11,
140:15, 149:23,
150:6, 150:9,
150:13, 150:19,
151:2, 151:11,
157:15, 159:22,
219:18
**hello** [1] - 97:6
**help** [27] - 12:18, 31:9,
33:6, 35:11, 43:13,
45:16, 53:4, 56:12,
68:20, 70:3, 78:22,
86:25, 91:14, 95:16,
95:20, 124:25,
161:1, 166:22,
167:3, 168:17,
175:24, 176:16,
180:24, 207:4,
218:7, 219:24
**helped** [3] - 111:22,
151:2, 151:3
**helpful** [2] - 174:24,
175:3
**helping** [3] - 107:23,
135:20, 203:13
**Hennepin** [59] - 31:16,
31:19, 44:2, 44:8,
44:12, 44:16, 45:6,
45:9, 45:25, 49:10,
49:12, 49:14, 50:3,
57:8, 57:19, 58:11,
59:7, 60:15, 60:16,
73:4, 73:19, 79:6,

83:8, 92:1, 92:12,
103:5, 103:23,
104:13, 104:22,
105:4, 105:8,
105:15, 106:4,
106:6, 106:7,
106:10, 106:13,
107:4, 107:11,
107:21, 108:14,
109:25, 110:9,
110:18, 111:24,
112:17, 123:16,
124:8, 125:7,
125:13, 130:10,
130:20, 130:22,
130:25, 131:1,
151:15, 159:19,
176:3, 207:16
**Herberholz** [2] -
151:24, 171:21
**hereby** [2] - 224:2,
225:4
**hesitating** [1] - 172:14
**Hewitt** [2] - 46:9,
125:12
**high** [9] - 9:4, 24:2,
38:6, 54:20, 66:23,
71:13, 93:5, 163:8,
163:10
**high-level** [1] - 38:6
**high-occupancy** [1] -
9:4
**highlight** [1] - 117:11
**Highway** [2] - 26:19,
217:25
**highways** [1] - 130:24
**himself** [1] - 184:11
**historically** [3] -
126:6, 184:13,
199:11
**hold** [5] - 8:16, 8:20,
80:19, 166:11,
166:16
**holders** [1] - 9:24
**holding** [2] - 89:23,
147:4
**homeless** [9] - 13:11,
30:22, 31:5, 34:12,
34:20, 74:18,
122:22, 152:19,
153:4
**Homeless** [100] -
10:14, 25:17, 26:14,
26:15, 27:15, 27:23,
27:24, 28:1, 28:2,
28:4, 29:15, 30:21,
31:18, 33:10, 34:7,
34:9, 34:16, 34:21,
35:17, 36:9, 36:14,
37:1, 37:11, 38:25,

40:20, 41:9, 44:22,
49:8, 71:16, 71:18,
72:1, 72:22, 72:24,
73:6, 73:9, 73:16,
73:20, 73:24, 74:2,
74:4, 74:5, 74:10,
74:12, 80:1, 80:24,
84:10, 84:15, 85:9,
85:17, 88:8, 89:6,
89:10, 89:18, 90:2,
90:15, 90:18, 90:21,
91:1, 91:2, 91:15,
91:18, 91:21, 91:23,
92:7, 92:8, 92:12,
96:21, 96:24, 97:2,
97:24, 99:1, 100:18,
100:23, 101:10,
101:17, 103:25,
104:5, 104:15,
109:3, 109:15,
113:6, 114:23,
115:4, 119:17,
119:18, 121:7,
131:13, 150:12,
151:24, 157:8,
174:19, 176:7,
186:1, 194:2,
203:24, 209:8,
218:19, 220:16
**Homelessness** [3] -
40:10, 79:8, 107:14
**homelessness** [46] -
10:16, 10:18, 17:15,
18:22, 20:9, 21:8,
25:4, 35:1, 47:22,
49:20, 58:15, 65:17,
69:19, 69:25, 70:17,
70:24, 72:15, 73:3,
75:16, 76:3, 76:16,
78:14, 79:14, 80:13,
80:17, 81:1, 91:11,
104:2, 104:11,
106:23, 124:12,
134:9, 134:25,
135:2, 135:4,
143:25, 145:23,
156:5, 164:14,
171:1, 182:17,
183:2, 217:21,
219:17, 220:25,
222:5
**honestly** [1] - 40:8
**honor** [1] - 6:1
**hoping** [2] - 5:3, 5:24
**hostile** [1] - 98:8
**hostility** [1] - 54:9
**hotline** [1] - 111:4
**hour** [3] - 122:10,
122:11, 128:15
**hours** [5] - 10:24,

22:10, 128:15,
164:8, 212:15
**house** [2] - 115:2,
189:25
**housed** [11] - 41:7,
78:23, 79:3, 138:18,
164:23, 189:24,
190:2, 191:2,
191:23, 194:3,
220:17
**housekeeping** [1] -
5:3
**houseless** [1] -
217:19
**houselessness** [5] -
23:22, 24:16, 74:25,
75:6, 78:7
**houselessness-
related** [1] - 74:25
**houses'** [1] - 40:17
**Housing** [13] - 31:17,
45:11, 46:4, 104:5,
104:14, 123:16,
130:21, 134:14,
134:24, 151:21,
159:22, 171:20
**housing** [58] - 9:2,
10:3, 33:14, 35:12,
44:5, 47:7, 56:25,
61:9, 70:5, 79:3,
90:8, 90:9, 90:14,
91:15, 104:19,
105:6, 107:24,
107:25, 114:25,
135:22, 136:1,
137:1, 137:5,
139:17, 139:20,
139:21, 139:23,
143:13, 144:1,
145:7, 149:8,
149:15, 149:22,
149:24, 150:7,
150:17, 150:24,
151:4, 156:20,
156:23, 157:16,
176:18, 180:15,
200:16, 202:4,
203:15, 205:18,
205:19, 205:25,
206:2, 206:8, 218:8,
219:19
**HR** [1] - 37:11
**HRT** [2] - 28:21, 29:13
**hum** [5] - 96:7, 100:4,
116:11, 125:4, 132:3
**human** [7] - 20:16,
51:9, 68:13, 76:9,
200:3, 200:13, 202:2
**Human** [1] - 11:3
**human-centered** [1] -

68:13
**humane** [1] - 68:8
**humanistic** [1] - 68:12
**humanity** [1] - 6:2
**humans** [2] - 169:5, 176:23
**hundreds** [1] - 61:1
**hypothetical** [2] - 75:11, 76:24
**hypothetically** [2] - 96:16, 180:18

**I**

**I-94** [1] - 198:5
**idea** [6] - 56:11, 77:14, 99:17, 110:2, 138:15, 150:4
**identifiable** [1] - 88:5
**identification** [3] - 82:4, 88:6, 161:3
**identified** [4] - 109:8, 111:21, 180:13, 212:5
**identifies** [1] - 153:3
**identify** [23] - 32:2, 33:6, 33:18, 36:23, 64:15, 65:3, 65:14, 65:24, 70:12, 74:6, 101:25, 102:23, 112:2, 125:19, 135:12, 150:10, 153:23, 163:16, 168:1, 176:3, 180:23, 183:7, 188:25
**identifying** [7] - 33:1, 35:3, 35:6, 109:22, 150:16, 163:13, 211:13
**identity** [1] - 136:14
**ignited** [1] - 213:24
**ignorant** [1] - 95:2
**illegal** [5] - 52:15, 78:20, 114:11, 202:3, 204:3
**illegally** [1] - 173:3
**illicit** [2] - 99:11, 195:6
**imagine** [1] - 13:25
**immediacy** [1] - 101:23
**immediate** [16] - 22:4, 22:7, 51:7, 51:19, 51:20, 52:16, 55:19, 55:25, 56:2, 56:5, 81:20, 85:23, 161:3, 173:18, 193:22, 208:10
**immediately** [4] - 56:7, 91:5, 158:25,

171:8
**imminent** [3] - 50:17, 50:20, 173:18
**imminently** [1] - 50:24
**Impact** [1] - 216:6
**impact** [5] - 24:20, 38:20, 39:6, 47:21, 216:4
**impacted** [1] - 53:6
**impede** [1] - 54:15
**impending** [2] - 22:11, 49:12, 130:8
**implement** [1] - 142:13
**implies** [1] - 9:11
**important** [1] - 56:22
**importantly** [1] - 214:6
**impose** [1] - 123:12
**improper** [1] - 100:20
**improve** [2] - 33:7, 161:24
**improved** [1] - 200:12
**Improvement** [19] - 79:23, 81:23, 82:14, 83:7, 85:18, 88:7, 88:10, 88:25, 93:18, 94:12, 94:24, 95:3, 95:4, 95:6, 95:15, 95:25, 96:10, 96:17, 103:1
**improvements** [2] - 123:9, 126:2
**in-the-field** [1] - 34:24
**inaccessibility** [1] - 185:22
**incentivized** [1] - 159:3
**incentivizing** [1] - 194:11
**incident** [3] - 52:12, 166:25, 217:7
**incidents** [1] - 164:11
**inclement** [1] - 103:9
**include** [1] - 22:7
**included** [4] - 72:10, 104:13, 117:2, 211:13
**includes** [8] - 9:20, 10:3, 28:23, 110:10, 119:9, 119:14, 143:14, 145:21
**including** [1] - 4:3
**income** [2] - 60:21, 206:3
**incomplete** [2] - 75:11, 76:24
**inconclusive** [3] - 213:20, 214:14, 214:20
**incorporate** [2] -

70:14, 101:24
**incorporates** [1] - 9:25
**incorporating** [1] - 36:4
**incorrect** [1] - 182:5
**increase** [4] - 15:9, 47:19, 75:20, 200:9
**increased** [1] - 208:12
**indeed** [1] - 207:23
**independently** [2] - 18:24, 77:7
**indi** [1] - 30:19
**Indian** [8] - 104:17, 113:8, 115:10, 129:15, 136:6, 191:17, 191:18, 191:19
**indicate** [5] - 64:18, 66:4, 67:11, 75:19, 110:5
**indicated** [3] - 35:5, 38:12, 49:1
**indicates** [2] - 64:23, 203:18
**indication** [2] - 94:14, 106:22
**indicators** [1] - 214:8
**indigenous** [2] - 136:3, 136:4
**Indigenous** [7] - 190:11, 190:12, 191:17, 198:18, 198:20, 198:24, 205:8
**indirectly** [1] - 107:21
**individual** [50] - 23:18, 32:23, 33:3, 33:24, 37:17, 41:18, 45:14, 47:9, 52:4, 55:23, 61:18, 62:4, 72:7, 74:3, 74:7, 76:13, 83:18, 84:4, 84:7, 86:18, 86:24, 87:15, 94:4, 94:22, 102:8, 111:6, 111:17, 112:10, 115:6, 116:15, 116:18, 116:22, 126:11, 126:17, 147:15, 147:18, 154:20, 157:24, 159:4, 160:24, 161:4, 167:2, 174:21, 184:24, 185:2, 191:8, 198:19, 203:19, 210:13, 216:25
**individual's** [2] - 87:2, 112:5

**individually** [1] - 115:13
**individuals** [167] - 10:10, 13:13, 13:14, 14:21, 15:20, 22:3, 23:10, 23:19, 25:22, 25:23, 26:7, 26:12, 26:21, 30:16, 32:2, 34:11, 34:25, 35:6, 35:10, 35:15, 35:24, 37:1, 39:5, 40:16, 45:8, 45:13, 46:19, 47:21, 48:7, 49:24, 53:11, 53:19, 55:9, 56:19, 57:6, 58:19, 58:22, 59:4, 59:9, 61:21, 62:1, 63:25, 65:17, 68:19, 69:3, 70:9, 70:23, 71:2, 71:11, 71:15, 73:2, 73:4, 73:9, 73:15, 74:14, 74:17, 75:5, 75:15, 75:24, 76:1, 76:11, 77:4, 77:6, 78:14, 78:21, 80:2, 80:8, 80:16, 81:1, 82:2, 85:21, 88:12, 90:7, 90:11, 91:10, 91:13, 91:16, 92:25, 93:6, 93:10, 93:25, 94:8, 94:16, 97:1, 98:3, 99:7, 104:1, 107:24, 109:8, 109:13, 110:6, 110:16, 111:8, 114:12, 114:23, 114:25, 119:22, 121:8, 124:9, 124:25, 127:8, 129:8, 130:16, 130:19, 132:14, 135:3, 135:5, 135:14, 135:25, 136:2, 136:3, 136:13, 136:25, 137:6, 138:14, 138:18, 139:20, 143:24, 148:20, 150:10, 150:14, 150:19, 151:18, 152:1, 153:8, 153:23, 155:1, 155:17, 156:4, 157:11, 158:12, 158:19, 158:25, 159:9, 160:16, 164:13, 166:17, 167:24, 168:22, 170:25, 171:4, 171:24, 172:1, 180:10, 180:12,

180:22, 182:16, 184:21, 188:25, 189:10, 191:2, 191:4, 192:12, 196:19, 203:12, 204:1, 206:24, 207:4, 207:20, 208:9, 208:23, 211:18, 215:10, 220:6, 220:11, 221:2, 221:7
**individuals'** [1] - 203:10
**indoor** [1] - 144:2
**indoors** [1] - 144:1
**indulging** [1] - 83:13
**infinitely** [1] - 64:24
**inflicting** [1] - 184:12
**influence** [1] - 44:7
**influences** [1] - 95:12
**influx** [1] - 130:19
**inform** [4] - 14:25, 109:12, 109:16, 206:25
**informal** [3] - 20:19, 21:2, 182:12
**Information** [4] - 73:21, 74:6, 107:15, 215:8
**information** [63] - 14:24, 16:10, 17:1, 17:10, 32:15, 32:16, 36:3, 36:4, 36:22, 40:23, 41:2, 41:5, 42:8, 46:25, 62:18, 64:11, 69:14, 70:7, 72:9, 72:11, 72:23, 73:15, 74:8, 74:13, 83:20, 88:3, 88:8, 88:24, 92:3, 92:9, 99:6, 99:7, 99:15, 109:3, 109:15, 109:19, 109:24, 110:8, 112:6, 115:13, 116:23, 125:11, 125:12, 125:22, 145:16, 147:13, 148:4, 148:7, 151:14, 169:17, 182:6, 183:9, 184:23, 193:8, 194:16, 196:5, 198:13, 199:2, 207:12, 207:14, 207:17, 221:18, 221:21
**INFORMATION/ DOCUMENT** [1] - 2:14
**informed** [1] - 75:3

informing [1] - 15:7
informs [3] - 26:9, 75:1, 109:22
inherently [1] - 75:3
inhumane [1] - 182:4
initial [13] - 25:20, 26:4, 27:4, 35:5, 44:21, 103:1, 138:19, 148:16, 167:16, 186:23, 189:14, 196:10, 207:19
initiate [1] - 41:11
initiatives [1] - 220:2
injury [1] - 212:9
input [20] - 13:24, 13:25, 14:7, 14:9, 17:20, 17:22, 18:1, 23:12, 25:7, 45:12, 47:12, 48:13, 58:7, 58:8, 58:10, 69:19, 69:21, 70:6, 106:10, 162:2
inquiry [1] - 100:20
inside [10] - 55:24, 78:21, 86:4, 152:22, 162:13, 167:6, 167:7, 189:14, 217:1, 217:3
inspection [2] - 196:10, 211:9
inspections [5] - 9:3, 9:4, 9:5, 10:1, 148:1
Inspections [9] - 7:15, 8:12, 9:2, 147:12, 210:10, 210:11, 211:6, 211:21, 212:23
Inspector [1] - 210:12
inspectors [5] - 33:13, 33:14, 33:16, 210:15
instance [5] - 58:24, 60:3, 65:16, 177:4, 178:1
instances [7] - 50:6, 60:18, 66:13, 86:16, 131:18, 133:9, 214:21
instead [2] - 54:22, 62:2
Institute [1] - 8:21
instruct [1] - 185:5
instructed [5] - 65:3, 113:21, 160:21, 165:24, 168:21
instruction [6] - 64:1, 64:8, 197:11, 208:15, 208:25, 209:5
INSTRUCTIONS [1] -

2:18
instructions [19] - 34:13, 34:14, 63:11, 63:22, 64:14, 118:3, 152:10, 160:5, 160:6, 160:10, 160:14, 165:14, 165:17, 166:20, 166:23, 174:10, 174:13, 210:17, 213:8
intact [2] - 62:25, 63:2
integrated [1] - 176:19
integrity [1] - 67:15
intellectual [2] - 25:6, 179:23
intended [3] - 82:12, 200:7, 211:23
intending [1] - 67:8
intent [2] - 65:8, 143:21
intents [2] - 201:25
interact [3] - 25:1, 104:3, 118:4
interaction [1] - 33:23
interactions [2] - 18:8, 98:25
Interagency [1] - 79:8
interagency [1] - 136:18
interest [5] - 18:20, 70:19, 137:10, 224:15, 224:16
interested [3] - 60:18, 114:18, 168:19
interfere [2] - 21:21, 22:1
interfered [1] - 105:23
interference [2] - 4:4, 42:20
interfering [1] - 211:1
intergovernment [1] - 136:19
interim [1] - 13:11
intermediate [1] - 82:1
intermediate-term [1] - 82:1
intern [1] - 183:11
internal [2] - 15:15, 92:10
internally [2] - 63:6, 124:24
interpret [1] - 187:10
interpretation [1] - 51:20
interrupt [3] - 12:16, 121:12, 201:18
interruptions [2] - 4:5, 83:14
Interstate [1] - 198:3

intimate [1] - 67:3
intimately [1] - 68:6
introduced [1] - 138:15
inventoried [1] - 154:2
invested [1] - 123:8
investigate [3] - 125:13, 125:15, 214:11
investigated [3] - 215:18, 217:6, 217:9
investigating [1] - 215:17
investigation [11] - 134:1, 196:11, 213:11, 213:19, 214:16, 215:5, 215:6, 215:9, 215:11, 215:19, 216:13
investigations [7] - 213:14, 213:17, 214:2, 214:25, 215:3, 215:24, 216:10
investigator [1] - 215:12
investment [2] - 123:2, 123:9
investments [1] - 107:1
invite [3] - 31:12, 206:21, 206:24
inviting [1] - 69:17
invoice [1] - 139:12
invoices [1] - 140:13
involved [10] - 14:19, 14:22, 23:7, 25:7, 34:3, 42:21, 53:9, 123:11, 132:14, 144:12
involvement [1] - 23:12
irrelevant [1] - 173:24
issue [1] - 102:22
issued [2] - 214:12, 214:13
issues [6] - 10:7, 170:24, 179:6, 193:8, 210:25
item [1] - 97:13
items [29] - 46:13, 80:16, 82:15, 82:16, 83:22, 85:17, 86:3, 86:5, 86:6, 86:10, 87:7, 93:3, 93:16, 94:5, 94:13, 94:25, 97:19, 154:3, 161:1, 162:25, 163:11, 163:15, 163:18,

166:14, 169:4, 169:8, 169:11, 177:1
iteration [7] - 132:1, 164:5, 170:12, 191:21, 209:18, 211:10, 218:1
iterations [1] - 190:7
ITS [1] - 1:16
itself [7] - 18:10, 23:5, 26:11, 39:21, 120:24, 172:23, 185:9

## J

Jacob [1] - 1:9
January [23] - 99:24, 99:25, 100:1, 100:2, 100:7, 124:2, 125:5, 132:2, 148:13, 151:6, 151:16, 153:10, 153:14, 153:20, 154:9, 155:8, 158:15, 159:11, 160:6, 162:11, 179:20, 225:23
Jenkins [1] - 69:15
job [6] - 5:5, 7:4, 8:24, 31:4, 32:8, 44:16
John [1] - 221:9
joined [2] - 8:4, 80:3
joint [1] - 37:2
jointly [1] - 215:4
Joseph [1] - 30:22
José [1] - 30:23
July [4] - 100:11, 170:11, 175:19, 176:21
Justice [2] - 152:16, 220:20
justifying [1] - 194:10

## K

Karmen [1] - 3:9
keep [6] - 5:13, 86:9, 99:15, 147:17, 172:22, 217:1
keeping [3] - 88:21, 218:4, 218:5
KELLEY [54] - 4:19, 6:14, 12:3, 12:6, 12:19, 12:23, 19:1, 19:14, 21:13, 22:15, 23:6, 28:13, 28:15, 29:6, 29:10, 29:11, 67:18, 67:21, 67:22, 74:23, 76:12, 76:25, 77:1, 77:10, 77:15, 77:21, 78:1, 78:4,

92:21, 93:23, 101:8, 118:9, 119:25, 121:18, 121:23, 122:2, 122:7, 122:11, 122:14, 122:18, 154:14, 178:3, 178:11, 178:14, 178:18, 178:21, 178:23, 179:1, 179:3, 193:1, 201:21, 202:7, 202:14, 222:19
Kelley [5] - 2:3, 3:3, 4:21, 223:7, 225:22
Kelliher [1] - 158:7
Kemp [1] - 210:12
kept [1] - 169:9
killed [1] - 159:4
killing [1] - 55:24
kind [44] - 15:22, 26:15, 31:6, 32:22, 33:24, 36:24, 38:6, 44:21, 50:11, 60:12, 64:14, 74:23, 80:1, 80:5, 84:25, 87:23, 95:6, 95:16, 95:17, 96:22, 97:9, 99:17, 104:12, 105:7, 106:20, 115:8, 115:23, 117:1, 119:8, 124:5, 129:13, 134:11, 137:23, 141:17, 146:11, 147:21, 149:5, 167:7, 173:13, 174:24, 200:24, 214:16, 221:11, 222:1
kinds [7] - 10:11, 65:10, 95:13, 168:2, 174:23, 204:16, 211:13
Kira [5] - 3:3, 4:21, 11:25, 13:18, 225:22
kira@ climatedefenseproject.org [1] - 3:7
knocked [1] - 198:20
knocking [1] - 191:22
knowing [3] - 65:22, 85:23, 127:2
knowledge [22] - 25:11, 34:4, 36:24, 60:6, 67:3, 91:3, 94:2, 112:21, 128:18, 129:24, 138:12, 140:8, 152:9, 155:22, 155:24, 163:6, 169:6, 175:9,

176:25, 191:25, 215:20, 222:24
**Kristin** [2] - 3:12, 11:23
**kristin.sarff@ minneapolismn. gov** [1] - 3:16

## L

**lab** [1] - 210:21
**labor** [1] - 141:1
**lack** [1] - 101:14
**LaCroix** [2] - 183:20, 184:11
**Lake** [8] - 130:25, 135:23, 136:11, 136:19, 138:12, 138:15, 150:20
**land** [4] - 117:9, 124:24, 220:4
**Land** [4] - 147:24, 148:5, 220:1
**landed** [1] - 96:6
**landowner** [1] - 39:16
**landscape** [1] - 127:16
**language** [3] - 25:25, 26:1, 63:16
**lanyard** [1] - 64:22
**large** [4] - 10:1, 80:22, 115:19, 163:11
**larger** [8] - 84:17, 84:20, 86:16, 163:15, 163:17, 219:12, 221:24, 222:2
**larger-volume** [1] - 84:17
**largest** [1] - 17:7
**Larry** [1] - 215:15
**last** [10] - 10:13, 24:1, 26:16, 31:1, 60:13, 93:15, 176:12, 187:23, 195:1, 209:14
**last-minute** [1] - 176:12
**lasted** [1] - 11:8
**late** [2] - 99:23, 187:24
**latent** [1] - 219:14
**launching** [1] - 140:11
**law** [26] - 34:3, 52:17, 94:17, 117:15, 117:21, 117:24, 118:3, 118:15, 130:1, 130:5, 155:7, 155:11, 155:13, 160:14, 163:21, 164:18, 164:25,

165:6, 165:23, 166:5, 166:7, 168:20, 181:1, 209:1, 220:17, 222:6
**Law** [2] - 3:4, 3:12
**laws** [5] - 19:13, 20:1, 20:3, 24:18, 24:23
**layers** [1] - 189:19
**lead** [7] - 28:1, 30:21, 68:18, 108:14, 120:6, 161:21, 222:11
**leaders** [1] - 15:17
**leadership** [1] - 142:20
**leading** [13] - 109:13, 118:17, 120:5, 149:17, 149:20, 149:24, 150:1, 186:5, 209:17, 210:2, 214:8, 216:12, 216:13
**leads** [2] - 39:25, 48:17
**learn** [5] - 16:25, 31:13, 31:14, 32:21, 198:17
**learned** [4] - 198:18, 207:9, 207:11
**learning** [2] - 32:9, 32:13
**least** [12] - 14:1, 14:5, 22:24, 26:7, 94:8, 127:1, 143:4, 172:16, 196:22, 197:6, 216:7, 219:12
**leave** [14] - 62:6, 62:8, 80:10, 81:22, 106:17, 108:12, 126:7, 126:11, 126:20, 126:21, 126:24, 127:1, 153:8, 156:6
**leaves** [1] - 122:16
**leaving** [6] - 23:25, 111:12, 111:16, 120:15, 165:19, 166:10
**led** [3] - 69:15, 158:18, 158:20
**left** [14] - 13:16, 17:19, 23:25, 62:2, 153:22, 154:4, 154:5, 162:20, 162:25, 176:22, 188:1, 209:14
**legal** [7] - 11:21, 13:25, 21:12, 185:12, 201:20, 202:12, 204:15

**legally** [3] - 188:18, 189:1, 189:4
**legislative** [2] - 19:5, 19:7, 19:21
**length** [1] - 75:20
**lengthy** [1] - 69:5
**lens** [2] - 129:13, 222:7
**less** [4] - 75:5, 77:3, 77:6, 206:5
**letter** [2] - 9:22, 182:11
**letterhead** [1] - 64:17
**level** [34] - 17:14, 26:8, 31:4, 32:3, 33:7, 33:20, 38:6, 38:15, 45:16, 61:20, 64:24, 66:2, 66:23, 71:13, 82:9, 96:20, 96:22, 98:17, 106:5, 106:10, 106:16, 107:19, 109:19, 110:7, 115:15, 127:6, 150:15, 196:15, 197:18, 200:4, 214:19, 219:14, 222:3
**levels** [1] - 10:8
**leverage** [1] - 48:21
**liability** [1] - 114:18
**liaise** [1] - 221:4
**liaison** [20] - 154:5, 154:23, 155:2, 160:18, 160:21, 160:23, 161:5, 166:24, 167:11, 167:14, 167:19, 167:20, 168:10, 168:21, 168:23, 173:10, 174:20, 175:2, 219:8, 220:17
**Liaison** [1] - 157:10
**liaisons** [6] - 10:4, 152:18, 172:20, 189:18, 190:24, 193:10
**liberty** [1] - 60:10
**license** [1] - 9:24
**licensing** [1] - 33:15
**Licensing** [1] - 8:8
**lies** [1] - 73:18
**Lieutenant** [2] - 155:6, 221:9
**lieutenant** [2] - 167:20, 220:23
**life** [5] - 68:21, 158:24, 193:23, 212:21, 212:23
**lifted** [1] - 199:17
**Light** [7] - 91:6, 91:7,

91:8, 130:15, 131:12, 131:14
**light** [1] - 95:11
**likely** [5] - 14:10, 34:6, 52:12, 53:2, 93:4
**limestone** [1] - 146:12
**limit** [14] - 86:1, 86:3, 153:19, 161:14, 161:16, 165:20, 165:24, 166:1, 166:3, 166:5, 166:8, 175:11, 175:15
**limitations** [2] - 4:2, 4:6
**limited** [5] - 4:3, 50:9, 90:3, 102:5, 102:11
**limits** [2] - 153:16, 160:11
**line** [5] - 43:22, 75:8, 87:23, 111:22, 130:16
**LINE** [1] - 225:6
**lines** [1] - 91:9
**list** [5] - 72:14, 72:23, 102:10, 131:22, 148:2
**listed** [2] - 129:22, 161:9
**listen** [1] - 135:2
**listening** [1] - 69:12
**literal** [1] - 96:22
**livability** [10] - 21:25, 38:14, 39:6, 41:22, 47:8, 56:20, 75:18, 199:24, 219:2, 219:5
**live** [7] - 142:17, 189:25, 195:10, 196:2, 200:14, 200:15, 203:5
**lived** [4] - 158:25, 206:24, 207:4, 220:6
**living** [2] - 23:24, 78:9
**lobby** [1] - 111:17
**located** [1] - 113:1
**location** [19] - 35:3, 46:19, 49:13, 53:2, 83:11, 86:24, 89:14, 98:6, 100:1, 100:5, 100:9, 101:20, 112:24, 119:1, 132:22, 146:14, 169:19, 170:13, 177:3
**locations** [8] - 22:2, 40:18, 40:22, 41:6, 42:18, 98:16, 146:13, 192:18
**locker** [2] - 102:8, 102:9, 102:12
**lockers** [3] - 102:5,

102:6, 102:11
**lodged** [1] - 181:12
**log** [1] - 75:7
**look** [28] - 11:13, 14:23, 14:24, 31:23, 32:5, 38:7, 38:13, 41:23, 43:7, 43:9, 43:21, 43:25, 57:18, 57:22, 58:4, 58:9, 74:5, 76:2, 76:4, 84:5, 93:7, 95:21, 101:16, 127:21, 193:7, 194:9, 195:14, 197:21
**looked** [10] - 15:2, 15:24, 16:18, 41:19, 78:5, 78:13, 78:18, 102:2, 102:13, 220:1
**looking** [18] - 48:7, 48:8, 49:24, 74:3, 76:10, 93:10, 111:18, 156:6, 156:8, 160:17, 160:25, 161:4, 173:14, 173:23, 191:9, 193:12, 218:23
**looks** [8] - 23:2, 80:21, 114:7, 114:22, 115:3, 119:18, 196:8, 197:16
**loosely** [4] - 123:14, 133:18, 189:9, 193:5
**lost** [1] - 60:13
**low** [4] - 60:21, 93:14, 102:6, 205:24
**lower** [2] - 143:16, 206:3
**lower-barrier** [1] - 143:16
**lunch** [4] - 6:10, 118:12, 121:20, 148:10
**lunchtime** [1] - 118:10

## M

**machamberlin04@ gmail.com** [1] - 225:25
**Maikao** [1] - 30:21
**main** [3] - 22:5, 38:12, 119:1
**maintain** [4] - 28:25, 98:7, 136:8, 164:18
**maintained** [2] - 143:1, 145:6
**maintaining** [1] - 28:18
**maintains** [2] - 94:15,

130:23
**Maintenance** [1] - 130:23
**maintenance** [5] - 61:4, 61:10, 143:13, 145:8, 202:5
**majority** [1] - 89:3
**makeup** [2] - 25:22, 118:25
**male** [1] - 127:19
**manage** [10] - 57:20, 58:14, 61:2, 66:8, 66:10, 66:11, 106:7, 141:5, 141:10
**managed** [5] - 57:19, 123:15, 140:11, 204:24, 204:25
**management** [18] - 8:18, 8:19, 50:22, 61:4, 61:13, 61:19, 62:13, 65:6, 74:15, 96:11, 120:22, 140:24, 141:12, 143:1, 144:15, 145:2, 147:13, 185:3
**Management** [9] - 9:11, 38:4, 38:5, 73:20, 74:5, 107:15, 147:24, 148:5, 215:8
**manager** [15] - 8:8, 13:11, 13:16, 27:14, 28:1, 30:21, 49:8, 74:6, 81:4, 81:5, 92:8, 97:16, 97:17, 151:24
**manages** [2] - 147:10, 185:2
**managing** [7] - 18:21, 62:10, 65:6, 65:15, 108:13, 174:19, 185:16
**manner** [1] - 182:14
**mapped** [1] - 112:11
**Margaret** [1] - 158:7
**MARKED** [1] - 2:5
**marriage** [1] - 135:11
**Martin** [1] - 221:10
**Mary** [2] - 102:4, 113:15
**Mason** [4] - 157:21, 157:24, 206:12, 206:16
**master's** [1] - 8:16
**match** [2] - 45:4, 139:10
**matched** [1] - 171:13
**matches** [1] - 163:20
**matching** [1] - 35:4
**material** [3] - 9:5, 211:25, 217:2

**materials** [11] - 146:4, 169:16, 180:4, 180:20, 197:11, 211:13, 211:15, 211:22, 211:24, 212:3, 216:3
**matter** [3] - 38:18, 49:18, 165:6
**maximum** [2] - 82:13, 136:24
**Mayor** [15] - 19:22, 40:5, 46:17, 46:23, 47:12, 47:15, 47:24, 48:13, 48:17, 48:20, 48:24, 49:1, 70:18, 136:20, 158:7
**mayor** [1] - 19:6
**Mayor's** [1] - 14:2, 17:16, 26:25, 38:3, 39:23, 39:24, 158:10, 182:4
**McFarren** [3] - 186:14, 186:15, 187:20
**McFarren's** [1] - 187:6
**MCQUITTY** [8] - 77:14, 77:16, 77:20, 78:2, 122:10, 178:7, 178:9, 179:2, 187:10
**McQuitty** [1] - 3:9
**mean** [15] - 12:1, 24:23, 34:14, 40:12, 41:1, 48:13, 53:19, 55:15, 64:17, 116:6, 131:17, 137:9, 154:21, 206:1, 217:8
**meaning** [4] - 93:5, 103:22, 107:16, 189:25
**meaningful** [1] - 196:4
**means** [4] - 14:8, 70:1, 103:19, 166:12
**measured** [1] - 195:18
**measures** [1] - 208:3
**measuring** [1] - 138:24
**mechanically** [1] - 142:13
**mechanics** [1] - 142:11
**mechanism** [8] - 32:14, 58:17, 73:7, 76:9, 93:8, 142:20, 142:24, 143:16
**mechanisms** [9] - 10:15, 45:21, 83:24, 108:3, 108:7, 108:12, 116:8, 123:17, 146:16
**median** [1] - 206:3
**medical** [4] - 109:10,

109:11
**medication** [1] - 6:22
**medium** [1] - 32:14
**meet** [7] - 21:19, 68:19, 132:23, 132:24, 135:14, 145:7, 157:18
**meeting** [15] - 16:24, 37:24, 39:25, 46:10, 51:16, 74:7, 91:22, 91:23, 92:13, 109:17, 152:3, 152:7, 152:20, 158:8, 161:22
**meetings** [20] - 37:3, 47:13, 47:15, 69:10, 69:12, 69:17, 91:20, 109:18, 157:25, 158:5, 158:8, 161:21, 180:2, 181:1, 191:10, 191:11, 206:10, 206:14, 206:20, 206:22
**meets** [3] - 36:10, 37:23, 143:12
**megaphone** [2] - 116:5, 116:9
**Melissa** [8] - 1:25, 3:22, 122:8, 178:15, 223:3, 224:2, 224:20, 225:24
**Member** [1] - 69:15
**members** [18] - 15:10, 15:17, 34:18, 69:8, 69:11, 69:17, 71:3, 74:1, 80:24, 129:1, 132:12, 135:23, 150:13, 150:20, 167:13, 188:19, 209:20, 221:15
**memorialized** [1] - 18:18
**memorializes** [1] - 18:13
**memory** [1] - 10:25
**mend** [1] - 185:6
**mental** [3] - 25:6, 136:16, 179:23
**mentioned** [1] - 79:25, 109:2, 137:25, 140:22, 144:3, 144:10, 158:13, 164:6, 188:8, 206:10, 220:14
**menu** [1] - 84:2
**merit** [1] - 70:13
**message** [3] - 95:16, 116:14, 120:23

**messages** [1] - 181:23
**Met** [1] - 206:4
**met** [4] - 10:23, 10:25, 157:1, 157:19
**methodologies** [1] - 58:2
**metric** [1] - 199:9
**metrics** [1] - 138:23
**Metro** [8] - 36:14, 89:6, 90:22, 90:23, 91:5, 113:6, 115:9, 131:10
**metropolitan** [1] - 17:8
**Metropolitan** [2] - 129:15, 191:19
**Michael** [2] - 40:4, 158:9
**microphone** [2] - 116:13, 118:2
**Microsoft** [1] - 14:17
**middle** [2] - 127:22, 177:11
**might** [59] - 5:12, 6:21, 12:9, 12:10, 21:21, 22:1, 22:12, 24:23, 28:4, 32:19, 33:19, 38:15, 39:13, 42:7, 44:24, 54:13, 54:14, 54:21, 54:22, 54:23, 57:24, 59:13, 65:21, 67:16, 70:12, 79:3, 90:9, 90:11, 94:6, 94:24, 95:21, 98:10, 101:3, 115:22, 116:12, 116:13, 119:15, 123:12, 123:21, 125:20, 128:7, 128:14, 130:19, 131:2, 134:2, 134:6, 134:15, 137:16, 141:15, 144:12, 146:9, 152:24, 163:10, 173:20, 177:19, 180:10, 188:25, 195:5
**migrate** [1] - 130:16
**Mike** [1] - 215:12
**milestones** [1] - 67:10
**Milwaukee** [1] - 17:12
**mimic** [1] - 32:19
**mind** [9] - 29:4, 78:10, 103:19, 111:10, 127:2, 133:9, 172:22, 184:7, 207:9
**mindset** [1] - 218:10
**mini** [2] - 113:9, 113:10
**minimally** [1] - 53:6

**minimum** [4] - 54:6, 200:16, 202:4
**MINNEAPOLIS** [1] - 1:15
**Minneapolis** [79] - 3:6, 3:13, 3:14, 3:20, 7:8, 8:4, 11:16, 13:21, 19:20, 20:2, 20:13, 20:17, 23:16, 24:17, 25:17, 31:14, 36:11, 36:13, 36:15, 36:16, 37:19, 38:1, 38:3, 39:3, 51:11, 51:13, 52:13, 52:18, 55:18, 56:6, 58:21, 60:11, 60:19, 66:5, 71:22, 71:24, 71:25, 72:13, 79:13, 79:22, 89:4, 91:23, 91:24, 95:10, 103:14, 105:7, 105:12, 106:13, 107:22, 119:7, 121:4, 121:14, 130:8, 130:12, 136:20, 139:11, 141:9, 143:9, 147:7, 152:17, 154:22, 157:9, 171:24, 172:20, 189:17, 190:24, 192:6, 193:10, 197:4, 199:14, 201:24, 203:24, 207:24, 209:10, 219:9, 220:21, 222:16, 224:4, 225:23
**Minneapolis's** [1] - 75:2
**MINNESOTA** [1] - 1:1
**Minnesota** [13] - 3:6, 3:14, 3:23, 20:2, 24:6, 26:18, 36:12, 79:7, 79:8, 91:25, 130:13, 207:15, 225:23
**minute** [3] - 77:19, 176:12, 178:18
**minutes** [5] - 11:9, 46:10, 77:16, 152:7, 178:9
**mischaracterizes** [1] - 22:18
**missed** [1] - 158:9
**missing** [2] - 104:16, 145:10
**misunderstandings** [1] - 85:4
**mitigate** [3] - 54:24, 125:1, 125:18, 164:19

**mixed** [1] - 127:19
**mobile** [1] - 221:23
**mobility** [2] - 110:4, 179:6
**mock** [4] - 32:10, 32:17, 33:10, 34:3
**model** [2] - 136:10, 219:19
**moderate** [1] - 60:21
**moderate-income** [1] - 60:21
**moment** [7] - 66:18, 74:8, 85:15, 85:22, 118:7, 131:21, 199:6
**Monday** [4] - 92:14, 109:17, 210:9
**money** [7] - 122:25, 127:4, 134:21, 139:9, 139:14, 139:15
**Monica** [2] - 121:16, 220:22
**month** [2] - 50:7, 194:22
**months** [3] - 82:12, 103:9, 179:18
**moratorium** [2] - 199:13, 199:17
**morning** [4] - 120:8, 126:22, 126:25, 127:25
**most** [9] - 14:10, 34:5, 49:1, 53:1, 67:3, 72:5, 93:4, 118:16, 132:8
**mostly** [2] - 59:15, 185:18
**mother** [1] - 23:23
**motorcycle** [1] - 163:14
**mounted** [1] - 116:10
**move** [53] - 7:20, 21:21, 22:6, 37:10, 38:8, 41:15, 42:5, 43:15, 47:1, 47:2, 47:4, 47:11, 49:24, 54:15, 55:2, 56:7, 56:21, 68:20, 69:1, 70:4, 102:24, 107:7, 107:24, 125:1, 131:3, 131:9, 135:17, 135:25, 137:1, 137:7, 138:8, 149:14, 149:21, 149:24, 150:6, 150:16, 150:25, 151:3, 156:16, 158:14, 159:10, 164:3, 168:17,

170:5, 186:8, 203:14, 204:5, 218:8
**moved** [17] - 8:7, 8:11, 13:20, 27:19, 29:22, 86:23, 100:9, 132:15, 140:8, 149:7, 149:8, 170:14, 170:25, 180:13, 180:14, 180:15, 212:8
**moves** [1] - 94:4
**moving** [5] - 69:4, 106:22, 153:13, 179:11, 186:12
**MS** [92] - 4:19, 6:13, 6:14, 11:25, 12:3, 12:5, 12:6, 12:7, 12:19, 12:23, 18:25, 19:1, 19:14, 21:11, 21:13, 21:15, 22:15, 22:18, 23:6, 28:8, 28:13, 28:14, 28:15, 28:25, 29:6, 29:10, 29:11, 67:17, 67:18, 67:21, 67:22, 74:20, 74:23, 75:7, 76:12, 76:22, 76:25, 77:1, 77:10, 77:14, 77:15, 77:16, 77:18, 77:20, 77:21, 77:24, 78:1, 78:2, 78:4, 92:18, 92:21, 93:23, 100:19, 101:8, 118:9, 119:25, 121:18, 121:23, 121:25, 122:2, 122:4, 122:7, 122:10, 122:11, 122:12, 122:14, 122:18, 154:11, 154:14, 178:3, 178:7, 178:9, 178:10, 178:11, 178:12, 178:13, 178:14, 178:18, 178:21, 178:23, 179:1, 179:3, 192:19, 193:1, 201:17, 201:21, 201:23, 202:7, 202:11, 202:14, 222:19, 223:2
**mu** [1] - 18:17
**multiple** [17] - 9:20, 24:18, 36:18, 45:1, 46:4, 47:5, 80:2, 98:18, 101:3, 103:11, 112:1, 127:15, 147:19, 179:18, 189:19,

213:22, 214:18
**multitude** [1] - 181:22
**munic** [1] - 17:5
**municipalities** [6] - 15:3, 15:25, 16:15, 16:19, 17:5, 17:24
**murdered** [1] - 51:5
**must** [1] - 64:9

**N**

**name** [13] - 4:21, 7:1, 7:3, 9:11, 12:18, 30:25, 31:1, 40:8, 62:17, 133:19, 183:23, 184:1
**named** [3] - 14:21, 59:23, 186:14
**names** [9] - 13:22, 30:19, 73:14, 144:7, 201:8, 203:10, 209:20, 215:10, 221:7
**Narin** [1] - 183:20
**Nation** [2] - 136:11, 136:19
**nations** [1] - 220:3
**Native** [2] - 184:12, 184:13
**Natives** [6] - 26:17, 27:5, 217:25, 218:16, 218:19
**natural** [1] - 200:2
**nature** [8] - 44:22, 52:9, 160:24, 182:3, 183:8, 187:9, 187:10, 208:13
**navigate** [2] - 53:4, 180:23
**navigated** [1] - 140:15
**near** [7] - 99:23, 100:3, 100:12, 130:15, 158:16, 190:1, 221:24
**nearby** [2] - 145:20, 190:11
**nearly** [1] - 162:21
**necessarily** [4] - 19:10, 44:6, 75:23, 80:12
**necessary** [2] - 110:9, 110:21
**need** [48] - 6:3, 6:6, 10:2, 39:20, 43:15, 49:21, 49:25, 51:16, 53:1, 53:10, 56:8, 57:23, 65:14, 70:11, 71:7, 76:20, 86:3, 90:6, 96:13, 96:14, 98:11, 106:23,

106:24, 114:15, 117:13, 118:11, 119:10, 119:15, 119:17, 119:24, 124:13, 131:16, 142:16, 142:18, 142:19, 145:9, 145:10, 161:24, 168:16, 172:8, 178:5, 185:13, 193:22, 200:2, 200:3, 204:5, 219:20
**needed** [14] - 17:25, 56:5, 93:8, 111:20, 119:15, 153:24, 155:21, 164:18, 175:17, 209:12, 212:8, 213:2, 216:4, 221:6
**needle** [3] - 106:23, 194:4, 197:5
**needles** [4] - 99:12, 196:24, 197:1, 197:13
**needs** [16] - 25:14, 26:1, 26:2, 56:20, 58:5, 107:17, 109:10, 109:11, 109:12, 113:19, 117:2, 119:24, 123:6, 142:17, 145:17, 195:18
**negative** [3] - 78:6, 78:8, 95:21
**negotiated** [1] - 92:25
**neighbor** [1] - 194:3
**neighbor's** [1] - 200:5
**neighborhood** [6] - 38:22, 63:9, 75:22, 134:5, 191:6, 191:11
**neighborhoods** [1] - 191:23
**neighbors** [18] - 22:4, 71:5, 71:6, 71:13, 158:23, 164:12, 164:23, 189:24, 190:2, 190:5, 190:6, 190:17, 191:14, 192:13, 208:10, 218:5, 219:21
**Neloms** [1] - 1:4
**Nen** [1] - 108:16
**Nenookaasi** [83] - 59:16, 59:17, 99:16, 99:18, 99:21, 100:15, 100:17, 100:24, 101:9, 108:17, 108:23, 117:18, 117:20, 117:21, 121:15,

124:3, 124:10, 129:14, 129:16, 131:15, 131:17, 131:20, 131:24, 132:1, 133:8, 148:11, 148:14, 150:7, 150:8, 150:22, 151:3, 151:8, 155:23, 155:25, 156:1, 156:24, 156:25, 158:14, 162:11, 162:22, 164:5, 170:12, 170:15, 173:14, 177:17, 177:24, 179:7, 181:13, 181:25, 182:8, 182:14, 182:18, 188:10, 190:2, 190:3, 190:7, 191:21, 191:24, 192:11, 192:18, 197:23, 198:12, 201:3, 201:6, 202:25, 204:22, 205:4, 205:6, 205:7, 205:17, 206:14, 207:21, 209:3, 209:19, 209:22, 211:10, 215:18, 216:15, 216:16, 217:18, 218:1, 218:17
**Nenookaasis** [2] - 200:19, 206:6
**nerd** [1] - 147:17
**net** [1] - 98:2
**neutral** [1] - 192:13
**never** [3] - 24:6, 87:6, 98:19
**new** [8] - 31:11, 57:24, 58:25, 87:5, 151:12, 151:14, 208:7, 219:18
**newer** [1] - 123:3
**next** [15] - 12:19, 12:24, 38:9, 43:2, 64:2, 68:20, 89:17, 101:24, 102:18, 126:23, 137:18, 161:21, 170:6, 170:21, 184:24
**nicely** [1] - 177:23
**Nick** [1] - 171:22
**Nicole** [5] - 157:20, 157:21, 157:24, 206:12, 206:16
**night** [4] - 126:24, 127:1, 151:7, 187:21

nights [1] - 98:21
nighttime [1] - 103:10
Nimlos [1] - 215:12
NO [2] - 225:6
nobody [1] - 66:9
non [1] - 192:11
non-Nenookaasii [1] -
192:11
None [3] - 2:7, 2:16,
2:20
none [1] - 101:12
nonencampment [1] -
158:4
nonphysical [1] - 25:5
nonprofit [3] - 8:17,
95:8, 190:6
nonprofits [1] -
192:12
nonstarter [1] - 57:4
noon [2] - 6:10,
121:20
normally [1] - 86:15
norovirus [8] - 11:4,
207:7, 207:23,
208:2, 208:11,
208:17, 208:22,
209:3
NOT [1] - 2:18
Notary [1] - 3:23
notation [1] - 84:6
note [1] - 46:12
Note [1] - 4:1
noted [1] - 169:9
notes [2] - 36:7, 36:22
nothing [2] - 6:24,
220:8
notice [63] - 22:10,
22:11, 22:17, 22:22,
23:5, 50:2, 50:7,
50:10, 50:25, 53:16,
54:6, 54:9, 54:22,
55:3, 55:4, 55:8,
55:10, 55:11, 59:21,
59:22, 59:24, 60:2,
60:4, 61:14, 62:2,
62:6, 62:8, 62:21,
63:3, 63:17, 64:7,
64:9, 64:11, 69:1,
69:5, 114:15,
118:10, 131:18,
132:7, 132:18,
132:20, 133:2,
133:3, 133:10,
139:16, 139:19,
156:15, 164:7,
172:9, 172:11,
172:18, 172:21,
173:2, 173:21,
175:18, 189:7,
189:10, 189:11,

189:15, 189:18,
189:19, 203:7
Notice [1] - 3:21
noticed [4] - 4:23,
172:24, 174:5,
224:10
notices [1] - 61:21
notified [2] - 49:6,
153:5
notifies [2] - 49:14,
130:9
notify [9] - 129:22,
130:2, 130:12,
130:13, 130:20,
131:6, 131:10,
166:24, 212:19
notifying [1] - 49:18
November [1] - 103:8
nuisance [3] - 34:18,
76:1, 219:6
number [48] - 35:15,
38:19, 41:5, 41:6,
45:12, 46:19, 56:24,
57:6, 57:7, 70:23,
72:13, 84:2, 86:22,
90:3, 99:9, 102:5,
103:14, 111:3,
111:23, 111:24,
112:3, 112:6,
112:14, 112:20,
113:2, 113:16,
124:9, 127:11,
128:13, 148:20,
149:2, 149:3, 150:4,
156:18, 160:11,
165:17, 165:21,
170:3, 171:12,
171:13, 171:23,
172:1, 190:4,
193:12, 195:22,
197:17, 198:1,
205:18
numbers [3] - 148:23,
149:22, 202:9

## O

oath [2] - 4:14, 224:4
object [7] - 28:9,
74:20, 75:10, 76:23,
92:18, 100:19,
192:19
objecting [1] - 182:13
objection [9] - 18:25,
21:11, 22:18, 29:1,
67:17, 75:8, 154:11,
201:19, 202:11
OBJECTIONS [1] - 2:9
objectives [1] - 21:20
objects [2] - 86:2,

154:16
observant [1] - 165:2
observation [1] -
35:23
observe [4] - 40:24,
169:14, 179:5,
219:12
observing [1] - 168:19
obstruction [1] -
160:25
obtain [2] - 35:15,
139:16
occupancy [1] - 9:4
occupied [1] - 9:8
occurred [3] - 11:4,
26:18, 108:17
occurring [2] - 34:19,
221:22
October [3] - 7:12,
7:19, 179:19
OF [3] - 1:1, 1:15
off-record [1] - 122:9
off-site [2] - 152:5,
152:6
offenses [1] - 75:19
offer [15] - 70:20, 81:2,
84:14, 84:15, 86:10,
100:25, 102:25,
103:7, 125:9, 144:9,
186:1, 218:20,
218:25, 219:3, 219:4
offered [11] - 85:8,
86:16, 96:21,
100:17, 101:2,
101:4, 101:10,
184:18, 186:10,
199:15, 200:20
offering [10] - 81:7,
84:11, 84:19, 90:1,
101:14, 108:9,
113:13, 186:3,
186:5, 219:1
offerings [1] - 84:25
offers [5] - 79:20,
84:10, 102:17, 176:9
offhand [3] - 31:2,
62:17, 152:1
office [13] - 12:8,
12:11, 14:2, 17:16,
26:25, 38:3, 39:23,
39:24, 47:17,
111:16, 136:20,
158:10, 207:22
Office [9] - 3:13, 12:2,
12:14, 12:22, 27:11,
38:2, 80:15, 130:21,
220:20
officer [1] - 168:3
Officer [3] - 7:25,
46:24, 158:6

officers [3] - 166:13,
168:20, 174:18
offices [2] - 83:8,
205:12
offsite [1] - 147:3
often [3] - 92:11,
92:16, 128:18
Ohama [2] - 40:4,
158:9
Oker [1] - 215:15
Oklahoma [1] - 8:22
older [1] - 125:22
Olson [1] - 30:22
on-site [10] - 45:14,
98:17, 150:14,
152:4, 155:14,
155:16, 164:19,
172:20, 204:1, 208:8
once [8] - 35:20,
42:25, 46:15, 46:18,
49:7, 73:11, 82:11,
176:6
one [103] - 7:11, 7:16,
9:9, 10:15, 12:7,
17:18, 27:2, 27:15,
27:16, 38:16, 40:5,
41:7, 41:17, 55:4,
58:24, 69:24, 73:7,
79:25, 81:2, 81:20,
83:17, 85:7, 85:8,
86:4, 88:13, 88:15,
88:17, 89:16, 89:22,
90:5, 99:22, 101:4,
101:19, 103:3,
103:5, 105:24,
105:25, 106:1,
108:6, 113:19,
118:6, 123:5, 124:6,
126:5, 126:10,
126:14, 126:16,
131:5, 131:21,
132:7, 133:21,
135:10, 135:16,
137:18, 138:6,
138:12, 138:20,
139:4, 142:24,
145:6, 147:11,
147:15, 147:18,
156:18, 157:25,
158:8, 158:15,
164:6, 164:9, 165:9,
170:20, 172:22,
174:12, 176:6,
177:4, 177:6,
183:23, 190:9,
199:1, 199:4,
200:11, 200:20,
201:3, 201:4,
201:11, 201:14,
204:22, 205:4,

205:6, 205:7,
206:11, 209:14,
212:12, 213:13,
213:14, 213:15,
214:9, 220:12
one-size-fits-all [1] -
69:24
one-time [4] - 123:5,
138:6, 138:20, 139:4
OneDrive [1] - 14:18
ones [8] - 34:21,
58:13, 118:23,
121:10, 153:5,
176:4, 221:25
ongoing [5] - 86:8,
123:3, 139:5,
169:23, 194:16
online [7] - 57:10,
57:16, 57:24, 58:3,
59:1, 124:19, 151:12
open [5] - 116:15,
124:4, 124:20,
124:21, 168:8
opening [1] - 59:2
operate [10] - 29:20,
31:14, 36:10, 49:15,
49:19, 68:7, 72:15,
133:24, 140:2, 201:1
operated [3] - 68:4,
131:24, 210:21
operating [5] - 18:11,
18:14, 19:11, 21:8,
21:17, 22:14, 22:20,
31:6, 42:19, 49:16,
64:5, 66:19, 86:25,
108:13, 140:4
operation [5] - 22:2,
49:21, 59:7, 139:5
Operational [7] -
12:25, 23:9, 25:8,
25:9, 66:14, 66:16,
68:1
operational [4] -
18:24, 49:22, 117:7,
119:8
Operations [8] - 7:25,
9:19, 10:13, 13:10,
13:19, 46:23,
147:14, 158:6
operations [6] -
103:10, 110:21,
123:3, 123:4, 123:9,
125:17
operator [1] - 59:8
operators [1] - 123:10
opioid [2] - 47:25,
134:20
opportunities [1] -
70:3
opportunity [7] -

32:21, 32:22, 57:13, 168:16, 176:13, 212:21, 223:1
**Opportunity** [3] - 102:4, 113:15, 157:14
**opposed** [6] - 51:17, 52:8, 75:5, 195:9, 196:1, 215:17
**opposite** [1] - 69:3
**opposition** [1] - 156:13
**option** [4] - 84:20, 94:9, 126:23, 138:7
**options** [7] - 96:14, 102:19, 156:20, 156:23, 157:12, 157:15, 157:16
**orchestrated** [1] - 114:21
**order** [1] - 52:22
**ordered** [1] - 224:11
**orderly** [1] - 156:9
**ordinance** [9] - 24:21, 63:18, 114:14, 202:6, 203:1, 203:3, 203:4, 203:20, 212:1
**Ordinances** [6] - 20:3, 20:13, 24:17, 114:12, 143:9, 201:25
**ordinances** [6] - 23:1, 25:3, 201:15, 202:16, 202:20, 203:23
**ordinarily** [2] - 57:11, 162:1
**organ** [1] - 7:22
**organically** [1] - 27:1
**organization** [6] - 58:20, 95:9, 133:20, 133:24, 144:16, 207:2
**Organization** [1] - 133:14
**organizational** [3] - 4:23, 7:22, 48:17
**organizations** [16] - 44:4, 49:15, 103:6, 103:11, 103:22, 104:3, 104:6, 108:1, 122:22, 123:20, 129:9, 134:7, 134:12, 135:7, 138:10, 174:15
**organizers** [4] - 157:1, 157:7, 157:11, 157:19
**original** [4] - 182:8, 210:18, 223:6,

224:10
**otherwise** [8] - 47:14, 74:10, 94:14, 144:17, 154:6, 192:8, 203:12, 224:15
**ourselves** [1] - 67:5
**outbreak** [4] - 11:4, 207:7, 208:4, 209:3
**outcomes** [5] - 78:6, 78:8, 78:13, 79:2, 200:10
**outline** [2] - 20:25, 137:14
**outlined** [1] - 67:13
**outlines** [2] - 23:1, 120:8
**outreach** [40] - 25:18, 26:3, 31:18, 45:10, 45:13, 49:11, 49:16, 72:25, 91:3, 92:2, 98:15, 103:3, 103:6, 103:18, 104:3, 104:18, 105:9, 105:13, 107:13, 107:22, 108:4, 108:18, 109:1, 109:21, 110:11, 110:12, 110:15, 118:4, 121:2, 121:10, 153:4, 157:10, 161:2, 167:23, 172:19, 174:14, 176:14, 189:16, 192:1, 211:9
**Outreach** [1] - 176:10
**outreach-focused** [1] - 107:13
**outside** [21] - 12:1, 12:13, 12:21, 14:21, 15:2, 28:9, 36:7, 54:10, 71:24, 74:21, 87:5, 94:19, 111:17, 125:2, 149:22, 156:4, 156:11, 158:11, 171:8, 196:17, 196:21
**outweighs** [1] - 57:6
**overall** [9] - 18:22, 35:8, 38:20, 47:21, 58:15, 104:21, 105:5, 135:20, 172:7
**overlaps** [1] - 36:21
**oversee** [4] - 9:1, 10:16, 31:18, 118:23
**oversees** [7] - 9:2, 9:15, 10:1, 46:6, 109:25, 148:1, 152:18
**oversight** [5] - 58:7,

58:8, 65:1, 65:2, 139:2
**overview** [3] - 79:19, 90:25, 134:21
**own** [7] - 16:9, 20:2, 33:22, 47:3, 60:11, 62:5, 77:8
**owned** [28] - 22:24, 39:9, 39:10, 39:11, 39:12, 55:5, 61:8, 62:11, 62:13, 62:14, 63:15, 66:11, 91:17, 131:4, 141:8, 142:4, 142:5, 142:16, 142:18, 142:22, 143:7, 143:20, 145:3, 145:7, 146:21, 197:7, 204:23
**Owned** [1] - 13:1
**owner** [6] - 60:12, 114:5, 114:8, 141:17, 142:9, 142:17
**owner's** [1] - 143:11
**owners** [6] - 9:23, 9:24, 10:6, 197:12
**ownership** [5] - 36:23, 39:8, 39:14, 39:16, 82:9
**owns** [1] - 60:25

**P**

**p.m** [8] - 122:15, 127:23, 128:7, 128:9, 179:2, 223:5
**P.O** [2] - 3:5, 225:22
**pack** [2] - 153:8, 161:15
**package** [1] - 60:22
**packed** [1] - 153:21
**packing** [1] - 153:17
**PAGE** [2] - 2:2, 225:6
**page** [2] - 13:7, 99:19
**pages** [2] - 224:6, 225:4
**Pages** [2] - 2:11, 3:4
**pairs** [1] - 98:8
**panels** [1] - 211:3
**par** [1] - 195:1
**parameters** [13] - 21:20, 42:19, 43:10, 57:21, 58:9, 63:11, 64:5, 66:19, 66:20, 78:18, 98:5, 108:14, 182:22
**parcel** [4] - 39:21, 39:22, 141:8, 141:14
**parcels** [9] - 61:1,

61:7, 66:11, 142:16, 145:7, 197:8, 197:9, 205:23, 220:4
**Park** [5] - 36:13, 91:24, 130:12, 199:14, 199:18
**Parking** [1] - 9:11
**parking** [1] - 9:13
**part** [32] - 26:4, 30:2, 40:16, 47:9, 54:1, 56:22, 63:25, 68:14, 71:9, 86:19, 92:23, 95:3, 95:4, 103:15, 105:4, 106:12, 114:1, 130:5, 135:18, 139:22, 140:8, 150:22, 158:2, 162:1, 180:3, 180:20, 185:15, 188:5, 200:3, 211:12
**partial** [1] - 190:9
**participate** [5] - 33:10, 86:20, 91:19, 161:19, 221:15
**participated** [1] - 115:17
**participates** [1] - 91:21
**participating** [1] - 34:5
**particular** [1] - 126:5
**parties** [7] - 10:8, 129:5, 129:7, 165:1, 224:11, 224:13, 224:15
**partner** [4] - 95:25, 105:25, 110:15, 131:8
**partnered** [1] - 89:5
**partnering** [1] - 31:8
**partners** [36] - 26:3, 43:12, 43:18, 43:19, 43:24, 44:1, 44:11, 49:11, 50:22, 52:25, 56:8, 57:9, 103:4, 103:18, 103:24, 104:8, 104:13, 104:23, 105:9, 105:13, 105:14, 105:19, 105:21, 106:8, 106:17, 106:18, 106:21, 107:2, 108:4, 108:8, 109:1, 109:16, 118:4, 159:21
**partners'** [1] - 108:18
**partnership** [5] - 37:25, 107:16, 107:19, 113:8, 125:8
**partnerships** [1] -

105:1
**parts** [4] - 19:21, 45:2, 47:13, 105:22
**party** [7] - 42:13, 61:3, 141:16, 197:5, 197:10, 197:14, 224:10
**pass** [1] - 142:12
**passing** [1] - 187:20
**past** [9] - 20:6, 32:10, 57:5, 63:10, 93:17, 113:16, 125:21, 138:18, 148:16
**pastor** [1] - 62:3
**Pastor** [3] - 59:24, 60:1, 61:12
**path** [3] - 9:8, 42:23, 67:12
**pathway** [4] - 10:10, 15:18, 48:5, 48:8
**pathways** [8] - 48:19, 48:22, 91:14, 135:1, 145:19, 184:21, 218:7, 220:3
**patients** [1] - 211:4
**pattern** [1] - 174:25
**Paul** [11] - 16:17, 17:7, 31:9, 31:11, 31:13, 92:1, 92:12, 103:15, 130:14, 130:17, 130:18
**pause** [3] - 77:11, 100:13, 121:19
**pay** [7] - 87:13, 89:11, 126:17, 127:3, 127:4, 139:22, 210:8
**Peace** [4] - 129:17, 129:18, 133:17, 133:21
**peak** [1] - 148:24
**peers** [4] - 16:1, 31:8, 33:5, 36:10
**pending** [1] - 215:24
**People** [1] - 36:14
**people** [124] - 13:23, 23:7, 23:15, 24:23, 25:5, 25:15, 25:21, 27:22, 28:21, 28:23, 31:22, 32:15, 33:19, 35:7, 41:5, 45:3, 45:15, 46:5, 48:4, 51:5, 52:11, 52:14, 55:13, 55:24, 56:17, 56:23, 57:3, 57:12, 65:7, 65:11, 67:16, 67:23, 68:2, 69:25, 70:3, 73:21, 78:6, 79:21, 81:15, 88:18, 88:20, 89:7, 89:12, 93:15, 95:18, 97:7,

98:9, 98:14, 98:25, 99:3, 99:4, 99:8, 99:12, 101:1, 101:2, 101:6, 101:9, 102:10, 108:5, 108:9, 109:4, 109:5, 111:18, 112:23, 113:2, 113:18, 113:21, 115:7, 115:13, 115:19, 115:21, 117:7, 117:12, 122:22, 125:21, 128:3, 135:18, 135:20, 139:16, 143:16, 146:15, 147:19, 148:25, 149:1, 149:4, 149:5, 149:7, 149:8, 149:9, 149:11, 149:13, 149:24, 150:1, 150:6, 150:16, 151:3, 153:12, 161:6, 161:9, 162:1, 163:8, 165:18, 165:19, 166:9, 166:13, 168:12, 170:14, 181:19, 181:20, 182:13, 182:25, 183:3, 184:13, 188:20, 189:19, 189:25, 192:1, 200:1, 203:13, 204:19, 204:21, 206:21, 208:16, 219:17
**people's** [2] - 41:4, 189:6
**Peoples** [6] - 190:11, 191:17, 198:18, 198:20, 198:24, 205:8
**per** [3] - 34:10, 201:5, 201:7
**percent** [5] - 37:4, 101:6, 140:18, 206:3, 206:5
**perfect** [1] - 122:13
**performance** [1] - 104:24
**performs** [1] - 139:3
**perhaps** [1] - 33:23
**perimeter** [11] - 89:4, 152:22, 155:19, 160:7, 160:15, 166:20, 167:6, 167:7, 174:11, 174:17, 174:19
**period** [12] - 69:5, 77:6, 100:5, 128:5,

132:8, 185:1, 194:21, 199:12, 200:21, 209:17, 218:25
**peripheral** [1] - 99:5
**periphery** [1] - 45:15
**perishable** [1] - 97:13
**permitted** [2] - 20:16, 199:14
**perpetrated** [1] - 222:9
**person** [44] - 11:6, 11:11, 23:20, 27:25, 30:24, 32:5, 35:18, 35:21, 38:24, 39:1, 45:25, 46:9, 62:5, 73:11, 74:1, 83:21, 84:2, 84:3, 88:13, 88:15, 89:24, 98:19, 101:3, 117:4, 135:16, 135:17, 147:15, 155:2, 166:25, 168:6, 173:10, 183:22, 185:16, 185:24, 188:9, 188:12, 193:20, 194:2, 195:24, 196:1, 198:21, 203:3, 210:14, 212:18
**personal** [17] - 34:4, 62:5, 73:15, 74:13, 80:16, 80:21, 81:25, 82:14, 82:15, 85:14, 85:16, 89:21, 89:22, 89:23, 93:3, 99:14, 102:14
**personally** [5] - 88:5, 111:5, 125:11, 128:22, 203:20
**personnel** [6] - 49:22, 96:11, 100:24, 203:24, 203:25, 209:1
**persons** [3] - 24:25, 25:1, 224:16
**perspective** [15] - 31:19, 56:11, 65:13, 67:7, 68:3, 68:22, 94:7, 94:18, 104:7, 111:14, 162:6, 182:16, 196:9, 211:8, 212:25
**pervasiveness** [1] - 71:2
**Peter** [5] - 17:19, 17:20, 18:3, 40:3, 158:10
**Peter's** [1] - 17:22
**phase** [1] - 68:21

**Phillips** [2] - 196:24, 197:1
**phone** [13] - 16:24, 34:23, 69:7, 71:23, 84:3, 111:19, 111:22, 112:6, 112:13, 164:25, 181:23, 192:8, 199:1
**phones** [1] - 72:3
**phonetic** [1] - 59:24
**photographic** [1] - 64:12
**phrased** [1] - 202:24
**physical** [2] - 179:6, 179:23
**physically** [5] - 26:7, 56:12, 64:21, 83:21, 141:2
**pick** [1] - 107:12
**pickup** [1] - 197:6
**picture** [3] - 88:5, 183:21
**pictures** [2] - 64:10, 154:1
**piece** [2] - 48:2, 127:2
**pieces** [4] - 41:2, 89:16, 90:5, 212:13
**pilot** [1] - 29:18
**pipeline** [1] - 205:22
**pivot** [2] - 70:12, 107:18
**place** [26] - 18:7, 19:13, 25:3, 26:9, 38:9, 65:24, 82:2, 82:18, 82:21, 82:23, 83:4, 83:24, 93:9, 108:7, 132:2, 132:8, 146:4, 146:24, 195:15, 199:13, 213:11, 216:8, 216:10, 220:9, 221:24, 224:5
**placed** [5] - 146:12, 153:15, 161:14, 166:1, 175:11
**placement** [3] - 73:22, 138:19, 147:5
**places** [3] - 22:3, 94:5, 112:23
**placing** [3] - 15:20, 16:9, 160:11
**Plaintiffs** [2] - 1:6, 3:2
**plaintiffs** [1] - 4:22
**Plan** [6] - 29:16, 29:23, 30:4, 141:10, 141:20, 141:23
**plan** [10] - 6:10, 37:14, 37:15, 46:15, 46:18, 50:20, 64:7, 131:7, 205:10, 211:7

**planners** [1] - 31:17
**Planning** [26] - 8:7, 14:3, 26:23, 27:7, 37:25, 39:15, 39:17, 60:25, 62:14, 66:12, 74:24, 107:6, 141:10, 142:5, 142:9, 142:21, 144:14, 144:22, 144:25, 146:21, 151:20, 171:19, 183:24, 185:4, 190:23, 206:18
**planning** [5] - 45:6, 45:24, 59:5, 174:15, 213:3
**plans** [3] - 48:22, 56:21, 205:16
**plastic** [1] - 217:2
**plus** [10] - 72:13, 82:17, 96:11, 146:22, 146:23, 150:18, 151:11, 151:13, 172:19
**point** [13] - 66:25, 75:17, 105:11, 117:15, 138:10, 176:16, 189:12, 195:1, 199:4, 199:16, 215:1, 216:9
**points** [3] - 121:1, 125:18, 153:6
**pol** [1] - 21:2
**poles** [1] - 146:12
**poli** [3] - 19:16, 67:25, 189:17
**Police** [18] - 36:15, 38:1, 39:3, 51:11, 51:13, 52:18, 55:19, 119:7, 121:4, 152:17, 157:10, 171:24, 189:17, 190:24, 209:10, 215:7, 219:9, 220:21
**police** [49] - 27:1, 44:23, 52:2, 52:21, 69:11, 96:12, 116:9, 118:21, 119:10, 120:22, 130:8, 152:18, 152:22, 154:5, 154:22, 155:2, 160:17, 160:19, 160:20, 160:21, 160:23, 163:18, 166:13, 166:24, 167:11, 167:19, 168:3, 168:21, 168:23, 172:2, 172:4, 172:20, 173:10,

174:18, 174:20, 175:2, 181:6, 193:10, 203:25, 213:15, 213:19, 214:12, 215:5, 215:9, 220:15, 220:17, 221:3, 221:19
**policies** [21] - 18:7, 18:23, 19:4, 19:5, 19:8, 19:11, 19:12, 20:4, 20:5, 20:8, 20:11, 20:18, 20:21, 20:24, 21:3, 24:15, 24:25, 25:2, 48:14, 74:25, 182:4
**Policies** [1] - 28:17
**policing** [1] - 134:5
**Policy** [2] - 151:22, 171:21
**policy** [20] - 13:4, 14:20, 14:25, 17:18, 18:11, 18:16, 19:11, 19:16, 19:17, 20:12, 22:16, 25:8, 25:9, 40:4, 40:5, 47:16, 48:12, 48:13, 56:16, 175:7
**pollution** [2] - 197:22, 198:1
**population** [1] - 195:12
**porta** [15] - 26:9, 26:11, 199:10, 199:12, 199:15, 199:20, 199:23, 200:9, 200:18, 200:20, 200:23, 216:22, 216:24, 217:2, 218:25
**porta-potties** [11] - 26:9, 26:11, 199:10, 199:12, 199:15, 199:20, 200:9, 200:18, 200:20, 200:23, 218:25
**porta-potty** [4] - 199:23, 216:22, 216:24, 217:2
**portable** [3] - 208:6, 208:7, 216:20
**Porte** [2] - 151:22, 171:20
**portfolio** [1] - 10:1
**portfolios** [1] - 10:2
**portraying** [1] - 32:23
**position** [7] - 7:9, 27:6, 27:9, 74:16, 76:18, 77:3, 77:5
**positions** [2] - 27:12,

27:19
**positive** [13] - 64:20, 72:10, 95:11, 95:12, 95:19, 112:15, 112:17, 140:18, 144:13, 158:1, 158:11, 192:14, 207:13
**possessions** [1] - 141:3
**possible** [10] - 5:5, 10:9, 15:15, 18:2, 48:4, 70:3, 110:22, 110:23, 168:9, 175:17
**possibly** [3] - 61:1, 61:2, 79:7
**post** [7] - 62:2, 63:4, 64:9, 161:21, 173:19, 215:23
**posted** [9] - 22:25, 64:10, 133:4, 172:19, 173:7, 174:7, 189:16, 203:7
**posting** [4] - 61:6, 61:20, 132:21, 140:23
**potential** [7] - 32:2, 33:17, 152:23, 205:20, 213:23, 214:18, 214:23
**potentially** [4] - 42:23, 163:7, 177:2, 207:6
**potties** [11] - 26:9, 26:11, 199:10, 199:12, 199:15, 199:20, 200:9, 200:18, 200:20, 200:23, 218:25
**potty** [4] - 199:23, 216:22, 216:24, 217:2
**power** [1] - 42:2
**PowerPoint** [2] - 152:13, 180:4
**PowerPoint-style** [1] - 152:13
**practice** [3] - 18:12, 20:25, 60:24
**pre** [2] - 26:12, 34:24
**preceding** [1] - 225:4
**precinct** [2] - 168:4, 222:3
**Precinct** [1] - 190:25
**precincts** [3] - 69:11, 221:5, 221:21
**precipitated** [5] - 7:20, 50:14, 164:10, 164:21, 211:5
**precise** [1] - 5:1

**predated** [1] - 107:7
**predicate** [5] - 22:12, 22:23, 54:8, 66:22, 98:10
**predict** [1] - 5:12
**predominantly** [1] - 34:24
**preface** [1] - 111:13
**prefer** [1] - 147:22
**preference** [1] - 6:16
**premise** [2] - 15:22, 153:22
**preparation** [4] - 120:5, 120:6, 180:20, 208:15
**prepare** [2] - 10:22, 222:10
**prepared** [4] - 137:9, 152:11, 152:14, 215:10
**prepares** [1] - 152:15
**preparing** [1] - 10:19
**prerecorded** [1] - 116:12
**presence** [10] - 35:21, 75:20, 95:20, 119:18, 164:18, 171:5, 171:6, 195:4, 196:24, 208:11
**PRESENT** [1] - 3:9
**present** [63] - 26:7, 26:12, 54:11, 54:12, 60:3, 61:12, 62:1, 64:21, 67:5, 67:6, 71:12, 71:19, 75:21, 79:25, 98:4, 99:10, 109:6, 113:2, 113:7, 114:24, 117:15, 117:21, 117:24, 118:2, 118:17, 124:9, 130:5, 147:2, 151:16, 151:19, 151:21, 152:2, 155:16, 158:8, 158:9, 158:13, 162:5, 162:16, 165:4, 165:7, 165:8, 171:16, 171:18, 171:20, 171:25, 175:21, 176:5, 176:7, 179:16, 179:18, 180:13, 180:19, 180:22, 183:6, 186:2, 204:17, 206:17, 210:15, 212:16, 213:25, 214:6, 219:11
**presented** [3] - 136:22, 152:14,

180:11
**presenting** [1] - 32:24
**presently** [2] - 196:22, 206:23
**presents** [1] - 89:1
**preserve** [4] - 54:16, 193:22, 193:23, 212:21
**pressure** [1] - 122:2
**pretty** [3] - 34:10, 57:3, 114:21
**prevent** [5] - 10:9, 143:14, 143:16, 146:15, 212:8
**prevention** [1] - 48:2
**Prevention** [5] - 36:16, 44:23, 133:14, 191:1, 203:25
**previous** [4] - 7:23, 57:5, 194:21, 194:23
**previously** [4] - 23:8, 23:10, 40:3, 41:21
**preying** [3] - 195:11, 195:16, 196:18
**primarily** [8] - 17:6, 31:4, 39:16, 69:9, 73:24, 85:7, 121:4, 123:15
**primary** [4] - 79:1, 91:4, 136:2, 199:24
**principals** [1] - 140:14
**priorities** [1] - 42:7
**prioritize** [1] - 41:25
**Priority** [3] - 193:18, 193:21
**priority** [2] - 38:15, 42:11
**private** [10] - 55:7, 63:14, 91:16, 114:5, 129:8, 141:14, 144:12, 197:8, 197:9, 197:12
**privately** [2] - 39:10, 142:18
**pro** [1] - 62:24
**problems** [1] - 32:24
**procedural** [1] - 207:5
**Procedural** [2] - 152:16, 220:20
**PROCEDURE** [1] - 225:21
**procedure** [3] - 28:20, 49:4, 215:16
**procedures** [3] - 28:17, 75:2, 181:5
**proceed** [2] - 50:24, 51:18
**proceedings** [2] - 4:10, 5:2
**process** [31] - 15:21,

20:19, 20:21, 20:25, 21:6, 47:13, 54:1, 67:15, 68:9, 70:14, 88:1, 95:24, 96:3, 97:9, 109:22, 113:12, 114:1, 115:20, 116:24, 124:15, 136:1, 150:9, 150:18, 152:25, 156:9, 161:18, 162:24, 163:19, 168:9, 203:2, 214:13
**processes** [2] - 108:8, 181:5
**procure** [1] - 146:3
**procured** [1] - 87:1
**procurement** [1] - 96:3
**products** [1] - 147:11
**Professional** [1] - 224:21
**profile** [1] - 119:22
**profusely** [1] - 198:22
**program** [4] - 13:12, 45:11, 138:21, 138:25
**programs** [1] - 9:17
**progress** [5] - 9:8, 78:22, 165:19, 166:10, 175:16
**Project** [2] - 3:5, 225:22
**project** [2] - 8:19, 205:9
**projects** [2] - 145:18, 147:3
**promotion** [1] - 7:24
**prompted** [1] - 55:25
**prompting** [2] - 130:17, 130:18
**promptly** [1] - 22:6
**prompts** [3] - 50:17, 51:3, 51:7
**pronouns** [1] - 6:17
**proof** [2] - 82:9
**propane** [2] - 163:16, 177:8, 212:6
**Properties** [1] - 13:1
**properties** [24] - 10:2, 18:9, 60:13, 60:17, 60:20, 61:8, 62:11, 62:14, 63:15, 65:18, 66:8, 130:11, 142:18, 142:22, 142:25, 143:7, 143:23, 145:3, 145:21, 146:21, 148:4, 199:18, 204:23, 205:2

**Property** [2] - 130:22, 147:8
**property** [84] - 9:3, 9:24, 10:5, 10:6, 23:2, 24:20, 26:19, 30:15, 36:23, 39:8, 39:9, 39:10, 39:11, 39:12, 55:6, 55:7, 60:12, 60:15, 61:3, 61:9, 61:13, 61:18, 62:12, 62:23, 63:2, 63:14, 65:5, 65:7, 65:12, 65:15, 71:5, 82:7, 91:16, 91:17, 93:13, 114:3, 114:5, 114:6, 114:7, 114:8, 114:13, 131:4, 141:11, 141:16, 142:1, 142:3, 142:9, 142:16, 142:19, 142:25, 143:11, 143:12, 143:13, 143:17, 143:18, 143:20, 144:13, 144:15, 145:2, 145:5, 145:8, 145:12, 148:2, 158:20, 163:7, 166:11, 166:16, 170:22, 171:8, 171:9, 172:23, 177:22, 177:25, 185:3, 185:6, 186:12, 189:14, 197:12, 199:15, 200:6, 202:4
**proposal** [6] - 102:23, 135:24, 136:21, 138:2, 138:5, 138:13
**proposals** [3] - 96:4, 101:24, 137:24
**proposed** [1] - 29:25
**prosecuting** [1] - 203:11
**protocol** [1] - 175:1
**prove** [1] - 29:19
**provide** [80] - 10:7, 10:10, 22:10, 22:21, 29:18, 30:9, 33:7, 35:10, 43:12, 43:13, 43:16, 44:4, 44:25, 45:11, 45:16, 48:1, 54:4, 54:8, 54:22, 55:3, 55:7, 55:9, 59:24, 60:2, 61:5, 62:6, 62:8, 63:19, 64:3, 64:4, 64:11, 69:1, 70:2, 72:11, 72:20, 73:5, 76:17, 76:19, 79:24, 82:3,

82:8, 95:18, 95:19,
102:7, 103:9,
103:12, 106:16,
106:21, 107:11,
107:19, 108:18,
109:19, 113:3,
113:4, 114:19,
118:14, 121:11,
122:21, 122:22,
137:2, 145:19,
167:4, 167:16,
175:17, 184:15,
189:18, 197:10,
197:11, 199:10,
199:23, 203:17,
205:14, 209:4,
211:14, 214:8,
219:13, 219:14,
222:4
**provided** [30] - 14:6,
14:9, 14:10, 18:1,
39:20, 60:4, 83:19,
88:4, 89:9, 106:5,
108:25, 113:14,
118:15, 122:25,
123:5, 125:7,
125:12, 132:6,
139:10, 140:10,
172:9, 172:11,
199:11, 199:20,
200:18, 200:22,
208:8, 208:14,
211:24, 212:13
**provider** [7] - 43:24,
44:1, 59:2, 103:13,
112:2, 124:14,
124:24
**Provider** [1] - 123:8
**providers** [23] - 45:10,
49:6, 50:3, 72:14,
73:3, 73:19, 102:2,
110:11, 110:19,
111:25, 118:5,
129:25, 131:19,
132:6, 133:10,
152:21, 164:7,
167:13, 175:18,
175:21, 175:24,
176:3, 189:8
**provides** [2] - 59:22,
148:7
**providing** [21] - 17:23,
50:10, 54:5, 54:21,
55:4, 55:10, 56:12,
58:13, 61:14, 61:19,
62:20, 64:7, 69:4,
115:12, 116:3,
116:23, 145:19,
150:20, 189:23,
200:8, 204:5

**provision** [1] - 188:9
**proximity** [6] - 63:8,
101:20, 112:24,
119:3, 130:10,
131:11
**PTSD** [1] - 31:22
**Public** [22] - 3:23, 8:5,
26:24, 36:15, 38:1,
39:2, 44:23, 119:13,
141:5, 141:9,
141:14, 144:4,
144:10, 145:14,
146:2, 146:3,
146:23, 147:5,
154:4, 169:17,
183:25, 209:9
**public** [30] - 8:17,
16:3, 16:20, 16:21,
17:9, 21:24, 22:3,
33:18, 38:13, 41:21,
41:22, 44:18, 50:15,
50:16, 52:11, 53:9,
146:20, 170:23,
193:23, 197:6,
197:7, 197:18,
199:25, 200:9,
200:12, 221:16,
222:6
**public-facing** [5] -
16:3, 16:20, 16:21,
17:9, 44:18
**publicly** [2] - 18:19,
197:7
**pull** [2] - 15:23, 41:4
**purpose** [11] - 20:16,
57:25, 88:21, 88:22,
134:22, 143:8,
143:10, 153:7,
200:7, 202:2, 220:5
**purposes** [4] - 46:25,
82:6, 141:24, 202:1
**pursuant** [1] - 3:21
**push** [1] - 118:11
**Push** [2] - 129:18,
133:17
**pushback** [3] - 67:15,
68:25, 69:2
**put** [10] - 24:7, 75:5,
86:6, 94:1, 97:17,
119:5, 119:7, 142:1,
185:7, 201:19
**putting** [3] - 141:1,
141:21, 143:8
**puzzle** [1] - 102:14

**Q**

**qualified** [1] - 224:3
**qualifying** [1] - 136:2
**quality** [7] - 47:7,

158:23, 158:24,
210:25, 211:8, 224:7
**quantify** [1] - 190:4
**quantity** [1] - 102:11
**questioning** [1] - 75:8
**questions** [13] - 5:7,
12:25, 15:14, 16:23,
79:16, 100:14,
112:2, 115:23,
137:13, 170:10,
176:12, 209:16
**quick** [2] - 164:4,
164:10
**quickly** [2] - 69:4,
71:10
**quite** [6] - 50:19, 79:6,
83:12, 155:15,
162:21, 187:25
**quotes** [1] - 90:8

**R**

**Rail** [7] - 91:6, 91:7,
91:8, 130:15,
131:12, 131:14
**rang** [1] - 112:8
**range** [1] - 222:16
**rate** [1] - 224:11
**rather** [5] - 5:8, 15:13,
24:25, 41:2, 168:12
**reach** [2] - 44:12, 72:6
**reached** [3] - 42:25,
191:15, 191:20
**reaching** [3] - 16:23,
191:4, 192:1
**reactivate** [1] - 111:1
**read** [4] - 187:18,
223:3, 225:4, 225:4
**ready** [3] - 48:11,
53:10, 170:5
**real** [2] - 50:18, 196:19
**real-time** [1] - 50:18
**reality** [1] - 68:17
**realize** [2] - 218:13,
222:19
**really** [24] - 14:22,
18:17, 20:12, 24:12,
37:4, 40:8, 44:16,
50:5, 51:1, 51:3,
58:12, 134:2, 137:8,
164:4, 165:20,
168:16, 172:25,
177:4, 198:4, 198:9,
203:21, 214:3,
222:20, 222:22
**REASON** [1] - 225:6
**reason** [9] - 6:5, 6:20,
30:2, 54:13, 75:25,
148:19, 167:5,
188:5, 210:18

**reasonable** [3] -
54:12, 54:20, 219:15
**reasoning** [1] - 199:23
**reassurance** [1] - 30:7
**receive** [23] - 31:21,
31:25, 64:1, 68:25,
69:9, 69:14, 70:7,
90:17, 97:11, 97:12,
107:20, 115:13,
129:4, 129:14,
139:16, 139:19,
183:5, 189:19,
190:14, 197:22,
221:18, 221:21
**received** [17] - 69:19,
89:13, 129:19,
181:22, 183:10,
185:24, 186:17,
186:18, 186:22,
187:3, 187:23,
188:2, 207:12,
207:13, 207:17,
210:20, 211:20
**receives** [1] - 198:2
**receiving** [7] - 58:14,
184:23, 186:13,
186:15, 188:8,
188:14, 189:9
**recent** [1] - 125:25
**recently** [1] - 49:1
**Recess** [3] - 78:3,
122:15, 179:2
**recharacterize** [1] -
130:4
**reclaim** [1] - 220:4
**recognize** [4] - 70:3,
89:1, 134:24, 204:13
**recognized** [2] -
124:7, 124:13
**recognizing** [5] -
42:10, 132:7,
148:19, 190:6,
211:25
**recollect** [1] - 160:9
**recollection** [6] - 18:5,
59:12, 132:19,
150:8, 157:20,
216:25
**recommendation** [3] -
52:19, 52:20, 52:24
**recommendations** [4]
- 42:17, 69:18,
106:16, 211:15
**record** [12] - 5:1, 5:13,
7:2, 84:5, 84:9,
94:15, 94:20, 94:21,
94:24, 122:9,
137:16, 204:17
**recording** [1] - 116:20
**records** [1] - 225:23

**recovered** [1] - 163:20
**recovery** [2] - 48:5,
170:22
**Recreation** [4] -
36:13, 91:24,
130:12, 199:14
**recreational** [1] -
212:2
**recycle** [1] - 87:18
**Recycling** [4] - 87:18,
151:23, 171:22,
209:9
**Red** [7] - 135:23,
136:11, 136:19,
138:12, 138:15,
150:20
**redevelop** [2] - 60:21,
60:22
**redeveloped** [1] -
60:23
**reemphasize** [1] -
176:15
**refer** [1] - 168:22
**reference** [4] - 22:25,
55:13, 129:8, 173:6
**referenced** [2] - 21:9,
23:9
**referencing** [2] -
173:7, 173:11
**referring** [6] - 12:9,
12:10, 37:17, 104:5,
181:14, 182:8
**reflected** [1] - 169:7
**refresh** [1] - 10:24
**Reg** [1] - 80:18
**regard** [2] - 74:14,
165:17
**regarding** [6] - 28:18,
75:2, 131:15,
188:12, 213:12,
216:11
**regardless** [1] - 67:14
**regards** [6] - 107:11,
108:17, 118:3,
133:7, 160:7,
166:19, 174:11,
179:11, 189:7
**Registered** [1] -
224:21
**regular** [5] - 16:16,
71:19, 121:6,
161:20, 167:22
**regularly** [1] - 155:1
**regulations** [1] - 9:13
**Regulatory** [17] - 7:6,
7:10, 7:15, 7:17,
7:19, 7:24, 8:11,
19:25, 27:14, 27:25,
80:4, 80:19, 107:8,
143:5, 147:12,

183:23, 187:21
**rehab** [1] - 87:18
**reinforce** [1] - 176:8
**reiterate** [1] - 185:11
**rel** [1] - 115:2
**relapsed** [1] - 171:5
**relate** [3] - 24:15, 28:12, 37:6
**related** [1] - 74:25
**relates** [3] - 24:19, 123:10, 126:5
**relating** [1] - 39:4
**relation** [1] - 172:6
**relations** [1] - 136:19
**relationship** [6] - 44:7, 44:9, 44:11, 46:5, 103:21, 106:12
**relationships** [3] - 106:8, 108:13, 167:23
**relative** [7] - 76:18, 90:10, 115:2, 194:20, 194:22, 224:13, 224:13
**relatively** [1] - 169:24
**relayed** [2] - 188:11, 199:2
**released** [1] - 128:10
**releasing** [1] - 82:5
**relevant** [5] - 8:14, 136:12, 150:21, 184:16, 217:17
**religious** [2] - 123:20, 123:23
**remain** [2] - 98:4, 138:18
**remained** [3] - 113:11, 169:4, 215:23
**remaining** [2] - 67:12, 125:2
**remains** [1] - 214:6
**remember** [31] - 6:21, 13:14, 14:8, 17:4, 17:20, 23:18, 59:11, 59:23, 107:3, 132:17, 138:14, 148:24, 151:16, 156:11, 163:21, 163:23, 163:24, 172:15, 183:21, 186:13, 186:15, 187:6, 187:11, 187:12, 187:14, 191:13, 201:8, 201:10, 201:13, 207:7, 215:14
**remind** [1] - 164:8
**reminder** [1] - 29:14
**Remote** [1] - 3:23
**remote** [1] - 4:6

**removal** [3] - 61:5, 65:10, 199:25
**remove** [1] - 65:9
**removed** [7] - 53:12, 133:5, 169:5, 176:23, 177:25, 178:2
**removing** [2] - 141:2, 153:25
**rental** [2] - 9:3, 9:24
**renter** [1] - 10:4
**renters** [1] - 10:4
**reoccupying** [1] - 146:15
**repair** [1] - 145:9
**repairing** [1] - 86:21
**repairs** [1] - 86:18
**repeat** [2] - 108:6, 186:21
**rephr** [1] - 29:4
**rephrase** [2] - 15:5, 76:20
**replaced** [1] - 133:5
**replacing** [1] - 149:9
**report** [7] - 35:20, 63:21, 165:3, 211:17, 211:20, 215:4, 215:10
**reported** [8] - 1:25, 25:19, 34:17, 124:8, 149:23, 151:11, 163:8, 199:6
**REPORTER** [2] - 178:17, 178:20
**reporter** [3] - 5:1, 6:5, 224:3
**Reporter** [2] - 122:9, 224:21
**Reporter's** [1] - 4:1
**REPORTER'S** [1] - 2:22
**reporter's** [1] - 5:5
**reporting** [5] - 4:7, 79:11, 107:15, 110:13, 151:14
**reports** [4] - 79:10, 152:10, 163:16, 207:23
**represent** [5] - 4:21, 12:8, 39:14, 65:23, 66:2
**representation** [2] - 12:13, 190:21
**representations** [1] - 198:10
**representative** [9] - 26:23, 26:24, 38:3, 64:18, 91:19, 114:8, 119:16, 156:14, 172:3

**representatives** [11] - 11:22, 14:2, 39:2, 39:13, 39:17, 119:16, 120:9, 129:15, 158:5, 190:25, 209:22
**represented** [7] - 11:18, 12:21, 92:8, 95:11, 158:2, 162:9, 190:13
**request** [5] - 52:5, 102:22, 129:7, 138:2, 157:6
**REQUEST** [1] - 2:14
**requested** [2] - 208:7, 224:9
**requests** [8] - 96:4, 119:20, 129:4, 129:14, 129:20, 137:24, 192:7, 192:17
**require** [3] - 110:6, 138:17, 161:6
**required** [5] - 25:1, 53:3, 88:4, 119:11, 119:12
**requirement** [5] - 82:10, 93:17, 94:3, 166:6, 166:9
**requirements** [5] - 93:24, 123:15, 123:21, 138:22
**requires** [1] - 52:25
**requiring** [1] - 22:16
**Rescue** [8] - 29:16, 29:23, 30:4, 59:20, 105:2, 141:20, 141:23, 151:12
**rescue** [1] - 9:17
**resecure** [1] - 119:13
**reservation** [6] - 126:6, 126:9, 126:18, 128:3, 128:4, 128:9
**reservations** [1] - 126:15
**reserve** [5] - 58:19, 58:21, 59:8, 111:4, 126:23
**reserved** [3] - 127:17, 127:18, 127:25
**reserves** [1] - 127:11
**reserving** [1] - 58:17
**reside** [2] - 198:5, 220:20
**resident** [15] - 65:11, 75:24, 159:7, 159:8, 161:2, 167:25, 168:2, 179:5, 193:19, 193:25,

195:9, 195:16, 195:17, 196:1, 202:25
**residential** [4] - 170:20, 190:5, 190:10, 190:16
**residents** [66] - 30:10, 53:17, 53:19, 54:17, 58:18, 59:25, 61:22, 65:21, 96:22, 100:17, 101:9, 120:14, 121:3, 121:9, 124:11, 130:1, 132:12, 132:17, 133:1, 139:22, 151:8, 153:16, 153:18, 156:19, 159:16, 160:12, 161:15, 162:12, 164:8, 164:12, 165:15, 166:22, 167:9, 170:3, 171:13, 172:9, 175:14, 175:23, 177:18, 178:2, 181:15, 189:7, 190:15, 191:2, 191:8, 191:23, 192:11, 193:15, 193:16, 195:24, 201:15, 202:17, 203:1, 203:22, 206:14, 211:10, 211:22, 212:10, 212:20, 212:25, 213:6, 218:4, 219:21, 221:13
**residents'** [1] - 179:22
**residing** [5] - 53:20, 71:12, 76:14, 77:7
**resistance** [1] - 68:25
**resolution** [1] - 46:14
**resolve** [3] - 10:7, 22:6, 195:21
**resort** [1] - 60:13
**resource** [1] - 141:18
**resources** [12] - 38:20, 43:17, 53:10, 56:12, 72:21, 72:23, 73:5, 73:8, 102:15, 108:25, 119:9, 119:10
**respect** [27] - 11:2, 15:12, 20:8, 21:17, 24:19, 34:20, 38:19, 47:16, 47:25, 70:16, 92:23, 109:21, 117:18, 121:20, 122:25, 126:15,

131:25, 134:8, 144:22, 156:25, 165:15, 181:14, 184:4, 185:2, 191:20, 196:25, 221:23
**respond** [8] - 5:7, 12:20, 29:8, 51:23, 69:18, 109:12, 184:19, 193:17
**responded** [1] - 212:10
**responders** [1] - 34:2
**responding** [7] - 5:11, 34:17, 34:22, 37:2, 37:5, 85:24, 207:1
**responds** [2] - 25:4, 196:6
**response** [62] - 9:6, 10:15, 10:17, 13:12, 17:14, 18:22, 20:8, 27:16, 27:17, 31:5, 31:6, 33:6, 33:21, 34:23, 35:9, 47:25, 51:7, 51:23, 55:25, 56:5, 58:16, 68:8, 69:13, 70:16, 70:22, 71:9, 93:5, 93:6, 93:14, 109:21, 130:17, 130:19, 132:11, 134:4, 134:9, 140:17, 140:20, 145:1, 145:23, 154:23, 155:18, 181:13, 183:2, 184:15, 186:4, 191:12, 195:14, 195:19, 198:7, 207:1, 208:4, 211:5, 213:7, 216:18, 217:18, 217:20, 218:15, 219:14, 221:1, 221:17
**Response** [89] - 10:14, 13:1, 23:8, 25:17, 26:14, 26:15, 27:16, 27:23, 27:24, 28:1, 28:2, 28:4, 29:16, 30:22, 30:23, 31:18, 33:10, 34:7, 34:9, 34:16, 34:21, 35:17, 36:9, 37:1, 37:11, 38:25, 40:20, 41:9, 41:14, 44:22, 49:9, 71:16, 71:18, 72:1, 72:22, 72:24, 73:7, 73:9, 73:17, 73:24, 74:2, 74:4, 74:11, 74:12, 80:1,

80:24, 84:10, 84:15,
85:9, 85:17, 88:9,
89:10, 89:18, 90:2,
90:15, 90:19, 91:15,
91:23, 92:7, 92:8,
92:13, 96:21, 96:24,
97:2, 97:24, 99:1,
100:18, 100:23,
101:11, 101:17,
103:25, 109:3,
109:16, 114:23,
115:4, 119:17,
119:19, 121:7,
150:12, 151:25,
157:8, 174:19,
176:7, 186:2, 194:2,
203:24, 209:8,
218:19, 220:16
**responses** [1] - 51:11
**responsibilities** [2] -
8:24, 8:25
**responsibility** [6] -
73:18, 108:12,
143:12, 185:14,
193:21
**responsible** [5] - 44:2,
107:2, 144:17,
185:16, 197:5
**responsive** [5] -
25:14, 144:21,
193:13, 194:9,
194:13
**rest** [2] - 14:19, 212:19
**restate** [1] - 67:18
**restating** [1] - 29:5
**restrictions** [3] - 4:6,
153:11, 153:15
**result** [1] - 171:5
**retain** [2] - 32:15,
225:23
**retained** [1] - 154:17
**retrieve** [2] - 81:24,
83:22
**return** [4] - 114:16,
117:9, 117:10
**RETURN** [1] - 225:21
**Return** [1] - 225:22
**returned** [2] - 24:4,
62:3
**returning** [1] - 145:12
**revenue** [3] - 30:12,
95:13, 136:9
**revenue-generating**
[1] - 95:13
**review** [5] - 11:2,
14:11, 139:8,
140:12, 224:9
**reviewed** [2] - 14:1,
17:16
**reviewing** [4] - 16:20,

16:21, 17:22, 139:12
**revisit** [1] - 43:20
**revisiting** [1] - 122:20
**riddle** [1] - 104:10
**ride** [3] - 89:25, 90:17,
114:25
**right-of-way** [1] -
197:7
**rights** [1] - 23:2
**ring** [2] - 163:12,
163:13
**riprap** [1] - 146:11
**rising** [1] - 98:10
**risk** [17] - 10:12, 16:9,
22:5, 50:15, 50:16,
52:10, 54:21, 54:24,
55:21, 66:23, 71:13,
125:2, 127:8, 131:2,
132:25, 208:22,
212:3
**risks** [1] - 32:2
**Ritchie** [2] - 11:1,
207:12
**Roberta** [1] - 1:4
**robot** [1] - 84:2
**robust** [3] - 17:14,
18:2, 102:24
**Roger** [1] - 210:12
**role** [5] - 7:14, 8:1,
9:1, 145:4, 162:5
**roll** [27] - 118:16,
118:17, 118:19,
120:1, 120:3, 120:8,
120:16, 121:14,
148:11, 152:3,
152:5, 152:7,
152:11, 153:11,
153:14, 160:1,
160:5, 160:6,
160:10, 165:11,
165:13, 165:14,
174:10, 179:21,
179:25, 181:1, 181:4
**Room** [1] - 3:14
**root** [2] - 65:9, 196:7
**roughly** [1] - 83:2
**route** [1] - 112:11
**routed** [1] - 187:5
**routine** [1] - 148:8
**routinely** [2] - 86:7,
110:18
**rove** [1] - 61:7
**RPR** [4] - 1:25, 3:22,
224:2, 225:24
**rubble** [5] - 146:1,
146:2, 146:6,
146:12, 147:2
**RULE** [2] - 1:14, 225:1
**Rule** [6] - 3:20, 4:24,
223:4, 224:4, 224:8,

224:11
**rules** [2] - 123:11,
123:14
**run** [2] - 131:21, 211:2
**running** [2] - 133:8,
159:5

## S

**safe** [15] - 22:1, 32:22,
47:7, 75:15, 77:4,
77:6, 80:10, 90:8,
90:9, 90:14, 114:25,
145:19, 200:15
**safekeeping** [1] - 86:6
**safer** [1] - 77:3
**safety** [24] - 21:24,
22:3, 38:13, 41:22,
50:15, 54:16, 54:25,
62:5, 69:13, 71:13,
76:18, 132:25,
135:4, 171:9,
191:10, 191:12,
193:23, 193:24,
208:3, 211:16,
212:22, 212:24,
221:16, 222:6
**Sagataw** [2] - 1:3,
225:2
**Saint** [5] - 31:9, 31:11,
92:1, 130:14, 130:18
**salt** [1] - 182:10
**Sanitation** [1] - 201:14
**Sarff** [2] - 3:12, 11:23
**SAS** [1] - 201:10
**sat** [1] - 113:11
**saw** [4] - 15:9, 135:13,
179:17, 179:19
**scan** [1] - 45:15
**scenario** [1] - 127:10
**scene** [1] - 155:14
**schedule** [2] - 200:24,
201:1
**scheduled** [1] -
174:15
**scheduling** [1] - 16:24
**school** [1] - 24:2
**scope** [5] - 28:9,
74:21, 105:19,
105:20, 106:1
**scope-of-services** [1]
- 105:19
**scopes** [1] - 123:18
**scrapes** [1] - 148:7
**screen** [1] - 76:5
**screening** [2] -
150:15, 207:19
**script** [4] - 116:19,
116:25, 117:2, 117:6
**scripting** [2] - 152:23,

153:3
**scripts** [1] - 152:10
**seal** [1] - 224:17
**seals** [1] - 64:17
**searches** [1] - 94:1
**Seattle** [1] - 17:12
**second** [20] - 9:10,
17:7, 27:9, 73:12,
80:14, 85:2, 100:13,
101:20, 126:20,
127:22, 158:14,
162:10, 162:16,
163:22, 174:6,
177:9, 183:24,
201:13, 201:14,
210:13
**section** [1] - 209:14
**sector** [1] - 168:4
**secure** [3] - 142:19,
143:19, 143:20
**securing** [1] - 143:14
**security** [4] - 143:16,
159:2, 173:18,
219:11
**see** [47] - 11:23, 13:15,
15:25, 17:10, 18:20,
26:6, 26:16, 28:5,
28:16, 31:23, 44:19,
45:19, 47:17, 54:2,
54:3, 55:2, 57:2,
65:19, 65:21, 67:7,
77:11, 90:11, 92:11,
93:19, 96:16, 96:19,
99:11, 100:13,
104:7, 104:8, 109:8,
125:25, 131:7,
138:7, 159:22,
163:9, 174:24,
178:4, 179:13,
179:16, 179:20,
187:9, 194:19,
195:2, 205:13,
217:10, 217:11
**seeing** [10] - 27:3,
40:19, 47:19, 51:4,
70:23, 71:2, 177:15,
179:8, 187:11,
211:14
**seek** [5] - 18:1, 48:5,
60:16, 143:25, 195:5
**seeking** [1] - 15:4
**segments** [1] - 27:17
**select** [1] - 106:18
**selecting** [1] - 95:24
**selects** [2] - 105:8,
106:11
**send** [2] - 46:16, 91:18
**sense** [12] - 6:9,
12:17, 85:6, 100:15,
136:23, 137:16,

149:11, 154:8,
154:15, 155:7,
162:19, 170:16
**sensitivity** [1] - 15:19
**sent** [3] - 140:3,
187:15, 210:17
**separate** [10] - 19:20,
84:24, 84:25, 91:21,
94:23, 135:15,
144:24, 149:16,
192:23
**separated** [2] - 187:2,
188:6
**separation** [1] - 188:5
**September** [1] - 69:16
**sequestered** [1] - 41:3
**sergeant** [2] - 167:21,
220:23
**Sergeant** [2] - 215:12,
221:9
**series** [3] - 55:1,
69:16, 212:5
**served** [2] - 7:10, 7:17
**serves** [1] - 9:21
**Service** [4] - 26:3,
103:21, 134:14,
135:7
**service** [34] - 9:22,
43:24, 43:25, 44:4,
45:9, 49:6, 49:11,
49:15, 50:3, 61:20,
72:14, 73:3, 73:19,
102:2, 103:6, 103:7,
113:5, 118:5,
129:25, 131:19,
132:6, 133:10,
152:21, 159:21,
164:7, 167:13,
175:18, 175:21,
175:23, 176:2,
189:7, 192:7, 219:3,
219:4
**serviced** [3] - 200:24,
201:4, 201:6
**Services** [31] - 7:6,
7:11, 7:15, 7:16,
7:17, 7:19, 7:24, 8:9,
8:11, 8:12, 9:2, 11:3,
19:25, 27:14, 27:25,
80:4, 80:19, 107:8,
134:14, 134:24,
143:5, 147:12,
159:22, 183:23,
187:21, 210:11,
211:6, 212:23
**services** [35] - 9:16,
30:9, 35:10, 39:20,
44:25, 73:6, 81:7,
81:22, 86:20,
105:19, 105:20,

108:9, 108:19,
110:15, 110:24,
117:3, 117:12,
136:10, 136:13,
137:2, 144:4, 144:8,
150:21, 167:4,
169:21, 176:9,
186:5, 192:17,
192:24, 204:6,
205:14, 205:15,
218:21, 219:2
**servicing** [1] - 200:8
**sessions** [3] - 69:13,
69:20, 70:10
**set** [21] - 19:10, 19:16,
21:20, 38:10, 57:21,
60:23, 63:9, 63:18,
68:24, 92:24, 117:6,
154:19, 154:21,
164:16, 174:17,
177:2, 177:5, 182:7,
200:17, 206:4,
208:19
**sets** [1] - 208:7
**setting** [4] - 155:19,
163:17, 213:3, 224:8
**settings** [1] - 190:8
**settlement** [1] -
134:20
**setup** [4] - 32:10,
32:17, 35:8, 63:7
**setups** [2] - 33:11,
34:3
**seventeen** [1] - 88:12
**several** [2] - 154:13,
222:21
**severe** [1] - 50:16
**Sewers** [1] - 8:6
**sex** [1] - 76:8
**shapes** [1] - 32:7
**Sharda** [1] - 3:11
**sharda.enslin@
minneapolismn.
gov** [1] - 3:15
**share** [6] - 16:4, 16:5,
17:1, 99:7, 197:3,
217:17
**shared** [12] - 14:10,
17:23, 36:4, 36:7,
40:21, 41:8, 46:22,
46:23, 71:21, 99:1,
109:24, 222:24
**SharePoint** [1] - 14:18
**sharing** [4] - 16:9,
24:10, 36:24, 182:25
**SHEET** [2] - 2:24,
225:1
**sheet** [2] - 72:11,
225:22
**Shelter** [2] - 105:3,

151:13
**shelter** [77] - 43:19,
44:5, 44:13, 44:17,
45:4, 45:20, 46:21,
49:24, 49:25, 56:14,
56:24, 57:7, 57:11,
59:1, 59:2, 59:6,
59:8, 59:18, 72:14,
81:4, 91:11, 91:12,
99:13, 103:7,
103:13, 104:18,
104:19, 109:23,
111:4, 111:6,
111:21, 111:25,
112:12, 113:13,
115:1, 122:19,
123:10, 123:13,
124:4, 124:7,
124:14, 124:18,
124:23, 125:1,
125:10, 125:17,
126:7, 126:11,
126:12, 126:13,
127:4, 127:10,
127:16, 127:17,
128:21, 135:15,
135:16, 144:1,
148:22, 151:7,
151:12, 151:13,
157:13, 159:15,
159:19, 169:21,
169:24, 171:12,
176:19, 188:12,
188:15, 188:21,
188:24, 189:2,
204:18, 204:20,
204:21
**sheltered** [2] - 78:23,
118:22
**sheltering** [3] - 9:16,
110:2, 125:17
**shelters** [12] - 49:19,
57:24, 103:14,
123:3, 123:12,
125:7, 125:23,
126:3, 128:23,
128:24, 129:1, 144:1
**shift** [5] - 30:2, 49:21,
59:4, 185:13
**shifted** [2] - 18:17,
107:4
**ships** [1] - 187:20
**short** [7] - 40:14,
81:21, 100:5, 122:6,
134:15, 162:7,
200:16
**shorthand** [2] - 224:3,
224:3
**shot** [1] - 159:4
**show** [7] - 115:19,

127:12, 128:5,
128:8, 128:9,
184:18, 194:3
**showed** [2] - 128:4,
198:25
**shower** [1] - 80:11
**showering** [1] - 81:16
**side** [3] - 31:10, 31:12,
207:5
**sidebarred** [1] - 37:11
**sidewalks** [1] - 145:20
**sign** [4] - 172:23,
173:7, 173:15, 223:3
**signage** [11] - 61:6,
63:1, 63:13, 64:4,
65:25, 133:4,
145:10, 172:19,
185:7, 189:13,
189:14
**signal** [2] - 4:4, 4:5
**signed** [2] - 142:6,
172:24
**significant** [3] - 54:14,
55:21, 187:25
**signs** [4] - 62:21,
63:12, 140:22, 173:6
**Sihavong** [2] - 183:20,
184:25
**similar** [13] - 15:14,
33:12, 34:6, 91:15,
96:13, 133:22,
166:23, 174:17,
184:3, 184:5, 195:2,
205:16
**similarly** [1] - 1:5
**simultaneously** [1] -
59:3
**single** [12] - 22:24,
37:7, 37:24, 40:24,
41:1, 41:7, 41:8,
41:17, 112:3,
126:13, 145:6,
155:24
**sip** [1] - 118:6
**sit** [1] - 184:18
**site** [41] - 22:24,
35:22, 45:14, 46:20,
63:18, 64:9, 81:3,
98:17, 119:14,
146:14, 150:14,
152:4, 152:5, 152:6,
154:21, 154:22,
155:14, 155:16,
156:10, 163:20,
164:19, 165:20,
166:10, 172:6,
172:10, 172:15,
172:20, 173:22,
173:24, 174:2,
175:21, 182:8,

203:8, 204:1,
207:18, 208:8,
208:18, 213:25,
214:19, 215:21,
215:23
**sites** [5] - 35:19,
131:24, 146:1,
146:8, 173:23
**sitting** [2] - 93:21,
187:16
**situated** [1] - 1:5
**situation** [17] - 22:7,
33:1, 39:19, 50:8,
55:18, 60:5, 60:6,
113:18, 115:11,
141:18, 164:20,
172:6, 173:22,
195:20, 196:18,
196:20, 222:6
**situational** [2] - 98:7,
118:24
**situations** [9] - 50:12,
50:20, 76:15, 126:1,
132:12, 155:14,
177:24, 221:25,
222:2
**six** [1] - 201:4
**sixty** [1] - 24:14
**size** [4] - 17:13, 69:24,
101:19, 146:9
**skip** [1] - 170:7
**sleep** [1] - 6:22
**sleeping** [1] - 98:22
**slight** [1] - 184:5
**slightly** [1] - 105:20
**small** [1] - 217:1
**smaller** [2] - 149:4,
222:2
**Smith** [2] - 198:3,
198:5
**smoke** [2] - 158:21,
210:23
**smoothly** [1] - 93:9
**snack** [1] - 6:7
**snacks** [4] - 97:4,
97:12, 99:14, 218:20
**snow** [2] - 61:5, 65:10
**snowblower** [1] -
163:15
**Social** [3] - 26:3,
103:21, 135:7
**socks** [1] - 97:4
**sofa** [2] - 24:7, 90:10
**sole** [6] - 96:9, 96:20,
106:6, 138:3, 138:5,
220:24
**sole-source** [1] -
96:20
**solely** [5] - 79:12,
94:7, 139:5, 157:24,

165:6
**solicit** [1] - 97:3
**solicited** [1] - 14:9
**Solid** [4] - 87:17,
151:23, 171:22,
209:9
**solution** [1] - 102:25
**solve** [2] - 102:14,
104:10
**someone** [3] - 116:13,
179:8, 198:15
**someplace** [1] - 200:3
**something's** [1] - 6:6
**sometime** [1] - 187:1
**sometimes** [1] -
105:23
**somewhere** [4] - 90:6,
107:9, 205:21, 206:7
**soon** [1] - 68:23
**sorry** [25] - 12:15,
12:16, 16:13, 24:12,
24:22, 29:4, 40:6,
54:12, 81:11, 90:22,
108:20, 120:12,
121:12, 153:4,
160:4, 160:20,
175:10, 179:13,
180:8, 180:9,
186:21, 186:25,
201:17, 202:22
**sort** [15] - 6:24, 14:12,
25:25, 64:21, 66:3,
87:11, 93:8, 134:10,
138:22, 185:8,
191:9, 203:17,
212:8, 214:8, 219:13
**sorted** [1] - 163:2
**sound** [6] - 5:22,
26:19, 77:25, 99:19,
121:23, 212:19
**sounds** [4] - 6:12,
77:21, 84:18, 99:20
**source** [9] - 40:25,
41:1, 96:9, 96:20,
106:6, 136:8, 138:3,
138:5, 214:20
**sources** [9] - 14:24,
15:2, 101:25,
102:13, 102:23,
183:10, 213:23,
214:18, 214:22
**South** [5] - 3:13,
100:7, 100:12,
170:13, 218:2
**space** [26] - 18:20,
45:22, 49:19, 49:20,
58:11, 80:7, 80:10,
93:21, 96:18,
104:10, 107:2,
112:7, 112:9, 127:4,

137:6, 140:9,
140:16, 149:5,
151:14, 159:25,
180:16, 180:25,
190:10, 201:1,
205:11, 205:12
**spaces** [19] - 57:3,
57:7, 57:9, 57:10,
57:15, 57:17, 58:3,
58:4, 58:9, 58:22,
59:9, 109:23,
127:24, 131:3,
131:5, 144:2,
146:16, 197:7,
219:16
**spacing** [1] - 57:22
**spanning** [1] - 17:11
**spark** [2] - 212:18,
213:23
**speakerphone** [1] -
4:7
**speakers** [1] - 116:10
**speaking** [12] - 8:23,
30:11, 38:17, 42:8,
42:15, 96:2, 96:16,
107:13, 116:14,
172:1, 177:16,
180:18
**special** [1] - 9:5
**Specialists** [4] -
36:16, 44:23, 191:1,
203:25
**specific** [84] - 9:1,
10:3, 10:7, 17:1,
18:3, 21:20, 22:2,
22:12, 22:16, 23:1,
24:19, 31:21, 31:24,
34:13, 35:22, 36:25,
38:10, 38:16, 41:6,
42:18, 42:21, 43:7,
43:13, 45:15, 46:11,
46:19, 48:21, 48:24,
53:20, 57:25, 59:10,
60:3, 61:11, 63:11,
65:16, 78:18, 81:25,
83:11, 84:16, 85:2,
86:24, 88:3, 96:6,
96:8, 98:16, 105:18,
121:15, 123:22,
125:20, 131:3,
132:15, 134:5,
136:12, 136:16,
140:11, 140:16,
145:1, 145:2,
148:11, 150:21,
150:23, 150:24,
152:24, 153:14,
153:18, 157:2,
159:2, 164:11,
165:5, 170:11,

170:25, 172:15,
173:8, 173:11,
179:14, 180:22,
184:16, 187:9,
188:2, 190:15,
194:13, 194:17,
196:6, 219:20
**specifically** [24] -
14:4, 19:25, 20:9,
21:23, 27:5, 37:6,
51:9, 51:12, 66:8,
80:7, 95:10, 109:16,
131:15, 136:5,
142:2, 142:4, 155:5,
168:25, 169:9,
181:5, 206:14,
206:15, 207:14,
221:22
**specificity** [2] - 72:22,
187:12
**specifics** [1] - 31:24
**specifies** [5] - 20:14,
21:19, 22:9, 22:20,
63:17
**speculate** [5] - 34:5,
107:9, 110:16,
188:6, 198:4
**speculation** [3] -
76:23, 154:12,
192:21
**spend** [6] - 10:19,
97:24, 139:14,
141:20, 207:6,
218:11
**spent** [2] - 10:23,
139:15
**spike** [1] - 195:2
**spill** [1] - 9:6
**spot** [2] - 126:23,
127:5
**spots** [2] - 58:18,
58:19
**spread** [1] - 208:22
**spreadsheet** [1] - 99:2
**St** [5] - 16:17, 17:7,
31:13, 103:15,
130:17
**Stability** [4] - 31:17,
46:4, 123:16, 130:22
**stable** [11] - 35:12,
70:5, 91:14, 107:24,
135:22, 135:25,
137:5, 149:21,
171:2, 203:14, 218:8
**stably** [1] - 78:23
**staff** [22] - 16:9, 19:9,
19:18, 19:24, 21:1,
31:12, 32:25, 33:22,
50:16, 54:11, 54:16,
54:25, 61:2, 63:23,

67:6, 115:19,
119:14, 141:5,
209:20, 210:6,
210:10, 211:1
**staffing** [4] - 27:6,
49:22, 119:12, 155:4
**stage** [1] - 78:22
**stakeholders** [1] -
15:16
**stand** [10] - 66:19,
69:12, 70:15,
109:18, 123:2,
136:10, 138:6,
138:21, 139:4,
219:18
**stand-up** [1] - 109:18
**standard** [6] - 49:4,
63:13, 142:17,
200:16, 202:5,
215:16
**standing** [4] - 47:2,
75:8, 144:20, 156:13
**standpoint** [1] - 117:7
**start** [11] - 4:20, 24:8,
36:20, 44:19,
115:20, 148:13,
149:12, 160:8,
172:13, 210:18
**started** [9] - 6:25,
15:23, 26:21, 30:25,
149:4, 164:14,
187:21, 213:21,
216:25
**starting** [2] - 7:11,
59:7
**starts** [1] - 214:23
**state** [3] - 7:1, 24:5,
130:24
**State** [3] - 3:23, 20:2,
79:7
**state-aid** [1] - 130:24
**statement** [1] - 116:21
**states** [2] - 4:14, 202:1
**STATES** [1] - 1:1
**static** [1] - 4:5
**station** [1] - 120:10
**stations** [1] - 91:6
**status** [1] - 24:24
**statutes** [1] - 202:9
**stay** [8] - 24:4, 28:22,
98:1, 98:4, 123:12,
135:18, 135:19,
188:22
**stayed** [2] - 87:5,
98:13
**staying** [2] - 188:15,
188:18
**steal** [1] - 76:6
**stenographic** [1] -
224:3

**step** [2] - 23:25, 114:2
**step-father** [1] - 23:25
**steps** [4] - 25:12, 38:9,
212:11, 213:7
**sticking** [1] - 129:13
**still** [14] - 13:20,
51:25, 52:25, 56:16,
82:14, 88:12, 88:19,
103:24, 117:18,
180:19, 182:6,
182:19, 186:7,
193:21
**stillborn** [3] - 198:15,
199:4, 199:8
**stolen** [6] - 163:7,
163:8, 163:10,
163:12, 163:17,
177:2
**stop** [1] - 91:12
**stops** [1] - 131:13
**storage** [70] - 79:17,
79:20, 79:24, 80:7,
80:15, 80:22, 81:2,
81:6, 81:25, 82:1,
82:6, 82:11, 82:20,
82:24, 82:25, 83:17,
83:23, 84:10, 84:11,
84:12, 84:16, 84:17,
84:20, 84:24, 85:19,
86:6, 86:10, 86:16,
87:1, 87:2, 87:7,
87:9, 87:14, 88:12,
88:13, 89:14, 89:19,
93:2, 93:7, 93:9,
94:5, 94:8, 94:9,
96:14, 96:21, 99:13,
100:17, 100:25,
101:2, 101:4,
101:10, 101:19,
102:1, 102:5, 102:7,
102:8, 102:11,
102:15, 102:17,
102:19, 102:25,
176:9, 185:22,
186:1, 186:2, 186:3,
188:9, 218:21,
218:24
**store** [8] - 85:14,
85:16, 87:12, 87:13,
94:22, 96:18, 97:19,
97:21
**stored** [8] - 83:6, 83:7,
83:19, 92:16, 94:16,
94:25, 192:5
**stores** [1] - 94:20
**storing** [3] - 87:21,
89:21, 93:22
**strategic** [1] - 147:25
**strategy** [1] - 38:6
**stream** [1] - 136:9

**streamlined** [1] -
112:4
**Street** [4] - 3:13,
100:10, 130:25,
176:10
**Streets** [4] - 45:10,
104:4, 104:14
**strip** [1] - 136:14
**Strong** [1] - 1:4
**structural** [1] - 104:25
**structure** [4] - 42:21,
202:1, 202:2, 214:7
**structured** [1] - 138:4
**structures** [9] - 20:14,
20:15, 35:7, 36:1,
41:6, 99:9, 143:10,
146:11, 214:5
**struggling** [4] - 12:17,
42:4, 187:11, 187:12
**stuff** [1] - 162:20
**stumble** [1] - 30:24
**style** [1] - 152:13
**styles** [1] - 32:13
**subject** [2] - 4:2,
114:17
**subjected** [1] - 208:16
**submit** [1] - 93:25
**submitted** [2] - 13:2,
192:6
**subparts** [1] - 222:21
**subset** [1] - 146:20
**substance** [4] -
116:17, 182:2,
184:2, 187:6
**substantively** [5] -
20:6, 20:11, 116:19,
184:3, 184:4
**subworking** [1] - 95:7
**Suheb** [1] - 31:1
**suicide** [1] - 23:24
**suites** [1] - 10:2
**summarily** [1] -
214:10
**summarize** [1] - 187:9
**summarizing** [1] -
184:7
**summer** [1] - 177:11
**summoned** [1] -
192:24
**Sunday** [1] - 210:8
**sunset** [1] - 30:4
**supplemental** [1] -
29:21
**support** [12] - 10:8,
39:5, 55:8, 56:10,
56:11, 56:12, 135:6,
168:23, 174:16,
175:17, 181:20,
221:5
**supporting** [2] -

31:21, 56:10
**supportive** [18] - 35:10, 56:25, 91:14, 104:19, 105:5, 135:25, 136:10, 137:1, 137:5, 144:1, 149:8, 149:14, 149:22, 150:24, 171:2, 182:17, 203:14, 219:19
**supports** [4] - 43:11, 46:22, 48:10, 117:12
**supposed** [1] - 143:22
**surf** [1] - 24:8
**Surface** [1] - 8:6
**surface** [5] - 14:5, 17:3, 98:10, 201:24
**surfing** [1] - 90:10
**surge** [1] - 49:23
**surrender** [1] - 102:9
**surrendered** [1] - 60:15
**surrenders** [1] - 83:18
**surround** [1] - 71:14
**surrounding** [6] - 54:17, 89:20, 91:7, 141:1, 158:25, 164:12
**surroundings** [1] - 36:1
**surveilling** [1] - 36:2
**suspected** [2] - 214:24, 216:19
**suspicion** [1] - 54:20
**sustained** [1] - 123:4
**sweep** [2] - 41:12, 131:20
**sweeping** [3] - 20:19, 20:22, 141:2
**sweeps** [4] - 37:16, 130:3, 144:3, 144:6
**swift** [1] - 132:15
**switch** [5] - 79:15, 111:24, 112:14, 112:18, 129:2
**switching** [2] - 140:21
**sworn** [1] - 4:13
**syringes** [1] - 197:17
**system** [14] - 27:16, 27:17, 35:9, 38:21, 58:16, 73:22, 79:14, 105:6, 110:2, 125:17, 126:6, 159:24, 193:6, 198:6
**System** [10] - 57:21, 73:21, 73:23, 74:6, 107:15, 110:1, 147:25, 148:5, 176:20, 215:8
**systems** [2] - 110:20,

110:24
**Systems** [1] - 210:21

# T

**table** [3] - 42:9, 62:19, 220:9
**tacit** [1] - 142:15
**tailor** [1] - 109:21
**tandem** [1] - 19:6
**Tank** [1] - 69:15
**tanks** [3] - 163:16, 177:8, 212:6
**tap** [1] - 136:5
**target** [1] - 146:10
**targeted** [1] - 208:18
**targeting** [2] - 219:15, 219:17
**Task** [6] - 190:11, 191:17, 198:18, 198:20, 198:24, 205:8
**task** [2] - 64:13, 185:20
**tasked** [8] - 34:15, 34:16, 34:22, 47:6, 61:13, 62:20, 65:20, 147:15
**tasking** [1] - 59:23
**tax** [2] - 30:13, 60:14
**taxes** [1] - 30:15
**Team** [83] - 10:14, 25:17, 26:14, 26:15, 27:16, 27:23, 27:24, 29:16, 33:10, 34:9, 34:16, 34:22, 35:17, 36:9, 37:1, 37:11, 38:25, 44:22, 49:9, 71:17, 71:18, 72:1, 72:25, 73:7, 73:9, 73:17, 73:24, 74:2, 74:11, 74:12, 80:1, 80:24, 84:10, 84:15, 85:9, 85:17, 88:9, 89:6, 89:10, 89:19, 90:2, 90:15, 90:18, 90:19, 90:21, 91:1, 91:2, 91:15, 91:18, 91:21, 91:23, 92:7, 92:9, 92:13, 96:22, 97:2, 97:24, 99:1, 100:18, 100:23, 101:11, 101:17, 103:25, 109:3, 109:16, 113:6, 114:24, 115:4, 121:7, 131:13, 150:12, 151:25, 157:8, 157:10, 176:7, 176:10,

186:2, 194:2, 209:9, 218:19, 220:16
**team** [21] - 26:5, 27:25, 28:24, 29:19, 29:22, 30:6, 35:18, 35:21, 37:2, 37:23, 40:1, 46:4, 71:21, 109:5, 118:23, 119:6, 121:5, 176:14, 207:18, 207:25, 219:8
**Team's** [4] - 34:7, 40:21, 41:9, 72:22
**Team/Homeless** [1] - 92:13
**teams** [2] - 68:10, 118:17
**technical** [1] - 35:13
**technology** [1] - 4:3
**telephone** [2] - 4:4, 4:7
**tempers** [1] - 164:17
**template** [3] - 63:13, 63:16, 117:1
**temporary** [9] - 20:14, 20:15, 81:15, 81:17, 81:19, 81:20, 82:2, 143:10, 202:2
**ten** [5] - 11:8, 77:16, 77:19, 178:9, 178:18
**ten-minute** [2] - 77:19, 178:18
**tent** [17] - 97:1, 97:23, 114:9, 115:15, 115:17, 115:18, 115:20, 116:22
**tent-by-tent** [3] - 115:15, 115:18, 115:20
**tents** [2] - 36:1, 97:7
**tenure** [1] - 20:7
**term** [5] - 81:21, 82:1, 103:17, 125:25, 133:13
**terminal** [1] - 83:9
**terminology** [1] - 85:10
**terms** [7] - 96:2, 132:23, 138:24, 139:24, 148:21, 195:22, 197:17
**terribly** [3] - 112:8, 133:19, 133:23
**testifying** [1] - 11:15
**testimony** [2] - 22:19, 224:7
**text** [1] - 181:23
**THE** [19] - 4:16, 21:16, 29:3, 29:7, 67:20, 75:13, 77:17, 77:23,

92:22, 118:13, 121:22, 122:1, 122:13, 178:17, 178:20, 178:22, 178:25, 201:22, 222:25
**themes** [1] - 183:8
**themselves** [19] - 1:4, 38:24, 57:14, 64:15, 64:21, 65:4, 65:23, 66:2, 68:21, 71:4, 94:9, 102:10, 107:5, 177:21, 181:19, 182:5, 183:12, 197:13, 217:1
**thereafter** [1] - 216:9
**therefore** [1] - 23:5
**they've** [10] - 33:15, 63:7, 63:9, 85:23, 85:25, 98:14, 99:4, 109:7, 125:16, 140:4
**thinking** [2] - 48:20, 204:22
**thinks** [1] - 75:4
**third** [19] - 11:6, 61:3, 129:5, 129:7, 132:1, 132:18, 141:16, 164:4, 166:1, 166:19, 169:1, 169:19, 174:2, 177:9, 183:22, 183:25, 197:5, 197:10, 197:13
**thoroughfares** [2] - 119:2, 131:1
**thoroughness** [2] - 137:9, 137:21
**threat** [2] - 156:3, 173:18
**threatened** [3] - 61:21, 61:25, 156:1
**three** [25] - 8:5, 10:24, 22:22, 27:12, 54:6, 64:7, 69:16, 82:12, 82:17, 82:21, 83:2, 93:15, 132:9, 132:23, 132:24, 172:15, 172:16, 177:14, 183:18, 183:19, 192:23, 193:2, 200:21, 221:2, 221:3
**three-business-day** [1] - 22:22
**three-plus** [1] - 82:17
**throughout** [1] - 190:20
**tickets** [1] - 204:9
**timetable** [2] - 124:19, 182:7

**TITLE** [1] - 225:2
**title** [3] - 7:4, 7:6, 215:14
**titled** [1] - 147:7
**titles** [2] - 7:5, 202:9
**TO** [1] - 2:18
**today** [6] - 4:25, 6:19, 54:3, 182:6, 217:23, 218:2
**today's** [1] - 10:20
**together** [17] - 5:4, 10:24, 26:22, 27:13, 41:5, 45:19, 47:10, 80:18, 105:23, 119:5, 119:7, 131:9, 188:16, 188:18, 188:22, 189:2, 212:7
**toilets** [3] - 208:7, 208:8, 216:20
**token** [1] - 89:25
**tokens** [3] - 89:7, 90:2, 90:17
**tomorrow** [2] - 51:17, 51:25
**took** [9] - 7:24, 80:11, 148:10, 212:11, 213:7, 216:8, 216:10, 224:3
**top** [5] - 122:24, 123:7, 149:9, 187:8, 202:9
**topic** [3] - 28:12, 74:22, 148:9
**topics** [1] - 28:10
**total** [2] - 27:22, 155:8
**totally** [4] - 5:17, 108:21, 118:8, 140:1
**tote** [5] - 80:22, 80:23, 84:11, 84:13, 85:1
**totes** [1] - 80:25
**touch** [3] - 71:16, 72:5, 97:17
**touchpoints** [2] - 33:17, 45:1
**tourists** [1] - 95:22
**towards** [7] - 9:9, 14:24, 42:19, 112:16, 157:2, 165:19, 166:10
**towns** [1] - 17:5
**track** [2] - 99:15, 152:25
**tracking** [2] - 139:13, 195:22
**Traffic** [1] - 9:10
**traffic** [7] - 9:13, 53:1, 53:3, 53:4, 119:11, 120:22
**trafficking** [2] - 76:8, 76:9

**train** [3] - 31:9, 41:7, 91:8
**trained** [1] - 31:3
**training** [5] - 31:5, 31:21, 31:25, 34:6
**trainings** [4] - 32:4, 32:5, 32:7, 32:11
**trajectory** [1] - 206:7
**tran** [1] - 115:4
**transcript** [4] - 223:6, 224:6, 224:9, 224:10
**transcription** [1] - 224:6
**transfer** [1] - 205:12
**transferred** [2] - 106:4, 205:7
**Transit** [8] - 36:14, 89:6, 90:23, 90:24, 91:5, 113:6, 115:9, 131:10
**transition** [5] - 35:11, 48:10, 135:21, 137:4, 180:24
**transitional** [1] - 149:15
**transitions** [1] - 155:4
**transparency** [1] - 67:7
**transparent** [3] - 15:15, 16:8, 168:9
**transport** [5] - 85:18, 86:25, 89:11, 94:11, 177:21
**Transportation** [4] - 26:19, 36:13, 91:25, 130:14
**transportation** [12] - 49:25, 90:6, 113:13, 113:14, 114:19, 114:22, 115:5, 115:24, 119:21, 147:5, 156:20, 156:23
**transported** [1] - 87:17
**trash** [1] - 219:3
**trauma** [1] - 33:20
**traumas** [2] - 111:1, 184:14
**travel** [3] - 85:9, 85:11, 86:9
**travels** [1] - 91:8
**Travis** [1] - 1:4
**treating** [1] - 136:15
**treatings** [1] - 208:1
**treatment** [2] - 48:6, 208:3
**trees** [1] - 145:6
**trespass** [4] - 61:14, 114:15, 143:15,

156:15
**trespassed** [1] - 23:4
**Trespassing** [7] - 22:25, 61:6, 62:21, 63:1, 133:4, 140:22, 173:6
**trespassing** [7] - 23:2, 23:4, 63:17, 114:13, 143:17, 158:19, 173:3
**triage** [5] - 25:21, 35:5, 73:1, 73:14, 73:25
**tribal** [1] - 220:3
**tried** [3] - 110:14, 112:19, 211:2
**triggered** [1] - 193:20
**triggering** [1] - 33:24
**trip** [2] - 165:24, 166:5
**trips** [6] - 120:14, 160:11, 165:15, 165:18, 165:21, 175:16
**trucks** [1] - 177:14
**trucks'** [1] - 154:13
**true** [7] - 125:20, 148:23, 165:22, 173:13, 173:15, 224:6, 225:5
**truly** [2] - 127:24, 167:3
**trust** [1] - 193:8
**truth** [2] - 40:25, 41:1
**try** [22] - 16:24, 25:24, 40:24, 41:4, 43:21, 48:21, 54:23, 60:20, 63:15, 71:25, 85:21, 91:13, 96:19, 97:6, 97:10, 102:14, 125:17, 126:12, 138:6, 164:19, 168:8, 194:1
**trying** [18] - 78:10, 88:3, 111:4, 111:6, 135:1, 152:23, 155:4, 157:23, 168:15, 168:22, 171:3, 175:3, 183:20, 184:14, 184:21, 185:11, 204:4, 220:7
**turn** [1] - 64:2
**turnaround** [1] - 164:4
**turns** [1] - 28:3
**twenty** [1] - 24:14
**twenty-two** [1] - 24:14
**Twin** [2] - 16:1, 17:6
**two** [41] - 24:1, 24:14, 28:2, 28:4, 35:18, 35:21, 36:17, 79:24,

81:12, 84:24, 90:22, 99:7, 105:14, 112:10, 126:15, 128:15, 134:11, 139:10, 141:8, 143:6, 144:24, 148:23, 158:9, 177:14, 187:20, 194:21, 198:9, 199:25, 200:20, 201:4, 201:11, 205:17, 205:18, 206:6, 206:10, 207:21, 210:15, 213:14, 214:1, 221:7
**two-person** [2] - 35:18, 35:21
**type** [2] - 144:13, 191:11
**types** [13] - 26:2, 31:24, 32:20, 49:23, 76:8, 109:11, 119:12, 134:1, 154:16, 194:20, 204:14, 214:1, 219:1
**typically** [7] - 43:4, 96:2, 97:24, 152:5, 173:17, 201:16, 214:2

## U

**Uber** [3] - 89:11, 89:25, 114:24
**ult** [1] - 212:22
**ultimate** [1] - 46:17
**ultimately** [9] - 42:6, 52:5, 87:20, 117:8, 127:14, 128:2, 140:10, 212:22, 214:21
**um-hum** [1] - 96:7, 132:3
**Um-hum** [3] - 100:4, 116:11, 125:4
**unavailability** [1] - 185:22
**uncertainty** [1] - 127:8
**unchanged** [1] - 169:24
**unclear** [1] - 61:24
**under** [9] - 4:24, 74:24, 188:23, 205:4, 208:19, 220:22, 221:8, 224:4
**underneath** [2] - 91:8, 130:23
**understood** [1] - 5:23
**underutilized** [1] - 218:23

**underway** [1] - 205:9
**undocumented** [1] - 21:3
**unenviable** [1] - 185:20
**unforeseen** [1] - 212:9
**unhoused** [26] - 18:8, 23:7, 23:10, 23:11, 23:15, 24:23, 24:24, 25:1, 25:13, 25:14, 28:19, 28:21, 28:23, 62:22, 71:15, 77:4, 79:4, 79:20, 89:24, 143:22, 164:23, 181:19, 181:20, 196:1, 196:3, 206:21
**unified** [1] - 37:23
**unison** [2] - 47:11, 131:9
**unit** [10] - 9:4, 10:13, 12:7, 87:2, 87:7, 135:17, 167:20, 188:22, 188:24, 220:24
**UNITED** [1] - 1:1
**units** [5] - 9:1, 37:18, 188:15, 188:18, 213:14
**universally** [1] - 165:22
**University** [1] - 8:21
**unlawful** [1] - 143:11
**unless** [2] - 173:17, 192:8
**unnecessarily** [1] - 56:18
**unresponsive** [1] - 198:21
**unsafe** [5] - 71:11, 74:17, 77:5, 125:8, 132:13
**unsanitary** [1] - 125:8
**unsheltered** [69] - 10:16, 10:17, 17:15, 18:21, 20:9, 21:8, 24:5, 24:16, 25:4, 34:12, 34:20, 35:1, 35:12, 40:17, 47:22, 49:20, 65:17, 65:21, 69:19, 69:24, 70:8, 70:11, 70:17, 70:24, 71:6, 72:15, 73:2, 74:18, 75:6, 75:16, 76:3, 77:7, 80:13, 80:17, 86:23, 91:10, 104:2, 104:10, 106:23, 118:20, 124:12, 134:9, 134:25, 135:2, 135:3, 135:22,

136:22, 143:25, 145:23, 146:8, 152:18, 154:6, 154:23, 156:5, 159:12, 161:20, 164:13, 171:1, 180:1, 183:2, 198:7, 209:6, 217:21, 218:5, 219:20, 220:10, 220:25, 221:13, 222:5
**Unsheltered** [2] - 40:10, 41:14
**unstable** [4] - 70:5, 79:4, 107:24, 218:8
**untenable** [1] - 134:25
**unvaluable** [1] - 163:3
**unveil** [1] - 120:24
**up** [79] - 19:4, 24:7, 27:22, 43:22, 45:4, 46:15, 54:2, 60:7, 61:20, 63:9, 65:5, 65:20, 66:19, 68:24, 69:12, 70:15, 73:10, 74:15, 81:11, 84:5, 90:12, 91:11, 92:24, 101:10, 105:10, 106:3, 109:13, 109:18, 115:20, 118:14, 120:5, 120:7, 123:2, 124:4, 128:5, 136:10, 137:6, 138:7, 138:21, 139:4, 139:5, 141:2, 141:21, 142:1, 143:8, 147:17, 148:23, 149:17, 149:20, 149:24, 150:1, 153:8, 153:17, 153:21, 155:19, 161:15, 164:16, 172:2, 174:17, 185:7, 186:5, 189:13, 192:9, 193:9, 194:3, 197:18, 198:25, 209:17, 210:2, 211:18, 213:3, 216:12, 216:13, 219:18, 222:19, 222:20
**upcoming** [1] - 130:2
**update** [1] - 84:8
**updated** [1] - 151:14
**updates** [3] - 125:16, 147:10, 148:8
**upfront** [1] - 48:3
**uphold** [2] - 20:3, 67:8

**upholding** [1] - 20:1
**uploaded** [1] - 215:7
**upset** [1] - 182:14
**upwards** [1] - 50:7
**Urban** [3] - 129:15, 136:6, 191:19
**urgency** [2] - 129:16, 174:2
**user** [1] - 110:15
**users** [1] - 110:22
**uses** [2] - 144:15, 205:17
**utility** [1] - 146:12
**utilization** [1] - 107:14
**utilize** [3] - 110:23, 141:12, 195:5
**utilized** [3] - 29:18, 88:13, 218:22
**utilizing** [3] - 117:25, 136:7, 200:6

**V**

**va** [1] - 190:21
**vacancy** [1] - 7:25
**vacant** [14] - 9:6, 61:1, 61:7, 65:11, 65:18, 65:19, 66:10, 66:11, 117:9, 148:1, 148:2, 148:4
**Vacant** [1] - 147:7
**vacate** [1] - 114:15
**vacuum** [1] - 32:23
**vague** [2] - 18:25, 67:17
**validity** [1] - 125:15
**valuable** [4] - 154:16, 163:2, 163:18, 177:2
**value** [4] - 154:3, 163:8, 163:10, 169:8
**var** [2] - 69:10
**variants** [1] - 79:13
**variety** [25] - 33:13, 33:16, 39:4, 41:3, 43:9, 53:5, 55:11, 58:2, 68:18, 69:25, 80:12, 97:5, 98:22, 102:13, 104:20, 113:1, 116:8, 145:17, 190:8, 190:12, 190:18, 190:21, 191:1, 211:3, 220:2
**various** [16] - 10:8, 26:21, 27:17, 32:13, 34:18, 48:9, 49:15, 69:10, 107:20, 109:9, 125:14, 131:13, 135:11, 147:2, 183:9, 190:7

**varying** [1] - 119:23
**vehicle** [2] - 97:20, 116:9
**vehicles** [2] - 166:15, 218:20
**Velazquez** [16] - 3:21, 6:15, 7:3, 7:4, 12:20, 19:3, 19:15, 21:14, 23:21, 24:10, 83:14, 137:8, 222:23, 224:4, 225:4, 225:20
**VELAZQUEZ** [2] - 1:17, 4:12
**vendor** [5] - 96:6, 201:2, 201:3, 201:5
**vendors** [2] - 200:25, 201:9
**venture** [1] - 51:13
**verbal** [4] - 5:10, 54:22, 114:15, 188:8
**verbally** [4] - 133:2, 172:21, 182:25, 189:6
**verbatim** [1] - 224:3
**verification** [2] - 108:16, 151:9
**verified** [2] - 198:13, 198:14
**verify** [9] - 108:8, 108:12, 108:24, 138:18, 159:19, 195:8, 195:24, 207:22, 208:1
**verifying** [1] - 35:3
**vermin** [1] - 219:6
**versa** [2] - 5:7, 31:15
**versus** [25] - 17:2, 17:3, 27:16, 45:17, 45:18, 51:24, 65:20, 73:6, 78:15, 86:6, 89:4, 99:13, 116:15, 121:9, 121:10, 123:9, 123:22, 127:18, 127:25, 142:25, 148:21, 168:3, 168:18, 211:16
**veterans** [1] - 25:23
**veterinary** [1] - 9:16
**veto** [1] - 42:2
**via** [1] - 4:7
**viability** [2] - 47:8, 190:18
**vice** [2] - 5:7, 31:15
**vicinity** [1] - 52:17
**video** [3] - 4:4, 217:11, 217:14
**videoconference** [7] - 3:19, 4:8, 122:16, 223:4, 224:3, 224:7,

224:10
**VIDEOCONFERENCE** [2] - 1:14, 225:1
**view** [1] - 52:24
**violates** [2] - 114:11, 202:5
**violating** [7] - 24:24, 201:16, 202:18, 203:1, 203:3, 203:4, 203:10
**violation** [5] - 203:7, 203:19, 203:23, 204:3, 212:1
**violations** [2] - 202:16, 202:23
**violence** [4] - 51:4, 51:6, 52:14, 54:13
**violent** [1] - 75:19
**virtual** [1] - 32:11
**virtue** [1] - 24:24
**visibility** [1] - 209:11
**visible** [2] - 18:19, 64:22
**visibly** [1] - 66:4
**visit** [7] - 38:23, 39:3, 73:12, 83:21, 99:3, 100:24, 210:17
**visited** [9] - 73:10, 98:18, 125:24, 128:20, 128:22, 129:1, 179:19, 209:22, 210:12
**visiting** [2] - 61:23, 159:9
**visitors** [1] - 95:22
**visits** [10] - 39:1, 40:17, 71:19, 72:9, 81:3, 90:16, 101:3, 101:5, 121:5, 211:19
**voice** [1] - 42:5
**voices** [1] - 162:8
**void** [3] - 200:1, 200:2, 200:4
**volume** [12] - 84:17, 86:1, 86:3, 93:6, 93:20, 154:8, 154:15, 169:11, 177:12, 183:7, 196:25, 197:17
**volumes** [2] - 169:15, 194:20
**volunteer** [2] - 161:1, 167:4
**volunteered** [1] - 128:23
**volunteers** [3] - 166:15, 174:13, 177:20
**vs** [2] - 1:7, 225:2
**Vue** [1] - 30:21

**vulnerable** [3] - 158:24, 170:21, 195:11

**W**

**W-r-u-c-k** [1] - 201:14
**wait** [3] - 102:21, 112:8, 216:4
**Wait** [1] - 115:23
**walk** [5] - 68:9, 167:1, 167:2, 168:11, 168:12
**walking** [3] - 80:9, 111:10, 111:16
**Wall** [5] - 26:17, 27:4, 217:24, 218:16, 218:18
**wall** [2] - 26:20, 212:5
**walls** [1] - 212:6
**wants** [1] - 48:20
**warm** [1] - 217:1
**warming** [2] - 103:7, 103:9
**warrants** [2] - 66:24, 204:14
**Waste** [4] - 87:17, 151:23, 171:22, 209:9
**waste** [3] - 169:15, 169:16, 199:25
**watch** [3] - 212:14, 212:17, 213:3
**watching** [2] - 36:19, 213:4
**Water** [1] - 8:6
**water** [3] - 6:7, 97:6, 97:12
**waterfall** [1] - 149:5
**wayfinding** [1] - 95:19
**ways** [12] - 33:2, 33:7, 33:25, 48:10, 48:21, 60:20, 101:14, 135:12, 184:15, 184:19, 218:24, 220:8
**weather** [1] - 103:9
**website** [3] - 147:6, 147:9, 147:11
**wedge** [1] - 63:9
**weeds** [2] - 65:9, 145:5
**week** [15] - 34:10, 37:24, 92:14, 194:21, 201:5, 201:7, 209:22, 209:24, 210:2, 210:4, 210:5, 210:7, 216:7, 216:11, 216:13

**weekly** [1] - 36:9
**weeks** [2] - 120:6, 194:21
**weigh** [3] - 47:14, 48:20, 197:15
**weighing** [1] - 47:24
**weirdly** [1] - 202:24
**wellness** [1] - 97:3
**whatnot** [3] - 35:16, 96:12, 176:12
**wheelchair** [1] - 179:9
**wheelchairs** [1] - 109:9
**whereas** [1] - 81:17
**whichever** [1] - 52:4
**whole** [5] - 32:12, 174:25, 199:3, 219:18, 222:16
**William** [1] - 221:10
**willing** [2] - 101:1, 156:15
**winter** [1] - 59:13
**wish** [3] - 68:3, 86:8, 98:3
**wishes** [2] - 85:13, 85:14
**WITNESS** [17] - 4:16, 21:16, 29:3, 29:7, 67:20, 75:13, 77:17, 77:23, 92:22, 118:13, 121:22, 122:1, 122:13, 178:22, 178:25, 201:22, 222:25
**witness** [2] - 75:9, 224:7
**Witness** [6] - 77:23, 85:3, 133:16, 169:2, 174:1, 224:17
**witnessing** [1] - 165:3
**wondering** [6] - 15:11, 29:12, 59:15, 67:14, 186:23, 198:12
**Word** [1] - 14:17
**words** [1] - 90:23
**worker** [1] - 161:2
**workers** [8] - 45:13, 49:16, 98:15, 107:23, 121:10, 153:4, 157:10, 167:23
**workgroup** [1] - 118:22
**workload** [1] - 185:13
**Works** [24] - 8:6, 26:24, 36:15, 38:1, 39:2, 44:24, 53:9, 119:13, 141:5, 141:9, 141:14, 144:4, 144:10,

145:14, 146:2,
146:3, 146:20,
146:23, 147:5,
154:5, 169:17,
183:25, 197:18,
209:9
**works** [5] - 6:17,
96:19, 106:13,
168:3, 183:23
**World** [1] - 95:17
**worn** [4] - 181:2,
181:3, 181:8, 181:10
**worth** [1] - 154:13
**wrap** [2] - 78:10,
222:22
**wraparound** [2] -
136:13, 137:2
**writes** [1] - 116:25
**writing** [3] - 9:22,
22:11, 36:3
**written** [4] - 13:10,
21:4, 54:21, 54:23
**wrote** [2] - 13:9,
187:19
**Wruck** [1] - 201:14

## Y

**year** [11] - 7:11, 28:4,
29:21, 30:5, 55:22,
93:15, 114:16,
114:17, 132:4,
194:23, 195:1
**year's** [1] - 102:18
**years** [12] - 8:5, 24:1,
26:16, 59:13, 82:17,
82:21, 83:2, 93:15,
137:3, 143:6,
145:15, 205:9
**yurts** [2] - 177:16,
177:25

## Z

**zero** [1] - 220:10
**zoning** [2] - 24:20,
202:5
**zoom** [1] - 37:10
**zooming** [2] - 173:13,
174:9