EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, TRAVIS NELOMS, ALVIN BUTCHER, ADRIAN TIGER, CHANCE ASKENETTE, DEVEN CASTON, LOLA HEGSTROM, and RONDEL APPLEBEE, *on behalf of themselves and a class of similarly-situated individuals*,

                    Plaintiffs,

    vs.

MAYOR JACOB FREY, *in his individual and official capacity*,

                    Defendant.

Civil Action

0:24-cv-00001-ECT/TNL

**PLAINTIFFS' RULE 26(a)(2)(C) DISCLOSURE FOR EXPERT WITNESS JARED MARING**

---

**To: DEFENDANT JACOB FREY, by and through his Counsel of Record:**

Pursuant to Rule 26(a)(2)(C) and the Scheduling Order, Plaintiff offers the following disclosure with regards to Jared Maring, expert witness, who may be contacted by email at jaredmaring@gmail.com or by telephone at (314) 705-9890.

Mr. Maring is a Certified Peer Recovery Specialist and an expert by training, profession, and personal lived experience on substance use disorder and addiction and homeless encampments in Minneapolis.

Mr. Maring's expertise comes first from his own lived experiences, having developed a substance use disorder as a teenager following a severe car accident. Percocet turned to heroin

use at age 19. A year and a half later, Mr. Maring began cycling between various rehabilitation facilities, sober living, and homelessness, which included living in his car for months at a time. After much hard work and many attempts at sobriety, relapses, and setbacks, Mr. Maring finally achieved permanent and stable sobriety in his mid 20's. Soon thereafter, in 2021, Mr. Maring obtained his Certified Peer Recovery Specialist (CPRS) licensure. Mr. Maring has treated unhoused clients with substance use disorders as a CPRS working for a variety Minneapolis based organizations, including: Kyros, Evergreen Recovery, Elite Recovery, Recovery Academy, Partners Behavioral Health, and Amethyst Recovery Solutions.

Currently, Mr. Maring is a Project Coordinator with Americorp's Recovery Corps program. His projects include running a warming shelter, compiling and distributing up to 150 "Kwe" bags (with tampons, pads, condoms, basic hygiene supplies, and snacks) per week directly to unhoused women, running a weekly drop-in space for people with substance use disorder, and picking up and distributing donated food from Whole Foods to unsheltered unhoused people–all in South Minneapolis, and predominantly in the East Phillips neighborhood.

Mr. Maring is offered as an expert on the connection between houselessness and substance use disorders. He will be called to testify on the impact of repeated evictions on houseless people, particularly as it relates to substance use disorders and social service providers, as well as the lack of available, accessible, humane alternatives to encampments.

He is expected to testify to related facts and opinions as summarized below based on his expertise through lived experience, specialized training, and employment, as well as his observations in a professional capacity of the population of unhoused people in Minneapolis with substance use disorder, particularly the residents of Nenookaasi:

1. Evictions in Minneapolis tend to occur without warning. The City does not make an effort or have any type of formal process to disclose to service providers when evictions happen. This impedes my work, and that of my colleagues, as we are not able to plan in advance or to make the most of the last chance we have to meet with clients before they are moved. Service providers like myself typically hear of evictions through the grapevine, and often cannot show up until at least an hour after they've begun.

2. The City also does not typically give reliable notice to encampment residents. When City representatives do give notice of evictions to residents, they do not go tent by tent to make sure people know. They walk into an encampment, yell an announcement, and leave. Only people who are there, awake, and in earshot at the time hear the announcement and even then they are not sure if the announcement is true or from a credible source.

3. While some effort was made to give service providers and residents notice of the Nenookaasi evictions prior to the first January eviction, these efforts proved short-lived.

4. If these evictions are going to be continuing, it would be beneficial for the City to team up with service providers. The manner in which evictions are currently undertaken is very destructive. If the City were even  an ounce more collaborative, evictions would be significantly less destructive to the lives of residents. My work, and that of my colleagues, would be more effective and my clients would have better outcomes if evictions did not happen at all.  But if evictions at least were to happen with input and coordination from service providers this would be better.

5. Encampments like Nenookaasi exist because shelters in Minneapolis are inadequate. They are overcrowded already, and still do not have enough space for everyone who is on

the streets. One major concern is that people can't stay consecutive nights or know that they have a spot the next night. The lack of certainty makes them inaccessible. If someone goes through all the trouble and manages to secure a shelter space this still only guarantees them shelter for one night and leaves them scrambling again the next morning, with no guarantees of finding another spot the next night. Shelters have less stability than the encampments, which are more likely to be able to have a place to sleep for a longer period of time.

6.  During evictions, whether people are allowed to take their time in packing up and leaving often depends on how many housed people from the community are present and watching law enforcement's behavior. When fewer witnesses are around, residents are not allowed as much time or opportunity to pack up. In my experience, this was increasingly the case for the Nenookaasi evictions aside from that first January 4, 2024 eviction, and has become even more restrictive in the past few months.

7.  For a very brief period of time, law enforcement were attempting to make sure people had time to prevent their belongings from being thrown away. That was a nice change of pace. Most of the time, people are rushed. I've seen people routinely have to leave heirlooms behind at evictions which are then thrown away–a grandmother's wedding ring, for example. I tell my clients to try to take their time packing everything in the first trip because often people are not allowed to come back in once they've left.

8.  Law enforcement and MNDOT employees and anyone else from the City at evictions are often aggressive, yelling at people. Supporters and service providers are not allowed to come in and help or to meet with clients and assist them with packing up. People are not

allowed to cross the line, including people who are trying to clear their own belongings out of an encampment.

9.  When people's belongings are taken and destroyed at evictions over and over, this poses all types of barriers to people getting out of this cycle. Someone who is otherwise ready to go into treatment will hold themself back out of shame, because now they only have one set of clothing and the City threw out what they needed to keep up basic hygiene.

10. My clients and the people I work with understand that the increase in evictions and in how they are conducted with less notice, less support, this all comes down from the Mayor. The impact of how these evictions are conducted is to feel like the Mayor is trying to hide homelessness. His preference is to have homelessness and suffering out of sight out of mind, rather than to provide actual solutions.

11.  Evictions are psychologically damaging for the encampment residents who experience continually being displaced.  Evictions are defeating, and mess with people's motivation, reinforces feelings of hopelessness, impermanence, and apathy. They make getting and staying sober much harder.

12. Evictions cost outreach workers and social service organizations a lot of money and makes them less effective. Evictions make it much more difficult for outreach and social services workers to keep track of our clients.   I had clients I was taking to rehab every day who I lost because of evictions, and I am not the only one. The disruption in client relationships and ability to meet with them is annoying and time consuming for service providers and life threatening for our clients. There are people who are trying to get help, and we are working on a step by step process that takes time and requires many repeated visits and relationship building, and then all of a sudden they can't be found. Even the

task of delivering meals and basic sanitation supplies to people is harder when there are not large encampments. Service providers like myself have to hand out a few meals here and there, then drive to find more people, as opposed to being able to make a few stops in total and handing out fifty meals at each location.

13. Between 80 and 90% of people who are living in encampments have open cases with the Hennepin county streets to housing program. Some people have been on the list for years. We've had people on the top of the list and not know it, because they don't have cell phones or reliable ways to be contacted. When there are locations where people can reliably be found, such as encampments like Nenookaasi, if a housing worker shows up who has relationships with those people they can typically get many people housed. That is why Nenookaasi was so successful and allowed astonishing numbers of people to get housed in a short amount of time.

14. A lot of the harms that people blame on encampment residents actually come from housed people in the neighborhood. Evictions are sometimes based on violence that occurs nearby but actually had nothing to do with the encampment or any of its residents.

15. I take issue from a policy perspective with the Mayor's statement that the homelessness problem is a fentanyl problem. Pervasive homelessness was a problem long before fentanyl came into the picture. We have a clear affordable housing crisis. We do not have the housing or support that people need in order to go from homeless to housed. Yes, fentanyl is also a problem, but it is scapegoating to say that fentanyl is to blame for a pre-existing affordable housing crisis and widespread homelessness. A lot of people turn to drugs because they are homeless and trying to numb themselves from that pain.

16. The "choice" to live in an encampment is not a meaningful choice to be in an encampment as opposed to in shelter or in housing, the choice is more "would I rather sleep in an encampment or alone outside somewhere else." People form encampments instead of sleeping out alone somewhere on the street because encampments offer safety, community, warmth, resources, and a chance at breaking the cycle.

17. People with severe trauma are more likely to be the ones struggling with daily drug abuse, especially in the homeless population. We need to address the trauma. I haven't met a person who is unhoused who hasn't had an extremely traumatic experience. A traumatic experience is typically the cause of someone becoming homeless, and then experiences while homeless on the street further traumatize people. Every person I've met through my work has absolutely shocking stories of what they have gone through.

18. I 100% agree with the "housing first" model. Unfortunately, so much of housing is limited to sober people. If someone manages to get sober while unhoused, it does become much easier for them to obtain housing.

19. Housing options for people who are not yet sober are few and far between, poorly run, and often very poor quality.

20. People complain that encampments are unsightly, unsafe, and unsanitary. Encampments can be unsightly. Sometimes there are uncapped needles on the ground. But the way to make that disappear is to give people housing, not to push the symptoms around. Taxpayers are paying for limited support, and wasteful evictions, and could easily instead be paying for housing. House people, and they will be able to get sober. It's very hard to get sober when you're on the street. I do not know anyone who has detoxed themself on the street. Getting housing provides motivation, helping people be able to see their lives

7

trending positively, this can provide the small amount of hope required to continue

making small and large steps to a more healthy lifestyle.


Dated: February 3, 2025           s/*Kira Kelley*
                                    Kira Kelley (#402932)
                                    Climate Defense Project
                                    P.O. Box 7040
                                    Minneapolis, MN 55407
                                    Phone: (802) 683-4086
                                    Email: kira@climatedefenseproject.org

                                    **ATTORNEY FOR PLAINTIFFS**