EXHIBIT C

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, TRAVIS NELOMS, ALVIN BUTCHER, ADRIAN TIGER, CHANCE ASKENETTE, DEVEN CASTON, LOLA HEGSTROM, and RONDEL APPLEBEE, *on behalf of themselves and a class of similarly-situated individuals*,<br><br>Plaintiffs,<br><br>vs.<br><br>MAYOR JACOB FREY, *in his individual and official capacity*,<br><br>Defendant. | Civil Action<br><br>0:24-cv-00001-ECT/TNL<br><br><br>**PLAINTIFFS' RULE 26(a)(2)(C) DISCLOSURE FOR EXPERT WITNESS AARON JOHNSON** |

**To: DEFENDANT JACOB FREY, by and through his Counsel of Record:**

Pursuant to Rule 26(a)(2)(C) and the Scheduling Order, Plaintiff offers the following disclosure with regards to Aaron Johnson, expert witness, who may be contacted via phone at 917-596-4167 or via email at aaronj2k@gmail.com. Plaintiff also incorporates by reference the opinions and facts provided in Mr. Johnson's previously submitted declarations.

Mr. Johnson is a disability rights advocate, documentarian, and an expert on houselessness, encampments, and encampment destruction. He serves as a consultant to the State of Minnesota's Department of Health on public health and homelessness and addiction. He has been a regular attendee and guest speaker at the Minnesota Inter-Agency Council on

Homelessness. Mr. Johnson's expertise has been relied on by multiple Minneapolis Council Members in crafting City policy related to encampments, evictions, and resources. He is currently directing, producing, and filming a documentary about encampments in Minneapolis. This film situates encampments in the historical context of colonialism, citing the legacy of colonization as a root cause of houselessness and its attendant suffering. Mr. Johnson has spent numerous hours at Camp Nenookaasi as a documentarian, a policy consultant, and an advocate.

Mr. Johnson has lived experience and expertise with houselessness, addiction, trauma, and disability. He also has over a decade of professional experience with housing and real estate markets; having worked as a property manager for Sela Investments in Minneapolis and before that as a real estate agent in Los Angeles and New York City.

Mr. Johnson is offered as an expert on the reasons encampments exist, the effects that evictions have on unhoused people and the community as a whole, the pervasive existence of disabilities within the unhoused community and how that impacts people seeking government services, and the availability and accessibility of alternatives to encampments to unhoused people. He is expected to testify to related facts and opinions as summarized below based on his experience as an expert and his observations of Minneapolis encampments generally and at Nenookaasi in particular:

1. Residents of encampments stay in them because they have nowhere else to go. Residents of Nenookaasi lived in that encampment because they had no alternative. Encampments like Nenookaasi exist because of a number of related causes—trauma and disability (whether diagnosed or not), addiction, and the affordable housing crisis. Many people want their lives to change, but there are extreme barriers to overcome before these changes could be possible. The system for accessing housing is convoluted and

incredibly difficult, and at times impossible, to navigate. The waiting list for treatment and/or housing is incredibly long and people without phones or consistent residences can't stay in touch to be informed when it's their turn. Even once someone is approved for housing, it can take months and sometimes more than a year to actually get into housing or receive housing assistance, but by that time people often can't be found. And the root causes are getting worse: from 2023-2024, houselessness in the United States increased by 18%.

2. Encampments like Nenookaasi create safety in numbers for unhoused people. Encampments often provide community, support, and protection against many of the elements that make people particularly vulnerable on the streets. These elements of danger include everything from extreme weather to human traffickers. Encampments are a safer place for people who are waiting to get into treatment and/or housing, who are getting by moment-to-moment, who are in a state of emergency, who are vulnerable because they lack resources. People are less safe and more vulnerable on their own in the streets than in an encampment like Nenookaasi. Nenookaasi served this role—as a protective community—for its residents.

3. Community and relational bonds keep people safe when they are experiencing unsheltered houselessness and give people the motivation and support to want to make changes and to think long-term. Encampments like Nenookaasi facilitate these bonds. Also, encampments allow residents to form bonds and trust with service providers which is necessary in order for case workers to be able to make their services accessible to people with disabilities that impact executive function and ability to trust. Nenookaasi

gave people this opportunity to build trust and stability, and did facilitate these bonds and kept people safer than being on the street alone.

4. Being at an encampment like Nenookaasi makes it more accessible to get into treatment and/or get into sheltered housing than if you are on the street on your own. Nenookaasi made it possible for many people to get into treatment and/or sheltered housing both because of the emotional support that the group setting provides and because logistically being in one place for a long time is how service providers can find clients who don't otherwise have phones or addresses or ways of being in contact. Case workers are overwhelmed, and encampments make it easier for case workers to connect with their clients and vice versa.

5. Recovery from addiction is a process. You must be ready to quit mentally, spiritually, and psychologically before you can actually physically quit. Encampments like Nenookaasi facilitate the conversations and create the environments where people become ready to quit using. Nenookaasi enabled people to recover from addiction.

6. The current shelter system currently is not an adequate substitute for encampments. There are more unsheltered unhoused people than available shelter beds on any given night. When encampments are evicted, there are not enough shelter beds available to house everyone who has just been displaced. On multiple occasions, I have documented individuals calling the Shelter Connect hotline during encampment evictions, including from Nenookaasi, and observed that there have never been nearly enough beds available for residents who are being displaced. The Star Tribune has also documented this issue. Furthermore, even when there is a small handful of beds available, what is actually

available changes minute to minute during an eviction—these resources are taken up fast when evictions are happening and what was available is gone ten minutes later.

7. For the few spaces that might be open at any given time, shelters and treatment placements are not accessible, particularly for people with disabilities—elevators in shelters are permanently out of service, treatment buildings have stairs with no ramps just to get in the door, people are not able to bring their belongings with them, they have to leave shelters early each morning and navigate the daily grind of figuring out where they'll be that night. Shelters are also sex-segregated, meaning there are no options for trans and nonbinary people.

8. Accessibility is an everyday issue in our society, and housing is no exception—disabilities make it even harder for people to access housing, stay in housing, and stay in touch with housing workers. Various studies have reported that 40-57% of unsheltered unhoused people are disabled. Furthermore, when you consider the extreme trauma that comes with unsheltered houselessness, essentially 100% of people in encampments have post-traumatic stress disorder. When you have already been experiencing extreme trauma and someone comes and bulldozes your home, that itself is traumatizing and the eviction itself makes it more difficult to obtain housing and/or sobriety. The repeated evictions of Camp Nennookaasi were further traumatizing to its residents seeking to recover from many forms of trauma, including the generational trauma of Indigenous genocide.

9. Most if not all Nenookaasi residents have physical, mental, and psychological disabilities. To my knowledge the City has not made any efforts to accommodate these disabilities.

5

Evicting Nenookaasi—particularly without any notice or meaningful housing alternatives—particularly harmed its residents with disabilities.

10. In my opinion and experience, Minneapolis officials and police respond to allegations of harm *by* Nenookaasi residents, but fail to respond to reports of violence that happen *to* encampment residents. This reflects the extreme biases of the Mayor and his agents against Nenookaasi residents, and their lack of concern for the safety and wellbeing of residents themselves. Despite the suspicious circumstances of the fire at Nenookaasi and the repeated requests for an investigation by residents and their supporters, for example, law enforcement has refused to adequately investigate its cause(s).

11. The City of Minneapolis generally has not provided adequate notice of Camp Nenookaasi evictions. For context, the City of Minneapolis historically has not provided notice for residents of encampment evictions. In response to political pressures and media presence, this changed for the first eviction of Camp Nenookaasi on January 4, 2024—the City was clear and communicative about the eviction and law enforcement was on their best behavior, showing that it was possible for them to do so. After that, things returned to business as usual. The eviction of the second camp on January 30, 2024, lacked clear notice. I had many conversations with residents, who in my opinion were extremely anxious about the generic threat of eviction and the confusing and apparently illegitimate notice provided by an evangelical pastor. Subsequent Nenookaasi evictions—on February 1 and July 25, 2024—lacked any notice whatsoever.

12. At each eviction, I have asked what storage options are available to residents. No storage was offered at any of the Nenookaasi evictions. In my opinion, not providing storage during an eviction makes the storage effectively useless and all but guarantees residents

6

will face property destruction during evictions. I personally observe these patterns of property destruction, and routinely see City workers at evictions seizing and destroying belongings that include mementos of deceased loved ones, antibiotics, birth certificates, and many other life saving, vital or irreplaceable items.

13. In my advocacy work at the state level, and because of my presence on the ground, I see firsthand how money earmarked for supports to unhoused people gets eaten up by piranhas before it becomes useful to people on the streets. For example, the large grant given by the City to Helix housing was poorly planned, poorly vetted, and predictably mismanaged. Helix was able to pocket the money, without long-term meaningful benefits going to Nenookaasi residents. The City does nothing to address the living conditions in the housing it pays Helix to provide, so many of these apartments have become unlivable, overtaken by gangs, drug dealing everywhere, no mental health support or any kind of programming to help people transition out of and recover from the war-like conditions of houselessness, and not a safe or viable place to stay especially for someone who is trying to remain sober.

14. The City makes Nenookaasi residents predictably and demonstrably less safe by evicting them, bulldozing their home, destroying their belongings, and scattering their community. For example, overdose rates and HIV and Hepatitis transmissions increase following evictions. The threat of evictions happening without notice, of belongings being lost, with residents left without anyplace safe to go, creates a pressure cooker when combined with people's existing psychological disabilities and all the existing, valid reasons they have to distrust government officials. The City's repeated evictions of Camp Nenookaasi

is a continuation of the colonizing government's long history of genocidal violence against Indigenous peoples.

Dated: February 3, 2025

s/*Kira Kelley*
Kira Kelley (#402932)
Climate Defense Project
P.O. Box 7040
Minneapolis, MN 55407
Phone: (802) 683-4086
Email: kira@climatedefenseproject.org

*/s/Claire Nicole Glenn*
**Claire Nicole Glenn (she/her)**
Staff Attorney
Climate Defense Project
P.O. Box 7040
Minneapolis, MN 55407
651-343-4816
claire@climatedefenseproject.org
District of Columbia License No. 888242412
Maryland License No. 1902280002
Minnesota License No. 0402443

**ATTORNEYS FOR PLAINTIFFS**