# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

CHERYL SAGATAW, et al. ,

                    Plaintiffs,

vs.

MAYOR JACOB FREY, *in his individual and official capacity*

                    Defendant.

Case No. 24-cv-00001 (ECT/TNL)

**DEFENDANT MAYOR JACOB FREY'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' MOTION FOR CERTIFICATION**

---

## <u>INTRODUCTION</u>

The last iteration of "Nenookaasi," the self-named homeless encampment that is the subject of this lawsuit, was closed on January 6, 2025, following a fire that consumed the encampment. Prior to that closure, there have been eight different iterations of Nenookaasi, located on six different City-owned properties since August 2023. Plaintiffs now move to certify a class for the purpose of obtaining an injunction to control how and when Defendant closes theoretical future iterations of Nenookaasi. This motion fails for numerous reasons.

First, to Defendant's knowledge, no Nenookaasi encampment exists on City-owned property. Plaintiffs cannot certify a class for the purpose of enjoining

Defendant from closing a speculative, future encampment. Moreover, no Plaintiffs have camped at Nenookaasi since July 2024 and they, therefore, do not have standing to represent a Rule 23(b)(2) class of people who seek forward-looking relief relating to hypothetical Nenookaasi closures. The Court should deny Plaintiffs' motion for class certification on these bases alone.

Moreover, Plaintiffs have not shown that their class is clearly ascertainable nor that the prerequisites of the Federal Rules for class actions - numerosity, commonality, typicality, and adequate representation - are satisfied. As outlined further below, the record is woefully bare of evidence regarding any of the Plaintiffs' experiences, let alone an explanation about how those experiences are representative of potential class members. Plaintiffs have failed to show that a single injunction could possibly address the individual circumstances of each class member.

Furthermore, Plaintiffs' theory of class cohesion is based on an unconstitutional policy or custom of Defendant, however, they fail to show that such a policy or custom exists. That there is no policy nor custom of unconstitutional conduct against Plaintiffs, which could be remedied through injunctive relief, defeats Plaintiffs' motion for class certification.

**FACTS**

I.      **The Inception of Nenookaasi.**

On August 24, 2023, the Minnesota Department of Transportation ("MNDOT") cleared and closed an encampment on MNDOT property known as the "Wall of Forgotten Natives." (Doc. 17 ¶2.) Immediately after, several individuals from that site broke through a fence surrounding a City-owned lot at 2313 13th Avenue South. *Id.* Within hours of this trespass, approximately 40 individuals set up tents and formed a new encampment. *Id.* This was the first iteration of the Nenookaasi encampment.

## II. For Months, the City Devoted Substantial Time and Resources to Connect Nenookaasi Residents With Services and Property Storage Options.

The City's Homeless Response Team ("HRT") connects homeless individuals with Hennepin County for housing assessments and/or case management, service providers or assigned case workers, storage services in partnership with Downtown Improvement District, shelter services, medical attention through Healthcare for the Homeless, and transportation services to these and other resources. (ECF 17 ¶¶5-6.) HRT made at least 15 separate visits to the First Nenookaasi, offering this assistance. (*Id.*) On numerous occasions, the City's additional outreach partners, including Agate, Avivo, Hennepin County's Streets to Housing, and Healthcare for the Homeless, visited the encampment to provide services to the unsheltered individuals. (*Id.* at ¶7.) Moreover, in connection with the First Nenookaasi, with the approval of Mayor Jacob Frey and

3

the Minneapolis City Council, the City provided one-time funding to Helix Health and Housing Services, an organization that provides housing, mental health services, and substance-use treatment to underserved populations in collaboration with Red Lake Nation. (*Id.* ¶8.) With the assistance of Helix's outreach efforts, the City supported 104 residents at the first Nenookaasi who found housing or other shelter. *Id.*

### III.    City Directors and Staff Engaged in Extensive Dialogue About Closure with Nenookaasi Organizers.

In addition to the over 15 visits to the first Nenookaasi by the City's HRT, the Director of the City's Community Planning and Economic Development Department ("CPED") and the Director of the City's Regulatory Service Department, with the approval of Mayor Frey, also separately met with encampment organizers on October 11, 2023, to evaluate the situation, observe conditions, and discuss closure. (ECF 17 ¶10.) They discussed ways in which the City would provide assistance to minimize health concerns in advance of the closure. *Id.* For example, while the City historically has not provided portapotties at encampments, City staff added portapotties as part of its plan to effect a healthy closure of the large encampment. (*Id.* ¶11.) Identifying a willing vendor was challenging because at encampments, portapotty vendors have been harassed and assaulted, portapotties are regularly vandalized, and service vehicles damaged while servicing encampments. (*Id.* ¶12.) Nonetheless, the City secured four

portapotties to be placed immediately outside of the encampment, including an accessible portapotty for residents with limited mobility. (*Id.* ¶13.) Additionally, to improve conditions as the parties worked towards a collaborative closure, the City increased trash removal outside the encampment from once to twice a week. (*Id.* ¶14.)

## IV.  Conditions Deteriorate and Community Safety Concerns Increase.

The longer the first Nenookaasi encampment existed, the more dangerous criminal activity increased in and around the encampment. Encampments are often a breeding ground for criminal activity. (ECF 17 ¶15.) Encampments pose risks not only to those camping in them, but to the community at large, and the first Nenookaasi encampment was no exception. (*Id.*) There were more than one hundred 911 calls to Minneapolis Police and Fire Departments relating to the first Nenookaasi. (*Id.* ¶16.) The calls reported illegal activity at the encampment including, but not limited to, death threats amongst campers, assault, gunshots, stolen vehicles, vandalism and property damage, drug overdoses, and fires.  (*Id.*)

On November 1, 2023, leaders from the Metropolitan Urban Indian Directors ("MUID") reached out to City staff and Mayor Frey demanding that the encampment be closed immediately, citing concerns not only about the recent deaths and other crimes, but about concerns that criminal activity was not being reported due to threats and physical violence inflicted. (ECF 17 ¶28, Ex. A.)

According to MUID, neighbors witnessed women and girls being dragged from the encampment into cars in the middle of the night, and open drug use and sex acts throughout the day. (*Id.*) Then, on December 12, 2023, a 45-year-old man was murdered at the encampment, having been shot six times. (*Id.* ¶19.)

## V.    Closure is Delayed Numerous Times to Give People More Time to Connect with Resources.

Due to escalating violence and safety concerns, the encampment was set for closure on December 14, 2023, and notice of the closure was posted on December 7, 2023. (ECF 17 ¶20.) However, Mayor Frey determined that a short delay was appropriate to give those remaining at the encampment additional time to access shelter and services. (*Id.* ¶21.) Accordingly, a new closure date was set for December 19, 2023. (*Id.*) Between December 7 and December 19, the HRT team made numerous visits to the encampment, offering connection to shelter and services, and providing free storage options. (*Id.* ¶22.)

On December 14, 2023, members of the Mayor's Office and Minneapolis City Council, County Commissioners, state legislators, and services providers met with Nenookaasi leaders. (ECF 17 ¶23.) There was broad agreement that Nenookaasi needed to close, but City leadership agreed to another extension to provide even more time for people to access services and shelter. (*Id.*)  At that meeting, Nenookaasi organizers asked that residents of the encampment be moved to a temporary, 24/7, indoor facility. (*Id.*) The City actively worked to explore that

request along with County, State, and experienced social service providers. (*Id.*) Four experienced and trusted service providers who were capable of providing this level of support were identified, but after several discussions, all four providers said they could not take on the role of managing such a project, owing to capacity and resources limitations, and other competing priorities. (*Id.*) However, these providers could collectively provide supportive housing to 45-60 individuals, including offering residents mental health and substance use disorder services. *Id.* Additionally, Salvation Army and Rescue Now made plans to add 90 shelter beds the week of January 1, 2024. (*Id.*) Hennepin Shelter Hotline, in partnership with the Adult Shelter Connect, made plans to help people access these additional beds and other beds that became available in existing shelters. (*Id.*) Accordingly, the encampment closure was rescheduled for January 4, 2024. (*Id.*)

Notice of the closure of the first Nenookaasi was posted on December 29, 2023, six days in advance of the closure. (ECF 17 ¶24.) Hennepin County service providers represented to the City that they engaged with *everyone* at the encampment. (*Id.* ¶25.) During the time between December 14, 2023, to January 4, 2024, City staff spent hundreds of hours preparing for the closure, allocating resources, designating staff, and assuring that all available resources had been

repeatedly made available to those at the encampment, and that shelter was available for all individuals at the first Nenookaasi. (*Id.* ¶26.)

## VI.     The City conducts closures pursuant to lawful guidelines.

The City conducts encampment closures in accordance with a set of operational guidelines. (ECF 17 ¶27.) On the day of an encampment closure, representatives from multiple departments are often present. (*Id.* ¶29.) The Minneapolis Health Department handles needle pick-up, if necessary, Minneapolis Public Works will help with site cleaning, the Minneapolis Department of Regulatory Services may be on hand to assist with community partners, provide shelter information, and offer rides. (*Id.*) When necessary, Minneapolis Police Department officers are on site to support other City staff and ensure that homeless individuals, the community, and City staff are safe throughout the closure. (*Id.*)  City employees on site encourage individuals to gather and take all of their belongings that they have not already placed in storage. (*Id.* ¶30.) City workers will often help individuals move their belongings off-site. (*Id.*) If individuals forget an item, they are typically allowed back on site to retrieve it, provided it is safe for them to do so.  (*Id.*) If specific personal items are left behind and identified, such as a purse or backpack, City workers will retrieve that item and turn it over to outreach workers for return it to its owner. (*Id.*)

Unfortunately, City employees at encampment closures frequently confront unwanted, hazardous, and/or dangerous items left behind. (*Id.* ¶31.) This includes garbage, food waste, torn tarps, hypodermic needles, and even stolen vehicles, explosives, and guns. (*Id.*) City employees have been stuck by used hypodermic needles when attempting to sort through property at encampment closures. (*Id.*) Discarded tents are often filled with urine, feces, spoiled food, and rats. (*Id.*)

## VII. The City Closes the First Nenookaasi.

On January 4, 2024, the City closed the first Nenookaasi encampment. (ECF 107 ¶2.) On January 2, 2024, two days before the scheduled and widely-advertised closure, individuals associated with first Nenookaasi broke into a locked, fenced property owned by CPED located at 2601 14th Avenue South. (ECF 107 ¶7.) Individuals cut a large hole in the secured fence, tore down "no trespassing" signs that were posted on the site, and began moving in various supplies, including a large amount of firewood. *Id.* By January 3, 2024, individuals associated with the first Nenookaasi had erected four large yurts on the CPED property. (*Id.*)

On January 4, 2024, representatives from multiple departments were on site for the closure of the first Nenookaasi. Staff, including Directors from the City's Department of Regulatory Services and CPED, were present. (*Id.*) Minneapolis Public Works staff were present to assist with cleaning the site. Minneapolis Police

Department officers were on site to support the other City staff and ensure that homeless individuals, the community, and City staff were safe throughout the duration of the encampment closure. (*Id.*)

On the day of the closure, City staff stood by as those in the first Nenookaasi encampment conducted a ceremony, held a lengthy press conference, and packed their belongings for transport from the site. (*Id.* ¶4.) Individuals at the first Nenookaasi encampment were given unlimited time to leave with their belongings. (*Id.* ¶5.) The City had buses standing by to transport people to the Catholic Charities' Opportunity Center, where they could connect with services, including but not limited to housing resources and medical and mental health care providers, as well as have access to storage lockers, internet services, breakfast and lunch services, and laundry. (*Id.* ¶6.) No one at the encampment chose to take these services. (*Id.*)

## VII.  The Second Nenookaasi Encampment.

A number of individuals leaving the first Nenookaasi on January 4, 2024, proceeded directly to 2601 14th Avenue South. (ECF 107 ¶8.) Those individuals moved their belongings onto the City-owned property and declared this site to be Camp Nenookaasi. Within hours, over 25 individuals and over a dozen yurts had moved to what then became the second Nenookaasi encampment. (*Id.*)

10

On January 5, 2024, City staff met with Nenookaasi organizers. (*Id.* ¶9.) City staff told the camp organizers that they could not stay at the second Nenookaasi and needed to leave. (*Id.*) On January 8, 2024, the City once again reposted notice of trespassing signs. (*Id.* ¶10.) Those signs were once again torn down by individuals in the Second Nenookaasi. (*Id.*) On January 17, 2024, City staff again met with camp organizers and told them that the City would be closing the second Nenookaasi. (*Id.* ¶11.)

On January 18, 2024, the City's Health Department was notified by the Minnesota Department of Health of a possible gastrointestinal illness in the second Nenookaasi. (*Id.* ¶12.) The City's Health Department team immediately initiated an investigation. (*Id.* ¶13.)  On January 19, 2024, City Health Department staff visited the second Nenookaasi and found that 20-30 people were ill with symptoms consistent with a viral gastrointestinal illness. (*Id.*) During the visit, the Health Department team provided cleaning supplies for common areas, including bleach solution in spray-bottles, bleach and water for replenishing the spray-bottles, gloves, and paper towels. (*Id.* ¶14.) The Health Department team also met with individuals in the second Nenookaasi to discuss community guidelines for minimizing transmission and recommended that new portapotties be provided. (*Id.*)

The Health Department determined that closure of the second Nenookaasi should be postponed until the virus was contained to minimize transmission to other vulnerable populations. (*Id.* ¶15.) The Health Department visited the second Nenookaasi again on January 20 and 21, 2024. (*Id.* ¶16.) On January 24, 2024, after 72 hours with no new cases, the Health Department determined the virus was contained and that closure of the second Nenookaasi could move forward. (*Id.* ¶17.) On January 24, 2024, City staff emailed camp organizers and told them that the second Nenookaasi would be closing soon. (*Id.*)

On January 28, 2024, a man was shot immediately outside of the second Nenookaasi. (*Id.* ¶18.) On January 30, 2024, after weeks of notice, the City closed the second Nenookaasi. (*Id.* ¶19.) On the day of closure, individuals at the second Nenookaasi were given an unlimited amount of time to remove their belongings. (*Id.* ¶20.)

Between the inception of the second Nenookaasi on January 4, 2024, and its closure on January 30, 2024, the City's HRT made eight separate site visits, each time offering connection to services, shelter, and storage options. (*Id.* ¶21.) No one at the second Nenookaasi chose to use the City's storage options. (*Id.*)

## VIII.  The Third Nenookaasi Encampment.

The day of the closure of the second Nenookaasi, on January 30, 2024, individuals from the encampment immediately moved to another City-owned

property located at 2213 16th Avenue South in Minneapolis. (ECF 107 ¶22.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.* ¶23.) Individuals associated with the encampment cut and removed a section of fence, and moved their belongings inside the property in what became the third Nenookaasi encampment. (*Id.*)

Individuals at the third Nenookaasi also tore down the "no trespassing" signs upon entry. (*Id.* ¶24.) That evening, City staff returned to the site of the third Nenookaasi encampment and reposted "no trespassing" signs. (*Id.*)  By the following morning, January 31, 2024, the signs were torn down again. (*Id.*) The City returned that day and again posted "no trespassing" signs. (*Id.*) On February 1, 2024, the City closed the third Nenookaasi. (*Id.* ¶25.) The day of the closure, individuals were given an unlimited amount of time to pack up their belongings. (*Id.* ¶26.)

## IX.    The Fourth Nenookaasi Encampment.

Individuals from the third Nenookaasi immediately moved to another City-owned property. (*Id.* ¶27.) This property was a locked and fenced property located at 1100 28th Avenue East in Minneapolis. (*Id.*) Individuals associated with Nenookaasi broke into the property by cutting through the fence, moved City-owned infrastructure stored at this location, and began setting up another

encampment. (*Id.*) Within a day, Plaintiffs had erected 18-20 yurts at the fourth Nenookaasi. (*Id.*)

The City was alerted that smoke in the air from the fourth Nenookaasi's bonfires caused significant problems for the Allina Central Laboratory located nearby at 2800 10th Avenue South in Minneapolis. (*Id.* ¶28.) On February 25, 2024, Allina staff reported to City staff that laboratory employees had noticed a strong odor of campfire smoke inside the laboratory and determined that the smell was coming from the fires at the fourth Nenookaasi. (*Id.* ¶29.)

The City was informed that this smoke not only created an uncomfortable and disruptive work environment for the laboratory employees, but there was concern that smoke particulates in the air could impact the laboratory's sensitive testing equipment. (*Id.* ¶30.) Allina further informed the City that without functioning testing equipment, the laboratory would not be able to operate, which would have a significant impact on patient access to medical testing. (*Id.*) On February 28, 2024, City staff visited the fourth Nenookaasi and spoke with individuals about the impact the smoke was having on the area. (*Id.* ¶31.) Staff advised to burn "class one" materials only and discontinue usage of other portable heat sources. (*Id.*) Class one materials consist of untreated wood products suitable for use in wood-burning firepits and fireplaces. (*Id.*)

On February 29, 2024, a massive fire broke out midday at the fourth Nenookaasi. (*Id.* ¶32.) Within a matter of minutes, the entire fourth Encampment went up in flames. (*Id.*) The Minneapolis Fire Department and other first responders immediately responded to the scene. (*Id.*) Minneapolis firefighters quickly extinguished the blaze, but almost nothing was salvageable from the charred remains of the encampment. (*Id.*)

## X.    The Fifth Nenookaasi Encampment.

Immediately following the fire, individuals from the fourth Nenookaasi moved to another City-owned property located at 2939 14th Avenue South. (*Id.* ¶34.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.*) Individuals associated with Nenookaasi cut and removed a section of fence and moved their belongings inside the property in what became the fifth Nenookaasi. *Id.*

From March through June 2024, the fifth Nenookaasi grew rapidly to more than 70 individuals across 50 structures. (*Id.* ¶35.) From March through June 2024, the City's HRT made ten site visits, each time offering connection to services, shelter, and storage options. (*Id.*) No one at the fifth Nenookaasi chose to use the City's storage options. (*Id.*)

On July 25, 2024, the City closed the fifth Nenookaasi. (*Id.* ¶36.) On the day of the closure, individuals were given an unlimited amount of time to pack up

their belongings. (*Id.* ¶37.) At the time of the closure of the fifth Nenookaasi, there were 10 unhoused individuals staying at the site. (*Id.* ¶38.) Hennepin County reported, at that time, there were 33 shelter spaces available – 19 for men, 10 for women, and 3 mixed gender spaces. (*Id.*)

## XI.    The Sixth Nenookaasi Encampment.

Immediately following the closure of the fifth Nenookaasi, individuals from the encampment moved to another City-owned property at 2313 13th Avenue South in Minneapolis. (*Id.* ¶39.) The property at 2313 13th Avenue South was the site of the first Nenookaasi encampment from which individuals had already been trespassed on January 4, 2024. (*Id.* ¶40.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.* ¶41.) Individuals associated with the encampment cut and removed a section of fence and moved their belongings inside the property in what became the sixth Nenookaasi. (*Id.*) On October 7, 2024, the City closed the sixth Nenookaasi (*Id.* ¶42.) Individuals then camped on the public right-of-way adjacent to the site of the sixth Nenookaasi encampment. (*Id.* ¶43.) On October 13, 2024, the City cleared the sidewalk adjacent to the sixth Nenookaasi. (*Id.* ¶44.)

## XII.    The Seventh Nenookaasi Encampment.

Immediately following the closure of the sixth Nenookaasi and public right of way, individuals from the encampment moved to another City-owned property

located at 2839 14th Avenue South.  (*Id*. ¶45.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.*) Individuals associated with the encampment cut and removed a section of fence and moved their belongings inside the property in what became the seventh Nenookaasi. (*Id.*)

On January 6, 2025, a large fire erupted at the seventh Nenookaasi encampment. (ECF 125 ¶3.) Multiple propane tanks exploded, and within minutes the entire encampment was engulfed in flames. (*Id.* ¶3.) Minneapolis firefighters quickly extinguished the blaze, but almost nothing was salvageable from the charred remains of the encampment.  (*Id.*)

## XIII.  The Eighth Nenookaasi.

On November 8, 2024, individuals broke into another City-owned property, located at 2601 14th Avenue South in Minneapolis. (ECF 125 ¶2.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.*) Individuals associated with the encampment cut and removed a section of fence and moved their belongings inside in what became the eighth Nenookaasi. (*Id.*) This encampment existed at the same time as the seventh Nenookaasi.  This iteration of the encampment was closed on November 12, 2024, four days after individuals set it up. (*Id.*)

## XIX.   No Nenookaasi Encampments Currently Exist.

As of today, there are no current iterations of the Nenookaasi encampment in Minneapolis. (*Id.* ¶4.)

## THE PLAINTIFFS

## I.    Plaintiffs' Experiences in Encampment Closures Differ Greatly.

While the nine named Plaintiffs have, at some point, camped at one of the eight Nenookaasi encampments, there is no evidence in the record that any of them are currently staying at a Nenookaasi encampment. In fact, there is no evidence that any Plaintiffs have camped at a Nenookaasi encampment since July 2024. As outlined above, between July 2024 to the present, there have been three additional Nenookaasi iterations.

**Cheryl Sagataw:** The Second Amended Complaint ("SAC") identifies Plaintiff Cheryl Sagataw ("Sagataw") as a "former" resident of Nenookaasi. (ECF 104 ¶3.) The only evidence in the record regarding Sagataw's claims is a single declaration dated December 15, 2023, prior to the closure of *any* Nenookaasi encampments. On January 4, 2024, the first iteration of Nenookaasi was lawfully closed. There is no evidence that Sagataw was a camper at the time of the closure of the first Nenookaasi. There is no evidence that Sagataw was unaware of the multiple notices of closure that were given for this encampment. There is no evidence that Sagataw lost any property at the closure of the first Nenookaasi.

There is no evidence that Sagataw has camped at any of the subsequent iterations of Nenookaasi or currently lives at a Nenookaasi encampment.

**DeAnthony Barnes:** The SAC identifies Plaintiff DeAnthony Barnes ("Barnes") as a "former" resident of Nenookaasi. (ECF 104 ¶8.). Barnes alleges that he was present at the closure of the first Nenookaasi. (ECF 37 ¶2.) Barnes admits that the campers were given a "fair" amount of time to move their belongings from City property and that outside individuals were allowed in to help campers move. (*Id.* ¶3.) Barnes also claims that he was at the third Nenookaasi, closed two days after the second Nenookaasi, and he acknowledges that he had not yet set up his belongings when he was asked to leave. (*Id.* ¶4.) Barnes claims that he lost items during the closures, including a suitcase, clothes, electronics, food, and blankets, but does not offer specific information about when, where, or how these items were lost. (*Id.* at 6.) There is no evidence in the record that Barnes has lived at any of the subsequent iterations of Nenookaasi or currently lives at a Nenookaasi encampment.

**Roberta Strong:** The SAC identifies Roberta Strong ("Strong") as a "former" resident at Nenookaasi. (ECF 104 ¶15.) Strong claims to have been at the first, second, and third Nenookaasi closures. (ECF 39.) Strong claims that she lost track of things at closures generally, including clothes and medicine, but does not offer specific information about when, where, or how these items were lost. (*Id.* ¶11.)

19

Strong also admits that she has had numerous items stolen while at Nenookaasi, and eventually no longer tried to replace those items. (*Id*. ¶14.) There is no evidence in the record that Strong has lived at any of the subsequent iterations of Nenookaasi or currently lives at Nenookaasi.

**Travis Neloms:** The SAC identifies Plaintiff Travis Neloms ("Neloms") as a "former" resident at Nenookaasi. (ECF 104 ¶21.)  Neloms claims that he has gone from encampment to encampment since 2018 and that he has been through "a lot of evictions," but there are no facts in the record that Neloms was ever present at Nenookaasi evictions, nor which iteration of Nenookaasis Neloms even stayed in. (ECF 36 ¶¶6, 11.) Neloms admits that he's been offered storage, but that he "never went to look into it." (*Id*. ¶¶14-15.)  Neloms admits he was given a spot in the Agate transitional housing program, but that "he didn't like the living situations," such as sharing a room, though Neloms admits that while at Nenookaasi he shared a yurt. (*Id*. ¶¶10-11.) Neloms admits that he does not like that shelters have "curfews and rigid rules," and acknowledges that he does not seek shelter availability. (*Id*. ¶¶8, 19.) Neloms claims to have lost clothes, bikes, tents, blankets, medications, and personal paperwork, but does not offer any specific information about when, where, and how these items were lost. (*Id*. ¶20.) There is no evidence that Neloms has camped at any Nenookaasi since February 2024, nor that Neloms currently lives at Nenookaasi.

**Lola Hegstrom:** The SAC identifies Plaintiff Lola Hegstrom ("Hegstrom") as a "former" resident of Nenookaasi. (ECF 104 ¶ 29.) There is no evidence in the record that Hegstrom camped at the first, second, or third Nenookaasi. Hegstrom admits that she was present at the fourth Nenookaasi when the massive fire broke out, destroying the camp in minutes. (ECF 98 ¶8.) Hegstrom claims that she lost personal belongings in the fire. (*Id.*) After the fire, Hegstrom set up camp at the fifth Nenookaasi, a City-owned property that was surrounded by a locked fenced and had "no trespassing" signs posted. (*Id.* ¶9; ECF 107 ¶34.) Hegstrom claims that she had no notice that she was not allowed to camp on City property. (ECF 98 ¶9.)

Hegstrom claims that she used the free City offered storage for a time, but eventually removed all of her items from storage. (*Id.* ¶12.) Hegstrom claims to have lost jewelry, clothes, sleeping bags, tents, toys, a generator, and "expensive purses," along with medical papers, but does not offer any specific information about when, where, and how these items were lost. (*Id.* ¶11.) There is no evidence that Hegstrom has camped at any Nenookaasi since July 2024, nor that Hegstrom currently camps at Nenookaasi.

**RonDel Applebee:** The SAC identifies Plaintiff RonDel Applebee ("Applebee") as a "former" resident of Camp Nenookaasi. (ECF 104 ¶35.) There is no evidence in the record that Applebee camped or was at the closure of the first to third Nenookaasis. Applebee was at the fourth and fifth Nenookaasi. (ECF 99

¶¶7-8.) Applebee claims that he lost his ID and social security card during the closure of the fifth Nenookaasi. (*Id.* ¶5.) Applebee did not use the City-offered storage because he did not trust the City workers offering storage. (*Id.* ¶12.) There is no evidence in the record that Applebee camped at a Nenookaasi encampment since July 2024. Applebee is currently housed. (*Id.* ¶¶10-11.)

**Chase Askenette:** The SAC identifies Plaintiff Chase Askenette ("Askenette") as a "former" resident of Camp Nenookaasi. (ECF 104 ¶44.) At some point, Askenette camped at the first Nenookaasi, which he admits was on fenced-off land. (ECF 96 ¶4.) There is no evidence in the record that Askenette was affected by the closure of the first Nenookaasi. Askenette claims that he was at the closures of the second, third, and fourth Nenookaasi. (*Id.* ¶¶7-8.) Askenette claims that he lost a yurt, clothing, a Playstation 5, and a family heirloom at the closure of the third or fifth Nenookaasi. (*Id.* ¶8.) There is no evidence in the record that Askenette camped at any Nenookaasi since July 2024. Askenette is currently living with his extended family. (*Id.* ¶6.)

**Adrian Tiger:** The SAC identifies Plaintiff Adrian Tiger ("Tiger") as a "former" resident of Camp Nenookaasi. (ECF 104 ¶49.) Tiger claims to have camped at the first through fifth Nenookaasis. (ECF 94 ¶¶3-7.) Tiger claims that he lost clothes, shoes, cell phones, jewelry, and identification documents at various closures, but does not offer any specific information about when, where, and how

these items were lost. (*Id.* ¶8.) There is no evidence that Tiger has camped at any Nenookaasi since July 2024, nor that Tiger currently camps at Nenookaasi.

**Alvin Butcher:** The SAC identifies Plaintiff Alvin Butcher ("Butcher") as a "former" resident of Camp Nenookaasi. (ECF 104 ¶57.) Butcher claims he camped at and was present at the closure of the first Nenookaasi. (ECF 95 ¶6.) He claims that he lost property at that closure because he was helping other people move and did not take his own belongings. (*Id.*) Butcher claims that at some closures he leaves behind everything but a backpack, and at some closures he takes all of his things. (*Id.* ¶7.) Butcher claims that he lost various things at various closures. (*Id.* ¶¶9-11.) Butcher claims that at the closure of the fifth Nenookaasi, he lost clothes, blankets, food, a solar panel, a car battery, and documents. (*Id.* ¶9.) Butcher claims that he has never been offered storage, but that he would like to use the City-offered storage. (*Id.* ¶20.) Butcher claims that he does not want to go to shelter, because he does not want to be separated from his girlfriend. (*Id.* ¶19.) There is no evidence in the record that Butcher camped at any Nenookaasi since July 2024, nor that he currently camps at Nenookaasi.

## ARGUMENT

Plaintiffs have "the burden of showing that the class should be certified and that the requirements of Rule 23 are met." *Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir. 1994). To maintain a class action under Rule 23, a plaintiff must satisfy all four

prerequisites of Fed. R. Civ. P. 23(a), in addition to meeting the requirements of one of the three types of class actions described in Fed. R. Civ. P. 23(b).  Fed. R. Civ. P. 23.  Here, Plaintiffs only seek class certification for injunctive relief under Fed. R. Civ. P. 23(b)(2).  (ECF 120 "P. Mem." at 6.)  However, Plaintiffs' motion fails because Plaintiffs cannot legally or factually meet the requirements of Fed. R. Civ. P. 23.

Notably, Plaintiffs' memorandum of law omits a "fact" section. Rather than facts supported by the record, Plaintiffs rely mainly on allegations from their SAC. This is insufficient to meet their burden of proof. "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The district court must undertake a rigorous analysis of the record on class certification.  *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011)(noting the parties "created an extensive record on class certification that included more than a thousand pages of expert reports, business records, sworn declarations, depositions transcripts, answers to interrogatories, and other evidentiary exhibits and materials.")  In this analysis, the Court may resolve disputes regarding the facts of the case "if necessary to the class certification analysis." *Id.* (citing *Blades*

*v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005)).  The Supreme Court has found that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).  There is good reason for this Court to probe "behind the pleadings" as the evidence fails to support Plaintiffs' certification arguments.

## I.    Each Plaintiff Lacks Standing to Seek Injunctive Relief and is Therefore Unable to Represent the Class.

Plaintiffs must maintain standing throughout the case to have claims that they can pursue on behalf of the class. Because Plaintiffs do not currently camp at Nenookaasi, and have not done so for months or years in some cases, they lack standing to pursue the requested injunctive relief – either on their own, or on behalf of a class.

"[A]n actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013)(internal quotations omitted).  If, during litigation, a change in circumstances causes the parties to lose a legally cognizable interest in the outcome, then the case is considered moot.  *Id.*; *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005). A plaintiff has standing to seek injunctive relief only when they face "an ongoing injury or a 'real and immediate' threat of future injury." *Let Them Play MN v. Walz*, 556 F. Supp. 3d 968, 976 (D. Minn. 2021) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-105, 107 n.8 (1983)). An individual cannot secure

prospective relief if the plaintiff does not face "certainly impending" injury. *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037–38 (8th Cir. 2000)(quoting *Friends of the Earth, Inc. v. Laidlaw Env't Services, Inc.*, 528 U.S. 167, 170 (2000)). A plaintiff must show that their likely future injury will be remedied by the relief sought. *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006).

Where a named plaintiff lacks standing, they are not typical of the proposed class. *E.g., O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)(stating if named plaintiffs do not establish the requisite case or controversy, "none may seek relief on behalf of himself or any other member of the class"); *Brenizer v. Cnty. of Sherburne*, No. CV 21-1301(DSD/TNL), 2023 WL 2609357, at *4-5 (D. Minn. Mar. 23, 2023). In *Brenizer*, the court found that the named plaintiffs lacked standing to pursue injunctive relief to change a jail's inmate exercise policies because the named plaintiffs were no longer inmates. *Id.* Because no inmate remained incarcerated, none was likely to be subject to the challenged policies again. *Id.* Since a "fundamental requirement of maintaining a class action is that the representatives must be members of the classes or subclasses they seek to represent," the court denied certification, holding that the named plaintiffs were atypical and could not represent the class. *Id.*

In cases involving people experiencing homelessness, courts have determined that formerly homeless plaintiffs who became housed lacked standing

to seek injunctive relief. In *Proctor v. Dist. of Columbia*, for example, plaintiffs challenged municipal practices relating to the handling of personal possessions during encampment closures. 531 F. Supp. 3d 49, 56 (D.D.C. 2021). The court held that one plaintiff that previously stayed in a homeless encampment but was "not now homeless" and was unlikely to be at risk of losing belongings in an encampment closure, lacked standing to seek injunctive relief. *Id.* at 61, 65.  The court came to an identical conclusion in *Fitzpatrick v. Little*, No. 22-CV-00162- DCN, 2023 WL 129815, at *6 (D. Idaho Jan. 9, 2023).

The reasoning in these cases applies equally to the present case. Here, Plaintiffs seek relief specific to Nenookaasi encampments, but all the named Plaintiffs self-identify as "former" residents of Nenookaasi, and none of them are currently at a Nenookaasi encampment. In fact, no Plaintiffs have camped at a Nenookaasi encampment since July 2024, though there have been three subsequent iterations of Nenookaasi. The last Nenookaasi iteration burnt down in January 2025. Currently, there is no Nenookaasi encampment. Consequently, this case is moot, because none of the Plaintiffs camp at a Nenookaasi encampment and are not in danger of being subjected to a Nenookaasi encampment closure.

While Plaintiffs do not address this issue in their memorandum, Defendant anticipates they may attempt to overcome mootness by arguing that the situation alleged is capable of repetition but evading review. This argument, if made, would

fail.  The capable-of-repetition-yet-evading-review exception to mootness is an "extraordinary and narrow exception to the mootness doctrine." *Minnesota Humane Soc'y v. Clark*, 184 F.3d 795, 797 (8th Cir. 1999).  It applies where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).  The party invoking the exception bears the burden of demonstrating that it applies.  *Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021).  Both exceptions must be shown to exist simultaneously.  *Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 485 (8th Cir. 1998).  Here, neither exists.

First, to the extent Plaintiffs claim they were injured by Defendant's policies regarding Nenookaasi encampment closures, they cannot claim that the challenged action was too short in duration to be fully litigated prior to its cessation.  Plaintiffs argue that the years-long use of these policies has and will be ongoing, i.e., it has not ceased or expired. However, as Plaintiffs no longer camp at Nenookaasi, they will no longer be affected by closure policies, and their claims are moot.  Additionally, after Plaintiffs' two motions for a Temporary Restraining Order were denied in January and March 2024, Plaintiffs did not seek a Preliminary Injunction during the litigation while Plaintiffs were still living at Nenookaasi.  If the Court had denied that Preliminary Injunction, Plaintiffs could

have appealed.  *See* 28 U.S.C. § 1292(a)(1). Plaintiffs point to no reason why they could not have availed themselves of these judicial remedies before their case became moot.  This defeats an assertion of the "capable of repetition yet evading review" exception to mootness.  *Minnesota Humane Soc'y*, 184 F.3d at 797 ("When a party has these legal avenues available, but does not utilize them, the action is not one that evades review.")(citing *Missouri ex rel. Nixon*, 163 F.3d at 485; *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1173 (8th Cir. 1994)).

Second, Plaintiffs do not show that there is a reasonable expectation that they will be subject to the same action.  To be subject to the same threat of injury, Plaintiffs would need to resume experiencing homelessness in Minneapolis, camp at a newly-formed theoretical different iteration of Nenookaasi, disregard notices that the encampment was to be closed, refuse to leave despite receiving notices of trespass, and again claim property loss at the closure.  The threat of this injury is too speculative, and Plaintiff do not present a "reasonable expectation" of being subject to the same action. *Whitfield*, 3 F.4th at 1047 (political candidate who could not say whether they would run again was no longer subject to challenged election law and had not shown controversy was capable of repetition yet evading review). *See also Beck by Beck v. Missouri State High Sch. Activities Ass'n*, 18 F.3d 604, 606 (8th Cir. 1994) (Plaintiff "has shown only a theoretical possibility of recurrence, not the demonstrated probability required.

We thus conclude [Plaintiff's] case does not fall within the 'capable of repetition yet evading review' exception to the mootness doctrine.")

Finally, this is not the type of case which has been recognized as presenting an exception for class actions where the class representatives' claims have become moot, but the claims of the class members are still alive. *Sosna v. Iowa*, 419 U.S. 393, 401 (1975). In *Sosna*, the plaintiff sued for injunctive and declaratory relief based on Iowa's one-year residency requirement prior to seeking a marriage dissolution, claiming that it was unconstitutional. *Id.* at 396. While she had still not met the one-year resident requirement, the case was certified as a class on behalf of all Iowa residents who wished to secure a divorce but who had not been resident for one year, but before the appeal made its way to the Supreme Court the time period elapsed and her case became moot. *Id.* at 398-99. The Court created an exception to the mootness rule because a class had been certified that had its own legal status and "the case before us is one in which state officials will undoubtedly continue to enforce the challenged statute and yet, because of the passage of time, no single challenger will remain subject to its restrictions for the period necessary to see such a lawsuit to its conclusion." *Id.* at 400. However, the Court did not create a *per se* exception to mootness for class actions but included two important caveats which bar Plaintiffs from using this to support their continuation as potential class representatives. *Id.* at 401-02. First, there must be

a named plaintiff who has an actual case or controversy at the time the complaint is filed *and* at the time the class action is certified.  *Id.* at 402. Here, Plaintiffs did not pursue class action before their claims became moot, and they provide no reason why they could not have pursued class certification earlier. Second, "[i]n cases in which the alleged harm would not dissipate during the normal time required for resolution of the controversy, the general principles of Art. III jurisdiction require that the plaintiff's personal stake in the litigation continue throughout the entirety of the litigation." *Id.*  As discussed above, Plaintiffs have not shown that this is a case where the alleged harm would dissipate for every potential class representative in the time it would take to litigate the case, or at least to obtain class certification.  Plaintiffs' claims are moot, and the attempted class certification is too late.

## II.    Plaintiffs' Claims Hinge on Individualized Fact Questions

Plaintiffs brought five claims in their SAC.  Count I alleges Defendant unlawfully seized Plaintiffs' property in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution. Count II alleges Defendant violated Plaintiffs' procedural due process rights under the Fourteenth Amendment to the U.S. and Minnesota Constitutions. Count III alleges Defendant violated Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.  Count IV alleges Defendant intentionally

inflicted emotional distress on Plaintiffs. Count V alleges Defendant violated Plaintiffs' rights under Title II of the Americans with Disabilities Act. All of these claims are very fact-specific and therefore inappropriate for class resolution.

### A. Defendant cannot be liable for destroying property reasonably believed, with a fact-specific inquiry, to have been abandoned.

*1. The Fourth Amendment does not protect property that a reasonable officer would believe was abandoned under the totality of the circumstances.*

The touchstone of the Fourth Amendment is reasonableness. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia,* 528 U.S. 11, 13 (1999) (per curiam); *Katz v. U.S.,* 389 U.S. 347, 357 (1967)). "An action is 'reasonable' under the Fourth Amendment, . . . 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Id.* (quoting *Scott v. U.S.,* 436 U.S. 128, 138 (1978))(emphasis in original). Seizing or searching abandoned property does not implicate the Fourth Amendment. *Abel v. U.S.*, 362 U.S. 217, 241 (1960); *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011).

Courts in the Eighth Circuit have used the standards applied in criminal cases to determine whether property was abandoned and any Fourth Amendment rights extinguished. *See McKenney*, 635 F.3d at 358–59. Even property that is central to the Fourth Amendment's protections, such as a home or cell phone (said to hold the "privacies of life"), are subject to the abandonment exception. *Id.; U.S.*

*v. Crumble*, 878 F.3d 656, 660 (8th Cir. 2018). "Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *U.S. v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997), *cert. denied*, 522 U.S. 1061 (1998); s*ee Crumble*, 878 F.3d at 659 (abandonment assessed under the "totality of the circumstances"). Factors relevant to abandonment include the condition of the property, whether it was left in the care of anyone else, or whether it was stored in a secure place or in a way that showed the owner cared about the contents. *McKenney*, 635 F.3d at 358–59 (objectively reasonable to conclude house was abandoned where "officers found the house in disrepair, with an unkempt yard and a fence that was incomplete and falling apart"); *but cf, DePugh v. Penning*, 888 F. Supp. 959, 977–79 (N.D. Iowa 1995)(not reasonable to find abandonment where "items seized were boxed and stored in a privately occupied building by permission of the leaseholder"). Therefore, the assessment of whether items left by individuals in an encampment would reasonably appear to be abandoned is a fact-specific inquiry that will vary based on the totality of the circumstances.

> 2. *For a Due Process right to attach, there must be a property right recognized by state law, and such a right is extinguished if the fact-intensive inquiry shows the property is abandoned.*

The first element of any due process claim is the existence of a liberty or property interest entitled to due process protection. *Mullane v. Cent. Hanover Trust*

*Co.*, 339 U.S. 306, 314 (1950). If no property interest exists, "there can be no due-process violation." *White v. City of Minneapolis*, No. 21-CV-0371 (WMW/KMM), 2021 WL 5964554, at *3 (D. Minn. Dec. 16, 2021)(citing *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997)). "Protected property interests are created by state law . . . ." *Ellis v. City of Yankton*, 69 F.3d 915, 917 (8th Cir. 1995).

Minnesota law recognizes personal property as entitled to due process protection. *Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012). However, Minnesota common law provides that an individual has abandoned interest in personal property when there is "(1) actual relinquishment of property, and (2) an intent to permanently part with the property." *Zephier v. Agate*, 957 N.W.2d 866, 872 (Minn. 2021). Whether abandonment has occurred "generally involves a fact-intensive analysis." *Id.* Whether a property owner intended to abandon the property may be inferred from both the owner's conduct and the nature and situation of the property. *Erickson v. Sinykin*, 26 N.W.2d 172, 176 (1947). Therefore, to determine whether individuals at a Nenookaasi encampment were entitled to due process protection for their property, it would be necessary to determine, from individual circumstances applicable to each individual, whether their property had been abandoned. At encampments generally, and at the Nenookaasi encampments specifically, this is always an active question as it appears residents who leave an encampment abandon a great quantity of broken and soiled items.

34

**B.  Whether the procedures used to close Nenookaasi encampments provided sufficient due process depends on the circumstances.**

If a Plaintiff has a due process right in his property, then the second element of a Due Process claim is what process is due. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  As an initial matter, where a plaintiff has received actual notice of the impending seizure of their property, there is no due process violation. *Hroch v. City of Omaha,* 4 F.3d 693, 696 (8th Cir. 1993).  But in all cases, "[d]ue process is a flexible concept, requiring only such procedural protections as the particular situation demands." *Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d 698, 702–03 (8th Cir. 2004) (quotation omitted).  To determine what procedural protection a particular situation demands, the Supreme Court directs courts to look at three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  This requires a fact-intensive inquiry of the situation.  *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 932 (8th Cir. 2016).  Pre-deprivation process can also be dispensed with due to emergency circumstances affecting the public health and welfare.  *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300–01 (1981).

35

Here, the Nenookaasi encampments have involved varied danger, both in scale and type. Some Nenookaasi encampments iterations were immediately rendered dangerous by encampment fires, including fires that spread to nearby homes. Other iterations of Nenookaasi were deemed particularly dangerous because they were the site of murders or deaths. Other iterations posed massive public health and sanitation concerns. Therefore, the amount and type of notice that would have satisfied due process in each situation would naturally vary significantly from one encampment closure to another, because the government's interest in closing the encampment under the third *Mathews* factor changes in each scenario.

### C.    Whether Plaintiffs are "qualified individuals with a disability" is a fact-specific determination.

Plaintiffs allege they are "are disproportionately individuals with physical and/or mental disabilities, disorders, and/or conditions including addiction which qualify them as 'persons with disabilities' under the ADA." (ECF 30 at ¶115.) However, there is no evidence in the record that they meet the ADA's definition of qualified individuals with a disability. The ADA states a disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102. Plaintiffs do not

specify how they are persons with disabilities under the definition or undertake that fact-specific analysis.

Moreover, there is no evidence in the record that they suffer from the *same* alleged disability. Rather, Plaintiffs' declarations identify the following distinct and separate medical conditions: chemical dependency/substance abuse/addiction (ECF 5 ¶¶4, 7 (Plaintiff Barnes)), PTSD (ECF 6 ¶4 (Plaintiff Sagataw)), traumatic brain injury (ECF 39 ¶2 (Plaintiff Strong)), broken ankle (ECF 35 ¶2 (Plaintiff Neloms)), various mental health diagnoses. (ECF 34 ¶3.) Plaintiffs' reliance on *Postawko v. Missouri Dep't of Corr.* is misplaced. 910 F.3d 1030 (8th Cir. 2018). While many of the plaintiffs in *Postawko* had differing *symptoms*, it was critical to their certification as a class that they all suffered from the same underlying medical diagnoses – Hepatitis C. *Id.* at 1039. Here, Plaintiffs allegedly suffer from a myriad of different medical conditions. Any determination about their disability qualification would be fact-intensive and individual in nature.

## III.    Plaintiffs Fail to Meet the Requirements of Fed. R. Civ. P. 23(a).

Plaintiffs propose a class defined as follows:

People who, while experiencing unsheltered houselessness, found a temporary home at and experienced an eviction from Camp Nenookaasi on one or more of the following dates:

a.    January 4, 2024 (evicted from 23rd Street and 13th Avenue);

b.    January 30, 2024 (evicted from 2601 14th Street);

c.    February 1, 2024 (evicted from 2213 16th Avenue);

37

      d.     July 25, 2024 (evicted from 2839 14th Avenue).

In determining whether Plaintiffs have met their burden to certify a class, the Court must rigorously analyze the factors of Fed. R. Civ. P. 23(a) and find that each of the following has been satisfied:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

*Dukes*, 564 U.S. at 350-51 (citing Fed. R. Civ. P. 23(a)). Additionally, every class must be "adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci.*, Inc., 821 F.3d 992, 996 (8th Cir. 2016)(internal quotation marks omitted).

**A.    Plaintiffs' proposed class is overbroad.**

A proposed class that is overbroad does not meet the adequately defined requirement of a proposed class. *See J.S.X. Through Next Friend D.S.X. v. Foxhoven*, 330 F.R.D. 197, 205 (S.D. Iowa 2019). "Overbreadth concerns whether the class is defined such that it captures a significant number of people who could not have been harmed by the defendant's alleged misconduct." *Id.* (citations omitted). Essentially, "a class cannot be certified if it contains members who lack standing."

*Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (citation omitted). A class "must therefore be defined in such a way that anyone within it would have standing." *Id.* (quotation omitted). The class members must have each suffered "an injury in fact" which is "fairly traceable to the challenged action of the defendant[.]" *Id.* (citing *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009)). Plaintiffs' proposal, to include all individuals who were camping at either the First, Second, Third or Fifth Nenookaasi, is overbroad. The proposed class definition does not require that any of the members have suffered any cognizable constitutional injury. For example, the class definition includes individuals that tore down no trespassing signs and cut City fences to gain access to the property. It includes individuals that saw the closure-notice signs posted. It includes individuals that were told by outreach workers that the encampment was closing. It includes individuals that did not lose any belongings during a closure. It includes individuals who were given unlimited time to pack. It includes individuals whose damaged property was disposed of because they intentionally left it behind as trash or no longer needed by them. This overbreadth creates problems for each element Plaintiffs must meet under Rule 23(a).

**B.    Plaintiffs fail to present evidence on the numerosity requirement.**

A class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). To satisfy the numerosity requirement, Plaintiffs must

present evidence to support the size of the proposed class. *E.g.*, *Dukes*, 564 U.S. at

350; *Campbell v. Minneapolis Pub. Hous. Auth. In & For City of Minneapolis*, 175 F.R.D.

531, 538 (D. Minn. 1997)(denying certification for lack of numerosity because

plaintiff's proffered statistics showed the number of housing applicants that were

categorized as disabled and offered no indication of how many applicants were

"disabled due to drug or alcohol addiction"), *vacated on other grounds sub nom.*

*Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis*, 168 F.3d 1069

(8th Cir. 1999). Even though putative class sizes of forty people will support a

finding of numerosity, *George v. Uponor Corp.*, No. 12-cv-249 (ADM/JJK), 2015 WL

5255280, at *3 (D. Minn. Sept. 9, 2015), Plaintiffs must prove, that there are "*in fact*

sufficiently numerous parties" to make joinder impracticable, *Dukes*, 564 U.S. at

350 (emphasis in original). Here, Plaintiffs offer no evidence in support of their

claims that the class would be comprised of "approximately 100" individuals.

There is no evidence in the record as to how Plaintiffs calculated this number or

whether this number is accurate. In the absence of any actual evidentiary showing

supporting sufficiently numerous parties, Plaintiffs' certification motion should be

denied. *See Hoekman v. Educ. Minnesota*, 335 F.R.D. 219, 248 (D. Minn. 2020).

### C.    There is not a common question of law or fact to unite the proposed class.

The chief problem with Plaintiffs' motion for class certification is the lack

of a common question of law or fact.  The Supreme Court spoke decisively on this

question in *Wal-Mart v. Dukes*, 564 U.S. at 352-360.  In *Dukes*, the plaintiffs were three women who were, or had been, employees of Wal-Mart.  *Id.* at 343.  They alleged that they, and 1.5 million members of the certified class, had been discriminated against by Wal-Mart based on their sex by denying them equal pay or promotions, in violation of the Title VII of the Civil Rights Act of 1964.  *Id.*  Their allegation was not that there was a specific company policy that caused harm, rather that there was a pattern or practice of discrimination in local managers' exercise of discretion regarding pay and promotions.  *Id.* at 344, 352.  Therefore, the plaintiffs argued, every female employee at Wal-Mart was a victim of this common discriminatory practice.  *Id.* at 345.

The Supreme Court found that the plaintiffs had failed to demonstrate the commonality requirement: that there were "questions of law or fact common to the class."  *Id.* at 349.  The Supreme Court explained that commonality was not satisfied merely because the class members have suffered a violation of the same provision of law, rather the claims "must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.  It is not enough that Plaintiffs' can state common

questions of law or fact, the class-wide proceeding must have the capacity to "generate common *answers*" that will resolve the litigation. *Id.* (citation omitted).

The Supreme Court went on to find that it was necessary to look behind the pleadings and examine the merits contention that Wal-Mart was engaging in a pattern or practice of discrimination. *Id.* at 351-52. It found that there must be some "glue holding the alleged *reasons*" for all the millions of employment decisions together. *Id.* at 352. To do so, in a case such as *Dukes*, where there was not a single discriminatory policy alleged, but a pattern or practice of discrimination, the Court found that there must be "[s]ignificant proof that an employer operated under a general policy of discrimination . . . [and that] the discrimination manifested itself in hiring and promotion practices in the same general fashion[.]" *Id.* at 353 (quoting *Falcon*, 457 U.S. at 159).

The plaintiffs in *Dukes* attempted to demonstrate the pattern or practice of discrimination with a combination of expert evaluation of the "culture" of Wal-Mart, statistical analysis of pay and promotions, and 120 anecdotes of discrimination. *Id.* at 354-356. The Supreme Court found these insufficient to be "significant proof" of discrimination. *Id.* Ultimately, the Supreme Court found that commonality failed, because the class members were too different. *Id.* at 359. They "held a multitude of jobs, at different levels . . . , for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male

and female) subject to a variety of regional policies that all differed. . . .  Some thrived while others did poorly.  They have little in common but their sex and this lawsuit."  *Id.* at 359-60 (quotation omitted).

Plaintiffs' proposed class suffers from this same central flaw as *Dukes* because Plaintiffs have not been able to identify the common legal or factual question that generates common answers for all the proposed class members. Here, Plaintiffs assert that the common questions are:

1. By ordering and orchestrating evictions that result in the destruction of Plaintiffs' property without probable cause, warrants, or exigent circumstances to justify a seizure, is Defendant violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution?

2. Does Defendant implement a pattern, practice, or custom of evicting Plaintiffs' encampments without effective notice, meaningful opportunities to be heard, and post-deprivation mechanisms to challenge the seizure and subsequent destruction of Plaintiffs' personal property?

3. Does Defendant's pattern, practice, and custom of evicting Plaintiffs' encampments, without notice to residents and absent safe, viable alternative living situations, and despite the obvious devastation that repeated evictions cause to unhoused people, constitute an unlawful State-Created Danger in violation of the Right to Substantive Due Process in the Fourteenth Amendment of the United States Constitution?

4. Does Defendant's pattern, practice, and custom of repeatedly evicting Nenookaasi residents from one vacant lot to another, against all manner of evidence and testimony that evictions actually worsen the problems used to justify them and inflict

trauma and hardship upon an already vulnerable population, constitute intentional infliction of emotional distress upon Plaintiffs?

5. Does Defendant's pattern, practice, and custom of evicting Plaintiffs, without first offering shelter, storage, and housing that accommodates their disabilities, constitute discrimination against people with disabilities in violation of the Americans with Disabilities Act?

(P. Mem. at 10.) These questions demonstrate precisely why the class fails for lack of commonality.

Each of these questions is about "Defendant's pattern, practice or custom," either about whether such a custom exists, or whether patterns, practices, or customs of Defendant violate various provisions of the Constitution. As in *Dukes*, there is no question that is common to all proposed class members that could be resolved through this litigation. Plaintiffs allege that individual's property was unlawfully seized or was taken without due process, but these actions occurred on different days, at different encampments, involved different property, with notice given in different ways, and giving different amount of time to leave, and under different encampment conditions. Plaintiffs have alleged that Defendant has violated their rights under the Americans with Disabilities Act, but allege that Plaintiffs have distinct and varied medical conditions. Plaintiffs have therefore attempted to unite all these disparate fact scenarios by framing the common

question as the constitutionality of Defendant's "pattern, practice or custom," that is, to invoke *Monell* liability based entirely on a custom claim.

Plaintiffs' attempt to invoke *Monell* liability to create a common question applicable to all Plaintiffs is unavailing.  Much like the plaintiffs in *Dukes,* they do not have a specific practice or custom that impacted *all* Plaintiffs and which was allegedly applied by Defendant at *all* four at-issue encampment closures. Rather, Plaintiffs allege a myriad of specific, individualized actions that cannot be broadly extrapolated to all of the closures nor to all of the Plaintiffs. This includes allegations such as a pattern or practice that "includes  conducting evictions without input from people with disabilities on the operational guidance, not requiring contractors to identify themselves as agents of the City when notify (sic) residents of upcoming evictions, and offering no means for an encampment resident without a telephone or computer to contact the City's Homeless Response Team." (P. Mem. at 11.)

Claims such as these call for the Court to go into the merits of the case to determine whether there is significant proof that commonality really exists. *Dukes*, 564 U.S. at 352-53.  Plaintiffs here, however, face an even higher legal hurdle than the Plaintiffs in *Dukes*.  Plaintiffs bringing a Title VII discrimination action may establish a pattern or practice case by showing by a preponderance of the evidence that "discrimination was the company's standard operating procedure[,] the

regular rather than the unusual practice." *Id.* at 352 n.7 (alteration in original)(quoting *Teamsters v. U.S.,* 431 U.S. 324, 336 (1977)). However, to establish the existence of a municipal "custom," under a *Monell* theory, a plaintiff must show:

1. The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2. Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3. Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson Cnty.,* 150 F.3d 873, 880 (8th Cir. 1998). Not only does the misconduct need to be so widespread, persistent, and continuing that it has "the effect and force of law", *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990), but the policymaking officials must have received notice of the conduct, *and* the custom must have been the reason that the plaintiff was injured. Plaintiffs cannot meet this standard with significant proof, and they have therefore failed to show commonality. That they have insufficient evidence in the record for their *Monell* claim is sufficient to defeat their class certification motion. *Goyette v. City of Minneapolis*, No. 20-CV-1302 (WMW/DTS), 2023 WL 2014792, at *7 (D. Minn. Feb. 15, 2023)("Here, Plaintiffs' insufficient evidence of

either an unlawful municipal custom or inadequate training practices falls short of this 'significant proof'" requirement.")

Specifically, Plaintiffs fail to provide evidence that there was any widespread unlawful custom by Defendant of unlawfully seizing the property of unhoused individuals or failing to provide them with due process. To the contrary, even Plaintiffs own declarations contradict one another. For example, there is no evidence in the record that Sagataw was even at any of the Nenookaasi encampment closures, nor that she lost any property. Barnes, who was at the first Nenookaasi closure, agrees he was given ample time to remove his belongings. Butcher claims that he had time to remove his belongings but chose to help others instead.

Nor can Plaintiffs establish that any alleged unconstitutional custom of Defendant's was the moving force behind Plaintiffs' injuries. None of the Plaintiffs submit evidence that Defendant's employees took their property. In fact, Strong alleged that many of her belongings were stolen while at a Nenookaasi encampment. Ultimately, Plaintiffs have not shown "significant proof" that there was a custom of violating the constitutional rights of unhoused individuals when clearing encampments.  Unlike the plaintiffs in *Dukes* who had expert assessments, statistical analysis, and anecdotal evidence, Plaintiffs here provide only varying, anecdotal assertions in the form of the experiences of the nine Plaintiffs at a

different encampment closures. Plaintiffs "provide no convincing proof" of an unconstitutional custom of the City when clearing encampments, and this Court should conclude here, as the Supreme Court did in *Dukes,* that Plaintiffs "have not established the existence of any common question." *Dukes,* 564 U.S. at 369.

### D. Plaintiffs' claims are not typical of those of the proposed class as there are too many unique factual circumstances.

Plaintiffs also must establish that their claims are typical of the class. Fed. R. Civ. P. 23(a)(3). There is usually overlap between the typicality and commonality requirements. *Dukes,* 564 U.S. at 349 n.5. "Typicality" requires that the claims of the named Plaintiffs and the members of the class "stem from a single event or are based on the same legal or remedial theory." *Paxton v. Union Nat. Bank,* 688 F.2d 552, 561–62 (8th Cir. 1982)(quotation omitted). However, Plaintiffs cannot show the required typicality where their claims "depend on a separate and distinct course of conduct." *Nagel v. United Food & Com. Workers Union,* No. 18-cv-1053, 2021 WL 347414, at *5 (D. Minn. Feb. 2, 2021). Nor can they show typicality where "proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez,* 458 F.3d 779, 787 (8th Cir. 2006). Additionally, where "it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not the proper

48

representative." *Irvin E. Schermer Tr. by Kline v. Sun Equities Corp.*, 116 F.R.D. 332, 336 (D. Minn. 1987). Plaintiffs' class suffers from all of these typicality problems.

Plaintiffs' claims do not stem from a single event. They are alleged in different encampments, with different staff, at different times, on different days, and widely different circumstances. They involved different types of notice, means of giving notice, and time to leave given by the notices. Plaintiffs' claims also do not all relate to a single legal theory. Plaintiffs bring claims of Fourth and Fourteenth Amendment violations, which, Plaintiffs declared, were violated in different ways for different Plaintiffs. Plaintiffs' claims are also distinct from the claims of the class members. Each class members' claim depends on a separate "course of conduct" that is dependent both upon the circumstances of the putative class member, whether they had received any notice, whether their property was abandoned, upon the actions of any involved Defendant employee in allowing them sufficient time to gather possessions or in assessing whether unattended property was abandoned, and the surrounding circumstances of that particular encampment and the dangers it posed to the public and the residents. There was no single course of conduct that makes Plaintiffs' claims typical of the claims of the class.

Finally, typicality founders in this case because each incident requires an individualized inquiry. In *Elizabeth M. v. Montez,* two plaintiffs brought a claim

for an injunctive class against Nebraska's residential mental health facilities claiming that the administrators of the facilities were failing to protect inmates from sexual and physical assaults by male patients and staff. 458 F.3d at 782. These were brought as substantive due process violations. *Id.* at 786. However, the Eighth Circuit found that typicality was not met because "*each* assault claim initially requires proof that another employee of *one* residential facility violated that class member's substantive due process right to safety." *Id.* at 786-87. (emphasis in original). This is because substantive due process claims demand an "exact analysis of circumstances." *Id.* (quotation omitted). Therefore, because the law required individual analysis of each assault of a named plaintiff and a prospective class member, the typicality requirement was defeated. The same is true here where Plaintiffs' claims of unlawful seizure, procedural due process violations, and conversion all require individualized analysis. As discussed *supra,* each seizure will require an analysis of the totality of the circumstances, and each closure would have to be looked at to determine if proper notice was given for the specific encampment situation and the urgency involved, or whether there was actual notice to any given class member. These are all individualized, fact-intensive analyses, and therefore defeats typicality.

**IV.    Plaintiffs Have Failed to Meet the Requirements of Fed. R. Civ. P. 23(b)(2).**

Rule 23(b)(2) allows a class only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  This type of class "applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."  *Dukes*, 564 U.S. at 360.   When there are "disparate factual circumstances of class members," this prevents the class from being cohesive and "thus unable to be certified under Rule 23(b)(2)." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 481 (8th Cir. 2016).

The proposed class members each have a distinct set of factual circumstances.  Additionally, each encampment had a different set of factual circumstances.  In some cases, closure was a matter of great urgency and encampments needed to be shut down quickly.  A single injunction that required, say, 72 hours of posted notice in all cases would not suffice as a single remedy given the differing urgencies faced by different encampments.  As the injuries of the Plaintiffs' proposed class would not be remedied by a single injunction, but multiple injunctions would need to be tailored to the specific facts affecting the

specific situations alleged, class certification under 23(b)(2) is therefore not warranted and should be denied.

## <u>CONCLUSION</u>

Plaintiffs have not met their burden of showing that they are entitled to class certification. Defendant respectfully requests that the Court deny the motion for class certification in its entirety.

Dated: February 24, 2025                   KRISTYN ANDERSON
                                           City Attorney
                                           By */s Sharda Enslin*
                                           SHARDA ENSLIN (#389370)
                                           KRISTIN R. SARFF (#388003)
                                           HEATHER P. ROBERTSON (#390470)
                                           J. HAYNES HANSEN (#399102)
                                           Assistant City Attorneys
                                           Minneapolis City Attorney's Office
                                           350 South Fifth Street, Room 210
                                           Minneapolis, MN 55415
                                           (612) 673-2180
                                           (612) 673-3919
                                           (612) 299-2742
                                           (612) 673-3339
                                           sharda.enslin@minneapolismn.gov
                                           kristin.sarff@minneapolismn.gov
                                           heather.robertson@minneapolismn.gov
                                           haynes.hansen@minneapolismn.gov

                                           *Attorneys for Defendant Mayor Jacob Frey*