UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, TRAVIS NELOMS, ALVIN BUTCHER, ADRIAN TIGER, CHANCE ASKENETTE, DEVEN CASTON, LOLA HEGSTROM, and RONDEL APPLEBEE, *on behalf of themselves and a class of similarly-situated individuals*,<br><br>                         Plaintiffs,<br><br>   vs.<br><br>MAYOR JACOB FREY, *in his individual and official capacity*,<br><br>                         Defendant. | Civil Action<br><br>0:24-cv-00001-ECT/TNL<br><br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(A) & 23(B)(2)** |

## TABLE OF CONTENTS

**I. INTRODUCTION**..................................................................................1

**II. ARGUMENT**...................................................................................... 2

   A. Mootness/Standing................................................................... 3

      1. The term "former Nenookaasi resident" refers to a person who has been evicted from Nenookaasi, not to a person who now has stable housing.........3

      2. The Operative Complaint seeks to enjoin the Defendant from conducting encampment evictions in an unconstitutional manner......................................5

      3. Plaintiffs need not be current residents of any encampment in order for them to have a cognizable interest in enjoining Defendant's eviction policies. 6

   B. Defendant's Challenges to the Rule 23 prerequisites are unfounded.............. 6

      1. Numerosity................................................................................. 6

      2. Commonality............................................................................. 7

      3. Typicality of Claims or Defenses............................................... 12

      4. Ascertainability......................................................................... 14

   C. Plaintiffs meet the prerequisites for Fed. R. Civ. P. 23(B)(2)........................ 15

**III. CONCLUSION**..................................................................................16

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Berry v. Hennepin County*, No. 20-CV-2189 (WMW/JFD) (D. Minn.
    Jan. 31, 2024) ........................................................................................ 6

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) .................................. 6

*DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) ............... 8

*Elizabeth M. v. Montenez*, 458 F.3d 779, 782 (8th Cir. 2006) .......................... 13

*Kincaid v. City of Fresno*, 244 F.R.D. 597, 607 (E.D. Cal. 2007) ...................... 7

*Lockwood Motors, Inc. v. Gen. Motors, Inc.*, 162 F.R.D. 569 (D. Minn.
    1995) ..................................................................................................... 7

*Love v. City of Chicago*, No. 96-C-396, 1997 WL 120041 (N.D. Ill.
    Mar. 11, 1997) ………………........................................................... 7

*Postawko v. Missouri Dept. of Corrections*, 910 F.3d 1030 (8th Cir. 2018) .. 8, 13

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ......................................... 7


**Rules**

Federal Rule 23 of Civil Procedure ................................................... *passim*

# I. INTRODUCTION

Nenookaasi is not a Plaintiff, nor is it a component of the requested injunctive relief in the complaint. Rather, Nenookaasi serves as a demonstration of the tremendous success that community members, service providers, and unhoused people achieved during a four month respite from Defendant's brutal enforcement of encampment sweeps,[1] successes which could be achieved again should Plaintiffs' requested relief be granted.

On January 4, 2024, the Mayor resumed his practice of repeatedly evicting encampments in violation of the residents' constitutional rights. Since then, evictions have increased with fervor, despite massive public outcry. By carrying out these evictions the Defendant knowingly leaves individuals with nowhere to sleep, disrupts their progress towards obtaining treatment, housing, and employment, traps them in cycles of addiction, violence, and indigency, destroys their property, and subjects them to repeated humiliation and trauma.

---

[1] In the approximately four months that the Mayor did not order an eviction of that encampment, almost one hundred people were able to obtain housing and move off the streets entirely. Doc. 7 ¶ 15. The City attributes this success to its own efforts, Doc. 124 at 3, however the reason people were able to move off the streets were due entirely to the efforts of non-profits regulated by Hennepin County, volunteer community members, and each other. Doc. 10, ¶ 25 *and* Doc. 120-2, 44:1-45:24. As the City itself notes, the Minneapolis Homeless Response Team ("HRT") only responds to encampments to address 311 calls, and provides no way for residents who do not have access to a phone to reach out to the HRT to seek services or follow up on existing requests, nor do HRT members visit encampments outside of the context of addressing 311 complaints. Doc. 120-2 at 37:1-8 and 71:15-72:7.

These evictions are not only illegal, but an impediment to the efficacy of the solutions to houselessness that do exist. It is the unlawful policy, pattern, practice, and custom of the Defendant in repeatedly carrying out these evictions, and the plight of the individuals who repeatedly suffer them, which is the substance of this lawsuit.

## II.　ARGUMENT

Plaintiffs have presented facts to support each element of the standard set forth in Federal Rule of Civil Procedure 23 so as to qualify for class certification. Defendant attempts to complicate this analysis using an arbitrary but unarticulated definition of Nenookaasi that does not match the description offered by Plaintiffs themselves and which misrepresents the object of Plaintiffs' lawsuit. However the abundant declarations from people with direct personal knowledge, conclusions of expert witnesses, and admissions of the City of Minneapolis provide ample grounds to find that: the contested harms are ongoing, the proposed represented Plaintiffs are a numerous and clearly defined class, the Plaintiffs seek common answers and relief, the named Plaintiffs are typical representatives of those on behalf of whom they seek relief, and the requested injunction would address the legal concerns of the entire proposed class.

*A. Mootness/Standing*

Defendant contends that Plaintiffs lack standing through reliance on three false assertions: one, that the term "former resident of Nenookaasi" means that a person is no longer unhoused; two, by claiming that the object of the Second Amended Complaint is specifically to preserve Nenookaasi rather than to enjoin a pattern and practice that has caused Nenookaasi to no longer exist; and three, by ignoring binding precedent that holds the cyclical nature of houselessness to allow formerly unhoused people standing to continue their litigation around encampment eviction policies.

1. <u>The term "former Nenookaasi resident" refers to a person who has been evicted from Nenookaasi, not to a person who now has stable housing.</u>

Defendant injects confusion by apparently inventing, without factual foundation, a definition of Nenookaasi that differs from the concise parameters identified by the Plaintiffs. *Compare* Doc. 124 at 16-18 (identifying what the Defendant refers to as the Sixth, Seventh, and Eighth Nenookaasi encampments and claiming that no Nenookaasi encampments currently exist, without offering any clear definition or bases for these factual assertions) *with* Doc. 120 at 2 (explicitly defining the putative class as those who experienced an eviction from four specified dates and locations) *and* Docs. 81 & 104 (same).

3

Plaintiffs have provided a clear definition of Nenookaasi for the purpose of providing ascertainable limits to the proposed class. *See* Doc. 120 at 2. The undisputed fact that Defendant ordered the destruction of prior iterations of Nenookaasi should preclude him from now arguing that a result which he directly engineered renders Plaintiffs' claims moot. Regardless, Nenookaasi as an entity is not a party to this case: its former residents are.

Notably, the word "former" is used in Plaintiffs' class certification motion to describe Plaintiffs' identities as former residents of Nenookaasi—not because the Plaintiffs are no longer houseless, but because after Defendant's repeated evictions, the people who resided at Nenookaasi's four identified iterations were forced to disperse.

The fact that Plaintiffs at some point camped at a Nenookaasi is not what qualifies them to represent the class, as Defendant claims. Doc. 124 at 18. The fact that Plaintiffs *were evicted* from camp Nenookaasi qualifies them to represent a class of other individuals who also experienced one or more of the same four identified evictions. Plaintiffs reject Defendant's arbitrary (and unfounded) apparent definition of what renders an encampment "Nenookaasi" and furthermore dispute that whether Nenookaasi still exists is relevant to the Court's jurisdiction over the legal issues at hand.

2. <u>The Operative Complaint seeks to enjoin the Defendant from conducting encampment evictions in an unconstitutional manner.</u>

Plaintiffs' requested relief is not "specific to Nenookaasi encampments." Doc. 124 at 27. Instead, as the operative Complaint makes clear, Plaintiffs seek to enjoin the pattern of repeated unconstitutional evictions which cause significant harm to residents and render the formation and successes of communities like Nenookaasi impossible. Plaintiffs have asked this Court:

> For preliminary and permanent injunctive relief enjoining Defendant Frey and his officials, employees, agents, officers, assigns, and all those working in concert with him from evicting encampments in East Phillips, unless and until safe, adequate, accommodative of disability, culturally appropriate, stable housing can be guaranteed and provided to all residents or unless such evictions are temporary relocations conducted in the same manner as law enforcement might clear an apartment or school in the case of an active shooter or a house fire.

Doc 104, 47-48.

Plaintiffs have a reasonable expectation of being subject to ongoing evictions from Defendant, and indeed at an increasing rate and without even the pretense of notice or due process. Doc. 128, Ex. A. Defendant has explicitly committed to continuing to engage in the pattern and policy that Plaintiffs seek to enjoin.

3. <u>Plaintiffs need not be current residents of any encampment in order for them to have a cognizable interest in enjoining Defendant's eviction policies.</u>

Houselessness is cyclical in nature. "Although [formerly unhoused] Plaintiffs are currently housed, given the cyclical nature of homelessness Plaintiffs may reasonably experience homelessness in the future." *Berry v. Hennepin County*, No. 20-CV-2189 (WMW/JFD) *13 (D. Minn. Jan. 31, 2024) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) to find that the formerly houseless plaintiffs in a lawsuit seeking to enjoin encampment evictions retained a personal stake in an injunction). Because the named Plaintiffs all remain unhoused or are subject to becoming unhoused once more at any time, their claims are not moot and they remain capable of representing the others who are trapped with them in the vicious cycle intensified by the Defendant's relentless eviction policies and practices. *See*, e.g. Doc. 99 at 11 and Doc. 96 at 10.

### B. *Defendant's Challenges to the Rule 23 prerequisites are unfounded*

1. <u>Numerosity</u>

Plaintiffs have identified numerous signed declarations to corroborate their assertion that the number of individuals in the proposed class is approximately 100 persons. *See* Doc. 120 at 5-6 (identifying several declarants who in various ways affirm that at least 100 persons experienced the first Nenookaasi eviction, and most of that group continued to travel and experience evictions from one Nenookaasi

6

location to the next). This is well-over the forty putative class members that courts generally consider to be numerous. *See Lockwood Motors, Inc. v. Gen. Motors, Inc.*, 162 F.R.D. 569, 574 (D. Minn. 1995).

Furthermore, the fact that the exact number is unknown does not preclude a finding of numerosity; to the contrary, courts have found even wide-ranging estimates to be sufficient in similar classes involving unhoused people. *See, e.g.*, *Kincaid v. City of Fresno*, 244 F.R.D. 597, 607 (E.D. Cal. 2007) (approving class of forty to eight hundred unhoused people); *Love v. City of Chicago*, No. 96-C-396, 1997 WL 120041, at *6 (N.D. Ill. Mar. 11, 1997) (approving class of eighty to one hundred and twenty unhoused people).

2. Commonality

Plaintiffs have commonality amongst each other and with the proposed represented class, notwithstanding slight variations in their particular factual circumstances. Notably, the standard is not: "all questions of law and fact must be identical," as the Defendant's memorandum seems to suggest, but rather that the named Plaintiffs' and class members' cases have at least some common questions of law *or* fact and, importantly, that resolving the named Plaintiffs' cases will generate *common answers* for the rest of the class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Of course, the exact itemization of each Plaintiffs' belongings, their condition, and the circumstances of their destruction and disposal vary from person to person. But the legality of Defendant's policy, pattern, and practice of encampment destruction—which has caused the harms from which Plaintiffs now seek relief—is "susceptible to common resolution." *Postawko v. Missouri Dept. of Corrections*, 910 F.3d 1030 (8th Cir. 2018).

Furthermore, the Plaintiffs here seek class certification for the purpose of obtaining injunctive relief. Individual variations in fact patterns that might vary the amount of damages owed to named Plaintiffs are not relevant for the purposes of class certification pursuant to Federal Rule of Civil Procedure 23(b)(2), which asks whether the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The required commonality derives from the "common course of conduct in the future" that all proposed class members and named Plaintiffs are seeking to enjoin, and is not defeated by variations in the fact patterns of how each individual member may have been injured in the past. *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995).

It is the Defendant's actions, and refusals to act, which apply generally to the class. The Defendant's policies, practices, patterns, and/or customs impact all

Plaintiffs and proposed class members, and notably these include explicit agreements by the City about the way that evictions should be conducted, as verified by the City deponent Mr. Velazquez, in addition to customs that constitute how these evictions play out in practice. The Defendant has a pattern, practice, and custom of repeatedly evicting encampments residents and destroying their property, homes, and community without notice or adequate alternative shelters, accessible accommodations or storage, or opportunities to retrieve seized property. The Defendant's pattern, practice, and custom, in turn, impacts and harms all of the named Plaintiffs and proposed class through the loss of property, emotional distress, endangerment, and disability-based discrimination. While Plaintiffs acknowledge the Mayor and his agents were on their best behavior for the first eviction of Nenookaasi on January 4, 2024, numerous affidavits indicate this eviction was an aberration from the Mayor's cruel and unconstitutional policies and practices both before and since. *See*, e.g. Doc. 45 and 46.

Plaintiffs have offered abundant declarations, for example, showing that notice was severely lacking and residents were limited in the number of trips they could take during the second, third and fourth evictions. *Id*.

Defendant claims that "Nenookaasi encampments have involved varied danger, both in scale and type," which according to Defendant then means that the amount and type of notice required to satisfy due process varies from encampment

to encampment. Doc. 124 at 36. However, Defendant's arguments about dangerous conditions justifying evictions on different timelines and with different amounts of notice are rooted in a logic that unhoused people are somehow to blame for the tragedies inflicted upon them or around them by virtue of their status as unhoused persons. *See*, e.g., Doc. 98  6 ("Neighbors think they know what goes on in camps, or think that we bring crime, but drug use and crime are everywhere already in the neighborhood. We are getting blamed for causing what was already there to begin with."). Plaintiffs are asking to be given the same respect as any other housed resident of Minneapolis. Plaintiffs explicitly noted that the February 29, 2024 fire was an emergency evacuation, not an "eviction" of the ilk challenged in this lawsuit. Doc. 120 at 5. Nor would it be reasonable to consider someone fleeing a burning apartment to have been "evicted." And while it is true that unhoused people are frequently the targets of violence, the tragic murder at the first Nenookaasi and subsequent incidents with guns were the result of *nonresidents* coming into the encampment to inflict violence upon Plaintiffs. *See*, e.g., Doc. 46  18 (describing several incidents where violence by housed neighbors against encampment residents provided cover for subsequent evictions).

In an apartment complex, if someone commits murder, the building may be evacuated temporarily for the safety of the residents, but the entire building is not permanently *evicted*. If one person commits an act of violence or harm in an

encampment, the Defendant's unconstitutional policy here is to evict the entire encampment, *even if the perpetrator of the violence is not a resident*. It is illogical and inhumane to respond differently in the face of violence against an unhoused community as compared to a housing complex, predicated on an unsupported, unverified, prejudicial assumption that unhoused people are by nature violent and dangerous.

Nor do health or sanitation concerns justify an eviction— in fact, according to the Minnesota Department of Health, public health and sanitation concerns would have been *exacerbated* by an earlier eviction, whereas simple solutions like trash pickup, port-a-potties, and *pauses in evictions* that allow people an increase in stability and mental capacity to devote towards learning basic life skills and being community-minded rather than in survival mode. Doc. 6, ¶¶ 15-16. The Defendant admits that, as a result of a norovirus outbreak, one of the evictions was temporarily delayed to address health and safety concerns. Doc. 120-2 208:3-24.

At the very least, this contested factual dispute is not one which should be resolved by the court as a matter of law in determining the appropriateness of certification of a class seeking injunctive relief from the Defendant's unconstitutional pattern and practice.

3. <u>Typicality of Claims or Defenses</u>

Defendant's attempts to fabricate material distinctions between Plaintiffs and their proposed class members highlight key questions which, if resolved for the named Plaintiffs, would be resolved for the proposed class. For example, whether the fact that "pre-deprivation process can . . . be dispensed with due to emergency circumstances" means that entire encampments of people can be evicted and their belongings destroyed without notice when a housed third party inflicts violence upon encampment residents is a question that applies to the entire putative class. As reflected in the record, everyone at Nenookaasi was evicted, with no factfinding or evaluation of which, *if any*, of the residents of Nenookaasi were specifically involved in any of the violence, harm, crime, or wrongdoing that purportedly justified the evictions. It is the lack of individualized determinations on the part of the Defendant prior to evicting residents which creates the typicality between the named Plaintiffs and the proposed class members.

Lastly, while Plaintiffs may have additional disabilities that vary from person to person, Plaintiffs have evidence that is currently undisputed showing that virtually all Plaintiffs and the putative class have Post Traumatic Stress Disorder ("PTSD"). Doc. 120-4  8, *see also* Doc. 95  3, Doc. 98  2, Doc. 46  16. In addition, many Plaintiffs have physical disabilities. Physical disabilities and their accompanying mobility issues render the Defendant's policy of requiring unhoused

persons to travel downtown to store and subsequently visit belongings impossible. Post Traumatic Stress Disorder renders storage and housing options inaccessible and unavailable when offered by strangers, particularly strangers affiliated with those who have publicly committed to compounding the trauma.

Where the putative class seeks injunctive relief, the potential for minor factual variations between individuals does not undermine typicality where the violation allegedly suffered by the named Plaintiffs is typical of that suffered by the class as a whole. *Postawko*, 910 F.3d at 1039. Here, the harms of disability discrimination, property destruction, emotional distress, and endangerment suffered by the named Plaintiffs are typical of those suffered by the putative class.

The case that Defendant cites for the proposition that "substantive due process claims demand an exact analysis of circumstances," in fact places the focus for typicality on an alignment of interests and goals between representative and represented plaintiffs. *Elizabeth M. v. Montenez*, 458 F.3d 779, 782 (8th Cir. 2006).

Plaintiffs are not putting the specific harms that they have suffered from being evicted at issue and not seeking to represent the class on the basis of how much property each person lost, or what injury any one person suffered. Plaintiffs seek forward-looking relief and respite from the suffering they—like other former Nenookaasi residents—continue to endure as a result of the Defendant's pattern, practice, and custom. The widespread evidence that evictions put people in danger

13

without creating any reduction in harms or violence to a community— and in the face of this evidence not only the Defendant's resolutely perpetuating evictions but also silencing voices to the contrary—this is the state-created danger, infliction of trauma, and act of discrimination, with no legitimate purpose, that Plaintiffs challenge.

    4. <u>Ascertainability</u>

Defendant misstates the definition of Plaintiffs' proposed class in order to claim that it is overbroad and contains individuals who were not injured. Plaintiffs do *not* define the class as "all individuals who were camping at either the First, Second, Third, or Fifth Nenookaasi." Doc. 124 at 39. This would indeed include individuals who were not injured, because such a class would include the individuals who were at the first Nenookaasi but who obtained stable housing prior to the eviction date and maintained it for at least the next seven months without enduring a single eviction. These individuals are specifically excluded both from the way that the class size was calculated, Doc. 120 at 4-5, and from the definition of the class. As has been made explicit by the Plaintiffs, *only people who have experienced an eviction from one of four specified locations constitute members of the class*. *Id*. at 2. Since the evictions are the basis for the injuries to the Plaintiffs, this creates precise parameters for the class around only those who have been subject to injury as a result of the Defendant's policies and practices. Each evicted

Plaintiff, regardless of what property specifically was lost, suffers the injustice of: evictions occurring despite residents having any reasonable or meaningful way to obtain guaranteed shelter anywhere else; possessions being destroyed except for those that cannot be carried away in the amount of time arbitrarily alloted by law enforcement (which is a fact alleged, albeit disputed, by the Defendant); the state-created danger to which evictions subject otherwise unhoused encampment residents; the intentional infliction of emotional distress that is inherent in pushing the same group of people around a half-mile radius at the expense of their safety; and the discriminatory impact of Defendant's policies and practices regarding evictions against people with PTSD and other physical and mental disabilities.

### C. Plaintiffs meet the prerequisites for Fed. R. Civ. P. 23(B)(2)

The requested injunction would apply to the entire class. The request is that unhoused people not be blamed and evicted for the violence of others around them, not be evicted when there are not secure and consistent places for them to safely sleep at night and store and access belongings during the day, and not be traumatized under false pretenses. Plaintiffs seek a concise adjustment through this injunction that would remedy the ongoing harms that all proposed class Plaintiffs suffer, or are at imminent risk of suffering. Emergencies that require evacuations would not constitute evictions—an injunction requiring the Mayor to treat

Plaintiffs like human beings, held to the same standards of decency as when the City interacts with affluent housed neighbors without disabilities, is not a hardship or an inconvenience, nor a request that requires separate eviction policies for different circumstances.

## III. CONCLUSION

The inefficacy of evictions towards improving the public health and safety of all Minneapolis residents, and the fact that conducting evictions under the circumstances common to each eviction listed in the complaint (lack of available shelter beds, no reasonable alternatives for storage, inaccessible evictions processes) poses constitutional concerns and grave harms. The unconstitutionality of this practice does not change from one eviction to the next when it has been clear all along that evictions do not address the root causes of the problems, and increase rather than reduce violence and harm in the community, waste city resources, traumatize residents, and impede social service and volunteer groups' ability to actually make the changes that are needed to improve the crisis of homelessness in Minneapolis.

Respectfully submitted,

Dated: March 10, 2025

s/*Kira Kelley*
**Kira Kelley** (MN Bar No 402932)
Climate Defense Project
P.O. Box 7040
Minneapolis, MN 55407
Phone: (802) 683-4086
Email: kira@climatedefenseproject.org

*/s/Claire Nicole Glenn*
**Claire Nicole Glenn (she/her)**
Staff Attorney
Climate Defense Project
P.O. Box 7040
Minneapolis, MN 55407
651-343-4816
claire@climatedefenseproject.org
District of Columbia License No. 888242412
Maryland License No. 1902280002
Minnesota License No. 0402443

**ATTORNEYS FOR PLAINTIFFS**