UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Cheryl Sagataw, et al.,

     Plaintiffs,

vs.

Mayor Jacob Frey, *in his individual and
official capacity*

     Defendant.

Case No. 24-cv-00001 (ECT/ECW)

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

---

From August 2023 to January 2025, nine different iterations of an unlawful encampment, known as Camp Nenookaasi, existed at various times on properties owned by the City of Minneapolis. Each of the nine Nenookaasi iterations started with encampment-associated individuals breaking into fenced and locked City properties and tearing down "No Trespassing" signs. Each time, the individuals then unlawfully trespassed onto the properties, assembled tents and yurts in violation of City Housing Code, maintained numerous fires in violation of City Fire Code, and discarded rubbish, human waste, and hypodermic needles around the encampment in violation of City Health Code. In seven of the Nenookaasi iterations, the City closed the encampments in accordance with City guidelines

after repeatedly providing notice and offering services to the encamped individuals. In the other two Nenookaasi iterations, the encampments were destroyed by fires.

Each Plaintiff unlawfully trespassed onto City property and unlawfully camped at a Nenookaasi encampment. Plaintiffs now seek monetary damages from Defendant Mayor Jacob Frey ("Defendant" or "Mayor Frey") related to the closures of these encampments. However, there is no evidence in the record that Defendant or anyone from the City participated in the purported seizure of Plaintiffs' property, let alone did so pursuant to an unconstitutional policy or custom. There is no evidence that Defendant or anyone from the City committed constitutional violations or deprived Plaintiffs of their constitutional rights. There is no evidence that Defendant intentionally inflicted emotional distress upon Plaintiffs. There is no evidence that Defendant's actions violated the Americans with Disabilities Act. Plaintiffs' evidence falls far short of what is required to support the claims they have brought against Defendant. Accordingly, Plaintiffs claims should be dismissed in their entirety.

2

## FACTS

### NENOOKAASI ENCAMPMENTS

### I.  THE FIRST NENOOKAASI

On August 24, 2023, the Minnesota Department of Transportation ("MNDOT") cleared and closed an encampment on MNDOT property known as the "Wall of Forgotten Natives." (ECF 17 ¶2.) Immediately after, several individuals from that site broke through a fence surrounding a City-owned lot at 2313 13th Avenue South. (*Id*.) Within hours of this trespass, approximately 40 individuals set up tents and formed a new encampment. (*Id*.) This was the first Nenookaasi encampment.

#### A. **The City Engages in Several Months of Extensive Effort And Engagement With Encampment Organizers.**

The City's Homeless Response Team ("HRT") connects homeless individuals with Hennepin County to obtain housing assessment, case management, service providers, case workers, storage services in partnership with Downtown Improvement District, shelter services, medical attention through Healthcare for the Homeless, and transportation to resources. (ECF 17 ¶¶5-6.) HRT made at least 15 visits to the First Nenookaasi, offering this assistance. (*Id*.) In addition to the HRT visits, the City Directors for the Community Planning and Economic Development Department ("CPED") and Regulatory Services

Department, with the approval of Mayor Frey, also separately met with encampment organizers on October 11, 2023, to evaluate the situation, observe conditions, and discuss closure. (*Id.* ¶10.) They discussed ways in which the City would provide assistance to minimize health concerns in advance of the closure. (*Id.*) City staff added portapotties, including an accessible one for those with limited mobility, as part of its plan to affect a healthy closure of the large encampment, as well as increased the frequency of trash removal. (*Id.* ¶11-14.)

On numerous occasions, the City's additional outreach partners, including Agate, Avivo, Hennepin County's Streets to Housing, and Healthcare for the Homeless, visited the encampment to provide services to the homeless individuals. (*Id.* ¶7, 10; Enslin Decl., Ex. A at 63:24-66-23.) Moreover, with approval from Mayor Frey and the City Council, the City provided funding to Helix Health and Housing Services, an organization that provides housing, mental health services, and substance-use treatment to underserved populations in collaboration with Red Lake Nation. (*Id.* ¶8.) With the assistance of Helix's outreach efforts, the City supported 104 residents at the first Nenookaasi who found housing or other shelter. (*Id.*)

## B. Conditions Deteriorate And Community Safety Concerns Increase.

Encampments often attract criminal activity. (*Id*. ¶15.) Encampments pose risks not only to those camping in them, but to the community at large, and the

4

first Nenookaasi encampment was no exception. (*Id.*; Enslin Decl., Ex. A. at 76:12-20.) There were more than one hundred 911 calls to Minneapolis Police and Fire Departments relating to the first Nenookaasi. (*Id.* ¶16.) The calls reported illegal activity at the encampment including death threats amongst campers, assault, gunshots, stolen vehicles, vandalism, property damage, drug overdoses, and fires. (*Id.*)

On November 1, 2023, leaders from the Metropolitan Urban Indian Directors ("MUID") reached out to City staff and Mayor Frey demanding that the encampment be closed immediately, citing recent deaths, crimes, and concerns about criminal activity going unreported due to threats and physical violence. (*Id.* ¶28, Ex. A.) According to MUID, neighbors witnessed women and girls being dragged from the encampment into cars at night, and open drug use and sex acts throughout the day. (*Id.*) Then, on December 12, 2023, a 45-year-old man was murdered at the encampment. (*Id.* ¶19.)

### C. Closure Is Delayed Numerous Times To Give People More Time To Connect With Resources.

Due to escalating violence and safety concerns, the encampment was set for closure on December 14, 2023, and notice of the closure was posted on December 7, 2023. (*Id.* ¶20.) However, Mayor Frey decided a short delay was appropriate to give those remaining at the encampment additional time to access shelter and

services. (*Id.* ¶21.) Accordingly, a new closure date was set for December 19, 2023. (*Id.*) Between December 7 and December 19, the HRT team made numerous visits to the encampment, offering connection to shelter and services, and providing free storage options. (*Id.* ¶22.)

On December 14, 2023, members of the Mayor's Office and City Council, County Commissioners, state legislators, and services providers met with Nenookaasi leaders. (*Id.* ¶23.) There was broad agreement that Nenookaasi needed to close, but City leadership agreed to another extension to provide even more time for people to access services and shelter. (*Id.*) At that meeting, Nenookaasi organizers asked that encampment residents be moved to a temporary, 24/7, indoor facility. (*Id.*) The City actively explored that request along with County, State, and social service providers. (*Id.*) Four experienced and trusted service providers who were capable of providing this level of support were identified, but after several discussions, each provider said they could not take on the role of managing such a project, owing to capacity and resource limitations, and other competing priorities. (*Id.*) However, these providers could collectively provide supportive housing to 45-60 individuals, including mental health and substance use disorder services. (*Id.*) Additionally, Salvation Army and Rescue Now made plans to add 90 shelter beds the week of January 1, 2024. (*Id.*) Hennepin Shelter Hotline, in partnership with the Adult Shelter Connect, made plans to help

people access these additional beds and others that became available in existing shelters. (*Id.*) Accordingly, the encampment closure was rescheduled for January 4, 2024. (*Id.*)

Notice of the closure of the first Nenookaasi was posted on December 29, 2023, six days in advance of the closure. (*Id.* ¶24.) Hennepin County service providers informed the City that they engaged with everyone at the encampment. (ECF ¶25.) During the time between December 14, 2023, to January 4, 2024, City staff spent hundreds of hours preparing for the closure, allocating resources, designating staff, assuring that all available resources were repeatedly made available to those at the encampment, and ensuring shelter was available for all individuals at the first Nenookaasi. (*Id.* ¶26.)

**D. The City Conducts Closures Pursuant To Lawful Guidelines.**

The City conducts encampment closures in accordance with operational guidelines. (ECF 17 ¶27.) On the day of an encampment closure, representatives from multiple departments are often present. (*Id.* ¶29.) The Minneapolis Health Department handles any needle pick-up, Minneapolis Public Works helps with site cleaning, the Minneapolis Department of Regulatory Services may be on hand to assist with community partners, provide shelter information, and offer rides. (*Id.*) When necessary, Minneapolis Police Department officers support other City staff and ensure that homeless individuals, the community, and City staff are safe

7

throughout the closure. (*Id.*)  City employees on site encourage individuals to gather and take all of their belongings that they have not already placed in storage. (*Id.* ¶30.) City workers will often help individuals move their belongings off-site. (*Id.*) If individuals forget an item, they are typically allowed back on site to retrieve it, provided it is safe for them to do so.  (*Id.*)  If specific personal items are left behind and identified, such as a purse or backpack, City workers will retrieve that item and pass it to outreach workers for return it to its owner. (*Id.*)

Unfortunately, City employees at encampment closures frequently confront unwanted, hazardous, and/or dangerous items left behind.  (*Id.* ¶31.) This includes garbage, food waste, torn tarps, hypodermic needles, and even stolen vehicles, explosives, and guns. (*Id.*) City employees have been stuck by used hypodermic needles when sorting through property at encampment closures.  (*Id.*) Discarded tents are often filled with urine, feces, spoiled food, and rats. (*Id.*)

### E.  The City Closes The First Nenookaasi.

On January 4, 2024, the City closed the first Nenookaasi encampment. (ECF 107 ¶2.) Representatives from multiple departments were on site for the closure of the first Nenookaasi, including City Directors from the Department of Regulatory Services and CPED. (*Id.*) Minneapolis Public Works staff assisted with cleaning the site. Minneapolis Police Department officers ensured that homeless individuals,

the community, and City staff were safe throughout the duration of the encampment closure. (*Id*.)

Encamped individuals were given unlimited time to pack and leave with their belongings. (*Id*. ¶¶4-5.) The City had buses ready to transport people to the Catholic Charities' Opportunity Center, where they could connect with housing resources, medical and mental health care providers, storage lockers, internet services, breakfast and lunch, and laundry. (*Id*. ¶6.) No one at the encampment chose to take these services. (*Id*.)

## II.        SECOND NENOOKAASI ENCAMPMENT

On January 2, 2024, two days before the closure of the first Nenookaasi, individuals associated with that encampment broke into a locked, fenced property owned by CPED located at 2601 14th Avenue South. (*Id*. ¶7.)  Individuals cut a large hole in the secured fence, tore down "no trespassing" signs that were posted on the site, and began moving in supplies, including a large amount of firewood. (*Id*.) By January 3, 2024, individuals had erected four large yurts on the CPED property. (*Id*.) Additionally, many individuals leaving the first Nenookaasi on January 4, 2024, proceeded directly to the CPED lot. (*Id*. ¶8.) Those individuals moved their belongings onto the City-owned property and declared this site to be Camp Nenookaasi. Within hours, over 25 individuals and over a dozen yurts had moved to what then became the second Nenookaasi. (*Id*.)

On January 5, 2024, City staff met with Nenookaasi organizers. (*Id.* ¶9.) City staff told the organizers that they could not stay at the second Nenookaasi and needed to leave. (*Id.*) On January 8, 2024, the City reposted notice of trespassing signs. (*Id.* ¶10.) Those signs were, again, torn down by individuals in the second Nenookaasi. (*Id.*) On January 17, 2024, City staff again met with camp organizers and told them the City would be closing the second Nenookaasi. (*Id.* ¶11.)

On January 18, 2024, the City's Health Department was notified by the Minnesota Department of Health of a possible gastrointestinal illness in the second Nenookaasi. (*Id.* ¶12.) The City's Health Department team immediately initiated an investigation. (*Id.* ¶13.) On January 19, 2024, Health Department staff visited the second Nenookaasi and found 20-30 people ill with symptoms consistent with a viral gastrointestinal illness. (*Id.*) During the visit, the Health Department team provided cleaning supplies for common areas, including bleach solution in spray-bottles, bleach and water for replenishing the spray-bottles, gloves, and paper towels, and requested new portapotties. (*Id.* ¶14.)

The Health Department determined that closure of the second Nenookaasi should be postponed until the virus was contained to minimize transmission to other vulnerable populations. (*Id.* ¶15.) On January 24, 2024, after 72 hours with no new cases, the Health Department determined the virus was contained and that closure of the second Nenookaasi could move forward. (*Id.* ¶17.) On January 24,

2024, City staff emailed camp organizers and told them that the second Nenookaasi would be closing soon. (*Id.*)

On January 28, 2024, a man was shot immediately outside of the second Nenookaasi. (*Id.* ¶18.) On January 30, 2024, after weeks of notice, the City closed the second Nenookaasi. (*Id.* ¶19.) On the day of closure, individuals were given an unlimited amount of time to remove their belongings. (*Id.* ¶20.)

Between the inception of the second Nenookaasi on January 4, 2024, and its closure on January 30, 2024, the City's HRT made eight site visits, each time offering connection to services, shelter, and storage options. (*Id.* ¶21.) No one at the second Nenookaasi chose to use the City's storage options. (*Id.*)

## III.    THIRD NENOOKAASI ENCAMPMENT

The day of the closure of the second Nenookaasi, on January 30, 2024, individuals from the encampment immediately moved to another City-owned property located at 2213 16th Avenue South in Minneapolis. (ECF 107 ¶22.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.* ¶23.) Individuals associated with the encampment cut and removed a section of fence and moved their belongings inside the property in what became the third Nenookaasi encampment. (*Id.*)

Individuals at the third Nenookaasi tore down the "no trespassing" signs upon entry. (*Id.* ¶24.) That evening, City staff returned to the site of the third

Nenookaasi and reposted "no trespassing" signs. (*Id.*)  By the following morning, January 31, 2024, the signs were torn down again. (*Id.*) The City returned that day and again posted "no trespassing" signs. (*Id.*) On February 1, 2024, the City closed the third Nenookaasi. (*Id.* ¶25.) The day of the closure, individuals were given an unlimited amount of time to pack up their belongings. (*Id.* ¶26.)

## IV.    FOURTH NENOOKAASI ENCAMPMENT

Individuals from the third Nenookaasi immediately moved to another City-owned property. (*Id.* ¶27.) This property was a locked and fenced property, located at 1100 28th Avenue East in Minneapolis. (*Id.*) Individuals associated with Nenookaasi broke into the property by cutting through the fence, moved City-owned infrastructure stored onsite, and began setting up another encampment. (*Id.*) Within a day, individuals had erected 18-20 yurts at the fourth Nenookaasi. (*Id.*)

The City was alerted that smoke from bonfires at the fourth Nenookaasi caused significant problems for the Allina Central Laboratory, located nearby at 2800 10th Avenue South in Minneapolis. (*Id.* ¶28.) The City was informed that this smoke not only created an uncomfortable and disruptive work environment for the laboratory employees, but there was concern that smoke particulates could impact the laboratory's sensitive testing equipment. (*Id.* ¶30.) Allina further informed the City that without functioning testing equipment, the laboratory

would not be able to operate, which would have a significant impact on patient access to medical testing. (*Id*.) On February 28, 2024, City staff visited the fourth Nenookaasi and spoke with individuals about the smoke's impact on the area. (*Id*. ¶31.)

On February 29, 2024, a massive fire broke out at the fourth Nenookaasi. (*Id*. ¶32.) Within minutes, the entire encampment went up in flames. (*Id*.) The Minneapolis Fire Department and other first responders immediately responded to the scene. (*Id*.) Firefighters quickly extinguished the blaze, but almost nothing was salvageable from the charred remains of the encampment. (*Id*.)

## V.    FIFTH NENOOKAASI ENCAMPMENT

Immediately following the fire, individuals from the fourth Nenookaasi moved to another City-owned property located at 2939 14th Avenue South. (*Id*. ¶34.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id*.) Individuals associated with Nenookaasi cut and removed a section of fence and moved their belongings inside the property in what became the fifth Nenookaasi. (*Id*.)

From March through June 2024, the fifth Nenookaasi grew to more than 70 individuals across 50 structures. (*Id*. ¶35.) During that time, the City's HRT made ten site visits, each time offering connection to services, shelter, and storage

options. (*Id*.) No one at the fifth Nenookaasi chose to use the City's storage options. (*Id*.)

On July 25, 2024, the City closed the fifth Nenookaasi. (*Id*. ¶36.) On the day of the closure, individuals were given an unlimited amount of time to pack up their belongings and offered connection to available shelter space. (*Id*. ¶37, 38.)

## VI.    SIXTH NENOOKAASI ENCAMPMENT

Immediately following the closure of the fifth Nenookaasi, individuals from the encampment moved to another City-owned property at 2313 13th Avenue South. (*Id*. ¶39.) This property was the site of the first Nenookaasi encampment from which individuals had already been trespassed on January 4, 2024. (*Id*. ¶40.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id*. ¶41.) Individuals associated with the encampment cut and removed a section of fence and moved their belongings inside the property in what became the sixth Nenookaasi. (*Id*.) On October 7, 2024, the City closed the sixth Nenookaasi (*Id*. ¶42.) Individuals then camped on the public right-of-way adjacent to the site of the sixth Nenookaasi encampment. (*Id*. ¶43.) On October 13, 2024, the City cleared the sidewalk adjacent to the sixth Nenookaasi. (*Id*. ¶44.)

## VII.   SEVENTH NENOOKAASI ENCAMPMENT

Immediately following the closure of the sixth Nenookaasi and public right of way, individuals from the encampment moved to another City-owned property

located at 2839 14th Avenue South.  (*Id.* ¶45.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.*) Individuals associated with the encampment cut and removed a section of fence and moved their belongings inside the property in what became the seventh Nenookaasi. (*Id.*)

On January 6, 2025, a large fire erupted at the seventh Nenookaasi. (ECF 125 ¶3.) Multiple propane tanks exploded, and within minutes the entire encampment was engulfed in flames. (*Id.* ¶3.) Minneapolis firefighters quickly extinguished the blaze, but almost nothing was salvageable from the charred remains of the encampment.  (*Id.*)

## VIII.  EIGHTH NENOOKAASI ENCAMPMENT

On November 8, 2024, individuals broke into another City-owned property, located at 2601 14th Avenue South in Minneapolis. (ECF 125 ¶2.) This property was fenced and locked, with prominent "no trespassing" signs posted. (*Id.*) Individuals associated with the encampment cut and removed a section of fence and moved their belongings inside what became the eighth Nenookaasi. (*Id.*) This encampment existed at the same time as the seventh Nenookaasi.  This iteration of the encampment was closed on November 12, 2024, four days after individuals set it up. (*Id.*)

## IX.    NO NENOOKAASI ENCAMPMENTS CURRENTLY EXIST

As of today, there are no iterations of the Nenookaasi encampment in Minneapolis. (*Id*. ¶4.)

## **THE PLAINTIFFS**

While the nine named Plaintiffs have, at some point, camped at one of the Nenookaasi encampments, there is no evidence in the record that any of them are currently staying at a Nenookaasi encampment. In fact, there is no evidence that any Plaintiffs have camped at a Nenookaasi encampment since July 2024. As outlined above, between July 2024 to the present, there have been three additional Nenookaasi iterations.

## I.    CHERYL SAGATAW

Plaintiff Cheryl Sagataw ("Sagataw") is a former resident of Nenookaasi. (ECF 104 ¶3.) The only evidence in the record regarding Sagataw's claims is a single declaration dated December 15, 2023, prior to the closure of any Nenookaasi encampments. (ECF 6.) On January 4, 2024, the first iteration of Nenookaasi was lawfully closed. There is no evidence that Sagataw was a camper at the time of the first Nenookaasi closure. There is no evidence that Sagataw was unaware of the closure notices that were given for this encampment. There is no evidence that Sagataw lost any property at the closure of the first Nenookaasi. There is no

evidence that Sagataw has camped at any subsequent iterations of Nenookaasi or currently lives at a Nenookaasi encampment.

## II.       DEANTHONY BARNES

Plaintiff DeAnthony Barnes ("Barnes") is a former resident of Nenookaasi. (ECF 104 ¶8.). Barnes alleges he was present at the closure of the first Nenookaasi. (ECF 37 ¶2.) Barnes admits that campers were given a "fair" amount of time to move their belongings from City property and that outside individuals were allowed in to help campers move. (*Id*. ¶3.) Barnes also claims he was at the third Nenookaasi, closed two days after the second Nenookaasi, and acknowledges that he was asked to leave before he had set up his belongings. (*Id*. ¶4.) Barnes claims he lost items during the closures, including a suitcase, clothes, electronics, food, and blankets, but does not offer specific information about when, where, or how these items were lost.  (*Id*. at 6.) There is no evidence in the record that Barnes has camped at any subsequent iterations of Nenookaasi or currently lives at a Nenookaasi encampment.

## III.      ROBERTA STRONG

Plaintiff Roberta Strong ("Strong") is a former resident at Nenookaasi. (ECF 104 ¶15.) Strong claims to have been at the first, second, and third Nenookaasi closures. (ECF 39.) According to Strong, she lost track of things at closures generally, including clothes and medicine, but does not offer information about

when, where, or how these items were lost. (*Id*. ¶11.) Strong admits that so many of her items were stolen at Nenookaasi that she no longer replaced the stolen items. (*Id*. ¶14.) There is no evidence in the record that Strong has camped at any subsequent Nenookaasi iteration or currently lives at Nenookaasi.

## IV.    TRAVIS NELOMS

Plaintiff Travis Neloms ("Neloms") is a former resident at Nenookaasi. (ECF 104 ¶21.) Neloms claims he has gone from encampment to encampment since 2018 and been through "a lot of evictions," but there is no evidence in the record that Neloms was ever present at Nenookaasi evictions, nor identifying which Nenookaasi iteration he stayed in. (ECF 36 ¶¶6, 11.) Neloms admits he was offered storage, but he "never went to look into it." (*Id*. ¶¶14-15.) Neloms admits he was given a spot in the Agate transitional housing program, but that "he didn't like the living situations," such as sharing a room, even though Neloms shared a yurt at Nenookaasi. (*Id*. ¶¶10-11.) Neloms does not like that shelters have "curfews and rigid rules," and admits he does not seek shelter availability. (*Id*. ¶¶8, 19.) Neloms claims to have lost clothes, bikes, tents, blankets, medications, and personal paperwork, but does not offer any specific information about when, where, and how these items were lost. (*Id*. ¶20.) There is no evidence that Neloms has camped at any Nenookaasi since February 2024, nor that Neloms currently lives at Nenookaasi.

## V.    LOLA HEGSTROM

Plaintiff Lola Hegstrom ("Hegstrom") is a former resident of Nenookaasi. (ECF 104 ¶29.) There is no evidence in the record that Hegstrom camped at the first, second, or third Nenookaasi. Hegstrom claims she was at the fourth Nenookaasi when a massive fire broke out, destroying the camp in minutes. (ECF 98 ¶8.) Hegstrom claims she lost personal belongings in the fire. (*Id*.) After the fire, Hegstrom set up camp at the fifth Nenookaasi, a City-owned property that was surrounded by a locked fenced and had "no trespassing" signs posted. (*Id*. ¶9; ECF 107 ¶34.) Hegstrom claims she had no notice that she was not allowed to camp on City property. (ECF 98 ¶9.)

Hegstrom claims she used the free City-offered storage for a time but eventually removed her items from storage. (*Id*. ¶12.) Hegstrom claims to have lost jewelry, clothes, sleeping bags, tents, toys, a generator, and "expensive purses," along with medical papers, but does not offer any specific information about when, where, and how these items were lost. (*Id*. ¶11.) There is no evidence that Hegstrom has camped at any Nenookaasi since July 2024. Hegstrom is currently housed. (Enslin Decl., Ex. B at 80:5-17.)

## VI.    RONDEL APPLEBEE

Plaintiff RonDel Applebee ("Applebee") is a former resident of Nenookaasi. (ECF 104 ¶35.) There is no evidence in the record that Applebee camped or was at

the closure of the first to third Nenookaasis. Applebee was at the fourth and fifth Nenookaasi. (ECF 99 ¶¶7-8.) Applebee claims he lost his ID and social security card during the closure of the fifth Nenookaasi. (*Id.* ¶5.) Applebee did not use the City-offered storage because he did not trust the City workers offering storage. (*Id.* ¶12.) There is no evidence in the record that Applebee camped at a Nenookaasi encampment since July 2024. Applebee is currently housed. (*Id.* ¶¶10-11.)

## VII.    CHANCE ASKENETTE

Plaintiff Chance Askenette ("Askenette") is a former resident of Nenookaasi. (ECF 104 ¶44.) Askenette camped at the first Nenookaasi, which he admits was on fenced-off land. (ECF 96 ¶4.) There is no evidence in the record that Askenette was affected by the closure of the first Nenookaasi. Askenette claims he was at the closures of the second, third, and fourth Nenookaasi. (*Id.* ¶¶7-8.)  He claims to have lost a yurt, clothing, Playstation 5, and a family heirloom at the closure of the third or fifth Nenookaasi but does not offer any specific information about how these items were lost. (*Id.* ¶8.) There is no evidence in the record that Askenette camped at any Nenookaasi since July 2024. Askenette is currently living with his extended family. (*Id.* ¶6.)

## VIII.    ADRIAN TIGER

Plaintiff Adrian Tiger ("Tiger") is a former resident of Nenookaasi. (ECF 104 ¶49.) Tiger claims to have camped at the first through fifth Nenookaasis. (ECF 94

¶¶3-7.) Tiger claims that he lost clothes, shoes, cell phones, jewelry, and identification documents at various closures, but does not offer any specific information about when, where, and how these items were lost. (*Id*. ¶8.) There is no evidence that Tiger has camped at any Nenookaasi since July 2024, nor that Tiger currently camps at Nenookaasi.

## IX.    ALVIN BUTCHER

Plaintiff Alvin Butcher ("Butcher") is a "former" resident of Nenookaasi. (ECF 104 ¶57.) Butcher claims he camped at and was present at the closure of the first Nenookaasi. (ECF 95 ¶6.) He claims that he lost property at that closure because he was helping other people move and did not remove his own belongings. (*Id*.) Butcher claims that at some closures he leaves behind everything but a backpack, and at some closures he takes all his things. (*Id*. ¶7.) Butcher claims that he lost various items at various closures. (*Id*. ¶¶9-11.) At the closure of the fifth Nenookaasi, Butcher claims he lost clothes, blankets, documents, food, a solar panel, and a car battery. (*Id*. ¶9.)  Butcher claims he has never been offered storage. (*Id*. ¶20.) Butcher claims he does not want to go to a shelter, because he does not want to be separated from his girlfriend. (*Id*. ¶19.) There is no evidence in the record that Butcher camped at any Nenookaasi since July 2024, nor that he currently camps at Nenookaasi.

## ARGUMENT

I.    **PLAINTIFFS' INDIVIDUAL CAPACITY CLAIMS AGAINST MAYOR FREY FAIL AS A MATTER OF LAW**

Plaintiffs bring five claims against Mayor Frey in his individual capacity: Unlawful Seizure, Deprivation of Procedural Due Process, Deprivation of Substantive Due Process,[1]Americans with Disabilities Act Violations. All of these claims fail as a matter of law.

A.    **Even Taken in the Light Most Favorable to Plaintiffs, the Evidence Does Not Support a Finding that Mayor Frey Violated the Constitution.**

1.    *There Are No Facts in the Record that Mayor Frey searched or seized Plaintiffs' property unreasonably or without procedural due process.*

Individual liability under Section 1983 requires a causal link to, and direct responsibility for, the deprivation of federal rights. *Madewell v. Roberts*, 909 F.2d

---

[1] To the extent Plaintiffs also allege illegal seizure or deprivation of due process under the Minnesota Constitution, those claims are not actionable. "No cause of action exists under Section 1983 for a violation of a state constitutional right." *White v. City of Minneapolis*, 2021 WL 5964554, at *7 (D. Minn. Dec. 16, 2021).

Additionally, "there is no corollary to section 1983 under state law, and 'courts have repeatedly stated that Minnesota has not recognized private remedies for violations of the Minnesota Constitution.'" *White v. Dayton*,  2023 WL 21918, at *16 (D. Minn. Jan. 3, 2023), *report and recommendation adopted,* No. 11-CV-3702 (NEB/DJF), 2023 WL 1797830 (D. Minn. Feb. 7, 2023); *Jones v. James,* 2005 WL 459652, *8 (D. Minn. Feb. 24, 2005)("Minnesota does not recognize a tort for deprivation of due process."); *Northstar Legal Found. v. Honeywell Project,* 355 N.W.2d 186, 188 (Minn. Ct. App. 1984)(no action lies under Art. I, § 10).

1203, 1208 (8th Cir. 1990). Only government actors whose personal conduct *caused* the deprivation of a federal right can be individually liable under Section 1983. *Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. Of Election Comm'rs,* 956 F.2d 172, 174 (8th Cir. 1992).

Additionally, "[a] supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995). Rather, a supervisor can only be liable when: (1) the supervisor was personally involved in the violation; or (2) there was a pattern of unconstitutional conduct by subordinates, and the supervisor exhibited deliberate indifference to or tacit authorization of the conduct. *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014); *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010); *Boyd*, 47 F.3d at 968.

Here, Plaintiffs seek to hold Mayor Frey individually liable for the alleged seizure and destruction of Plaintiffs' property in violation the Fourth and Fourteenth Amendments of the U.S. Constitution. The Fourth Amendment protects the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. [2] *Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021)

---

[2] Plaintiffs do not allege that there has been any unconstitutional searches of their property, i.e., a government intrusion upon a person's actual and objectively reasonable expectation of privacy. *Azam v. City of Columbia Heights*, 865 F.3d 980, 989 (8th Cir. 2017).

(quotation marks omitted). "To determine the constitutionality of a seizure," courts "balance the nature and quality" of the government interference "against the importance of the governmental interests alleged to justify" the interference. *Baribeau v. City of Minneapolis*, 596 F.3d 465 (8th Cir. 2010). The Fourth Amendment does not protect abandoned property. *Abel v. United States*, 362 U.S. 217, 241 (1960).

Under the Fourteenth Amendment, the government may not deprive a person of property without due process. U.S. Const. amend. XIV, § 1. Courts ask: (1) whether there is a property interest of which a person has been deprived, and (2) if so, whether the procedures followed by the government were constitutionally sufficient. *Jenner v. Nikolas*, 828 F.3d 713, 716 (8th Cir. 2016). In general, due process requires notice and an opportunity to be heard. *U.S. v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993).

Here, there is absolutely no evidence in the record that Mayor Frey seized or destroyed any of the Plaintiffs' property, much less in a way that violated of the Constitution. It is undisputed that Mayor Frey was never at any of the Nenookaasi closures.  Moreover, there is no evidence in the record that Mayor Frey directly authorized or was deliberately indifferent to any alleged unconstitutional conduct by his subordinates. *See Boyd*, 47 F.3d at 968 (supervisor not individually liable under § 1983, unless supervisor was personally involved or was deliberately indifferent to subordinates' pattern of unconstitutional conduct). There is certainly

no evidence that Mayor Frey directed any employee to seize or destroy Plaintiffs' property, that he knew of employees unlawfully seizing, or destroying property, or that he specifically chose to ignore such conduct. There is no evidence in the record that Mayor Frey was directly involved in the operational aspects of closing Nenookaasi encampments, nor is there any evidence that he was informed of the details relating to the closures, including the Nenookaasi encampment closures wherein Plaintiffs claim to have lost property. Accordingly, Mayor Frey cannot be liable to Plaintiffs in his individual capacity for unlawful seizure, or procedural due process violations, and those claims should be dismissed.

> ### 2. *There are No Facts in the Record that Mayor Frey Personally Engaged in a "Conscience-Shocking" Violation of Plaintiffs' Constitutional Rights.*

To state a substantive due process claim, a plaintiff must allege both that the government's actions were "conscience-shocking[ ] and that the [conduct] violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017)(quoting *Moran v. Clarke*, 296 F.3d 638, 651 (8th Cir. 2002) (en banc)); *see also Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Here, Plaintiffs cannot establish either.

Plaintiffs claim they were placed at significant risk of serious, immediate, and proximate harm by being evicted from public land, because some had their possessions taken from them and were exposed to the elements in a Minnesota winter. Under this state-created danger theory posited by Plaintiffs, Plaintiffs must prove (1) that they were members of a limited, precisely definable group; (2) that the state actor's conduct put them at a significant risk of serious, immediate, and proximate harm; (3) that the risk was obvious or known to the state actor; (4) that the state actor acted recklessly in conscious disregard of the risk; and (5) that in total, the state actor's conduct shocks the conscience. *Montgomery v. City of Ames*, 749 F.3d 689, 694 (8th Cir. 2014), *citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). To shock the conscience, an official's action must either be motivated by an intent to harm or, where deliberation is practical, demonstrate deliberate indifference. *Montgomery*, 749 F.3d at 695. Deliberate indifference requires both that the official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and that official actually draw the inference." *Id.* (quotation omitted). As a matter of law, however, these claims cannot give rise to a substantive due process claim.

First, Mayor Frey did not require Plaintiffs to live outside nor does he control the weather and, therefore, he did not create any danger to Plaintiffs. *Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/JFD), 2021 WL 4427215, at *10 (D. Minn.

Sept. 27, 2021)(citing *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005))("Plaintiffs do not allege a state-created danger because inclement weather and the COVID-19 pandemic, although dangerous, were not created by the state.") Second, there is no evidence in the record that Mayor Frey personally required Plaintiffs to leave their tents, winter gear, or other possessions behind. As noted *supra*, there is no evidence in the record that Mayor Frey authorized or directed any employee to seize or destroy Plaintiffs' property, that he knew of employees seizing or destroying property, or that he chose to ignore such conduct. Again, there is no evidence in the record that Mayor Frey was directly involved in the operational aspects of closing Nenookaasi encampments. The record actually shows that Plaintiffs created the danger themselves by not availing themselves of free storage for any necessary gear ahead of the announced closures, by not preparing to leave, and by not accepting shelter services. Accordingly, the substantive due process claims against Mayor Frey fail as a matter of law.

### B. Qualified Immunity also Shields Mayor Frey from Individual-Capacity Liability under Section 1983.

Even assuming the record could support an individual capacity Section 1983 claim against Mayor Frey, he would be entitled to qualified immunity. Qualified immunity protects government agents who perform discretionary functions from civil liability, so long as the challenged actions are objectively reasonable in light of clearly established legal principles. *See Anderson v. Creighton*, 483 U.S. 635, 638

(1987). Qualified immunity is a question of law that the Court determines as early as possible to shield appropriate officials from suit. *See Gainor v. Rogers*, 973 F.2d 1379, 1382–83 (8th Cir. 1992).

In evaluating a claim of qualified immunity, the facts alleged must show the government official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005). If the facts alleged do not establish a constitutional violation, no further inquiry is necessary and qualified immunity is warranted. *Saucier*, 533 U.S. at 201. If the facts do allege a constitutional violation, the court must determine whether the right allegedly violated was clearly established so that a reasonable official would understand that the conduct he engaged in was unlawful. *See id.; Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). A right is only clearly established if its "contours were sufficiently definite that any reasonable official in (the defendant's) shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City & Cty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (quotations, citations, alterations omitted). Plaintiffs must "point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officers' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present a robust consensus of cases of persuasive authority constituting settled law." *Graham v. Barnette*, 970 F.3d 1075,

1090 (8th Cir. 2020)(quotations marks, citations omitted). This precise standard "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)(citation omitted).

First, as discussed above, there are no facts in the record that could support a finding that Mayor Frey violated Plaintiffs' constitutional rights. For this reason alone, he is entitled to qualified immunity as a matter of law. Second, Mayor Frey is immune from liability under Section 1983 because there was (and is) no clearly established constitutional right prohibiting government officials from removing people or their belongings from unauthorized encampments on City-owned property. Although the Ninth Circuit and some out-of-circuit district courts have issued rulings related to government seizure of property belonging to residents of encampments, there are no Eighth Circuit cases with "sufficiently similar facts to squarely govern" Mayor Frey's alleged conduct here. *See Graham*, 970 F.3d at 1090. As such, Mayor Frey's alleged actions do not amount to "plain incompetence" nor a "knowing violation" of the Constitution, and Mayor Frey is entitled to qualified immunity under existing federal court precedent. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

**C.    Plaintiffs Cannot Sustain a Claim for Intentional Infliction of Emotional Distress.**

There is an extremely high standard of proof to maintain an intentional infliction of emotional distress claim in Minnesota: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003). While Plaintiffs allege a laundry list of occurrences that supposedly constitute intentional infliction of emotional distress, there is nothing in the record that even approaches the high bar of "extreme and outrageous" conduct.

The purported extreme and outrageous conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983). There is simply no evidence of any such conduct in the record. To the contrary, requiring trespassing individuals who have been offered shelter and storage to vacate unlawful encampments that have become violent and a public health hazard is not extreme and outrageous conduct. Requiring individuals who have unlawfully broken into City property to disperse is not extreme and outrageous.

The Minnesota Supreme Court has said "[t]o qualify as extreme and outrageous, the conduct must lead an average member of the community to exclaim 'Outrageous!'" *Id.* (citing Restatement (Second) of Torts § 46 cmt. d (1965)). Here, the Mayor's alleged conduct does not elicit this response. Quite the opposite

is true. It is undisputed that numerous members of the community detailed outrageous conduct coming from those camping at or visiting the Nenookaasi encampments. (*See* ECF 52-55; Enslin Decl. Ex. B at 69:5-70:17.) Plaintiffs' intentional infliction of emotional distress claim against Mayor Frey must be dismissed.

### D. The ADA Claim against Mayor Frey in his Individual Capacity Fails as a Matter of Law.

Although the ADA does permit some individual capacity claims, "[i]ndividuals in their personal capacities, however, are not subject to suit under Title II, which provides redress only from public entities." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010) (citing *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999)(en banc)). Therefore, Plaintiffs' individual claim against Mayor Frey under the ADA fail as a matter of law.

## II. PLAINTIFFS' OFFICIAL CAPACITY CLAIMS AGAINST MAYOR FREY FAIL AS A MATTER OF LAW

### A. Plaintiffs Cannot Sustain a Municipal Policy, Custom, or Training Claim.

Suits against individuals in their official capacity are treated as a suit against the government entity. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998)(citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or

supervise an official or employee." *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016)(citing *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013)).

The first task is to identify the municipal policy or custom at issue. *Mahaffy v. Kroll*, 2010 WL 3385222, *12–13 (D. Minn. Aug. 24, 2010)(citing *Dick v. Watonwan County*, 738 F.2d 939, 943 (8th Cir. 1984)). Plaintiffs allege that Mayor Frey had a "policy, pattern, and custom" that caused unlawful seizure and destruction of Plaintiffs' personal property in violation of the Fourth and Fourteenth Amendment. (ECF 81 ¶¶ 121, 126, 135.)

### 1. Plaintiffs Did Not Suffer a Constitutional Injury at the Hands of a City Employee.

In order to survive summary judgment, Plaintiffs must be able present evidence that their alleged harm was caused by: 1) a constitutional violation; 2) committed by the municipality's employee. *Golberg v. Hennepin Cnty.*, 417 F.3d 808, 813 (8th Cir. 2005); *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). Plaintiffs have failed to establish either. Plaintiffs' constitutional claims arise from the purported loss of their property, yet none of the Plaintiffs put forth any evidence that Mayor Frey, or someone acting under his direction, took their property. Without an underlying constitutional violation, by a City employee, Plaintiffs have no sustainable claim.

**2.  Plaintiffs Cannot Point to Any Evidence that their Alleged Harm was Caused By an Official Municipal Policy, Unofficial Custom, or a Deliberately Indifferent Failure to Train or Supervise an Employee.**

Even if Plaintiffs could point to evidence that City employees unreasonably deprived Plaintiffs of their property, that is not enough to impose liability. Plaintiffs must also "prove that a municipal policy or custom was the 'moving force [behind] the constitutional violation.'" *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)(alteration in original)(quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)); *Slaven v. Engstrom*, 848 F.Supp.2d 994, 1002 (D. Minn. 2012)(citing *Monell*, 436 U.S. at 694–95).  A "policy" is an official policy, a deliberate choice of a guiding principle, or procedure made by the municipal official who has final authority regarding such matters. *Mettler*, 165 F.3d at 1204. It is only when the "execution of a government's policy . . . inflicts the injury" that a municipality may be held liable.  *Monell*, 436 U.S. at 694.  Additionally, a "policy is not unconstitutional if it might allow for unconstitutional conduct in some instances[;] such a policy is unconstitutional only if it requires its officer to act in such an unconstitutional manner." *Peroceski v. Tarr,* 2009 WL 3202463, at *12 (D. Minn. Sept. 30, 2009)(citations omitted).

Even when the evidence is viewed in the light most favorable to Plaintiffs, Plaintiffs cannot identify any official City policy regarding the closure of homeless encampments that is unconstitutional.  To the contrary, Plaintiffs ignore the City's

fulsome and substantive Operational Guidance, which provides detailed procedures for safe, dignified, and constitutional encampment closures. (ECF 17, Ex. B.) Because there is no evidence in the record that Plaintiffs' purported constitutional violations are based on an official City policy, any municipal claim based on policy must be dismissed.

### 3. Plaintiffs Have Not Established That There Was a "Custom" Of Unconstitutional Behavior During Encampment Closures.

To establish the existence of a municipal "custom," a plaintiff must show:

• The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

• Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

• Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998).

For a municipality "to be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.,* 901 F.2d 642, 646 (8th Cir. 1990)(citing *Monell,* 436 U.S. at 691); *City of Oklahoma City v. Tuttle,* 471 U.S. 808,

823-24 (1985)("considerably more proof than the single incident will be necessary").  Plaintiffs have failed to show any custom associated with closing encampments that differs from the City's constitutional policies.

a. Plaintiffs have not established any evidence of a custom of Fourth Amendment violations

Plaintiffs are unable to establish that the City had a widespread, persistent, and continuing custom of unconstitutionally seizing property and violating privacy rights during encampment closures. As discussed *supra*, there is no record evidence that Plaintiffs' property was seized by City employees, so none of the purported experiences of Plaintiffs during encampment closures can be the basis for their custom claim. Moreover, there is no evidence in the record that would support a finding that the City had an unconstitutional custom of seizing property and violating *any* individuals' rights during closures. To the contrary, the record demonstrates that the City's custom and practice of handling property during encampment closures is decidedly constitutional.

The touchstone of the Fourth Amendment is reasonableness. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)(citations omitted). "An action is 'reasonable' under the Fourth Amendment, . . . 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Id.* (quoting *Scott v. U.S.,* 436 U.S. 128, 138 (1978))(emphasis in original).  Here, there is no evidence in the record that the City has a custom of

acting unreasonably in dealing with property at encampment closures. It is the City's practice to give notice several days in advance of a closure, both by signage and individual outreach, so people can prepare to move their belongings. The City also provides storage options for individuals at encampments in the days leading up to a closure, so they can easily keep track of their possessions. On the day of a closure, City employees actively encourage people to take their belongings with them and frequently offer transportation for individuals and their belongings. When City employees see items at an encampment closure that appear to be personal in nature, employees will bring those items to outreach workers to try to get them back to their owner, in case those items were accidentally left behind.

Moreover, even though there is no evidence in the record of *any* individual claiming their property was seized at an encampment closure conducted by City employees, any such claim would fail as a matter of law, because seizing or searching what reasonably appears to be abandoned property does not implicate the Fourth Amendment. *Abel,* 362 U.S. at 241 (1960); *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011). Even belongings that are central to Fourth Amendment protections, such as a home or a cell phone (said to hold the "privacies of life"), are subject to the abandonment exception. *U.S. v. Crumble*, 878 F.3d 656, 660 (8th Cir. 2018).

There is no fact dispute that individuals often choose to leave their property behind before, during, and after encampment closures. As a result, City employees are routinely confronted with dangerous and soiled abandoned items, including but not limited to, tents with human waste, used hypodermic needles, unstable propane tanks and gasoline, and trash.

"Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *U.S. v. Tugwell,* 125 F.3d 600, 602 (8th Cir. 1997) *cert. denied,* 522 U.S. 1061 (1998); s*ee Crumble*, 878 F.3d at 659 (abandonment assessed under the "totality of the circumstances").  As outlined above, the City has a detailed process to ensure people have ample opportunity to take or store their belongings in the days leading up to and during encampment closures. Accordingly, it is reasonable for City employees to believe that property left behind has been abandoned, particularly given the state of much of the property left behind.

Finally, even *if* Plaintiffs were able to identify an incident or two in which unabandoned property was unlawfully seized at a City encampment closure, which they cannot, such a showing would still be insufficient to establish municipal liability. For the City to be liable here, there would have to be evidence that there was a custom of unlawfully seizing property at closures so widespread, persistent, and continuing that it has "the effect and force of law". *Jane Doe A By &*

*Through Jane Doe B*, 901 F.2d at 646. Plaintiffs cannot meet this burden, and Plaintiffs' claims for unlawful seizure must be dismissed.

**b.** Plaintiffs have not established a custom of procedural due process violations

Plaintiffs are unable to establish that the City had a widespread, persistent, and continuing custom of unconstitutionally depriving individuals of due process rights during encampment closures. To establish a procedural due process claim, a plaintiff must establish both the existence of a liberty or property interest entitled to due process protection, and that the government deprived the plaintiff of that interest without due process of law. *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950); *Krentz v. Robertson Fire Protection Dist.*, 288 F.3d 897, 902 (8th Cir. 2000). Here, Plaintiffs cannot establish either.

Plaintiffs fail to provide evidence that there was a widespread unlawful custom by the City of unlawfully seizing the property of people staying at encampments or failing to provide them with due process. To the contrary, Plaintiffs own declarations contradict such a claim. For example, there is no evidence in the record that Sagataw was present during any Nenookaasi closure, nor that she lost any property as a result. Barnes, who was at the first Nenookaasi closure, concedes he was given ample time to remove his belongings. Butcher claims that he had time to remove his belongings but chose to help others instead.

Moreover, to the extent Plaintiffs left behind property after an encampment closure, such property was abandoned. As a matter of law, an individual abandons their property interest in personal property when there is "(1) actual relinquishment of property, and (2) an intent to permanently part with the property." *Zephier v. Agate*, 957 N.W.2d 866, 872 (Minn. 2021)[3] Whether a property owner intended to abandon their property may be inferred from the owner's conduct and the nature and the situation of the property. *Erickson v. Sinykin*, 26 N.W.2d 172, 176 (1947). As discussed above, property left behind at encampments is often, at best, in a state of disrepair – at worst in a state of hazard. Both conditions suggest abandonment.

Even if the Court were to determine that Plaintiffs did have a property interest in personal property disposed of by City employees, the second step of the analysis requires Plaintiffs to establish that the City deprived Plaintiff of that interest without due process of law. *See Krentz v. Robertson Fire Protection Dist.*, 228 F.3d 897, 902 (8th Cir. 2000). The Court must then consider what process is due. *Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976). Here, Plaintiffs cannot meet that burden.

---

[3] "Protected property interests are created by state law[.]" *Ellis v. City of Yankton*, 69 F.3d 915, 917 (8th Cir. 1995).

As an initial matter, where a plaintiff has received actual notice of the impending seizure of their property, there is no due process violation. *Hroch v. City of Omaha,* 4 F.3d 693, 696 (8th Cir. 1993). But in all cases, "[d]ue process is a flexible concept, requiring only such procedural protections as the particular situation demands." *Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d 698, 702–03 (8th Cir. 2004)(quotation omitted). When determining what procedural protection a particular situation demands, the Supreme Court directs , courts to examine three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

As to factor one, it is undisputed that Plaintiffs have not been deprived of their property by the City. Moreover, even a theoretical plaintiff would not have suffered a deprivation under the facts of this case. Indeed, as a matter of law, property left behind after the closure of an encampment in which individuals have received notice, time to remove their belongings, storage options, and transportation assistance, has been legally abandoned.

As to factor two, the risk of erroneous deprivation is extremely small, given all the notice and consideration provided by the City as discussed above. Plaintiffs knew they were not permitted to live on these City-owned properties. Each of the sites of a Nenookaasi iteration has been fenced and locked, which the encamped individuals only gained access to by cutting through those fences and breaking the locks. Each site of a Nenookaasi iteration had *multiple* "no trespassing" signs posted which encamped individuals subsequently tore down. The City engaged in weeks of dialogue and outreach to individuals at the encampments. Plaintiffs knew the City intended to close the encampments. Plaintiffs had numerous opportunities to secure alternative housing and obtain storage for their personal items to avoid any losses on the date of closure. When City's employees are confronted with a collection of dirty, broken, and soiled objects that have been left behind during a closure, it is reasonable for the City to dispose of those items. Sorting through the items left behind is extremely hazardous because City employees have been stuck with used hypodermic needles, and exposed to feces, other hazardous unknown substances, and vermin infestations. (ECF 17 at 31.) Accordingly, it is objectively reasonable to forego searching the items left behind after people were given many opportunities to remove or store them. To any reasonable official, these items have been abandoned. As discussed, *supra*, seizing

abandoned property does not implicate the Fourth Amendment. *Abel,* 362 U.S. at 241 (1960); *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011).

And finally, as to factor three, there is no material fact dispute that the burden on the government of additional process would be incredibly high. Plaintiffs have not articulated in this case what additional process they believe they are entitled to, but certainly postponing closure until the City is absolutely certain all wanted property has been removed would be extremely burdensome on the City, as well as the community. Critically, the City not only has an interest in serving the needs of those at an encampment, which it does with ample outreach, notice, and storage, but in serving the surrounding community members and businesses as well. Encampments pose multiple health and safety concerns, including but not limited to, open drug use, trash accumulation, infestation, violent crime, human trafficking, poor sanitation, human waste contamination, and property damage. The longer encampments are left uncleared, the greater the risk that these issues grow. Requiring the City to interminably delay closings or to store large quantities of broken, soiled, and hazardous materials would be unreasonably burdensome.

Ultimately, even if Plaintiffs were able to identify an incident or two in which unabandoned property was unlawfully seized at an encampment closure, that would still be insufficient to establish municipal liability. For the City to be

liable, there must be evidence that there was a custom of unlawfully seizing property without due process at closures so widespread, persistent, and continuing that it has "the effect and force of law". *Jane Doe A By & Through Jane Doe B*, 901 F.2d at 646. Plaintiffs have not produced any evidence to meet this high burden, and Plaintiffs' claims for due process violations must be dismissed.

ii.    <u>Plaintiffs have not established a custom of substantive due process violations</u>

The Due Process Clause of the Fourteenth Amendment "is phrased as a limitation on a state's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). "Its purpose [is] to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* at 196. The "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The exception to this rule is that "the state owes a duty to protect individuals *if it created the danger* to which the individuals are subjected." *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005)(emphasis added).

Plaintiffs argue that City employees, under the supervision and instruction of Mayor Frey and pursuant to a state-created danger theory, violated Plaintiffs' substantive due process rights based on the manner in which the City closed the

Nenookaasi encampments. Under this theory, "[i]f the state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced, the state actor, depending on his or her state of mind, may have committed a constitutional tort." *Id.* (citation omitted). To sustain such a claim, Plaintiffs must be able to point to facts that would support a finding of the following five elements: (1) that "they were members of a limited, precisely definable group"; (2) that Mayor Frey's conduct "put them at significant risk of serious, immediate, and proximate harm" by a third party; (3) that "the risk was obvious or known" to Mayor Frey; (4) that Mayor Frey "acted recklessly in conscious disregard of the risk"; and (5) in total, Mayor Frey's conduct "shocks the conscience." *Id.* Plaintiffs cannot meet any of these elements.

First, Plaintiffs cannot point to evidence that they are members of a "limited, precisely definable group." To the contrary, Plaintiff were all staying at different encampments, some did not even experience a closure, some do not claim to have lost property, some do not claim to have been left without notice of the closure, and each closure of a Nenookaasi  iteration occurred on different days, at different locations, with notice given in different ways and provided different amount of time to leave, and under different encampment closure conditions.

Second, Plaintiffs have no evidence that Mayor Frey's conduct "put them at significant risk of serious, immediate, and proximate harm" by a third party. This

Court has already held that the City cannot be responsible for the type of risks claimed by Plaintiffs:

> The claim as I understand it is that the Plaintiffs are at risk of harm through the dispossession of their property, being forced to live in the cold in a Minnesota winter, and the risks that certain individuals will face a relapse of underlying health conditions through the loss of stability the camp provides, and by those health conditions I mean health conditions including drug and alcohol dependency, mental health conditions and the like. The City's conduct did not and does not create these risks. Again, the City has given Plaintiffs notice and options to safeguard their belongings. The City is not forcing Plaintiffs to reside outdoors. Plaintiffs reside outdoors today, and the City is telling them they need to reside somewhere else, perhaps in another outdoor location, perhaps in a shelter. Regardless, the City's conduct does not shock the conscience.

(ECF 57, Ex. A. at 69:17-70:8.)

Third, as to the third and fourth elements, there is no evidence that Mayor Frey "acted intentionally or wrongfully in disregarding a known danger." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Indeed, there is no evidence that Mayor Frey knew that Plaintiffs would be injured by a third party if Plaintiffs left Nenookaasi or that Mayor Frey unreasonably ignored that risk. Plaintiffs argue that they are trapped in a "cycle of homelessness, where they are preyed upon by human traffickers, drug dealers, arsonists, and murderers." (ECF 104.) This is not a risk that is a result of closing an encampment, however. Plaintiffs were already living outside and drug dealers, arsonists, and murderers were coming to the

Nenookaasi encampment. Mayor Frey simply told them that they could not continue living at a Nenookaasi encampment.

Fourth, courts have repeatedly rejected the state-created danger theory in cases involving encampments on public property. *Murray v. City of Philadelphia*, --- F. Supp. 3d ----, 2020 WL 5006046, at *5-7 (E.D. Pa. Aug. 25, 2020)(no likelihood of success on state-created-danger claim that encampment disbandment exposed encampment residents to sleeping outside or in dangerous shelter conditions); *Housing is a Human Right Orange Cty. v. Cty. of Orange*, Civ. No. 19-00388, 2019 WL 6481311, at *12 (C.D. Cal. Aug. 12, 2019)(dismissing state-created-danger claim); *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 432-33 (N.D. Cal. 2017)(dismissing state-created-danger claim and finding that "generalized dangers of living on the street preexisted" disbandment of encampment). These courts have all held that closing encampments does not constitute a state-created danger, and this Court should find the same.

### B.   PLAINTIFFS' ADA CLAIM FAILS

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability ... be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a claim, plaintiffs must be able to prove that (1) they are qualified individuals with a disability; (2) they were

denied the benefits of a public entity's service or program, or otherwise discriminated against; and (3) the denial or discrimination was based on their disability." *Loye v. Cty. of Dakota*, 647 F. Supp. 2d 1081, 1087 (D. Minn. 2009) (citing *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)). The record in this case, however, fails to show that Plaintiffs are qualified individuals with a disability, that they were denied any benefits of any City service or program or were discriminated against, or that any action taken relating to them was based upon any alleged disability.

### 1. Plaintiffs Cannot Establish that they are "Qualified Individuals" with a disability

Plaintiffs have failed to provide any evidence that they meet the ADA's definition of "qualified individual[s] with a disability." The ADA provides a disability involves "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102. Plaintiffs do not specify why it is they are persons with disabilities under the definition. The individual Plaintiffs[4] claim that they suffer from the following conditions:

---

[4] Plaintiffs Askenette and Tiger do not claim that they suffer from any disabilities. (ECF 94, 96).

- Cheryl Sagataw: post-traumatic stress disorder (ECF 6 at ¶4);

- DeAnthony Barnes: chemical dependency, substance abuse and addiction (ECF 5 at ¶¶4,7);

- Roberta Strong: traumatic brain injury (ECF 29 at ¶2);

- Travis Neloms: broken ankle, "multiple mental health diagnoses" (ECF 35 at ¶2);

- Rondel Applebee: post-traumatic stress disorder, chemical dependency, anxiety and depression (ECF 99 at ¶3.)

- Alvin Butcher: post traumatic stress disorder, depression, various foot ailments (ECF 95 at ¶3)

There is no evidence in the record, however, that any of these claimed disabilities substantially limit one or more major life activities of the individual, which is a qualifying requirement of a "disability" under the ADA.  To the extent Plaintiffs are claiming the protection of the ADA because of a current, untreated substance abuse problem,  the ADA specifically provides that "'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C.A. § 12210(a). Thus, if Plaintiffs assert that Mayor Frey is not providing adequate alternative shelter space because encampment residents with addiction cannot continue their use of illegal drugs, they have not identified a request legally entitled to accommodation. "[T]he ADA protects only individuals who are no

longer using illegal drugs." *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 (8th Cir. 2007)(citing *Campbell v. Minneapolis Public Hous. Auth.*, 168 F.3d 1069, 1072 n.1 (8th Cir. 1999)). Accordingly, because none of the Plaintiffs have provided evidence that they have a qualifying disability, Plaintiffs' ADA claims must be dismissed.

### 2. Plaintiffs have not put forth any evidence of discrimination in the administration of City services or programs based on any disability.

The crux of Plaintiffs' discrimination argument is that Mayor Frey is closing encampments "without first identifying and offering appropriate alternative shelter and storage for belongings that meets the disability-related needs of its residents[.]" (ECF 104 ¶153.) Plaintiffs also argue that closures must be postponed until "appropriate alternative shelter – shelter that would meet Plaintiffs' disability related needs – is made available." (*Id.* ¶155.) Essentially, Plaintiffs claim that Mayor Frey is not providing them with a reasonable accommodation for their disability. This argument, however, fails as a matter of law.

"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). "[I]n no event is the entity required to

undertake measures that would impose an undue financial or administrative burden ... or effect a fundamental alteration in the nature of the service." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (citation omitted).

Plaintiffs have pointed to no particular "program" provided by the City for which they request accommodation, except the closure of the encampments. The issue then is whether Plaintiffs have made a reasonable request to not be moved from their illegal encampment until they have found housing that they decide has met their specific needs. *See One Love Hous., LLC v. City of Anoka, Minnesota*, 2024 WL 632041, at *6 (8th Cir. Feb. 15, 2024).

Such a request is inherently unreasonable. It is undisputed that the City has undertaken closures of Nenookaasi several times due to the urgent safety concerns presented by the different encampments. These concerns, sometimes immediately and sometimes later, became so overwhelming that closure must occur, and no further extensions may be given. As part of every encampment closure the City provided outreach to those at the encampments to connect them with social services and storage for their items. To postpone the closure of dangerous encampments indefinitely in hopes that other organizations will develop housing deemed acceptable to encampment residents, and for encampment residents to be willing to accept that housing, is an impermissible, fundamental alteration of the City's programs. *Where Do We Go Berkeley v. California Dep't of Transportation*, 32

F.4th 852, 862 (9th Cir. 2022)("The district court effectively asked [the California Department of Transportation] to house Plaintiffs on its property until Plaintiffs found new housing, with no regard to the safety risks that make clearing level 1 encampments so critical.") Therefore, Plaintiffs' requested accommodation is not reasonable.

Moreover, Plaintiffs' requested accommodation cannot be reasonable unless it is necessitated by the Plaintiffs' disabilities. *One Love Hous., LLC*, 2024 WL 632041, at *6 (citing *Peebles v. Potter*, 354 F.3d 761, 769 (8th Cir. 2004)). There is no evidence in the record, however, about why or how the existing shelters are unusable by Plaintiffs based on their alleged disabilities. None of the Plaintiffs have put forth any proof that shelters are not a viable option *because of their disability*. Barnes states that shelters do not work for couples or people struggling with addiction. (ECF 5 ¶16.) Neloms states he does not like shelters because they "have curfews, rigid, rules, I get sick when I stay there [from poor food/hygiene]" and that he did not like that he had to share a room and could not have company in Agate housing. (ECF 36 ¶¶8, 11.) Strong stated she did not go to shelters because "I am not good with too many rules, I'm not good with having a bedtime, and if you break a rule you get kicked out." (ECF 29 ¶9.) No Plaintiff has provided any evidence that a mental or physical condition is the reason they cannot go to a shelter or cannot otherwise find housing when the City closes an illegal encampment on City

property. Plaintiffs do not make a connection between their need for more time to find housing and any possible disability. In fact, there is no evidence in the record of what kind of housing Plaintiffs argue they *do* need, simply that shelters are distasteful to them. Additionally, as Plaintiffs do not show that more time is a necessity due to their disability, they cannot show that their requested accommodation is reasonable, and their ADA claim must be denied.

## CONCLUSION

Accordingly, the Court should dismiss all claims against Defendant.

Dated: July 29, 2025                KRISTYN ANDERSON
                                    City Attorney
                                    By

                                    */s/ Sharda Enslin*
                                    SHARDA ENSLIN (#389370)
                                    KRISTIN R. SARFF (#388003)
                                    HEATHER P. ROBERTSON (#390470)
                                    J. HAYNES HANSEN (#399102)
                                    Assistant City Attorneys
                                    Minneapolis City Attorney's Office
                                    350 South Fifth Street, Room 210
                                    Minneapolis, MN 55415
                                    (612) 673-2180
                                    612 673-3919
                                    (612) 299-2742
                                    (612) 673-3339
                                    sharda.enslin@minneapolismn.gov
                                    kristin.sarff@minneapolismn.gov
                                    heather.robertson@minneapolismn.gov
                                    haynes.hansen@minneapolismn.gov

                                    *Attorneys for Defendant Mayor Jacob Frey*