## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CHERYL SAGATAW, DEANTHONY BARNES, ROBERTA STRONG, TRAVIS NELOMS, ALVIN BUTCHER, ADRIAN TIGER, CHANCE ASKENETTE, DEVEN CASTON, LOLA HEGSTROM, and RONDEL APPLEBEE, *on behalf of themselves and a class of similarly-situated individuals*,

Plaintiffs,

vs.

MAYOR JACOB FREY, *in his individual and official capacity*,

Defendant.

Civil Action

0:24-cv-00001-ECT-ECW

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs oppose Defendant Mayor Jacob Frey's July 29, 2025 motion for summary judgment seeking judgment as a matter of law as to the entirety of Plaintiffs' Second Amended Complaint.

## INTRODUCTION

The Plaintiffs in this lawsuit are a testament to resilience and humanity. Despite the significant and ever-present obstacles of houselessness, they worked with each other and many others to create Camp Nenookaasi, an Indigenous-led and culturally informed encampment community that resulted in unprecedented and monumental successes in helping residents achieve stability, housing, and sobriety. In response, Mayor Frey maintained unconstitutional and violent policies and customs, ordering repeated evictions of

Nenookaasi residents as they were forced to flee from location to location. The Mayor's treatment of Nenookaasi residents is a case study in double standards and prejudice, government waste, and cruelty disguised as public service.

Mayor Frey's aggressive evictions of Plaintiffs' encampments have done nothing to address the problems he campaigned on a promise to solve. Instead, he has effectively swept Plaintiffs from one location to another, while violating their constitutional rights, inflicting further harms and traumas upon them, and worsening the impacts of the systemic problems faced by houseless people. This Court should deny Mayor Frey's motion for summary judgment and allow the jury to decide the merit of Plaintiffs' claims and the adequacy of Mayor Frey's asserted defenses.

## STANDARD OF LAW

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party." *Fofana v. Wolf*, 437 F. Supp. 3d 673, 680 (D. Minn. 2020).

"The burden of demonstrating an absence of a genuine dispute of material fact is on the moving party." *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2008). The summary judgment standard, however, "does not require

the non-moving party to *prove* its case, but to submit evidence that gives rise to a genuine dispute of material fact." *Hill v. Sw. Energy Co.*, 858 F.3d 481, 487 (8th Cir. 2017).

In reviewing whether there are genuine issues as to any material fact, the court looks to "the pleadings, the discovery and disclosure materials on file, and any affidavits." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). The court must "construe the facts in the light most favorable to the non-moving party and afford [them] all reasonable inferences supported by the record." *Solomon v. Petray*, 795 F.3d 777, 788 (8th Cir. 2015).

## LEGAL ARGUMENTS

### I. The Mayor Has Failed to Meet His Initial Burden to Identify Undisputed Material Facts in the Record of Admissible Evidence to Support His Motion.

Under *Celotex Corp. v. Catrett*, the Mayor may meet his burden as the summary judgment movant by relying on the "pleadings, depositions, answers to interrogatories, and admissions on file," and need not file an affidavit specifically negating the non-movant's claims. 477 U.S. at 323–24. The Supreme Court has made clear, however, that its *Celotex* holding should not be taken out of context: "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Likewise, Justice White noted in his concurrence: "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Id.* at 328 (White, J., concurring).

Overlooking this initial burden of production by the movant is "an unfortunately common error in the application of summary judgment review." *See, e.g.*, *Logan v. Commercial*

3

*Union Ins. Co.,* 96 F.3d 971, 978 (7th Cir. 1996). But under *Celotex,* an unsupported or conclusory motion for summary judgment does not require the nonmovant to come forward with evidence to support each and every element of its claims; only *after* the movant has provided adequate notice, articulating with references to the record specific reasons why it believes there is no genuine issue of material fact, must the nonmovant present evidence sufficient to demonstrate an issue for trial. *Celotex,* 477 U.S. at 323.

In addition, the summary judgment movant must support its assertions with evidence "that would be admissible" at trial. *See* Fed. R. Civ. P. 56(c)(1)(B); Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 56(c)(4). In particular, an affidavit used to support a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). An affidavit based upon "information and belief," rather than personal knowledge, is insufficient as a matter of law. *Automatic Radio Mfg. Co. v. Hazeltine Research,* 339 U.S. 827, 831 (1950). Hearsay statements which cannot be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based upon personal knowledge, may be stricken. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) (lack of personal knowledge); *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (conclusory allegations and legal arguments).

Here, the Mayor has failed to meet his initial burdens to identify those portions of the record which it claims demonstrate the absence of a genuine issue of material fact and to base his claims on evidence which would be admissible at trial. The Mayor failed to produce a statement of undisputed facts to accompany his motion for summary judgment. Instead,

his memorandum includes nearly twenty pages of flagrantly one-sided factual recitations that appear to be almost entirely based on the previously submitted declarations of Minneapolis Director of Regulatory Services Enrique Velazquez. First, Mr. Velazquez's declarations were not based on his personal knowledge, but "information [he] learned from [unidentified] City employees." *See* ECFs 17, 27, 56, and 125. These declarations are insufficient to support a motion for summary judgment as a matter of law, and should be stricken. *See, e.g.*, *Hazeltine Research,* 339 U.S. at 831. Furthermore, the City's factual recitations do not include any apparent attempt to reconcile or otherwise address the numerous facts to the contrary reflected in the affidavits of Plaintiffs and their witnesses as well as expert witness deposition testimony. *Compare* Br. at 3-21 *with* ECFs 5-10, 33-46, 94-99, 120-2-4, *and* Exs. A-C.

The Mayor's motion also heavily relies on the unsupported assertion that "[e]ach Plaintiff unlawfully trespassed onto City property," without any citation to admissible, non-hearsay evidence indicating Plaintiffs conduct would qualify as a criminal trespass under Minnesota law,[1] and conclusory statements that Plaintiffs' claims are unsupported by evidence. *See, e.g.*, Br. at 2 ("There is no evidence that Defendant or anyone from the City committed constitutional violations or deprived Plaintiffs of their constitutional rights. There is no evidence that Defendant intentionally inflicted emotional distress upon Plaintiffs. There is no evidence that Defendant's actions violated the Americans with Disabilities

---

[1]     The Mayor has not identified any admissible, non-hearsay record evidence as to when, where, how, what, and by whom alleged trespass notices and eviction notices were posted, except for the dubious (and now infamous) sandwich board dropped off by a pastor without any apparent lawful authorization or indicia of legitimacy. *See* Section II(A)(a)(ii), *infra*. The Mayor also claims such notices were periodically removed, although he again fails to identify any admissible, non-hearsay evidence suggesting when, how, or by whom such notices were removed.

Act."). The only other references in the Mayor's memorandum to allegedly "undisputed" facts are conclusory statements without record cites that are either plainly erroneous or immaterial, as further detailed below. The Mayor's representations of the factual record in this case border on bad faith. At the very least, the Mayor has failed to meet his initial burden under the Rules of Civil Procedure and *Celotex*. For that reason alone, the Mayor's motion for summary judgment should be denied.

## II. Genuine Issues of Material Fact Exist as to Each of Plaintiffs' Claims.

The record evidence in this case — including expert disclosures, deposition transcripts, and the sworn declarations of both Plaintiffs and others with firsthand knowledge of the evictions — provides ample support for a jury to find that Defendant is liable for all five causes of action in Plaintiffs' Second Amended Complaint. At a minimum, the record creates a material factual dispute over the issues of each cause of action.

### A. Count I: Fourth Amendment Violation for Unlawful Property Interference

The Fourth Amendment guarantees the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and applies to state and municipal governments through the Fourteenth Amendment. *Ker v. California*, 374 U.S. 23, 30–31 (1963). A government entity violates the Fourth Amendment's prohibition against unreasonable warrantless seizures by engaging in "some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

> **a. Facts and inferences exist to create a material dispute over whether Defendant's agents seized Plaintiffs' unabandoned property.**

To determine whether a violation occurs, the key question is whether a person had a subjective and an objectively reasonable expectation of privacy in the seized item under the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). People do not have objectively reasonable privacy interests in property that appears to be "abandoned." *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008). Other courts distinguish between "abandoned" property and items momentarily unattended or "left in the attendance of another person," finding that "[o]nly property that in good-faith appears to be abandoned is subject to seizure." *Cooper v. Gray*, 2015 WL 13119400, *8 (D. Ariz. Feb. 13, 2015).

Whether property has been abandoned is a fact-dependent inquiry, which involves looking at whether Plaintiffs have enough time to gather their belongings during evictions and whether advance notice and storage offerings provide Plaintiffs the opportunity to make arrangements for their property ahead of time.

### i. Plaintiffs' evidence contradicts Defendant's blanket assertion that people have enough time to pack during evictions.

Defendant's position is that Plaintiffs are allowed time to gather their belongings at evictions, and that any items ultimately destroyed are those which Plaintiffs have chosen to leave behind. Part of Defendant's argument seems to be that so many of the items, according to Defendant's agents, are in poor condition or of little value. *See* ECF 142 at 37. But an item's value is not a factor in whether an individual has a reasonable expectation of privacy. *See, e.g., Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008) (the Fourth Amendment applies "regardless of whether the property in question is ... a Cadillac or a cart.").

Defendant also claims that Plaintiffs are given unlimited time and opportunity to remove items from an encampment, but this fact is squarely disputed:

> In the wake of encampment evictions, people lose their items, and frequently that includes winter survival gear, meaning shelter. Albeit a tent is a challenging bit of shelter when it's very, very cold, but it's shelter; but more importantly, sleeping bags and all of the other warm garments that people might use to clothe themselves and stay safe. . . . [At the first Nenookaasi eviction,] I saw a large amount of items that people had been forced to abandon because of a hard deadline that people needed to be out of that space by. . . . People were not allowed an opportunity to have the time they needed, the capacity needed, or access to locations that would allow them to store the items that they needed to have stored.

Ex. A[2] at 97:23-98:13, 99:6-11.

During evictions, Minneapolis employees permitted Plaintiffs only a finite amount of time to gather what belongings they could carry with them and destroyed everything else. The jury should have the opportunity to hear these facts, and to reject Defendant's discriminatory (and incorrect) assumptions that Plaintiffs' belongings are dangerous, worthless, or dirty, and thus must have been intentionally left behind.

### ii. Notice is inadequate or nonexistent, and does not provide an opportunity for Plaintiffs to avoid losing everything at evictions.

Defendant also argues that Plaintiffs have ample notice of closures and an opportunity to utilize storage to safeguard their items, but this again is a disputed fact to be presented to a jury.

Notices were unreliable to the point of being functionally useless. "[T]he dates are frequently, as posted, unreliable indicators as to when the final date of closure and removal is going to actually occur." Ex. A at 100. "The collective experience, you know, based on my expertise, is that the dates *may* be posted; people honestly don't know, like, is today the day

---

[2] This transcript has been redacted at the request of the witness, in compliance with the parties' protective order.

that people are going to come in, evict the encampment, and dispose of and throw away any items that I'm not able to physically carry away from the location?" *Id.* at 81:5-11.

Defendant claims that notice is provided by City workers, ECF 120-2 at 114. Even assuming Mr. Velazquez has personal knowledge of his claims, they are impeached by Plaintiffs' expert:

> The City does not typically give reliable notice to encampment residents. When City representatives do give notice of evictions to residents, they do not go tent by tent to make sure people know. They walk into an encampment, yell an announcement, and leave. Only people who are there, awake, and in earshot at the time hear the announcement and even then they are not sure if the announcement is from a credible source.

ECF 120-3   2.

Eviction notices were issued, then amended, ignored or revoked, then re-issued, creating a "boy who cried wolf" situation that "made things just like a bigger challenge" for people trying to plan for and survive the evictions. Ex. B at 131-32. Defendant delegates the task of providing notice to a third party, and the official City working group that oversees evictions provides zero oversight as to whether or how these contractors might identify themselves as agents of the city issuing valid and credible eviction notices. ECF 120-2 at 65:22-66:5.

This lack of oversight led to the absurd situation where a religious evangelical identifying only as "Pastor Collin" dropped off a sandwich board eviction notice at the front of the second Nenookaasi encampment. Ex. B at 147-150. Pastor Collin did not enter the encampment and attempted to leave without speaking to anyone, causing a "great deal of confusion as to why a church from Minnetonka was delivering legal forms for the City of Minneapolis." *Id.* at 148-149.

On other occasions, residents were not given any notice at all. *See, e.g.*, ECF 95 9; ECF 94 4. It is hotly disputed that Defendant provided adequate notice to Plaintiffs of encampment evictions.

### iii. Storage is functionally unavailable to residents and does not provide them a means to avoid their belongings being seized.

Even if notice had been adequate, additional time to prepare for an eviction achieves little when encampment residents have nowhere else to go or store their belongings. *See* Ex. A at 100. Defendant purports to offer storage for Plaintiffs' items, but this is a highly disputed fact.

Many residents simply have never been offered storage at all. *See, e.g.*, ECF 36 17; ECF 94 10; ECF 95 18.

One Plaintiff who *had* heard about storage, not from a City employee but from a rumor, made a good faith attempt to use the program but found it to be ineffective and useless. ECF 98 12. Ms. Hegstrom exerted considerable effort to track down the rumor, travel downtown, and to attempt to utilize the storage. *Id.* Shortly thereafter she retrieved her items from storage because the location was too far away to access needed items and the one-tote size limit made storing most items impossible. *Id.*

Even the City acknowledges the concerns with the size limitations and prohibitive distance. ECF 120-2 at 101-102. The City received, but disregarded, feedback asking for storage to be offered during evictions instead of at random prior to closure. *Id.* at 185:24-186:10. Instead, the City's Homeless Response Team offers to take a single tote bag of items away from residents in the course of their visits to encampments, which exclusively consist of responding to housed neighbors' complaints. *Id.* at 34:16-22, 80:22-83:3, 84:11.

A jury should be able to decide whether residents have a meaningful way to safeguard their belongings when their only option for "storage" is to place what can fit, but what is not needed on a regular basis (such as winter survival gear), into one bin to then entrust to a City worker whose entire job is responding to complaints about houseless people, to be stored several miles away in a facility whose policy, for all those residents know, is to destroy items whose owners are not heard from for two weeks. *Id.*

### b. A material dispute exists over whether Defendant's actions in seizing Plaintiffs' property at evictions was justified by an important interest.

In addition Fourth Amendment seizure claims involve a balancing test between "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983).

Defendant claims that any seizure of items is justified by safety concerns, however Plaintiffs assert time and again that Defendant's conduct actually *worsens* these same safety concerns. This is a disputed factual question for the jury.

Many alleged safety concerns do not originate from encampments to begin with: "[a] lot of the harms that people blame on encampment residents actually come from the housed people in the neighborhood. Evictions are sometimes based on violence that occurs nearby but actually had nothing to do with the encampment or any of its residents." ECF 120-3, 14. "We have not had any large-scale encampments for most of 2025, and we have seen some pretty extreme spasms of mass homicide occurring in those same neighborhoods at a time when there aren't encampments. . . . these are communities that are . . . struggling already." Ex. A at 119.

Defendant deposits rubble, erects fencing, and uses other hostile architecture against unhoused people, but by barricading more remote or out-of-the-way locations, he forces encampments to form in specific neighborhoods where violence already exists, and where the inevitable symptoms of houselessness are concentrated around more people. *Id.* at 108:7-23.

Encampments do not create the harms which continue to exist whether unhoused people are living in more dispersed or more concentrated areas. "When encampments are dispersed, any issues that might be related to them in terms of issues that are problematic to the community members that may be housed, that you could attribute to people experiencing homelessness, just simply shift location; and that, oftentimes, what is labeled as criminal activity, is a direct result of the fact of not having a house." *Id.* at 145:8-14.

Simply put, housing people is the solution to houselessness, not evictions. Most people who are in encampments want to be housed, and 80 to 90 percent are on housing waiting lists. ECF 120-3 ¶ 13; Ex. C at 81. Moving from the streets into housing requires being on waiting lists for months or even years, followed by a tiny window of time where a person is at the top of the list. Ex. A at 138-39. Evictions cause people to lose contact with their outreach workers, miss their placement window, and have to start the process all over again. *Id.* Encampments allow outreach workers to keep in contact with their clients (who rarely have phones), and thus move people off the street and into stable housing in "astonishing numbers." ECF 120-3, ¶ 13.

Supporting encampments with adequate sanitation and safety controls and respecting Plaintiffs constitutional rights would not burden government interests but *further* them.

Pausing unconstitutional evictions would spare the exorbitant waste of resources involved in chasing the same people from block to block, throwing their progress towards stability into the dumpster every time.

This balancing test should be applied to Plaintiffs and their unhoused peers in the same way that it would be for their housed neighbors in a similar situation. When someone who lives in an apartment has been accused of a violent crime, the solution is not to evict the entire apartment complex. ECF 43 ¶ 22. Plaintiffs do not dispute that unsanitary conditions are a public health concern, or that people who engage in acts of violence should face consequences. However, the response should be to address the sanitation concerns and the violence directly. Evicting an entire community for one person's wrongdoing is not reasonable and does not justify a seizure and destruction of property.

## B. Count II: Fourteenth Amendment Procedural Due Process Violation

The record contains evidence which, at a minimum, raises material disputed issues of fact regarding whether Defendant violated Plaintiffs' procedural due process rights pursuant to the Fourteenth Amendment to the U.S. Constitution.

A procedural due process claim involves two steps: 1) whether the government has deprived a person of a liberty or property interest, and 2) whether the government followed constitutionally sufficient procedures in doing so. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). The focus of procedural due process is not the merits of the deprivation itself, but instead the adequacy of pre- and post-deprivation procedures. *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998). Reviewing courts assess "the affected private interest, the risk of an

erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including burdens that additional safeguards would entail." *Id.*

1. **Defendant fails to show that no dispute exists over whether Defendant provides encampment residents with sufficient notice prior to evictions.**

A due process violation occurs when notice was not provided, or was not "reasonably calculated, under all the circumstances, to apprise interested parties of the [seizure] and afford them an opportunity to present their objections." *Jones v. Flowers*, 547 U.S. 220, 226 (2006).

Nowhere has Defendant suggested a location, process, or opportunity for Plaintiffs to present their objections, and factual issues with whether notice was actually or reasonably provided are addressed in Part II(A)(a)(i), *supra*.

2. **Defendant fails to show that no dispute exists over whether Plaintiffs have an opportunity to collect wrongfully seized items.**

Courts have said that no due process violation occurs if civilians have a "meaningful postdeprivation remedy for the loss." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Defendant points to the three *Matthews* factors as the metric for appropriate procedural due process: the affected private interest, the risk of erroneous deprivation and the value of additional procedural safeguards, and the government's interest in its existing process and potential alterations. ECF 142 at 40. Plaintiffs have offered evidentiary support to create material issues of fact for each of these factors.

a. **Defendant has deprived Plaintiffs of their property.**

Contrary to Defendant's patently false claim that "it is undisputed that Plaintiffs have not been deprived of their property by the City," ECF 142. at 40, Plaintiffs personally describe extensive losses as a result of evictions. *See*, e.g. ECF 94 ¶¶ 4-5, 7-8 (describing his

experience at Nenookaasi evictions where he was present at the outset of the eviction but only allowed to make two, one, or zero trips to remove his belongings–causing him to "lose clothes, shoes, cell phones, jewelry, papers, ID, EBT cards, social security, everything"); ECF 95 ¶9 (Butcher was in his tent when he first received notice of the second Nenookaasi eviction, and was only able to retain one backpack worth of belongings, leaving "clothes, blankets, bins of food, paperwork, phone chargers, a solar panel, [and] a car battery" to be seized and destroyed by the City); ECF 96 ¶8 ("I lost two generators, an $1800 waterproof yurt, a lot of new clothes, a play station 5, a family heirloom from my grandpa. Most of these things, and more, that I lost were at the 26th and 14th eviction and the 28th and 14th eviction. We had no warning for those evictions. They just came up in the morning and told us we had to leave. I was in the camp both times … I was only allowed to make one trip."); ECF 98 ¶¶ 9-11 (describing the July 25, 2024 Nenookaasi eviction where she had ten minutes to pack and leave, the reality that she is not permitted enough time to remove her belongings, and that during Nenookaasi evictions she has lost "jewelry, clothes, my sleeping chair, tent, expensive purses I've had, nice shoes, toys for my kids, all my important paperwork, birth certificate, mental health papers about my diagnosis, an electric generator."); ECF 99 ¶5 (describing his experience at the second Nenookaasi eviction, where he lost his ID, social security card, and everything else he was not able to carry with him when he left. He was not allowed to return to retrieve more of his belongings.); *see also* ECF 95 ¶¶ 7; ECF 5 ¶¶ 13-14; ECF 37 ¶¶ 6;  ECF 6 ¶20; ECF 36 ¶¶ 12, 20; ECF 39 ¶7; ECF 39 ¶¶ 11.

In addition to direct testimony of their losses, Plaintiffs have been clear all along that their experiences are an ongoing pattern. They have been unhoused and continuously experiencing evictions for years, typically travelling as a group. *See*, e.g., ECF 36    5 ("I started living with this group of people a long time ago, years and years. We were by Franklin, where all the bricks are now, and then at the Wall of Forgotten Natives in 2018, and then from encampment to encampment."). Even the Mayor agrees that the way evictions have been conducted has not changed much since at least 2016, aside from a recent increase in the intensity and frequency of evictions to the point where encampments are disbanded as soon as they form. ECF 120-2 at 8:4-5, 20:5-11. And expert witnesses have opined extensively that Defendant's agents routinely dispose of encampment residents' property at evictions. *See*, e.g., ECF 120-4    12 ("I personally observe these patterns of property destruction, and routinely see City workers at evictions seizing and destroying belongings that include mementos of deceased loved ones, antibiotics, birth certificates, and many other life saving, vital or irreplaceable items.").

Plaintiffs have alleged that they are experiencing evictions, and that the City destroys their belongings at evictions by forcing them out of encampments and bulldozing anything they cannot carry out with them in however many (sometimes none) trips back and forth they are permitted. If Mayor Frey felt entitled to know more details about these seizures, the precise minutia of what items and of what value have been seized at each eviction, he should not have foregone his opportunity to depose the Plaintiffs during the discovery phase of this litigation. Regardless, and especially in light of the fact that at the summary judgment stage reasonable inferences must be drawn in favor of the Plaintiffs, they have met their relatively

low burden of creating material issues of fact for the jury as to the City depriving them of their property.

### b. Risk of Erroneous Deprivations

The risk of an erroneous deprivation through the existing procedures is high, and most importantly is a factual dispute within the purview of the jury. Defendant claims that notice and storage options are sufficient so that erroneous deprivations are Plaintiffs' own fault, but Plaintiffs describe at length the insufficiency of storage and notice. *See* Sections II(A)(a)(i-iii), *supra*. At a minimum, these are disputed factual questions for the jury.

Defendant claims that "Plaintiffs had numerous opportunities to secure alternative housing and obtain storage for their personal items to avoid any losses on the date of closure," as a way to shift the blame back onto Plaintiffs for Defendant destroying their belongings. ECF 142 at 41. As Plaintiffs' expert puts it: "the narrative that it is a simple process whereby someone can get housing if they just want to is extremely false and misleading." Ex. A at 111.

As explained thoroughly above in Section II(A)(b), *supra*, 80-90% of people in encampments are actively trying to get into housing, but are stuck on waiting lists. ECF 120-3,  13. Evictions cause them to lose contact with the outreach workers who have a very narrow window of time to find and notify them when their housing becomes available, causing them to cycle back to the bottom of the list where they wait for months or years for housing to become available for them again. Ex. A at 138-39. Getting into housing takes years, and being evicted draws out that process even more.

Nor are temporary shelters an option, since encampment residents cannot bring their belongings with them into shelter–going into a shelter would mean abandoning the winter survival gear necessary to withstand the next day in the cold, or the next night when they are unable to find a shelter bed. *Id.* at 75:12-24; ECF 9 (describing the lengths to which a person has to go, just to see if beds are available).

Housing takes years to obtain, shelters do not allow people to bring their belongings with them, and storage is either unknown to Plaintiffs or so limited and inaccessible as to be quite literally useless.

### c. Defendant overlooks the material factual dispute over whether existing procedures are insufficient, or whether alternative procedures exist without undue burden to the government.

Defendant claims (with no record citation) that an existing procedure exists whereby City employees will save aside items at encampments that "appear to be personal in nature." ECF 142 at 36. According to an uncited source, these saved items are allegedly given to outreach workers in an attempt to reunite those items with people who might have been forced to leave them behind during evictions. *Id.* This method seems improbable, because it would require City agents to sort through and hold aside a large volume of items. It is a factual dispute whether this procedure is used, as there is no evidence that City workers have ever set aside any of Plaintiffs' belongings.

The City did admit that some items are saved aside at encampments during evictions in a process similar to the "save aside items of value" strategy the memo describes, but with one glaring difference: Defendant's agents *do* save items aside in case these items can be reunited with their owner, *but only if those items are believed to be stolen by an encampment resident but*

*in fact owned by a housed person.* ECF 120-2 at 163:2-8 (nothing of value was set aside for any resident at the second Nenookaasi eviction, but items were set aside that were "potentially stolen property" whereby City agents set "larger valuable items aside" so that police can determine whether those items are stolen). A jury could find that Defendant has the means to safeguard residents' property at encampments, because existing methods are already employed to safeguard valuable items in evictions that are specifically believed *not* to belong to unhoused encampment residents.

Another easy alternative might be, instead of evicting an entire encampment at great taxpayer expense, to evict only the small fraction of encampment residents who are not on waiting lists for housing, and to make a specific determination of which encampment residents if any are actually engaging in acts of violence in the community–rather than treating all unhoused people as an interchangeable, stigmatized monolith of criminals. This approach would look like placing reasonable limits and providing health-focused resources to encampments, instead of evicting them altogether. *See* Section II(A)(b), *supra.*

Evictions cause public health problems amongst the unhoused populations and keep people on the streets in the type of conditions that cause encampments to form in the first place. "If our focus is trying to exit people into positive outcomes, be that shelter, medical care, substance use disorder care, or permanent housing, or shelter, we disrupt those workflows every time there's an eviction." Ex. A at 142. Allowing encampments to exist, in a controlled, supported manner, actually *reduces* the population of unhoused people and the existence of encampments overall: "the whole point of a place like Camp Nenookaasi is

because we don't want encampments. It's that we don't want homelessness." Ex B, Johnson Tr. at 141:2-5.

Defendant could allow encampments to form in places farther removed from housed neighbors, who may have understandable concerns with proximity to the unavoidable symptoms of substance use disorder or of people living outside without running water who need to perform basic human functions. Instead, "the response from government has been to place increasingly large, hostile architecture elements throughout the city that are extremely difficult to penetrate… Locations where there were opportunities for people to be less visible, less close to homes, to be in locations that had less impact on the community have been made inaccessible." Ex. A at 84. Defendants would *reduce* their burden and expense by not paying contractors to drop concrete over vacant lots in lower population density areas. Instead, funds could be spent providing port-a-potties and trash pickup, as the community and City Council encourage. ECF 7    29.

Houseless people are not animals content to live in squalor, they are human beings who *want* an opportunity to lead dignified lives. ECF 95    20 ("I think that things would be a lot cleaner around here if the City provided more garbage disposal and port-a-potty resources … we want to have clean and safe places to go to the bathroom"). Reallocating resources away from endlessly moving people around towards keeping encampments as clean and safe as possible until everyone is able to leave the streets permanently would first reduce and then ultimately eliminate any safety and health concerns that encampments represent to housed neighbors.

The record resoundingly supports Plaintiffs' position that "[d]estroying Camp Nenookaasi isn't going to get rid of the problem, it's just going to make the problems move to a new location." ECF 5 ¶8.

Plaintiffs have offered facts to show repeated seizure and destruction of Plaintiffs' property without notice, an opportunity to be heard, or any pre or post-deprivation mechanisms to challenge the seizure or reclaim the property, with no legitimate government interest. The jury is entitled to weigh those facts.

### C. Count III: Fourteenth Amendment Substantive Due Process Violation

As with the majority of Defendant's challenges to Plaintiffs' causes of action, Defendant and Plaintiffs largely agree on the legal standard that applies to their substantive due process claim, but disagree starkly on whether a material factual dispute exists. A jury could find Defendant liable for violating Plaintiffs' substantive Fourteenth Amendment due process rights if evidence shows that Defendant created dangerous conditions and then failed to protect the civilians that he put in harm's way. *Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2011). The record has more than sufficient factual support to create material factual disputes over whether: (1) the plaintiffs are members of a limited, precisely definable group; (2) the municipality's conduct put them at significant risk of serious, immediate, and proximate harm; (3) the risk was obvious or known to the municipality; (4) the municipality acted recklessly in conscious disregard of the risk; and (5) in total, the municipality's conduct "shocks the conscience." *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011).

### a.  Plaintiffs' facts show that they are a precisely definable group.

Plaintiffs offer evidence to show that they are members of a precisely definable group–they are all disabled, unhoused persons, living in south Minneapolis, who all experienced at least one of four specific evictions which occurred within a time period of seven months in approximately the same neighborhood. Each of the qualifying evictions were overseen and orchestrated by the Defendant, in accordance with a policy that has remained functionally the same since 2016. Velazquez Tr. Doc 120-2 8:4-5, 20:5-11.

### b. Defendant's conduct puts Plaintiffs at risk of serious, immediate, and proximate harm.

On the second factor, Defendant improperly invokes this Court's reasoning when it applied the standard for whether to grant Plaintiffs' motion for a preliminary injunction. ECF 142 at 44. Instead, the question must be whether the record raises material facts as to whether Defendant's conduct puts Plaintiffs at significant risk of serious, immediate, and proximate harm.

Evictions are traumatizing and destabilizing to encampment residents, and result in death, overdose, relapse, and exposure to human trafficking. Johnson Tr. at 94:16-20 (Evictions put residents in "a heightened sense of, you know, like a fight or flight essentially … I remember individuals that were experiencing trauma and an emergency in real time."). Because of the stressors of evictions, "overdoses go way up, transmission of infectious diseases go way up," drug use increases, and people relapse as a direct result of the stress and trauma of losing their belongings and safety. *Id.* at 130:20-131:10. Evictions lead to an increase in the spread of deadly infectious diseases like HIV, to people going missing, freezing to death without the gear they were reliant on for survival. ECF 10    27; ECF 40 ¶¶ 25, 28.

Evictions also rupture the social and professional connections that are lifelines to unhoused people, preventing people from accessing housing and social services, trapping them in a vicious cycle. ECF 120-3 ¶¶ 9-12.

Not only are the evictions violent experiences, but also Defendant causes further harm in his attempts to justify the violence of evictions by the foreseeable consequences of intentionally under-resourcing encampments.

For example, Defendant often cites problems such as residents of encampments defecating in neighbors' yards, and "human waste contamination." ECF 142 at 42. However, Defendant has been incredibly reluctant to provide port-a-potties to residents. Velazquez Tr. Doc 102-2 at 199:9-200:12 (despite knowing that providing bathrooms "contributes to improved public health," the City only provides port-a-potties for encampments that are scheduled to close.). Housed neighbor and advocate for encampment residents Christin Crabtree summarized this outrageous hypocrisy in her sworn declaration:

> We fought for more than 100 days just to get porta-potties. We've actively sought partnership with government, and while we have the support of some of our city council members, the City itself has been hostile, issuing the eviction notice based on a claim that there is a lack of public health and lack of access for emergency services. This is insulting considering it was our own government that we had to fight for sanitation services and bathrooms. When we finally got approval for the bathrooms, we found out that they had been ready for delivery for weeks prior. And only days after getting bathrooms, we got the eviction notice.

ECF 10   24.

When bathroom facilities are provided, they are often not serviced, or are delivered in a shamefully unsanitary condition.

> I know that the City also dropped off some, you know, porta-potties. One of them was covered in human feces when they dropped it off. There was diarrhea splattered

all over the walls when they dropped it off in the first place … they were also not picking them up and cleaning them, which they said they would … things like trash pickup were also agreed upon that were also widely neglected by the City. So I see a lot of the cleanliness and the conditions as also being directly linked to the lack - - or the broken agreement by the City.

Ex. B at 143-44.

Similarly, trash pickup is promised but not delivered, and then used as a pretext for further evictions. Even emergency services are withheld, and the deadly consequences weaponized: "residents called 911 for assistance removing a person with a gun from camp. The police failed to assist and physically left the area near the camp where they had been previously stationed. The person then shot someone and city officials used the shooting to say the camp was dangerous." ECF 40  26.

A jury could find from these facts that Defendant engages in intentional and despicable behavior to put Plaintiffs in harms way, whether that is to undermine conditions at encampments so that they are less appealing or so that the manufactured unsafe conditions at the camp provide cover for ongoing evictions. The Mayor's lack of support for encampments, as well as his evictions themselves, create dangerous and unsafe conditions that keep Plaintiffs traumatized, addicted, and vulnerable.

### c. The risk of these harms are obvious and known to Defendant, who acted recklessly in conscious disregard of the risk.

Defendant cannot credibly claim that no evidence exists indicating that he "acted intentionally or wrongfully in disregarding a known danger." ECF 142 at 45.

"To prevent the destruction of Camp Nenookaasi, we've sent emails, made phone calls, flooded City Council meetings, talked to the media, state representatives, talked to community members, residents, and city council members together. Many city council

members have visited camp and listened to the personal stories of residents." ECF 7 ¶ 24.
"There was a press conference basically begging the City not to go through with [the first
Nenookaasi eviction]" Ex. B at 125.

The City admits to receiving complaints that evictions are inhumane, but many of
those complaints were taken "with a grain of salt" because they were "form letters." ECF
120-2 ¶ 182:10-11. Three of the City's own employees complained, particularly about the
impacts of enclosures on Native people and of these evictions compounding generational
trauma. *Id.* at 183-85. The City's response was to meet with these employees to explain away
their concerns, not to adjust its policies to address them. *Id.*

Not only is Defendant aware of the dangers of his eviction policy, but he works
actively to *silence* critiques–even invoking veto power over providing funding to service
providers who disagree with the City's approach to encampments. *Id.* at 106:9-10,
107:25-108:2 (admitting that the City "has some level of input into who Hennepin County
selects" as outreach partners, and that the City wants service providers who are not "deriding
the approaches by any of these organizations that are funding them.").

Notwithstanding the well documented harms and public outrage surrounding
repeated evictions, Defendant continued to recklessly move forward with evictions, in
conscious disregard of the risk. *See*, e.g. ECF 128 (describing the City's commitment to evict
encampments as soon as they form, with even less notice or opportunity for residents to
stabilize enough to transition off the streets entirely); Ex. A at 118-19 (noting the lack of
large-scale encampments in 2025 and the open admission from the Minneapolis Chief of
Police that they are trying to evict encampments before they can take hold).

The fact that evictions have *increased* in frequency since this lawsuit was first filed over eighteen months ago indicates that, despite the community's best efforts to document the ways that evictions are devastating to them and to the community at large, Defendant knowingly ploughs forward on his path of destruction through the homes Plaintiffs are forced to rebuild over and over.

### d.  In total, Mayor Frey's actions shock the conscience.

The fifth factor at this stage asks the Court to inquire whether Plaintiffs have put forth evidence to create a material issue of fact as to whether this pattern of evictions shocks the conscience.

People show up to help residents during evictions, submit declarations in this case in support of Plaintiffs' lawsuit, call and email the City in outrage, and flood public meetings about encampment evictions because their conscience is shocked and because they find the City's behavior unacceptable. Plaintiff Sagataw contextualizes just how egregious this conduct is: "Genocide isn't just in history books, we are living genocide right now. And that's not an exaggeration, that's how it really is. This is my ancestors' land, where my ancestors would hunt and migrate, and the government won't even let us stay in an empty lot just to live." ECF 6   27. "If Camp Nenookaasi is destroyed, people will die. It's genocide. It's cold out. You're going to take all their resources away, disease will spread, further trauma. I've seen it personally after past evictions, when we left the Wall of Forgotten Natives back in August and came here. People were scared and crying, elders were crying." ECF 7    33. If furthering the legacy of genocide against Native people on their own stolen land does not

raise an issue as to whether Defendant's behavior shocks the conscience, it's unclear what could.

Plaintiffs' facts demonstrating that Defendant's conduct was "extreme and outrageous," as discussed below in more depth in connection to Plaintiffs' claim of Intentional Infliction of Emotional Distress, further support Plaintiffs' contention that Defendant's conduct shocked the conscience and create factual issues for the jury.

### D. Count IV: Intentional Infliction of Emotional Distress

Plaintiffs have put facts into the record to support the elements of intentional infliction of emotional distress, which "requires proof that: (1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; (4) and the distress suffered was severe." *Kelly v. City of Minneapolis*, 598 N.W. 657, 666 (1999). A Defendant's conduct must "pass[] the boundaries of decency" and be "utterly intolerable to the civilized community." *Id.*

Defendant appears to directly contest only the first element of intentional infliction of emotional distress–evictions and the encampment response generally are indisputably intentional actions undertaken by the City with direct approval and oversight from the Mayor as the chief Executive of the City. The evictions cause Plaintiffs severe emotional distress. *See, e.g.*, ECF 95  16 ("The repeated evictions mess you up."); ECF 99  14 ("Evictions make me lose hope. They keep tearing us down every time we build ourselves up. We lose our dignity. Our hope of being welcomed even by our own city."); ECF 120-3  11 ("Evictions are psychologically damaging for the encampment residents who experience continually being displaced.").

To the extent that Defendant disputes, as he does with Plaintiffs' state-created-danger claim, that his conduct was intentional or reckless, it is abundantly clear that Defendant knows exactly what he is doing. Plaintiffs' expert witness Aaron Johnson describes how shocked he was when he received notice of the first eviction, given how hard he and others had worked to explain to the City the disastrous consequences of evicting Nenookaasi:

> When I learned of Mayor Frey's eviction notice, I felt betrayed. I had met with Guthrie Byard, the newly appointed disability coordinator for the City of Minneapolis and discussed with him the number of disabled people living here and the Camp's importance. We had met with Enrique Velazquez, the City's newly confirmed Regulatory Services Director, and given countless testimonies to the Chief Information Officer Eric Hanson about the importance of Camp Nenookaasi, and they expressed their commitment to working with the community. For the Mayor to issue an eviction notice when the City knows people are getting housing, people are getting into treatment, felt like a betrayal and a misuse of taxpayer dollars, spending thousands and millions of dollars money to bulldoze people's homes. In response to this news, I contacted the Mayor's office and spoke at the City Council's budget hearing, asking that the eviction notice be rescinded or at least postponed.

ECF 8 ¶ 14.

Defendant appears to concede his intent and Plaintiffs' impacts by focusing only on (or asserting a lack of) a dispute about whether Defendant's conduct has been outrageous. ECF 142 at 30.

A jury has facts to find that Defendant was outrageous for evicting an encampment that was allowing unhoused people to find housing placements at "astonishing" rates. ECF 120-3, ¶ 13. Even more outrageous is justifying this first eviction on a future construction project that did not break ground for more than a *full year* after Defendant bulldozed the tremendous success that was the first Nenookaasi encampment. Ex. B at 111 (describing the Mayor's timing decision, the fallacy of his pretext, and the City's false promises surrounding the first Nenookaasi eviction as "an act of violence."). A jury could find that the Mayor is

threatening to veto service provider funding if they call out the way the City's policies undermine their ability to create safer, more secure communities, *see* ECF 120-2 106:9-10, 107:25-108:2. Silencing the people most connected to and informed about the crisis is outrageous and shocking. Contorting a tragic miscarriage into allegations of multiple "dead children" in order to further demonize an entire group of unhoused people to justify ongoing evictions is beyond extreme. ECF 16, 17; ECF 41 8.

As a community supporter and social work student said, upon witnessing evictions, supporting residents through the traumatic aftermath, and reflecting on the way that the City of Minneapolis responds to encampments:

> For me as a neighbor, these evictions are shocking. I feel anger and outrage and deep deep sadness, and frustration that the city is spending its resources on repeatedly traumatizing my neighbors instead of investing in the services we need in this city. … I am really appalled with how the City of Minneapolis and the police department are creating more problems for residents instead of solving them … It's abhorrent.

ECF 35, ¶¶ 20, 23.

Defendant ran on a campaign promise to "end homelessness." ECF 7, 27. To follow through on that promise by escalating a brutal campaign where homeless people feel as though they are no longer allowed to even exist in their own city anymore is outrageous, particularly given the widely documented reality that evictions exacerbate homelessness by dispersing, prolonging, and intensifying the suffering and trauma of living on the streets.

Defendant might not believe that the above-described behavior is outrageous, extreme, shocking, abhorrent, or genocidal, but his subjective understanding is not the legal standard. A jury would be able to review evidence suggesting Defendant's behavior to be outrageous, therefore Defendant's motion for summary judgment must fail as to Count IV.

**E. Count V: Discrimination under the Americans with Disabilities Act**

Plaintiffs agree that the three-part test set forth in the City's memorandum applies to their claims under the Americans with Disabilities Act. ECF 142 at 46-47. The question at the summary judgment stage is whether, in the light most favorable to Plaintiffs, no genuine issues of material fact exist regarding whether Plaintiffs are qualified individuals with a disability, whether Plaintiffs were denied benefits or otherwise discriminated against by the City, and whether the discrimination or denial of benefits was based on their disability. *Id.* and Fed. R. Civ. P. 56.

This is a question, again, for the jury.

**1.  Plaintiffs have qualifying ADA disabilities**

The jury should hear the evidence offered by Plaintiffs' expert, thusfar undisputed, that "essentially 100% of people in encampments have post-traumatic stress disorder" (PTSD) given the "war-like conditions of houselessness." ECF 120-4, ¶¶ 8, 13. Several of Plaintiffs' own declarations corroborate this by explicitly sharing their PTSD diagnosis (ie Sagataw, Applebee, and Butcher). Others share traumatic experiences, which are commonly known to give rise to PTSD, such as Roberta Strong mentioning that she suffered a traumatic brain injury as a result of domestic abuse, ECF 29 ¶2, or DeAnthony Barnes describing the experience of watching people die at a homeless shelter, ECF 5 ¶6.

The basic premise of an inference, which summary judgment requires drawing in the nonmovants favor, supports the position that Plaintiffs all have PTSD: an expert has proffered testimony that experiencing unsheltered houselessness causes PTSD, Plaintiffs all experience unsheltered houselessness, therefore it is reasonable to infer that Plaintiffs all

have PTSD. As Defendant outlined on page 48 of his memorandum, most of the Plaintiffs also identified themselves as having other unique mental and physical disabilities.

The assertion that the record lacks evidence of how "any of these claimed disabilities substantially limit[s] one or more major life activities," ECF 142 at 48, is underinformed at best. "Instead [of a medical diagnosis], the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1024–25 (8th Cir. 2003).

Plaintiffs and their supporters have stated at length how their mindset makes it hard for them to form social bonds with new people and perform day to day survival tasks. E.g. ECF 5    5; ECF 6    21 (DeAnthony Barnes and Cheryl Sagataw both note how hard it is to trust people given their experiences.). PTSD is widely known to cause hypervigilance, or an inability to trust. People who have been connecting with encampment residents throughout this lawsuit note how long it takes to build trust with residents as a result of their traumatic histories. ECF 10 ¶15; ECF 40    10.

Especially in light of the disproportionate or universal rate of disability among unhoused people, it is reasonable to infer that this cohort of mental, physical, and psychological disabilities impact Plaintiffs' and their peers' ability to perform basic life functions like finding food, warmth, and a place to sleep. Indeed this could be why people rely on places like Camp Nenookaasi to get these basic survival needs met. ECF 46    8. Plaintiffs describe the way their mental and psychiatric disabilities make even continuing to exist from one day to another a challenge. ECF 36    4. Plaintiffs' concerns about staying in

shelters (proximity to strangers, confined spaces, lack of control of environment) also reflect or are explicitly named as symptoms of PTSD, and are on their face material impacts to Plaintiffs' ability to seek alternative shelter apart from an encampment. *See* e.g. Ex. B at 90:12-23, 121:7-15; ECF 36,   11. While Defendant might argue that Neloms is picky for not having a problem with sharing a yurt, a jury might find that Neloms' qualms with the confined shelter situation are material impacts of his PTSD.

Lastly, Plaintiffs physical disabilities impact them as well, such as Ms. Hegstrom's inability to sleep lying down. ECF 98   2. Mr. Butcher is unable to walk without pain due to a physical disability in his foot, as was Mr. Caston before his death. ECF 95   3.

PTSD and other mental health diagnoses that cause difficulties trusting other people and forming essential social connections or accessing social services, as well as physical disabilities that interfere with sleeping and walking, around are materially life-limiting disabilities that are evident from the record.

### 2. Plaintiffs are discriminated against because of those disabilities.

Defendant's actions in ordering and orchestrating evictions is subject to Title II of the Americans with Disabilities Act. *Loye v. Cty. of Dakota*, 647 F. Supp. 2d 1081, 1087 (D. Minn. 2009). Plaintiffs have offered ample evidence that would allow a jury to find that these evictions discriminate against Plaintiffs on the basis of their disabilities, and the jury has the exclusive power at this stage to determine whether or not they believe Defendant's oversimplified and stigmatizing hearsay narrative, or Plaintiffs' and their experts' researched and directly informed perspectives.

Evicting encampments without proper notice or meaningful alternative places for people to live and sleep disproportionately harm disabled people such as the Plaintiffs, by further impeding their efforts to transition permanently out of houselessness. This connection between encampment evictions preventing people with PTSD from being able to access public housing and services is very straightforward: "encampments allow residents to form bonds and trust with service providers[,] which is necessary in order for case workers to be able to make their services accessible to people with disabilities that impact executive function and ability to trust." ECF 120-4 ¶3. Evictions disrupt these bonds, making it inaccessible for people with PTSD to build the requisite trust and relationships in order to seek out or accept public housing, treatment, and other services offered or overseen by the Homeless Response Team and the City's outreach partners.

Furthermore, conducting encampment evictions on the premise that residents could simply go to City-funded shelters instead constitutes discrimination against Plaintiffs based on their disabilities. Nightly shelters are not accessible to disabled unhoused individuals such as Plaintiffs. 120-4 ¶7 ("shelters and treatment placements are not accessible, particularly for people with disabilities—elevators in shelters are permanently out of service, treatment buildings have stairs with no ramps just to get in the door"). Nor are shelters accessible to people with PTSD, given that they are either generally triggering due to the confined space and lack of autonomy and control, exposure to unknown people, or specifically triggering because people have experienced trauma at shelters before. Ex. B at 121.

Evicting people on the justification that they are choosing not to seek shelter discriminates against disabled people for whom shelters are simply not accessible. Ex. A at

89 ("[W]hen terms like 'refuse shelter,' 'doesn't want shelter,' 'doesn't want help' are used, it lacks an understanding of the deeper realities of people's lives when they're experiencing unsheltered homelessness.").

In sum, "[e]victing Nenookaasi–particularly without any notice or meaningful housing alternatives–particularly harmed its residents with disabilities." ECF 120-4 ¶9.

It is a fact question for the jury whether the City should be allowed to continue with evictions that, according to Plaintiffs' evidence, either do nothing or in fact exacerbate the public health and safety concerns that the City claims to be addressing by conducting evictions.

Alternatively, if the City did want to meaningfully address the legitimate concerns with encampments, such as sanitation and safety concerns, the City could divert the resources it currently spends depositing rubble on vacant, out-of-the-way lots towards increased trash pickup and port-a-potty facilities. The City's current policy, preventing encampments from forming altogether by engaging in rapid, repeated evictions and by using hostile architecture and rubble to prevent encampments from forming, forces unhoused people to find places to sleep in locations that cause more and more damage to the public.

Whether alternatives are "reasonable" is a question of fact, best determined by a cohort of objective everyday people–the jury. The jury should decide whether, as Defendant posits, encampments are a *source* of otherwise non-existent crime and danger to a community, rather than, as Plaintiffs show, a tactic for surviving, mitigating, and ultimately reducing the crime and harm that are already endemic in the under-resourced neighborhood and populations where encampments form.

### III.    Mayor Frey Is Liable for the Harms Suffered by Plaintiffs in Both His Individual and Official Capacities.

Plaintiffs have sued Defendant Jacob Frey in both his individual and official capacity. Causes of action evaluated against him in his official capacity constitute claims against the City of Minneapolis. *Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020). Both theories of liability apply here.

#### A. Mayor Frey Is Individually Liable for the Harms Suffered by Plaintiffs.

To establish Mayor Frey's liability under Section 1983, plaintiffs must show that he was personally involved in the alleged constitutional violation or in some way "direct[ly] responsib[le] for the deprivation of rights." *See White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017). The theory of *respondeat superior* does not apply in Section 1983 suits. *See, e.g., Choate v. Lockhart,* 7 F.3d 1370, 1376 (8th Cir.1993). Those with supervisory authority can, however, "incur liability . . . for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001).

Here, Plaintiffs allege that Mayor Frey was directly responsible for the unconstitutionality of their evictions. The day, time, location, and manner of evictions are orchestrated by a working group called the Unsheltered Homelessness Governing Group, which meets weekly to discuss encampments and their evictions. ECF 120-2, 40. Michael Ohama represents the mayor's office as a member of this group. Plans for evictions are sent to the Mayor, who has policy oversight on this process. *Id.* at 46.

It's no secret to the community who is in charge of evictions. When a community member questioned the incident commander at the January 30th, 2024 Nenookaasi eviction

about "who wanted this to happen, he said 'it goes all the way to the top.'" ECF 43, 25.

When pressed who the top meant, the commander said "who do you think?" and responded

with a small smile when the community member said "sounds like Jacob Frey." *Id.*

Mayor Frey orders these evictions even over the objections of his own government

employees:

> [C]ommunity members, nonprofits, residents, and many people within local government are working together and making progress on finding a solution that everyone feels good about. We are all coming together, community, residents, nonprofits, government, putting personal issues aside and making a plan. City council in the meantime has provided port-a-potties and been supportive. The one person who's pushing through the eviction is Mayor Frey.

ECF 7 29.

Complaints have been brought directly to members of the Unsheltered Homelessness

Governing Group, such as Regulatory Services Director Enrique Velazquez. ECF 8 14.

Advocates contacted the Mayor's office directly and raised concerns with impending

evictions at many city council meetings. *Id.* City council members disputed the Mayor over

the violence of evictions, engendering his response: "several City Council members are

trying to prevent the closure of encampments through advocacy, activism, and soon-to-come

policy changes. This is irresponsible." Brett Hoffland & Ben Henry, "Minneapolis City

Council Passes Housing Crisis Policies as Mayor Expedites Encampment Closures" KSTP

(Sept. 19, 2024)

https://kstp.com/kstp-news/top-news/minneapolis-city-council-passes-housing-crisis-polici

es-as-mayor-expedites-encampment-closures/.

Despite his personal knowledge that they were being carried out in an unlawful

manner, without enough notice, Mayor Frey ordered Nenookaasi and subsequent

encampments evicted at an ever-increasing pace. ECF 120-2 at 49:1-2 ("More recently, the Mayor indicated a desire to close encampments faster."). *Accord. Madewell v. Roberts,* 909 F.2d 1203, 1208 (8th Cir. 1990) (denying defendants' motions for summary judgment where plaintiff had alleged that one defendant "was directly responsible for the conditions and at least some of the actions," and two other defendants "had personal knowledge of them through their review of the relevant grievances").

In addition to being directly responsible for ordering the repeated unconstitutional evictions of Plaintiffs, Mayor Frey is also individually liable because he was personally aware of the complaints from community members and his own employees that evictions were being carried out in an unconstitutional manner, yet he failed to take any corrective actions. His repeated corrective inaction amounts to a deliberate indifference to or tacit authorization of the violative practices.

## B. Mayor Frey Is Not Entitled to Qualified Immunity.

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether an official is entitled to qualified immunity, courts consider "(1) whether the facts alleged or shown, construed most favorably to the plaintiffs, establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013). A "clearly established" right does not require a case directly on point. *Hope v. Pelzer*, 536 U.S.

37

730, 741 (2002).  Rather, the key inquiry is whether the state actor had fair warning that the conduct violated a right.  *Id.*

Federal law is ever-evolving, and Plaintiffs acknowledge the recent developments in cases related to encampment evictions of unhoused people across the country.  *See, e.g., Grants Pass v. Johnson*, 603 U.S. 520 (2024).  These developments were one reason why Plaintiffs amended their complaint, to remove claims which were no longer viable.  With regard to Plaintiffs' remaining claims, Mayor Frey was on notice that evictions were being carried out in an unconstitutional manner. See, *supra.*

### C. Mayor Frey Is Liable in His Official Capacity for the Constitutional Violations Suffered by Plaintiffs Under *Monell*, Due to the City's Unconstitutional Policies and Customs

A plaintiff may establish municipal liability under § 1983 by proving that their constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law."  *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 691 (1978).

A policy is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler*, 165 F.3d at 1204;  *Jane Doe A,* 901 F.2d at 645.  A policy includes where "a particular municipal action itself violates federal law, or directs an employee to do so," or, where "a facially lawful municipal action has led an employee to violate a plaintiff's rights" and "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). Policies in violation of 1983 also include

a mere single event that reveals a failure to train city agents in such a way that constitutional violations are plainly foreseeable as a result. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  A failure to train can constitute an actionable policy under Monell, *City of Canton v. Harris*, 489 U.S. 378, 389 (1989), and failure to train under Monell can be adequately pleaded even only by a single instance where the failure would so obviously lead to constitutional violations, *id.* at 412.

Alternatively, Monell liability predicated on a City's unconstitutional custom is demonstrated by:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.,* [proof] that the custom was the moving force behind the constitutional violation.

*Id.* at 646.

An unconstitutional custom may exist where a municipality's official policy is inadequate and employees develop unofficial — and unconstitutional — customs or practices to fill in the gaps.  *Ware*, 150 F.3d at 880.  When determining whether actions are widespread and longstanding enough to rise to the level of a custom, the question is whether "some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 829 (8th Cir. 2013).

In § 1983 cases deliberate indifference is ordinarily shown by a pattern of constitutional violations. *Molina v. City of St. Louis*, 766 F.Supp.3d 857, 870 (E.D. Miss. 2025). For example, "[e]vidence that a police department has failed to investigate previous [excessive force] incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment." *Perkins v. Hasting*, 915 F.3d 512, 521 (8th Cir. 2019).

The record in this case is sufficient for a jury to find the City liable for either its unconstitutional policy and/or its unconstitutional customs. The evidence suggests that Mayor Frey, as the final authority regarding such matters, has made deliberate choices to direct the repeated and increasingly aggressive evictions of encampments without regard to the constitutional rights of Plaintiffs. ECF 20-2 at 49:1-2. His deliberate indifference is apparent from the numerous complaints regarding the unconstitutionality, and significant harms, caused by these evictions to encampment residents, and his direct response to City Council members raising those complaints. The ample record evidence of a pattern includes not only unconstitutional practices with regard to Nenookaasi evictions, but other evictions even prior to Nenookaasi's founding for a period spanning years, such as the Wall of Forgotten Natives evictions in 2018 and 2023. ECF 6   20 ("I've been kicked out of encampments so many times that I've lost track of the number.") *See, e.g.*, *Ware*, 150 F.3d (jury was entitled to infer that a pattern of unconstitutional conduct existed from the evidence of correctional officer's sexual misconduct spanning five months, although there were only a handful of complaints despite 8,000 inmates being processed through the facility

annually).  The Mayor's encampment eviction policy is a "deliberate choice of a guiding principle or procedure made by the municipal official who has the final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  And that policy is the "moving force behind the constitutional invasion" of the Plaintiffs' rights.  *Id.*

Even if this Court finds insufficient evidence of an official policy, there is ample record evidence of a custom of unlawful encampment evictions. *See* ECF 5  13: "I myself have been evicted more times than I can count, and I know the same is true for many people in here. Just in the last couple years, I've been evicted 6-7 times. And every time I lost everything… All you can take with you during an eviction is one armload."

Unconstitutional encampment evictions that occur with inadequate notice, involve blatant destruction of property, lack adequate disability accommodations, and create compounding traumas and dangers reflect "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Ware*, 150 F.3d at 880. Given the numerous meetings and complaints, Mayor Frey was at the very least on notice that the City's employees were violating constitutional rights in the absence of a policy that prevented them from doing so.

The "timeframe or duration of the incidents" is an important factor to consider when evaluating whether official action amounts to an unconstitutional custom or practice. *Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933, 941 (D. Minn. 2021). Thus, a municipal employee's egregious misconduct that "spanned five months" sufficiently established "a pattern of unconstitutional conduct" for purposes of *Monell* liability. *Ware*, 150 F.3d at 881. Here, this pattern has indisputably spanned years. *See*, e.g., ECF 7  9 (describing an eviction in 2021

where residents "tried to keep it peaceful and advocate for people to be able to get their belongings but the cops were resistant to that. Most of it went into dumpsters.").

## CONCLUSION

Wherefore, Defendant's motion for summary judgment should be denied.


Sincerely,


Dated: August 19, 2025                 **CLIMATE DEFENSE PROJECT**

                                       s/*Kira Kelley*
                                       Kira Kelley (#402932)
                                       Staff Attorney
                                       P.O. Box 7040
                                       Minneapolis, MN 55407
                                       Phone: (802) 683-4086
                                       Email: kira@climatedefenseproject.org

                                       /s/*Claire Nicole Glenn*
                                       **Claire Nicole Glenn (she/her)**
                                       Staff Attorney
                                       P.O. Box 7040
                                       Minneapolis, MN 55407
                                       651-343-4816
                                       claire@climatedefenseproject.org
                                       District of Columbia License No. 888242412
                                       Maryland License No. 1902280002
                                       Minnesota License No. 0402443


                                       **ATTORNEYS FOR PLAINTIFFS**