UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cheryl Sagataw, DeAnthony Barnes, Travis Neloms, Roberta Strong, Alvin Butcher, Deven Caston, Lola Hegstrom, Adrian Tiger, RonDel Applebee, and Chance Askenette, | File No. 24-cv-1 (ECT/ECW) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Mayor Jacob Frey, *in his individual and official capacity*, | |
| Defendant. | |

Kira Aakre Kelley and Claire Glenn, Climate Defense Project, Minneapolis, MN, for Plaintiffs Cheryl Sagataw, DeAnthony Barnes, Travis Neloms, Roberta Strong, Alvin Butcher, Deven Caston, Lola Hegstrom, Adrian Tiger, RonDel Applebee, and Chance Askenette.

Sharda R. Enslin, Kristin R. Sarff, Heather Passe Robertson, and J. Haynes Hansen, Minneapolis City Attorney's Office, Minneapolis, MN, for Defendant Mayor Jacob Frey.

This case concerns several iterations of a homeless encampment the parties refer to as Camp Nenookaasi. Between January 1, 2024, and January 6, 2025, Camp Nenookaasi occupied nine successive locations in the City of Minneapolis, each on City-owned property. Plaintiffs are individuals who were residing in one or more of four iterations of Camp Nenookaasi when the camps were forcibly cleared.

Plaintiffs seek damages from Minneapolis Mayor Jacob Frey in his individual and official capacities. Through 42 U.S.C. § 1983, Plaintiffs claim Mayor Frey violated their rights under the Federal and Minnesota Constitutions. They claim the Mayor committed

the Minnesota tort of intentional infliction of emotional distress. And they claim he violated Title II of the Americans with Disabilities Act (or "ADA").

Mayor Frey seeks summary judgment, and the motion will be granted. Plaintiffs' claims under the Minnesota Constitution fail because § 1983 creates no cause of action for state constitutional violations and because the Minnesota Supreme Court has not recognized a private damages action for violations of that foundational document. Plaintiffs' § 1983 individual-damages claims don't get past qualified immunity or the municipal-liability-triggering requirements of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). The intentional-infliction-of-emotional-distress claims are not trial-worthy because no reasonable jury could find that Mayor Frey's decisions to clear the encampments were extreme and outrageous. The ADA claims fail because Mayor Frey is not subject to an individual suit under Title II and because no reasonable juror could find that any Plaintiff was denied benefits or subjected to discrimination because of a disability.

I

Before turning to the facts, it is necessary to resolve one issue regarding the scope of the record on which the summary-judgment motion will be adjudicated. The materials Mayor Frey filed to support his summary-judgment motion include five declarations of the City's Director of Regulatory Services, Enrique Velazquez. ECF Nos. 17, 27, 56, 107, 125. Plaintiffs argue that these declarations (or at least parts of some of them) cannot be considered because their contents are based on "information and belief," not personal knowledge. *See* ECF No. 146 at 4–5. This is not correct.

2

Velazquez testified that each of his declarations was "based on [his] personal knowledge from first-hand involvement and/or information [he] learned from City employees occurring in the normal course of [his] work."  ECF No. 17 ¶ 1; ECF No. 27 ¶ 1; ECF No. 56 ¶ 1; ECF No. 107 ¶ 1.  "Although firsthand knowledge is obviously the most common form of personal knowledge, that is not the only basis for it."  *United States v. Christie*, 624 F.3d 558, 568 (3d Cir. 2010) (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 602.03[1][a] (2d ed. 2010)).  A witness may acquire personal knowledge through supervisory responsibilities.  *Id.*; *see In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000) ("Personal knowledge may be inferred from a declarant's position.").  It is true that hearsay statements within a declaration generally cannot be used to support (or defeat) a summary-judgment motion.  *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).   Here, however, Plaintiffs do not identify which specific statements in Velazquez's declaration testimony they contend are hearsay.  The facts will be drawn from Velazquez's declaration testimony to the extent it is not disputed by Plaintiffs' evidence.

## II[1]

*The City's homeless encampment closure policies.*  The City's closure policies are outlined in a document entitled "Operational Guidance: Encampment Response on City-owned Properties."  ECF No. 17 ¶ 27; *see* ECF No. 17-2 at 1.  The City's policy is to

---

[1]    The facts are undisputed or described in a light most favorable to Plaintiffs.  *See* Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 378 (2007).

post a notice of trespass, notice to vacate, and notice of closure seventy-two hours before

closure, though a shorter notice window may occur if:

- The encampment poses imminent community safety risks;

- There have been threats to City employees relating to the encampment in particular or the closure of encampments in general;

- The encampment has experienced an increase in violence or other illegal activities;

- The encampment is inhibiting or interfering with the normal operation of a business, school, daycare, or sober living facility;

- If law enforcement agencies are currently engaged in investigations in response to credible information and the 72-hour notice would put the investigation at risk; or

- Any other condition that poses an imminent danger to human life or safety.

ECF No. 17-2 at 6–7. In these situations, "the notice shall be posted as soon as is

reasonably possible." *Id.* at 7. The City's policy called for its Homeless Response Team

to "continue visiting sites and engaging with unsheltered individuals to offer services,

resources, transportation to shelters, and storage for personal property in advance of a site

closure." *Id.* As best I can tell, Plaintiffs do not challenge the City's written policy per se.

They challenge the lawfulness of Mayor Frey's discretionary decisions applying the policy

to Camp Nenookaasi.

*Nenookaasi I.* Camp Nenookaasi was first established at 2313 13th Avenue South

on August 24, 2023. ECF No. 17 ¶ 2. The City of Minneapolis owned the property, and

it was surrounded by fencing. *Id.* Individuals broke through the fencing to set up the

4

encampment.  *Id.*  At its peak in mid-December 2023, between 150 and 180 people lived in Nenookaasi I.  *See* ECF No. 6 ¶ 10 (stating on December 15, 2023, "[t]here are around 180 residents here currently"); ECF No. 7 ¶ 15 ("About 160 people are here right now today [December 15, 2023], but that number changes a lot."); ECF No. 120-2 at 148–49 (stating that about 150 people were at the first Nenookaasi at its peak).  Reports of crime and unsafe conditions prompted Mayor Frey to order Nenookaasi I cleared by December 14, 2023.  ECF No. 17 ¶ 20.  Notice of the impending closure was posted on-site at Nenookaasi I on December 7, 2023.  *Id.*  The closure date eventually was extended to January 4, 2024, and notice of this closure date was posted at the site on December 29, 2023.  *Id.* ¶¶ 23–24.  Nenookaasi I was cleared on January 4, 2024.  For the most part, items left at the encampment were destroyed.  *See* ECF No. 120-2 at 153 ("[A]ny belongings that were left on premise [of Nenookaasi I] that individuals did not identify that they were coming back for or that they needed assistance in taking down or removing . . . were discarded.").  Items that "appeared to be of value" were given to the police.  *Id.* at 154.

*Nenookaasi II.*  On January 2, 2024—two days before Nenookaasi I was cleared—individuals formed Nenookaasi II at 2601 14th Avenue South.  ECF No. 56 ¶ 7.  This property was owned by the City, fenced off, and marked with "no trespassing" signs.  *Id.*  To enter the site, individuals cut through the fence and removed the no-trespassing signs.  *Id.*  At one point, the encampment hosted over twenty-five residents and more than a dozen yurts.  *Id.* ¶ 8.  On January 5, the City informed camp organizers that the camp's residents needed to leave, and on January 8, the City reposted no-trespassing signs.  *Id.* ¶¶ 9–10.  On

January 19, the City's Health Department visited the site and found that twenty to thirty residents were sick with a gastrointestinal illness. ECF No. 56 ¶ 13. On January 24—after the illness subsided—the City emailed camp organizers stating Nenookaasi II "would be closing soon." *Id.* ¶ 17. On January 28, a man was shot "immediately outside" the encampment. *Id.* ¶ 18. For that reason and other safety concerns, Nenookaasi II was cleared on January 30. *See id.* ¶ 19; ECF No. 120-2 at 158–59; ECF No. 52 ¶¶ 2–12; ECF No. 53 ¶ 6. Residents were given ninety minutes to leave the encampment from the time officials arrived on scene. ECF No. 41 ¶ 6. Most items left behind were discarded. ECF No. 120-2 at 163. The exceptions were items officials suspected may have been stolen and larger-sized items of potentially greater value, like a bicycle or snowblower. *Id.* at 163.

*Nenookaasi III.* On January 30, 2024 (the same day Nenookaasi II was cleared), Nenookaasi III was established at 2213 16th Avenue South. ECF No. 56 ¶ 22. The property was owned by the City, fenced off, and marked with "no trespassing" signs. *Id.* ¶¶ 22–23; ECF No. 120-2 at 133. To enter the site, individuals cut through the fence and tore down the signs. ECF No. 56 ¶¶ 23–24. The City cleared the camp two days later, on February 1. *Id.* ¶¶ 22–25. The decision to clear the camp was based on "the emerging safety risk to community and the residents at the encampment." ECF No. 120-2 at 132–33; *see id.* at 164–65 (stating that neighbors "wanted the encampment gone," and "[t]empers were flaring"). Only law enforcement was present at this eviction; no service providers were notified or appeared. *Id.* at 165. No evidence indicates precisely how much time residents were allowed to gather their belongings and leave the property after officers arrived.

*Nenookaasi IV.*  Nenookaasi IV was located at 1100 28th Street East.  ECF No. 107 ¶ 27.[2]  The property was owned by the City and fenced off, and individuals cut through the fence to enter.  *Id.*  The camp was formed sometime after February 1, 2024.  *See id.* ¶¶ 25–27.  Smoke from the site caused problems to the nearby Allina Central Laboratory—employees at the Laboratory informed the City that sensitive testing equipment could not function properly because of particulates in the air coming from the camp.  *Id.* ¶¶ 28–30; ECF No. 56-1.  Nenookaasi IV was not cleared by City officials; a fire started in the camp, grew out of control, and destroyed the camp on February 29, 2024.  ECF No. 56 ¶ 32.

*Nenookaasi V.*  Nenookaasi V was established on February 29, 2024—the same day Nenookaasi IV burned down—at 2839 14th Avenue South.  ECF No. 107 ¶ 34.[3]  The property was owned by the City, fenced off, and marked with "no trespassing" signs.  *Id.*  To enter, individuals cut through the fence.  *Id.*  Nenookaasi V was closed on July 25, 2024, when about ten residents remained.  ECF No. 107 ¶¶ 36, 38.  The City justified the closure because this camp was "in a residential area with vulnerable adults next door and those that were in recovery adjacent to the property," and some of those people had relapsed because there was drug dealing in or immediately outside Nenookaasi.  ECF No. 120-2 at 170–71.

---

[2]    The declaration places the camp at 1100 28th *Avenue* East.  This is a clerical error.  All other record evidence places Nenookaasi IV at 1100 28th *Street* East.  *See* ECF No. 120-2 at 100.

[3]    The declaration places the camp at *2939* 14th Avenue South when all other record evidence places the camp at *2839* 14th Avenue South.  *See* ECF No. 120-2 at 100; ECF No. 125 ¶ 3.  Again, the reference to 2939 14th Avenue South is understood to be a clerical mistake.

*Nenookaasi VI.*  Nenookaasi VI was located at 2313 13th Avenue South, also the site of Nenookaasi I.  ECF No. 107 ¶¶ 39–40.  The property was fenced off and marked with "no trespassing" signs.  *Id.* ¶ 41.  The camp was formed sometime after July 25, 2024, and lasted until the City evicted its residents on October 7, 2024.  *Id.* ¶¶ 36–42.  Since the Second Amended Complaint was filed, Camp Nenookaasi existed in at least two other iterations, both in the same general area of south Minneapolis.  *Id.* ¶¶ 44–45; ECF No. 125 ¶¶ 2–3.  There is no record evidence that any Plaintiffs were present at or injured by the closure of Nenookaasi VI or any subsequent iteration of Camp Nenookaasi.

*Conditions present at the camps.*  The camps experienced crime, illness, and other safety hazards, though the parties dispute the extent and source of problems.  Some facts are not disputed.  For example, on December 12, 2023, a man was shot to death at Nenookaasi I.  ECF No. 17 ¶ 19.  On January 28, 2024, there was a shooting immediately outside Nenookaasi II.  ECF No. 107 ¶ 18.  After closing encampments, City workers found

> unwanted and often hazardous or dangerous items left behind. This can include garbage, food waste, torn tarps, and even stolen vehicles, explosives, and guns.  City employees have been stuck with used hypodermic needles when attempting to sort through property at encampment closures. Discarded tents are frequently filled with trash, urine, feces, spoiled food, or rats.

ECF No. 17 ¶ 31.  The camps generated a large amount of smoke affecting the neighborhoods in which they were situated.  *See* ECF No. 52 ¶ 3; ECF No. 53 ¶ 3; ECF No. 54 ¶ 3; ECF No. 55 ¶ 12.  Camp residents urinated, defecated, and disposed of waste— including used hypodermic needles—on neighboring property.  *See, e.g.*, ECF No. 55 ¶¶ 3– 8.  Plaintiffs do not dispute the existence of crime, drug use, or derelict conditions at any

iteration of Camp Nenookaasi, though some Plaintiffs testified that crime was already present in the area, *see* ECF No. 98 ¶ 6; ECF No. 36 ¶ 22, and that outsiders were primarily responsible for trash accumulation, *see* ECF No. 95 ¶ 8.

*Plaintiff Sagataw.*  The only evidence regarding Plaintiff Cheryl Sagataw is her declaration dated December 15, 2023, a date that preceded any camp closure.  ECF No. 6.  In this declaration, Sagataw testified that she moved to Nenookaasi I "around late August/early September 2023."  *Id.* ¶ 6.  Sagataw learned the City was planning to close the camp, though she did not testify regarding how or when she received this information.  *Id.* ¶ 18.  Sagataw testified that she had "been kicked out of encampments so many times that [she's] lost track of the number," *id.* ¶ 20, and that she had lost property "[i]n prior evictions," *id.* ¶ 23.  No evidence shows that Sagataw was present for the January 4, 2024, eviction of Nenookaasi I or any subsequent camp closure, or that she lost belongings in any Nenookaasi closure.  *See id.*

*Plaintiff Barnes.*  DeAnthony Barnes was residing in Nenookaasi I, II, and III when each camp was closed.  ECF No. 37 ¶¶ 2–4.  Barnes testified that the Nenookaasi I closure "felt more fair than other evictions" because "people were allowed to come in and help" camp residents.  *Id.* ¶ 2.  He testified that law enforcement used drones and "were keeping people away" during the Nenookaasi II closure.  *Id.* ¶ 3.  He described the closure of Nenookaasi III as follows:

> We didn't even have a chance to set up before we got evicted from there.  The drone was back.  There were police all over.  They were there bulldozing us before we were even there for two days.  We had no notice.  Nobody from the city came to help us, no storage was offered, and they wouldn't even let

> other people from the community come in to help us take down the yurts, or let trucks from community members pull up to put our stuff in. We had to drag our stuff all the way down the street, which meant we couldn't watch the rest of our stuff while we were gone walking our other stuff away. We were forced to spread out our stuff, we didn't know where any of it was going, we couldn't keep track of where we were putting it because everything was happening so fast, we had to run and put stuff here and there. They kicked us off the spot and then dumped big boulders where were at so that we couldn't go back.

*Id.* ¶ 4. Barnes testified that he "lost a couple of suitcases," along with "clothes, electronics/chargers, food, [and] blankets" in these closures, though he did not identify what specific property he lost during which camp closure. *Id.* ¶ 6.

*Plaintiff Neloms.* Travis Neloms filed a declaration. ECF No. 36. We can infer from the declaration that Neloms resided in Nenookaasi IV—the declaration is dated February 6, 2024, *id.* at 5, and Neloms testified he was "at Nenookaasi" on that date, *id.* ¶ 8. Neloms did not testify that he resided in the camp at any other location. *See generally id.* Though he testified that he had "been through a lot of evictions," *id.* ¶ 12, he did not testify that he was present at any Nenookaasi closure, *see generally id.* And, though he described losing property in camp evictions, including "thousands of dollars worth of clothes, bikes, tents, blankets, medications, court paperwork, drivers license, social security card, birth certificate, [and] all types of stuff," *id.* ¶ 20, he did not attribute any property loss to a Nenookaasi eviction, *see generally id.*

*Plaintiff Strong.* Roberta Strong experienced the closures of Nenookaasi I, II, and III. ECF No. 39 ¶ 11. She testified that she lost her "belongings," including "almost all of [her] clothes" and "some of [her] medicine" during these closures. *Id.*

*Plaintiff Butcher.*    Like Strong, Alvin Butcher experienced the closures of Nenookaasi I, II, and III.  ECF No. 95 ¶¶ 6–10.  At the Nenookaasi I eviction, he "lost a lot of stuff because [he] was busy helping everyone else move their stuff," so he didn't have time to move his own belongings.  *Id.* ¶ 6.  Butcher testified that he "had no idea" that the Nenookaasi II "eviction was coming."  *Id.* ¶ 9.  He was only able to leave with a backpack and left behind "clothes, blankets, bins of food, paperwork, phone chargers, a solar panel, [and] a car battery."  *Id.*  Though Butcher lived in Nenookaasi III, he "was at a doctor's appointment" when the closure occurred.  *Id.* ¶ 10.  Butcher testified that he "didn't lose much at that eviction, just a tent and a few blankets."  *Id.*

*Plaintiff Hegstrom.*  Lola Hegstrom resided in Nenookaasi V when it was closed. ECF No. 98 ¶ 9.  She testified that police officers arrived around 7:00 a.m. and told residents they "had ten minutes to get [their] belongings and go, and that once [they] left [they] couldn't come back in."  *Id.*  Hegstrom described losing various items in "evictions" generally.  *Id.* ¶ 11.  These included "jewelry, clothes, [her] sleeping chair, tent, expensive purses . . . , nice shoes, toys for [her] kids, . . . important paperwork, birth certificate, mental health papers about [her] diagnosis, [and] an electric generator."  *Id.*  She did not describe what specific items she lost in the Nenookaasi V closure.  *See generally id.*

*Plaintiff Tiger.*  Adrian Tiger resided in Nenookaasi I, II, III, IV, and V, and he was present for the closures of I, II, III, and V.  ECF No. 94 ¶¶ 3–7.  At the first eviction he had "time to move some things but not enough time to move everything" because he was "helping other people move."  *Id.* ¶ 3.  Tiger testified that he had no notice of the subsequent closures.  *Id.* ¶¶ 4–5.  Tiger lost all his belongings in the closure of Nenookaasi

V, and across the four evictions, he "lost clothes, shoes, cell phones, jewelry, papers, ID, EBT cards, social security, everything." *Id.* ¶¶ 7–8.

*Plaintiff Applebee.* RonDel Applebee was present for closures of Nenookaasi I and II. ECF No. 99 ¶¶ 4–5, 7. At the first eviction he had "all day" to move his belongings, and he kept most of them. *Id.* ¶ 4. The second eviction was "rushed"—he "wasn't allowed to come back for a second trip." *Id.* ¶ 5. In this eviction, Applebee lost his "ID and social security card because [he] didn't have time to find and save the folder" in which these items were located. *Id.*

*Plaintiff Askenette.* Chance Askenette's declaration testimony implies he was present for the closures of Nenookaasi I, II, and V. ECF No. 96 ¶¶ 4, 7–8. In his declaration, Askenette testified that he helped establish Nenookaasi I, but he described no facts regarding the Nenookaasi I closure. *See generally id.* He testified that he received "no warning" for the evictions at the second and fifth sites. *Id.* ¶ 8. Askenette testified that he lost several items in the closures of Nenookaasi II and V. *Id.* These included "two generators, an $1800 waterproof yurt, a lot of new clothes, a play station 5, [and] a family heirloom from [his] grandpa." *Id.*

*Plaintiffs' legal theories.* In their operative Second Amended Complaint, Plaintiffs assert five legal theories arising out of the forced clearings of Nenookaasi I, II, III, and V. (1) Plaintiffs claim the camp closings resulted in the seizure of their property in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 10 of the Minnesota Constitution. Second Am. Compl. [ECF No. 104] ¶¶ 116–21. (2) Plaintiffs claim the camp clearings violated their procedural due process rights under the Fourteenth

Amendment to the Federal Constitution and Article 1, Section 7 of the Minnesota Constitution. *Id.* ¶¶ 122–26. (3) Plaintiffs claim the clearings violated their substantive due process rights under the Fourteenth Amendment and under the Minnesota Constitution broadly. *Id.* ¶¶ 127–35. (4) Plaintiffs claim the camp clearings amounted to intentional infliction of emotional distress under Minnesota common law. *Id.* ¶¶ 136–45. (5) Plaintiffs claim they are disabled and that the clearings resulted in a disparate impact in violation of Title II of the Americans with Disabilities Act. *Id.* ¶¶ 146–63. Plaintiffs assert all these claims against Minneapolis Mayor Jacob Frey in his individual and official capacities. *Id.* ¶ 72.

*Plaintiffs' individual damages claims.* Plaintiffs originally sought damages and forward-looking equitable relief on behalf of themselves and a proposed class, but the individual damages claims are all that's left. Why this is so deserves a brief explanation. In each of the three versions of their complaint, Plaintiffs requested an injunction that would have prevented Mayor Frey (and everyone he worked with) from clearing Camp Nenookaasi wherever it may have been located. Compl. [ECF No. 1] at 29 ¶ 1; Am. Compl. [ECF No. 30] at 39–40 ¶ 1; Second Am. Compl. at 47–48 ¶ 1. Plaintiffs sought declaratory relief consistent with their injunction request. Compl. at 29 ¶ 2; Am. Compl. at 40 ¶ 2; Second Am. Compl. at 48 ¶ 2. Enjoining camp clearings seemed to be the suit's primary focus. On January 2, 2024, Plaintiffs moved for a preliminary injunction that would have prevented Mayor Frey from clearing Camp Nenookaasi at its first location. ECF No. 4. Following expedited briefing and a hearing, I denied that motion on January 3. ECF No. 21. Not long after—on February 20, 2024—Plaintiffs sought a preliminary injunction

that would have prevented Mayor Frey from clearing Camp Nenookaasi at its fourth location.  ECF No. 31.  After this motion was filed, an uncontrolled fire broke out in the camp, destroying everything in it, and the camp moved to a new, fifth location.  For this reason, I denied the second preliminary-injunction motion as moot.  *Sagataw v. Frey*, No. 24-cv-1 (ECT/TNL), 2024 WL 1154677, at *1–3 (D. Minn. Mar. 18, 2024).  Plaintiffs then sought class certification to pursue, not damages, but an injunction that would have prevented Mayor Frey "from evicting encampments in" the East Phillips neighborhood of Minneapolis.  ECF No. 104 at 47–48 ¶ 1; ECF No. 120 at 16.  I denied that motion because no record evidence showed that any Plaintiff possessed Article III standing to seek injunctive relief.  *Sagataw v. Frey*, No. 24-cv-1 (ECT/ECW), 2025 WL 1993536, at *2–3 (D. Minn. July 17, 2025).  This same conclusion led me to dismiss the Second Amended Complaint without prejudice under Rule 12(h)(3) "for lack of subject-matter jurisdiction to the extent it seeks injunctive and prospective declaratory relief."  *Id.* at *3.  What remains, then, are Plaintiffs' individual damages claims.

III

On February 4, 2025, counsel filed a notice of Plaintiff Deven Caston's death pursuant to Federal Rule of Civil Procedure 25.  ECF No. 122.  No substitution motion has been filed.  Under Rule 25(a)(1), if a substitution "motion is not made within 90 days after" filing the notice, "the action by . . . the decedent must be dismissed."  Fed. R. Civ. P. 25(a)(1).  A Rule 25(a)(1) dismissal may be with or without prejudice.  *See Zanowick v. Baxter Healthcare Corp.*, 850 F.3d 1090, 1095 nn. 5–6 (9th Cir. 2017) (citing cases).  Here, a with-prejudice dismissal is appropriate because almost ten months have passed since

14

Plaintiffs filed notice of Caston's death.  ECF No. 122.  I infer from that passage of time that Plaintiffs do not intend to seek substitution.

IV

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor."  *Id.* at 255 (citation omitted).

A

Before turning to the merits, Article III standing issues must be addressed.  *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010).  The "'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'"  *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citation modified).  At summary judgment, each plaintiff must "submit affidavits or other evidence showing, through specific facts," the elements of standing.  *Id.* at 563

(citation modified); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (explaining that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek"). A federal court lacks subject-matter jurisdiction to adjudicate the rights of plaintiffs who lack standing and must dismiss the action. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016); Fed. R. Civ. P. 12(h)(3).

Each of Plaintiffs' legal theories tethers injury to a Camp Nenookaasi eviction. *See* Second Am. Compl. ¶ 119 ("The repeated seizures and destruction of Plaintiffs' property during the evictions of Camp Nenookaasi and its successors constitute meaningful interference with Plaintiffs' possessory interests in their property, and thus a 'seizure.'"); *id.* ¶ 125 ("Defendant Frey's repeated seizure and destruction of Plaintiffs' property without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim their property violates Plaintiffs' rights to Due Process of law protected by the Fourteenth Amendment to the U.S. Constitution . . . ."); *id.* ¶ 133 ("Defendant Frey's prior and impending actions in repeatedly Plaintiffs [sic] and forcing Nenookaasi to disband were done recklessly and in conscious disregard of the risks they have previously created and continue to create because of the forceful manner in which his law enforcement officers have ejected and plan to continue ejecting Plaintiffs from their shelters, destroying their vital personal property in the process."); *id.* ¶ 138 ("Defendant's commitment to evictions, in the face of evidence, testimony, and public outcry that evictions actually exacerbate the harms used to justify them, is outrageous."); *id.* ¶ 159 ("Defendant Frey's repeated evictions of Camp Nenookaasi residents and refusal to

postpone the evictions until a reasonable accommodation can be made, amounts to intentional discrimination against Plaintiffs on the basis of their disability.").

Two Plaintiffs—Sagataw and Neloms—have not shown they were present for any at-issue eviction, meaning these Plaintiffs lack Article III injury. (1) The only information regarding Sagataw comes from a declaration she signed on December 15, 2023. ECF No. 6. The declaration predates the first eviction by about three weeks. In her declaration, Sagataw expressed apprehension about a future closure; she testified that, if Nenookaasi were to be closed, she would suffer trauma, find it harder to obtain health treatment, and likely lose some of her possessions. *Id.* ¶¶ 19–20, 23. Sagataw testified that she had been evicted from other encampments, and that some of her belongings were destroyed in those events. *Id.* ¶ 20. But she did not testify that she suffered any injury caused by a Camp Nenookaasi closure. (2) The information regarding Neloms comes from a declaration dated February 6, 2024, after three Camp Nenookaasi sites had been closed. ECF No. 36. Neloms testified that he resided in Camp Nenookaasi. *Id.* ¶¶ 6–7. Though Neloms also testified that he had been through "a lot of evictions" in which he had lost property, *id.* ¶ 12, he did not testify that he experienced or lost property in any Nenookaasi eviction, *see generally id.* Without that, Neloms' declaration testimony leaves the reader to guess regarding which, if any, Nenookaasi closures he experienced and what, if any, property he lost during those evictions. That information would have been easy to include in the declaration. At the summary-judgment stage, this testimony is too broad to show Neloms suffered an Article III injury.

B

1

Turning to the merits, Plaintiffs' claims under the Minnesota Constitution fail for purely legal reasons. *See* Second Am. Compl. ¶¶ 117, 120–21, 125–26, 135. Section 1983 affords Plaintiffs no cause of action for a violation of Minnesota law. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (noting that a § 1983 "plaintiff must allege that some person has deprived him of a federal right"); *Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000) ("It is well settled . . . that § 1983 may be an avenue for relief only when a plaintiff asserts that violations of *federal* rights have occurred."). And "Minnesota courts explicitly refuse to find causes of action for damages under the Minnesota Constitution on their own unless the Minnesota Supreme Court has recognized the cause of action." *Riehm v. Engelking*, 538 F.3d 952, 969 (8th Cir. 2008) (first citing *Mitchell v. Steffen*, 487 N.W.2d 896, 905 (Minn. Ct. App. 1992), *aff'd on other grounds*, 504 N.W.2d 198 (Minn. 1993); and then citing *Bird v. State, Dep't of Pub. Safety,* 375 N.W.2d 36, 40 (Minn. Ct. App. 1985)); *see also Eggenberger v. West Albany Township*, 820 F.3d 938, 941 (8th Cir. 2016) ("[T]here is no private cause of action for violations of the Minnesota Constitution." (quotation omitted)); *White v. Dayton*, No. 11-cv-3702 *et al.* (NEB/DJF), 2023 WL 21918, at *16 (D. Minn. Jan. 3, 2023) ("[T]here is no corollary to section 1983 under state law, and 'courts have repeatedly stated that Minnesota has not recognized private remedies for violations of the Minnesota Constitution.'" (quoting *Fearing v. St. Paul Police Dep't*, No. 02-cv-4744 (ADM/JSM), 2005 WL 914733, at *5 (D. Minn. Apr. 20, 2005)), *R. & R. adopted*, 2023 WL 1797830 (D. Minn. Feb. 7, 2023)).

Here, Plaintiffs cite no Minnesota Supreme Court case recognizing a damages remedy for any of the state constitutional theories they assert, and other courts have found that the Minnesota Supreme Court has not recognized these remedies. *Heryla v. Hennepin County*, No. 03-cv-4893 (JRT/SRN), 2005 WL 1430469, at *1 (D. Minn. Mar. 25, 2005) ("[N]o private cause of action for damages exists under Article 1 § 10 of the Minnesota Constitution."); *Hummel v. Minn. Dep't of Agric.*, 430 F. Supp. 3d 581, 594 (D. Minn. 2020) (holding that no private right of action for damages exists under Minnesota Constitution for deprivation of procedural or substantive due process); *Smith v. Youngbird*, No. 21-cv-2249 (DSD/ECW), 2022 WL 3648700, at *9 (D. Minn. July 29, 2022), *R. & R. accepted*, 2022 WL 3647862 (Aug. 24, 2022) ("The Minnesota Supreme Court has not recognized any cause of action for damages for violations of the Due Process Clause of the Minnesota Constitution." (citing *Bird*, 375 N.W.2d at 40)). Considering the law's status on these questions, Plaintiffs cannot continue to pursue their claims under the Minnesota Constitution.

2

Consider Plaintiffs' three § 1983/federal constitutional claims together. Though each of these claims is distinct and involves different elements, each claim arises from the same core facts—the Mayor's decisions to clear Camp Nenookaasi's different iterations, the high-level process by which each encampment was cleared, and the camp closings' consequences. To recap, Plaintiffs claim the Mayor violated the Fourth Amendment because the camp closures and attendant seizures of Plaintiffs' property occurred "without a valid warrant, probable cause, or exigent circumstances." Second Am. Compl. ¶¶ 120–

21.    Plaintiffs claim the Mayor violated their Fourteenth Amendment procedural-due-process rights because the closures and accompanying property seizures occurred "without adequate and effective notice, an opportunity to be heard, and pre- and post-deprivation mechanisms to challenge and reclaim . . . property." *Id.* ¶¶ 125–26.  And Plaintiffs claim the Mayor violated their Fourteenth Amendment substantive-due-process rights because the closures "place[d] Plaintiffs at significant risk of serious, immediate, and proximate harm that Plaintiffs would not otherwise have faced without [Mayor Frey's] actions." *Id.* ¶ 129.  These theories depend only on Mayor Frey's camp-closure decisions.  They do not challenge the actions of officers or officials who personally participated in the closures apart from their adherence to the Mayor's eviction orders.  In other words, though some Plaintiffs testified in their declarations that individual officers treated them harshly, *see, e.g.*, ECF No. 5 ¶ 14, Plaintiffs nowhere claim that any individual officer's unique treatment of any Plaintiff supports the federal constitutional theories.

The individual-capacity aspect of Plaintiffs' federal constitutional claims "seek[s] to impose individual liability upon [Mayor Frey] for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  "To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006); *see Geiger v. Minn. Dep't of Hum. Servs.*, No. 13-cv-2140 (JRT/LIB), 2013 WL 5596599, at *3 (D. Minn. Oct. 11, 2013) ("In a civil rights action, the 'plaintiff must plead that each Government-official defendant *through the official's own individual actions*, has violated the Constitution.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

676 (2009))). Alleging that a defendant has general responsibility for supervising the operations of a department is insufficient to establish personal involvement. *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987). A director may be sufficiently involved, however, if he makes policy decisions that directly result in the alleged unconstitutional conditions. *Id.*; *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001) (dismissing complaint that failed to identify specific policies instituted by the commissioner).

Mayor Frey seeks summary judgment against the individual-capacity claims based on qualified immunity. In determining whether Mayor Frey has qualified immunity, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Kong ex rel. Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). If the material facts are not genuinely disputed, then the constitutionality of an official's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

Plaintiffs have not shown a federal constitutional violation. It's difficult to understand how the evictions alone raise a constitutional concern. There is no fact dispute that the organizers and residents of every at-issue version of Camp Nenookaasi trespassed on City-owned land—that is, they entered on City-owned property without any lawful claim of right or justification and refused to depart until the camps were forcibly cleared. Minn. Stat. § 609.605, subdiv. 1(b)(3) (2023); *see Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 701 (Minn. 2012) (defining trespass tort under Minnesota law). Officers could lawfully have arrested Plaintiffs for their violations of section 609.605, subdivision 1(b)(3). Minn. Stat. § 629.34, subdiv. 1(c)(1) (authorizing peace officer to make a warrantless arrest "when a public offense has been committed or attempted in the officer's presence"); *see Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990) ("'Public offense' includes both misdemeanors and felonies, and need not involve a breach of peace." (quoting *Smith v. Hubbard*, 91 N.W.2d 756, 761 (Minn. 1958))); *see also Spottswood v. Washington County*, No. 19-cv-1331 (MJD/ECW), 2022 WL 707202, at *8 (D. Minn. Jan. 20, 2022) (reading section 629.34, subdivision 1(c) to mean that "a party can be arrested even for a misdemeanor when it is committed in the presence of an officer"); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). If officers could lawfully have arrested Plaintiffs, it is difficult to see how the lesser step of ordering Plaintiffs to depart each property and move along might by itself cause a constitutional problem.

If advance notice of an eviction were constitutionally required, Plaintiffs haven't shown its absence or identified what more notice they think was required.  Nenookaasi I and II were cleared with at least six days' notice each.  ECF No. 17 ¶¶ 23–24; ECF No. 56 ¶¶ 17, 19.  Though officers arrived to evict residents from Nenookaasi III and V without prior notice of their arrival, Plaintiffs testified they were allowed some time to gather and leave with their belongings at both evictions.  *See* ECF No. 37 ¶ 4; ECF No. 94 ¶¶ 5, 7;[4] ECF No. 96 ¶ 8; ECF No. 98 ¶ 9.  Plaintiffs have not explained or cited any authority showing why these periods fell short of a constitutional requirement (or what that constitutional requirement might be), and it was their burden to do so.  *Cf. Berry v. Hennepin County*, No. 20-cv-2189 (ECT/JFD), 2024 WL 3495797, at *14 (D. Minn. July 22, 2024) (citing encampment-clearing cases rejecting Fourth Amendment claims where residents were given prior notice).  Nor have Plaintiffs explained what they think the Constitution required the Mayor to do with items they were unable to take with them. Plaintiffs claim the Mayor did not offer storage to some of them and that, regardless, what storage he offered was "ineffective and useless."  ECF No. 146 at 10.  But Plaintiffs cite no authority supporting the proposition that the Mayor was constitutionally required to provide property storage as part of the encampment-clearing process.  *See id.* at 10–11.

Considering the undisputed fact that Plaintiffs were trespassing and the undisputed facts regarding the camps' derelict conditions and the risks they posed to the surrounding

---

[4]    Although Tiger testified in his declaration that he "had no notice" of the Nenookaasi III and V evictions, he also testified that he was allowed to depart with his belongings at the Nenookaasi III eviction and that "the same thing happened" at the Nenookaasi V eviction.  ECF No. 94 ¶¶ 5, 7.

community, Mayor Frey's decisions to clear the camps cannot reasonably be characterized as "conscience-shocking." *See Hall v. Ramsey County*, 801 F.3d 912, 917 (8th Cir. 2015). And Plaintiffs identify no specific feature of any camp eviction that might reasonably be characterized that way.

If it mattered, Plaintiffs have not shown any of the at-issue rights was clearly established. "For purposes of the second prong, [courts] look to 'the legal rules that were clearly established at the time' the action at issue was taken." *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021) (quoting *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004)). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). While Supreme Court "case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation modified). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas*, 595 U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). As the Eighth Circuit has explained, a plaintiff can show that a right was clearly established in different ways: (1) A plaintiff may point to existing Supreme Court or circuit precedent involving facts that are sufficiently like the facts under consideration to give the official notice that his actions were unlawful; (2) a plaintiff may present "a robust consensus of cases of persuasive authority" doing the same; or (3) a plaintiff may demonstrate that a general constitutional rule applies with "obvious clarity"

24

to the at-issue facts. *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (first quoting

*Kisela*, 584 U.S. at 1152–53; then quoting *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir.

2017); and then quoting *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018)).

Plaintiffs did not address this second qualified-immunity prong in a meaningful

way; they have not identified what clearly established right they think the Mayor violated.

Plaintiffs' discussion of the issue appears in two paragraphs of their opposition brief. ECF

No. 146 at 37–38. After describing qualified immunity's two-element test in the first

paragraph, *id.* at 37, Plaintiffs wrote in the second:

> Federal law is ever-evolving, and Plaintiffs acknowledge the
> recent developments in cases related to encampment evictions
> of unhoused people across the country. *See, e.g.*, *Grants Pass
> v. Johnson*, 603 U.S. 520 (2024). These developments were
> one reason why Plaintiffs amended their complaint, to remove
> claims which were no longer viable. With regard to Plaintiffs'
> remaining claims, Mayor Frey was on notice that evictions
> were being carried out in an unconstitutional manner. See,
> *supra.*

*Id.* at 38. Plaintiffs do not identify Supreme Court or Eighth Circuit precedent addressing

facts that are anything like this case's. In other words, they cite no cases addressing Fourth

and Fourteenth Amendment claims in the context of homeless encampment clearings.

They cite no consensus of persuasive authorities addressing these types of claims.

Plaintiffs cite several cases for their discussion of high-level constitutional rules, but

Plaintiffs do not attempt to explain how any of these general rules might apply with obvious

clarity here.[5] It is difficult to see how they would. Plaintiffs' Fourth and Fourteenth

---

[5]     To be precise, Plaintiffs cite three Supreme Court cases and one Eighth Circuit case
identifying general Fourth Amendment rules. ECF No. 146 at 6–7 (first citing *Ker v.*

Amendment theories are fact-bound and situation-specific. Plaintiffs do not claim the City's written encampment closure policies themselves violate the Constitution; they claim Mayor Frey's decisions regarding how these policies would be implemented regarding each version of Camp Nenookaasi were unconstitutional or resulted in unconstitutional actions. High-level rules would not have given the Mayor any clear indication that one or more of his actions would have violated the Fourth or Fourteenth Amendment.

Plaintiffs' official-capacity claims against Mayor Frey are treated as if they had been brought against the City. *Hafer*, 502 U.S. at 25. Plaintiffs cannot survive summary judgment against the City without satisfying *Monell*, 436 U.S. 658. *Monell*'s basic rule is "that civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom." *Los Angeles County v. Humphries*, 562 U.S. 29, 30–31 (2010). In the Eighth Circuit, "'there must be an unconstitutional act by a municipal employee' before a municipality can be held liable."

---

*California*, 374 U.S. 23 (1963); then citing *United States v. Jacobsen*, 466 U.S. 109 (1984); then citing *Smith v. Maryland*, 442 U.S. 735 (1979); and then citing *United States v. James*, 534 F.3d 868 (8th Cir. 2008)). Plaintiffs also cite Ninth Circuit case law for the proposition that the Fourth Amendment applies to property regardless of its value and a District of Arizona case discussing property abandonment in the context of homeless encampments. *Id.* at 7 (first citing *Cooper v. Gray*, Nos. CV 12-208 TUC DCB, CV 12-781 TUC DCB, 2015 WL 13119400 (D. Ariz. Feb. 13, 2015); and then citing *Clement v. City of Glendale*, 518 F.3d 1090 (9th Cir. 2008)). Plaintiffs cite three Supreme Court cases and one Eighth Circuit case identifying high-level rules applicable to a Fourteenth Amendment procedural-due-process claim. *Id.* at 13–14 (first citing *Swarthout v. Cooke*, 562 U.S. 216 (2011); then citing *Parrish v. Mallinger*, 133 F.3d 612 (8th Cir. 1998); then citing *Jones v. Flowers*, 547 U.S. 220 (2006); and then citing *Hudson v. Palmer*, 468 U.S. 517 (1984)). And Plaintiffs cite two Eighth Circuit cases describing general rules governing a Fourteenth Amendment substantive-due-process claim. *Id.* at 21 (first citing *Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2011); and then citing *Fields v. Abbott*, 652 F.3d 886 (8th Cir. 2011)).

*Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (quoting *Russell v. Hennepin County*, 420 F.3d 841, 846 (8th Cir. 2005)); *see Partridge v. City of Benton*, 157 F.4th 970, 973–74 (8th Cir. 2025) (recognizing that municipal "liability may not be imposed where no municipal official or employee committed a constitutional violation"). Here, Plaintiffs' official-capacity claims fail because, as discussed earlier, they have not identified trial-worthy evidence of a constitutional violation.

3

In Minnesota, intentional infliction of emotional distress has four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983)). "Successful [intentional-infliction-of-emotional-distress] claims are 'sharply limited to cases involving particularly egregious facts,' and there is a 'high threshold standard of proof." *López Prater v. Trs. of Hamline Univ. of Minn.*, 693 F. Supp. 3d 1009, 1030 (D. Minn. 2023) (quoting *McDonald v. City of Saint Paul*, 679 F.3d 698, 708 (8th Cir. 2012)). "Conduct is extreme and outrageous when it is so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *McDonald*, 679 F.3d at 708 (quoting *Langeslag*, 664 N.W.2d at 865).

Plaintiffs identify several facts to show the presence of conscience-shocking conduct, but no reasonable jury could find for Plaintiffs on these facts. Almost all the facts Plaintiffs identify reflect policy-based disagreements with the Mayor's decisions. These

include: that Mayor Frey closed encampments even though they were "allowing unhoused people to find housing placements at astonishing rates"; that the Mayor justified the Nenookaasi I closure "on a future construction project that did not break ground for a *full year*" later; that the Mayor "threaten[ed] to veto service provider funding" if those service providers opposed the camp clearings; and that the closures "exacerbate homelessness by dispersing, prolonging, and intensifying the suffering and trauma of living on the streets." ECF No. 146 at 28–29 (quotation omitted). High-level policy disagreements of this sort might raise questions regarding the best approach to the City's homelessness problem, but they do not show extreme and outrageous conduct.

Plaintiffs also claim that assertions made by the Mayor's counsel during this case show conscience-shocking conduct by the Mayor. The statements concerned a pregnancy-miscarriage that occurred in one encampment. According to Plaintiffs, the Mayor's counsel "ma[de] it sound like this baby was born healthy and allowed to die." ECF No. 41 ¶ 8. This contention is not convincing. Plaintiffs do not explain how lawyers' arguments during the case might show extreme and outrageous conduct under the operative complaint's theory. The Second Amended Complaint alleges extreme and outrageous conduct based only on the Mayor's eviction policies, not on anything that happened during this litigation. *See* Second Am. Compl. ¶¶ 138–45. Plaintiffs cite no authority that might justify attributing counsel's statement to the Mayor. And, if the statement could be attributed to the Mayor, Plaintiffs' counsel acknowledged originally that it was an "accurate" characterization of an event that occurred within the camp. *See* ECF No. 28 at 9. Though Plaintiffs' counsel subsequently explained this concession was a mistake, ECF

No. 71 at 107–08, the event sequence shows that everyone was doing their best to determine the facts with imperfect information.

4

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A disability is, "with respect to an individual . . . (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[T]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 949 (8th Cir. 1999); *see* 29 C.F.R. § 1630.2(j)(1)(iv) ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment."). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Plaintiffs claim that Mayor Frey discriminated against them by closing encampments while knowing that residents were "disproportionately (and exclusively) people with disabilities" and that existing shelters did not "meet their disability-related needs." Second Am. Compl. ¶¶ 151, 153.

The individual-capacity ADA claim fails for a purely legal reason. "Individuals in their personal capacities . . . are not subject to suit under Title II [of the ADA], which provides redress only from public entities." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010) (citing *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc)). The official-capacity claim fails for a factual reason—no record evidence shows that the Mayor closed any iteration of Camp Nenookaasi "by reason of" Plaintiffs' disabilities. 42 U.S.C. § 12132.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Mayor Jacob Frey's Motion for Summary Judgment [ECF No. 139] is **GRANTED** as follows:

1.    With respect to Plaintiff Deven Caston, the action is **DISMISSED WITH PREJUDICE** pursuant to Federal Rule of Civil Procedure 25(a)(1).

2.    With respect to Plaintiffs Cheryl Sagataw and Travis Neloms, the action is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

3.    With respect to Plaintiffs DeAnthony Barnes, Roberta Strong, Alvin Butcher, Lola Hegstrom, Adrian Tiger, RonDel Applebee, and Chance Askenette, the action is **DISMISSED WITH PREJUDICE**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 1, 2025                             s/ Eric C. Tostrud
                                                                    Eric C. Tostrud
                                                                    United States District Court